## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| RENEW NORTHEAST; ALLIANCE FOR CLEAN ENERGY NEW YORK; RENEWABLE NORTHWEST; SOUTHERN RENEWABLE ENERGY ASSOCIATION; INTERWEST ENERGY ALLIANCE; MID-ATLANTIC RENEWABLE ENERGY COALITION ACTION; CLEAN GRID ALLIANCE; and CAROLINAS CLEAN ENERGY BUSINESS ASSOCIATION, | |
| *Plaintiffs*, | |
| *v.* | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; BUREAU OF LAND MANAGEMENT; STEVE PEARCE, Director of Bureau of Land Management, in his official capacity; BUREAU OF OCEAN ENERGY MANAGEMENT; MATTHEW GIACONA, Acting Director of Bureau of Ocean Energy Management, in his official capacity; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; KENNETH STEVENS, Principal Deputy Director of Bureau of Safety and Environmental Enforcement, in his official capacity; UNITED STATES FISH AND WILDLIFE SERVICE; BRIAN NESVIK, Director of United States Fish and Wildlife Service, in his official capacity; UNITED STATES ARMY CORPS OF ENGINEERS; and WILLIAM H. GRAHAM, JR., Chief of Engineers and Commanding General, in his official capacity, | Civil Action No. 1:25-cv-13961 |
| *Defendants*. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs RENEW Northeast, Mid-Atlantic Renewable Energy Coalition Action, Alliance for Clean Energy – New York, Renewable Northwest, Southern Renewable Energy Association, Interwest Energy Alliance, Clean Grid Alliance, and the Carolinas Clean Energy Business Association (collectively, "Plaintiffs") bring this Complaint against Defendants United States Department of the Interior ("DOI"); Douglas Burgum, Secretary of the Interior, in his official capacity; Bureau of Land Management ("BLM"); Steve Pearce, Director of BLM, in his official capacity; Bureau of Ocean Energy Management ("BOEM"); Matthew Giacona, Acting Director of BOEM, in his official capacity; Bureau of Safety and Environmental Enforcement ("BSEE"); Kenneth Stevens, Principal Deputy Director of BSEE, in his official capacity; United States Fish and Wildlife Service ("USFWS"); Brian Nesvik, Director of USFWS, in his official capacity; United States Army Corps of Engineers ("USACE" or the "Corps"); and William H. Graham, Jr., Chief of Engineers and Commanding General, in his official capacity (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      As electricity demand and prices continue to rapidly rise and burden ordinary Americans, certain agencies are pursuing a concerted and illegal strategy to choke the ability of private developers' ability to build new and much-needed energy generation projects.  Wind and solar are affordable forms of energy that can be quickly deployed on private or public lands to meet the Nation's growing energy demand and reduce costs for consumers.  These renewable energy sources add critical diversity to the country's energy supply and enhance both short-term and long-term grid reliability.

2.      Congress has long supported developing wind and solar technologies alongside traditional energy sources.  But recently, several federal agencies have unleashed a barrage of adverse actions, contrary to Congress' directives and with the goal and effect of destroying solar

and wind energy.  These agencies are systematically issuing decisions that disfavor wind and solar technologies in comparison to other energy sources, changing longstanding agency processes and legal determinations to delay and prevent the permitting and construction of wind and solar facilities on both private and public lands.

3.      These agencies' actions are having catastrophic consequences for an entire sector of the energy industry, as well as electricity consumers and the nation's electrical grid.

4.      This lawsuit challenges six final agency actions that place wind and solar technologies into second-class status without providing any rational justification for such disparate treatment or drastic policy shifts—unlawfully picking winners and losers among energy sources, contrary to Congress' intent.

5.      Each of these actions is inadequately explained, fails to consider serious reliance interests, and is premised on open animus against wind and solar energy.  And each of these actions violates the Administrative Procedure Act, 5 U.S.C. §§ 500-596; 701-706 ("APA").

6.      These agency actions have caused and will continue to cause serious, irreparable harm to Plaintiffs' members, who are wind and solar energy developers and participants in the extensive wind and solar supply chain, as well as to a vulnerable public staring down the barrel of an energy affordability crisis.

7.      This lawsuit is made even more urgent by this Court's recent order vacating agency actions implementing this Administration's January 20, 2025, directive to freeze all approvals of wind energy projects.  *See New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) (vacating *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 20, 2025) (the "Wind Memorandum" or

"Wind Mem.")).  Most of the six final agency actions challenged here were issued while *New York v. Trump* was pending, while achieving some of the same underlying goals as the Wind Memorandum sought.  These six actions suffer the same profound legal deficiencies as the vacated permitting freeze, and have the same objective—shutting down the entire wind industry—while now expanding to decimate the solar industry as well.

8.     These six actions are:

a.  <u>*The DOI Renewable Bottleneck Memorandum*</u>. DOI has issued a final order requiring that any decision or action relating to a wind and solar facility within DOI's jurisdiction be reviewed and approved by the offices of three of the most senior officials within DOI, including the Secretary of the Interior himself (the "DOI Renewable Bottleneck Memorandum").  This action arbitrarily singles out only wind and solar energy facilities for a punitive review scheme.  The DOI Renewable Bottleneck Memorandum has effectuated a virtual freeze on wind and solar permitting within DOI's jurisdiction.

b.  <u>*The Federal Lands Anti-Renewable Order*</u>. DOI has issued a final order requiring it to consider a proposed facility's "capacity density" when reviewing applications to construct wind and solar projects on lands and waters within DOI's jurisdiction and only permit those projects that are the most "appropriate" (or "efficient") use of federal lands (the "Federal Lands Anti-Renewable Order").  Capacity density considers the relationship between a project's geographic footprint and energy output.  This metric has no precedent in DOI's permitting regime.  Because wind and solar

projects require large areas of land to generate electricity, they are by design less "capacity dense" than conventional energy alternatives, and the Federal Lands Anti-Renewable Order thus reverse engineers (without any reasoned basis) DOI's permitting process specifically to disfavor wind and solar development in comparison with non-renewable energy sources.

c. *The Corps' Anti-Renewable Memorandum*. The Corps has similarly issued a final order mandating that it consider this new "capacity density" factor and prioritize projects with high "per acre" energy generation when reviewing applications for individual permits under Section 404 of the Clean Water Act ("CWA") and Section 10 of the Rivers and Harbors Act ("RHA") (the "Corps' Anti-Renewable Memorandum"). Like the DOI's Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable Memorandum results in the categorical disfavoring of wind and solar facilities in comparison to non-renewable facilities, including those sited on private lands.

d. *The Eagle Take Permit Ban*. USFWS has prohibited wind facilities from obtaining permits authorizing the incidental "take" of both eagle species under the Bald and Golden Eagle Protection Act ("BGEPA") (the "Eagle Take Permit Ban") and has compounded the harms from that illegal action by announcing an aggressive campaign to enforce BGEPA. By arbitrarily banning wind facilities from obtaining the permits they need to avoid potential BGEPA liability while continuing to allow all other technologies to apply for and receive such permits, USFWS is forcing wind farm

operators to make a pernicious choice: expose themselves to civil and potentially criminal liability under BGEPA by operating without a permit, install costly avoidance technologies that could financially ruin a project, or shut down operating facilities that are delivering crucial power into the electricity grid and risk losing revenue and violating contractual power purchase agreements, while also undermining grid reliability. Developers of new wind farms face a similar choice, causing many developers to abandon projects currently under development or not pursue future wind projects.

e. *The Wind And Solar IPaC Ban*. DOI has banned wind and solar projects from accessing the Information for Planning and Consultation ("IPaC") database created and maintained by USFWS (the "Wind and Solar IPaC Ban"). The IPaC database is a publicly available, taxpayer-funded tool designed to provide vital information on the presence of protected species and help developers of all types of projects avoid or minimize wildlife impacts. With respect to the permitting process, developers use IPaC to facilitate or eliminate the need for agency consultations under Section 7 of the Endangered Species Act ("ESA"), streamline the process for obtaining incidental take permits under Section 10 of the ESA, and seek Section 404 Nationwide Permits ("NWP") from the Corps without the need for USFWS consultation if their proposed project would have no effect or is not likely to adversely affect federally listed or candidate species. By denying wind and solar developers access to IPaC, DOI has hindered their ability to obtain

one or more critical permits, without doing the same for developers of any other energy technologies.

    f.   *The Zerzan/Jorjani Opinion*. DOI withdrew its prior Memorandum Opinion ("M-Opinion") interpreting subsection 8(p)(4) of the Outer Continental Shelf Lands Act ("OCSLA"), which pertains primarily to offshore wind developments, and adopted an illegal approach that directly contradicts DOI's own codified regulations. *See* 30 C.F.R. § 585.102. This new M-Opinion (the "Zerzan/Jorjani Opinion"), now requires DOI to prevent "all interference" from proposed activities on the Outer Continental Shelf if such interference is more than "*de minimis* or reasonable," rather than consider whether the proposed activity on balance supports the goals enumerated in subsection 8(p)(4)—and to reevaluate existing offshore wind approvals on this basis. This new, narrow so-called "*de minimis*" standard, which does not exist in the statute, has created a *de facto* moratorium on the approval and construction of new offshore wind facilities on the Outer Continental Shelf and is being used to justify revocation of existing offshore wind permits.

9.    These final agency actions are inflicting cascading and irreparable economic and operational harms on Plaintiffs' member companies. They have stopped the pipeline for new wind and solar projects that require federal permits and have impermissibly undermined existing project authorizations, resulting in project delays and cancellations. These delays and cancellations have, in turn, caused billions of dollars in increased project costs, lost investments and revenues, breached contracts, and unrecoverable expenditures.

10.     When federal agencies delay or vacate critical permitting approvals, schedules slip, revenue is deferred, debt service rises, and many sponsors will be forced to borrow more funds to keep projects alive.   The delay wreaks havoc on developers' contractual obligations, as construction, supply, and other agreements are canceled, renegotiated, or paused.  That in turn triggers penalties, price escalations, storage fees, and standby charges for idle crews and equipment.  The heightened regulatory uncertainty also increases capital costs and risk premiums, leading investors to pull back and making financing more expensive.

11.     These final agency actions are forcing Plaintiffs' members to redesign projects to avoid federally jurisdictional waters or other regulated resources, which similarly lengthens timelines, raises costs, and heightens compliance risk.

12.     Every day that these final actions remain in place is a day that hundreds of utility-scale wind and solar projects at various stages of the permitting process cannot move forward. Countless more will never even reach the drawing board, and still others risk being unnecessarily shut down.

13.     The losers are not just wind and solar developers and suppliers.  The ordinary customers and entities who rely on these sources of energy to power their homes and businesses will also suffer.  With both electricity demand and power prices rising, wind and solar are essential to maintaining a reliable, affordable, and resilient grid.  When agencies delay, vacate, or deny permits for wind and solar facilities, or force fully functional generation offline, the country risks higher prices, increased volatility, and diminished reliability.

14.     By contrast, the public stands to gain substantial benefits from continued renewable energy development and operation: thousands of well-paying jobs, stable local tax revenues, lower energy costs, and greater business certainty for manufacturers, suppliers, and communities that

rely on planned investments. The agency actions at issue also undermine the public interest, as recognized and supported by Congress, in developing renewable energy sources and strengthening the electrical grid. Finally, they are inconsistent with the Administration's own emphasis on achieving energy dominance and meeting the rapidly escalating demand for electric generation to power new data centers necessary to support the growth of artificial intelligence.

15.    Each of the challenged actions—the DOI Renewable Bottleneck Memorandum, the Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable Memorandum, the Eagle Take Permit Ban, the Wind and Solar IPaC Ban, and the Zerzan/Jorjani Opinion—is unlawful and must be set aside.

## PARTIES

16.    Plaintiff RENEW Northeast is a not-for-profit association with its principal place of business in Cambridge, Massachusetts.

17.    RENEW Northeast aims to unite renewable energy companies and environmental advocates seeking to promote the use of sustainable energy technologies across New England, including in Massachusetts. RENEW Northeast's member include companies and organizations involved in developing and advocating for renewable energy projects, including onshore and offshore wind developers and solar developers. Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies and so undermines RENEW Northeast's core mission.

18.    Plaintiff Mid-Atlantic Renewable Energy Coalition Action ("MAREC Action") is a 501(c)(4) not-for-profit organization with its principal place of business in Silver Spring, Maryland.

19.    MAREC Action serves as the voice of the transmission-connected clean energy industry in the Pennsylvania-New Jersey-Maryland Interconnection—the world's largest electricity grid.  MAREC Action's mission is to advocate for and promote the development of utility-scale renewable energy and storage in the Mid-Atlantic region.  MAREC Action's diverse membership includes utility-scale solar, wind, and energy storage developers, alongside manufacturers of wind turbines and solar panels.  Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies and so undermines MAREC Action's core mission.

20.    Plaintiff Alliance for Clean Energy – New York ("ACE NY") is a 501(c)(3) not-for-profit organization with its principal place of business in Albany, New York.

21.    ACE NY serves as the premier multi-technology clean energy industry organization for the State of New York.  Its mission is to promote the use of clean electricity technologies and energy efficiency in New York, increase energy diversity and security, boost economic development, improve public health, reduce energy costs, and reduce air pollution.  ACE NY's diverse membership includes companies engaged in the development, construction, and operation of land-based wind and solar power; offshore wind power facilities; energy efficiency contracting; manufacturing of clean energy equipment; and consulting to or supporting the clean energy industry.  ACE NY's membership also includes environmental and labor organizations interested in the advancement of the clean energy industry in the State of New York.  Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies and so undermines ACE NY's core mission.

22.    Plaintiff Renewable Northwest is a 501(c)(3) not-for-profit organization with its principal place of business in Portland, Oregon.

23.     Renewable Northwest serves as one of the nation's most impactful renewable energy advocacy organizations, representing the interests of the Northwest. Renewable Northwest's mission is to decarbonize the Northwest region by accelerating the transition to renewable electricity. To date, Renewable Northwest has supported state and regional policies that have brought the region over 13,270 MWs of new solar, wind, and geothermal projects—enough to serve 2,000,000 customers. Renewable Northwest's diverse membership includes a unique and powerful coalition of renewable energy professionals, energy buyers and marketers, ratepayer advocates, and environmental NGOs. Renewable Northwest operates within a geographic region that encompasses four Northwestern states: Oregon, Washington, Idaho, and Montana. Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies and so undermines Renewable Northwest's core mission.

24.     Plaintiff Southern Renewable Energy Association ("SREA") is a not-for-profit organization with its principal place of business in Little Rock, Arkansas.

25.     SREA is an industry-led initiative dedicated to fostering the responsible use and development of renewable energy sources, specifically wind energy, solar energy, energy storage, and transmission solutions, in the Southern United States. Its vision is to establish renewable energy as a primary energy source across the South, ensuring that these sustainable options play a significant role in powering communities and businesses. To achieve this, SREA's mission focuses on promoting the responsible adoption and growth of renewable energy technologies, ensuring they are developed in a way that benefits both the environment and local economies. SREA operates within a geographic region that encompasses seven Southeastern states: Alabama, Arkansas, Georgia, Kentucky, Louisiana, Mississippi, and Tennessee. Through advocacy,

education, and collaboration, SREA aims to advance the renewable energy landscape in these areas, empowering individuals, businesses, and policymakers to embrace cleaner energy solutions for a more sustainable future.  Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies and so undermines SREA's core mission.

26.    Plaintiff Interwest Energy Alliance ("Interwest") is a non-profit trade association with its principal place of business in Albuquerque, New Mexico.

27.    Interwest brings the nation's leading companies in the renewable energy industry together with the Wests' advocacy community to expand deployment of a reliable, cost-effective, and diverse portfolio of renewable energy resources.  Interwest works across New Mexico, Colorado, Wyoming, Utah, Nevada, and Arizona.  Its membership brings together the leading developers and manufacturers of utility-scale renewable energy in the Intermountain West with environmental advocacy organizations, promoting the deployment of reliable, cost-effective, and diverse renewable energy resources.  Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies and so undermines Interwest's core mission.

28.    Plaintiff Clean Grid Alliance ("CGA") is a 501(c)(6) trade organization with its principal place of business in St. Paul, Minnesota.

29.    CGA is dedicated to advancing clean energy development and grid modernization in the Midwest.  CGA provides a unified voice for its members, advocating for policies and regulations that support the growth of renewable energy and strengthen the regional energy market. By engaging directly with policymakers, regulators, and industry stakeholders, CGA helps ensure that its members' interests are represented while promoting the business case for clean energy

solutions across the region.  CGA covers the nine Upper Midwest States of the Midcontinent Independent System Operator ("MISO") footprint: Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, and Wisconsin.  Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies, and so undermines CGA's core mission.

30.     Plaintiff Carolinas Clean Energy Business Association ("CCEBA") is a 501(c)(6) non-profit trade association with its principal place of business in Durham, North Carolina.

31.     CCEBA promotes and expands market opportunities for the clean energy sector in North and South Carolina. CCEBA represents a broad cross-section of businesses—from independent power producers and developers to engineering and construction firms, financial and legal service providers, manufacturers, and commercial clean-energy purchasers.  Through active engagement with state utility commissions, legislative bodies, and local governments, CCEBA advocates for policies that enable greater access, competitive market structures, and regulatory reform.

32.     Key issues for CCEBA include integrated resource planning, grid interconnection, energy pricing, and clean energy procurement.  The organization intervenes in regulatory cases at the North Carolina Utilities Commission and the South Carolina Public Service Commission, bringing a data-driven, industry-informed voice to major proceedings.  Each of the agency actions challenged in this lawsuit places wind and solar technologies into second-class status in relation to non-renewable technologies and so undermines CCEBA's core mission.

33.     Defendant DOI is a cabinet agency within the executive branch of the United States government.  43 U.S.C. § 1451.

34.     Defendant Douglas Burgum is the Secretary of DOI.  He is the highest-ranking official within DOI.  In that capacity, Secretary Burgum has ultimate responsibility for compliance with all applicable federal laws.  Secretary Burgum is sued in his official capacity.

35.     Defendant BLM is an agency within DOI.  43 U.S.C. § 1731.

36.     Steve Pearce is the Director of BLM.  In that capacity Director Pearce has ultimate responsibility for compliance with all applicable federal laws.  He is sued in his official capacity.

37.     Defendant BOEM is an agency within DOI.  Sec'y of Interior, *Secretarial Order No. 3299, Establishment of the Bureau of Ocean Energy Management, the Bureau of Safety and Environmental Enforcement, and the Office of Natural Resource Revenue* § 3 (May 19, 2010).

38.     Defendant Matthew Giacona is the Acting Director of BOEM.  In that capacity, Acting Director Giacona has ultimate responsibility for compliance with all applicable federal laws.  He is sued in his official capacity.

39.     Defendant BSSE is an agency within DOI.  *Secretarial Order 3299*, *supra*, § 4.

40.     Defendant Kenneth Stevens is the Principal Deputy Director of BSEE.  In that capacity, Principal Deputy Stevens has ultimate responsibility for compliance with all applicable federal laws.  He is sued in his official capacity.

41.     Defendant USFWS is an agency within DOI.  16 U.S.C. § 742b.

42.     Defendant Brian Nesvik is the Director of USFWS.  In that capacity, Director Nesvik has ultimate responsibility for compliance with all applicable federal laws.  He is sued in his official capacity.

43.     Defendant USACE is a branch of the U.S. Army.  10 U.S.C. § 7036.

44.    Defendant William H. Graham, Jr., is the Chief of Engineers and Commanding General for the Corps.  In that capacity, Lieutenant General Graham has ultimate responsibility for compliance with all applicable federal laws.  He is sued in his official capacity.

## JURISDICTION AND VENUE

45.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. §§ 701–06.

46.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacities, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Plaintiff RENEW Northeast resides in this District.

47.    The APA waives the sovereign immunity of the United States for the relief sought in this Complaint.  5 U.S.C. § 702.

## LEGAL AND FACTUAL BACKGROUND

**A.    Wind And Solar Energy Provide Critical Benefits For The Electrical Grid And The Public**

48.    Wind and solar energy are two of the nation's fastest-growing, lowest-cost, and most easily deployable energy sources.

49.    The country's electricity consumption—driven by the rapid electrification of transportation, manufacturing, and buildings, as well as the expansion of data centers and artificial intelligence infrastructure—is projected to increase by more than 1,000 terawatt-hours by 2035.[1]

---

[1] *See Annual Energy Outlook 2025*, Energy Info. Admin. (Apr. 15, 2025), https://www.eia.gov/outlooks/aeo/ (all websites last visited Dec. 23, 2025).

50.    Wind and solar technologies have the lowest levelized cost of new electricity generation and the fastest deployment timelines among all large-scale generation sources, making them uniquely suited to meet this growing demand in the short term.[2]

51.    Utility-scale solar and onshore wind now account for nearly 20% of total U.S. electricity generation, and analysts consistently identify these sources as the most cost-effective options for new capacity additions.[3]  In fact, 93% of new energy capacity that came online in 2024 was solar, wind, or battery storage, up from an average of 75% over the previous five years.[4]

52.    Wind and solar facilities are also essential to long-term grid reliability.  These projects diversify generation sources and reduce system vulnerability to single-fuel disruptions or mechanical failures in centralized facilities.[5]  When paired with energy storage and advanced grid management technologies, wind and solar technologies provide necessary flexibility, enabling rapid ramping, frequency regulation, and voltage support.[6]  The growth of utility-scale wind and solar generation also helps relieve congestion, lower peak demand, and bolster resilience against extreme weather events.

53.    In addition, these technologies enhance national security by reducing reliance on volatile global thermal energy markets and insulating the economy from supply disruptions and/or geopolitical conflict.[7]

---

[2] *Id.*

[3] Electric Power Monthly, Energy Info. Admin. (Nov. 2025), https://www.eia.gov/electricity/monthly/.

[4] *See* Am. Clean Power Ass'n, Snapshot of Clean Power in 2024 (2024), https://cleanpower.org/resources/clean-power-annual-market-report-2024-snapshot.

[5] *See* Nat'l Renewable Energy Lab., Renewable Energy to Support Energy Security 2 (Oct. 2019), https://docs.nrel.gov/docs/fy20osti/74617.pdf.

[6] *Id.* at 3.

[7] *Id.* at 1–4.

54.    In short, wind and solar energy strengthens the grid, offering the redundancy, geographic diversity, and adaptability that are indispensable to a modern and reliable electric system.[8]

55.    The wind and solar industries support hundreds of thousands of American jobs and attract tens of billions of dollars in annual investment. The wind industry currently provides approximately 300,000 jobs, including 20,000 manufacturing positions across more than 450 facilities, and contributes roughly $2 billion annually in state and local tax and land-lease payments.[9]  The solar industry employs over 350,000 workers nationwide, adding over 50,000 jobs in 2023 alone, and accounts for over 40% of all new electricity generation capacity added in the past year, supported by more than $35 billion in private investment.[10]  These sectors offer durable, high-quality employment across both rural and urban communities, and contribute substantially to regional economic development.

56.    Recognizing the important role that renewable energy sources play in ensuring grid reliability and resiliency, Congress has long supported wind and solar development, as it has with other energy sources.

57.    For more than two decades, Congress has made it the nation's policy to support renewable energy research, development, demonstration, and deployment.[11]  Since 1978, federal

---

[8] *See* N. Am. Elec. Reliability Corp., 2024 Long-Term Reliability Assessment 6–8 (Dec. 2024), https://www.nerc.com/globalassets/our-work/assessments/2024-ltra_corrected_july_2025.pdf.

[9] *See* Am. Clean Power Ass'n, Clean Power Annual Market Report 2024 (2024), https://cleanpower.org/resources/market-report-2024.

[10] *See* Solar Energy Indus. Ass'n & Wood Mackenzie, U.S. Solar Market Insight Q1 2025.

[11] *See, e.g.*, Energy Policy Act of 2005, Pub. L. 109-59, 119 Stat. 594 (Aug. 8, 2005); Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492 (Dec. 19, 2007); Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, 122 Stat. 3765 (Oct. 3, 2008); American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, 123 Stat. 115 (Feb. 17, 2009); Consolidated Appropriations Act of 2021, Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020); Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429 (Nov. 15, 2021); Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818 (Aug. 16, 2022).

law has supported tax credits for renewable energy development to encourage the commercialization of a broad range of energy technologies and resources.[12]

58.    Multiple administrations have sought to advance wind and solar energy development, while faithfully implementing congressional directives.

59.    President George W. Bush signed the Energy Policy Act 2005 into law and touted a more than 400% increase in wind energy generation and 32% increase in solar between 2001 and 2007.[13]

60.    President Barrack Obama initiated several programs to drive the manufacturing and deployment of renewable energy technologies, and U.S. wind and solar energy generation increased multiple times over during his administration.[14]

61.    President Donald Trump's first administration was "very bullish" on wind energy, with President Trump signing into law multiple bills supporting the expeditious development of renewables on public lands,[15] and holding offshore wind energy auctions.[16]

---

[12] *See* Energy Tax Act of 1978, Pub. L. 95-618, 92 Stat. 3174 (Nov. 9, 1978).

[13] *See Fact Sheet: Diversifying Our Energy Supply and Confronting Climate Change*, White House (Dec. 15, 2008), https://perma.cc/3HEV-7WYV.

[14] *See Fact Sheet: The Recovery Act Made the Largest Single Investment in Clean Energy in History*, Obama White House Archives (Feb. 25, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/02/25/fact-sheet-recovery-act-made-largest-single-investment-clean-energy.

[15] Consolidated Appropriations Act of 2021, Division Z § 3012, Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020) (codified at 43 USC § 3002); *see also* Trump Administration Accomplishment, Trump White House Archives (Jan. 2020), https://trumpwhitehouse.archives.gov/trump-administration-accomplishments (noting that the administration "enacted policies that helped double the amount of electricity generated by solar and helped increase the amount of wind generation by 32 percent from 2016 to 2019").

[16] *See Trump Administration Delivers Historic Progress on Offshore Wind*, Dep't of the Interior (Oct. 18, 2018), https://www.doi.gov/pressreleases/trump-administration-delivers-historic-progress-offshore-wind; *Lease and Grant Information*, Bureau of Ocean Mgmt., https://www.boem.gov/renewable-energy/lease-and-grant-information; *Fact Sheet: Biden-Harris Administration Announces New Actions to Expand U.S. Offshore Wind Energy*, Dep't of the Interior (Sep. 15, 2022), https://www.doi.gov/pressreleases/fact-sheet-biden-harris-administration-announces-new-actions-expand-us-offshore-wind.

62.     President Joseph Biden likewise enacted policies to boost wind and solar energy.[17]

**B. The Recent Agency Attack On Wind And Solar Energy**

63.     On January 20, 2025, the Wind Memorandum withdrew all unleased areas of the Outer Continental Shelf from future wind energy leasing, froze all federal permitting for onshore and offshore wind indefinitely pending the completion of an ill-defined "comprehensive assessment" of the potential environmental impacts and economic costs of wind projects, and gave the Attorney General the discretion to delay pending wind litigation while this comprehensive assessment takes place.  *See* Wind Mem., *supra*.

64.     Since then, agencies have used the Wind Memorandum to justify an array of anti-wind actions, including "stop-work" orders against two offshore wind projects in various stages of construction.[18]  The former order was lifted unilaterally without explanation,[19] while the latter order was found to be arbitrary and capricious by the U.S. District Court for the District of Columbia, *see Revolution Wind, LLC v. Burgum*, 1:25-cv-02999-RCL (D.D.C. Sep. 22, 2025) (ECF No. 36).

65.     Seventeen states, the District of Columbia, and ACE NY on behalf of its hundreds of wind industry members challenged the Wind Memorandum's freeze on federal permitting for

---

[17] *See, e.g.*, Owen Roberts, et al., *Potential Impacts of the Inflation Reduction Act on Domestic Manufacturing and Deployment for Land-Based Wind Turbines* 3, Nat'l Renewable Energy Lab. (Mar. 2024), https://docs.nrel.gov/docs/fy24osti/87300.pdf; *Biden-Harris Administration Delivers Historic Milestones, New Actions for Clean Energy on Public Lands*, Dep't of the Interior (April 11, 2024), https://www.doi.gov/pressreleases/biden-harris-administration-delivers-historic-milestones-new-actions-clean-energy.

[18] *See, e.g.*, Letter from Walter Cruickshank, Acting Director, Bureau of Ocean Energy Mgmt. to Rob Keiser, Head of Asset Mgmt., Orstead North Am. (Aug. 22, 2025), https://www.boem.gov/renewable-energy/directorsorder-20250822pdf; Letter from Walter Cruickshank, Acting Director, Bureau of Ocean Energy Mgmt. to Matthew Brotmann, Secretary, Empire Offshore Wind LLC (Apr. 16, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf.

[19] *See* Letter from Walter Cruickshank, Acting Director, Bureau of Ocean Energy Mgmt. to Matthew Brotmann, Secretary, Empire Offshore Wind LLC (May 19, 2025), https://www.boem.gov/renewable-energy/state-activities/boem-directors-order-empire-wind-amendment.

wind projects in federal district court, and the court recently vacated the permitting freeze. *See New York*, 2025 WL 3514301.

66.    In setting aside the Wind Memorandum, the court determined that the agencies' adoption and implementation of the Memorandum's permitting ban constituted final agency action, was arbitrary and capricious due to its complete failure to explain this administration's dramatic change in policy and account for wind developers' reliance interests, and was contrary to law in violation of 5 U.S.C. §§ 555(b) and 558(c) for failing to make permitting decisions "within a reasonable time." *Id.* at *16.

67.    The now-vacated Wind Memorandum was only one part of the Administration's war on wind and solar energy. Its campaign has leveraged virtually every aspect of federal energy regulation. In addition to the inter-agency effort to prevent wind and solar projects from obtaining federal permits that is the subject of this lawsuit, the Administration has limited wind and solar projects' ability to qualify for congressionally enacted energy tax credits,[20] rescinded grants for renewable projects and supply chain development,[21] and most recently issued five simultaneous orders suspending the leases of every offshore wind project under active construction—including the two projects whose "stop-work" orders had previously been reversed (as set forth in ¶ 64, *supra*).[22]

---

[20] Notice 2025-42, Section 45Y and 48E Beginning of Construction Notice, Dep't of the Treasury (Aug. 20, 2025), https://www.irs.gov/pub/irs-drop/n-25-42.pdf.

[21] *See, e.g., Trump's Transportation Secretary Sean P. Duffy Terminates and Withdraws $679 Million from Doomed Offshore Wind Projects*, Dep't of Transp. (Aug. 29, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-terminates-and-withdraws-679-million#:~:text=WASHINGTON%2C%20D.C.%20%E2%80%93%20U.S.%20Transportation%20Secretary,maritime%20dominance%20and%20preventing%20waste; *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion*, Dep't of Energy (Oct. 2, 2025) (announcing termination of 321 financial awards for clean energy projects), https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion.

[22] *The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases*, Dep. of the Interior (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases

68.     The President has been particularly vocal about his intention to eliminate wind and solar projects, stating at various points during this Administration that "[w]e will not approve wind," that wind and solar are "THE SCAM OF THE CENTURY,"[23] and that "we will not allow a windmill to be built in the United States".[24]

69.     The President also stated in a September 23, 2025 speech before the United Nations General Assembly that "[w]e're getting rid of the falsely named renewables. [ ] They don't work. They're too expensive.  They're not strong enough to fire up the plants that you need to make your country great."[25]  Multiple White House statements similarly refer to clean energy as the "Green New Scam."[26]

70.     DOI Secretary Doug Burgum—who is responsible for several of the agency actions challenged in this lawsuit—has said that renewables are "an absolute disaster," and that, "under this administration, there is not a future for offshore wind projects."[27]

71.     Most relevant to this lawsuit, multiple agencies have taken final agency actions that systematically handicap wind and solar technologies in comparison to conventional energy sources, attempting to pick winners and losers in a manner that Congress did not authorize.

---

[23]  Donald Trump (@realDonaldTrump), Truth Social (Aug. 20, 2025 at 9:51 AM EST), https://truthsocial.com/users/realDonaldTrump/statuses/115061417084982814.

[24]  APT, *Trump Blasts Windmills as 'Con Job' in Fiery Tirade at Von der Leyen* (YouTube, July 28, 2025*)*, https://www.youtube.com/watch?v=LJejNsx6PeM.

[25]  PBS News, *Watch Live: Trump Addresses UN General Assembly for First Time Since Reelection* (YouTube, Sep. 23, 2025), transcript available at https://www.rev.com/transcripts/trump-speaks-at-un.

[26]  *President Trump Is Unleashing American Energy*, White House (Mar. 4, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-is-unleashing-american-energy/; *Ending The Green New Scam*, White House, https://www.whitehouse.gov/wp-content/uploads/2025/05/Ending-the-Green-New-Scam-Fact-Sheet.pdf; *50 Wins In The One Big Beautiful Bill*, White House (June 3, 2025), https://www.whitehouse.gov/articles/2025/06/50-wins-in-the-one-big-beautiful-bill.

[27]  Ari Natter, *U.S. Reviewing Five Offshore Wind Farms Under Construction*, Bloomberg (Sep. 10, 2025), https://www.bloomberg.com/news/articles/2025-09-10/five-offshore-wind-projects-under-review-burgum-says.

- 21 -

72.     This lawsuit challenges six discrete actions that have the individual and cumulative effect of imposing substantial and serious harm on the permitting and development of wind and solar energy facilities—and threatening the viability of certain operating assets—throughout the country.  Each action violates the APA and must be set aside.

### 1.  The DOI Renewable Bottleneck Memorandum

73.     On July 15, 2025, Deputy Chief of Staff Gregory Wischer issued a memorandum titled "Department Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities" ("DOI Renewable Bottleneck Memorandum").  *See* Gregory Wischer, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities*, Dep't of the Interior, Office of the Sec'y (July 15, 2025) (attached hereto as Exhibit A).[28]

74.     This action imposes on wind and solar energy facilities—and *only* wind and solar energy facilities—within DOI's jurisdiction a new and burdensome review scheme, subjecting virtually every step in the wind and solar permitting process to review by three of DOI's most senior political offices, including the Office of the Secretary of the Interior.

75.     The DOI Renewable Bottleneck Memorandum evidences a significant departure from prior agency procedure, under which the individual decisions (now subject to enhanced review) have typically been delegated to the directors of individual bureaus and then re-delegated to career-level staff members in local field offices with oversight by regional offices. [29]

---

[28]  Available at https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other.

[29] *See, e.g.*, Departmental Manual, 218 DM 1, Dep't of the Interior (Sep. 14, 2022) (delegating development of energy on the Outer Continental Shelf to the BOEM Director), https://www.doi.gov/document-library/departmental-manual/218-dm-1-general-program-authority-outer-continental-shelf-0;  2017  Program Delegations Handbook, Bureau of Ocean Energy Mgmt. (Feb. 7, 2017) (re-delegating BOEM Director's authority), https://www.boem.gov/about-boem/boemm-2182-h-program-delegations-handbookpdf; Departmental Manual, 235

76.    DOI, through various subordinate bureaus and agencies (including BOEM, BLM, USFWS, BSEE, the Bureau of Reclamation ("BOR"), and the Bureau of Indian Affairs ("BIA")), manages federal lands and waters, including by permitting activities that take place on the 480 million acres of public lands and other federal lands and 2.5 billion acres of the Outer Continental Shelf under DOI's stewardship.[30]

77.    Its authority over these lands stems from Congress's delegation of authority under the Property Clause of the U.S. Constitution, U.S. Const. art. IV, § 3, cl. 2, and several statutes, including the Federal Land Policy and Management Act ("FLPMA"), which governs projects on federal lands management by BLM, *see* 43 U.S.C. § 1701 *et seq.*, and OCSLA, which applies to the Outer Continental Shelf as managed by BOEM, *see id.* § 1331 *et seq.*

78.    In addition, under the Consolidated Appropriations Act of 2021, DOI must "implement a program to improve Federal permit coordination" and "expedite the permitting" of wind and solar, as well as other renewable energy projects, on federal land, 43 U.S.C. § 3002, as well as "seek to issue permits" for a minimum of 25 gigawatts of wind, solar, and geothermal energy on public lands by the end of 2025, *id.* § 3004(b).

79.    Other statutes, such as the Endangered Species Act ("ESA") and BGEPA, require consultation with USFWS on federal permit applications for projects on public *or private lands* that may impact protected species, *see* 16 U.S.C. § 1536, and authorize USFWS to issue permits

DM 1, Dep't of the Interior (delegating energy development on federal lands to the BLM Director), https://www.doi.gov/document-library/departmental-manual/235-dm-1-general-program-delegation-director-bureau-land; Departmental Manual, 135 DM 14, Dep't of the Interior, https://www.doi.gov/document-library/departmental-manual/135-dm-14-regional-and-field-organization#:~:text=14.4%20Field%20Offices%20(FOs).,inventorying%20 and%20monitoring%20resource%20conditions.

[30]    *See* Dep't of the Interior, FY2022–2026 Strategic Plan at 4, available at https://www.doi.gov /sites/default/files/u.s.-department-of-the-interior-fy-2022-2026-strategic-plan.pdf.

allowing the incidental "take" of protected species as a result of otherwise lawful activities, *id.* §§ 668, 1539.

80.    BLM, BOEM, USFWS, BSEE, BOR, and BIA are all subordinate bureaus and agencies within DOI.  *Bureaus*, Dep't of the Interior.[31]  The Memorandum affects the permitting processes of each of these bureaus and sub-agencies, to the extent they relate to wind and solar energy.

81.    The DOI Renewable Bottleneck Memorandum states that "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities shall require" review by the Office of the Executive Secretariat and Regulatory Affairs, the Office of the Executive Secretariat and Regulatory Affairs, and the Office of the Secretary.  Ex. A (DOI Renewable Bottleneck Mem.) at 1.

82.    The Memorandum further identifies a list of 68 "decisions, actions, consultations, and other undertakings" relating to wind and solar projects—such as construction and operation plans ("COPs"), onshore rights-of-way, mitigation plans, and notices to proceed—and a catch-all for "any other similar or related decisions, actions, consultations, or undertakings" that are subject to this new, burdensome review.  *Id.* at 1, 2.

83.    The DOI Renewable Bottleneck Memorandum is "effective immediately," and, on its face, applies only to wind and solar energy facilities.  *Id.*  As a practical matter, it mandates that virtually every single step of a proposed action related to wind and solar (whether it be the relatively ministerial step of reviewing access road authorizations, or the more critical step of a final permitting decision) be reviewed and approved by three levels of senior DOI leadership before the action can proceed.

---

[31] Available at https://www.doi.gov/bureaus.

84.     No other type of activity reviewed by DOI—energy development or otherwise—requires this type of process.

85.     By subjecting virtually every step of DOI's wind and solar permitting processes to review by the offices of its most senior political appointees, including the Secretary himself, the DOI Renewable Bottleneck Memorandum is designed to stall wind and solar applications and deter developers from advancing permit applications in the first place because any attempt to do so would be futile.  Indeed, solar or wind project permitting has come to a standstill since the Memorandum was issued.

86.     Permitting delays and standstills of the type created by the Bottleneck Memorandum create significant and immediate economic harm for wind and solar developers. Wind and solar projects often involve complex, commercial obligations, tight construction timelines, and limited options for the physical labor and material resources needed to complete development.  For instance, wind and solar developers often enter into power purchase agreements that identify a deadline for the project's power delivery capabilities with prospective off-takers before construction commences.  Because delays in fulfilling these deadlines often result in penalties, developers must take steps early in the development process—including supply chain procurement—to ensure such future delivery obligations can be fulfilled.  Even modest disruptions to the federal permitting timeline can disrupt these tightly aligned manufacturing and construction schedules.

87.     Permitting delays like those caused by the Bottleneck Memorandum also increase the cost of constructing a wind or solar project.  For instance, developers must at the outset grapple with complicated logistics and significant expenses to store massive project components before construction can begin, which expenses increase when permits are not approved in the anticipated

timeframe.  Additionally, when permitting delays make it impossible for construction to proceed as scheduled, developers may be forced to cancel or postpone existing manufacturing orders, pay contractual penalties and incur higher prices for the procurement of such goods in the future. Permitting delays also inflate wind and solar developers' labor costs, as wind and solar developers may be required to renegotiate contracts for specialized, limited-availability installation and equipment crews if developers do not possess all necessary permits by the time construction is meant to begin.

88.    For all of these reasons, among others, delays of months or years can significantly threaten a project's viability and economic outcome.

89.    Because each step identified in the DOI Renewable Bottleneck Memorandum is necessary for wind and solar developers to obtain financing, break ground, and continue progress on their projects, the Memorandum has caused, and is causing, significant and immediate economic harm to Plaintiffs' member's businesses, whose wind and solar projects cannot obtain necessary permits as a result of the Memorandum.

**2.  The Federal Lands Anti-Renewable Order**

90.    On August 1, 2025, Secretary Burgum issued Secretarial Order 3438, titled "Managing Federal Energy Resources and Protecting the Environment" ("Federal Lands Anti-Renewable Order").  *See* Sec'y of Interior, *Secretarial Order 3438, Managing Federal Energy Resources and Protecting the Environment* (Aug. 1, 2025) (attached hereto as Exhibit B).[32]

---

[32] Available at https://www.doi.gov/document-library/secretary-order/so-3438-managing-federal-energy-resources-and-protecting.

91.     The Federal Lands Anti-Renewable Order gerrymanders DOI's permitting analysis to deny wind and solar construction permits for projects on federal lands and in federal waters, in favor of non-renewable energy sources.

92.     Two statutes—FLPMA and OCSLA—authorize DOI to issue permits for renewable energy projects on federal lands and in federal waters, respectively.

93.     FLPMA requires DOI to, as relevant, manage public lands "on the basis of multiple use." 43 U.S.C. § 1701(a)(7). The agency must ensure a "combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources" and undertake a "harmonious and coordinated management of the various resources," "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." *Id.* § 1702(c).

94.     OCSLA states that the Outer Continental Shelf "should be made available for expeditious and orderly development, subject to environmental safeguards," *id.* § 1332(3), and authorizes DOI to grant leases, easements, and rights-of-way on the Outer Continental Shelf for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas," such as offshore wind projects, *id.* § 1337(p)(1)(C).

95.     Neither statute (nor any applicable regulations) even mentions, let alone requires, a "capacity density" analysis.

96.     When reviewing a permit application under FLPMA or OCSLA, DOI must perform a review of environmental impacts under the National Environmental Policy Act ("NEPA"). Any wind and solar project that requires a major federal permit must undergo a NEPA analysis,

including an analysis of "a reasonable range of alternatives" that are "technically and economically feasible and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(iii).

97.    NEPA is a "purely procedural statute" that "does not mandate particular results, but prescribes the necessary process" for an agency's environmental review of a project. *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 169 (2025) (citation omitted). DOI and other agencies have prepared, and successfully defended in court, numerous programmatic and project-specific NEPA analyses entailing many years and thousands of pages thoroughly studying wind and solar energy development, documenting the relative lack of adverse environmental and safety impacts therefrom, and identifying mitigation measures as appropriate.[33]

98.    The Federal Lands Anti-Renewable Order establishes "capacity density"—a metric manufactured by DOI to target wind and solar—as the determinative consideration in DOI's NEPA analysis for proposed energy projects. The Order then instructs DOI to deny permits to wind and solar projects if the agency decides that there is a more "appropriate" (*i.e.*, more capacity dense) use for the land. Ex. B (Federal Lands Anti-Renewable Order) at 1–3. It directs the agency to "optimize" land use "by considering, when reviewing a proposed energy project under NEPA, a reasonable range of alternatives that includes projects with capacity densities meeting or exceeding that of the proposed project." *Id.* at 1.

99.    The Order defines "capacity density" as the "nameplate generation capacity of an energy project multiplied by its projected capacity factor, the product of which is then divided by

---

[33] Bureau of Ocean Energy Mgmt., *Record of Decision: Vineyard Wind 1 Offshore Wind Energy Project Construction and Operations Plan* 36, 39, 93 (May 10, 2021), https://www.boem.gov/sites/default /files/documents/renewable-energy/state-activities/Final-Record-of-Decision-Vineyard-Wind-1.pdf; *New York Bight Final Programmatic Environmental Impact Statement*, Bureau of Ocean Energy Mgmt., https://www.boem.gov/renewable-energy/state-activities/new-york-bight-final-programmatic-environmental-impact-statement; *Western Solar Utility-Scale Solar Energy Development PEIS/RMPA*, Bureau of Land Mgmt. (Aug. 21, 2025), https://eplanning.blm.gov/eplanning-ui/project/2022371/510.

the total acres of the project area." *Id.* Said another way, capacity density asks how much power an energy project can potentially generate within a specific area.

100.    Wind and solar facilities are less "capacity dens[e]" than nuclear or thermal energy generation because wind turbines and solar panels must be spread out to most effectively capture their respective renewable energy resources.[34]

101.    By declaring that energy projects with higher capacity densities presumptively constitute the best use of federal lands, and then requiring that DOI "shall only permit those energy projects that are the most appropriate land use when compared to a reasonable range of project alternatives," *id.* at 3, the Federal Lands Anti-Renewable Order categorically disfavors wind and solar technologies.

102.    It is plain from the Order's face that the agency designed the Federal Lands Anti-Renewable Order to target wind and solar energy.

103.    Despite citing no precedent for considering capacity density in NEPA's reasonable alternatives analysis, or any other analysis under governing law such as FLPMA or OCSLA, the Order questions "whether the use of Federal lands for *any* wind and solar projects is consistent with the law, given these projects' encumbrance on other land uses, as well as their disproportionate land use when reasonable project alternatives with higher capacity densities are technically and economically feasible." *Id.* at 1.

104.    The Order purports to invoke "common sense, arithmetic, and physics" to characterize wind and solar projects as "highly inefficient uses of Federal lands," particularly in comparison to the capacity density of "other energy sources, like nuclear, gas, and coal." *Id.* at 2.

---

[34] *See* Hannah Ritchie, *How does the land use of different electricity sources compare?*, Our World In Data (June 16, 2022), https://ourworldindata.org/land-use-per-energy-source#:~:text=There%20are%20several% 20reasons%20for,8%20m2%20per%20MWh.

Offering data from the U.S. Energy Information Administration ("EIA"), the Order states that "one advanced nuclear plant . . . produces 33.17 megawatts (MW) per acre, while one offshore wind farm produces approximately 0.006 MW/acre." *Id.* The Order concludes that "when there are reasonable alternatives that can generate the same amount of or more energy on far less Federal land, wind and solar projects may unnecessarily and unduly degrade Federal lands." *Id.*

105.     In addition, the Federal Lands Anti-Renewable Order states that "energy projects with higher capacity densities have lower Federal land use impacts" and so "disturb far less of the natural environment for fish, birds, and other wildlife" and "provide more Federal lands for other uses." *Id.*

106.     The Federal Lands Anti-Renewable Order states that it is "effective immediately, and will remain in effect until it is amended, superseded, or revoked." *Id.* at 3. By requiring DOI to deny permits to wind and solar projects if it determines that there is a more "appropriate" (that is, more capacity dense) "land use," the Federal Lands Anti-Renewable Order causes substantial and immediate harm to the wind and solar industries by creating an arbitrary and insurmountable barrier to project approval.

107.     The Federal Lands Anti-Renewable Order has caused, and is causing, significant and immediate economic harm to Plaintiffs' members, who cannot obtain necessary permits for their wind and solar projects as a result of the Order.

### 3. The Corps' Anti-Renewable Memorandum

108.     On September 18, 2025, Assistant Secretary of the Army for Civil Works Adam Telle issued a memorandum titled "Direction on Reviewing Permit Applications Related to Energy General Projects" ("Corps' Anti-Renewable Memorandum"). Adam Telle, *U.S. Army Corps Of Engineers re: Direct on Reviewing Permit Applications Related to Energy Generation Projects, Department of the Army*, Army Corps of Eng'rs, Office of the Sec'y (Sep. 18, 2025) (attached

hereto as Exhibit C).[35]  Like the Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable Memorandum writes a new capacity-density metric into the Corps' permitting processes, with the goal of deprioritizing and denying permits for wind and solar projects.

109.    Under Section 404 of the CWA, if any type of construction involves the discharge of dredged or fill materials into jurisdictional waters of the United States, the developer must obtain a permit from the Corps.  33 U.S.C. § 1344.  And under Section 10 of the RHA, wind and solar projects must obtain permits from the Corps for the construction of obstructions in navigable waters of the United States.  *Id.* § 403.

110.    To grant a permit under these statutes, the Corps must conduct a "public interest" review, considering "all factors which may be relevant to the proposal" and balancing the "benefits which reasonably may be expected to accrue from the proposal . . . against its reasonably foreseeable detriments."  33 C.F.R. § 320.4(a).  These factors include "conservation, economics, aesthetics, general environmental concerns," and "energy needs."  *Id.* § 320.4(a)(1).

111.    Where there are "unresolved conflicts as to resource use," the Corps is required to consider "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work," *id.* § 320.4(a)(2)(ii), and with limited exceptions, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem," *id.* § 230.10(a).  "Practicable alternatives" are alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).

---

[35] The Corps has not made this order available on its website, instead only announcing it in a press release. *See Army Corps of Engineers Begins Implementing Policy To Increase America's Energy Generation Efficiency*, Army Corps. Of Engineers (Sep. 22, 2025), https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/4311128/army-corps-of-engineers-begins-implementing-policy-to-increase-americas-energy/.

112.    The Corps' Anti-Renewable Memorandum now mandates that the Corps consider, as part of its "public interest" review for individual permits under Section 404 of the CWA and Section 10 of the RHA, an energy generation project's "annual potential energy generation per acre"—that is, its capacity density.  Ex. C (Corps' Anti-Renewable Mem.) at 2.  Additionally, the agency must consider whether an energy project "displace[s] other more reliable energy sources, and whether the activities related to the projects denigrate the beauty of the Nation's natural landscape." *Id.*

113.    The Memorandum further instructs the agency to "consider whether an alternative energy generation source can deliver the same amount" of energy generation with less impact to aquatic resources.  *Id.*  Under the Corps' Anti-Renewable Memorandum, the Corps must "prioritize processing . . . applications related to projects that would generate the most annual energy generation per acre over projects with low generation per acre."  *Id.* at 3.  Said another way, the Corps must now *deprioritize* energy generation projects with supposedly low capacity densities according to an arbitrary metric.

114.    None of these new requirements are contained in the CWA, the RHA, or the Corps' implementing regulations.

115.    Because wind and solar energy sources utilize larger land areas due to the nature of the technology, they inherently have lower capacity density than other types of energy generation projects, particularly when the land needed for fossil fuel extraction and transportation is excluded. And so, these energy sources will be categorically deprioritized or rejected under the Corps' Anti-Renewable Memorandum.

116.    Wind and solar projects that involve over 0.5 acres of waters of the United States require individual CWA Section 404/RHA Section 10 permits, meaning that the Memorandum

will cause substantial permitting delays for wind and solar projects.[36]  Given the Corps' decision to require consideration of project alternatives with higher "capacity density" and to prioritize permitting of such projects, wind and solar developers with projects that require CWA Section 404 individual permits or RHA Section 10 permits will never obtain them.

117.    The Corps' Anti-Renewable Memorandum will, at minimum, force many costly project redesigns or cause delay and uncertainty that threatens construction timelines and options for suppliers and contractors, resulting in contract penalties, cost hikes, and deferred revenue. Other projects may never get their Corps individual permits and thus will need to be canceled altogether.

118.    The Corps' Anti-Renewable Memorandum has caused, and is causing, significant and immediate economic harm to Plaintiffs' members, who cannot obtain necessary permits as a result of the Memorandum.

### 4.  The Eagle Take Permit Ban

119.    On or about January 20, 2025—the same day the Wind Memorandum was announced and based solely thereon—USFWS announced on its website that it was "temporarily ceasing issuance" of eagle incidental take permits to wind energy facilities under BGEPA "until further notice," and "will no longer automatically issue general permits" (the "Eagle Take Permit Ban").  *See* 3-200-71: Eagle Incidental Take (General Permit), U.S. Fish & Wildlife Serv. (navigate to "Notice To Applicants") (screenshot captured on December 23, 2025 attached hereto as Exhibit D).[37]

---

[36] While the Corp's Anti-Renewable Memorandum is drafted to only apply to individual Section 404 permits, the accompanying press release makes no such distinction.  To the extent the Corps is applying this Memorandum more broadly to prejudice any type of Section 404 permit, it is causing harm to an even larger number of wind and solar projects.

[37] Available at https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit.

120.    Notwithstanding judicial vacatur of USFWS's adoption of the Wind Memorandum, *New York*, 2025 WL 3514301, USFWS has not expressly repudiated the Eagle Take Permit Ban.

121.    The harms from the Ban have recently become more acute because DOI has directed USFWS to specifically target wind energy projects with increased BGEPA enforcement—including against operating wind projects that do not have the very permits it categorically refuses to issue.[38]    Consistent with its newly aggressive enforcement approach, in September 2025 USFWS issued records requests for what is believed to be every wind project with a BGEPA permit.

122.    BGEPA generally prohibits the "take" of bald and golden eagles, their parts, nests, or eggs and imposes substantial, escalating penalties for violations of the statute.  16 U.S.C. § 668. But USFWS may "permit the taking" of such eagles upon a "determin[ation] that it is compatible with the preservation of the bald eagle."  *Id.* § 668a.

123.    In 2024, after a yearslong rulemaking process involving detailed USFWS review of scientific data regarding the interaction of eagles and wind farms as well as extensive notice and comment under the APA, DOI found that certain allowable levels of incidental take will not have population-level impacts on eagle species, and promulgated revised regulations governing the issuance of permits for incidental take of eagles.[39]    Those 2024 regulations remain in place today.

124.    The revised eagle take permit rules made available for the first time "general permits" authorizing incidental take of bald and golden eagles by, among other activities and types

---

[38] *See* Gregory Wisher, *Ensuring Compliance with the Bald and Golden Eagle Protection Act and Executive Order 14315*, Dep't of the Interior, Office of the Sec'y (Aug. 4, 2025) (attached hereto as Exhibit E).  This document was announced on X, *see* Secretary Burgum (@SecretaryBurgum), X (Aug. 4, 2025 at 6:46 PM EST), https://x.com/SecretaryBurgum/status/1952501870393786822, but has still not been posted to the agency website.

[39] *Permits for Incidental Take of Eagle and Eagle Nests*, 89 Fed. Reg. 9920, 9928 (Feb. 12, 2024).

of infrastructure, wind energy projects located in areas designated by USFWS as having a low risk

of eagle take.  *Id.*  The "incidental take" of a bald or golden eagle "means the species is harmed,

harassed, killed, etc. as a foreseeable byproduct of an activity where the take is not the primary

intent but may happen incidentally."  *See* 3-200-71: Eagle Incidental Take (General Permit), U.S.

Fish & Wildlife Serv.[40]

125.    USFWS's 2024 rulemaking also authorized the issuance of general permits for,

among other things, transmission lines, timber harvesting, and building construction.  50 C.F.R.

§§ 22.260, 22.280.

126.    The Eagle Take Permit Ban immediately and indefinitely bans wind facilities from

obtaining general or specific eagle incidental take permits, without limiting the ability of any other

types of projects and activities to obtain such permits.  Notwithstanding that USFWS recognizes

that regulated entities "need" these permits to avoid criminal and civil liability in the event of

incidental take, the agency has stated that it is "ceasing issuance of permits to wind facilities until

further notice."  Ex. D (Eagle Take Permit Ban).

127.    Instead of providing any reasoning to support its decision, USFWS merely noted

that its decision was made "pursuant to" the Wind Memorandum, which was just vacated by the

District of Massachusetts.  *Id.*  Since the issuance of this Court's order, USFWS has announced no

change in its Eagle Take Permit Ban—which continues to appear on the USFWS website as of the

filing of this Complaint.

128.    While the Eagle Take Permit Ban is problematic in its own right, it has become dire

for Plaintiffs' members because the agency has now begun to target wind facilities for aggressive

BGEPA enforcement.  Specifically, on August 4, 2025, the USFWS Deputy Chief of Staff directed

---

[40] Available at https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit.

the agency to specifically review *wind energy* projects' compliance with BGEPA general permits and to "refer violations of [BGEPA] to the Solicitor's Office for its review and, where appropriate, referral to the U.S. Department of Justice for criminal and/or civil penalties under 16 U.S.C. § 668." *See* Ex. E at 1.

129.    Banning new eagle take permits for wind facilities while ramping up enforcement actions against such facilities—including those without permits and without any ability to obtain them because of the Ban—creates a Catch-22 for wind farm developers and operators. Wind farm operators that do not currently have BGEPA permits must now choose whether to operate the facility consistent with contractual requirements but without a permit and risk incurring criminal and civil liability under the BGEPA, or shut down altogether and cease generating much-needed electricity, causing them to default on contractual obligations to their power purchasers, leading to loss of associated revenue and potentially to additional economic damages under those contracts.

130.    The Eagle Take Permit Ban has caused, and is causing, significant and immediate economic harm to Plaintiffs' members.

131.    The Ban has caused immediate economic harm by forcing some member companies to curtail generation, resulting in lost revenue from electricity sales and decreased overall project efficiency. In many cases, projects must reduce output even when conditions are safe, creating unnecessary operational disruptions. These forced curtailments also increase costs, as staff, maintenance, and other fixed expenses continue despite lower production, further straining the financial performance of affected facilities.

132.    Additionally, because of the Ban, Plaintiffs' members have invested in or have to evaluate the feasibility of investing in expensive and, in most cases, unnecessary mitigation technologies to minimize perceived risks and satisfy investor concerns, despite survey data

indicating a project has very low risk of experiencing an eagle fatality.  But because no minimization technology is guaranteed to be 100% effective, the absence of a permit renders even these extremely costly measures insufficient from a regulatory compliance standpoint.

133.    These harms—lost revenue from curtailed production, increased compliance costs, and superfluous mitigation investments—have materially compromised the financial viability for many affected companies.

### 5.  The Wind And Solar IPaC Ban

134.    On or around July 15, 2025, USFWS announced its final decision to deny solar and wind developers access to its IPaC database ("Wind and Solar IPaC Ban"), which in turn prevents such developers from (among other things) obtaining Corps nationwide permits for their projects. *IPaC Information for Planning and Consultation*, U.S. Fish & Wildlife Serv. (screenshot captured on December 23, 2025 attached as Exhibit F).[41]

135.    USFWS created and manages IPaC as a taxpayer-funded, public online tool that identifies the protected species and critical habitats present in the area of proposed projects on both private and public lands.

136.    The ESA establishes protections for fish, wildlife, and plants that are listed as endangered or threatened, and imposes criminal and civil penalties for non-compliance. 16 U.S.C. §§ 1531 *et seq*.  Section 7 of the ESA requires that "[e]ach Federal agency shall" conduct consultations on protected species "with the assistance of the Secretary [of the Interior]" to ensure that their actions—which include construction permits for energy projects such as wind and solar—are "not likely to jeopardize the continued existence" of any listed species. *Id.* § 1536(a)(2).

---

[41] Available at https://ipac.ecosphere.fws.gov/.

137.    That statute further mandates that federal agencies "shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species." *Id.* § 1536(a)(3).

138.    Applicants use IPaC to facilitate federal agency consultations with USFWS under Section 7 of the ESA. They also use IPaC to assist with applications for incidental take permits under Section 10 of the ESA that help developers minimize impacts to protected species and avoid potential criminal and civil liability under that statute.

139.    In addition, IPaC is the means by which prospective permittees "obtain information on the location of threatened or endangered species and their critical habitats" as part of the CWA Section 404 permitting process. 33 C.F.R. § 330.4(f)(3). To the extent that construction of a wind or solar project requires the discharge of dredge or fill materials into waters of the United States, the developer must obtain a permit from the Corps under Section 404 of the CWA. 33 U.S.C. § 1344. Developers may obtain coverage under NWPs for projects with impacts below a certain threshold, and individual permits for projects with greater impacts. *Id.* § 1344(e).

140.    For wind and solar projects that may require a CWA Section 404 permit to discharge dredged or fill material into United States waters and potential impacts to species listed or proposed for listing under the ESA, access to IPaC is essential to the developer's ability to obtain the requisite NWP. When the Corps receives confirmation from IPaC that a proposed wind or solar energy development will have "no effects" or is "not likely to adversely affect" federally protected species, the Corps will rely on that representation to issue the requisite NWP (provided other

permitting requirements are met)[42] without triggering the Corps' obligation to initiate consultation with USFWS under Section 7 of the ESA.

141.    Following the Wind and Solar IPaC Ban, neither wind and solar developers nor federal permitting agencies like the Corps can use the IPaC database to "identify the species and critical habitats" that may be affected by proposed wind and solar projects, or obtain a determination from the IPaC that a project will have no effect on or is not likely to adversely affect species listed or proposed for listing under the ESA.

142.    Upon information and belief, USFWS has never before denied anyone use of IPaC—let alone a particular disfavored category of project.

143.    The Wind and Solar IPaC Ban, in conjunction with the DOI Renewable Bottleneck Memorandum, has effectively stalled ESA Section 7 consultations for wind and solar projects and thereby prevented otherwise eligible projects that will or merely might impact protected species from proceeding under an NWP.   In this way, the Wind and Solar IPaC Ban has caused significant and immediate economic harms to Plaintiffs' members.

144.    Specifically, wind and solar developers' inability to obtain necessary information from IPaC precludes them from obtaining an NWP to the extent their projects impact jurisdictional waters of the United States and protected species are in the vicinity of or might be affected by the project, thereby forcing developers to attempt costly and time-consuming project redesigns or, if a redesign is not feasible, abandon their projects altogether (incurring all of the financial harms associated with such an outcome).

---

[42] Of particular relevance is General Condition 18 to the NWPs, which requires submission to the Corps of a preconstruction notification if any federally listed (or proposed for listing) endangered or threatened species or critical habitat "might be affected or is in the vicinity of the project or activity."  Army Corps of Eng'rs, Nationwide Permit General Condition 18 Endangered Species, https://www.swf.usace.army.mil/Portals/47/Users/053/21/821/Nationwide%20Permit%20General%20Condition%2018.pdf.

145.    The permitting delays caused by the IPaC Ban have wrought significant and immediate economic harm to Plaintiffs' Members.  As explained above with respect to the DOI Renewable Bottleneck Memorandum, permitting delays of the type caused by the IPaC Ban dramatically increase the cost of developing and constructing wind and solar facilities.  *See supra* ¶¶ 86–88.

### 6.    The Zerzan/Jorjani Opinion

146.    On May 1, 2025, Gregory Zerzan, the Acting Solicitor of DOI, issued the Zerzan/Jorjani Opinion, which reinstated a prior interpretation of OCSLA that was first adopted at the end of the last Trump administration.  *See* Dep't of the Interior, M-37086, *Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059* at 3 (May 1, 2025) (attached as Exhibit G).[43]  The Zerzan/Jorjani Opinion stymies and effectively bars approval of new offshore wind projects, and BOEM has repeatedly used it retroactively as the basis for decisions to claw back existing final COP approvals.

147.    OCSLA governs energy projects occurring in federal waters (including offshore wind facilities) and mandates that the Outer Continental Shelf "should be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3).[44]

148.    Under subsection 8(p) of OCSLA, the Secretary of the Interior has authority to grant a lease, easement, or right-of-way on the Outer Continental Shelf for "activities" that, among

---

[43] Available at https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[44] Federal district courts in other jurisdictions have relied on section 1332(3) to strike down wholesale bans on offshore energy developments.  *See Louisiana v. Biden*, 622 F.Supp.3d 267 (W.D. La 2022); *Louisiana v. Biden*, No. 2:21-CV-778, 2021 WL 4312502, at *16 (W.D. La. Aug. 23, 2021), *report and recommendation adopted*, No. 2:21-CV-0778, 2021 WL 4314795 (W.D. La. Sep. 22, 2021); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 336–37 (E.D. La. 2011).

other things, "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas," such as offshore wind projects.  *Id.* § 1337(p)(1)(C).

149.    When granting such rights, the Secretary must "ensure that any activity under this subsection is carried out in a manner that provides for" 12 enumerated criteria, including "safety," "protection of the environment," "conservation of the natural resources of the outer Continental Shelf," "coordination with relevant Federal agencies," and "prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas."  *Id.* § 1337(p)(4)(A)–(L).  The Secretary of the Interior has delegated this authority to BOEM.[45]

150.    In December 2020, then-DOI Solicitor Daniel Jorjani issued a Memorandum Opinion (the "Jorjani Opinion") interpreting the phrase "prevention of interference with reasonable uses"—one of the twelve factors subsection 8(p)(4) requires BOEM to consider when evaluating permit applications under OCSLA, *id.* § 1337(p)(4)(I)—as requiring DOI to "act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference."[46]

151.    The Jorjani Opinion determined that the Secretary must therefore "prevent[] *all* interference, if the proposed activity would lead to unreasonable interference, but not the type of interference that would be described as *de minimis* or reasonable."[47]  In other words, an offshore wind project could be rejected outright if it created anything more than "*de minimis*" interference with other ocean users.

---

[45] Departmental Manual, 218 DM 1, Dep't of the Interior (Sep. 14, 2022)

[46] Dep't of the Interior, M-37059, *Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas* at 2 (Dec. 14, 2020), https://www.doi.gov/sites/default/files/m-37059.pdf.  The Jorjani Opinion is attached as Exhibit H.

[47] *Id.* (emphasis added).

152.    A few months later, after a change in presidential administrations, then-Principal Deputy Solicitor Robert Anderson withdrew the Jorjani Opinion on the basis that it failed to interpret the phrase "prevention of interference" in the context of subsection 8(p)(4)'s remaining text, which makes clear that the Secretary must act "'in a manner providing' for several goals" (the "Anderson Opinion").[48]

153.    As the Anderson Opinion explained, "subsection 8(p)(4) commands only that the Secretary rationally balance the subsection's various goals" and "may not be read to impose additional requirements in its individual paragraphs."[49]

154.    In 2024, DOI amended its offshore wind regulations at 30 C.F.R. § 585.102(a) via notice and comment to incorporate the Anderson Opinion's interpretation of subsection 8(p)(4), stating that BOEM should "reach[ ] a rational balance among" the 12 criteria set forth in subsection 8(p)(4) "to the extent they conflict or are otherwise in tension," and noting that no factor "inherently outweighs or supplants any other."[50]   The First Circuit subsequently upheld this interpretation of OCSLA in *Seafreeze Shoreside v. U.S. Department of the Interior*, 123 F.4th 1, 25–27 (1st Cir. 2024), and no court has concluded otherwise.

155.    In May of 2025, Acting Solicitor Zerzan issued M-Opinion 37086 (*i.e.*, the Zerzan/Jorjani Opinion), which reinstates the former Jorjani Opinion and thereby re-adopts that opinion's impermissibly narrow approach to subsection 8(p)(4), based on its conclusion that the Anderson Opinion "conflicts with the best reading of OCSLA."  Ex. G (Zerzan/Jorjani Opinion) at 3.

---

[48] *See* Dep't of the Interior, M-37067, *Secretary's Duties Under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf* (Apr. 9, 2021) (quoting 43 U.S.C. § 1337(p)(4)), available at https://www.doi.gov/sites/default/files/m-37067.pdf.

[49] *Id.* at 4–5.

[50] *See* 30 C.F.R. § 585.102(a)*; Renewable Energy Modernization Rule*, 89 Fed. Reg. 42602 (May 15, 2024).

156.    To support its conclusion about the meaning of the phrase "prevention of interference," the Zerzan/Jorjani Opinion purports to rely on the First Circuit's decision in *Seafreeze* (which, as noted above, does not support the Zerzan/Jorjani Opinion at all), and further contends that the Anderson Opinion's balancing approach "diminishes the importance of each subparagraph" of subsection 8(p)(4) "while also opening the door to the possibility that any one criteria may be favored over another," and so "no longer reflects the best, or even a permissible, agency interpretation." *Id.* It "instruct[s]" "all relevant Department bureaus and offices" "to treat [the Jorjani Opinion] as binding and authoritative," and further requires the Department to "reevaluate[ ]" all "Departmental action[s] taken in reliance on the now withdrawn [Anderson Opinion]." *Id.*

157.    The Zerzan/Jorjani Opinion stymies and imposes a *de facto* ban on offshore wind developers obtaining new COP approvals and alters the legal status quo for fully approved projects. It mandates that BOEM adopt a new narrow standard—found nowhere in OCSLA and contrary to the agency's own regulations—wherein a COP can be disapproved solely on the basis that it has *de minimis* interference with other "reasonable uses" of the Outer Continental Shelf.

158.    BOEM has made clear that the Zerzan/Jorjani Opinion's intent and effect is to block all offshore wind projects by repeatedly using the opinion to seek remand and vacatur of existing COP approvals in order to "rereview" them and make "new decisions."[51] This implementation of

---

[51] *See* Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand with Vacatur & to Dismiss at 7–10, *Mayor & City Council of Ocean City v. U.S. Dep't of Interior*, No.1:24-cv-03111-SAG (D. Md. Sep. 12, 2025) (ECF No. 79); Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand & Stay at 6–9, *Town & Cnty. of Nantucket v. Burgum*, No.1:25-cv-00906-TSC (D.D.C. Sep. 18, 2025) (ECF No. 21); Fed. Defs.' Mot. and Mem. in Support of Voluntary Remand and Stay, *Save Long Beach Island, Inc. v. U.S. Dep't of Comm.*, No. 1:25-cv-02211 (D.D.C. Sep. 26, 2025) (ECF No. 13); Fed. Defs.' Mot. and Mem. in Support of Voluntary Remand and Stay, *ACK for Whales, Inc., et. al. v. U.S. Dept. of Commerce*, No. 2:25-cv-1678 (D.D.C. Dec. 2, 2025) (ECF No. 18).

the Zerzan/Jorjani Opinion has grievously disrupted the affected offshore wind developers' efforts to construct their projects pursuant to their COP approvals.

159.    The Zerzan/Jorjani Opinion has caused, and is causing, significant and immediate economic harm to Plaintiffs' members.

160.    Several member projects that had received COP approval under the Anderson Opinion have become subject to federal motions for remand or vacatur of their COP approvals based on the Zerzan/Jorjani Opinion.  These actions place billions of dollars in investment and years of planning at risk.

161.    Other member projects that have not yet submitted COPs are deferring their submittal because seeking BOEM review under the Zerzan/Jorjani Opinion legal standard would be futile.  These actions place billions of dollars in investment and years of planning at risk.

C.    The APA's Legal Framework

162.    Final agency action is reviewable under the APA.  An action is "final" if it (1) "marks the consummation of the agency's decision making process" and (2) determines "right and obligations" or creates "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Courts consider finality against the backdrop of Congress' "evident intent [in enacting the APA] to make agency action presumptively reviewable."  *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987).

163.    The APA instructs courts to "hold unlawful and set aside" final agency actions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), "in excess of statutory authority," *id.* § 706(2)(C), or taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

164.    Agency action that is "arbitrary and capricious" violates the APA.  5 U.S.C.
§ 706(2)(A).  There are "numerous ways in which an agency may act arbitrarily and capriciously."
*FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025).

165.    "The APA's arbitrary-and-capricious standard requires that agency action be
reasonable and reasonably explained."  *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).
Therefore, an action is "arbitrary and capricious" if the agency did not "examine the relevant data
and articulate a satisfactory explanation for its action."  *FCC v. Fox Television Stations, Inc.*, 556
U.S. 502, 513 (2009) (citation omitted).

166.    Agency actions may be arbitrary and capricious if they are undertaken merely to
fulfill a presidential directive.  *New York*, 2025 WL 3514301, at *9 (collecting cases).  Even where
an agency is compelled to act by an executive order or presidential directive, an agency must
provide "independent, reasoned decision making" to support its decision.  *Kingdom v. Trump*, No.
1:25-CV-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025).

167.    The APA's emphasis on "reasoned decisionmaking" renders agency action
arbitrary and capricious if the agency's "stated rationale [is] pretextual" or "contrived."  *Dep't of
Com. v. New York*, 588 U.S. 752, 773–74 (2019).  This is particularly true when such pretext is
used to conceal political animus.  *See Rhode Island State Council of Churches v. Rollins*, No. 25-
CV-569-JJM-AEM, 2025 WL 3111213, at *11 (D.R.I. Nov. 6, 2025) (agency action held arbitrary
and capricious in light of statements from executive branch that "make clear" that agency's
proffered justification was pretextual); *see also Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO
v. United States Off. of Mgmt. & Budget*, No. 25-CV-08302-SI, 2025 WL 3018250, at *17 (N.D.
Cal. Oct. 28, 2025) (invaliding agency action that was "intended for the purpose of political
retribution"); *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 1276229, at *3 (N.D.

Cal. May 2, 2025) (granting extra-record discovery where evidence suggested "direct animus" on the part of the Executive branch that "appears to have directly influenced the Secretary's decision making").

168.    An agency also acts arbitrarily and capriciously if "it departs significantly from its own precedent" without explanation. *Thompson v. Barr*, 959 F.3d 476, 484 (1st Cir. 2020).  When an agency changes its position, it must "display awareness that it is changing position," and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  In other words, an agency must provide a "more detailed justification" for that change "than would suffice for a new policy created on a blank slate," particularly if that "prior policy has engendered serious reliance interests." *Fox Television Stations*, 556 U.S. at 515; *see also New York*, 2025 WL 3514301, at *13–14.

169.    In addition, an agency acts arbitrarily and capriciously if it fails to "apply the same basic rules to all similarly situated applicants," unless it provides a reasonable justification for such differential treatment. *Lafortune v. Garland*, 110 F.4th 426, 434 (1st Cir. 2024).

170.    An agency action must also be set aside if it exceeds the agency's statutory authority or is contrary to law.  5 U.S.C. § 706(2)(A), (C).

171.    In particular, agency action must "be consistent with [any governing] statute," *Decker v. Nw. Env't Defense Ctr.*, 568 U.S. 597, 609 (2013), and regulations, *New York*, 2025 WL 3514301, at *14.  In other words, courts must "reject agency [actions] which conflict[] with congressional intent," *accord Grunbeck v. Dime Sav. Bank of N.Y., FSB*, 74 F.3d 331, 336 (1st Cir. 1996), or that "frustrate the policy Congress sought to implement," *Friends of Animals v. Haaland*, 997 F.3d 1010, 1016 (9th Cir. 2021) (citations omitted).  "Courts must exercise their independent judgment in deciding whether an agency has acted" in accord with the statutory scheme, and may

- 46 -

not "defer to an agency interpretation of the law." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024); *see also id.* at 391–92.

172.    Finally, agency action must be set aside when it is implemented "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Legislative rules must go through the APA's mandatory notice and comment procedures.  *Craker v. U.S. Drug Enf't Agency*, 44 F.4th 48, 55 (1st Cir. 2022).  If an agency promulgates a legislative rule without observing the APA's notice and comment procedures, the rule is invalid.

### CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701-706
### The DOI Renewable Bottleneck Memorandum Violates The APA

173.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 172 above.

174.    The APA instructs courts to "hold unlawful and set aside" final agency actions that are, among other things, taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory . . . authority," *id.* § 706(2)(C).

175.    On July 15, 2025, DOI issued a memorandum titled "Department Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities," *i.e.*, the DOI Renewable Bottleneck Memorandum.  Ex. A (DOI Renewable Bottleneck Mem.).  The DOI Renewable Bottleneck Memorandum is a final agency action.

- 47 -

176.    The DOI Renewable Bottleneck Memorandum consummates DOI's decision-making process with respect to the way DOI reviews permit applications for wind and solar energy projects.

177.    Specifically, it requires "all decisions, actions, consultations, and other undertakings" related to DOI's permitting of wind and solar energy projects to undergo three levels of review at the highest echelons of DOI. *Id.* at 1. The Memorandum applies only to actions concerning wind and solar projects. DOI decisions related to all other types of energy projects remain subject to DOI's extant review procedures, or even expedited procedures summarily announced by DOI under the current administration, which do not require such extreme and disproportionate scrutiny.

178.    By subjecting even the most ministerial step of wind and solar development to three independent levels of review by high-level political appointees within the Department, the order unjustifiably stymies and effectively halts DOI wind and solar permitting in violation of the APA.

179.    The DOI Renewable Bottleneck Memorandum thus creates significant and adverse legal consequences for any wind and solar developer who already has in the pipeline, or intends to submit, a permit application that must be approved by DOI, for whom this new, burdensome review procedure will harm their ability to obtain such permits in a timely and predictable manner—if they are able to obtain such permits at all.

180.    The DOI Renewable Bottleneck Memorandum violates the APA.

181.    First, the DOI Renewable Bottleneck Memorandum is arbitrary and capricious because it does not provide any adequate or reasoned explanation for subjecting "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities" to a

new, burdensome review regime that delays and effectively halts wind and solar development by DOI altogether.  *See id.* at 1.

182.    The only basis that the DOI Renewable Bottleneck Memorandum identifies for mandating these additional levels of review is a purported intent to make DOI's policies "[c]onsistent" with the Wind Memorandum, Executive Order ("EO") 14315 and EO 14156, and Secretarial Order ("SO") 3417 and SO 3418.  But the Wind Memorandum—which did not by its own terms justify the DOI Renewable Bottleneck Memorandum—has been declared illegal and vacated, *New York*, 2025 WL 3514301, at *1, and none of the cited executive and secretarial orders rationalize in any way the DOI Renewable Bottleneck Memorandum.

183.    Second, the DOI Renewable Bottleneck Memorandum is arbitrary and capricious because it fails to provide a sufficient justification for treating wind and solar projects dissimilarly and relegating these energy sources to second-class status as compared to other energy-generating projects.

184.    The Memorandum applies only to actions "related to wind and solar facilities."  All other types of energy generation remain free of the Memorandum's burdensome procedures. DOI's failure to identify any facts, evidence, or other reasoned explanation for its discriminatory decision to subject only certain types of projects to additional levels of procedural review—and inevitably delay or halt the permitting of those technologies—independently renders the DOI Renewable Bottleneck Memorandum arbitrary, capricious, and invalid.

185.    Third, the DOI Renewable Bottleneck Memorandum is arbitrary and capricious because its stated rationale played an insignificant role in the agency's decision-making process and was instead contrived to harm the wind and solar industries.  Based on the anti-renewable agenda articulated above, *supra* ¶¶ 63–72, and the wholesale lack of cogent and evidence-based

rationales for the DOI Renewable Bottleneck Memorandum, it is obvious that animus against wind and solar energy sources is the sole motivator for the Memorandum. This action was therefore pretextual, in violation of the APA.

186.    Fourth, the DOI Renewable Bottleneck Memorandum is arbitrary and capricious for the additional reason that it departs from agency precedent without acknowledgment or explanation. Although the Memorandum represents a sea change in the way submissions for energy facilities are processed and reviewed, with wind and solar projects being singled out for multiple layers of senior-level clearance on top of the typical career and managerial review, the agency failed to recognize that it changed its position on this issue, let alone provide any good reason for the change.

187.    This failure is especially problematic given the serious reliance interests that DOI's prior regime had engendered in wind and solar developers, who have planned their projects and structured their business models in reliance on the expectation that regulatory submissions within DOI's jurisdiction would be reviewed and resolved in a manner that did not require every step in the process to be elevated to the Secretary of the Interior.

188.    Fifth, the DOI Renewable Bottleneck Memorandum constitutes a violation of sections 555(b) and 558(c) of the APA by failing to process permit applications for wind and solar projects within a reasonable time.

189.    Finally, the DOI Renewable Bottleneck Memorandum is arbitrary and capricious and not in accordance with law because it puts the agency in direct conflict with Title 41 of the Fixing America's Surface Transportation Act ("FAST-41"), a 2015 statute that established a federal program run by a Permitting Council to streamline and improve agency coordination,

timeliness, and transparency with respect to federal permitting for large infrastructure projects, including "infrastructure for renewable . . . energy production."  42 U.S.C. § 4370m(6)(A).

190.    By requiring every incremental step in the wind and solar permitting process to be elevated to three of the seniormost offices within DOI, the DOI Renewable Bottleneck Memorandum makes it functionally impossible for DOI to perform its obligations as a lead or facilitating agency under FAST-41.

191.    The DOI Renewable Bottleneck Memorandum should be set aside.

## COUNT II
### Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701-706
### The Federal Lands Anti-Renewable Order Violates The APA

192.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 191 above.

193.    The APA instructs courts to "hold unlawful and set aside" final agency actions that are, among other things, taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory authority," *id.* § 706(2)(C).

194.    On August 1, 2025, DOI issued Secretarial Order 3438, titled "Managing Federal Energy Resources and Protecting the Environment," *i.e.*, the Federal Lands Anti-Renewable Order.  Ex. B (Federal Lands Anti-Renewable Order).  The Federal Lands Anti-Renewable Order is a final agency action.

195.    The Federal Lands Anti-Renewable Order consummates DOI's decision-making process with respect to the criteria DOI will consider when reviewing permit applications for wind and solar energy projects on federal lands and in federal waters.

196.    The Federal Lands Anti-Renewable Order requires DOI to "only permit" proposed energy projects that are "the most appropriate land use when compared with a reasonable range of project alternatives," with the agency's "most appropriate land use" inquiry turning on whether the proposed project has a higher "capacity density" than that of a reasonable project alternative. *Id.* at 2, 3.  Wind and solar facilities are less capacity dense than conventional alternatives by DOI's own definition, and so the Order's emphasis on this singular factor gerrymanders DOI's permitting regime in a manner that systematically targets and disfavors wind and solar permitting on federal lands and in federal waters.

197.    In so doing, the Federal Lands Anti-Renewable Order has significant, adverse legal consequences for wind and solar developers who rely on—but will be henceforth unable to obtain—mandatory permits from DOI.

198.    The Federal Lands Anti-Renewable Order violates the APA.

199.    First, the Federal Lands Anti-Renewable Order is arbitrary and capricious because it lacks any adequate or reasoned explanation for requiring DOI to deny permit applications to wind and solar facilities wherever "reasonable project alternatives with higher capacity densities are technically and economically feasible."  *Id.* at 1.  The Order just assumes that the "optimal" use of federal lands is the use that can yield the most energy relative to its geographic footprint, but it cites no evidence or other support for that conclusion.  It instead gestures to "common sense, arithmetic, and physics" for the *ipse dixit* notion that "wind and solar projects are highly inefficient uses of Federal lands."  *Id.* at 2.

200.    While the Order attempts to show that wind and solar projects are less capacity dense than a nuclear power plant, that does not provide a reasoned basis for making capacity density a dispositive threshold factor—or even a relevant consideration—in DOI's permitting

decisions. The Order's singular capacity density example, for instance, sets up an absurd hypothetical choice between offshore wind and offshore nuclear energy, and DOI has not established that the existence of one energy generation technology in a particular federally controlled area forecloses any other.

201. The Order also ignores that land used for wind and solar projects can be used contemporaneously for other purposes, fails to account for any of the upstream land use necessary to support thermal energy generation, and ignores the myriad other ways in which an energy project might impact federal lands.

202. The Federal Lands Anti-Renewable Order is independently arbitrary and capricious because it constitutes a significant departure from DOI's prior permitting policies, without any justification for or consideration of the significant reliance interests those policies have engendered in wind and solar developers.

203. The Order does not acknowledge that it represents a departure from DOI's longstanding policies, consistent with statutory mandates in OCSLA, FLPMA, and the 2021 Consolidated Appropriations Act, to encourage renewable energy development on federal lands and waters.[52] Neither does the Order acknowledge that it departs from the new DOI NEPA Handbook's carefully proscribed definition of "reasonable alternatives" by encouraging the consideration of purely hypothetical energy projects that may not be "technically and economically

---

[52] *See, e.g.*, *Rights-of-Way, Leasing, and Operations for Renewable Energy*, 89 Fed. Reg. 35634, 35367 (May 1, 2024) (amending BLM regulations to "accelerate deployment of renewable energy resources in the United States"); *Renewable Energy Modernization Rule*, 89 Fed. Reg. 42602, 42603 (May 15, 2024) (final rule "facilitat[ing] the development of OCS renewable energy and support[ing] the Department's commitment to ensuring safe and responsible domestic energy production").

- 53 -

feasible," will not "meet the purpose and need of the proposed action," are unlikely to be "within the jurisdiction of the bureau," and certainly will not "meet the goals of the applicant."[53]

204.    Beyond merely stating that capacity density bears on the most "appropriate" use of federal lands, DOI offers no good reason for departing from the departmental definition of "reasonable alternatives" and rigging the analysis to systematically result in the denial of wind and solar permit applications.

205.    The Federal Lands Anti-Renewable Order is also arbitrary and capricious because its stated rationale played an insignificant role in the agency's decision-making process and was instead contrived to harm the wind and solar industries.  Based on the anti-renewable agenda articulated above, *supra ¶¶* 63–72, and the wholesale lack of cogent and evidence-based rationales for the Federal Lands Anti-Renewable Order, it is obvious that animus against wind and solar energy sources is the sole motivator for the Order.  This action was therefore pretextual, in violation of the APA.

206.    Additionally, the Order is arbitrary and capricious because DOI ignored the reliance interest harms that a change in its approach to permitting will have on wind and solar developers. Wind and solar developers have long structured the development stages of proposed projects on federal lands and in federal waters and attracted investments based on the understanding that those proposals would be subjected to a fair and lawful permitting process.

207.    The Order turns that process on its head by, for the first time and without any cogent reasoning, elevating a single novel factor that has the inherent effect of rigging the process against

---

[53] Dep't of the Interior, 516 DM 1 (DOI NEPA Handbook) § 6(t), https://www.doi.gov/media/document/doi-nepa-handbook.

wind and solar proposals. DOI failed to reasonably explain why countervailing policies outweighed those reliance interests.

208.     Second, the Federal Lands Anti-Renewable Order is contrary to OCSLA, FLPMA, NEPA, and the Consolidated Appropriations Act.

209.     Congress enacted OCSLA to ensure that the Outer Continental Shelf be "made available for expeditious and orderly development," 43 U.S.C. § 1332(3), and, when expanding the statute to encompass renewable energy projects in 2005, explicitly required DOI to "ensure that any activity under this subsection is carried out in a manner that provides for" 12 enumerated statutory criteria, including "safety," "protection of the environment," "conservation of the natural resources of the outer Continental Shelf," and the "prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas." *Id.* § 1337(p)(4).

210.     By making a single, extra-statutory factor designed to prevent wind development dispositive of DOI's permitting decisions, the Order contravenes OCSLA's statutory directive that DOI's permitting decisions on the Outer Continental Shelf be made after careful consideration and balancing of these 12 factors.

211.     FLPMA calls for holistic permitting decisions with a focus on ensuring that public lands are managed "on the basis of multiple use[s]," *id.* § 1701(a)(7), and that "balanced and diverse uses" "account[s for] the long term needs of future generations for renewable and nonrenewable resources," *id.* § 1702(c). The statute also allows the Secretary of DOI to withdraw public lands from certain uses pursuant to specific statutory procedures that include publication of public land orders in the Federal Register. *Id.* § 1702(j).

212.    The Federal Land Anti-Renewable Order, however, effectively withdraws public land from wind and solar development without complying with that statutorily mandated withdrawal process, and jettisons FLPMA's balanced approach in favor of relying on a single metric that is explicitly focused on "the greatest economic return or the greatest unit output," *id.* § 1702(c), albeit in an ill-reasoned manner that inherently disfavors wind and solar energy.

213.    To the extent the Order relies on NEPA, that statute does not impose substantive requirements or require selection of any alternative, much less prescribe DOI's new capacity-density-based standard of review.  The Federal Lands Anti-Renewable Order preordains the outcome of DOI's NEPA analyses for wind and solar projects by making capacity density its *primary* (if not outcome-determinative) consideration and then gives the reasonable alternative analysis a substantive dimension by requiring that DOI deny the permit application when that analysis identifies a more capacity-dense "reasonable alternative."

214.    Third, the Federal Lands Anti-Renewable Order was not promulgated through the APA's notice and comment procedures and so was issued without observing the procedures required by law.  The Order imposes on DOI's permitting regime a new and unfounded presumption that projects with greater capacity densities are the most "appropriate" use of federal lands and waters, and mandates that only those "appropriate" projects be permitted.  Ex. B (Federal Lands Anti-Renewable Order) at 3.

215.    Neither of the statutes from which the Order purports to derive its permitting authority—OCSLA and FLPMA—contemplate the use of a single factor as dispositive of permitting decisions.  The Order therefore constitutes a legislative rule that should have been, but was not, promulgated through the APA's public notice and comment rule making process.

216.    The Federal Lands Anti-Renewable Order should be set aside.

## COUNT III
### Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701-706.
### The Corps' Anti-Renewable Memorandum Violates The APA

217.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 216 above.

218.    The APA instructs courts to "hold unlawful and set aside" final agency actions that are, among other things, taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory . . . authority," *id.* § 706(2)(C).

219.    On September 18, 2025, the Corps issued a memorandum titled "Direction on Reviewing Permit Applications Related to Energy Generation Projects," *i.e.*, the Corps' Anti-Renewable Memorandum. Ex. C (Corps' Anti-Renewable Mem.). The Corps' Anti-Renewable Memorandum is a final agency action.

220.    The Corps' Anti-Renewable Memorandum consummates the Corps' decision-making process with respect to the new way the Corps will carry out its permitting responsibilities under the CWA and RHA for wind and solar projects on both private and public lands.

221.    Like the Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable Memorandum rigs the CWA Section 404 and RHA Section 10 permitting processes against wind and solar by disadvantaging and deprioritizing energy sources that generate lower amounts of energy per acre—*i.e.*, have a lower capacity density—in favor of "projects that would generate the most annual potential energy generation per acre." *Id.* at 3. Again, wind and solar energy facilities by their nature generate less energy per acre than other energy projects (such as nuclear or coal-fired plants), so the Memorandum directs the Corps to manipulate the outcome of its public interest

analysis by contriving imaginary alternative projects that have higher capacity densities, and deprioritize wind and solar permit applications.

222.    The Memorandum creates lasting, adverse legal consequences for wind and solar developers, whose projects may never even be considered for individual CWA Section 404 and RHA Section 10 permits, let alone approved under the Corps' new scheme.

223.    The Corps' Anti-Renewable Memorandum violates the APA.

224.    First, the Memorandum is arbitrary and capricious because it provides no adequate or reasoned explanation for its decision to elevate a single criterion specifically calibrated to deny permits to wind and solar projects.

225.    The only purported reasoning cited by Assistant Secretary Telle for this new permitting regime is that "the nation's current energy production and generation capacity is inadequate," such that the "buildout of energy infrastructure is crucial."   *Id.* at 2.   The Memorandum cites no evidence supporting a connection between these generalized concerns and imposing new systematic impediments for permits for wind and solar projects, and fails to explain how the "capacity density" metric determines whether a specific project is best suited to meet the country's energy production and generation capacity needs, or how hampering individual permits for wind and solar advances the buildout of the nation's energy infrastructure.

226.    The Corps' Anti-Renewable Memorandum also repeats the same methodological flaws with respect to the "capacity density" concept discussed in connection with the DOI Federal Lands Anti-Renewable Order.  *Supra ¶¶* 199–201.

227.    Nor does the Memorandum provide any explanation for its significant departure from prior permitting policies or consider the substantial reliance interests that wind and solar developers have had in those longstanding policies.

228.    Wind and solar developers have long relied on the Corps' predictable approach to the Section 404 public interest analysis—planning projects based on the Corps' established permitting regime and making investments on the assumption that their applications for permits would be reviewed in a manner that was not biased toward rejection of wind and solar projects.

229.    The Corps' Anti-Renewable Memorandum undermines those reliance interests by subjecting wind and solar developers to a public interest analysis that for the first time utilizes factors and alternatives hand-picked to foreclose these specific energy sources.

230.    In addition, the Corps' Anti-Renewable Memorandum is arbitrary and capricious because its stated rationale played an insignificant role in the agency's decision-making process and was instead contrived to harm the wind and solar industries.  Based on the anti-renewable agenda articulated above, *supra* ¶¶ 63–72, and the wholesale lack of cogent and evidence-based rationales for the Corps' Anti-Renewable Memorandum, it is obvious that animus against wind and solar energy sources is the sole motivator for the Memorandum.  This action was therefore pretextual, in violation of the APA.

231.    Second, the Memorandum is in excess of statutory authority and contrary to law because the CWA does not authorize the Corps to implement national energy policy when issuing Section 404 permits, and the Memorandum violates the Corps' regulations at 33 C.F.R. § 320.4.

232.    The CWA authorizes the Secretary of the Army Corps to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  This framework is focused on aquatic impacts of proposed actions.  The Corps has a narrow statutory role, and has no statutory authority to set energy policy as to the proper use of private property.  The CWA does not empower the

Corps to make policy decisions concerning which types of energy sources to prioritize during the permitting process.

233.    Moreover, the Memorandum's decision to prioritize projects based on their capacity density flies in the face of the Corps' regulations requiring that the agency's "public interest" analysis balance various factors, with no one factor being determinative. 33 C.F.R. § 320.4(a)(1); *see id.* ("[A]ll factors which may be relevant to the proposal must be considered . . . ."); § 320.4(a)(3) ("how important a factor is and how much consideration it deserves will vary with each proposal").

234.    By requiring consideration of alternatives with higher capacity density than the proposed projects (*i.e.*, completely different energy projects), the Memorandum also violates the Corps' requirement that alternatives must be "practicable"—*i.e.*, "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

235.    The Corps' Anti-Renewable Memorandum is also contrary to law because it ensures that the Corps will not comply with requirements regarding the timing of permit review set forth in the APA and other relevant statutes.

236.    For instance, the Corps' Anti-Renewable Memorandum's directive to systematically and categorically deprioritize Section 404 permits for wind and solar projects constitutes a clear violation of sections 555(b) and 558(c) of the APA by failing to process permit applications "within a reasonable time."

237.    The Corps' Anti-Renewable Memorandum is also contrary to law because it defies statutory and regulatory mandates related to the advancement of Section 404 permits. For instance, 33 U.S.C. § 1344 requires the Secretary to issue a public notice of a pending permit application

"[n]ot later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit," 33 U.S.C. § 1344(a), and requires coordination amongst federal agencies so that "to the maximum extent practicable, a decision with respect to an application for a permit . . . will be made not later than the ninetieth day after the date the notice for such application is published," *id*. § 1344(q).

238.    The Corps' regulations also specify the procedures that govern the agency's processing of permit applications.  *See* 33 C.F.R. §§ 325.2(d), 320.1(a)(4), 323.6(a).  By directing the Corps to systematically and categorically deprioritize Section 404 permits for wind and solar projects, the Memorandum assures the Corps will not comply with these mandatory timelines.

239.    Third, the Corps' Anti-Renewable Memorandum is unlawful for failing to undergo notice and comment rulemaking.

240.    The Memorandum directs the Corps to consider a new metric—capacity density—as part of its "public interest" analysis when determining whether to issue a CWA Section 404 or RHA Section 10 permit, and to "prioritize" permit applications for projects with higher capacity densities over projects with lower capacity densities.  Ex. C (Corps' Anti-Renewable Mem.) at 3. Said another way, the Memorandum requires the Corps to apply a threshold presumption that projects with higher capacity densities better serve the public interest.

241.    But the Corps' existing regulations do not contemplate threshold, categorical presumptions to prioritize certain permit applications, and instead set forth an all-things-considered balancing scheme.  *See* 33 C.F.R. § 320.4.  The Corps' decision to elevate capacity density as a potentially decisive metric for prioritizing individual permit applications and de-prioritizing applications for projects with low capacity densities is inconsistent with this regulatory scheme.

242.    The Corps' Anti-Renewable Memorandum should be set aside.

## COUNT IV
### Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701-706
### The Eagle Take Permit Ban Violates The APA

243.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 242 above.

244.    The APA instructs courts to "hold unlawful and set aside" final agency actions that are, among other things, taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory . . . authority," *id.* § 706(2)(C).

245.    On or about January 20, 2025, USFWS announced on its website that it is "temporarily ceasing issuance" of eagle incidental take permits to wind energy facilities under BGEPA "until further notice," and "will no longer automatically issue general permits." Ex. D (Eagle Take Permit Ban) at 1. The Eagle Take Permit Ban is a final agency action.

246.    The Ban represents USFWS's final decision with respect to the availability of this critical tool, and its decision has significant and harmful legal consequences for wind and solar developers because it prohibits them from obtaining the only type of permit that insulates them from criminal liability associated with incidental eagle takings.

247.    The Eagle Take Permit Ban violates the APA.

248.    First, the Eagle Take Permit Ban is arbitrary and capricious in multiple respects.

249.    Initially, the Ban does not provide any adequate or reasoned explanation for "ceasing issuance of [BGEPA permits] to wind facilities until further notice." *Id.* at 1. The only explanation in the Ban is a reference to the Wind Memorandum, but agency implementation

of the Wind Memorandum's permitting freeze was recently and rightly vacated as itself being arbitrary and capricious and contrary to law. *New York*, 2025 WL 3514301, at *9–14.

250.    The Ban is also arbitrary and capricious because USFWS fails to provide any justification for treating wind projects dissimilarly from other projects eligible for eagle take permits.  The Ban applies *only* to wind projects, despite DOI's recently promulgated regulations specifically authorizing the issuance of permits for wind energy projects, power lines, and a range of other activities, *see* 89 Fed. Reg. at 9930; 50 C.F.R. § 22.250; *id.* § 22.260, as well as nest disturbance and nest take by businesses in a number of sectors, 89 Fed. Reg. at 9945.

251.    The Ban provides no justification for singling out wind projects in comparison to any other activity that may incidentally harm an eagle, for which entities remain free to apply for and obtain permits as means of insulating themselves from BGEPA liability.  And, like the Corps, USFWS' role does not entail selecting among energy sources or dictating use of private lands.

252.    The Ban is arbitrary and capricious for the additional reason that USFWS failed to provide any justification for departing from its prior precedent regarding wind projects' eligibility for an eagle take permit.

253.    USFWS authorized the issuance of general permits "for incidental take of eagles by wind energy projects" in 2024, the culmination of a painstaking, multi-year rulemaking process that was informed by and based upon extensive, real-world data regarding the impacts of wind projects on eagles.  89 Fed. Reg. at 9930.

254.    The Ban constitutes a reversal, without justification or reason, of the agency's recently promulgated, carefully considered, science-based policy with respect to the availability of specific and general permits for wind facilities, based on the flimsiest and most unscientific of rationales.

255.    USFWS's failure to explain its policy change is particularly problematic because USFWS's permitting regime, and specifically the non-discretionary, rapid availability of general permits, engendered serious reliance interests for wind farm developers and operators.  Even though USFWS only made BGEPA general permits available in 2024, many wind farm operators have already obtained such permits to avoid running afoul of BGEPA or are otherwise seeking them.[54]

256.    Owners of projects in qualifying areas that have been operating for years without experiencing any eagle fatalities have relied upon the recent availability of the general permits in evaluating whether permit coverage is necessary for their facilities, while developers of new projects have relied upon the ready availability of the general permits in making investment decisions to move forward with the development of projects in qualifying areas, heretofore secure in the knowledge that they can obtain BGEPA general permits as a matter of course to authorize incidental take of eagles that might result from those projects.

257.    The Ban, in tandem with USFWS's recent enforcement initiative targeted at wind energy projects, upends those reliance interests by putting wind operators without permits in limbo: they can either continue to develop, construct and operate their facilities without a permit and risk exposure to criminal and civil liability under BGEPA if a take incidentally occurs, or they can curtail operations or cease operating altogether—incurring significant economic harm while taking power from the nation's grid and jobs from the nation's workforce in the process.

---

[54] Before the 2024 rule, wind farm operators could comply with BGEPA by applying for individual eagle incidental take permits, see *Eagle Permits; Revisions to Regulations for Eagle Incidental Take and Take of Eagle Nests*, 81 Fed. Reg. 91494 (Dec. 16, 2016), and/or adhering to USFWS's land based wind energy guidelines.  *See* Land Based Wind Energy Guidelines, U.S. Fish & Wildlife Serv., https://www.fws.gov/sites/default/files/documents /land-based-wind-energy-guidelines.pdf.

258.    The Eagle Take Permit Ban is additionally arbitrary and capricious because its stated rationale played an insignificant role in the agency's decision-making process and was instead contrived to harm the wind and solar industries.  Based on the anti-renewable agenda articulated above, *supra ¶¶* 63–72, and the wholesale lack of cogent and evidence-based rationales for the Eagle Take Permit Ban it is obvious that animus against wind and solar energy sources is the sole motivator for the Ban.  This action was therefore pretextual, in violation of the APA.

259.    Second, the Eagle Take Permit Ban is procedurally deficient because it was not promulgated through notice and comment rulemaking.  The Ban prohibits wind farm developers and operators from obtaining permits for the potential incidental take of bald and golden eagles as a result of wind turbine operations.  BGEPA, however, contains no provision allowing USFWS to bar an entire industry from obtaining an incidental eagle take permit.  Instead, USFWS regulations specifically "authorize the incidental killing or injury of bald eagles and golden eagles associated with the operation of wind energy projects," and allow applicants to qualify for permits so long as they meet certain regulatory requirements.  50 C.F.R. § 22.250.

260.    The Eagle Take Permit Ban now indefinitely rescinds this regulatory regime, which was the result of a robust APA notice and comment rulemaking process completed in 2024, by refusing to issue permits for wind facilities, even if those facilities would otherwise qualify for a permit under the DOI's existing regulations.  The agency needed to comply with notice and comment procedures and provide a reasoned basis before doing so.

261.    The Eagle Take Permit Ban should be set aside.

**COUNT V**
**Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701-706**
**The Wind And Solar IPaC Ban Violates The APA**

262.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 261 above.

263.    The APA instructs courts to "hold unlawful and set aside" final agency actions that are, among other things, taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory . . . authority," *id.* § 706(2)(C).

264.    On or around July 15, 2025, USFWS made a final decision to deny solar and wind developers access to its IPaC database, *i.e.*, the Wind and Solar IPaC Ban.  Ex. F (Wind and Solar IPaC Ban).  The Wind and Solar IPaC Ban is a final agency action.

265.    The IPaC Ban consummates USFWS's decision-making process with respect to the use of the IPaC tool by wind and solar developers.  Specifically, USFWS's website pronounces that "solar and wind projects are currently not eligible" to use IPaC in connection with any permit reviews—with no limitations or exceptions.  *Id.*

266.    The IPaC Ban also imposes harmful legal consequences on wind and solar developers because the Ban prohibits wind and solar developers (and even other federal agencies) from accessing this critical information resource that is used to (1) facilitate mandatory consultations under section 7 of the ESA, and (2) allow developers whose projects may result in discharges of dredged or fill materials into waters of the United States, and will or merely might have an effect on protected species, to obtain Section 404 authorization from the Corps without the need for formal ESA Section 7 consultations.

267.    By prohibiting wind and solar developers from accessing and obtaining effects determinations from IPaC, therefore, USFWS has robbed developers of the ability to avoid the need for formal consultations that it has suspended under the DOI Renewable Bottleneck Memorandum.  That means that wind and solar developers cannot construct projects without redesigning them to avoid all impacts, placing them at a significant disadvantage as compared to developers of other types of projects that retain full, unfettered access to the IPaC database.

268.    The Wind and Solar IPaC Ban violates the APA.

269.    The Ban is arbitrary and capricious because it provides no basis—let alone a reasoned basis—for prohibiting use of this vital information resource for wind and solar projects.

270.    The only purported justification for the Wind and Solar IPaC Ban is a single citation, without explanation, to the DOI Renewable Bottleneck Memorandum.  But the DOI Renewable Bottleneck Memorandum, which mandates that each step of DOI's permitting process, including "permits under the ESA," be reviewed by three of the most senior offices within DOI, and which itself violates the APA, *see supra* ¶¶ 173–191, says nothing about denying wind and solar projects access to critical tools necessary to help *effectuate* the permitting process.

271.    The Ban is also arbitrary and capricious because it singles out a particular class of users—wind and solar projects—for adverse treatment without justification.  The IPaC shutdown on its face applies only to wind and solar projects, while *all other* IPaC users remain able to access the database and receive the benefits of such access.  The IPaC website provides no recognition of—let alone authority for—facially disadvantaging wind and solar projects and placing them into a second-class status as compared to all other energy generation and infrastructure projects.

272.    The Ban is additionally arbitrary and capricious because USFWS did not even attempt to justify the stark departure from its prior position with respect to IPaC accessibility.

273.    The arbitrary and capricious nature of USFWS's departure from its prior precedent is compounded by the fact that it failed to address the serious reliance interests wind and solar developers had in IPaC's accessibility.

274.    Losing access to IPaC effectively prevents developers whose projects will impact waters of the United States, but may affect protected species, from being able to obtain CWA Section 404 authorization.  This is the case because denial of access to IPaC forces mandatory consultations with USFWS under Section 7 of the ESA, and the DOI Renewable Bottleneck Memorandum has shut the door on the Corps' ability to engage in ESA Section 7 consultations with USFWS with respect to wind and solar projects.

275.    Wind and solar developers have designed their projects and planned their construction activities, as well as attracted investments for particular projects, on the understanding that they would be able to use IPaC, including to help obtain NWP authorization in compliance with their obligations under CWA Section 404.

276.    In addition, the Wind and Solar IPaC Ban is arbitrary and capricious because its stated rationale played an insignificant role in the agency's decision-making process and was instead contrived to harm the wind and solar industries.  Based on the anti-renewable agenda articulated above, *supra ¶¶* 63–72, and the wholesale lack of cogent and evidence-based rationales for the Wind and Solar IPaC Ban, it is obvious that animus against wind and solar energy sources is the sole motivator for the Ban.  This action was therefore pretextual, in violation of the APA.

277.    The Wind and Solar IPaC Ban is also contrary to law because it violates Sections 7(a)(2) and (3) of the ESA.  These provisions require that "[e]ach Federal agency shall" conduct consultations on protected species "*with the assistance* of the Secretary [of the Interior]," 16 U.S.C. § 1536(a)(2) (emphasis added), and that such federal agencies "*shall consult with the Secretary on*

*any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant* if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species," *id.* § 1536(a)(3) (emphasis added).

278.    The Wind and Solar IPaC Ban blocks access to a vital ESA Section 7 consultation resource for one particular class of permit applications, with the DOI Renewable Bottleneck Memorandum blocking any other paths for this class of permit applications to go through the Section 7 consultation process, and so thus violates Congress' requirements that USFWS (a) "assist[]" the action agency during a Section 7 consultation, *id.* § 1536(a)(2), and (b) consult with the action agency on "any" agency action, *id.* § 1536(a)(3).

279.    The Wind and Solar IPaC Ban should be set aside.

**COUNT VI**
**Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701-706**
**The Zerzan/Jorjani Opinion Violates The APA**

280.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 279 above.

281.    The APA instructs courts to "hold unlawful and set aside" final agency actions that are, among other things, taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory . . . authority," *id.* § 706(2)(C).

282.    On May 1, 2025, DOI issued M-Opinion 37086, *i.e.*, the Zerzan/Jorjani Opinion. Ex. G (Zerzan/Jorjani Opinion).  The Zerzan/Jorjani Opinion is a final agency action.

283.    In the Zerzan/Jorjani Opinion, the Department of the Interior purported to reinstate the previously revoked Jorjani Opinion's interpretation of subsection 8(p)(4) of OCSLA, a

statutory provision that sets forth BOEM's standard of review for offshore wind COPs. The Zerzan/Jorjani Opinion constitutes the final step in DOI's decision-making process with respect to the interpretation and application of subsection 8(p)(4).

284.    The alteration of the legal status quo memorialized in the Zerzan/Jorjani Opinion will have significant, adverse legal consequences for offshore wind developers because it disregards BOEM's own regulations and hands it a cudgel to kill any and all new offshore wind farms and is currently being invoked to justify vacating or remanding existing COP approvals.

285.    The Zerzan/Jorjani Opinion violates the APA.

286.    First, the Zerzan/Jorjani Opinion is arbitrary and capricious because it fails to account for serious reliance interests.

287.    Wind and solar developers plan their projects and structure their businesses models in reliance on DOI's permitting statutes, which set forth clear processes that lead to final decisions. Offshore wind developers have spent billions of dollars to acquire leases at auction in reliance on the understanding that their COPs would be fairly reviewed according to a legal standard consistent with the requirements of OCSLA subsection 8(p)(4) and was not rigged to provide BOEM with a lever that it can pull at any time to disapprove any project.

288.    The Zerzan/Jorjani Opinion pulls the rug out from under these developers, making it effectively impossible for them to obtain permitting approval despite their significant investments. In addition, offshore wind developers whose projects have already been approved are at imminent risk of having their COP approvals rescinded as a result of the Zerzan/Jorjani Opinion, nullifying their significant investments in obtaining (and then relying upon) such approvals.

289.    The Zerzan/Jorjani Opinion is additionally arbitrary and capricious because its stated rationale played an insignificant role in the agency's decision making process and was instead contrived to harm the wind and solar industries.  Based on the anti-renewable agenda articulated above, *supra ¶¶* 63–72, and the wholesale lack of cogent and evidence-based rationales for the Zerzan/Jorjani Opinion, it is obvious that animus against wind and solar energy sources is the sole motivator for the Opinion.  This action was therefore pretextual, in violation of the APA.

290.    Second, the Zerzan/Jorjani Opinion is "not in accordance with law," 5 U.S.C. § 706(2)(A), because it conflicts with OCSLA subsection 8(p)(4)'s plain text.  Subsection 8(p)(4) provides that the Secretary "shall ensure that any activity under this subsection is carried out in a manner that provides for" 12 statutory criteria.  43 U.S.C. § 1337(p)(4).  This requires only that an activity account for each of the enumerated criteria, without mandating that any single criteria be achieved to any particular degree.  The Zerzan/Jorjani Opinion adopts a contrary, and erroneous, reading of subsection 8(p)(4), allowing the Secretary to reject an offshore wind project if he simply determines that the project would involve more than "*de minimis*" interference with other ocean activities, such as commercial fishing operations.  In purporting to adopt an extra-statutory "*de minimis*" standard, the Zerzan/Jorjani Opinion adds to OCSLA "something which is not there." *United States v. Calamaro*, 354 U.S. 351, 359 (1957).

291.    Moreover, the Opinion is contrary to law because DOI's adherence to and implementation of it operates as a functional ban on offshore wind approvals.  Congress has explained that the Outer Continental Shelf is a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3).  Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing DOI to grant leases to "produce or support production,

transportation, or transmission of energy for sources other than oil and gas," including offshore wind. 43 U.S.C. § 1337(p)(1)(C).   In expanding OCSLA to include offshore wind development, Congress sought to "enhance the energy security of the United States," to "decrease dependence on foreign sources of fuel," S. Rep. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rep. No. 109-190, at 1 (2005).

292.    But given that the Outer Continental Shelf is a venue for multiple uses (*e.g.*, commercial and recreational fishing, vessel transit, military exercises),[55] allowing BOEM to apply an impermissibly narrow *de minimis* interference standard constitutes an effective ban on new offshore wind projects—in violation of DOI's various statutory mandates to support offshore wind development.  And it is clear from the Administration's anti-renewable actions and rhetoric, as well as its implementation of the Opinion to vacate or remand existing COP approvals, that this is the Zerzan/Jorjani Opinion's goal.

293.    By instructing DOI's bureaus and offices to "reevaluate[ ]" "any" "Departmental action[s] taken in reliance" on the Anderson Opinion—including, for instance, leases, COP approvals, and permits—the Zerzan/Jorjani Opinion is also impermissibly retroactive and therefore contrary to law.  Ex. G (Zerzan/Jorjani Opinion) at 3.

294.    In fact, DOI has since determined that it will disturb several final COP approvals in reliance on the Zerzan/Jorjani Opinion's "reevaluat[ion]" directive.  It does so despite the fact that DOI has issued detailed memoranda accompanying COP approvals that specify how each

---

[55] A cursory review of the Marine Cadastre, a tool for ocean geospatial planning, makes clear the need to balance multiple uses of the ocean.  *See* Marine Cadastre, https://hub.marinecadastre.gov/.  And indeed, BOEM spends years doing just this as part of its offshore wind leasing and permitting process.  *See* Bureau of Ocean Energy Mgmt., Wind Energy Commercial Leasing Process, https://www.boem.gov/about-boem/re-commercial-leasing-process-fact-sheet.

enumerated OCSLA factor was addressed.[56]  The Opinion does not identify any authority that would permit the Secretary to act retroactively.

295.    Finally, the Zerzan/Jorjani Opinion violates the APA by purporting to modify existing DOI regulations without going through the notice and comment rulemaking process.  In 2024, DOI specifically amended 30 C.F.R. § 585.102(a) through notice and comment rulemaking, *see Renewable Energy Modernization Rule*, 88 Fed. Reg. 5968 (Jan. 30, 2023), to incorporate the Anderson Opinion's interpretation of subsection 8(p)(4), clarifying that BOEM should "reach[ ] a rational balance among" the 12 criteria set forth in subsection 8(p)(4) "to the extent they conflict or are otherwise in tension," and noting that no factor "inherently outweighs or supplants any other," *see* 30 C.F.R. § 585.102(a).

296.    The Zerzan/Jorjani Opinion rejects the balancing approach set forth in this regulatory provision and invites BOEM to instead deny COP approval if it determines that the project would create more than "*de minimis*" interference with other ocean activities and so is inconsistent with existing regulations codifying the Anderson Opinion.

297.    The Zerzan/Jorjani Opinion should be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and specifically provide the following:

1.    Declare that Defendants' adoption and implementation of the DOI Renewable Bottleneck Memorandum, the Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable

---

[56] *See, e.g.,* Bureau of Ocean Energy Mgmt., Record of Decision: Atlantic Shores Offshore South Project Construction and Operations Plan at Appendix B (July 1, 2024), https://www.boem.gov/renewable-energy/state-activities/asow-south-0499-rod.

Memorandum, the Eagle Take Permit Ban, the Wind and Solar IPaC Ban, and the Zerzan/Jorjani Opinion violate the APA, 5 U.S.C. § 706(2).

2.      Pursuant to 5 U.S.C. § 706(2), vacate and set aside the DOI Renewable Bottleneck Memorandum, the Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable Memorandum, the Eagle Take Permit Ban, the Wind and Solar IPaC Ban, and the Zerzan/Jorjani Opinion.

3.      Preliminarily and permanently enjoin, without bond, the Defendants from implementing or otherwise giving effect to the DOI Renewable Bottleneck Memorandum, the Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable Memorandum, the Eagle Take Permit Ban, the Wind and Solar IPaC Ban, and the Zerzan/Jorjani Opinion.

4.      Grant all other relief as the court may deem just and proper, including, but not limited to, attorney's fees and costs.

Dated: December 23, 2025.

Respectfully submitted,

BY: */s/ Daron L. Janis*
Daron L. Janis (BBO #703028)
TROUTMAN PEPPER LOCKE LLP
111 Huntington Ave., 9th Floor
Boston, MA 02199
(617) 239-0124
daron.janis@troutman.com

Misha Tseytlin (*pro hac vice to be filed*)
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr.
Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

M. Benjamin Cowan (*pro hac vice to be filed*)
TROUTMAN PEPPER LOCKE LLP
600 Travis Street, Suite 2800
Houston, TX 77002
(713) 226-1339
ben.cowan@troutman.com

Kaitlin O'Donnell (*pro hac vice to be filed*)
TROUTMAN PEPPER LOCKE LLP
1313 N. Market St., Suite 1000
Wilmington, DE 19801
(302) 777-6541
kaitlin.odonnell@troutman.com

Anais Jaccard (*pro hac vice to be filed*)
TROUTMAN PEPPER LOCKE LLP
301 S. College St, 34th Floor
Charlotte, NC 28202
(704) 916-1506
anais.jaccard@troutman.com