# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| RENEW NORTHEAST, *et al*, | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 1:25-cv-13961 |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*, | |
| *Defendants*. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

    A.  Wind And Solar Energy Provide Critical Benefits For The Public ............................ 2

    B.  Defendant Agencies' Recent Attacks On Wind And Solar Energy ............................ 4

        1.  DOI Renewable Bottleneck Memorandum .................................................. 5

        2.  Federal Lands Anti-Renewable Order ...................................................... 7

        3.  Corps' Anti-Renewable Memorandum ...................................................... 9

        4.  The Eagle Take Permit Ban ................................................................. 11

        5.  Wind and Solar IPaC Ban ................................................................... 13

        6.  The Zerzan/Jorjani Opinion ................................................................. 15

ARGUMENT ..................................................................................................... 17

  I.  Plaintiffs Are Likely To Succeed On The Merits .......................................... 18

    A.  Applicable Legal Standards To Challenges Brought Under The APA .................... 18

    B.  Each Of The Challenged Agency Actions Is Unlawful .................................... 19

        1.  The Bottleneck Memorandum ............................................................... 19

        2.  Federal Lands Anti-Renewable Order ...................................................... 24

        3.  The Corps' Anti-Renewable Memorandum ................................................ 28

        4.  The Eagle Take Permit Ban ................................................................. 32

        5.  The Wind and Solar IPaC Ban .............................................................. 35

        6.  The Zerzan/Jorjani Opinion ................................................................. 37

  II.  Plaintiffs And Their Members Will Suffer Irreparable Harm In The Absence Of A Preliminary Injunction ....................................................................... 41

  III.  The Balance Of The Equities And Public Interest Favor Preliminary Injunctive Relief ................................................................................................ 48

CONCLUSION ................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**

*Agatha v. Trump,*
 151 F.4th 9 (1st Cir. 2025) ........................................................................ 18

*Am. Assoc. of Univ. Prof. v. Rubio,*
 780 F. Supp. 3d 350 (D. Mass. 2025) ........................................................ 46

*Arkema Inc. v. EPA,*
 618 F.3d 1 (D.C. Cir. 2010) ...................................................................... 40

*Bennett v. Spear,*
 520 U.S. 154 (1997) ......................................................................... *passim*

*Craker v. U.S. Drug Enf't Agency,*
 44 F.4th 48 (1st Cir. 2022) ........................................................................ 19

*Decker v. Nw. Env't Defense Ctr.,*
 568 U.S. 597 (2013) .................................................................................. 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
 591 U.S. 1 (2020) ................................................................................. 22, 26

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,*
 653 F.3d 1 (D.C. Cir. 2011) ...................................................................... 24

*Encino Motorcars, LLC v. Navarro,*
 579 U.S. 211 (2016) ..................................................................... 19, 22, 26

*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) ......................................................................... *passim*

*FCC v. Prometheus Radio Proj.,*
 592 U.S. 414 (2021) .................................................................................. 18

*FDA v. Wages & White Lion Invs., LLC,*
 604 U.S. 542 (2025) .................................................................................. 18

*Friends of Animals v. Haaland,*
 997 F.3d 1010 (9th Cir. 2021) .................................................................. 19

*Grunbeck v. Dime Sav. Bank of N.Y., FSB,*
 74 F.3d 331 (1st Cir. 1996) ...................................................................... 19

*Health Ins. Ass'n of Am., Inc. v. Shalala,*
 23 F.3d 412 (D.C. Cir. 1994) .................................................................... 40

*Invenergy Renewables LLC v. United States*,
    422 F. Supp. 3d 1255 (U.S. Ct. Int'l Trade 2019) ................................................. 49

*Lafortune v. Garland*,
    110 F.4th 426 (1st Cir. 2024) ................................................. 19, 33, 36

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................. 48, 50

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La 2022) ................................................. 15

*Maceira v. Pagan*,
    649 F.2d 8 (1st Cir. 1981) ................................................. 46

*N.H. Indonesian Cmty. Support v. Trump*,
    765 F. Supp. 3d 102 (D.N.H. 2025) ................................................. 50

*New York v. Trump*,
    No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ................................................. *passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................. 17

*Ohio v. EPA*,
    603 U.S. 279 (2024) ................................................. 41, 43

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................. 19

*Revolution Wind, LLC v. Burgum*,
    1:25-cv-02999-RCL (D.D.C. Sep. 22, 2025) ................................................. 5

*Seafreeze Shoreside v. U.S. Department of the Interior*,
    123 F.4th 1 (1st Cir. 2024) ................................................. 16, 39

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
    605 U.S. 168 (2025) ................................................. 8, 27

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ................................................. *passim*

*Sig Sauer, Inc. v. Brandon*,
    826 F.3d 598 (1st Cir. 2016) ................................................. 18

*Thompson v. Barr*,
    959 F.3d 476 (1st Cir. 2020) ................................................. 18, 22, 36, 37

*Trump v. CASA*,
    606 U.S. 831 (2025)..................................................................................18

*United States v. Calamaro*,
    354 U.S. 351 (1957)..................................................................................39

*Watt v. Energy Action Educ. Found.*,
    454 U.S. 151 (1981)..................................................................................39

*Weststar Energy, Inc. v. FERC*,
    473 F.3d 1239 (D.C. Cir. 2007)...............................................................36

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)......................................................................17, 41, 48

**Statutes**

5 U.S.C. § 555 ...............................................................................................5

5 U.S.C. § 558 ....................................................................................5, 22, 23

5 U.S.C. § 702 ..........................................................................24, 29, 32, 35

5 U.S.C. § 705 .............................................................................................18

5 U.S.C. § 706 .......................................................................................*passim*

16 U.S.C. § 668 ...........................................................................................12

16 U.S.C. § 668a .........................................................................................12

16 U.S.C. §1531 ..........................................................................................14

16 U.S.C. § 1536 .............................................................................14, 23, 37

16 U.S.C. § 1539 .........................................................................................14

33 U.S.C. § 1344 ...............................................................................9, 14, 30, 31

33 U.S.C. § 403 .............................................................................................9

42 U.S.C. § 4332 ...........................................................................................8

42 U.S.C. § 4370m .......................................................................................23

42 U.S.C. § 4370m-2 ...................................................................................23

43 U.S.C. § 1332..................................................................................*passim*

43 U.S.C. § 1337 ............................................................................................... *passim*

43 U.S.C. § 1701 ................................................................................................ 7, 27

43 U.S.C. § 1702 ................................................................................................ 7, 27

43 U.S.C. § 3002 .............................................................................................. 23, 27

43 U.S.C. § 3004 ................................................................................................... 27

American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, 123 Stat. 115
(Feb. 17, 2009) ...................................................................................................... 4

Consolidated Appropriations Act of 2021, Pub. L. 116-260, 134 Stat. 1182
(Dec. 27, 2020) ...................................................................................................... 4

Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, 122 Stat. 3765
(Oct. 3, 2008) ........................................................................................................ 4

Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492
(Dec. 19, 2007) ...................................................................................................... 4

Energy Policy Act of 2005, Pub. L. 109-59, 119 Stat. 594
(Aug. 8, 2005) ....................................................................................................... 4

Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818
(Aug. 16, 2022) ..................................................................................................... 4

Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429
(Nov. 15, 2021) ..................................................................................................... 4

**Rules And Regulations**

Adam Telle, *U.S. Army Corps of Engineers re: Direction on Reviewing Permit Applications Related to Energy Generation Projects, Department of the Army*, Army Corps of Eng'rs, Office of the Sec'y (Sep. 18, 2025) ................................................................ *passim*

Dep't of the Interior, M-37086, *Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059* at 3 (May 1, 2025) ..................................................... 15, 16, 17

*Eagle Permits; Revisions to Regulations for Eagle Incidental Take and Take of Eagle Nests*, 81 Fed. Reg. 91494 (Dec. 16, 2016) ...................................................................... 34

Gregory Wischer, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities*, Dep't of the Interior, Office of the Sec'y (July 15, 2025) ................................................. *passim*

Gregory Wisher, *Ensuring Compliance with the Bald and Golden Eagle Protection Act and Executive Order 14315*, Dep't of the Interior, Office of the Sec'y (Aug. 4, 2025) ................. 11

v

*IPaC Information for Planning and Consultation*, U.S. Fish & Wildlife Serv. ..................... 13, 35

*Permits for Incidental Take of Eagle and Eagle Nests*,
89 Fed. Reg. 9920, 9930 (Feb. 12, 2024) ................................................................. 12, 33, 34

*Renewable Energy Modernization Rule*, 89 Fed. Reg. 42602 (May 15, 2024) ............... 16, 25, 41

*Rights-of-Way, Leasing, and Operations for Renewable Energy*,
89 Fed. Reg. 35634 (May 1, 2024) ........................................................................................ 25

Sec'y of Interior, *Secretarial Order 3438, Managing Federal Energy Resources and
Protecting the Environment* (Aug. 1, 2025) ................................................................... *passim*

*Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing
and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*,
90 Fed. Reg. 8363 (Jan. 20, 2025) ..................................................................................... 4, 21

30 C.F.R. § 585.102 ........................................................................................................... 16, 40

30 C.F.R. § 585.621 ................................................................................................................. 41

33 C.F.R. § 320.1 .................................................................................................................... 31

33 C.F.R. § 320.4 ........................................................................................................... 10, 31, 32

33 C.F.R. § 323.6 .................................................................................................................... 31

33 C.F.R. § 325.2 .................................................................................................................... 31

33 C.F.R. § 330.4 .................................................................................................................... 14

40 C.F.R. § 230.10 .................................................................................................................. 10

50 C.F.R. § 22.250 .................................................................................................................. 34

50 C.F.R. § 22.260 .................................................................................................................. 12

50 C.F.R. § 22.280 .................................................................................................................. 12

## Constitutional Provisions

U.S. Const. art. IV, § 3, cl. 2 ...................................................................................................... 7

## Other Authorities

2017 Program Delegations Handbook, Bureau of Ocean Energy Mgmt. (Feb. 7, 2017) ............... 6

3-200-71: Eagle Incidental Take (General Permit), U.S. Fish & Wildlife Serv. ............. 11, 12, 32

Am. Clean Power Ass'n, Clean Power Annual Market Report 2024 (2024) ................................ 3

Am. Clean Power Ass'n, Snapshot of Clean Power in 2024 (2024) ............................................ 3

*Annual Energy Outlook 2025*, Energy Info. Admin. (Apr. 15, 2025) ........................................... 2

*Army Corps of Engineers Begins Implementing Policy To Increase America's Energy Generation Efficiency*, Army Corps. Of Engineers (Sep. 22, 2025) ......................................... 9

*Biden-Harris Administration Delivers Historic Milestones, New Actions for Clean Energy on Public Lands*, Dep't of the Interior (Apr. 11, 2024) .................................................................. 4

BLM, Wind Energy .................................................................................................................. 26

Dep't of the Interior, 516 DM 1 ................................................................................................ 26

Dep't of the Interior, M-37067, *Secretary's Duties Under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf* (Apr. 9, 2021) ........................................................................................................................... 16

Dep't of the Interior, M-37059, *Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf* (Dec. 14, 2020) ............................................................................... 16

Departmental Manual, 135 DM 14, Dep't of the Interior .......................................................... 6

Departmental Manual, 218 DM 1, Dep't of the Interior...................................................... 6, 16

Departmental Manual, 235 DM 1, Dep't of the Interior ............................................................ 6

Electric Power Monthly, Energy Info. Admin. (Nov. 2025) ........................................................ 3

EO 14156, Declaring a National Energy Emergency (Jan. 20, 2025) ......................................... 20

*Fact Sheet: Diversifying Our Energy Supply and Confronting Climate Change*, White House (Dec. 15, 2008) ...................................................................................................................... 4

*Fact Sheet: The Recovery Act Made the Largest Single Investment in Clean Energy in History*, Obama White House Archives (Feb. 25, 2016)....................................................................... 4

Hannah Ritchie, *How does the land use of different electricity sources compare?*, Our World In Data (June 16, 2022).............................................................................................................. 8

H.R. Rep. No. 109-90 (2005)..................................................................................................... 39

Nat'l Renewable Energy Lab., Renewable Energy to Support Energy Security (Oct. 2019) ........ 3

Officer of the Solicitor, Dep't of the Interior, *Mem. Subject: M-Opinion Review* (2025)............ 38

S. Rep. No. 109-78 (2005) ................................................................................................ 39

SO 3417, Addressing the National Energy Emergency, U.S. DOI (Feb. 3, 2025) ..................... 21

SO 3418, Unleashing American Energy, U.S. DOI (Feb. 3, 2025) ............................................ 21

Solar Energy Indus. Ass'n & Wood Mackenzie, U.S. Solar Market Insight Q1 2025 .................. 3

U.S. Dep't of Energy, Grid Resilience and Innovation Partnerships (GRIP) Program 2025 Overview ........................................................................................................................... 3

U.S. Dep't of Interior, BOEM, Record of Decision: Atlantic Shores Offshore Wind South Project Construction and Operations Plan (July 1, 2024) .................................................... 40

## INTRODUCTION

At a time when electricity demand and electricity prices continue to rise and strain the pocketbooks of average Americans, certain federal agencies are pursuing a concerted, unlawful strategy to choke private developers' ability to build new and necessary energy generation projects. Wind and solar are affordable forms of energy that can be rapidly deployed on private or public lands to meet the nation's growing energy demand, reduce energy costs for consumers, and add needed diversity to the country's electrical grid. That is why Congress has long supported developing wind and solar technologies alongside traditional energy sources. But recently, multiple federal agencies have unleashed a barrage of adverse actions, contrary to Congress's directives, aimed at destroying solar and wind energy. These actions arbitrarily disfavor wind and solar technologies in comparison to other energy sources and alter longstanding agency processes and legal determinations in a manner that stifles the permitting and construction of wind and solar facilities on both private and public lands. If allowed to stand, these actions will have catastrophic consequences for the energy industry, electricity customers, and the nation's electrical grid.

This lawsuit challenges six final agency actions (collectively, the "Anti-Renewable Actions") that place wind and solar technologies into second-class status—including subjecting agency decisions only for these sources of energy to senior review, irrationally gerrymandering permitting criteria to disfavor these sources systematically, and banning only developers of these sources from using necessary government tools for the permitting process. The Actions provide no valid justification for such disparate treatment, and each violates an array of statutes and regulations as described below. The Actions have caused and will continue to cause irreparable harm to the members of Plaintiff regional organizations, who are wind and solar energy developers and participants in the extensive wind and solar supply chain, and to Plaintiff Green Energy Consumer Alliance, Inc. ("GECA"), which sells renewable energy certificates ("RECs") to

consumers and municipalities. The Actions have halted the pipeline for new wind and solar projects that require federal permits and undermined existing project authorizations, resulting in project delays and cancellations that have in turn caused—and, if not enjoined, with continue to cause—billions of dollars in increased project costs, lost investments and revenues, breached contracts, and unrecoverable expenditures. Every day that the Anti-Renewable Actions remain in place is a day that hundreds of utility-scale wind and solar projects at various stages of the permitting process cannot move forward, while operating projects risk being unnecessarily shut down. And everyone loses: not just the developers, suppliers, and their organizations, but also the homes and business that now face higher prices, increased volatility, and diminished grid reliability.

This Court should grant this Motion and enjoin Defendants from enforcing each of the Anti-Renewable Actions pending resolution of the merits of Plaintiffs' claims.

## BACKGROUND

### A. Wind And Solar Energy Provide Critical Benefits For The Public

Wind and solar energy are two of the nation's fastest-growing, lowest-cost, and most easily deployable energy sources, which are necessary to support the nation's growing energy demand.[1] Wind and solar technologies have the lowest levelized cost of new electricity generation and the fastest deployment timelines among all large-scale generation sources.[2] The wind and solar industries also support hundreds of thousands of American jobs and attract tens of billions of

---

[1] *See Annual Energy Outlook 2025*, Energy Info. Admin. (Apr. 15, 2025), https://www.eia.gov/outlooks/aeo/ (all websites last visited Jan. 12, 2026).

[2] *Id.*

dollars in annual investment.[3]  Utility-scale solar and onshore wind now account for nearly 20% of total U.S. electricity generation, and analysts consistently identify these sources as the most cost-effective options for new capacity additions.[4]  Ninety-three percent of new energy capacity that came online in 2024 was solar, wind, or battery storage—up from an average of 75% over the previous five years.[5]

Wind and solar facilities are essential to long-term grid reliability because they diversify generation sources, reduce system vulnerability to single-fuel disruptions, and provide critical flexibility—enabling rapid ramping, frequency regulation, and voltage support.[6]  Declaration of Michael Goggin ("Goggin Dec.") ¶¶ 9–17 (attached as Ex. L).  Wind and solar technologies also help relieve congestion, lower peak demand, and bolster resilience against extreme weather events,[7] while protecting national security by reducing reliance on volatile global thermal energy markets.[8]

Both Congress and the Executive Branch have long supported developing wind and solar technologies alongside traditional energy sources.  For over 20 years, Congress has made it the nation's policy to support renewable energy research, development, demonstration, and

---

[3]  *See* Am. Clean Power Ass'n, Clean Power Annual Market Report 2024 (2024), https://cleanpower.org/resources/market-report-2024; Solar Energy Indus. Ass'n & Wood Mackenzie, U.S. Solar Market Insight Q1 2025.

[4] Electric Power Monthly, Energy Info. Admin. (Nov. 2025), https://www.eia.gov/electricity/monthly/.

[5]  *See* Am. Clean Power Ass'n, Snapshot of Clean Power in 2024 (2024), https://cleanpower.org/resources/clean-power-annual-market-report-2024-snapshot.

[6] *See* Nat'l Renewable Energy Lab., Renewable Energy to Support Energy Security 2–3 (Oct. 2019), https://docs.nrel.gov/docs/fy20osti/74617.pdf.

[7] U.S. Dep't of Energy, Grid Resilience and Innovation Partnerships (GRIP) Program 2025 Overview, https://www.energy.gov/gdo/grid-resilience-and-innovation-partnerships-grip-program-projects.

[8] Nat'l Renewable Energy Lab., *supra* n.6, at 1–4.

deployment.[9]  President George W. Bush signed EPAct 2005 into law and touted a more than 400%

increase in wind energy generation and 32% increase in solar between 2001 and 2007.[10]  President

Barack Obama initiated several programs to drive the manufacturing and deployment of renewable

energy technologies.[11]  President Donald Trump's first administration was "very bullish" on wind

energy, with President Trump signing multiple laws supporting the expeditious development of

renewables on public lands.[12]  President Joseph Biden enacted similar policies.[13]

### B.  Defendant Agencies' Recent Attacks On Wind And Solar Energy

On January 20, 2025, the White House issued a presidential memorandum that withdrew

all unleased areas of the Outer Continental Shelf from future wind energy leasing, indefinitely

froze all federal permitting for onshore and offshore wind projects and gave the Attorney General

discretion to delay pending wind litigation during the pendency of a comprehensive evaluation of

such technologies (the "Wind Memorandum").[14]  A coalition of plaintiffs challenged the Wind

---

[9] *See, e.g.*, Energy Policy Act of 2005, Pub. L. 109-59, 119 Stat. 594 (Aug. 8, 2005); Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492 (Dec. 19, 2007); Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, 122 Stat. 3765 (Oct. 3, 2008); American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, 123 Stat. 115 (Feb. 17, 2009); Consolidated Appropriations Act of 2021, Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020); Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429 (Nov. 15, 2021); Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818 (Aug. 16, 2022).

[10] *See Fact Sheet: Diversifying Our Energy Supply and Confronting Climate Change*, White House (Dec. 15, 2008), https://perma.cc/3HEV-7WYV.

[11] *See Fact Sheet: The Recovery Act Made the Largest Single Investment in Clean Energy in History*, Obama White House Archives (Feb. 25, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/02/25/fact-sheet-recovery-act-made-largest-single-investment-clean-energy.

[12] Consolidated Appropriations Act of 2021, Division Z § 3012, Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020) (codified at 43 USC § 3002); *see also Trump Administration Accomplishment*, Trump White House Archives (Jan. 2020), https://trumpwhitehouse.archives.gov/trump-administration-accomplishments.

[13] *See, e.g.*, *Biden-Harris Administration Delivers Historic Milestones, New Actions for Clean Energy on Public Lands*, Dep't of the Interior (Apr. 11, 2024), https://www.doi.gov/pressreleases/biden-harris-administration-delivers-historic-milestones-new-actions-clean-energy.

[14] *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 20, 2025). Agencies have used the Wind Memorandum to justify an array of anti-wind actions, including "stop-work" orders against two offshore wind projects in various stages of construction.  The former order was lifted unilaterally without explanation, while the latter order was found to be arbitrary and capricious by the U.S. District Court for the

Memorandum's implementation by federal agencies in federal district court, and the court recently vacated the permitting freeze. *See New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025). The court held that the agencies' adoption and implementation of the Wind Memorandum's permitting ban was final agency action as a "*de facto* suspension of the law" that "altered the legal status quo," *id.* at *8–9; was arbitrary and capricious due to a complete failure to explain the Administration's dramatic change in policy and account for wind developers' reliance interests, *id.* at *13–15; and contrary to law, including 5 U.S.C. §§ 555(b) and 558(c).

The now-vacated Wind Memorandum was only one part of the Administration's war on wind and solar energy, as detailed in the Amended Complaint. *See* Am. Compl. ¶¶ 65–73. This lawsuit focuses on six final agency actions that systematically disfavor wind and solar technologies in comparison to conventional energy sources, and illegally attempt to pick winners and losers in a manner that Congress did not authorize.

### 1. DOI Renewable Bottleneck Memorandum

On July 15, 2025, Deputy Chief of Staff Gregory Wischer issued a memorandum that departs from prior agency policy by requiring virtually every step in the wind and solar permitting process to be reviewed by three of DOI's most senior political offices (the "DOI Renewable Bottleneck Memorandum"). *See* Gregory Wischer, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities*, Dep't of the Interior, Office of the Sec'y (July 15, 2025) (attached as Ex. A).[15]

---

District of Columbia, *see Revolution Wind, LLC v. Burgum*, 1:25-cv-02999-RCL (D.D.C. Sep. 22, 2025) (ECF No. 36).

[15] Available at https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other.

The Memorandum mandates that "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities shall require" review by the Office of the Executive Secretariat and Regulatory Affairs; the Office of the Executive Secretariat and Regulatory Affairs, and the Office of the Secretary. Ex. A at 1. It then enumerates 68 "decisions, actions, consultations, and other undertakings" relating to wind and solar projects—such as construction and operation plans ("COPs"), onshore rights-of-way, mitigation plans, and notices to proceed—and a catch-all for "any other similar or related decisions, actions, consultations, or undertakings" that are subject to this new, burdensome review. *Id.* at 1–2. The Memorandum requires *virtually every single step* of the wind and solar permitting process within DOI's jurisdiction to be reviewed and approved by three levels of senior DOI leadership before the action can proceed. No other type of activity reviewed by DOI—energy development or otherwise—requires this type of process. The Memorandum significantly departs from prior agency policy, pursuant to which these individual decisions were delegated to the directors of individual bureaus and then re-delegated to individual career-level staff members.[16]

By subjecting virtually every step of DOI's wind and solar permitting processes to review by the offices of its most senior political appointees, the Memorandum creates insurmountable bottlenecks designed to freeze wind and solar applications and deter developers from advancing permit applications in the first place because any attempt to do so would be futile. *See* Ex. A at 1;

---

[16] *See, e.g.*, Departmental Manual, 218 DM 1, Dep't of the Interior (Sep. 14, 2022) (delegating development of energy on the Outer Continental Shelf to the BOEM Director), https://www.doi.gov/document-library/departmental-manual/218-dm-1-general-program-authority-outer-continental-shelf-0; 2017 Program Delegations Handbook, Bureau of Ocean Energy Mgmt. (Feb. 7, 2017) (re-delegating BOEM Director's authority)., https://www.boem.gov/sites/default/files/documents/about-boem/BOEMM-218.2-H-Program-Delegations-Handbook.pdf; Departmental Manual, 235 DM 1, Dep't of the Interior (delegating energy development on federal lands to the BLM Director), https://www.doi.gov/document-library/departmental-manual/235-dm-1-general-program-delegation-director-bureau-land; Departmental Manual, 135 DM 14, Dep't of the Interior, https://www.doi.gov/document-library/departmental-manual/135-dm-14-regional-and-field-organization#:~:text=14.4%20Field%20Offices%20(FOs).,inventorying%20and%20monitoring%20resource%20conditions.

Joint Declaration of Clean Energy Plaintiffs' Executive Directors in Support of Motion for Preliminary Injunction ("Joint Dec.") ¶¶ 33–45; 52–237 (attached as Ex. H).  Indeed, solar and wind projects have ground to a halt since the Memorandum was issued.  *Id.* ¶¶ 53–54.

### 2.  Federal Lands Anti-Renewable Order

On August 1, 2025, Secretary Burgum issued a Secretarial Order that gerrymanders DOI's permitting analysis to deny wind and solar construction permits for projects on federal lands and in federal waters, in favor of non-renewable energy sources ("Federal Lands Anti-Renewable Order").  *See* Sec'y of Interior, *Secretarial Order 3438, Managing Federal Energy Resources and Protecting the Environment* (Aug. 1, 2025) (attached as Ex. B).[17]

The Federal Land Policy and Management Act ("FLPMA") and the Outer Continental Shelf Lands Act ("OCSLA") authorize DOI to issue permits for renewable energy projects on federal lands and in federal waters.[18]  FLPMA requires DOI to, as relevant, manage public lands "on the basis of multiple use," 43 U.S.C. § 1701(a)(7), which ensures a "combination of balanced and diverse resource uses" "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."  *Id.* § 1702(c).  OCSLA specifies that the Outer Continental Shelf "should be made available for expeditious and orderly development, subject to environmental safeguards," *id.* § 1332(3), and authorizes DOI to permit activities on the Outer Continental Shelf that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas," including offshore wind, *id.* § 1337(p)(1)(C).

---

[17]  Available at https://www.doi.gov/document-library/secretary-order/so-3438-managing-federal-energy-resources-and-protecting.

[18]  DOI's authority over public lands ultimately derives from the Property Clause of the United States Constitution, U.S. Const. art. IV, § 3, cl. 2.

When reviewing a permit application under FLPMA or OCSLA, DOI must perform a review of environmental impacts under the National Environmental Policy Act ("NEPA"). NEPA requires all major federal permitting decision to analyze "a reasonable range of alternatives" that are "technically and economically feasible and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(iii). As a "purely procedural statute," NEPA "does not mandate particular results, but prescribes the necessary process" for an agency's environmental review of a project. *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 169 (2025) (citation omitted).

The Federal Lands Anti-Renewable Order establishes "capacity density" as the determinative consideration in DOI's NEPA analysis and then directs DOI to deny permits to wind and solar projects if the agency determines that there is a more "appropriate" (*i.e.*, more capacity dense) use for the land. Ex. B at 1–3. The Order instructs the agency to "optimize" land use "by considering . . . a reasonable range of alternatives that includes projects with capacity densities meeting or exceeding that of the proposed project." *Id.* at 1. It defines "capacity density" as the "generation capacity of an energy project multiplied by its projected capacity factor, the product of which is then divided by the total acres of the project area." *Id.* at 2. Wind and solar projects are inherently less "capacity dens[e]" than nuclear or thermal energy generation since wind turbines and solar panels must be spread out to most effectively capture their respective renewable energy resources.[19] So, by declaring that projects with higher capacity densities presumptively constitute the best use of federal lands, and requiring that the agency "only permit" projects that

---

[19] *See* Hannah Ritchie, *How does the land use of different electricity sources compare?*, Our World In Data (June 16, 2022), https://ourworldindata.org/land-use-per-energy-source#:~:text=There%20are%20several%20reasons%20for,8%20m2%20per%20MWh.

"are the most appropriate land use" as compared to a "reasonable range of project alternatives," *id.* at 3, the Order categorically disfavors wind and solar technologies.[20]

By requiring DOI to deny permits to wind and solar projects if it determines that there is a more capacity dense "land use," *id.*, the Order inflicts significant and immediate harm on the wind and solar industries—and on specific members of Plaintiffs—by creating an arbitrary and insurmountable barrier to project approval.  Joint Dec. ¶¶ 33–45; 238–319.

### 3.  Corps' Anti-Renewable Memorandum

On September 18, 2025, Assistant Secretary of the Army for Civil Works Adam Telle issued a memorandum that, like the Federal Lands Anti-Renewable Order, imposes the capacity density metric onto the Corps' permitting processes while deprioritizing wind and solar permit applications ("Corps' Anti-Renewable Memorandum").  Adam Telle, *U.S. Army Corps of Engineers re: Direction on Reviewing Permit Applications Related to Energy Generation Projects, Department of the Army*, Army Corps of Eng'rs, Office of the Sec'y (Sep. 18, 2025) (attached as Ex. C).[21]

Section 404 of the CWA requires a developer to obtain a permit from the Corps if the proposed construction involves the discharge of dredged or fill materials into jurisdictional waters of the United States.  33 U.S.C. § 1344.  Section 10 of the RHA requires developers to obtain Corps permits for construction in navigable waters of the United States.  *Id.* § 403.  To grant a permit, the Corps must conduct a "public interest" review, considering "all factors which may be relevant to the proposal" and balancing the "benefits which reasonably may be expected to accrue

---

[20] It is clear from the Order's face that that the agency designed this Order to target wind and solar energy. The Order openly questions "whether the use of Federal lands for any wind and solar projects is consistent with the law, given these projects' encumbrance on other land uses, as well as their disproportionate land use when reasonable project alternatives with higher capacity densities are technically and economically feasible."  Ex. B at 1.

[21] The Corps has not made this order available on its website, instead only announcing it in a press release. *See Army Corps of Engineers Begins Implementing Policy To Increase America's Energy Generation Efficiency*, Army Corps. Of Engineers (Sep. 22, 2025), https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/4311128/army-corps-of-engineers-begins-implementing-policy-to-increase-americas-energy/.

from the proposal . . . against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a). Where there are "unresolved conflicts as to resource use," the Corps must consider "the practicability of using reasonable alternative locations and methods to accomplish the objective" of the proposed project. *Id.* § 320.4(a)(2)(ii). "Practicable alternatives" are those that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes," 40 C.F.R. § 230.10(a)(2), and with limited exceptions, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." *Id.* § 230.10(a).

The Corps' Anti-Renewable Memorandum requires the Corps to consider, as part of its "public interest" review for individual CWA permits and RHA permits, an energy generation project's "annual potential energy generation per acre"—that is, its capacity density. *See* Ex. C at 2.[22] The Memorandum directs the agency to "consider whether an alternative energy generation source can deliver the same amount" of energy generation with less impact to aquatic resources, *id.*, a transparent direction to disapprove less "capacity dense" proposals under 40 C.F.R. § 230.10(a). The agency must "prioritize processing . . . applications related to projects that would generate the most annual energy generation per acre over projects with low generation per acre," Ex. C at 2, meaning the Corps must now *deprioritize* wind and solar projects that supposedly have low capacity densities. None of these requirements are contained in the CWA, the RHA, or the Corps' implementing regulations. And as explained above, wind and solar projects inherently have lower capacity density than other types of energy generation. *Supra* p.8.

---

[22] The Corps' Anti-Renewable Memorandum also requires consideration of whether an energy project "displace[s] other more reliable energy sources, and whether the activities related to the projects denigrate the beauty of the Nation's natural landscape." *Id.* This is presumably intended as another thumb on the scale against wind and solar, although wind and solar energy unequivocally *enhance* grid reliability. *See* Goggin Dec. "Beauty" is an arbitrary metric, although the Corps' intent is clear enough.

The Memorandum will cause substantial permitting delays for wind and solar projects that require Corps' permits because the Corps' new focus on and prioritization of purportedly "capacity dense" projects ensures these projects will never obtain them.[23]   The Memorandum will at minimum force many costly project redesigns or cause delay and uncertainty that threatens construction timelines and options for suppliers and contractors, resulting in contract penalties, cost hikes, and deferred revenue—while other projects may never get their Corps individual permits and thus will need to be canceled altogether.  *See* Joint Dec. ¶¶ 33–45; 320–38.

### 4.  The Eagle Take Permit Ban

On or about January 20, 2025, USFWS announced that it was "temporarily ceasing issuance" of eagle incidental take permits to wind energy facilities under the Bald and Golden Eagle Protection Act ("BGEPA") "until further notice," and "will no longer automatically issue general permits" (the "Eagle Take Permit Ban").  *See* 3-200-71: Eagle Incidental Take (General Permit), U.S. Fish & Wildlife Serv. (navigate to "Notice To Applicants") (screenshot captured on December 23, 2025 attached as Ex. D).  Although USFWS removed this language from its website at some point after Plaintiffs filed their initial Complaint,[24] the Ban remains in place.  *See infra* p.32.  The harms from the Ban have recently crystalized because DOI has directed USFWS to target wind energy projects with increased BGEPA enforcement—including against operating wind projects that do not have the very permits it categorically refuses to issue.[25]

---

[23] While the Corps' Anti-Renewable Memorandum is drafted to only apply to individual Section 404 permits, the accompanying press release makes no such distinction.  To the extent the Corps is applying this Memorandum more broadly to prejudice any type of Section 404 permit, it is causing harm to an even larger number of wind and solar projects.

[24] Available at https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit.

[25] *See* Gregory Wisher, *Ensuring Compliance with the Bald and Golden Eagle Protection Act and Executive Order 14315*, Dep't of the Interior, Office of the Sec'y (Aug. 4, 2025) (attached as Ex. E).  This document was announced on X, *see* Secretary Burgum (@SecretaryBurgum), X (Aug. 4, 2025 at 6:46 PM EST), https://x.com/SecretaryBurgum/status/1952501870393786822, but has still not been posted to the agency website.

BGEPA generally prohibits the "take" of bald and golden eagles and imposes substantial, escalating penalties for violations of the statute, 16 U.S.C. § 668, but authorizes USFWS to "permit the taking" of such eagles upon a "determination that it is compatible with the preservation of the bald eagle," *id.* § 668a.  In 2024, after a years-long rulemaking process, DOI issued revised regulations governing the issuance of permits for incidental take of eagles.[26]  The revised eagle take permit rules made available for the first time general permits authorizing incidental take of bald and golden eagles by, among other activities and types of infrastructure, wind energy projects located in areas designated as having a low risk of eagle take.[27]  The rulemaking also authorized general permits for transmission lines, timber harvesting, and building construction, among others.  50 C.F.R. §§ 22.260, 22.280.  Those regulations remain in place today.

Despite recognizing that regulated entities "need" these permits to avoid criminal and civil liability in the event of incidental take, the Eagle Take Permit Ban immediately and indefinitely prohibits wind facilities from obtaining general or specific eagle incidental take permits, without limiting the ability of any other types of projects and activities to obtain such permits.  Ex. D.  Rather than provide any reasoning to support its decision, USFWS simply noted that its decision was made "pursuant to" the Wind Memorandum.  *Id.*  USFWS's adoption of the Wind Memorandum was just vacated in federal court, *New York*, 2025 WL 3514301, but as noted above, USFWS has not resumed issuing such permits for wind.

While the Ban is problematic in its own right, it has become dire for Plaintiffs' members because USFWS recently directed the agency to review wind energy projects' compliance with

---

[26] *Permits for Incidental Take of Eagle and Eagle Nests*, 89 Fed. Reg. 9920, 9928 (Feb. 12, 2024).

[27] The "incidental take" of a bald or golden eagle "means the species is harmed, harassed, killed, etc. as a foreseeable byproduct of an activity where the take is not the primary intent but may happen incidentally."  *See* 3-200-71: Eagle Incidental Take (General Permit), U.S. Fish & Wildlife Serv., https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit.

BGEPA general permits and to "refer violations of [BGEPA] to the Solicitor's Office for its review and, where appropriate, referral to the U.S. Department of Justice for criminal and/or civil penalties under 16 U.S.C. § 668." *See* Ex. E at 1. Consistent with its newly aggressive enforcement approach, in September 2025, USFWS issued records requests for numerous wind projects with a BGEPA permit, Joint Dec. ¶ 345, and has begun bringing enforcement actions against operating wind projects that lack permits—while refusing to issue those same permits, *id.* ¶ 346.

This creates a Catch-22 for wind farm developers and operators. Wind farm operators that do not currently have BGEPA permits must choose whether to operate the facility consistent with contractual requirements but without a permit (often while implementing prohibitively expensive and unnecessary mitigations) and risk incurring criminal and civil liability under BGEPA, or curtail operations (reducing generation of much-needed electricity and associated revenues and risking failing to meet contractual obligations to their power purchasers). Joint Dec. ¶¶ 347–52.

### 5. Wind and Solar IPaC Ban

On or around July 15, 2025, USFWS announced its final decision to deny solar and wind developers access to its IPaC database, which it updated in mid-November to state that usage of the IPaC database for wind and solar required the approval of the Deputy Secretary and Secretary of the Interior ("Wind and Solar IPaC Ban"). *IPaC Information for Planning and Consultation*, U.S. Fish & Wildlife Serv. (screenshot captured December 23, 2025 attached as Ex. F).[28] The IPaC Ban prevents such developers from using IPaC, which in turn prevents them from, *inter alia*, obtaining Corps nationwide permits ("NWPs") for their projects. To the undersigned's knowledge, USFWS has never before restricted anyone's use of this database. Joint Dec. ¶ 355.

---

[28] Available at https://ipac.ecosphere.fws.gov/.

Wind and solar developers rely on the IPaC database to obtain necessary federal permits for their projects. *Id.* ¶¶ 356–57. The ESA establishes protections for threatened and endangered species, 16 U.S.C. §§ 1531 *et seq.* Section 7 requires all federal agencies to conduct consultations with USFWS to ensure that their actions—including the issuance of construction permits for energy projects—are "not likely to jeopardize the continued existence" of any listed species under the ESA. *Id.* § 1536(a)(2). The statute further requires federal agencies to consult with USFWS at the "request of, and in cooperation with [a] prospective permit or license applicant" that "has reason to believe" that a protected species may be affected by a proposed project. *Id.* § 1536(a)(3). IPaC is a taxpayer-funded, public online tool that facilitates federal agency consultations with USFWS pursuant to Section 7 of the ESA by providing proponents of projects on private and public lands, federal agencies, and others with information necessary to identify whether a proposed activity may affect federally listed species, designated critical habitat, migratory birds, eagles, wetlands, and other USFWS trust resources. Joint Dec. ¶¶ 356–57.

IPaC is also the means by which prospective permittees "obtain information on the location of threatened or endangered species and their critical habitats" as part of the CWA Section 404 permitting process applicable to projects that require the discharge of dredge or fill materials into waters of the United States. 33 C.F.R. § 330.4(f)(3); 33 U.S.C. § 1344. Developers may obtain coverage under NWPs for projects with "minimal" impacts, and individual permits for projects with greater impacts. *Id.* § 1344(e). Access to IPaC is essential to the developer's ability to qualify for the requisite NWP, as it is typically needed for the permit application and allows the Corps to avoid a Section 7 consultation altogether if IPaC confirms there are "no effects" on federally protected species. *See* Joint Dec. ¶ 357. IPaC also facilitates wind and solar developers' applications for incidental take permits under Section 10 of the ESA. 16 U.S.C. § 1539(a), Joint

Dec. ¶ 360.  Many state and local permitting authorities rely on IPaC as part of their environmental review processes for non-federal approvals.  *Id.* ¶ 361.

After the Wind and Solar IPaC Ban, neither wind and solar developers nor government agencies can use the IPaC database—absent the approval of the Deputy Secretary and Secretary of the Interior—to identify the species and critical habitats that may be affected by proposed wind and solar projects and ensure the relevant regulators receive IPaC reports, stymieing developers' ability to apply for or receive Corps permits, ESA incidental take permits, or (in some cases) local or state approvals.  *Id.* ¶¶ 354–61.  As with the Bottleneck Memorandum, requiring senior-level DOI approval for wind and solar projects to use IPaC creates a functional ban, resulting in significant financial harm to developers and, in some cases, forcing projects to be redesigned or cancelled all together.  *Id.* ¶¶ 33–45; 365; 359–446.

### 6.  The Zerzan/Jorjani Opinion

On May 1, 2025, DOI Acting Solicitor Zerzan issued an M-Opinion re-instating a prior interpretation of OCSLA subsection 8(p)(4) adopted at the end of the last Trump administration ("Zerzan/Jorjani Opinion").  *See* Dep't of the Interior, M-37086, *Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059* at 3 (May 1, 2025) (attached as Ex. G).[29]

OCSLA provides that the Outer Continental Shelf "should be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3).[30]  Subsection 8(p) of OCSLA gives the Secretary authority to authorize offshore wind activities on the Outer Continental Shelf.  *Id*. § 1337(p)(1)(C).  Those activities must account for twelve enumerated criteria, including "safety," "protection of the environment," "conservation of

---

[29] Available at https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[30] Federal district courts in other jurisdictions have relied on section 1332(3) to strike down wholesale bans on offshore energy developments.  *See, e.g., Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La 2022).

the natural resources of the outer Continental Shelf," and "prevention of interference with reasonable uses (as determined by the Secretary) of the" ocean. *Id.* § 1337(p)(4)(A)–(L). The Secretary of the Interior has delegated this authority to BOEM.[31]

In December 2020, then-DOI Solicitor Jorjani issued an M-Opinion (the "Jorjani Opinion") interpreting the phrase "prevention of interference with reasonable uses"—one of the twelve factors in subsection 8(p)(4), *id*. § 1337(p)(4)(I)—as requiring DOI to "prevent[] *all* interference, if the proposed activity would lead to unreasonable interference, but not the type of interference that would be described as *de minimis* or reasonable."[32]  A few months later, then-Principal Deputy Solicitor Anderson withdrew the Jorjani Opinion on the basis that it failed to interpret the phrase "prevention of interference" in the context of subsection 8(p)(4)'s remaining text, which calls for a balancing of the subsection's enumerated factors (the "Anderson Opinion").[33]  DOI subsequently amended its offshore wind regulations via notice and comment, to incorporate the Anderson Opinion's interpretation of subsection 8(p)(4).[34]

The Zerzan/Jorjani Opinion reinstates the former Jorjani Opinion, re-adopts its impermissibly narrow interpretation of subsection 8(p)(4), instructs the agency "to treat [the Jorjani Opinion] as binding," and requires the Department to "reevaluate[ ]" all "action[s] taken in reliance on the now withdrawn [Anderson Opinion]."  Ex. G at 3.  The Zerzan/Jorjani Opinion

---

[31] Departmental Manual, 218 DM 1, Dep't of the Interior (Sep. 14, 2022).

[32] Dep't of the Interior, M-37059, *Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf* at 2 (Dec. 14, 2020) (emphasis added), https://www.doi.gov/sites/default/files/m-37059.pdf.

[33] *See* Dep't of the Interior, M-37067, *Secretary's Duties Under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf* (Apr. 9, 2021) (quoting 43 U.S.C. § 1337(p)(4)), https://www.doi.gov/sites/default/files/m-37067.pdf.

[34] *See* 30 C.F.R. § 585.102(a)*; Renewable Energy Modernization Rule*, 89 Fed. Reg. 42602 (May 15, 2024); *see also Seafreeze Shoreside v. U.S. Department of the Interior*, 123 F.4th 1, 25–27 (1st Cir. 2024) (upholding the "balancing approach" interpretation of subsection 8(p)(4), and rejecting an "absolutist" approach wherein a project is disapproved simply because it creates impacts for one factor).

contends that the Anderson Opinion's balancing approach "diminishes the importance of each subparagraph" of subsection 8(p)(4), "while also opening the door to the possibility that any one criteria may be favored over another," and so "no longer reflects the best, or even a permissible, agency interpretation." *Id.* at 3.

The Zerzan/Jorjani Opinion imposes a *de facto* bar on offshore wind developers obtaining new COP approvals. The Opinion directs BOEM to adopt a new, narrow standard—found nowhere in OCSLA or BOEM's regulations—wherein a COP can be disapproved solely on the basis that it has *de minimis* interference with other "reasonable uses" of the Outer Continental Shelf. BOEM has made clear that the Zerzan/Jorjani Opinion's intent and effect is to block all offshore wind projects by repeatedly using the opinion to seek remand and/or vacatur of existing COP approvals in order to "rereview" them and make "new decisions."[35] This implementation of the Zerzan/Jorjani Opinion has grievously disrupted the affected offshore wind developers' efforts to construct their projects pursuant to their COP approvals. Joint Dec. ¶¶ 447–86.

## ARGUMENT

Courts issue preliminary injunctive relief when the plaintiff demonstrates (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) lack of harm to other parties from an injunction; and (4) that the public interest favors relief. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The third and fourth factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Section 705 of the APA authorizes a court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of review proceedings," when such relief is "necessary to prevent

---

[35] *See, e.g.,* Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand with Vacatur & to Dismiss at 7–10, *Mayor & City Council of Ocean City v. U.S. Dep't of Interior*, No.1:24-cv-03111-SAG (D. Md. Sep. 12, 2025) (ECF No. 79); Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand & Stay at 6–9, *Town & Cnty. of Nantucket v. Burgum*, No.1:25-cv-00906-TSC (D.D.C. Sep. 18, 2025) (ECF No. 21)

irreparable injury." 5 U.S.C. § 705.  Because relief under Section 705 "only involve[s] postponing the effective date of the portions of the [agency actions]," the limits on preliminary injunctions in *Trump v. CASA*, 606 U.S. 831, 851–52 (2025), do not apply under Section 705.  *New York*, 2025 WL 3514301 at *17; *see CASA*, 606 U.S. at 851 n.10.

## I.    Plaintiffs Are Likely To Succeed On The Merits

### A.  Applicable Legal Standards To Challenges Brought Under The APA

Agency action is reviewable under the APA if it is "final," *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (quoting 5 U.S.C. § 704), meaning that it (1) "marks the consummation of the agency's decision making process" and (2) determines "rights and obligations" or creates "legal consequences," *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  Courts must "hold unlawful and set aside" final agency actions that are taken "without observance of procedure required by law," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(a), (c), (d).

*Arbitrary and Capricious*.  There are "numerous ways in which an agency may" violate the APA "by act[ing] arbitrarily and capriciously," *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025); 5 U.S.C. § 706(2)(a), three of which are relevant here.  First, agency action must be "reasonable and reasonably explained," *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021), so an action is "arbitrary and capricious" if the agency did not "examine the relevant data and articulate a satisfactory explanation for its action," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).  An agency may not justify its actions merely on the basis that they were undertaken to fulfill a presidential directive.  *New York*, 2025 WL 3514301 at *9–10 (collecting cases); *Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025).  Second, an agency acts arbitrarily and capriciously if "it departs significantly from its own precedent" without explanation.  *Thompson v. Barr*, 959 F.3d 476, 484 (1st Cir. 2020).  When an agency changes its

position, it must "display awareness that it is changing position," and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Third, agency action is also "arbitrary and capricious" if the agency fails to "apply the same basic rules to all similarly situated" parties, unless it provides a reasoned justification for such treatment. *Lafortune v. Garland*, 110 F.4th 426, 434 (1st Cir. 2024).

*Contrary To Law*. Agency action must "be consistent with [any governing] statute," *Decker v. Nw. Env't Defense Ctr.*, 568 U.S. 597, 609 (2013), and regulations, *New York*, 2025 WL 3514301, at *14, and courts must "reject agency [actions] which conflict[ ] with congressional intent," *Grunbeck v. Dime Sav. Bank of N.Y., FSB*, 74 F.3d 331, 336 (1st Cir. 1996), or that "frustrate the policy Congress sought to implement," *Friends of Animals v. Haaland*, 997 F.3d 1010, 1016 (9th Cir. 2021) (citations omitted).

*Actions Implemented Without Observing Procedure Required By Law*. Agency action must be set aside when it is implemented "without observance of procedure required by law." 5 U.S.C. § 706(2)(d). Legislative rules—"statements of general or particular applicability and future effect" that "implement, interpret, or prescribe law and policy," and that have the "force and effect of law," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015)—must go through the APA's mandatory "notice and comment" procedures, *Craker v. U.S. Drug Enf't Agency*, 44 F.4th 48, 55 (1st Cir. 2022), and the failure to do so invalidates agency action, 5 U.S.C. § 706(2)(d).

## B. Each Of The Challenged Agency Actions Is Unlawful

### 1. The Bottleneck Memorandum

The Bottleneck Memorandum marks the "consummation" of DOI's "decision making process," *Bennett*, 520 U.S. at 178, with respect to the way DOI reviews permit applications for wind and solar energy projects. The Memorandum requires "all decisions, actions, consultations, and other undertakings" related to DOI's permitting of wind and solar energy projects to undergo

19

three levels of review at the highest echelons of DOI. Ex. A at 1. By subjecting every step of wind and solar development to three levels of review by high-level DOI political appointees, the Memorandum unjustifiably stymies and all-but-halts DOI wind and solar permitting in violation of the APA. The Memorandum creates significant "legal consequences" for any wind and solar developer who already has in the pipeline (or intends to submit) a permit application that must be approved by DOI, *see Bennett*, 52 U.S. at 178, for whom this review procedure will "adversely affect" their ability to obtain such permits in a timely manner, if at all, 5 U.S.C. § 702.

The Memorandum violates the APA for multiple independent reasons. First, it is arbitrary and capricious because it does not provide any "satisfactory explanation," *Fox Television*, 556 U.S. at 513, for subjecting "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities," Ex. A at 1, to this new review regime. The only basis the Memorandum identifies for requiring these additional levels of review is to make DOI's policies "[c]onsistent" with the Wind Memorandum, EO 14315 and EO 14156, and SO 3417 and SO 3418. But agencies' implementation of the permitting freeze in the Wind Memorandum has been vacated as illegal. *New York*, 2025 WL 3514301. Neither of the other cited executive orders purports to "explain[ ]," *Fox Television*, 556 U.S. at 513, the Memorandum's bottleneck mandate. EO 14156 declares a "national energy emergency" related to the current state of the nation's "inadequate and intermittent energy supply" and "increasingly unreliable grid," but provides no data or evidence suggesting that unprecedented levels of review for wind and solar energy projects will resolve these purported issues.[36] SO 3417 is simply DOI's implementation of EO 14156, and provides no

---

[36]    EO   14156,   Declaring   a   National   Energy   Emergency   (Jan.   20,   2025), https://www.govinfo.gov/content/pkg/DCPD-202500123/pdf/DCPD-202500123.pdf.

additional justification for stalling review of wind and solar projects.[37]  Delaying or preventing approvals for new wind and solar facilities only jeopardizes and undermines the country's energy supply.  EO 14315, in turn, instructs DOI to "review" existing regulations and policies that may "provide preferential treatment to wind and solar facilities" and revise them to "eliminate any such preferences.[38]  That order directs DOI to eliminate any purported preferential treatment of wind and solar energy, not to prejudice wind and solar energy relative to *other* energy sources.  By requiring multiple tiers of additional and duplicative review by senior officials only for wind and solar energy facilities, it puts these projects at a distinct disadvantage compared to other energy projects.  Finally, SO 3418 implements EO 14154, which "directs the *removal of impediments* imposed on the development and use of our Nation's abundant energy and natural resources" and "encourage[s] energy exploration and production on Federal lands and waters."[39]  This order thus seeks to accomplish the exact opposite of the Memorandum, which creates impediments to developing our energy resources and discourages energy production.

Second, the Bottleneck Memorandum is arbitrary and capricious because it fails to provide a sufficient justification for relegating wind and solar energy projects to second-class status as compared to other energy-generating projects.  *Lafortune*, 110 F.4th at 434.  The Memorandum applies only to actions "related to wind and solar facilities," while all other types of energy generation remain free of these burdensome procedures.  DOI's failure to identify any facts, evidence, or other "reasoned explanation" for its discriminatory decision independently renders the Bottleneck Memorandum arbitrary, capricious, and invalid.  *Id.*

---

[37]  SO 3417, Addressing the National Energy Emergency, U.S. DOI (Feb. 3, 2025), https://www.doi.gov/document-library/secretary-order/so-3417-addressing-national-energy-emergency.

[38]  90 Fed. Reg. at 30821.

[39]  SO 3418, Unleashing American Energy, U.S. DOI (Feb. 3, 2025) (emphasis added), https://www.doi.gov/document-library/secretary-order/so-3418-unleashing-american-energy.

Third, the Memorandum is arbitrary and capricious because "it departs significantly from its own precedent" without explanation and fails to consider reliance interests. *Thompson*, 959 F.3d at 484. Because the Memorandum represents a substantial change in the way submissions for energy facilities are processed and reviewed, *supra* p.6, DOI had an obligation to provide a "more detailed justification" for departing from prior practice "than [it] would" had it adopted a "new [permitting] policy . . . on a blank slate." *Fox Television*, 556 U.S. at 515. But the Memorandum fails to even recognize that DOI has "chang[ed its] position" on this issue, let alone "show that there are good reasons" for such a change, as the APA requires. *Encino Motorcars*, 579 U.S. at 221. This failure is particularly problematic in light of the "serious reliance interests" DOI's prior regime had "engendered" in wind and solar developers, *Fox Television*, 556 U.S. at 515, who have come to rely on DOI's prior procedures, planning their projects and structuring their business models in reliance on the expectation that permit applications and submissions within DOI's jurisdiction would be reviewed and resolved in a manner that did not require every step in the process to be elevated to the Secretary of the Interior. Because the Memorandum departs from agency precedent by radically changing the rules of the game with respect to wind and solar, DOI was "*required*" to—but did not—consider these interests. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020) (emphasis added).

Fourth, the Memorandum is contrary to law because it violates both the APA and DOI's own governing statutes and regulations requiring it to render timely final decisions. For instance, APA sections 555(b) and 558(c) require agencies to make decisions on license applications "within a reasonable time." 5 U.S.C. § 555(b), 558(c). DOI's governing statutes similarly call for the orderly and expeditious adjudication of permit applications, with 43 U.S.C. § 1332(3) stating that the Outer Continental Shelf should be made available for "expeditious and orderly development,"

and 43 U.S.C. § 3002(a) requiring DOI to "implement a program to improve Federal permit coordination" and "expedite the permitting" of wind and solar, as well as other renewable energy projects, on federal land," *see also* 16 U.S.C. § 1536(b)(1) (setting 90- and 150-day time limits for ESA section 7 consultations related to permit applications). By mandating that even the most ministerial approval in the permitting process be subjected to three levels of review, the Memorandum forecloses the possibility of issuing wind and solar permits within the timeframe contemplated by these statutes. *See, e.g.*, *New York*, 2025 WL 3514301 at *15–18 (finding that implementation of the Wind Memorandum, by indefinitely delaying wind energy project approvals, violated 5 U.S.C. §§ 555(b) and 558(c)).

The Memorandum also puts DOI in conflict with Title 41 of the Fixing America's Surface Transportation Act ("FAST-41")—a 2015 statute designed to give large infrastructure projects, including for renewable energy, a reliable and predictable permitting timetable. 42 U.S.C. § 4370m(6). Any eligible project that elects to participate automatically receives a "coordinated project plan," which establishes a permitting timetable created by the lead agency in coordination with other federal and state "facilitating agencies" and the project sponsor, *id.* § 4370m-2(b)(2)(A), and participants typically receive a decision "nearly 18 months fast than those that did not opt-in to the program," *see* Permitting Council, FAST-41 Program (Dec. 11, 2024), https://www.permitting.gov/projects/title-41-fixing-americas-surface-transportation-act-fast-41. Because DOI's onerous review process makes it impossible for DOI to adhere to any permitting timetables for covered wind and solar projects, the Bottleneck Memo frustrates Congress' goal of giving all covered projects a predictable and efficient coordinated permitting process. Indeed, at least one of Plaintiffs' members' projects has fallen woefully behind its FAST-41 schedule as a result of the Bottleneck Memo. *See, e.g.,* Joint Dec. ¶ 426.

Finally, the Bottleneck Memorandum violates the APA because it was not promulgated via notice and comment, and so was issued without observing the procedures required by law. 5 U.S.C. § 706(2)(D).  While the Memorandum does not impose "new substantive obligations" on regulated entities, its review regime nevertheless "substantively affects [regulated parties] to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011).  The Memorandum thus constitutes a legislative rule that should have been, but was not, promulgated through the APA's notice and comment rulemaking process.

### 2.  Federal Lands Anti-Renewable Order

The Federal Lands Anti-Renewable Order "marks the consummation of" DOI's "decision-making process" with respect to the criteria DOI will consider when reviewing permit applications for wind and solar energy projects.  *Bennett*, 520 U.S. at 178.  This Order requires DOI to "only permit" proposed energy projects that are "the most appropriate land use when compared with a reasonable range of project alternatives," with the agency's "most appropriate land use" inquiry turning on whether the proposed project has a higher "capacity density" than that of a reasonable project alternative.  Ex. B at 1, 3.  Because wind and solar facilities are less "capacity dense" than conventional alternatives by DOI's own definition, the Order creates "legal consequences" for, *Bennett*, 520 U.S. at 178, and "adversely affect[s]," wind and solar developers who rely on—but will be unable to obtain—mandatory permits from DOI, 5 U.S.C. § 702.

The Federal Lands Anti-Renewable Order violates the APA for multiple independent reasons.  First, the Order is arbitrary and capricious because it lacks a "satisfactory explanation," *Fox Television*, 556 U.S. at 513, for requiring DOI to deny permit applications to wind and solar facilities wherever "reasonable project alternatives with higher capacity densities are technically and economically feasible," Ex. B at 1.  The Order *assumes* that the "optimal" use of federal lands

is the use that can yield the most energy relative to its geographic footprint, but it cites no evidence for that conclusion. Instead, the Order points to "common sense, arithmetic, and physics" for the *ipse dixit* notion that "wind and solar projects are highly inefficient uses of Federal lands," and cites a single data point from EIA suggesting that a nuclear power plant "produces 33.17 megawatts per acre, while one offshore wind farm produces approximately 0.006 MW/acre." *Id.* at 2. While this flawed example attempts to show that wind and solar projects are less capacity dense than a nuclear power plant, that does not provide a reasoned basis for making capacity density a dispositive threshold factor, or even a relevant consideration, in DOI's permitting decisions. That example sets up an absurd hypothetical choice between offshore wind and offshore nuclear energy, and DOI has not established that the existence of one energy generation technology in a particular federally controlled area forecloses any other.

The Order is independently arbitrary and capricious because it constitutes a significant departure from DOI's prior permitting policies, without any justification for or consideration of the "significant reliance interests" those policies "engendered" in wind and solar developers. *Fox Television*, 556 U.S. at 515. The Order does not even acknowledge that it represents a total break from DOI's policies, consistent with statutory mandates in OCSLA and FLMPA, to encourage renewable energy development on federal lands and waters.[40] Nor does the Order acknowledge that it departs from the new DOI NEPA Handbook's carefully proscribed definition of "reasonable alternatives" by encouraging the consideration of hypothetical energy projects that may not be "technically and economically feasible," will not "meet the purpose and need of the proposed

---

[40] *See, e.g.*, *Rights-of-Way, Leasing, and Operations for Renewable Energy*, 89 Fed. Reg. 35634, 35367 (May 1, 2024) (amending BLM regulations to "accelerate deployment of renewable energy resources in the United States"); *Renewable Energy Modernization Rule*, 89 Fed. Reg. 42602, 42603 (May 15, 2024) (final rule "facilitat[ing] the development of OCS renewable energy and support[ing] the Department's commitment to ensuring safe and responsible domestic energy production").

action," are unlikely to be "within the jurisdiction of the bureau," and certainly will not "meet the goals of the applicant."[41]   DOI offers no "good reason[ ]" for departing from its own definition of "reasonable alternatives" and rigging the analysis to systematically result in the denial of wind and solar permit applications, *Encino Motorcars*, 579 U.S. at 221, let alone the "more detailed justification" required for such policy changes, *Fox Television*, 556 U.S. at 515.

The Order is also arbitrary and capricious because DOI ignored the reliance interests that wind and solar developers had in DOI's prior permitting regime.  *Id*.  Wind and solar developers have long structured the development stages of proposed projects on federal lands and in federal waters and attracted investments based on a decades-long understanding that those proposals would be subjected to a fair and lawful permitting process.[42]  The Order turns that process on its head by, for the first time and without any cogent reasoning, *see supra* p.6, elevating a single novel factor that has the inherent effect of rigging the process against wind and solar proposals.  Given these reliance interests and the impact that the Order will have on wind and solar developers' ability to obtain permits from DOI, the agency was at least required to reasonably explain why countervailing policies outweighed those reliance interests, *Regents*, 591 U.S. at 30–33, which DOI failed to do here.

Second, the Order is contrary to OCSLA, FLPMA, and NEPA.  Congress enacted OCSLA to ensure that the Outer Continental Shelf be "made available for expeditious and orderly development," 43 U.S.C. § 1332(3), and, when expanding the statute to encompass renewable energy projects in 2005, explicitly required DOI to "ensure that any activity under this subsection

---

[41] Dep't of the Interior, 516 DM 1 (DOI NEPA Handbook) § 6(t), https://www.doi.gov/media/document/doi-nepa-handbook.

[42] *See* BLM, Wind Energy, https://www.blm.gov/programs/energy-and-minerals/renewable-energy/wind-energy (first wind project permitted on BLM lands in 1982).

is carried out in a manner that provides for" twelve enumerated statutory criteria. *Id.* § 1337(p)(4). By making a single, extra-statutory factor designed to prevent wind development dispositive of DOI's permitting decisions, the Order contravenes OCSLA's statutory directive that DOI's permitting decisions on the Outer Continental Shelf be made after careful consideration and balancing of these twelve factors. *Seafreeze Shoreside*, 123 F.4th at 25–27.

FLPMA calls for holistic permitting decisions with a focus on ensuring that public lands are managed "on the basis of multiple use[s]," 43 U.S.C. § 1701(a)(7), that "balanced and diverse resources" are used in a way that "account[s the long term needs of future generations for renewable and nonrenewable resources," *id.* § 1702(c), and that "consideration [is] given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output," *id.* The statute also allows the Secretary of DOI to withdraw public lands from certain uses pursuant to specific statutory procedures that include publication in the Federal Register. *Id.* § 1702(j). The Order, however, functionally withdraws public land from wind and solar development without complying with that statutorily mandated withdrawal process, and jettisons FLPMA's balanced approach in favor of relying on a single metric that is explicitly focused on "the greatest economic return or the greatest unit output" in an ill-reasoned manner that inherently disfavors wind and solar energy.[43]

To the extent that the Order relies on NEPA, that statute does not impose substantive requirements, *Seven Cnty.*, 605 U.S. at 173, or require selection of any alternative, much less prescribe DOI's new capacity density-based standard. The Order preordains the outcome of DOI's

---

[43] The Federal Lands Anti-Renewable Order also flies in the face of Congress' directive in the 2021 Consolidated Appropriations Act that DOI "implement a program to improve Federal permit coordination" and "expedite the permitting" of wind and solar, as well as other renewable energy projects, on federal land, 43 U.S.C. § 3002, as well as to "seek to issue permits" for a minimum of 25 gigawatts of wind, solar, and geothermal energy on public lands by the end of 2025, *id.* § 3004 (b).

NEPA analyses for wind and solar projects by making capacity density its *primary* consideration and then gives the reasonable alternative analysis a substantive dimension by requiring that DOI deny the application when that analysis identifies a more capacity-dense "reasonable alternative."

Finally, the Order is unlawful, 5 U.S.C. § 706(2)(d), because it was not promulgated through the APA's notice and comment mechanism. The Order imposes on DOI's permitting regime a new and unfounded presumption that projects with greater capacity densities are the most "appropriate" use of federal lands and waters, and mandates that only those "appropriate" projects be permitted. Ex. B at 3. Neither of the statutes from which the Order purports to derive its permitting authority—OCSLA and FLPMA—contemplate the use of a single factor as dispositive of permitting decisions, so DOI's elevation of capacity density as a threshold metric in its permitting regime supplements and is "inconsistent" with these governing authorities. *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995).

### 3. The Corps' Anti-Renewable Memorandum

The Corps' Anti-Renewable Memorandum constitutes the "consummation" of the Corps' "decision-making process" with respect to how the Corps will carry out its permitting responsibilities under the CWA and RHA for wind and solar projects on both private and public lands. *Bennett*, 520 U.S. at 178. Like the Federal Lands Anti-Renewable Order, the Corps' Anti-Renewable Memorandum rigs the CWA Section 404 and RHA Section 10 permitting processes against wind and solar by disadvantaging energy sources that generate lower amounts of energy per acre—*i.e.*, have a lower capacity density—in favor of "projects that would generate the most annual potential energy generation per acre." Ex. C at 3. Because wind and solar energy facilities by their nature generate less energy per acre than other energy projects, the Memorandum manipulates the outcome of the Corps' public interest analysis against wind and solar projects. *Supra* p.8. Thus, it creates lasting "legal consequences" and "adversely affects" wind and solar

28

developers, whose projects may never even be considered—let alone approved—for individual CWA Section 404 and RHA Section 10 permits. *Bennett*, 520 U.S. at 178; 5 U.S.C. § 702.

The Memorandum is arbitrary and capricious because it provides no "satisfactory explanation," *Fox Television*, 556 U.S. at 513, for its decision to structure Corps permit reviews to ensure disapproval of wind and solar projects. The only purported reasoning cited for this new permitting regime is that "the nation's current energy production and generation capacity is inadequate," such that the "buildout of energy infrastructure is crucial." Ex. C at 1. The Memorandum cites no evidence supporting a connection between these generalized concerns and imposing new systematic impediments for Corps wind and solar permits. Indeed, the Memorandum's attack on wind and solar projects will only serve to delay and undermine the nation's energy production and generation capacity. *See generally* Report of Charles River Associates ("CRA Rep.") (attached as Exhibit 2 to the Declaration of Charles River Associates ("CRA Dec.") (attached hereto as Ex. M)). The Memorandum also fails to explain how "capacity density" determines whether a specific project is best suited to meet the country's energy production and generation capacity needs, or how hampering individual permits for wind and solar advances the buildout of the nation's energy infrastructure.

The Memorandum also repeats the same methodological flaws with respect to the "capacity density" concept discussed above in connection with DOI's Federal Lands Anti-Renewable Order. *See supra* pp.24–25. The Memorandum's singular example merely purports to prove that wind and solar technologies are inherently less capacity dense than thermal facilities, without explaining how prioritizing capacity-dense projects would further the Memorandum's stated goals. *See* Ex. C at 1–2. The Memorandum fails to consider that (1) land used for wind and solar technologies can be used concurrently for other purposes, (2) the data cited fails to account for land use associated

with thermal energy facilities, and (3) thermal energy facilities require substantially more disturbance of upstream lands.  *See supra* pp.24–25.  The Corps also provides no explanation for why "displace[ment] of other more reliable energy sources" is appropriate as a mandatory public interest factor, Ex. C at 1, or why it has elected to single out wind and solar.

Nor does the Corps provide any explanation for its significant departure from prior permitting policies or consider the "significant reliance interests," *Fox Television*, 556 U.S. at 515, wind and solar developers have had in those longstanding policies.  Wind and solar developers have long relied on the Corps' predictable approach to the Section 404 public interest analysis, planning projects based on the Corps' established permitting regime and making investments on the assumption that their applications for permits would be reviewed in a manner that was not biased toward rejecting wind and solar projects.  Joint Dec. ¶ 321.  The Memorandum undermines those reliance interests by subjecting wind and solar developers to a public interest analysis that utilizes factors hand-picked to foreclose these energy sources.

The Memorandum is in excess of statutory authority and contrary to law because the CWA does not authorize the Corps to implement national energy policy when issuing Section 404 permits, and the Memorandum violates the Corps' regulations.  The CWA authorizes the Secretary of the Army to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a).  This framework is focused on aquatic impacts of proposed actions.  The Corps has no statutory authority to set energy policy, nor to make policy decisions concerning which types of energy sources to prioritize during the permitting process.  *See id.*  Moreover, the Memorandum's decision to prioritize projects based on their capacity density flies in the face of the Corps' regulations requiring that the agency's "public interest" analysis balance various factors, with no one factor

being determinative. 33 C.F.R. § 320.4(a)(1) ("all factors which may be relevant to the proposal must be considered"); *id.* § 320.4(a)(3) ("how important a factor is . . . will vary with each proposal").

The Memorandum is also contrary to law because it ensures that the Corps will not comply with requirements regarding the timing of permit review set forth in the APA and other relevant statutes. For instance, the categorical de-prioritization of Section 404 permits for wind and solar projects constitutes a violation of APA Sections 555(b) and 558(c)'s requirements that permits be processed "within a reasonable time." *New York*, 2025 WL 3514301 at \*16. The Memorandum also defies statutory and regulatory mandates related to Section 404 permits, including the requirement that the Secretary issue a public notice of a pending permit application within 15 days of the submission of "all the information required to complete" the application, 33 U.S.C. § 1344(a), and the obligation that the Corps coordinate with federal agencies to ensure that a permit application decision "will be made not later than the ninetieth day after the date the notice for such application is published," *id.* § 1344(q). The Corps' regulations also specify the procedures that govern the agency's processing of permit applications. *See* 33 C.F.R. §§ 325.2(d), 320.1(a)(4), 323.6(a). The Memorandum assures the Corps will not comply with these mandatory timelines.

Finally, the Memorandum is unlawful for failing to undergo notice and comment rulemaking because it effects a substantive change in the Corps' existing policy and adopts a position that is "inconsistent with [the agency's] existing regulations." *See Shalala*, 514 U.S. at 100. The Corps' existing regulations do not contemplate threshold, categorical presumptions or prioritize certain permit applications. *See* 33 C.F.R. § 320.4. To the contrary: the relevant regulations instead require the agency to "evaluat[e] the probable impacts, including cumulative impacts, of the proposed activity and intended use on the public interest" through a "careful,"

31

particularized, and holistic "balancing" of many different factors, *id.* § 320.4(a)(1), and no single factor is dispositive, *id.* § 320.4(a)(3). The Corps' elevation of capacity density as a decisive metric for prioritizing permit applications and de-prioritizing applications for projects with low capacity densities is wholly "inconsistent," *Shalala*, 514 U.S. at 100, with this all-things-considered balancing scheme, so the agency was required to promulgate the Memorandum through the rulemaking process.

### 4. The Eagle Take Permit Ban

The Eagle Take Permit Ban prohibits USFWS from issuing general and specific permits authorizing incidental eagle take by wind energy projects—and only wind energy projects—under BGEPA and its implementing regulations. The Ban represents USFWS's final decision with respect to the availability of this critical tool, *Bennett*, 520 U.S. at 178, and its decision has significant "legal consequences" that "adversely affect" wind and solar developers because it prohibits them from obtaining the only type of permit that insulates them from criminal liability associated with incidental eagle takings, *id.*; 5 U.S.C. § 702.[44] Although USFWS has removed the Eagle Take Permit Ban language from its website, the agency has not resumed eagle permitting activities, and such permits are expressly subject to the Bottleneck Memorandum, Ex. A at 3 (Number 64) . For those reasons, and because not a single Eagle Permit has been issued since the Ban was first announced, all indications are that the Ban is still in effect. Joint Dec. ¶ 340.

The Ban is arbitrary and capricious in multiple respects. For one, the Ban does not provide any "satisfactory explanation," *Fox Television*, 556 U.S. at 513, for "ceasing issuance of [BGEPA permits] to wind facilities until further notice," Ex. D at 1. The only explanation provided is a

---

[44] As noted above, USFWS's removal of the offending language from its website after Plaintiffs filed their initial Complaint does not constitute evidence that the Ban is no longer in effect. *See supra* p.11.

reference to the Wind Memorandum, the implementation of which was recently and rightly vacated under the APA. *New York*, 2025 WL 3514301, at *13–18.

The Ban is also arbitrary and capricious because USFWS fails to provide any justification for treating wind projects dissimilarly from other projects eligible for eagle incidental take permits. *Lafortune*, 110 F.4th at 434. The Ban applies *only* to wind projects; all other eligible entities and projects remain free to apply for and obtain such permits as a means of insulating themselves from BGEPA liability. The Ban is arbitrary and capricious for the additional reason that USFWS failed to provide any justification for its "depart[ure] from agency precedent" regarding wind projects' eligibility for an eagle take permit. USFWS authorized the issuance of general permits "for incidental take of eagles by wind energy projects" in 2024, the culmination of a painstaking, multi-year rulemaking process that was informed by and based upon extensive, real-world data regarding the impacts of wind projects on eagles. *See Permits for Incidental Take of Eagle and Eagle Nests*, 89 Fed. Reg. 9920, 9930 (Feb. 12, 2024). The Ban reverses the agency's policy decision with respect to the availability of specific and general permits for wind facilities, based on the flimsiest of rationales. At a minimum, USFWS had an obligation to provide a "more detailed justification" for its action than would be necessary if it was acting "on a blank slate," *Fox Television*, 556 U.S. at 515, but the Ban does not even attempt to do so.

USFWS's failure to explain its policy change is particularly problematic because the non-discretionary, rapid availability of general permits under USFWS's prior policy had engendered "serious reliance interests" for wind farm developers and operators. *Id*. Even though USFWS only made BGEPA general permits available in 2024, many wind farm operators have already

obtained such permits to avoid running afoul of BGEPA or are otherwise seeking them.[45]  Joint Dec. ¶¶ 342–43.  Owners of projects in qualifying areas that have been operating for years without experiencing any eagle fatalities have relied upon the recent availability of the general permits in evaluating whether permit coverage is necessary for their facilities.  Similarly, developers of new projects relied upon the ready availability of general permits in making investment decisions.  *Id.* ¶ 343.  The Eagle Permit Ban, in tandem with USFWS's recent enforcement initiative targeted at wind energy projects, Memorandum from Deputy Chief of Staff, *supra*, upends those reliance interests by putting wind operators without permits in limbo: they can either continue to develop, construct and operate their facilities without a permit and risk exposure to criminal and civil liability under BGEPA if a take incidentally occurs, or they can cease operating altogether—incurring significant economic harm while taking power from the nation's grid and jobs from the nation's workforce in the process.  *Id.* ¶¶ 348–52.

Second, the Eagle Take Permit Ban is procedurally deficient, 5 U.S.C. § 706(2)(d), because it adopts a new position "inconsistent with [ ] existing regulations," *Shalala*, 514 U.S. at 100, yet was not promulgated through notice and comment rulemaking.  BGEPA contains no provision allowing USFWS to bar an entire industry from obtaining eagle incidental take permits.  Further, USFWS's own regulations allow applicants to qualify for incidental take permits so long as they meet certain regulatory requirements, 50 C.F.R. § 22.250, specifically because USFWS determined that incidental take related to wind turbine operations did not have population-level effects on relevant eagle species, *see* 89 Fed. Reg. at 9928.  Without citing any supporting

---

[45] Before the 2024 rule, wind farm operators could comply with BGEPA by applying for individual eagle incidental take permits, *see Eagle Permits; Revisions to Regulations for Eagle Incidental Take and Take of Eagle Nests*, 81 Fed. Reg. 91494 (Dec. 16, 2016), and/or adhering to USFWS's land based wind energy guidelines, *see* Land Based Wind Energy Guidelines, U.S. Fish & Wildlife Serv., https://www.fws.gov/sites/default/files/documents/land-based-wind-energy-guidelines.pdf.

evidence, the Ban indefinitely rescinds this regulatory regime for wind facilities, even if those facilities would otherwise qualify for a permit under existing regulations.  USFWS's departure from its codified regulation required compliance with the APA's notice and comment procedures.

### 5.  The Wind and Solar IPaC Ban

The IPaC Ban "marks the consummation" of USFWS's "decision making process" with respect to the use of the IPaC tool by wind and solar developers.  *Bennett*, 520 U.S. at 178.  Specifically, USFWS's website pronounces that "solar and wind projects are currently not eligible to utilize the Information for Planning and Consultation website prior to review by the Office of the Deputy Secretary, and final review by the Office of the Secretary."  Ex. F.  The IPaC Ban also creates "legal consequences" for wind and solar developers, *id.*, because the Ban prohibits wind and solar developers (and even other federal agencies) from accessing this critical resource that is used to, *inter alia*, (1) facilitate mandatory consultations under Section 7 of the ESA and (2) allow developers whose projects may result in discharges of dredged or fill materials into waters of the United States, but have low impacts on protected species, to obtain Section 404 authorization from the Corps without the need for formal ESA Section 7 consultations.  Because the Ban essentially conditions access to IPaC on the same onerous procedures from the Bottleneck Memo that have stalled all wind and solar permitting, USFWS has functionally precluded developers from participating in the statutory consultations required to obtain certain types of permits necessary for their projects' operation.  *Bennett*, 520 U.S. at 178.  That, in turn, creates obvious and significant "adverse" effects, 5 U.S.C. § 702, and "legal consequences," *Bennett*, 520 U.S. at 178; Joint Dec. ¶¶ 353–446, for wind and solar developers, who cannot break ground on new projects and who are at a significant disadvantage in comparison to developers of other types of projects who retain full, unfettered access to the IPaC database.

The Ban is arbitrary and capricious because it provides no basis—let alone a reasoned basis—for functionally prohibiting use of this information resource for wind and solar projects. *Fox Television*, 556 U.S. at 513. The only purported justification for the Ban is a single unexplained citation to the Bottleneck Memorandum. But the Bottleneck Memorandum mandates that each step of DOI's permitting process be reviewed by three of the most senior offices within DOI. Ex. A. Even setting aside the Bottleneck Memorandum's illegality, *see supra* pp.19–24, it says nothing about inhibiting wind and solar projects from accessing tools necessary to help *effectuate* the permitting process and at times *avoid* DOI's permitting bottleneck.

The Ban is also arbitrary and capricious because it singles out wind and solar projects for adverse treatment without "point[ing] to a relevant distinction," *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007), between these projects and other IPaC users, *Lafortune*, 110 F.4th at 434. The Ban facially applies only to wind and solar projects, while *all other* IPaC users (which include developers of all types of energy) retain unfettered access the database and receive the benefits of such access. The IPaC website provides no recognition of—let alone authority for—facially disadvantaging wind and solar projects and placing them into a second-class status as compared to all other energy generation and infrastructure projects, which itself renders the IPaC Ban arbitrary and capricious. *Id.* at 434.

The Ban is additionally arbitrary and capricious because USFWS did not even attempt to justify the stark departure from its prior position with respect to IPaC accessibility. *See Thompson*, 959 F.3d at 484. Agencies must provide a "more detailed justification" for departing from prior practice "than [it] would" had it adopted a "new [permitting] policy . . . on a blank slate," *Fox Television*, 556 U.S. at 515, but USFWS's abrupt about-face does not satisfy this basic requirement of the APA's reasoned decision-making standard. The arbitrary and capricious nature of

36

USFWS's departure "from its own precedent," *Thompson*, 959 F.3d at 484, is compounded by the fact that it failed to address the "serious reliance interests" that wind and solar developers had in IPaC's accessibility, *Fox Television Stations*, 556 U.S. at 515.  Among other things, losing access to IPaC prevents developers from obtaining CWA Section 404 authorizations, as well as ESA Section 10 permits and sometimes even state and local authorizations.  *See supra* p.35.  Wind and solar developers have designed their projects, planned their activities, and attracted investment on the understanding that they would be able to use IPaC to help obtain these permits.  Joint Dec. ¶ 362.  The Ban is arbitrary and capricious because it fails to mention—let alone consider—these significant reliance interests.

The Ban is also "contrary to law," 5 U.S.C. § 706(c), because it violates Sections 7(a)(2) and (a)(3) of the ESA, which require federal agencies to conduct consultations on protected species "*with the assistance* of the Secretary [of the Interior]," 16 U.S.C. § 1536(a)(2) (emphasis added), and to "*consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant* if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species," *id.* § 1536(a)(3) (emphasis added).  The IPaC Ban blocks access to a vital ESA Section 7 consultation resource for one particular class of permit applications, with the Bottleneck Memo blocking any other paths for this class of permit applications to go through the Section 7 consultation process.  The IPaC Ban thus violates Congress' requirements that USFWS (a) "assist[]" the action agency during a Section 7 consultation, and (b) consult with the action agency on "any" agency action.

### 6.  The Zerzan/Jorjani Opinion

In the Zerzan/Jorjani Opinion, DOI reinstated an interpretation of subsection 8(p)(4) of OCSLA, which governs BOEM's standard of review for offshore wind COPs.  The Opinion

constitutes the final step in DOI's "decision-making process" with respect to the interpretation and application of subsection 8(p)(4).  *Bennett*, 520 U.S. at 178.  Further, the alteration of the "legal status quo" memorialized in the Opinion, *New York*, 2025 WL 3514301, *21, will have adverse "legal consequences" for offshore wind developers because it is binding on BOEM,[46] disregards BOEM's own regulations, and is currently being used to justify making "new decisions" on (*i.e.*, revoking) existing COP approvals.

The Zerzan/Jorjani Opinion violates the APA on multiple grounds.  First, the Opinion is arbitrary and capricious because it fails to account for the "serious reliance interests," *Fox Television*, 556 U.S. at 515, offshore wind developers had in DOI's prior, predictable permitting procedures.  Offshore wind developers have spent billions of dollars to acquire leases at auction and develop them in reliance on the understanding that their COPs would be fairly reviewed according to a legal standard consistent with the requirements of OCSLA subsection 8(p)(4), and that the review process was not rigged to provide BOEM with a lever that it can pull at any time to disapprove any project.  Joint Dec. ¶¶ 451; Declaration of Liz Burdock ("Burdock Dec.") ¶ 22 (attached as Ex. K).  The Zerzan/Jorjani Opinion pulls the rug out from under these developers, making it effectively impossible for them to obtain COP approval and recoup their investments. In addition, offshore wind developers have seen their COP approvals "reevaluated" in anticipation of "new decisions" based on the Zerzan/Jorjani Opinion, *see supra* p.17 n.34, nullifying their significant investments in obtaining such approvals, Joint Dec. ¶¶ 447–86.

Second, the Opinion is unlawful because it conflicts with OCSLA subsection 8(p)(4). Subsection 8(p)(4) provides that the Secretary "shall ensure that any activity under this subsection

---

[46] *See* Officer of the Solicitor, Dep't of the Interior, *Mem. Subject: M-Opinion Review* (2025), https://www.doi.gov/sites/default/files/documents/2025-03/m-opinion-suspension-review0.pdf    (M-Opinions "constitute legal interpretations that are binding on all Department officials").

is carried out in a manner that provides for" twelve statutory criteria.  43 U.S.C. § 1337(p)(4).  This "requires" only that an activity account for each of the enumerated criteria, without requiring any single criterion to be achieved to any particular degree.  *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 164–65 (1981); *Seafreeze Shoreside, Inc.* 123 F.4th at 25–26 ("BOEM must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria[.]").

The Zerzan/Jorjani Opinion adopts a contrary reading of subsection 8(p)(4), permitting the Secretary to reject an offshore wind project if he simply determines that the project would involve more than "*de minimis*" interference with other ocean activities.  Zerzan/Jorjani Opinion at 2.  In creating an extra-statutory "*de minimis*" standard, the Opinion adds to OCSLA "something which is not there," *United States v. Calamaro*, 354 U.S. 351, 359 (1957), which an administrative agency may not do, *see SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 363 (2018).

The Zerzan/Jorjani Opinion is also contrary to law because it operates as a functional ban on new offshore wind approvals.  Congress has explained that the Outer Continental Shelf is a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards."  43 U.S.C. § 1332(3).  Congress also amended OCSLA in 2005 to expand its reach to include advances in renewable energy, including offshore wind.  43 U.S.C. § 1337(p)(1)(C).  Congress endeavored to "enhance the energy security of the United States," "decrease dependence on foreign sources of fuel," S. Rep. No. 109-78, at 1 (2005), and "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rep. No. 109-90, at 1 (2005).  But given that the Outer Continental Shelf is a venue for multiple uses (*e.g.*, commercial and recreational fishing, vessel transit, military exercises), allowing BOEM to apply

a *de minimis* interference standard constitutes an effective ban on new offshore wind projects—in violation of DOI's various statutory mandates to support offshore wind development.[47]

By instructing DOI's bureaus and offices to "reevaluate[ ]" "any" "Departmental action[s] taken in reliance" on the Anderson Opinion—including leases, COP approvals, and permits—the Zerzan/Jorjani Opinion is also impermissibly retroactive and contrary to law. "Generally, an agency may not promulgate retroactive rules without express congressional authorization," *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) (citation omitted), a prohibition that applies to "interpretative rules, no less than legislative rules," *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994). By instructing the agency to "reevaluate[ ]" past actions, the Zerzan/Jorjani Opinion seeks to "use its new statutory interpretation to undo [ ] completed transactions." *Arkema*, 618 F.3d at 9. In fact, DOI has since determined that it will disturb several final COP approvals in reliance on the Zerzan/Jorjani Opinion's "reevaluat[ion]" directive, *supra* p.17 n.34; *see also* Burdock Dec. ¶ 26, despite the agency having issued detailed memoranda accompanying COP approvals that specify how each enumerated OCSLA factor was addressed.[48] The Zerzan/Jorjani Opinion does not identify any authority that would permit the Secretary to act retroactively or reconsider a fully approved COP, *see generally* Zerzan/Jorjani Opinion, and its effort to "undo [ ] completed transactions" therefore violates the APA, *see Arkema*, 618 F.3d at 9.

Finally, the Zerzan/Jorjani Opinion purports to modify existing DOI regulations without going through the notice-and-comment rulemaking process, in violation of 5 U.S.C. § 706(2)(d). In 2024, DOI amended 30 C.F.R. § 585.102(a), through notice and comment rulemaking, *see*

---

[47] The new *de minimis* standard in the Zerzan/Jorjani Opinion is also contrary to law for the same reason it violates the APA's notice and comment rulemaking requirement: it runs counter to multiple BOEM regulations. *See infra* pp.40–41.

[48] *See, e.g.*, U.S. Dep't of Interior, BOEM, Record of Decision: Atlantic Shores Offshore Wind South Project Construction and Operations Plan at Appendix B pg. 70 (July 1, 2024), https://www.boem.gov/renewable-energy/state-activities/asow-south-0499-rod.

*Renewable Energy Modernization Rule*, 89 Fed. Reg. 42602 (May 15, 2024), to codify the Anderson Opinion's interpretation of subsection 8(p)(4).  The Zerzan/Jorjani Opinion rejects the balancing approach set forth in the codified regulation and permits BOEM to instead deny COP approval if it determines that the project would create more than "*de minimis*" interference with other ocean activities.[49]  The Zerzan/Jorjani Opinion is "inconsistent" with these regulations, *Shalala*, 514 U.S. at 100, thus requiring formal rulemaking.

## II.  Plaintiffs And Their Members Will Suffer Irreparable Harm In The Absence Of A Preliminary Injunction

To obtain injunctive relief, a plaintiff must show that "irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.  Economic harm resulting from agency action is irreparable because monetary damages are "nonrecoverable" due to the government's sovereign immunity.  *See Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted).

The recent vacatur of the Wind Memorandum's implementation only underscores the stakes for the wind and solar industries in this litigation—who remain irreparably harmed by Defendants' categorical and unjustified animus toward their technologies.  Notwithstanding that vacatur, the Anti-Renewable Actions continue to indefinitely delay, or outright prohibit, wind and solar development on both public and private lands and, in doing so, cause the same harms as Wind Memorandum imposed, *see infra* pp.4–5, while expanding these harms to solar developers.

A study conducted by Charles River Associates ("CRA") has conservatively estimated that the Anti-Renewable Actions have resulted in the cancellation or delay of 57.2 gigawatts (GW) of wind and solar projects planned by Plaintiffs' members and other wind and solar developers, jeopardizing at least $905 million in sunk investment costs.  *See* CRA Rep. at 1.  Permitting delays

---

[49] By creating a new *de minimis* standard, the Zerzan/Jorjani Opinion also unlawfully modifies 30 C.F.R. § 585.621(d), which simply requires that a COP demonstrate that it "[d]oes not *unreasonably interfere* with other uses of the OCS, including those involved with national security or national defense." (emphasis added).

caused by the Anti-Renewable Actions have also jeopardized the wind and solar industry's ability to receive up to $26 billion in investment tax credits that expire if developers cannot start construction of their projects within the statutory deadline. *Id.*; *see also* Joint Dec. ¶ 44. Developers will also face millions of dollars of additional financing costs with every year of project delay. *Id.* ¶ 41. "The observed impacts will compound over the 2026–2029 horizon" absent restoration of the federal permitting regime that existed before the Anti-Renewable Actions. CRA Dec. at 2.

The harms wrought by the Anti-Renewable Actions extend to companies like Plaintiff GECA that rely on wind and solar energy development and the energy they generate. Plaintiff GECA sells RECs to consumers and uses the proceeds from those sales to fund its environmental, renewable-energy-focused programming. Declaration of Green Energy Consumer Alliance, Inc. ("GECA Dec.") ¶ 19 (attached as Ex. I). By halting the pipeline of renewable energy development and frustrating those currently in service, the Anti-Renewable Actions reduce the supply of available RECs, thereby reducing GECA's revenues from the sale of those credits and GECA's ability to engage in its environmental programming. *Id.* ¶ 19. Certain members of Plaintiffs who have made significant investments in the wind and solar supply chain have also been grievously harmed by the Anti-Renewable Actions, including a Rhode Island-based operator of offshore wind support vessels (a member of RENEW Northeast and ACE-NY) that has lost millions due to the lack of a path forward for new offshore wind projects. *See* Declaration of Charles A. Donadio, Jr. ("Donadio Dec.") ¶¶ 8–9, 11–15 (attached at Ex. J). Similarly, a trade association focused on the offshore wind supply chain (a member of RENEW and ACE-NY) has members who have lost millions in contracts due to offshore wind developers' inability to permit their projects as a result

42

of the off-shore-wind-related Anti-Renewable Actions—and has lost revenue stemming from market disruptions directly caused by these actions.  *See* Burdock Dec. at ¶¶ 44–65.

Without a preliminary injunction, Plaintiffs' member companies—and Plaintiff GECA itself—face specific, irreparable economic and operational harm from each of the administrative actions at issue.  Because these harms stem from agency action, they are unrecoverable through damages.  *See Ohio*, 603 U.S. at 292.

*Bottleneck Memorandum.*  The Memorandum imposes irreparable economic harm on Plaintiffs' members with pending permit applications because it indefinitely delays all DOI wind and solar permitting.  Because of tight construction timelines, limited options for suppliers and contractors, and complex commercial obligations, delays in pending permit applications cause Plaintiffs' members to lose revenue and incur other unrecoverable expenditures.  Joint Dec. ¶¶ 35–45.  Those irreparable economic harms extend to Plaintiffs' members with projects in the pre-permitting stages, who rely on DOI's efficient and predictable permitting regime to attract investors.  *Id.* ¶¶ 39–40.  Uncertainty surrounding the regulatory regime has already increased capital costs and project risk, and the threat of impending delays in the permitting process risks making investors less likely to invest the capital required to construct and generate revenue from wind and solar projects.  *Id.* ¶¶ 39–40; Burdock Dec. ¶ 17.

The Memorandum has harmed a wide range of specific projects developed by members of Plaintiffs by making it practically impossible to secure a DOI permit or any other permit that requires consultation with a DOI bureau.  *Id.* ¶¶ 52–237.  A 250 megawatt ("MW") wind project in New York exemplifies this dynamic: it requires, and has applied for, a Section 404 permit from the Corps, which must then conduct an ESA Section 7 consultation with USFWS before issuing such permit.  *Id.* ¶¶ 92–94.  But USFWS has refused to consult with the Corps due to the Bottleneck

Memorandum, so the developer has been forced to redesign the project to avoid the need for a Section 404 permit, extending the construction timeline, reducing design efficiency, and diminishing anticipated revenues. *Id.* ¶¶ 95–97. An injunction against the Memorandum would allow the developer to revert to its original design and save itself (and ultimately consumers) significant money. *Id.* ¶ 98. Similar harms apply to countless projects of Plaintiffs' members. *Se, e.g.*, Joint Dec. ¶¶ 56–92, 99–237.

*Federal Lands Anti-Renewable Order.* This Order is causing irreparable harm to Plaintiffs members with projects proposed or in the planning stages on federal lands or the Outer Continental Shelf, because it rigs DOI's permitting regime to result in the denial of such projects (if the application even reaches a decision point, which the Bottleneck Memo prevents). Joint Dec. ¶¶ 238–39; Goggin Dec. ¶¶ 48, 50–51 (attached as Ex. L) (explaining flaws in capacity density metric). Such actual or anticipated denials deprive Plaintiffs' members of the revenues they anticipated generating from the permitted projects, result in the irretrievable loss of sunk costs invested in project development, and threaten contractual commitments made while their permit applications were pending. Joint Dec. ¶ 240.

The Order has harmed numerous specific wind and solar projects under development by Plaintiffs' members on federal lands or in federal waters. *Id.* ¶¶ 242–319. For example, the Order precludes a proposed 1,000 MW solar project in Arizona that has a comparatively low "capacity density" from receiving BLM approval of its ROW application that the developer submitted in May 2021. *Id.* ¶¶ 258–66. By pre-ordaining a permit denial, the Order threatens the over $5 million investment the project developer has already made in reliance on DOI's prior standard of review for ROW applications, and may require the developer to abandon the project all together

under the Order is vacated. *Id.* ¶¶ 264–66. Many projects developed by other members of Plaintiffs are subject to the same, or substantially similar, harms. *Id.* ¶¶ 242–58, 267–319.

*Corps' Anti-Renewable Memorandum.* This Memorandum will cause irreparable harm to any of Plaintiffs' members whose projects require a CWA Section 404 individual permit or RHA Section 10, because it imposes an array of barriers (including the rigged "capacity density" metric) that ensure wind and solar projects will not receive such permits. *Id.* ¶¶ 320–23.

The Memorandum has harmed numerous projects under development by Plaintiffs' members. *Id.* ¶¶ 325–52. For example, an 800 MW hybrid wind and solar project on private lands in Missouri has been re-engineered at a cost of millions of dollars to the developer in order to avoid impacts to jurisdictional waters that would have triggered the need for a Corps individual permit. *Id.* ¶¶ 325–31. If the Corps' Memo is vacated, the developer will once again be able to obtain a Corps individual permit because it will no longer be subject to the rigged capacity density analysis and deprioritized, and can thereby save those millions of dollars in unnecessary expenses by avoiding the costliest aspects of the redesign. *Id.* ¶¶ 330–31. Other Plaintiffs' members' projects are subject to similar harms. *Id.* ¶¶ 332–39.

*Eagle Take Permit Ban.* The Ban, now paired with USFWS's targeted enforcement of BGEPA against wind energy, has caused and will continue to cause irreparable economic harm to Plaintiffs' member companies. *Id.* ¶¶ 339–52. Plaintiffs' members who do not have an eagle incidental take permit must decide whether they can operate their facilities without a permit and risk expansive BGEPA liability, or if they must cease operations altogether. *Id.* ¶ 347. In order to manage this USFWS-created risk, wind farm operators often curtail generation, resulting in lost revenue from electricity sales and decreased overall project efficiency, *id.* ¶ 348, or implement extremely expensive (and likely unnecessary) mitigation technologies, despite the fact that even

these extraordinary measures cannot ensure compliance in the absence of a permit, *id.* ¶ 349. These harms—lost revenue from curtailed production, increased compliance costs, and superfluous mitigation investments—have materially compromised the financial viability of projects for many affected companies. *Id.* ¶ 350. These harms would be alleviated if the Eagle Take Permit Ban was lifted, because Plaintiffs' members would once again be allowed to obtain eagle incidental take permits, thereby protecting against enforcement risk and obviating the need to engage in curtailment or implement unnecessary mitigation measures. *Id.* ¶ 352.

Plaintiffs' members are unwilling to disclose specific operating projects that have been harmed by the Ban due to ongoing concerns about potential retaliation. *Id.* ¶ 351. However, as the declaration "plausibly" demonstrates, *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981), the Ban has forced certain of Plaintiffs' members to curtail generation and implement expensive (and potentially unnecessary) mitigation techniques to avoid potential takings—and lose revenue as a result, *see Am. Assoc. of Univ. Prof. v. Rubio*, 780 F. Supp. 3d 350, 377-78 (D. Mass. 2025) (considering anonymized harm allegations at preliminary injunction phase).

*Wind and Solar IPaC Ban*. The Ban has caused and will continue to cause irreparable economic harm to Plaintiffs' members because it precludes them from, among other things, completing the species and habitat analyses required to support a CWA Section 404 individual permit application or a pre-construction notice ("PCN") requesting that the Corps "verify" that the project qualified for a CWA NWP. Joint Dec. ¶ 358–60. The Ban also hurts Plaintiffs' members with pending individual permit applications or PCNs by making it impossible for the Corps to ascertain whether Section 7 consultation with USFWS is necessary, thus preventing even low-impact projects—which would proceed under streamlined mechanisms such as NWPs—from obtaining Corps permits. *Id.* As a direct result, many wind and solar developers are being forced

46

to redesign their projects to avoid jurisdictional waters—often at substantial expense—or abandon them all together. *Id.* ¶ 359; *see also id.* ¶¶ 35–45. The Ban also hinders wind and solar developers' ability to apply for an ESA Section 10 incidental take permit that helps them avoid potential criminal and civil liability. *Id.* ¶ 360. Many state and local permitting authorities also rely on IPaC as part of their environmental review processes for non-federal permits, so the Ban delays or impedes these decisions as well. *Id.* ¶ 361.

The Ban has harmed numerous specific wind and solar projects under development by Plaintiffs' members. *Id.* ¶¶ 364–446. For example, a 140 MW project on private lands in Illinois requires a CWA Section 404 authorization from the Corps, but the developer cannot apply for that permit because its application must include IPaC documentation that the developer cannot access due to the Ban. *Id.* ¶¶ 364–70. Without a Section 404 permit (or any way to apply for one), the developer may be forced to redesign its project to avoid the need for the permit, which would extend construction times, reduce design efficiency, increase costs, diminish revenues, and threaten the project's financial viability. *Id.* ¶¶ 367–69. If the Ban was lifted, the developer would be able to obtain the information necessary to submit its Section 404 permit application and the project could timely obtain this permit—the type of which the Corps routinely grants—without the need for a costly redesign. *Id.* ¶ 370. Similar dynamics continue to plague many of Plaintiffs' other members. *Id.* ¶¶ 371–446.

*The Zerzan/Jorjani Opinion*. The Zerzan/Jorjani Opinion is causing irreparable harm to Plaintiffs' members by ensuring that none of them will receive new COP approvals for offshore wind projects, and placing other members at risk of losing their existing COP approvals. *Id.* ¶¶ 449–51. The Opinion thus places billions of dollars in investment and years of planning at risk, causing further harm to Plaintiffs' members. *Id.* ¶ 451. The impending loss of existing COP

47

approvals justified by the Zerzan/Jorjani Opinion will result in developers breaching or being forced to walk away from contracts and relationships with suppliers, contractors, unions, stakeholders, and state governments. *Id*. And more broadly, the increased uncertainty around permitting for offshore wind projects will result in the same unrecoverable and irreparable harms described above, including schedule disruptions, cost hikes, deferred revenue, and reputational harm. *Id.*

The Opinion has harmed numerous specific offshore wind projects under development by Plaintiffs' members. Joint Dec. ¶¶ 453–86. For example, an offshore wind developer spent $780 million in 2022 acquiring a BOEM lease off of New Jersey, and has continued to incur rental expenses in the expectation that its COP would be timely reviewed under a legal standard consistent with Congress's intent to build offshore wind. *Id.* ¶¶ 468–471; 472. The Zerzan/Jorjani Opinion undermines that statutory standard by allowing BOEM to disapprove any COP solely on the basis of a finding that the Project creates "more than *de minimis*" interference with other ocean users—a likely outcome given that the Outer Continental Shelf is a venue for multiple uses and in light of this administration's animus toward offshore wind energy. *Id.* ¶ 471. The developer has thus postponed indefinitely its preparation and submittal of a COP as doing so would be futile. *Id*.

## III.    The Balance Of The Equities And Public Interest Favor Preliminary Injunctive Relief

The equities and the public interest "merge" when the government is the opposing party. *Nken*, 556 U.S. at 435. The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotations omitted). While there "is generally no public interest in the perpetuation of unlawful agency action," there "is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation modified).

Here, the public interest favors preliminarily enjoining the challenged agency actions during the pendency of this lawsuit. The Anti-Renewable Actions harm the public by delaying and preventing the development of wind and solar energy projects in the United States, which in turn threatens the public's vital interest in maintaining a reliable, affordable, and resilient power grid, which is currently struggling to meet record energy demand. *See* CRA Exec. Summary at 6; CRA Rep. at 23–27. While the Department of Energy has itself acknowledged that the nation's energy "status quo is unsustainable," CRA Rep. at 23 (citation omitted), wind and solar energy sources diversify the electrical grid, which inherently makes the grid more reliable, Goggin Dec. ¶¶ 10–12, and helps grid operators meet the ever-increasing demand for electricity, *id.* ¶¶ 18–19.

The Anti-Renewable Actions' stymieing of wind and solar energy developments also causes direct financial harm to consumers. As CRA explains, such delays "reduce both expected energy supply and accredited capacity during stressed hours, increasing the likelihood and magnitude of unserved energy events and shifting generation toward higher cost resources, which can contribute to higher wholesale prices and, where costs are passed through, higher retail bills." CRA Exec. Summary at 6. Ratepayers stand to suffer up to $89 million in higher electricity costs in 2026 alone due to the Anti-Renewable Actions. *Id.* at 7; CRA Rep. at 19–20. Wind and solar are indispensable to combatting this urgent, expensive, and growing energy crisis.

The agency actions also undermine the public's interest in sustained economic growth, job creation, and industrial stability, which a stable, predictable, and apolitical permitting regime for wind and solar development promotes. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1291 (U.S. Ct. Int'l Trade 2019) (describing the harms caused by "eliminating the business certainty required by the solar industry to plan and develop future projects"). As a result of the Anti-Renewable Actions, many wind and solar projects will be canceled or delayed,

"affect[ing] tens of thousands of direct construction jobs and thousands of long-term operating positions over the 2026-2029 period." CRA Rep. at 28. The Anti-Renewable Actions will also result in "sizable losses"—up to billions of dollars per year—"in direct GDP from wind and solar projects that do not proceed as planned." *Id.* at 29–30; Burdock Dec. ¶¶ 39–43.

The Government does not have any countervailing interests here that would weigh against the issuance of a preliminary injunction, because it suffers no harm from an injunction that merely prevents it from "perpetuat[ing] . . . unlawful agency action." *Newby*, 838 F.3d at 12. Nor is the government harmed by "[a] continuation of the status quo during the pendency of litigation." *N.H. Indonesian Cmty. Support v. Trump*, 765 F. Supp. 3d 102, 111 (D.N.H. 2025). Because Plaintiffs are likely to prevail on their claims, an injunction blocking enforce of those actions for the duration of this litigation would serve, rather than undermine, the public's interest in making sure federal agencies follow the law. *Newby*, 838 F.3d at 12.

## CONCLUSION

Plaintiffs respectfully request that this Court grant a preliminary injunction enjoining Defendant Agencies from enforcing the challenged Agency Actions.


Dated: January 12, 2025.

Respectfully submitted,


BY: */s/ Daron L. Janis*
Daron L. Janis (BBO #703028)
TROUTMAN PEPPER LOCKE LLP
111 Huntington Ave., 9th Floor
Boston, MA 02199
(617) 239-0124
daron.janis@troutman.com

Misha Tseytlin (*pro hac vice pending*)
TROUTMAN PEPPER LOCKE LLP

111 S. Wacker Dr.
Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

M. Benjamin Cowan (*pro hac vice pending*)
Troutman Pepper Locke LLP
600 Travis Street, Suite 2800
Houston, TX 77002
(713) 226-1339
ben.cowan@troutman.com

Kaitlin O'Donnell (*pro hac vice pending*)
Troutman Pepper Locke LLP
1313 N. Market St., Suite 1000
Wilmington, DE 19801
(302) 777-6541
kaitlin.odonnell@troutman.com

Anais Jaccard (*pro hac vice pending*)
Troutman Pepper Locke LLP
301 S. College St, 34th Floor
Charlotte, NC 28202
(704) 916-1506
anais.jaccard@troutman.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of January, 2026, a true and correct copy of the foregoing is being served via the Court's CM/ECF system upon all counsel of record, and is also being served via certified mail on January 13, 2026, upon the following:

Leah B. Foley
U.S. Attorney for the District of Massachusetts
1 Courthouse Way, Suite 9200
Boston, MA 02210

Pamela Bondi
U.S. Attorney General
950 Pennsylvania Avenue NW
Washington, DC 20530

U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Douglas Burgum
1849 C Street, NW
Washington, DC 20240

Bureau of Land Management
1849 C Street, NW
Washington, DC 20240

Steve Pearce
1849 C Street, NW
Washington, DC 20240

Bureau of Ocean Energy Management
1849 C Street, NW
Washington, DC 20240

Matthew Giacona
1849 C Street, NW
Washington, DC 20240

Bureau of Safety and Environmental Enforcement
1849 C Street, NW
Washington, DC 20240

Kenneth Stevens
1849 C Street, NW
Washington, DC 20240

U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, DC 20240

Brian Nesvik
1849 C Street, NW
Washington, DC 20240

U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314

William H. Graham, Jr.
441 G Street NW
Washington, DC 20314

*/s/ Daron L. Janis*
Daron L. Janis