# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |
|---|---|
| RENEW NORTHEAST, *et al.*,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR, *et al.*,<br><br>        *Defendants*. | Civil Action No. 1:25-cv-13961 |

**JOINT DECLARATION OF REGIONAL ORGANIZATION PLAINTIFFS' EXECUTIVE DIRECTORS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746(2), I, Francis Pullaro; I, Marguerite Wells; I, Nicole Hughes; I, Simon Mahan; I, Erika ("Rikki") Seguin; I, Evan Vaughan; I, Beth Soholt; and I, Chris Carmody submit this joint declaration in support of Plaintiffs' motion for a preliminary injunction. Each declarant serves as the Executive Director of a regional or statewide clean energy organization and offers this testimony based on personal knowledge, professional experience, and information obtained through their respective organizations and member companies. Collectively, we provide decades of experience in renewable energy development, policy, and advocacy across multiple regions of the United States. The following statements set forth our backgrounds, the missions of our organizations, and an explanation of the general and project-specific harms our member companies across the nation are experiencing as a result of the six final agency actions challenged in this suit: the July 15, 2025, Department of Interior ("DOI") Secretarial Review Memorandum

1

("DOI Renewable Bottleneck Memorandum");[1] the August 1, 2025, Secretarial Order 3438 ("DOI Capacity Density Order");[2] the September 18, 2025, U.S. Army Corps of Engineers (the "Corps") Directive ("Corps' Anti-Renewable Memorandum");[3] the Eagle Take Permit Ban;[4] the U.S. Fish and Wildlife Service ("USFWS") Information for the Planning and Consultation Portal Shutdown ("Wind and Solar IPaC Ban");[5] DOI Solicitor's Office M-37086 Opinion ("Zerzan/Jorjani Opinion)[6] (collectively, the "Anti-Renewable Actions").

## I.    DECLARANTS' RELEVANT BACKGROUND AND EXPERIENCE

### A.  FRANCIS PULLARO

1.    I, Francis Pullaro, am the President of RENEW Northeast. I have over 23 years in the energy industry.  I have held this position since 2011. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge,

---

[1] Memorandum from Gregory Wischer, Deputy Chief of Staff – Policy, to Assistant Secretaries Bureau and Office Heads (July 15, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other, also available as Amended Complaint, Exhibit A.

[2] U.S. Sec'y of the Interior, Order No. 3438, Managing Federal Energy Resources and Protecting the Environment (Aug. 1, 2025), https://www.doi.gov/document-library/secretary-order/so-3438-managing-federal-energy-resources-and-protecting, also available as Amended Complaint, Exhibit B.

[3] Amended Complaint, Exhibit C; *see also* Army Corps of Engineers Begins Implementing Policy to Increase America's Energy Generation Efficiency, U.S. Army Corps of Eng'rs (Sept. 22, 2025), https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/4311128/army-corps-of-engineers-begins-implementing-policy-to-increase-americas-energy/.

[4] U.S. Fish & Wildlife Service, 3-200-71: Eagle Incidental Take (General Permit), available at https://www.fws.gov/service/3-200-71-eagle-incidental-take-general-permit, also available as Amended Complaint, Exhibit D.  As noted in the Amended Complaint, USFWS removed this language from its website at some time after Plaintiffs filed their initial Complaint.  On information and belief—and also due to the DOI Renewable Bottleneck Memorandum remaining in effect—the Ban remains in place.

[5] U.S. Fish & Wildlife Service, Information for Planning and Consulting, https://ipac.ecosphere.fws.gov/location/index ("Solar and wind projects are currently not eligible to utilize the Information for Planning and Consultation website (per the July 15, 2025, DOI memo titled, "Departmental Review Procedures for Decisions, Actions, Consultations, and other Undertakings Related to Wind and Solar Energy Facilities" )"), also available as Amended Complaint, Exhibit F.

[6] United States Department of the Interior, Office of the Solicitor, M-37086: *Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059, Secretary's Duty to Prevent Interference with Reasonable Uses of Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf*, https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf, also available as Amended Complaint, Exhibit G.

2

investigation, and review of information and business records provided by RENEW Northeast member companies.

2.     RENEW Northeast is a 501(c)(6) not-for-profit organization that brings together renewable energy companies, environmental advocates, and communities to expand sustainable energy across New England. We champion the use of the region's abundant renewable resources—including offshore and land-based wind, solar, small hydropower, and energy storage—and emphasize the importance of transmission investments to deliver this clean power.

3.     As Executive Director, I am responsible for the day-to-day administration and management of RENEW's operations and for carrying out the organization's activities consistent with its mission and governing documents. I act pursuant to, and subject at all times to, the direction, authority, and oversight of RENEW's Board of Directors. The Board of Directors is RENEW's governing body and exercises exclusive authority over the organization's strategic direction, policy positions, and significant organizational actions, including the approval of major initiatives, expenditures, and commitments. The Board acts collectively and only through duly convened meetings or other formal action authorized by RENEW's bylaws. RENEW does not adopt positions or undertake material actions except as authorized by the Board of Directors, and all such decisions are made through a vote of the full Board.

4.     Based on my extensive discussions with RENEW Northeast members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

## B.  MARGUERITE WELLS

5.     I, Marguerite Wells, am the Executive Director of Alliance for Clean Energy New York, Inc. ("ACE NY"). I have over 15 years of experience in the clean energy industry, including grid-

scale land-based and offshore wind energy, and have held this position since April 2024. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by ACE NY member companies.

6.    ACE NY is a 501(c)(3) not-for-profit organization that serves as the premier multi-technology clean energy industry organization for the State of New York. ACE NY's mission is to promote the use of clean electricity technologies and energy efficiency in the State of New York, increase energy diversity and security, boost economic development, improve public health, reduce energy costs, and reduce air pollution. ACE NY's diverse membership includes companies engaged in the development, construction, and operation of land-based wind and solar power; offshore wind power facilities; energy efficiency contracting; manufacturing of clean energy equipment; and consulting to or supporting the clean energy industry. ACE NY's membership also includes environmental and labor organizations interested in the advancement of the clean energy industry in the State of New York.

7.    As Executive Director, I am the spokesperson for the organization and primarily responsible for ensuring ACE NY's effective advocacy and outreach operations on behalf of the renewable energy industry. I set the organization's legislative agenda and policy goals. I advocate for wind and solar energy industries with the New York State Legislature, state executive agencies, the New York State Energy Research and Development Authority ("NYSERDA"), and the New York Independent System Operator ("NYISO") by developing and delivering various policy positions, issuing media statements, responding on behalf of industry to public comment periods for relevant regulations, and conducting various speaking engagements to advance this industry. This work is done in consultation with ACE NY member companies. I also work to inform

4

members of pertinent policy developments, media coverage, advocacy, and industry progress in the State of New York. This includes tracking, researching, and analyzing proposed policies that will affect the development of wind and solar facilities.

8.    Based on my extensive discussions with ACE NY's members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

### C. NICOLE HUGHES

9.    I, Nicole Hughes, am the Executive Director of Renewable Northwest. I have over 20 years of experience in the renewable energy industry, specializing in management of utility scale energy development projects and policy development for national, state, and local organizations. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by Renewable Northwest members.

10.    Renewable Northwest is a 501(c)(3) not-for-profit organization that serves as one of the nation's most impactful renewable energy advocacy organizations, representing the interests of the Northwest. Renewable Northwest's mission is to decarbonize the Northwest region by accelerating the transition to renewable electricity. To date, we have supported state and regional policies that have brought the region over 13,270 megawatts ("MW") of new solar, wind, and geothermal projects—enough to serve 2,000,000 customers. Renewable Northwest's diverse membership includes a unique and powerful coalition of renewable energy professionals, energy buyers and marketers, ratepayer advocates, and environmental NGOs. Renewable Northwest operates within a geographic region that encompasses four Northwestern states: Oregon, Washington, Idaho, and Montana.

11.    In my role as Executive Director, I act as the primary public voice for the organization and oversee all major advocacy and outreach efforts that support the renewable energy community. My responsibilities include shaping our policy recommendations, preparing public and press statements, submitting formal comments on regulatory actions that affect the industry, and representing the organization at events and forums. I carry out these duties in close partnership with Renewable Northwest's member companies. I also ensure that our members stay up to date on significant policy shifts, media narratives, advocacy initiatives, and developments in the regional clean-energy landscape.

12.    Based on my extensive discussions with Renewable Northwest members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

**D.  SIMON MAHAN**

13.    I, Simon Mahan, am the Executive Director of the Southern Renewable Energy Association ("SREA"). I have over a decade of local, state, and federal legislative and regulatory experience. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by SREA members.

14.    SREA is an industry-led initiative dedicated to fostering the responsible use and development of renewable energy sources, specifically wind energy, solar energy, energy storage, and transmission solutions, in the Southern United States. Our vision is to establish renewable energy as a primary energy source across the South, ensuring that these sustainable options play a significant role in powering communities and businesses. To achieve this, our mission focuses on promoting the responsible adoption and growth of renewable energy technologies, ensuring they

6

are developed in a way that benefits both the environment and local economies. SREA operates within a geographic region that encompasses seven Southeastern states: Alabama, Arkansas, Georgia, Kentucky, Louisiana, Mississippi, and Tennessee. Through advocacy, education, and collaboration, we aim to advance the renewable energy landscape in these areas, empowering individuals, businesses, and policymakers to embrace cleaner energy solutions for a more sustainable future.

15.    As Executive Director of SREA, I engage in utility-scale wind energy and solar power advocacy, electric utility regulatory engagement, and legislative advocacy at the state and federal levels, throughout the South. In this capacity, I oversee SREA's participation in public utility proceedings, provide technical comments on integrated resource planning and transmission development, and intervene in regulatory dockets to ensure renewable energy interests are fairly represented. I also serve as SREA's public voice in policymaking circles, collaborating with utilities, state regulators, and other stakeholders to push for grid reforms, regional planning, and policies that reduce permitting friction and support the growth of renewable generation in the region. I coordinate SREA's strategic direction by engaging member companies (which include developers, investors, and energy consumers) to align advocacy goals with their technology and business priorities.

16.    Based on my extensive discussions with SREA members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

### E.  RIKKI SEGUIN

17.    I, Rikki Seguin, am the Executive Director of Interwest Energy Alliance ("Interwest"), and have held this position since 2019. I have over a decade of experience building clean energy

coalitions and advocating for clean energy deployment. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by Interwest members.

18.    The Interwest Energy Alliance is a non-profit trade association that brings the nation's leading companies in the renewable energy industry together with the West's advocacy community to expand deployment of a reliable, cost-effective, and diverse portfolio of renewable energy resources. Interwest works across New Mexico, Colorado, Wyoming, Utah, Nevada, and Arizona. Our membership brings together the leading developers and manufacturers of utility-scale renewable energy in the Intermountain West with environmental advocacy organizations, promoting the deployment of reliable, cost-effective, and diverse renewable energy resources.

19.    As Executive Director, I manage a multidisciplinary team of policy and technical experts engaged in advocacy efforts within regulatory and legislative forums to facilitate large-scale development of wind, solar, storage, and transmission resources. I work with our member organizations to understand the issues facing the renewable energy industry and to build consensus across a diverse set of Interwest members to advance our organization's six-state strategic agenda. I am deeply involved in development of strategy and implementation of each facet of Interwest's work, including permitting and market reform efforts, such as promoting the development of Regional Transmission Organizations ("RTOs") in the West, and regulatory proceedings and stakeholder forums that facilitate renewable energy development. In addition, I speak to policymakers, media, and industry groups about the economic and environmental benefits of renewable energy and transmission expansion in the interior West.

20.    Based on my extensive discussions with Interwest members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

### F.  EVAN VAUGHAN

21.    I am the Executive Director of MAREC Action (informally, "Mid-Atlantic Renewable Energy Coalition").  I have over 10 years of experience working to grow clean energy in the United States. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by MAREC Action members.

22.    MAREC Action is a 501(c)(4) not-for-profit organization that serves as the voice of the transmission-connected clean energy industry in PJM Interconnection—America's largest electricity grid. MAREC Action's mission is to strengthen and expand renewable energy development across ten jurisdictions in the PJM region: Delaware, the District of Columbia, Kentucky, Maryland, New Jersey, North Carolina, Ohio, Pennsylvania, Virginia, and West Virginia. MAREC Action's diverse membership includes utility-scale solar, wind, and energy storage developers and owner-operators, alongside manufacturers of wind turbines, solar panels, and batteries.

23.    As Executive Director, I am the chief executive and spokesperson for the organization and I am primarily responsible for ensuring MAREC Action's effective advocacy and outreach operations on behalf of our members in the renewable energy industry. I lead legislative and regulatory advocacy across ten PJM jurisdictions on behalf of over 50 utility-scale wind, solar, and energy storage companies. I collaborate with policymakers, regulators, and other stakeholders to advance clean energy development and grid modernization throughout the Mid-Atlantic region. I

also advise members on strategic opportunities and challenges in the renewable energy sector, helping them navigate market and regulatory developments. In addition, I oversee initiatives to support industry growth, including identifying best practices for project development and facilitating collaboration among stakeholders.

24.     Based on my extensive discussions with MAREC Action members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

## G. BETH SOHOLT

25.     I, Beth Soholt, am the Executive Director for the Clean Grid Alliance ("CGA"). I have over 20 years of experience in the energy industry. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by CGA members.

26.     CGA is a 501(c)(3) nonprofit and associated 501(c)(6) trade organization dedicated to advancing clean energy development and grid modernization in the Midwest. CGA provides a unified voice for its 80+ members, advocating for policies and regulations that support the growth of renewable energy and strengthen the regional energy market. By engaging directly with policymakers, regulators, and industry stakeholders, CGA and its members support an industry responsible for over $450 million in annual economic benefits and hundreds of thousands of jobs across the Midwest. CGA covers the nine Upper Midwest States of the Midcontinent Independent System Operator ("MISO") footprint, including: Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, and Wisconsin.

27.     As Executive Director, I lead the organization in advancing clean energy and modernizing the electric grid throughout the Midwest. I am responsible for guiding CGA's strategic initiatives,

10

including programs that help members navigate evolving market conditions, regulatory changes, and emerging technology opportunities. I work closely with industry partners, stakeholders, and regional leaders to foster collaboration, share best practices, and drive initiatives that strengthen the clean energy sector. In addition, I ensure members have access to timely information on industry developments, market trends, and initiatives that impact renewable energy deployment, enabling them to make informed decisions and pursue growth opportunities.

28.    Based on my extensive discussions with CGA members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

## H.  CHRIS CARMODY

29.    I, Chris Carmody, am the Executive Director of the Carolinas Clean Energy Buyers Association ("CCEBA"). I have over 14 years of experience working to grow clean energy in the United States. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge, investigation, and review of information and business records provided by CCEBA members.

30.    CCEBA is a 501(c)(6) non-profit trade association that promotes and expands market opportunities for the clean energy sector in North and South Carolina. CCEBA represents a broad cross-section of businesses—from independent power producers and developers to engineering and construction firms, financial and legal service providers, manufacturers, and commercial clean-energy purchasers. Through active engagement with state utility commissions, legislative bodies, and local governments, CCEBA advocates for policies that enable greater access, competitive market structures, and regulatory reform. Key issues for CCEBA include integrated resource planning, grid interconnection, energy pricing, and clean energy procurement. The

organization intervenes in regulatory cases at the North Carolina Utilities Commission and the South Carolina Public Service Commission, bringing a data-driven, industry-informed voice to major proceedings.

31.     As Executive Director of CCEBA, I lead the organization's advocacy, regulatory, and policy efforts on behalf of clean energy companies in North and South Carolina. I oversee all aspects of CCEBA's engagement with state regulatory agencies, legislative bodies, and market operators to advance policies that support renewable energy development and market growth. In this role, I coordinate with member companies and stakeholders to identify priority issues, develop strategic positions, and drive initiatives that promote clean energy deployment and economic competitiveness in the region.

32.     Based on my extensive discussions with CCEBA members, I am qualified to speak to the harms that members of the wind and solar energy industries are suffering as a result of the Anti-Renewable Actions challenged in this suit.

## II.     HARMS CAUSED BY THE CHALLENGED AGENCY ACTIONS

### A.     GENERAL HARM CAUSED BY PERMIT DENIALS AND DELAYS

33.     Wind and solar projects cannot be built unless and until they obtain all permits mandated under federal, state, and/or local laws and regulations. Both denials of such permits and delays in permitting decisions are likely to significantly delay or even terminate a project's development, and cause significant consequential, economic harms to the project developer as a result.

34.     Harms flowing from the Anti-Renewable Actions arise from the following federal permitting regimes (or permitting prerequisites) critical to the construction and operation of wind and solar facilities on public and private lands:

12

a. Bureau of Ocean Energy Management ("BOEM") Construction and Operations Plan ("COP") approval: Construction permit needed prior to commencing construction of offshore wind facilities on the Outer Continental Shelf, as well as for operating such facilities.

b. Bureau of Land Management ("BLM") Right-of-Way ("ROW") approval: Construction permit needed prior to commencing construction of wind, solar, and associated transmission facilities on BLM lands, as well as for operating such facilities.

c. Endangered Species Act ("ESA") Section 7 consultation: Mandatory consultation between a permitting agency and USFWS to ensure permitted action is "not likely to jeopardize the continued existence" of any listed species, which consultation must take place before any federal construction permit can be issued.

d. ESA Section 10 Incidental Take Permit: Permit issued by USFWS that allows project developers to incidentally take listed species during construction or operation of a project, needed to avoid civil and criminal liability for such incidental take, and often expected by lenders in order to finance such projects; procured when a project is likely to harm listed species, but does not require a federal permit that would trigger ESA Section 7 consultation.

e. Bald and Golden Eagle Protection Act ("BGEPA") Incidental Take Permit: Permit issued by USFWS that allows project developers to incidentally take bald and golden eagles during construction or operation of a project; needed to avoid civil and criminal liability for such incidental take, and often expected by lenders in order to finance such projects.

13

      f.   Clean Water Act ("CWA") Section 404 Dredge and Fill Permit: Permit issued by the Corps that allows for discharge of dredged and fill material into waters of the United States during construction of a project, and needed prior to construction of any portion of a project that results in such discharges.

35.    The inability to obtain these permits or complete such consultations can terminate a wind or solar project outright and/or put the project's financing in jeopardy. The inability to obtain these permits or consultations (particularly with respect to Corps Section 404 permits) can often force developers to undertake a costly project redesign to avoid the need to obtain or complete the relevant permit or consultation.

36.    Protracted permitting delays can also be costly or even fatal to wind and solar energy projects. These projects have complex commercial obligations, tight construction timelines, and limited options for contractors and material resources needed to complete construction. Consequently, delays of months or years can severely reduce the financial viability of a project— sometimes to the extent that the project must be canceled.

37.    For instance, wind and solar energy developers often enter contracts with prospective off-takers—called "power purchase agreements" ("PPAs")—before they commence the project development process. These PPAs typically contain deadlines by which the project must begin delivering power. Delays in the fulfillment of these deadlines frequently trigger penalties and/or force the parties to renegotiate the PPA's terms, often on terms less favorable to the developer. To ensure that these PPA deadlines can be met, developers must take steps early in the process to ensure they can meet future delivery agreements. For example, projects often begin supply chain procurement—such as placing orders with manufacturing facilities—well before permitting has

14

begun or while it is still underway. This dynamic makes timely permitting essential, as even modest delays can disrupt tightly aligned manufacturing and construction schedules.

38.     When permitting delays disrupt the carefully coordinated sequence between component production and project installation, material costs tend to escalate dramatically. If permitting delays make it impossible for a wind or solar developer to move forward with component installation as scheduled, the developer may be required to cancel or postpone existing manufacturing orders, breach contracts, pay a penalty to the manufacturer, and/or incur higher prices in the future due to inflation or accelerated delivery timelines.  Developers also need to plan in advance to secure a location suitable for storing massive project components, before and during construction, in a way that will not impact their structural integrity and life expectancy.  Permitting delays can result in developers paying exorbitant fees to hold these storage facilities for longer than expected or to seek alternative storage locations that increase construction costs.

39.     Permitting delays also substantially increase construction, labor, and shipping costs. For example, offshore wind turbine installation requires specialized equipment that is typically owned by third parties. Onshore wind turbine installation likewise relies on limited, and often seasonal, availability of specialized cranes, heavy-haul transportation, and experienced construction crews that are typically provided by third-party contractors. Consequently, developers generally secure these services well in advance of the planned start of construction—while federal permitting is still underway or has not even begun.  If required federal, state, or local permits are not obtained before construction is scheduled to begin, developers may need to delay mobilization, reschedule contracted services, or renegotiate construction timelines. Such delays can extend a project's completion date and increase overall costs by requiring additional equipment rental periods, extended site management, storage or rescheduling of turbine components, and adjustments to

transportation and logistics plans. In some cases, delays may also increase the risk that critical equipment or labor will not be available during subsequent construction windows, further complicating project execution.

40.    In addition, project financing contracts rely heavily on predictable and certain timelines for construction, development, and operations. Permitting delays push back the start of operations and revenue generation, which can increase interest rates on existing loans and require developers to seek additional capital. Uncertainty around project completion and permitting timelines also elevates perceived risk for investors, regularly leading to higher risk premiums or more restrictive financing terms to compensate for the potential of delayed or insufficient returns.

41.    When indefinite permitting delays are a near certainty, this harms developers who have not even started the permitting process.  Capital providers depend on predictability in permitting to underwrite investments, and the cloud over the current regulatory regime for wind and solar projects has already increased capital costs and project risk.  As noted above, uncertainty over project timelines make those projects less attractive to investors, leading to higher risk premiums and borrowing costs.  Therefore, the threat of impending delays in the permitting process risks making investors less willing to invest in wind and solar development projects at the outset of the process, when investments are most crucial to the projects' eventual construction and the generation of revenues therefrom.

42.    Collectively, these types of disruptions can negatively impact a developer's reputation in the marketplace, as it is difficult to build relationships of trust and reliability with contractors and suppliers when the developer is constantly subject to arbitrary and dilatory regulatory behavior and struggles to make firm contractual commitments.

43.    Permitting delays are also harmful to the wind and solar energy supply chain and manufacturing sectors. If permitting uncertainty exists, developers cannot set construction timelines, enter into new construction contracts, or place new orders for project components and subcomponents. Such uncertainty may also force energy projects in later stages of development to postpone or suspend construction timelines and cancel existing orders. This reduces demand for specialty wind and solar equipment and materials produced at domestic manufacturing facilities, including towers, blades, nacelles, solar racks, solar panels, inverters, and transformers. If this lack of demand persists, the domestic supply chain for renewable energy development may completely collapse. If such a collapse occurs, future domestic wind and solar energy projects will have to source a greater proportion of project components from foreign markets, potentially at a cost premium due to increased shipping expenses, tariffs, and other factors.  The declarations of the Oceantic Network (a member of RENEW Northeast, ACE NY, and Renewable Northwest) and Atlantic Wind Transfers (both members of RENEW Northeast and ACE NY) (attached to the Motion for Preliminary Injunction) provide further detail on the general impacts of the Anti-Renewable Actions on parts of the supply chain and on specific companies within it.

44.    The One Big Beautiful Bill Act ("OBBBA") has also made wind and solar projects even more vulnerable to permitting delays. Prior to its enactment on July 4, 2025, key wind and solar tax credits were scheduled to phase out gradually beginning in 2032 or once the United States achieved a 25% reduction in carbon emissions from electricity generation. This extended timeline encouraged investment in renewable energy, and many companies have committed significant capital in reliance on these credits. The OBBBA conditions continued eligibility for wind and solar tax credits on compliance with compressed timing requirements—either beginning construction by July 4, 2026, or, if construction begins later, placing projects in service by December 31, 2027.

17

As a result, the substantial permitting delays—and the resulting development delays—caused by the Anti-Renewable Actions make compliance with the placed-in-service requirement impossible for many projects that will miss the July 4 construction-start deadline. The loss of these tax credits can increase the cost of affected wind and solar projects by as much as 50%. The aggregate effects of these lost tax credits are described in more detail in the Charles River Associates study attached to the Motion for Preliminary Injunction.

45.    In sum, permitting delays generate severe, compounding harms felt at every stage of wind and solar project development. Delays disrupt carefully sequenced commercial arrangements, inflate material and construction costs, and undermine the financial assumptions on which project financing depends. They also destabilize the broader domestic supply chain by stripping manufacturers of predictable demand, threatening long-term erosion of domestic production capacity. The compressed tax-credit deadlines imposed by OBBBA magnify these impacts, transforming setbacks into existential threats for many projects. If permitting delays persist, the cumulative commercial, logistical, and financial pressures they create will continue to escalate, increasing the likelihood that projects fail to move forward at all.

46.    The United States wind and solar energy industries are integrated national industries and cannot be disaggregated by State. Our members depend on the existence of a flourishing *national* clean energy industry, which requires a manufacturing supply chain, skilled labor, and specialized installation and transportation equipment, among other necessary inputs, all of which exist in nationwide and international markets. The electricity produced at wind and solar facilities is often sold locally but may also be purchased or sold in regional electricity markets. As such, the Anti-Renewable Actions have directly affected the interests of RENEW Northeast, ACE NY, Renewable Northwest, SREA, Interwest, MAREC Action, CGA, and CCEBA members nationwide.

18

47.     The harms caused by the Anti-Renewable Actions have been getting progressively worse over time, with no end in sight, as described below.  Plaintiffs and their members generally do not engage in affirmative APA litigation, but it has now become clear that only judicial relief can stop the ongoing, accelerating harms that the Actions are imposing.  Further, the December 8, 2025 vacatur of agency implementation of the Presidential Wind Memorandum's permitting freeze for wind energy development—which, if allowed to stand, would have prevented a significant portion of Plaintiffs' requested injunctive relief in this lawsuit from having any practical benefit for wind projects—has now made the need for a preliminary injunction in this matter even more immediate.

### B.  SPECIFIC HARMS CAUSED BY EACH FINAL AGENCY ACTION

48.     We have worked closely with our respective members to ascertain the specific impacts the Anti-Renewable Actions will have on their businesses and wind and solar energy development prospects. These actions have the individual and cumulative effect of imposing a functional moratorium on the permitting and development of wind and solar energy facilities.  We also note that even if a few wind or solar projects occasionally ever make it through the permitting process (perhaps as the result of political pressure/favoritism and/or being at a highly advanced stage in the permitting process), that does not in any way negate the harms the Anti-Renewable Actions are causing the vast majority of projects, Plaintiffs' members, and the public.

49.     Member companies of RENEW Northeast, ACE NY, Renewable Northwest, SREA, Interwest, MAREC Action, CGA, and CCEBA will continue to face significant harms each day the Anti-Renewable Actions are in place. Specifically, because of these directives, project development and construction deadlines have been delayed; contracts have been lost; the costs of capital and equipment has increased; delay-related contract penalties have been incurred; operating projects have had to curtail production; supply chains have been disrupted; investments have been

19

sidelined; layoffs have been forced; projects in early stages of development are being redesigned, at substantial costs, to avoid a federal permitting nexus; and tax credit eligibility windows have or will soon close.

50.    As such, the Anti-Renewable Actions have caused direct, immediate, and irreversible harm to RENEW Northeast, ACE NY, Renewable Northwest, SREA, Interwest, MAREC Action, CGA, and CCEBA members. Without immediate judicial intervention, these Anti-Renewable Actions will continue to inflict escalating and irreversible financial and operational damage and will undermine members' long-term business stability and competitive position in the energy market.

51.    Each project listed in this declaration is owned or developed by a member of at least one regional or statewide clean energy organization that is a plaintiff in this action. Each of those plaintiff organizations, in turn (with the exception of GECA, which is not a member-based organization), includes, as a member in its own right, at least one company or an owner or developer associated with a project listed in this declaration. For example, Atlantic Wind Transfers is a member of RENEW; Rich Road Solar LLC, the developer of the Rich Road Solar Project, is a member of ACE-NY; Spacedust Solar 1 LLC, the developer of the Spacedust Solar Project, is a member of Renewables Northwest; Boeuf LLC, the developer of the Boeuf Solar Project, is a member of SREA; American Glory Solar LLC, the developer of the American Glory Solar Project, is a member of Interwest; MarWin LLC, a developer of the Mayland Offshore Wind Project, is a member of MAREC Action; Austin Creek Solar LLC, the developer of the Austin Creek Solar Project, is a member of CGA; and Castalian Spring LLC, the developer of the Castalian Spring Solar Project, is a member of CCEBA.

a. *July 15, 2025, DOI Renewable Bottleneck Memorandum*

52.    The DOI Renewable Bottleneck Memorandum mandates that "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities shall require" review by DOI's Office of the Executive Secretariat and Regulatory Affairs; the Office of the Executive Secretariat and Regulatory Affairs; and the Office of the Secretary.

53.    Since the DOI Renewable Bottleneck Memorandum was issued, the permitting process for wind and solar projects owned by members of RENEW Northeast, ACE NY, Renewable Northwest, SREA, Interwest, MAREC Action, CGA, and CCEBA has come to a virtual standstill.

54.    More specifically, the DOI Renewable Bottleneck Memorandum has made it functionally impossible for such members to make progress toward securing any of the permits listed in ¶ 34, *supra*, and in many instances, members of Plaintiffs have been discouraged from even trying to advance wind and solar projects through the DOI permitting process because doing so would be futile.  This results in all of the harms set forth in ¶¶ 33–47, *supra*.

55.     The DOI Renewable Bottleneck Memorandum has caused immediate economic harm to the following projects, each of which are either members of one or more Plaintiffs or projects owned by members of one or more Plaintiffs.

a) **The American Glory Solar Project**

56.    The American Glory Solar Project is a proposed 1500 MW photovoltaic solar facility on BLM lands in Nevada.

57.    The American Glory Solar Project requires a ROW grant to proceed on BLM lands.

58.    In December 2022, American Glory Solar LLC submitted a ROW application to BLM for the American Glory Solar Project.

21

59.     In July 2022, BLM approved the American Glory Solar Project's variance request and accepted it for further review under NEPA.

60.     The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application.  The process established by the Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

61.     The Memorandum thus precludes the American Glory Solar Project from securing a ROW from BLM for the foreseeable future.

62.     Without a ROW grant from BLM, the American Glory Solar Project will not  be able to commence development, deliver electricity, or generate revenue.

63.     To date the developer has invested approximately $1 million in development of the project, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

64.     Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the American Glory Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive ROW approval within a predictable timeframe.

65.     If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the American Glory Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

**b) The Atlantic Shores Bight Project**

66.     The Atlantic Shores Bight Project is a proposed offshore wind project off the coast of New Jersey.

67.     On February 23, 2022, the developer secured lease OCS-A 0541 in a competitive BOEM auction for $780 million, which it paid to the U.S. Treasury.

68.     The Atlantic Shores Bight Project requires a COP approval to proceed.  However, the process established by the DOI Renewable Bottleneck Memorandum prevents BOEM staff from advancing applications, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.  For this reason and due to other final agency actions challenged in this suit, the developer has postponed indefinitely its preparation and submittal of a COP, as doing so would be futile.

69.     The Memorandum thus precludes the Atlantic Shores Bight Project from securing its COP approval from BOEM for the foreseeable future.

70.     Without a COP approval, the Atlantic Shores Bight Project will never be able to commence development, deliver electricity, or generate revenue. To date, the Atlantic Shores Bight Project has spent more than $780 million in lease acquisition fees, along with hundreds of thousands of dollars more in rental fees based on the reasonable expectation of timely approval of its ROW application and related federal authorizations. The Atlantic Shores Bight Project continues to pay rental fees to the United States despite being unable to proceed with development.

71.     Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Atlantic Shores Bight Project that is

23

sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive COP approval within a predictable timeframe.

72.    If federal permitting does not resume expeditiously, the developer may be forced to abandon the Atlantic Shores Bight Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

**c)  The Atlantic Shores North Project**

73.    The Atlantic Shores North Project is a proposed offshore wind project of up to 2.35 GW off the coast of New Jersey.

74.    On December 4, 2018, the developer acquired lease OCS-A 0499 for $215 million. Following the assignment of the lease to the developer, the OCS-A 0499 lease was segregated into three separate leases, OCS-A 0499, OCS-A 0549, and OCS-A 0570.  The Atlantic Shores North Project is affiliated with lease OCS-A 0549.

75.    The Atlantic Shores North Project requires a COP approval to proceed; it submitted a COP to BOEM on April 29, 2022 and an updated version on March 1, 2024.  BOEM's review of the COP was paused on May 22, 2025 according to the FAST-41 permitting dashboard.

76.    The DOI Renewable Bottleneck Memorandum has effectively halted BOEM's review of any COP application.  The process established by the Memorandum prevents BOEM staff from advancing applications, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.  For this reason and due to other final agency actions challenged in this suit, the developer has been forced to pause efforts to progress its submitted COP application as continuing to do so would be futile.

77.    The Memorandum thus precludes the Atlantic Shores North Project from securing a Final Environmental Impact Statement, Record of Decision and ultimately COP approval from BOEM for the foreseeable future.

78.    Without a COP approval from BOEM, the Atlantic Shores North Project will never be able to commence development, deliver electricity, or generate revenue.

79.    To date, the developer has spent $215 million in initial lease acquisition fees plus an additional milestone payment of tens of millions of dollars (for all three leases), and continues to pay rental fees, including $243,387 in rental payments attributable to the OCS-A 0549 lease for 2025 alone, based on the reasonable expectation of timely approval of its COP application and related federal authorizations. The Atlantic Shores North Project continues to pay rental fees to the United States despite being unable to proceed with development.

80.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Atlantic Shores North Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive COP approval within a predictable timeframe.

81.    If federal permitting does not resume expeditiously, the developer may be forced to abandon the Atlantic Shores North Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

   d)  **The Bouse Solar Project**

82.    The Bouse Solar Project is a proposed 1,000 MW solar photovoltaic solar facility on BLM lands in Arizona.

83.    The Bouse Solar Project requires a ROW grant to proceed on BLM land.

25

84.    In May 2021, the developer submitted a ROW application to BLM for the Bouse Solar Project.

85.    In May 2022, BLM approved the Bouse Solar Project's variance request and accepted the Bouse Solar Project for further review under NEPA.

86.    The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application.   The process established by the DOI Renewable Bottleneck Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

87.     The DOI Renewable Bottleneck Memorandum thus precludes the Bouse Solar Project from securing a ROW from BLM for the foreseeable future.

88.    Without a ROW grant from BLM, the Bouse Solar Project will never be able to commence development, deliver electricity, or generate revenue.

89.    To date, the developer has invested more than $5 million on development based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

90.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Bouse Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive ROW approval within a predictable timeframe.

91.    If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Bouse Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs totaling approximately $15 million.

e) **The Canisteo Wind Project**

92.     The Canisteo Wind Project is a 250-MW wind energy facility on private lands in New York that is under development.

93.     As designed, the Canisteo Wind Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

94.     Further, based on pre-construction surveys and site studies, the Canisteo Wind Project may have had "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, in March of 2024, the Corps indicated that it must conduct an ESA Section 7 consultation with USFWS before it could issue a Section 404 authorization to the Canisteo Wind Project.

95.     The Canisteo Wind Project submitted its application and all accompanying materials to the Corps in October 2024.  The Corps is unable to issue the Section 404 authorization, however, because USFWS is no longer processing ESA Section 7 consultations due to the DOI Renewable Bottleneck Memorandum.

96.     Through 2024, the Canisteo Wind Project had invested tens of millions of dollars based on the reasonable expectation of timely authorization from the Corps.

97.     In 2025, in light of federal permitting uncertainty—including because of the DOI Renewable Bottleneck Memorandum—in order to move forward, the Canisteo Wind Project needed to be redesigned at significant cost,  reducing design efficiency and ultimately resulting in higher expenses and diminished revenues.

98.     Based on our extensive experience advocating for wind and solar development, and consultations with our developer members, the developer would have received its Corps permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place and the Corps

27

was allowed to consult with USFWS under ESA Section 7.  For now, the project can still be built more efficiently and at a significantly lower cost if the Memorandum is expeditiously enjoined.

f) **The Kaskaskia Wind Project**

99.     The Kaskaskia Wind Project is a 500 MW wind facility under development on private lands in Southern Illinois.

100.    As designed, the Kaskaskia Wind Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

101.    Further, based on pre-construction surveys and site studies, construction of the Kaskaskia Wind Project may have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, the Corps must conduct an ESA Section 7 consultation with USFWS before it can authorize project construction that impacts jurisdictional wetlands.

102.    Operation of the Kaskaskia Wind Project may also require an incidental take permit under Section 10 of the ESA.

103.    To date, $10 million has been invested in Kaskaskia Wind Project based on the reasonable expectation of timely authorization from the Corps.

104.    Because USFWS is not conducting Section 7 consultations for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, the Kaskaskia Wind Project cannot obtain the Corps permit it requires to commence construction.

105.    If DOI does not resume ESA Section 7 consultations expeditiously, the Kaskaskia Wind Project will have to be redesigned at a significant cost, which will extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues. Additionally, due to uncertainty surrounding permit approvals, the Kaskaskia Wind Project did not

28

submit the required deposit to secure an advantageous interconnection position in the 2022 MISO queue. Losing this position delays the start of revenue generation, imposing substantial financial harm on the company.

106.    Because USFWS is not issuing ESA Section 10 incidental take permits for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, the Kaskaskia Wind Project will be required to engage in production curtailment (i.e. operational avoidance) to eliminate the possibility of "taking" of bats.

107.    The required curtailment would occur during the most valuable hours of wind generation, particularly the evening ramp when solar output diminishes, resulting in a reduction in annual generation.

108.    Because the Kaskaskia Wind Project will have to absorb this loss of high-value generation while maintaining the same capital expenditures, the effective cost per megawatt-hour increases substantially, reducing project returns and necessitating higher PPA pricing to remain viable. These dynamics also increase the Kaskaskia Wind Project's relative cost of capital due to the heightened operational and permitting risk.

109.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the Kaskaskia Wind Project would receive its Corps permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place and the Corps were allowed to consult with USFWS under ESA Section 7, and would receive a Section 10 incidental take permit in a timely manner for the same reasons.  For now, the project can still be built and operated more efficiently and at a significantly lower cost if the Memorandum is expeditiously enjoined.

g) **The Lonely Road Solar Project**

110.    The Lonely Road Solar Project is a proposed 600 MW photovoltaic solar facility on BLM lands in Nevada.

111.    The Lonely Road Solar Project requires a ROW grant to proceed on BLM lands.

112.    In July 2024, the developer submitted a ROW application to BLM.

113.    In September 2024, BLM approved the developer's variance request and accepted the Lonely Road Solar Project for further review under the NEPA.

114.    The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application.  The process established by the DOI Renewable Bottleneck Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

115.    The DOI Renewable Bottleneck Memorandum thus precludes the Lonely Road Solar Project from securing a ROW from BLM for the foreseeable future.

116.    Without a ROW grant from BLM, the Lonely Road Solar Project will not be able to commence development, deliver electricity, or generate revenue.

117.    To date the Lonely Road Solar Project has invested approximately $200,000 in development of the project, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

118.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Lonely Road Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive ROW approval within a predictable timeframe.

30

119.   If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Lonely Road Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

h)  **The Macadamia Solar Project**

120.   The Macadamia Solar Project is a proposed 484 MW photovoltaic solar facility on private lands in North Carolina.

121.   As designed, the Macadamia Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

122.   Further, based on pre-construction surveys and site studies, the Macadamia Solar Project may have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, the Corps must conduct an ESA Section 7 consultation with USFWS before it can authorize Project construction that impacts jurisdictional wetlands.

123.   The Macadamia Solar Project has been deterred from attempting to obtain the Corps permit it requires to commence construction, based on the understanding that such application is futile because USFWS is not conducting Section 7 consultations for renewable energy projects due to the DOI Renewable Bottleneck Memorandum.

124.   If DOI does not resume ESA Section 7 consultations expeditiously, the Macadamia Solar Project will have to be redesigned at a significant cost, which will extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

125.   Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the developer would receive the Corps permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place and the Corps

31

was allowed to consult with USFWS under ESA Section 7. For now, the project can still be built more efficiently and at a significantly lower cost if the Memorandum is expeditiously enjoined.

### i) The Monte Cristo Solar Project

126. The Monte Cristo Solar Project is a proposed 2,500 MW solar photovoltaic solar facility on BLM lands in Arizona.

127. The Monte Cristo Solar Project requires a ROW grant to proceed on BLM land.

128. In September 2022, the developer submitted a ROW application to BLM for the Monte Cristo Solar Project.

129. In September 2024, BLM approved the Project's variance request and accepted the Project for further review under NEPA.

130. The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application. The process established by the DOI Renewable Bottleneck Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

131. The Memorandum thus precludes the Monte Cristo Solar Project from securing a ROW from BLM for the foreseeable future.

132. Without a ROW grant from BLM, the Monte Cristo Solar Project will not be able to commence development, deliver electricity, or generate revenue.

133. To date, the developer has invested more than $2 million in project development, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

134. Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Monte Cristo Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive ROW approval within a predictable timeframe.

135. If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Monte Cristo Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### j) The Nemo Wind Project

136. The Nemo Wind Project is a 290 MW wind facility under development on private lands in Eastern Illinois.

137. The Nemo Wind Project requires an incidental take permit under Section 10 of the ESA because of the possibility that the Nemo Wind Project may "take" bats when operational.

138. The Nemo Wind Project submitted its ESA Section 10 incidental take permit application and all accompanying materials to USFWS in July 2024. The last USFWS correspondence was received in June 2025, which indicated that USFWS had prepared a draft environmental assessment, but that it had "not received any updates regarding the timeline for the Federal Register notice associated with wind energy actions." USFWS stopped communicating with the Nemo Wind Project after the DOI Renewable Bottleneck Memorandum was issued.

139. Because of the DOI Renewable Bottleneck Memorandum, USFWS has not published the draft environmental assessment in the Federal Register and the permitting process has been indefinitely halted.

140. To date, over $23 million has been invested in the Nemo Wind Project based on the reasonable expectation of timely Section 10 authorization from USFWS.

141.    If DOI does not resume federal permitting expeditiously, the Nemo Wind Project will continue to incur daily losses. Without a Section 10 incidental take permit, investors are unwilling to continue financing the Nemo Wind Project, placing construction on indefinite hold, and threatening the Nemo Wind Project's position in the interconnection queue. If delays persist, the Nemo Wind Project may fail to meet contractual obligations and suffer even greater financial losses.

142.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the developer would receive a Section 10 incidental take permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place.

### k) The Parker Solar Project

143.    The Parker Solar Project is a proposed 250 MW solar photovoltaic solar facility on BLM lands in Arizona.

144.    The Parker Solar Project requires a ROW grant to proceed on BLM land.

145.    In September 2021, the developer submitted a ROW application to BLM for the Parker Solar Project.

146.    In November 2024, BLM approved the Parker Solar Project's variance request and accepted the Parker Solar Project for further review under NEPA.

147.    The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application. The process established by the DOI Renewable Bottleneck Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

148.    The DOI Renewable Bottleneck Memorandum thus precludes the Parker Solar Project from securing a ROW from BLM for the foreseeable future.

149.    Without a ROW grant from BLM, the Parker Solar Project will not be able to commence development, deliver electricity, or generate revenue.

150.    To date, the developer has invested more than $3 million in project development based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

151.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Parker Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive ROW approval within a predictable timeframe.

152.    If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Parker Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

   **l)  The Rainbow Star Solar Project**

153.    The Rainbow Star Solar Project is a proposed 200 MW photovoltaic solar facility on BLM lands in Nevada.

154.    The Rainbow Star Solar Project requires a ROW grant to proceed on BLM lands.

155.    In June 2025, the developer submitted a ROW application to BLM for the Rainbow Star Solar Project.

156.    In July 2025, BLM approved the Rainbow Star Solar Project's variance request and accepted the Rainbow Star Solar Project for further review under NEPA.

157.    The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application.  The process established by the Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

158.    The Memorandum thus precludes the Rainbow Star Solar Project from securing a ROW from BLM for the foreseeable future.

159.    Without a ROW grant from BLM, the Rainbow Star Solar Project will not be able to commence development, deliver electricity, or generate revenue.

160.    To date, the developer has incurred approximately $175,000 in costs based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

161.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Rainbow Star Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive ROW approval within a predictable timeframe.

162.     If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### m) The Rich Road Solar Project

163.    The Rich Road Solar Project in New York Project is a proposed 240 MW photovoltaic solar facility, which may include approximately 20 MW of energy storage capacity, on private lands in New York.  The developer of the project is Rich Road Solar LLC.

36

164.    As designed, the Rich Road Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

165.    Further, based on publicly available species range maps for federally listed species which indicate the Rich Road Solar Project may be within the possible range of a federally listed species, the Rich Road Solar Project may have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, the Corps must conduct an ESA Section 7 consultation with USFWS before it can authorize project construction that impacts jurisdictional wetlands.

166.    The Rich Road Solar Project anticipates based on known industry standards that the project has minimized potential effects to federally listed species through pre-construction surveys, scheduling of construction activities, and mitigation practices to proactively avoid potential impacts to federally listed species or suitable habitat.

167.    The Rich Road Solar Project submitted its application and all accompanying materials to the Corps in June 2025.

168.    Since the DOI Renewable Bottleneck Memorandum was issued, USFWS field office staff have not acted on any Section 7 consultations for any renewable energy projects in New York.

169.    Because USFWS is not conducting Section 7 consultations for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, the Rich Road Solar Project cannot obtain the Corps permit it requires to commence construction.

170.    If DOI does not resume ESA Section 7 consultations expeditiously, the Rich Road Solar Project will have to be redesigned at a significant cost, which will extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

37

171.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the developer would receive its Corps permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place and the Corps was allowed to consult with USFWS under ESA Section 7.  For now, the project can still be built more efficiently and at a significantly lower cost if the Memorandum is expeditiously enjoined.

n)  **The Sapphire Solar Project**

172.    The Sapphire Solar Project is a proposed 117 MW photovoltaic solar facility on BLM lands in California.

173.    The Sapphire Solar Project requires a ROW grant for a generation tie ("gen-tie") line on public lands, which is needed to connect the facility, located entirely on private lands, to the transmission network.

174.    On March 14, 2025, BLM issued a Finding of No Significant Impact ("FONSI") for the gen-tie line.

175.    The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application. The process established by the DOI Renewable Bottleneck Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

176.    The DOI Renewable Bottleneck Memorandum thus precludes the Sapphire Solar Project from securing a ROW from BLM for the foreseeable future.

177.    If the DOI Renewable Bottleneck Memorandum was not in place, Sapphire Solar LLC would have expected to receive a ROW Grant by August 2025.

178.    Without a ROW grant from BLM, the developer will not be able to commence development, deliver electricity, or generate revenue.  Instead, the project is months behind schedule, and BLM cannot provide any indication of when it will move forward.

179.    To date, the developer has incurred $18.6 million in costs based on the reasonable expectation of timely approval of its ROW application and related federal authorizations. Additionally, the Sapphire Solar Project is subject to outstanding liabilities associated with its Interconnection Agreement in the amount of $1.8 million that cannot be recouped if the Project is not allowed to proceed.

180.    Based on our extensive experience advocating for wind and solar development and consultation with member developers, projects like the Sapphire Solar Project that are sited and designed to satisfy the legal standard in place prior to the Anti-Renewable Actions are typically approved within a predictable timeframe.

181.    Due to the uncertainty in timing of obtaining a ROW, the developer is unable to secure a PPA, which threatens the Sapphire Solar Project's financial viability.

182.    If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Sapphire Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

o)  **The Ship Rock Solar Project**

183.    The Ship Rock Solar Project is a proposed 372 MW solar photovoltaic solar facility on BLM lands in New Mexico.

184.    The Ship Rock Solar Project requires a ROW grant to proceed on BLM land.

185.    In April 2018, the developer submitted a ROW application to BLM.

39

186.    In May 2019 BLM approved the Ship Rock Solar Project's variance request and accepted the Project for further review under NEPA.

187.    The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application.  The process established by the DOI Renewable Bottleneck Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

188.    The Memorandum thus precludes the Ship Rock Solar Project from securing a ROW from BLM for the foreseeable future.

189.    Without a ROW grant from BLM, the Ship Rock Solar Project will not be able to commence development, deliver electricity, or generate revenue.

190.    To date, the developer has incurred approximately $4 million in costs based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

191.    Based on our extensive experience advocating for wind and solar development and consultation with member developers, projects like the Ship Rock Solar Project that are sited and designed to satisfy the legal standard in place prior to the Anti-Renewable Actions are typically approved within a predictable timeframe.

192.    If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Ship Rock Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

40

p) **The Shoals Wind Project**

193.   The Shoals Wind Project is a 500-MW wind facility under development on private lands in Central Illinois.

194.   As designed, the Shoals Wind Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

195.   Further, based on pre-construction surveys and site studies, construction of the Shoals Wind Project may have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, the Corps must conduct an ESA Section 7 consultation with USFWS before it can authorize project construction that impacts jurisdictional wetlands.

196.   Operation of the Shoals Wind Project may also require an incidental take permit under Section 10 of the ESA.

197.   To date, $10 million has been invested in the Shoals Wind Project based on the reasonable expectation of timely authorization from the Corps.

198.   Because USFWS is not conducting Section 7 consultations for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, the Shoals Wind Project cannot obtain the Corps permit it requires to commence construction.

199.   If DOI does not resume ESA Section 7 consultations expeditiously, the Shoals Wind Project will have to be redesigned at a significant cost, which will extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

200.   Because USFWS is not issuing ESA Section 10 incidental take permits for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, it will be required to engage

41

in production curtailment (i.e. operational avoidance) to eliminate the possibility of "taking" of bats.

201. The required curtailment would occur during the most valuable hours of wind generation, particularly the evening ramp when solar output diminishes, resulting in a reduction in annual generation.

202. Because the Shoals Wind Project will have to absorb this loss of high-value generation while maintaining the same capital expenditures, the effective cost per megawatt-hour increases substantially, reducing project returns and necessitating higher PPA pricing to remain viable. These dynamics also increase the Shoals Wind Project's relative cost of capital due to the heightened operational and permitting risk.

203. Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the developer would receive its permits in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place. For now, the project can still be built and operated more efficiently and at a significantly lower cost if the Memorandum is expeditiously enjoined.

### q) The Wildcat Solar Project

204. The Wildcat Solar Project is proposed 2,500 MW photovoltaic solar facility on BLM lands in Nevada.

205. The Wildcat Solar Project requires a ROW grant to proceed on BLM lands.

206. In March 2022, the developer submitted a ROW application to BLM.

207. In July 2022, BLM approved the developer variance request and accepted the Wildcat Solar Project for further review under NEPA.

208.    The DOI Renewable Bottleneck Memorandum has effectively halted BLM's review of the ROW application.  The process established by the DOI Renewable Bottleneck Memorandum prevents BLM staff from advancing the application, and participating parties understand that permitting decisions, actions, consultations, or undertakings elevated to DOI senior leadership are unlikely to be acted on within a defined timeframe.

209.    The DOI Renewable Bottleneck Memorandum thus precludes the Wildcat Solar Project from securing a ROW from BLM for the foreseeable future.

210.    Without a ROW grant from BLM, the Wildcat Solar Project will not be able to commence development, deliver electricity, or generate revenue.

211.    To date, the developer has incurred approximately $5 million dollars in costs, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

212.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Wildcat Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Anti-Renewable Actions would typically receive ROW approval within a predictable timeframe.

213.    If federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the Wildcat Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

r)    **Empire Prairie Wind and Solar Project**

214.    The Empire Prairie Wind and Solar Project is a proposed 800 MW photovoltaic solar and wind facility on private lands in Missouri.

43

215.    As originally designed, the Empire Wind and Solar Project requires a specific permit under Section 404 of the Clean Water Act because it will impact jurisdictional wetlands.

216.    Further, based on pre-construction surveys and site studies, the Empire Wind and Solar Project may have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, the Corps must conduct an ESA Section 7 consultation with USFWS before it can authorize the portions of the Empire Prairie Wind and Solar Project construction that impact jurisdictional wetlands.

217.    Because USFWS is not conducting Section 7 consultations for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, the Empire Prairie Wind and Solar Project as originally designed will not be able to obtain the Corps permit it requires to commence construction.

218.    To date, the developer has invested tens of millions of dollars into the Empire Prairie Wind and Solar Project based on the reasonable expectation of timely authorization from the Corps.

219.    Because of the DOI Renewable Bottleneck Memorandum, in tandem with the Army Corps' Anti-Renewable Memorandum as discussed below, the Empire Prairie Wind and Solar Project had to be re-engineered to avoid the need for a Section 404 permit, at a cost of millions of dollars to the developer, extending construction timelines and reducing design efficiency. Such redesign was necessary to ensure that the Project would not require authorization from the Corps, which would threaten the project's financial viability given the unavailability of that permit.

220.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the developer would receive its Corps permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place, the Corps was

44

allowed to consult with USFWS under ESA Section 7, and (as discussed below) the Corps' Anti-Renewable Memorandum was also enjoined.

221. In so doing, the developer would be able to able to avoid the costliest aspects of the redesign, saving the developer millions of dollars in unnecessary costs.

### s) The Castalian Spring Solar Project

222. Castalian Spring Solar is a 50 MW photovoltaic solar facility under development on private lands in North Carolina.

223. As designed, Castalian Spring Solar may impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

224. Further, based on pre-construction surveys and site studies, construction of the Castalian Spring Solar Project may have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, the Corps must conduct an ESA Section 7 consultation with USFWS before it can authorize project construction that impacts jurisdictional wetlands.

225. Because USFWS is not conducting Section 7 consultations for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, the developer cannot obtain the Corps permit it requires to commence construction.

226. To date, significant investments have been made in the Castalian Spring Solar Project based on the reasonable expectation of timely authorization from the Corps.

227. Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the Castalian Spring Solar Project would receive its Corps permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place and the Corps was allowed to consult with USFWS under ESA Section 7.

228.    Due to the uncertainty resulting from the DOI Renewable Bottleneck Memorandum, the developer has suspended all development activities pending the resumption of federal permitting.

229.    If the DOI Renewable Bottleneck Memorandum is not enjoined expeditiously, the Castalian Spring Solar Project may ultimately be forced to be permanently abandoned, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

t)    **The Sundew Solar Project**

230.    Sundew Solar Project is a 65 MW photovoltaic solar facility under development on private lands in North Carolina.

231.    As designed, the Sundew Solar Project may impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

232.    Further, based on pre-construction surveys and site studies, construction of the Sundew Solar Project may have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat. Therefore, the Corps must conduct an ESA Section 7 consultation with USFWS before it can authorize project construction that impacts jurisdictional wetlands.

233.    Because USFWS is not conducting Section 7 consultations for renewable energy projects due to the DOI Renewable Bottleneck Memorandum, the developer cannot obtain the Corps permit it requires to commence construction.

234.    To date, significant investments have been made in the Sundew Solar Project based on the reasonable expectation of timely authorization from the Corps.

235.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, the Sundew Solar Project would receive its Corps

46

permit in a timely manner if the DOI Renewable Bottleneck Memorandum was not in place and the Corps was allowed to consult with USFWS under ESA Section 7.

236.    Due to the uncertainty resulting from the DOI Renewable Bottleneck Memorandum, the developer has suspended all development activities pending the resumption of federal permitting.

237.    If the DOI Renewable Bottleneck Memorandum is not enjoined expeditiously, the Sundew Solar Project may ultimately be forced to be permanently abandoned, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

b. *August 1, 2025, Secretarial Order 3438 ("Federal Lands Anti-Renewable Order")*

238.    The Federal Lands Anti-Renewable Order establishes "capacity density" as the determinative consideration in DOI's NEPA analysis for energy projects proposed on federal lands or in federal waters, and further directs DOI to deny permits to wind and solar projects if the agency determines that there is a more "appropriate" (*i.e.*, more capacity dense) use for the land. The Order instructs the agency to "optimize" land use "by considering, when reviewing a proposed energy project under NEPA, a reasonable range of alternatives that includes projects with capacity densities meeting or exceeding that of the proposed project." It defines "capacity density" as the "nameplate generation capacity of an energy project multiplied by its projected capacity factor, the product of which is then divided by the total acres of the project area." This is clearly a metric manufactured to target wind and solar.

239.    By pre-determining the fate of permit applications even if they hypothetically made it through the process established by the DOI Renewable Bottleneck Memorandum, the Federal Lands Anti-Renewable Order contributes to the ongoing freeze in permitting of wind and solar projects on federal lands or in federal waters owned by Plaintiffs' members. By transparently rigging the permitting process against wind and solar projects sited on federal lands or in federal

47

waters, the Federal Lands Anti-Renewable Order has also deterred members of Plaintiffs' members from even trying to advance their wind and solar projects proposed in these areas because doing so would be futile.

240.    Such actual or anticipated denials not only deprive Plaintiffs' members of the revenues they anticipated generating from the permitted projects, but also result in the irretrievable loss of sunk costs invested in project development (e.g., surveys, studies, engineering, regulatory compliance), as well as contractual commitments made while their permit applications were pending.  Such commitments could include expenses related to securing offtake agreements, supplies, equipment, and labor—that will expose these developers to contract penalties, inflated prices, and higher long-term costs, all while degrading their reputation in the marketplace.  *See also* ¶¶ 33–47, *supra*.

241.    The Federal Lands Anti-Renewable Order has caused immediate economic harm to the following projects, each of which are either members of one or more Plaintiffs or projects owned by members of one or more Plaintiffs.

### a.    The American Glory Solar Project

242.    The American Glory Solar Project is a proposed 1500 MW photovoltaic solar facility on BLM lands in Nevada.

243.    The American Glory Solar Project requires a ROW grant to proceed on BLM lands.

244.    In December 2022, the developer submitted a ROW application to BLM.

245.    In July 2022, BLM approved the developer's variance request and accepted the American Glory Solar Project for further review under NEPA.

246.    The Federal Lands Anti-Renewable Order effectively precludes the American Glory Solar Project from securing a ROW from BLM.  The American Glory Solar Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy

48

projects that could hypothetically be built on the project site. Assuming, arguendo, the American Glory Solar Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site.

247. Without a ROW grant from BLM, the American Glory Solar Project will not be able to commence development, deliver electricity, or generate revenue.

248. To date, the developer has invested approximately $1 million in development of the project, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

249. Based on our extensive experience advocating for wind and solar development, a project like the American Glory Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe.

250. Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may ultimately be forced to abandon the American Glory Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### b. The Atlantic Shores Bight Project

251. The Atlantic Shores Bight Project is a proposed offshore wind project 27 miles off the coast of New Jersey.

252. On February 23, 2022, the developer secured lease OCS-A 0541 in a competitive BOEM auction for $780 million, which it paid to the U.S. Treasury.

253. The Atlantic Shores Bight Project requires a COP approval to proceed.

49

254.    The Federal Lands Anti-Renewable Order effectively precludes the Atlantic Shores Bight Project from securing a COP approval from BOEM.  The Atlantic Shores Bight Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  To the extent the Atlantic Shores Bight Project's COP could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BOEM is expected to deny it on the grounds that there is a more "appropriate" use of the site.  For this reason and due to other final agency actions challenged in this suit, the developer has postponed indefinitely its preparation and submittal of a COP.

255.    To date, the Atlantic Shores Bight Project has spent more than $780 million in lease acquisition fees, along with millions of dollars more in rental fees and activities on its lease, based on the reasonable expectation of timely approval of its COP and related federal authorizations. The Atlantic Shores Bight Project continues to pay rental fees to the United States despite being unable to proceed with development.

256.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Atlantic Shores Bight Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive COP approval within a predictable timeframe.

257.    Unless the Federal Lands Anti-Renewable Order is enjoined and BOEM's prior standard of review of offshore wind projects is restored, the developer may be forced to abandon the Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

   c.    **The Bouse Solar Project**

258.    The Bouse Solar Project is a proposed 1,000 MW solar photovoltaic solar facility on BLM lands in Arizona.

259.    The Bouse Solar Project requires a ROW grant to proceed on BLM land.

260.    In May 2021, the developer submitted a ROW application to BLM.

261.    In May 2022, BLM approved the developer's variance request and accepted the Bouse Solar Project for further review under NEPA.

262.    The Federal Lands Anti-Renewable Order effectively precludes the Bouse Solar Project from securing a ROW from BLM.  The Bouse Solar Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  Assuming, arguendo, the Bouse Solar Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site.

263.    Without a ROW grant from BLM, the Bouse Solar Project will not be able to be able to commence development, deliver electricity, or generate revenue.

264.    To date, the developer has invested more than $5 million dollars on development based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

265.    Based on our extensive experience advocating for wind and solar development, a project like the Bouse Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe.

266.    Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may ultimately be forced to abandon

51

the Bouse Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs totaling approximately $15 million.

### d.  The Lonely Road Solar Project

267.    The Lonely Road Solar Project is a proposed 600 MW photovoltaic solar facility on BLM lands in Nevada.

268.    The Lonely Road Solar Project requires a ROW grant to proceed on BLM lands.

269.    In July 2024, the developer submitted a ROW application to BLM.

270.    In September 2024, BLM approved the developer's variance request and accepted the Lonely Road Solar Project for further review under the NEPA.

271.    The Federal Lands Anti-Renewable Order effectively precludes the Lonely Road Solar Project from securing a ROW from BLM. The Lonely Road Solar Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  Assuming, arguendo, the Lonely Road Solar Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site.

272.    Without a ROW grant from BLM, the Lonely Road Solar Project will not be able to commence development, deliver electricity, or generate revenue.

273.    To date, the Lonely Road Solar Project has invested approximately $200,000 in development of the project, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

274.    Based on our extensive experience advocating for wind and solar development, a project like the Lonely Road Solar Project that is sited and designed to satisfy the legal standard in place

prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe. Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may ultimately be forced to abandon the Lonely Road Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

**e. The Monte Cristo Solar Project**

275.    The Monte Cristo Solar Project is a proposed 2,500 MW solar photovoltaic solar facility on BLM lands in Arizona.

276.    In September 2022, the developer submitted a ROW application to BLM for the Monte Cristo Solar Project.

277.    In September 2024, BLM approved the developer's variance request and accepted the Project for further review under NEPA.

278.    The Federal Lands Anti-Renewable Order effectively precludes the Monte Cristo Solar Project from securing a ROW from BLM.  The Monte Cristo Solar Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  Assuming, arguendo, the Monte Cristo Solar Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site. Without a ROW grant from BLM, the Monte Cristo Solar Project will never be able to commence development, deliver electricity, or generate revenue.

279.    To date, the developer has invested more than $2 million in project development, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

280.    Based on our extensive experience advocating for wind and solar development, a project like the Monte Cristo Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe.

281.    Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may ultimately be forced to abandon the Monte Cristo Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### f.  The Parker Solar Project

282.    The Parker Solar Project is a proposed 250 MW solar photovoltaic solar facility on BLM lands in Arizona.

283.    The Parker Solar Project requires a ROW grant to proceed on BLM land.

284.    In September 2021, the developer submitted a ROW application to BLM for the Parker Solar Project.

285.    In November 2024, BLM approved the developer's variance request and accepted the Parker Solar Project for further review under NEPA.

286.    The Federal Lands Anti-Renewable Order effectively precludes the Parker Solar Project from securing a ROW from BLM.  The Parker Solar Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  Assuming, arguendo, the Parker Solar Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site.

54

287.    The Federal Lands Anti-Renewable Order effectively precludes the Parker Solar Project from securing a ROW from BLM.

288.    Without a ROW grant from BLM, the Parker Solar Project will not be able to commence development, deliver electricity, or generate revenue.

289.    To date, the developer has invested more than $3 million in project development based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

290.    Based on our extensive experience advocating for wind and solar development, a project like the Parker Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe.

291.    Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may be forced to abandon the Parker Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

g.  **The Rainbow Star Solar Project**

292.    The Rainbow Star Solar Project is proposed 200 MW photovoltaic solar facility on public lands in Nevada.

293.    The Rainbow Star Solar Project requires a ROW grant to proceed on BLM lands.

294.    In June 2025, the developer submitted a ROW application to BLM for the Rainbow Star Solar Project.

295.    In July 2025, BLM approved the developer's variance request and accepted the Rainbow Star Solar Project for further review under NEPA.

296.    The Federal Lands Anti-Renewable Order effectively precludes the Rainbow Star Solar Project from securing a ROW from BLM.  The Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  Assuming, arguendo, the Rainbow Star Solar Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site.

297.    Without a ROW grant from BLM, the Rainbow Star Solar Project will not be able to commence development, deliver electricity, or generate revenue.

298.    To date, the developer has incurred approximately $175,000 in costs based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

299.    Based on our extensive experience advocating for wind and solar development, a project like the Rainbow Star Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe.

300.    Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may ultimately be forced to abandon the Rainbow Star Solar Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### h.  The Ship Rock Solar Project

301.    The Ship Rock Solar Project is a proposed 372 MW solar photovoltaic solar facility on BLM lands in New Mexico.

302.    The Ship Rock Solar Project requires a ROW grant to proceed on BLM land.

303.    In April 2018, the developer submitted a ROW application to BLM.

304.    In May 2019 BLM approved the developer's variance request and accepted the Project for further review under the NEPA.

305.    The Federal Lands Anti-Renewable Order effectively precludes the Ship Rock Solar Project from securing a ROW from BLM.  The Ship Rock Solar Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  Assuming, arguendo, the Ship Rock Solar Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site.

306.    Without a ROW grant from BLM, the Ship Rock Solar Project will never be able to commence development, deliver electricity, or generate revenue.

307.    To date, the developer has incurred approximately $4 million in costs based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

308.    Based on our extensive experience advocating for wind and solar development, a project like the Ship Rock Solar Project that is sited and designed to satisfy the legal standard in place prior to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe.

309.    Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may ultimately be forced to abandon the Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### i.  The Wildcat Solar Project

310.    The Wildcat Solar Project is proposed 2,500 MW photovoltaic solar facility on BLM lands in Nevada.

311.    The Wildcat Solar Project requires a ROW grant to proceed on BLM lands.

312.    In March 2022, the developer submitted a ROW application to BLM.

313.    In July 2022, BLM approved the developer's variance request and accepted the Wildcat Solar Project for further review under NEPA.

314.    The Federal Lands Anti-Renewable Order effectively precludes the Ship Rock Solar Project from securing a ROW from BLM.  The Project has a low capacity density, as defined by the Federal Lands Anti-Renewable Order, compared to alternative energy projects that could hypothetically be built on the project site.  Assuming, arguendo, the Project's ROW application could make it through the process set forth in the DOI Renewable Bottleneck Memorandum, BLM is expected to deny it on the grounds that there is a more "appropriate" use of the site.

315.    Without a ROW grant from BLM, the project will not be able to commence development, deliver electricity, or generate revenue.

316.    To date, the developer has incurred approximately $5 million in costs, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations.

317.    Without a ROW grant from BLM, the Wildcat Solar Project will not be able to commence development, deliver electricity, or generate revenue. The developer may be forced to abandon the Project, forfeiting all anticipated profits.

318.    Based on our extensive experience advocating for wind and solar development, a project like the Wildcat Solar Project that is sited and designed to satisfy the legal standard in place prior

58

to the issuance of the Federal Lands Anti-Renewable Order would typically receive ROW approval within a predictable timeframe.

319.    Unless the Federal Lands Anti-Renewable Order is enjoined and BLM's prior standard of review of wind and solar projects is restored, the developer may ultimately be forced to abandon the Wildcat Solar Project, thereby forfeiting all anticipated profits. The developer will be burdened with significant sunk, nonrecoverable costs.

   c.  *September 18, 2025, Army Corps Directive (Corps' Anti-Renewable Memorandum)*

320.    The Corps' Anti-Renewable Memorandum requires the Corps to consider, as part of its "public interest" review for individual permits under Section 404 of the CWA and Section 10 of the RHA, an energy generation project's "annual potential energy generation per acre"—that is, its capacity density.  In addition, the agency must consider whether an energy project "displace[s] other more reliable energy sources, and whether the activities related to the projects denigrate the beauty of the Nation's natural landscape."  The Memorandum further directs the agency to "consider whether an alternative energy generation source can deliver the same amount" of energy generation with less impact to aquatic resources.  Under the Corps' Anti-Renewable Memorandum, the agency must "prioritize processing . . . applications related to projects that would generate the most annual energy generation per acre over projects with low generation per acre." In other words, the Corps must *deprioritize* energy generation projects with supposedly low capacity densities according to this arbitrary metric.

321.    Wind and solar developers have long relied on the Corps' predictable approach to the Section 404 public interest analysis, planning projects based on the Corps' established permitting regime and making investments on the assumption that their applications for permits would be reviewed in a manner that was not biased toward rejecting wind and solar projects.  Since the

59

issuance of the Corps' Anti-Renewable Memorandum, the process for issuing specific permits for wind and solar projects under CWA Section 404 and RHA Section 10 has stalled for Plaintiffs' members. By transparently rigging the permitting process against wind and solar projects requiring these permits, the Corps' Anti-Renewable Memorandum has also deterred Plaintiffs' members from even trying to advance wind and solar projects that require such permits—or forcing costly redesigns to avoid triggering the need for these permits. *See* ¶¶ 33–47, *supra*.

322. By pre-determining the fate of Corps permit applications, the Corps' Anti-Renewable Memorandum contributes to the ongoing freeze in permitting of wind and solar projects on private and public lands. By transparently rigging the permitting process against wind and solar projects, the Corps' Anti-Renewable Memorandum has also deterred Plaintiffs' members from even trying to advance Corps individual permits for wind and solar projects because doing so would be futile.

323. Such actual or anticipated denials not only deprive Plaintiffs' members of the revenues they anticipated generating from the permitted projects, but also result in the irretrievable loss of sunk costs invested in project development (e.g., surveys, studies, engineering, regulatory compliance), as well as contractual commitments made while their permit applications were pending. Such commitments could include expenses related to securing offtake agreements, supplies, equipment, and labor—that will expose these developers to contract penalties, inflated prices, and higher long-term costs, all while degrading their reputation in the marketplace. *See also* ¶¶ 33-47, *supra*.

324. This Memorandum has caused immediate economic harm to the following projects, each of which are either members of one or more Plaintiffs or projects owned by members of one or more Plaintiffs.

a. **The Empire Prairie Wind and Solar Project**

325.    The Empire Prairie Wind and Solar Project is a proposed 800 MW photovoltaic solar and wind facility on private lands in Missouri.

326.    As originally designed, the Empire Prairie Wind and Solar Project requires a specific permit under Section 404 of the Clean Water Act because it will impact more than 0.5 acres of jurisdictional wetlands.

327.    To date, the developer has invested tens of millions of dollars based on the reasonable expectation of timely authorization from the Corps.

328.    The Corps' Anti-Renewable Memorandum effectively precludes the Empire Prairie Wind and Solar Project from securing a CWA Section 404 individual permit from the Corps.  First, the Corps will "deprioritize" the Empire Prairie Wind and Solar Project's application.  To the extent the project's application could even make it through the Corps' public interest review process, the Corps is expected to deny it on the grounds that has a low "potential energy generation per acre," as defined by the Memorandum and compared to alternative energy projects that could hypothetically be built on the project site.

329.    Because of delays and/or permit denial are a certainty due to the Corps' Anti-Renewable Memorandum, the Empire Prairie Wind and Solar Project is currently being re-engineered at a cost of millions of dollars to the developer, extending construction timelines and reducing design efficiency.

330.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, projects of this nature routinely receive CWA Section 404 authorizations.  If the Corps' Anti-Renewable Memorandum and other challenged final agency

61

actions were not in place, the developer could revert to its original design in anticipation that its CWA Section 404 individual permit application would be approved within a predictable timeframe.

331.    In so doing, the developer would be able to able to avoid the costliest aspects of the redesign, saving the developer millions of dollars in unnecessary costs.

### b.  The Atlantic Shores Bight Project

332.    The Atlantic Shores Bight Project is a proposed offshore wind project off the coast of New Jersey.

333.    On February 23, 2022, the developer secured lease OCS-A 0541 in a competitive BOEM auction for $780 million, which it paid to the U.S. Treasury.

334.    The Atlantic Shores Bight Project requires an individual permit under Section 404 of the CWA and Section 10 of the RHA prior to construction.

335.    The Corps' Anti-Renewable Memorandum effectively precludes the Atlantic Shores Bight Project from securing its CWA Section 404 and RHA Section 10 individual permit from the Corps. First, the Corps will "deprioritize" the Atlantic Shores Bight Project's application.  To the extent the Atlantic Shores Bight Project's application could even make it through the Corps' public interest review process, the Corps is expected to deny it on the grounds that has a low "potential energy generation per acre," as defined by the Memorandum and compared to alternative energy projects that could hypothetically be built on the project site.  For this reason and due to other final agency actions challenged in this suit, the developer has postponed indefinitely its preparation and submittal of a Corps permit application.

336.    To date, the Atlantic Shores Bight Project has spent more than $780 million in lease acquisition fees, along with millions of dollars more in rental fees and activities on its lease, based on the reasonable expectation of timely approval of its Corps permit and related federal

authorizations. The Atlantic Shores Bight Project continues to pay rental fees to the United States despite being unable to proceed with development.

337.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like Atlantic Shores Bight that is sited and designed to satisfy the legal standard in place prior to the issuance of the Corps' Anti-Renewable Memorandum would typically receive Corps permit approval within a predictable timeframe.

338.    Unless the Corps' Anti-Renewable Memorandum is enjoined and the Corps' prior standard of review of offshore wind projects is restored, the developer may be forced to abandon the Atlantic Shores Bight Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

   d.   *The Eagle Take Permit Ban*

339.     On or around January 20, 2025, USFWS announced that it was "temporarily ceasing issuance" of eagle incidental take permits for wind energy facilities under BGEPA "until further notice," and "will no longer automatically issue general permits" for such projects (the "Eagle Take Permit Ban").

340.    So far as we have been able to determine, no eagle incidental take permits have been issued since the Eagle Take Permit Ban took effect—although numerous projects have submitted applications.

341.    USFWS removed this language from its website only after Plaintiffs filed their initial Complaint.  Notwithstanding the change to the website, the Ban remains in place, as USFWS continues not to issue eagle incidental take permits and has given no indication that it has been or will be recommencing the issuance of such permits.  Moreover, the DOI Renewable Bottleneck

Memorandum, which explicitly names BGEPA permits as item number 64 on its list, remains in place. *See* Amended Complaint, Exhibit A at 3.

342.    Since USFWS promulgated its final rule in April 2024 creating eagle incidental take general permits, numerous wind developers have applied for such general permits. Between April 2024 and January 20, 2025, USFWS issued such permits routinely to qualified wind energy projects.

343.    Owners of projects in qualifying areas that have been operating for years without experiencing any eagle fatalities have relied upon the recent availability of the general permits in evaluating whether permit coverage is necessary for their facilities, while developers of new projects have since April 2024 relied upon the ready availability of the general permits in making investment decisions to move forward with the development of projects in qualifying areas, heretofore secure in the knowledge that they can obtain BGEPA general permits as a matter of course to authorize incidental take of eagles that might result from those projects.

344.    While the Ban has been in effect, USFWS has acted to increase enforcement of BGEPA. On August 4, 2025, the DOI Deputy Chief of Staff for Policy issued a memorandum to the Acting Assistant Secretary for Fish and Wildlife and Parks directing USFWS to review wind energy projects' compliance with BGEPA's general permit requirements and to "refer violations of [BGEPA] to the Solicitor's Office for its review and, where appropriate, referral to the U.S. Department of Justice for criminal and/or civil penalties under 16 U.S.C. § 668."[7]   The memorandum does not acknowledge the ongoing Eagle Take Permit Ban or offer any mechanism for facilities to obtain the permits they are expected to hold during these reviews.

---

[7] *See* Gregory Wischer, *Ensuring Compliance with the Bald and Golden Eagle Protection Act and Executive Order 14315*, Dep't of the Interior, Office of the Sec'y (Aug. 4, 2025), also available as Amended Complaint, Exhibit E.

345.    In early September, USFWS sent comprehensive document requests to what we believe to be every holder of eagle incidental take permits, seeking all records relating to permit eligibility and compliance with the terms and conditions of the permits.

346.    Since the August 4 Memorandum, USFWS also has begun bringing enforcement actions against operating wind projects that lack eagle incidental take permits.  During this time, several of Plaintiffs' members have attempted to obtain eagle incidental take permits but were told that USFWS was no longer processing applications.  Some of these members have since received enforcement communications premised on the absence of permits projects are currently prohibited from obtaining.

347.    Due to the combination of the Eagle Take Permit Ban and the increased risk of BGEPA enforcement targeted at wind energy projects, Plaintiffs' members now face a regulatory Catch-22.  Because the Eagle Take Permit Ban prohibits the issuance of any permits, members who currently lack eagle incidental take permits for their wind energy projects must either operate without a permit, risking civil or criminal liability under BGEPA, curtail operations, or shut down entirely.

348.    The Ban has caused immediate economic harm by forcing numerous member companies to curtail generation to manage their risk of facing BGEPA enforcement action, resulting in lost revenue from electricity sales and decreased overall project efficiency. In many cases, projects must reduce output even when conditions are safe, creating unnecessary operational disruptions. These forced curtailments also increase costs, as staff, maintenance, and other fixed expenses continue despite lower production, further straining the financial performance of affected facilities.

349.    Additionally, because of the BGEPA enforcement risks created by the Ban, some members have invested in expensive, and in most cases unnecessary, mitigation technologies to mitigate

65

perceived risks and satisfy investor concerns, even though in the absence of a permit even these extraordinary measures cannot ensure compliance. For example, certain member companies have reported installing IdentiFlight technology, an automated eagle detection and avoidance system that scans the skies around project turbines and automatically sends a signal to shut down individual turbines when an eagle is detected in the area. For a typical utility-scale wind farm, implementation of IdentiFlight can involve an upfront capital cost of several million dollars or more, plus annual service, support and maintenance. While the system is highly effective at reducing eagle collisions, the expected number of incidents is extremely low, meaning the significant cost to purchase and install the system is highly disproportionate to the risk it addresses, and the possibility remains that an eagle fatality could still occur.

350.    These harms—lost revenue from curtailed production, increased compliance costs, and superfluous mitigation investments—have materially compromised the financial viability of projects for many affected companies.

351.    Plaintiffs' members are unwilling to disclose specific projects that have been harmed by the Eagle Take Permit Ban due to ongoing concerns about potential persecution or retaliation in direct response to their participation in this lawsuit. This fear is grounded in fact. USFWS has recently departed from its longstanding policy of exercising BGEPA enforcement discretion so long as wind farm operators can demonstrate that they are implementing best practices for eagle take mitigation and minimization. Instead, USFWS is now issuing notices of violation and seeking penalties against member companies who are engaging in such best practices, often based on eagle takes reported by companies themselves that have been seeking permits. This development, in tandem with the consistent animus DOI has demonstrated toward wind energy, has amplified

66

Plaintiffs' members' fear that their projects could become the subject of increased scrutiny and/or enforcement actions.

352.    These harms would be alleviated if the Eagle Take Permit Ban was lifted, because Plaintiffs' members would once again be allowed to obtain eagle incidental take permits, thereby obviating the need to engage in curtailment or implement unnecessary mitigation measures. Receiving and complying with an eagle incidental take permit—particularly a general permit where applicable—would result in substantial cost reductions, greater predictability, and a much lower risk of facing a criminal or civil enforcement action.

e.    *FWS Information for Planning and Consultation Portal Shutdown (The Wind And Solar IPaC Ban)*

353.    On or around July 15, 2025, USFWS announced its final decision to deny solar and wind developers access to its IPaC database, which it subsequently updated in approximately mid-November to state that usage of the IPaC database for wind and solar required the approval of the Deputy Secretary and Secretary of the Interior (the "Wind and Solar IPaC Ban"). Independently and in connection with the DOI Renewable Bottleneck Memorandum, the Wind and Solar IPaC Ban prevents wind and solar developers from (among other things) obtaining Corps nationwide permits for their projects. We are not aware of any wind or solar developer that has successfully obtained approval from the Deputy Secretary and Secretary of the Interior to use IPaC for its wind or solar project. Given DOI's track record imposing a similarly onerous process in the DOI Renewable Bottleneck Memorandum, attempting to obtain such approval would be futile.

354.    As a result of the Ban, wind and solar projects have functionally lost access to a taxpayer-funded, public online tool managed by USFWS that provides project proponents, federal agencies, and state and local governments with information necessary to identify whether a proposed activity

67

may affect federally listed species, designated critical habitat, migratory birds, eagles, wetlands, and other USFWS trust resources.

355.    To the undersigned's knowledge, USFWS has never before denied anyone use of IPaC, let alone a particular disfavored category of project.

356.    Wind and solar developers rely on IPaC to obtain crucial information about the presence of federally listed species, critical habitat, and other USFWS-managed resources when planning their projects. Meanwhile, federal agencies rely on IPaC as a tool to determine whether a proposed project "may affect" species, triggering the need for an ESA Section 7 consultation with USFWS. If consultation is required, agencies use the information provided through IPaC to assess potential project impacts, document pre-consultation analyses, and streamline interagency reviews.

357.    For example, the Corps routinely instructs applicants to use IPaC to develop baseline species information, which the Corps then uses to determine what actions it needs to take to comply with its statutory obligations under Section 7 of the ESA. Without IPaC, developers cannot complete the species and habitat analyses required to support a CWA Section 404 individual permit application or a pre-construction notice ("PCN") requesting that the Corps "verify" that the project qualified for a CWA Nationwide Permit ("NWP"). Typically, when the Corps receives confirmation from IPaC that a proposed wind or solar project will have "no effects" on federally protected species, the Corps will rely on that representation to allow the developer to apply for the requisite NWP (provided other permitting requirements are met),[8] without triggering the Corps' obligation to initiate consultation with USFWS under Section 7 of the ESA.  Now, to the extent

---

[8] Of particular relevance is General Condition 18 to the NWPs, which requires submission to the Corps of a preconstruction notification if any federally listed (or proposed for listing) endangered or threatened species or critical habitat "might be affected or is in the vicinity of the project or activity."  Army Corps of Eng'rs, Nationwide Permit General Condition 18 Endangered Species, https://www.swf.usace.army.mil/Portals/47/Users/053/21/821/Nationwide%20Permit%20General%20Condition%2018.pdf.

that a project's individual permit application or PCN was pending with the Corps before the Wind and Solar IPaC Ban commenced, the Ban now makes it virtually impossible for the Corps to ascertain whether Section 7 consultation with USFWS is necessary.

358.   The Wind and Solar IPaC Ban, in combination with the Renewable Bottleneck Memorandum, has effectively stalled ESA Section 7 consultations for wind and solar projects seeking Corps permits. This has prevented even low-impact projects—which would ordinarily proceed under streamlined mechanisms such as NWPs—from obtaining Corps permits.

359.   As a result of this inability to secure necessary Corps authorizations due to the Wind and Solar IPaC Ban in tandem with the DOI Renewable Bottleneck Memorandum, many wind and solar developers are being forced to redesign their projects to avoid legally protected jurisdictional waters—often at substantial expense. Where redesign is infeasible, the Wind and Solar IPaC Ban may prevent the project from proceeding at all, resulting in sunk development costs, lost financing, and cancellation of contracted energy-delivery commitments.

360.   Even in the absence of a trigger for a Corps permit, wind and solar developers use IPaC to determine whether the level of impacts to listed species may trigger the need to apply for an incidental take permit under Section 10 of the ESA that minimizes impacts to such species and helps developers avoid potential criminal and civil liability under the ESA.

361.   Many state and local permitting authorities also rely on IPaC as part of their environmental review processes for non-federal approvals. These authorities frequently require applicants to submit IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—before issuing building permits, land-use approvals, siting authorizations, or other state or local development permits.  Although not every jurisdiction expressly labels IPaC outputs as mandatory, the tool is widely integrated into standard practice,

69

and USFWS's own guidance directs project proponents to use IPaC as the first step in species-compliance planning. As a result of the Wind and Solar IPaC Ban, wind and solar developers are unable to obtain valid IPaC-supported consultation records—which in turn can delay or impede state and local permitting decisions in addition to preventing them from obtaining Corps permits.

362.    Wind and solar developers have designed their projects, planned their activities, and attracted investment on the understanding that they would be able to use IPaC to help obtain these permits.  The disruption and delay in the wind and solar permitting process caused by the Wind and Solar IPaC Ban results in the adverse financial harms set forth in ¶¶ 33–45, *supra*.

363.    The Wind and Solar IPaC Ban has caused immediate economic harm to the following projects, which are owned by companies that are members of one or more Plaintiffs.

### a.   The Austin Creek Solar Project

364.    The Austin Creek Solar Project is a proposed 140 MW photovoltaic solar facility on private lands in Illinois.

365.    As designed, the Austin Creek Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

366.    The Austin Creek Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps.  The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

367.    Because of the Wind and Solar IPaC Ban, the Austin Creek Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit

70

application. Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the Austin Creek Solar Project to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

368. To date, the Austin Creek Solar Project has invested approximately $2 million based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

369. If the Wind and Solar IPaC Ban is not soon lifted, the Austin Creek Solar Project will have to be redesigned at a significant cost to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit. This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues, and could result in loss of over $5 million of additional at-risk deposits.

370. If the Wind and Solar IPaC Ban was lifted, the Austin Creek Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit, the type of which the Corps routinely grants. As a result, the Austin Creek Solar Project would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Project.

### b. The Black Spruce Wind Project

371. The Black Spruce Wind Project is a proposed 151 MW wind project on private lands in Minnesota.

372. As designed, the Black Spruce Wind Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

373. The Black Spruce Wind Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of

71

any Section 404 authorization application submitted to the Corps. The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

374.    Because of the Wind and Solar IPaC Ban, the Black Spruce Wind Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application. Without the ability to submit an application for its CWA Section 404 permit, it is impossible for Black Spruce Wind LLC to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

375.    To date, the developer has invested approximately $3 million based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

376.    If the Wind and Solar IPaC Ban is not soon lifted, the Black Spruce Wind Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit. This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues, and could result in loss of over $15 million of additional at-risk deposits.

377.    If the Wind and Solar IPaC Ban was lifted, the developer would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit. As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Black Spruce Wind Project.

c.  **The Redwood Solar Project**

378.    The Redwood Solar Project is a proposed 250 MW wind project on private lands in Minnesota.

379.    As designed, the Redwood Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

380.    The Redwood Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps.  The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

381.    Because of the Wind and Solar IPaC Ban, the Redwood Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application.  Without the ability to submit an application for its CWA Section 404 permit, it is impossible for Redwood Solar LLC to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

382.    To date, the Redwood Solar Project has invested approximately $500,000 based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

383.    If the Wind and Solar IPaC Ban is not soon lifted, the Redwood Solar Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit.  This redesign, in turn, would extend

construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues, and could result in loss of roughly $4 million of additional at-risk deposits.

384.   If the Wind and Solar IPaC Ban was lifted, the developer would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit.  As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Redwood Solar Project.

### d.   The Boeuf Solar Project

385.   The Boeuf Solar Project is a proposed 180 MW photovoltaic solar facility on private lands in Arkansas.

386.   The Project requires authorization under Section 404 of the Clean Water Act because it will impact jurisdictional wetlands.

387.   If the project has the potential to have "effects," as that term is broadly defined under Section 7 of the ESA, on federally listed species or designated critical habitat, the Corps will need to conduct an ESA Section 7 consultation with USFWS before it can authorize the project. Consequently, the project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Army Corps.

388.   Because of the Wind and Solar IPaC Ban, the Project is unable to access the required wildlife information and cannot finalize its CWA Section 404 permit application.  The inability to obtain IPaC records has thus made it impossible for the developer to secure authorization from the Corps to commence construction.

389.   To date, the Project has invested approximately $1.5 million dollars based on the reasonable expectation of timely authorization from the Corps.

74

390.    If the Wind and Solar IPaC Ban is not soon lifted, the Project will have to be redesigned at a significant cost, which will extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues, and could result in loss of roughly $1 million of additional at-risk deposits.

###    e.    The Larkspur Solar Project

391.    The Larkspur Solar Project is a proposed 200 MW photovoltaic solar facility on private lands in Illinois.

392.    As designed, the Larkspur Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

393.    The Larkspur Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps.  The IPaC documentation allows the Corps to determine if the Larkspur Solar Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

394.    Because of the Wind and Solar IPaC Ban, the Larkspur Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application.  Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the developer to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

395.    To date, the developer has invested approximately $2 million based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

396.    If the Wind and Solar IPaC Ban is not soon lifted, the Larkspur Solar Project will have to be redesigned at a significant cost to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit.  This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues, and could result in loss of roughly $4 million of additional at-risk deposits.

397.    If the Wind and Solar IPaC Ban was lifted, the Larkspur Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit.  As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Larkspur Solar Project.

f.    **The Patoka Solar Project**

398.    The Patoka Solar Project is a proposed 250 MW photovoltaic solar facility on private lands in Indiana.

399.    As designed, the Patoka Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

400.    The Patoka Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps.  The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

401.    Because of the Wind and Solar IPaC Ban, the Patoka Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application.

Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the developer to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

402.    To date, the developer has invested approximately $1 million based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

403.    If the Wind and Solar IPaC Ban is not soon lifted, the Patoka Solar Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit.  This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues, and could result in loss of roughly $12 million of additional at-risk deposits.

404.    If the Wind and Solar IPaC Ban was lifted, the Patoka Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit.  As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Patoka Solar Project.

### g.  The Carrisalito Creek Solar Project

405.    The Carrisalito Creek Solar Project is a proposed 300 to 400 MW photovoltaic solar facility on private lands in California.

406.    As designed, the Carrisalito Creek Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

407.    The Carrisalito Creek Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps.  The IPaC documentation allows

77

the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

408.    Because of the Wind and Solar IPaC Ban, the Carrisalito Creek Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application.  Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the developer to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

409.    To date, the Carrisalito Creek Solar Project has invested $3 million based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

410.    If the Wind and Solar IPaC Ban is not soon lifted, the Carrisalito Creek Solar Project will have to be redesigned at a significant cost  to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit. This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues, and could result in loss of over $7 million of additional at-risk deposits.

411.    If the Wind and Solar IPaC Ban was lifted, the Carrisalito Creek Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit.  As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Carrisalito Creek Solar Project.

**h. Sky Rocket Solar Project**

412.   The Sky Rocket Solar Project is a proposed 200 MW wind project on private lands in Washington.

413.   As designed, the Skyrocket Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

414.   The Sky Rocket Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps. The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

415.   Because of the Wind and Solar IPaC Ban, the Sky Rocket Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application. Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the Sky Rocket Solar Project to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

416.   To date, the Sky Rocket Solar Project has invested tens of thousands of dollars based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

417.   If the Wind and Solar IPaC Ban is not soon lifted, the Sky Rocket Solar Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit. This redesign, in turn, would extend

79

construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

418.   If the Wind and Solar IPaC Ban was lifted, the Sky Rocket Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit.  As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Sky Rocket Solar Project.

### i.   The Summer Falls Solar Project

419.   The Summer Falls Solar Project is a proposed 200 MW wind project on private lands in Washington.

420.   As designed, the Sumer Falls Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

421.   The Summer Falls Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps.  The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

422.   Because of the Wind and Solar IPaC Ban, the Summer Falls Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application.  Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the Summer Falls Solar Project to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

423.    To date, the Summer Falls Solar Project has invested more than one hundred thousand dollars based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

424.    If the Wind and Solar IPaC Ban is not soon lifted, the Summer Falls Solar Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit. This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

425.    If the Wind and Solar IPaC Ban was lifted, the Summer Falls Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit. As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Summer Falls Solar Project.

### j.    The Four Sisters Solar Project

426.    The Four Sisters Solar Project is a proposed 200 MW wind project on private lands in Idaho.

427.    As designed, the Four Sisters Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

428.    The Four Sisters Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps. The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under

81

Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

429.    Because of the Wind and Solar IPaC Ban, the Four Sisters Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application.  Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the Redwood Solar Project to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

430.    To date, the Four Sisters Solar Project has invested hundreds of thousands of dollars based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

431.    If the Wind and Solar IPaC Ban is not soon lifted, the Four Sisters Solar Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit.  This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

432.    If the Wind and Solar IPaC Ban was lifted, the Four Sisters Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit.  As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Four Sisters Solar Project.

### k.  The Perrine Solar Project

433.    The Perrine Solar Project is a proposed 200 MW wind project on private lands in Idaho.

82

434.    As designed, the Perrine Solar Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

435.    The Perrine Solar Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps.  The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

436.    Because of the Wind and Solar IPaC Ban, the Perrine Solar Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application. Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the Redwood Solar Project to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

437.    To date, the Perrine Solar Project has invested tens of thousands of dollars based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

438.    If the Wind and Solar IPaC Ban is not soon lifted, the Perrine Solar Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and therefore the need to obtain a CWA Section 404 permit.  This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

439.    If the Wind and Solar IPaC Ban was lifted, the Perrine Solar Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to

timely obtain this permit. As a result, the developer would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Perrine Solar Project.

### l.   The Spacedust Solar Project

440.    The Spacedust Solar Project is a proposed 300 MW photovoltaic solar facility on private lands in Idaho.

441.    As designed, the Spacedust Solar 1 Project will impact jurisdictional wetlands and thus requires authorization under CWA Section 404.

442.    The Spacedust Solar 1 Project must include IPaC documentation—such as Official Species Lists, effect determinations, or conservation-measure recommendations—in support of any Section 404 authorization application submitted to the Corps. The IPaC documentation allows the Corps to determine if the Project has the potential to have "effects," as that term is defined under Section 7 of the ESA, on federally listed species or designated critical habitat, which would trigger an ESA Section 7 consultation with USFWS before it can authorize the Project.

443.    Because of the Wind and Solar IPaC Ban, the Spacedust Solar 1 Project is unable to access the required wildlife information and cannot finalize its Section 404 authorization permit application. Without the ability to submit an application for its CWA Section 404 permit, it is impossible for the Spacedust Solar 1 Project to secure authorization to construct the portions of the Project that impact jurisdictional wetlands.

444.    To date, the Spacedust Solar 1 Project has invested more than half a million dollars based on the reasonable expectation of being able to apply for a Corps Section 404 permit and receive a timely decision from the Corps.

445.    If the Wind and Solar IPaC Ban is not soon lifted, the Spacedust Solar 1 Project will have to be redesigned at a significant cost in order to avoid any impacts to jurisdictional wetlands—and

therefore the need to obtain a CWA Section 404 permit. This redesign, in turn, would extend construction timelines and reduce design efficiency, ultimately resulting in higher expenses and diminished revenues.

446.    If the Wind and Solar IPaC Ban was lifted, the Spacedust Solar 1 Project would be able to obtain the information necessary to submit its Section 404 permit application and have an opportunity to timely obtain this permit. As a result, Spacedust Solar 1 Project LLC would not need to engage in the costly and risky project redesign that would otherwise be required to salvage the Spacedust Solar 1 Project.

f.    *DOI Solicitor's Office M-37086 Opinion (the "Zerzan/Jorjani Opinion")*

447.    On May 1, 2025, Gregory Zerzan, the Acting Solicitor of DOI, issued the Zerzan/Jorjani Opinion that reinstated a prior interpretation of Outer Continental Shelf Lands Act's ("OCSLA") standard for approval of offshore wind projects that was first adopted at the end of the last Trump administration. *See* n.6, *supra*. The reinstated prior interpretation, the Jorjani Opinion, interpreted the phrase "prevention of interference with reasonable uses"—one of the twelve factors subsection 8(p)(4) requires BOEM to consider when evaluating permit applications under OCSLA, § 1337(p)(4)(I)—as requiring DOI to "act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference."[9] The Jorjani Opinion concluded that the Secretary must therefore "prevent[] *all* interference, if the proposed activity would lead to unreasonable interference, but not the type of interference that would be described as *de minimis* or reasonable." *Id.* (emphasis added). In other words, under this reinstated

---

[9] Dep't of the Interior, M-37059, *Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas* at 2 (Dec. 14, 2020), https://www.doi.gov/sites/default/files/m-37059.pdf, also available as Amended Complaint, Exhibit H.

interpretation, an offshore wind project could be rejected outright if it created anything more than "*de minimis*" interference with other ocean users.

448.    The Zerzan/Jorjani Opinion "instruct[s]" "all relevant Department bureaus and offices" "to treat [the Jorjani Opinion] as binding and authoritative," and further requires DOI to "reevaluate[ ]" all "Departmental action[s] taken in reliance on" the withdrawn Solicitor's Opinion M-37067.

449.    The Zerzan/Jorjani Opinion stymies and imposes a *de facto* bar on offshore wind developers obtaining new COP approvals by directing BOEM to adopt a new narrow standard wherein a COP can be disapproved solely on the basis that it has *de minimis* interference with other "reasonable uses" of the Outer Continental Shelf.   In the context of this administration's animus toward offshore wind energy, Zerzan/Jorjani Opinion effectively guarantees that BOEM will disapprove a submitted COP.

450.    The Zerzan/Jorjani Opinion has also altered the "legal status quo" for certain fully approved projects by serving as the basis for conducting a "rereview" of approved COPs and making "new decisions" that retroactively apply the narrow legal standard imposed by the Opinion.

451.    Offshore wind projects require extensive, multi-year permitting, capital investment, and contractual coordination among developers, states, suppliers, and financiers—investments made in reliance on the understanding that their COPs would be fairly reviewed according to a legal standard consistent with the requirements of OCSLA subsection 8(p)(4), and that the review process was not rigged to provide BOEM with a lever that it can pull at any time to disapprove any project.  By creating a new legal standard that assures COP disapproval and applying it both prospectively and retroactively, the Zerzan/Jorjani Opinion places billions of dollars in investment

and years of planning at risk, causing immediate economic harm to members of one or more Plaintiffs.  Moreover, vacatur of existing COP approvals can result in a developer breaching or being forced to walk away from contracts and relationships with suppliers, contractors, unions, stakeholders, and state governments.  *See also* ¶¶ 33–47, *supra*.

452.    The Zerzan/Jorjani Opinion has caused immediate economic harm to the following projects, each of which are either members of one or more Plaintiffs or projects owned by members of one or more Plaintiffs.

### a.  The Atlantic Shores North Project

453.    The Atlantic Shores North Project is a proposed offshore wind project of up to 2.35 GW off the coast of New Jersey.

454.    On December 4, 2018, the developer acquired lease OCS-A 0499 for $215 million.  Following the assignment of the OCS-A 0499 lease to the developer, it was segregated into three separate leases, OCS-A 0499, OCS-A 0549, and OCS-A 0570.  The Atlantic Shores North Project is affiliated with lease OCS-A 0549.

455.    The Atlantic Shores North Project requires COP approval to proceed; it submitted a COP to BOEM on April 29, 2022 and an updated version on March 1, 2024.  BOEM's review of the COP was paused on May 22, 2025 according to the FAST-41 permitting dashboard.

456.    The Zerzan/Jorjani Opinion effectively precludes the Atlantic Shores North Project from securing a COP approval from BOEM.  The Opinion explicitly states that BOEM can disapprove any COP that the developer might submit solely on the basis of a finding that the Project creates "more than *de minimis*" interference with other ocean users.  Given that the Outer Continental Shelf is a venue for multiple uses (*e.g.*, commercial and recreational fishing, vessel transit, military exercises)*,* and in light of this administration's animus toward offshore wind energy, the Atlantic

Shores North Project's COP would be disapproved under the Zerzan/Jorjani Opinion's reinstituted legal standard.

457.   Without a COP approval from BOEM, the Atlantic Shores North Project will never be able to commence development, deliver electricity, or generate revenue.

458.   To date, the developer has spent $215 million in initial lease acquisition fees plus an additional milestone payment of tens of millions of dollars (for all three leases), and continues to pay rental fees, including $243,387 in rental payments attributable to the OCS-A 0549 lease for 2025 alone, based on the reasonable expectation of timely approval of its ROW application and related federal authorizations—despite being unable to proceed with development.

459.   If federal permitting does not resume expeditiously, the developer may be forced to abandon the Atlantic Shores North Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### b.  The Atlantic Shores South Project

460.   The Atlantic Shores South Project consists of two proposed offshore wind projects off the coast of New Jersey.

461.   On December 4, 2018, the developer acquired lease OCS-A 0499 for $215 million dollars. Following the assignment of the lease, the lease was segregated into three separate leases, OCS-A 0499, OCS-A 0549, and OCS-A 0570.  The Atlantic Shores South Project is affiliated with leases OCS-A 0499 and OCS-A 0570.

462.   The Atlantic Shores South Project requires COP approval to proceed with development.

463.   On October 1, 2024, BOEM approved the COP for the Atlantic Shores South Project.

464.   On September 27, 2025, citing as its sole basis the Zerzan/Jorjani Opinion, BOEM asked a federal court for a voluntary remand of the Atlantic Shores South COP approval, and in so doing

88

stated that it intends to "reach a new decision on [the Atlantic Shores South] COP: to either approve, disapprove, or approve with conditions." Given that the Outer Continental Shelf is a venue for multiple uses (e.g., commercial and recreational fishing, vessel transit, military exercises), and in light of this administration's animus toward offshore wind energy, Atlantic Shores Offshore Wind, LLC is effectively guaranteed to have its COP approval vacated at the end of this "re-evaluation" thorough a finding—pre-ordained by the Zerzan/Jorjani Opinion—that the Atlantic Shores South Project creates more than *de minimis* interference with other ocean users.

465.    As a result of the Zerzan/Jorjani Opinion, the Atlantic Shores South Project is indefinitely halted and cannot commence construction as planned.

466.    To date, the developer has invested $215 million in lease acquisition fees (across all three leases) plus an additional milestone payment of tens of millions of dollars, and the Atlantic Shores South Project specifically has incurred $431,502 in rental fees and invested hundreds of millions of dollars in development costs in reliance on its lease rights to construct the Projects following COP approvals.

467.    As a result of the Zerzan/Jorjani Opinion, the developer has been forced to continue reducing its workforce, terminating contracts, and canceling planned investments. If the Atlantic Shores South Project loses its COP approval due to the Zerzan/Jorjani Opinion, the developer may be forced to abandon the Atlantic Shores South Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

c.    **The Atlantic Shores Bight Project**

468.    The Atlantic Shores Bight Project is a proposed offshore wind project off the coast of New Jersey.

89

469.    On February 23, 2022, the developer secured lease OCS-A 0541 in a competitive BOEM auction for $780 million, which it paid to the U.S. Treasury.

470.    The Atlantic Shores Bight Project requires a COP approval to proceed.

471.    The Zerzan/Jorjani Opinion effectively precludes the Atlantic Shores Bight Project from securing a COP approval from BOEM.  The Opinion explicitly states that BOEM can disapprove any COP that the developer might submit solely on the basis of a finding that the Project creates "more than *de minimis*" interference with other ocean users.  Given that the Outer Continental Shelf is a venue for multiple uses (*e.g.*, commercial and recreational fishing, vessel transit, military exercises)*,* and in light of this administration's animus toward offshore wind energy, the Atlantic Shores Bight Project's COP would be disapproved under the Zerzan/Jorjani Opinion's reinstituted legal standard.   For this reason and due to other final agency actions challenged in this suit, the developer has postponed indefinitely its preparation and submittal of a COP as doing so would be futile.

472.    Without a COP approval, the Atlantic Shores Bight Project will never be able to commence development, deliver electricity, or generate revenue.  To date, the Atlantic Shores Bight Project has spent more than $780 million in lease acquisition fees, and millions of dollars more in rental fees and activities on its lease, based on the reasonable expectation of having its COP reviewed under legal standard consistent with Congress's intent to build offshore wind. The Atlantic Shores Bight Project continues to pay rental fees to the United States despite being unable to proceed with development

473.    Based on our extensive experience advocating for wind and solar development and consultations with our developer members, a project like the Atlantic Shores Bight Project that is

90

sited and designed to satisfy the legal standard in place prior to the issuance of the Zerzan/Jorjani Opinion would typically receive COP approval within a predictable timeframe.

474.    Unless the Zerzan/Jorjani Opinion is enjoined and BOEM's prior standard of review of offshore wind projects is restored, the developer may be forced to abandon the Atlantic Shores Bight Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### d.  Maryland Offshore Wind Project

475.    The Maryland Offshore Wind Project is a proposed offshore wind facility off the coast of Maryland having a nameplate capacity of around 2,000 MW.

476.    The Maryland Offshore Wind Project requires a COP approval to proceed

477.    On August 19, 2014, the developers secured leases OCS-A 0498 and OCS-A 0490 off the coast of Maryland in a competitive auction for approximately $9 million.

478.    On  December 3, 2024, BOEM approved the Maryland Offshore Wind Project COP.

479.    On September 12, 2025, BOEM asked a federal court for permission to voluntarily remand and vacate the Maryland Offshore Wind Project COP approval on the basis that it needed to "reevaluate" the COP approval based on the retroactive application of the Zerzan/Jorjani Opinion.

480.    Following this remand and adopting the narrow legal standard imposed by the Zerzan/Jorjani Opinion, BOEM intends to "reach a new decision on [the Maryland Offshore Wind Project] COP: to either approve, disapprove, or approve with conditions."  Given that the Outer Continental Shelf is a venue for multiple uses (e.g., commercial and recreational fishing, vessel transit, military exercises), and in light of this administration's animus toward offshore wind energy, the developers are effectively guaranteed to have their COP approval vacated at the end of

this "re-evaluation" thorough a finding—pre-ordained by the Zerzan/Jorjani Opinion—that the Maryland Offshore Wind Project creates more than *de minimis* interference with other ocean users.

481.    The federal court denied BOEM's request to approve the remand without prejudice. However, BOEM has represented that it does not need federal approval to remand the COP approval, and the uncertainty that this application of the Zerzan/Jorjani Opinion has created has undermined investor confidence, significantly increasing costs for the Project.

482.    The immediate impact on the developers' day-to-day business and operations is stark. In the short term, such uncertainty imposes a *de facto* suspension of many critical Project activities contemplated by the COP, including in the areas of engineering, procurement, financing and construction.

483.    The developers cannot justify incurring the millions of dollars required to move forward with the COP activities they would otherwise be performing right now—including preparation of detailed designs and on-shore construction activities—when BOEM has expressly stated that that the COP approval is being "re-evaluated" for a "new decision."  Expenses of the magnitude required to move the Project forward can be incurred only if there is a reasonable prospect of a clear permitting and legal pathway to allow completion of the Mayland Offshore Wind Project.

484.    The developers are practically prevented from engineering, procuring, financing, installing or operating the wind turbines that its Lease expressly entitles it to build.  Instead of the developers being able to conduct preparatory and construction activities that they would be otherwise performing right now consistent with the approved COP, they have had to suspend those activities indefinitely.  Furthermore, the necessary delay of near-term design, installation and construction activities keeps the developer trapped in a pre-construction "development phase" that prevents it from accessing more favorable lending rates.  The Zerzan/Jorjani Opinion and other adverse

92

government actions have discouraged already engaged vendors and contractors from performing needed work. Multiple vendors and contractors have refused to deploy their resources on a project that they perceive to be at risk. Others, in light of that perceived risk, have sought to impose onerous commercial terms on the developers as a condition of performing the necessary work.

485.    To date the developers have invested more than $320 million into the Maryland Offshore Wind Project, including $36.1 million for hiring, training, and compensation of the development team, $13.1 million for scientific research, field work, and assessments, $28.3 million for legal services; $14.6 million for engineering, procurement, fabrication, and deployment of a meteorological buoy and met tower on the Lease; $12.1 million to BOEM for lease acquisition and annual rental payments; $22.3 million for acquisition of land rights for onshore construction infrastructure, including transmission, rights of way, and an operations and maintenance facility; $10.3 million for grid interconnection costs; $54.3 million for engineering, procurement & construction deployment of a meteorological buoy and met tower on the Lease based on the reasonable expectation that the COP approval would not be remanded based on the Zerzan/Jorjani Opinion.

486.    If the Zerzan/Jorjani Opinion is not enjoined and the Maryland Offshore Wind Project's COP approval is not preserved, the developers may be forced to abandon the Project, forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs.

### III.    CONCLUSION

487.    RENEW Northeast, ACE NY, Renewable Northwest, SREA, Interwest, MAREC Action, CGA, and CCEBA members are, and will continue to be, significantly harmed by the Anti-Renewable Actions. If these actions are not enjoined, members will continue to suffer direct,

significant, and irreversible harm that will place their investments at risk, threaten the long-term viability of their projects, and severely cripple the U.S. domestic energy supply.

We declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on January 12, 2026.



_____

Francis Pullaro



_____

Marguerite Wells



_____

Nicole Hughes

_____

Simon Mahan

_____

Erika ("Rikki") Seguin

_____

Evan Vaughan

_____

Beth Soholt

95

Chris Carmody

96