# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| RENEW NORTHEAST, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>        *Defendants*. | Civil Action No. 1:25-cv-13961 |

**DECLARATION OF ELIZABETH J. BURDOCK, PRESIDENT AND CHIEF EXECUTIVE OFFICER, OCEANTIC NETWORK IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746(2), I, Elizabeth J. Burdock, declare as follows:

1.      I, Elizabeth J. Burdock, serve as the President and Chief Executive Officer ("CEO") of Oceantic Network ("Oceantic"), a nonprofit organization dedicated to advancing offshore wind development and building a robust domestic supply chain.  Through this declaration, I describe my background, the mission and activities of Oceantic, and the general and project-specific harms that Oceantic and its members across the United States are experiencing as a result of recent federal administrative actions targeting the offshore wind industry.  I offer this testimony based on my personal knowledge, professional experience, and information obtained through Oceantic's work with its members and partners. I therefore have personal knowledge of the facts set forth below, and if called as a witness, I could testify competently thereto.

**I.      Relevant Background and Experience**

2.      I have been recognized as an expert in offshore wind supply chain development with over 30 years of experience in clean energy and economic development.  I am the founder

and CEO of Oceantic (formerly the Business Network for Offshore Wind), a globally respected nonprofit organization advancing offshore wind and building a robust domestic supply chain. Early in my career, I cofounded Dutko Worldwide's pioneering Sustainability Practice, where I partnered with FedEx and Sharp Solar to launch one of the largest private solar installations in California.

3.      I served as Executive Director of the Partnership for Advancing Technology in Housing (PATH) program during the Clinton Administration where I led a cross-agency federal initiative to promote energy-efficient housing technologies.

4.      As founder of Greenworks Partners, a certified Minority Business Enterprise and Women Business Enterprise (MBE/WBE) firm, I helped local governments and workforce nonprofits develop green economic plans and job-creating initiatives for underserved communities.

5.      I have been nationally recognized as an authority in offshore wind and supply chain development. I briefed President Joseph Biden and cabinet officials on the U.S. offshore wind supply chain and testified before both the Maryland Public Service Commission and the U.S. House Subcommittee on Energy and Mineral Resources.  I have authored several forward-looking pieces on wind energy development and contributed greatly to leading energy and business publications including: Recharge, reNEWS, RTO Insider, Forbes, Reuters, The Wall Street Journal, and The Baltimore Sun.  In 2018, I was named one of Windpower Monthly's "Influential and Interesting Leaders in the Offshore Wind Industry" and have received several prestigious honors, including the 2023 John V. Kabler Changemakers Award from the League of Conservation Voters and the 2024 Emery Rice Medal (Maritime Person of the Year) from the Massachusetts

Maritime Academy.  A graduate of Leadership Maryland, I am a frequent advisor, speaker, and advocate for the offshore wind industry's growth.

6.    In 2013, I cofounded the Business Network for Maryland Offshore Wind (now doing business as the Oceanic Network) as an IRS-recognized 501(c)(3) organization. Under my leadership, it has become a nationally and globally recognized organization dedicated to advancing the offshore energy market and building a strong, locally driven supply chain.  With more than 400 supply chain members, Oceanic endeavors to ensure that offshore wind energy strengthens the economy, expands domestic manufacturing, and delivers reliable, affordable clean energy to the grid. Oceanic members represent the range of the supply chain and include offshore wind developers, local and international unions, domestic shipyards and fabrication facilities, maritime service providers, small and medium-sized enterprises, educational institutions, labor unions, and local economic development organizations.

7.    Oceanic hosts the International Partnering Forum ("IPF"), the largest offshore wind conference in the U.S.  Oceanic also has created several industry tracking products, like Supply Chain Connect[1] and OSW Market Dashboard,[2] and produces annual U.S. Offshore Wind Market Reports.  *See, e.g.*, Oceanic Network, 2024 U.S. Offshore Wind Market Report (2024) (attached hereto as Exhibit 1).

8.    Oceanic serves as a vital source of information regarding the status and progress of the offshore industry, and its data and metrics have been frequently used by the federal government as evidence of market activity or to underpin research activity, including in a July 2023 White House fact sheet. These same data and metrics have been cited in numerous press

---

[1] *Supply Chain Connect*, Oceanic Network, https://oceanic.org/supplychain/ (all websites last visited Jan. 7, 2026).
[2] *OSW Market Dashboard*, Oceanic Network, https://oceanic.org/market-dashboard.

articles including: The Washington Post[3]; the New York Times[4]; the Wall Street Journal[5]; and Reuters.[6]

9.      Oceantic has also partnered with national laboratories on several studies mapping the offshore wind supply chain and national capabilities.[7] Oceantic routinely collaborates with other organizations involved in wind energy development, including through reciprocal relationships with Alliance for Clean Energy New York (ACE NY) and Renewable Northwest.

## II.      The Anti-Renewable Actions and Their Impacts on Offshore Wind.

10.      The Administration's continued and wide-reaching actions against offshore wind, including four of the six actions challenged in this lawsuit, have decimated confidence in the U.S. offshore wind industry and caused severe and irreparable harm to Oceantic's members, other American businesses, and the U.S. economy. As Siemens Energy, a leading global offshore wind supplier, CEO Christian Burch told POLITICO: "The American offshore wind market currently does not exist."[8] This attack on the offshore wind industry has been devastating for the thousands of businesses and tens of thousands of people whose livelihoods have benefitted from or relied on the vitality of offshore wind in the U.S.

---

[3] Jake Spring, *Trump's Wind Power Restrictions Put Blue States' Climate Goals Out of Reach*, Wash. Post, Feb. 16, 2025 (attached hereto as Exhibit 2).
[4] Lisa Friedman, et al., *Trump Is Freezing Money for Clean Energy. Red States Have the Most to Lose.*, N.Y. Times, Feb. 11, 2025 (attached hereto as Exhibit 3).
[5] Jennifer Hiller, *Trump Paralyzes the U.S. Wind Power Industry*, Wall St. J., Feb. 23, 2025 (attached hereto as Exhibit 4).
[6] Nicholas Groom, *Focus: Trump Hostility to U.S. Offshore Wind Reverberates Through Supply Chain*, Reuters, Feb. 14, 2025 (attached hereto as Exhibit 5); Nicholas Groom, *U.S. Shipbuilders, Ports Take Knock-On Hit from Trump Assault on Offshore* Wind, Reuters, Oct. 22, 2025 (attached hereto Exhibit 6).
[7] *See., e.g., A Supply Chain Road Map for Offshore Wind Energy in the United States*, National Renewable Energy Laboratory (Jan. 2023), docs.nrel.gov/docs/fy23osti/84710.pdf.
[8] Benjamin Storrow et al., '*Windmills are a Disgrace': Inside Trump's War Against a Growing U.S. Industry*, Politico (Dec. 11, 2025), https://www.politico.com/news/2025/12/11/how-the-wind-industry-misread-trump-00666895?fbclid=IwZXh0bgNhZW0CMTEAc3J0YwZhcHBfaWQPMTczODQ3NjQyNjcwMzcwAAEe6wInXX5UfyeHVhJFVhjrFZQ1aY-LgkPLrscCG-BCTsoct7hYkedjRDIpc0I_aem_vFXjHuOcBK26hRo-U1AalQ (all websites last accessed Jan. 6, 2026).

11.    In May, Oceantic submitted a Declaration of Facts in support of ACE NY as an intervenor in the case challenging federal agency implementation of the Presidential Wind Memorandum (the "Wind Memo").[9]  This Declaration was amended upon request from the Court in July to reflect an updated market as litigation progressed.  Oceantic's data in that Declaration showed an immediate and negative impact on contracts signed or announced which, in addition to investment, are the two primary indicators of market health.[10]

12.    Figure 1[11] below presents supplier contract data collected by Oceantic for the industry representative of the year from January 1 through December 31, 2025.[12]  This chart is the most complete depiction of the industry's freeze.  Almost no work is being contracted, and what contracts are signed or announced are primarily related to vessel chartering and/or construction of projects that have advanced out of the permitting pipeline. No significant contracts tied to surveying or permitting phases were identified.  With dozens of projects in various phases of the pipeline, one would expect a natural spread across different milestones.  One does not see that for 2025, evidence of the real impact the Administration and its agencies' actions are having on the offshore wind industry.

---

[9] *New York v. Trump*, No. 1:25-cv-11221 (D. Mass. filed May 5, 2025).

[10] On December 8, 2025, Judge Patti B. Saris of the United States District Court for the District of Massachusetts ruled that implementation of the second half of the challenged Wind Memo, governing permitting, was unlawful.  *See New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025).

[11] *See also* Oceantic, Contracts (attached hereto as Exhibit 7); Oceantic, Contracts by Quarter Comparison (attached hereto as Exhibit 8).  Figure 1 is found in both Exhibit 7 and Exhibit 8.  Exhibit 8 contains the charts Oceantic provided to the Court for *New York v. Trump*, No. 1:25-cv-11221 (D. Mass. filed May 5, 2025), first in May and then in July.

[12] Oceantic recognizes that between May and the writing of this declaration, its data has changed. By comparing the graphs presented in May, July, and in this declaration, a reader will notice that, for some quarters in past years, the counts have slightly changed. This is a natural part of the research process, and a number of these entries are from companies who sign up for Oceantic's Supply Chain Connect database and then enter their work, which may have been previously unknown to Oceantic. Oceantic then does its due diligence to accurately place that work on the grander timeline.

(Figure 1: Contracts by Quarter)



13.     Given the size of the potential U.S. offshore wind market, an aggressive ramp-up in supplier contract activity and investments should be present. Prior to the current Administration, the federal government had leased to private developers approximately 63 gigawatts ("GW") of potential generation capacity[13] to private developers spread across at least 40 different commercial-scale projects.  *See* Oceantic, U.S. Offshore Wind Market (Jan. 7, 2026) (attached hereto as Exhibit 9). These projects are all in various permitting stages, which should spark activity in different facets of the supply chain.  Five of these projects, representing 6 GW of generation capacity, are in active construction in which one would see vessel activity, logistics, and final installation work.  Approximately 10 GW more have received federal permits, and under a normal regulatory environment would be moving to construction, wherein new manufacturing, shipbuilding, and fabrication contracts would be signed.  That leaves 45 GW in either

---

[13] *See* Angel McCoy, et al., *Offshore Wind Market Report: 2024*, U.S. Dep't Of Energy (Aug. 2024), https://docs.nrel.gov/docs/fy24osti/90525.pdf. The Department of Energy lists the market's pipeline as 80 GW, but this has been corrected to remove areas unleased and removed from consideration under the current Administration.

environmental review or pre-review, in which the developer could engage in engineering activity, survey campaigns, and other pre-development work.[14]

14.    This amount of potential activity was only going to grow. The previous Administration had identified at least 15 GW of additional area suitable for leasing,[15] and had planned up to 12 more lease auctions between 2025 and 2029.[16]

15.    The federal government's leasing activity and planned activity was in direct response to the demand signals emanating from the states.  In 2024, both Oceantic and the Department of Energy calculated—based on state planning documents and legislative or executive targets—that state demand for offshore wind had surpassed 115 GW.[17]  By the end of 2024, the federal government had established a pipeline of projects moving through permitting, and states were sending long-term demand signals that envisioned an enormous potential market. Still, the significant market activity described in this declaration —$25 billion in supply chain investments, dozens of new vessels, and 2,000+ supply chain contracts—should be viewed as an initial "down payment" on the long-term needs of the market; only 6 GW had successfully entered installation, and only 19 GW had received final construction and operations plan approval from the federal government to move forward with construction.

16.    As detailed previously, the Wind Memo caused immediate and significant harm to the offshore wind industry.  Although the implementation of the Wind Memo's permitting ban has now been vacated, there is little industry confidence that market activity will return to normal due

---

[14] Up-to-date project permitting stage information comes from Oceantic's OSW Market Dashboard. *See supra* n.2.

[15] *See supra* n.2.

[16] *See* Press Release, U.S. Dep't of the Interior, Secretary Haaland Announces New Five-Year Offshore Wind Leasing Schedule (Apr. 24, 2024), https://www.doi.gov/pressreleases/secretary-haaland-announces-new-five-year-offshore-wind-leasing-schedule.

[17] *Supra* n.13.

to subsequent actions undertaken by the Department of the Interior ("DOI") and U.S. Army Corps of Engineers (the "Corps") challenged in this lawsuit. Through these actions, the DOI and Corps have further eroded the pipeline of projects for which many suppliers had contracts or had made significant investments in preparation. In this way, these actions have perpetuated harm on American business, driving further long-term losses and stifling future investments in the industry.

17.     On average, an offshore wind project takes approximately ten years to materialize, from siting to construction, and requires significant, front-end capital expenditure and logistical choreography. Given the long lead times and upfront costs, permitting certainty is paramount to raising financing and investment in development, manufacturing, or construction activities. Therefore, the administration's actions inhibiting project permitting have been the most detrimental to the industry; without permitting certainty and a stable, reasonable, and defined timeline, neither developers nor their contractors or subcontractors can execute on work or make investments. When permitting rules are changed mid-stream, confidence dips and market activity evaporates as developers, suppliers, and investors await a return to clarity; the effects are detrimental to suppliers who have made investments in anticipation of or were awarded work.

18.     It is clear from our data and our direct conversations with suppliers that the existing supply chain views the current administratively-driven uncertainty as perpetual and indefinite. Additionally, DOI's willingness to seek the rescission of previously-issued permits for fully, thoroughly, and legally permitted projects[18] or to issue so-called "Stop Work Orders" ("SWOs")

---

[18] *See* Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand with Vacatur & to Dismiss at 7–10, *Mayor of Ocean City v. U.S. Dep't of Interior*, No.1:24-cv-03111-SAG (D. Md. Sep. 12, 2025) (ECF No. 79); Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand & Stay at 6–9, *Town of Nantucket v. Burgum*, No.1:25-cv-00906-TSC (D.D.C. Sep. 18, 2025) (ECF No. 21); Fed. Defs.' Mot. and Mem. in Support of Voluntary Remand and Stay, *Save Long Beach Island, Inc. v. U.S. Dep't of Comm.*, No. 1:25-cv-02211 (D.D.C. Sep. 26, 2025) (ECF No. 13); Fed. Defs.' Mot. and Mem. in Support of Voluntary Remand and Stay, *ACK for Whales, Inc. v. U.S. Dept. of Commerce*, No. 2:25-cv-1678 (D.D.C. Dec. 2, 2025) (ECF No. 18).

or suspend leases for projects that are under construction (and, in the case of projects such as Revolution Wind, off the Rhode Island coast, nearly complete)[19] is severely curtailing what little economic activity still existed in the U.S. offshore wind industry pipeline. Under these conditions, manufacturers and shipbuilders cannot move forward with needed investments even with potentially near-term projects.

19.     Since issuing the Wind Memo, the Administration has taken a series of final agency actions that have exacerbated the harm caused by the Wind Memo, and that will continue to harm the offshore wind industry despite the recent vacatur of the Wind Memo's permitting ban—unless and until they are undone. As noted above, these actions represent four of the six actions challenged in this lawsuit.

20.     DOI Solicitor's Office Opinion M-37086 ("Zerzan/Jorjani Opinion"), which was released on May 1, 2025,[20] is a final agency action that creates a legal standard for approval of offshore wind construction and operations plans ("COPs") that effectively ensure this administration will reject any permit application. Furthermore, the Zerzan/Jorjani Opinion indicates that its application can be retroactive, allowing the agency to reopen previously issued COP approvals. The COP is where the developer outlines and details what practices it will undertake. Its approval by the federal government is seen as a green light for a developer to begin work, and this is when the key go/no-go decision to take final investment occurs. Here, the Tier

---

[19] Press Release, U.S. Dep't of the Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases; *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Sep. 22, 2025) (ECF No. 36); *Va. Elec. and Power Co. v. U.S. Dep't of the Interior*, No. 2:25-cv-00830 (E.D.Va. filed Dec. 23, 2025); *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (D.D.C. supplemental complaint filed Jan. 1, 2026); *Empire Leaseholder LLC v. Burgum*, No. 1:26-cv-00004 (D.D.C. filed Jan. 2, 2026); *Sunrise Wind LLC v. Burgum*, 1:26-cv-00028 (D.D.C. filed Jan. 6, 2026).
[20] Dep't of the Interior, M-37086, *Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059* (May 1, 2025).

One contracts for foundations, engines, and installation are executed and suppliers are bound by contractual terms. The Zerzan/Jorjani Opinion was and is a direct indication to the supply chain that offshore wind permitting is at risk at any stage in the process: permitting, construction, or operations. Any uncertainty within this process results in a significant reduction in or stop of actions within the supply chain.

21.     On July 15, 2025, the DOI's Deputy Chief of Staff, Gregory Wischer, issued a memo titled *Department Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities* ("Renewable Bottleneck Memorandum").[21] The Memo announced that "all decisions, actions, consultations, and other undertakings […] related to wind and solar energy facilities shall require submission to the Office of the Executive Secretariat and Regulatory Affairs, subsequent review by the Office of the Deputy Secretary, and final review by the Office of the Secretary." The Memo further outlined a list of 68 potential applications which would require the secretary's signature, including some as mundane as *Federal Register* notices and access road authorizations, while also stating that the requirement for the Secretary's express approval was "not limited to" this list.

22.     Before the current Administration implemented its procedures, an energy project could reasonably rely on a certain timeline based on previously-achieved milestones—for example: the publication of a project's Record of Decision (which precedes a COP approval) usually occurs approximately three months after publication of a Final Environmental Impact Statement. This kind of predictability in the permitting timeline affords the project's supply chain to prepare for contract obligations and fulfilments. The DOI Renewable Bottleneck Memorandum

---

[21] Gregory Wischer, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities*, Dep't of the Interior, Office of the Sec'y (July 15, 2025).

imposes unprecedented and burdensome new agency procedures and guarantees unceasing permitting delays. Reducing an entire agency to the availability of a very busy Secretary erases any confidence in the fairness and predictability of the permitting process and development timeline, placing the supply chain perpetually and indefinitely on its proverbial back foot.

23. On August 1, 2025, the DOI published a Secretarial Order titled *Managing Federal Energy Resources and Protecting the Environment* (the "Federal Lands Anti-Renewable Order").[22] The document was released 17 days after the DOI Renewable Bottleneck Memorandum and details that priority will be given to certain energy projects in the permitting pipeline over others. The agency claims this preference of "considering, when reviewing a proposed energy project under the National Environmental Policy Act (NEPA), a reasonable range of alternatives that includes projects with capacity densities meeting or exceeding that of the proposed project." The Federal Lands Anti-Renewable Order goes on to explicitly use offshore wind as an example of the kind of project they will be disfavoring using this justification. And more broadly, the Order questions "whether the use of Federal lands for *any* wind and solar projects is consistent with the law." The document includes an appendix showing the agency's definition of density factors for energy types, placing offshore wind squarely at the rear by erroneously equating the entirety of an offshore wind lease area to that of a nuclear plant (considered the most density efficient by the table)— erroneously so because it includes the undisturbed seabed between the turbines (usually placed one nautical mile apart), not just the true footprint of the actual facilities. This order sends a further and unmistakable signal to the supply chain that no new offshore wind projects will be approved.

24. On September 18, 2025, the Army Corps of Engineers issued a memorandum (the "Corps' Anti-Renewable Memorandum") requiring the Corps to penalize renewable energy

---

[22] U Sec'y of Interior, *Secretarial Order 3438, Managing Federal Energy Resources and Protecting the Environment* (Aug. 1, 2025).

projects in their "public interest" review of individual permits required by the Clean Water Act and Rivers and Harbors Act.[23]   This includes docking projects with low-capacity density and deprioritizing their review.  Because all offshore wind projects require these Corps individual permits, the Corps' Anti-Renewable Memorandum represents yet another effort to halt offshore wind permitting.

25.    From August through December, DOI also indicated its intent to remand and vacate permits for every offshore wind project which has received COP approval but has not yet started offshore construction.   The administration is justifying these actions on the basis of the Zerzan/Jorjani Opinion, essentially declaring that the COP approvals were issued unlawfully.

26.    Five reviewed and approved COPs (Atlantic Shores South[24], Empire Wind II[25], New England Wind[26], SouthCoast Wind[27], and US Wind[28]) are now at risk of vacatur. Up and down these supply chains, the prospect of the anticipated work being terminated due to permit revocation is not only undermining future confidence in domestic investments but also putting

---

[23] Adam Telle, *U.S. Army Corps of Engineers re: Direction on Reviewing Permit Applications Related to Energy Generation Projects, Department of the Army*, Army Corps of Eng'rs, Office of the Sec'y (Sep. 18, 2025).

[24] The Maritime Executive, *Dept. of Justice Tells Court BOEM Will Review Atlantic Shores COP Approval*, Maritime Exec. (Oct. 1, 2025), https://www.maritime-executive.com/article/dept-of-justice-tells-court-boem-will-review-atlantic-shores-cop-approval.

[25] Mark Chediak & Jennifer A. Dlouhy, *Trump Plans Review of Equinor's Empire Wind 2 Near New York*, Bloomberg L. (Oct. 1, 2025), https://news.bloomberglaw.com/health-law-and-business/trump-plans-review-of-equinors-empire-wind-2-near-new-york.

[26] Miriam Wasser, *Trump Administration Moves to Revoke Key Permit from Another Offshore Wind Project Proposed Near Mass.*, WBUR (Dec. 3, 2025), https://www.wbur.org/news/2025/12/03/new-england-wind-1-and-2-boem-cop-permit-revoked-massachusetts.

[27] Miriam Wasser, *In Latest Anti-Wind Action, Trump Administration Moves to Revoke Southcoast Wind Permit*, WBUR (Sep. 19, 2025), https://www.wbur.org/news/2025/09/19/southcoast-wind-permit-seek-to-revoked-trump.

[28] *Interior to Revoke Permit for Maryland Offshore Wind Project*, Politico Pro (Aug. 26, 2025), https://www.eenews.net/articles/interior-to-revoke-permit-for-maryland-offshore-wind-project/.

American companies at risk of bankruptcy, as in the case of U.S. Wind, developer of the fully permitted Maryland Offshore Wind project.[29]

27.    On top of this permitting limbo, the DOI has taken action to halt projects while they are under construction, and in some cases, when they are nearly complete and generating hundreds of megawatts of electricity into the grid.

28.    The first action was a SWO against Empire Wind 1 just as offshore construction was commencing,[30] while the second was against Revolution Wind,[31] which was 80% complete when it received its order.[32] SWOs are particularly damaging because they are indicators from the DOI to the industry that even if suppliers make crucial investments and fulfill 80% of their work, it can still be stopped.  Although the Empire Wind 1 SWO was ultimately lifted and a federal court enjoined the Revolution Wind SWO, the Administration was not through.

29.    On December 22, the Administration went even further and stopped all market activity by suspending the leases of the five projects currently undergoing major installation activity, representing 6 GW of capacity, for unspecified national security concerns. The projects were ordered to stop installation activity on the Outer Continental Shelf despite one project being

---

[29] Shayna Greene, *US Wind Warns Judge of Bankruptcy if Project Approval Is Revoked*, Bloomberg L. (Oct. 16, 2025),          https://news.bloomberglaw.com/environment-and-energy/us-wind-warns-judge-of-bankruptcy-if-project-approval-is-revoked.

[30] U.S. Dep't of the Interior, BOEM, *Director's Order to Empire Offshore Wind LLC* (Apr. 16, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf.

[31] U.S. Dep't of the Interior, BOEM, *Director's Order to* Revolution Wind, LLC (Aug. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId=Y674sNo8zi7jLu3VWRvq2hFb_8KtMldc.

[32] Ørsted, *Revolution Wind Receives Offshore Stop-Work Order from U.S. Department of the Interior's Bureau of Ocean Energy Management* (Aug. 22, 2025), https://via.ritzau.dk/ir-files/13560592/14538770/15983/%C3%98rsted%20CA%20no.%2015%202025.pdf.

an estimated 87% percent complete,[33] and another project already transmitting power to the grid.[34] Oceantic estimates at least 12,000 jobs are tied to the projects—either past or future—and developers have collectively spent at least $20 billion already. States were looking forward to at least two projects beginning first power this spring, in addition to the aforementioned project that was already supplying power.

30.    DOI's actions are part of a government-wide attack on offshore wind, ranging from Department of Commerce investigations into turbine component imports under the guise of national security,[35] to pulling funding for ports associated with offshore wind activities (U.S. Department of Transportation ("USDOT"))[36] and research (Department of Energy)[37], to unsubstantiated investigations into supposed health effects of offshore wind energy (Department of Health and Human Services).[38] The reasoning these agencies use to further harm offshore wind is apparent in the title of the August 29 press release from the USDOT announcing their recission of port funding: *Trump's Transportation Secretary Sean P. Duffy Terminates and Withdraws $679*

---

[33] Plaintiff's Motion for Preliminary Injunction, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999, (D.D.C. Jan 02, 2026) (ECF No. 50).

[34] Press Release, Maura Healey, Massachusetts Governor, Governor Healey Responds to Trump Administration Stop Work Order for Vineyard Wind (Dec. 22, 2025), https://www.mass.gov/news/governor-healey-responds-to-trump-administration-stop-work-order-for-vineyard-wind.

[35] *Notice of Request for Public Comments on Section 232 National Security Investigation of Imports of Wind Turbines and Their Parts and Components*, 90 Fed. Reg. 41380, 41380–81 (U.S. Dep't of Com., Aug. 25, 2025) http://federalregister.gov/documents/2025/08/25/2025-16191/notice-of-request-for-public-comments-on-section-232-national-security-investigation-of-imports-of.

[36] U.S. Dep't of Transp., *Trump's Transportation Secretary Sean P. Duffy Terminates and Withdraws $679 Million from Doomed Offshore Wind Projects* (Aug. 29, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-terminates-and-withdraws-679-million.

[37] U.S. Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025), https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion.

[38] Josh Eidelson & Ari Natter, *RFK Jr. Orders CDC to Study Alleged Harms of Offshore Wind Farms*, Bloomberg (Oct. 28, 2025), https://www.bloomberg.com/news/articles/2025-10-28/rfk-jr-orders-cdc-to-study-alleged-harms-of-offshore-wind-farms.

*Million from Doomed Offshore Wind Projects.*[39] The offshore wind projects could only be considered "doomed" because DOI's and the Corps' actions have created that reality.

31.    When the industry had a stable permitting pipeline, it saw tremendous economic growth.  Before January 20, the U.S. offshore wind industry equated to approximately $41 billion—$25 billion of which was direct investment into the domestic supply chain's manufacturing, shipbuilding, port upgrades, transmission upgrades, workforce development, and research sectors.  In 2025, there has been a dramatic shrinking of the market—the market gave back nearly $3 billion in supply chain investments between 2024 and 2025.  This is in contrast to the clear ramp-up in investment activity before the current Administration took power, presented here as Figure 2.[40]

(Figure 2: Supply Chain Investments by Quarter)



32.    Beyond investments, lack of certainty has prompted some states or developers to cancel commercial agreements. The New England regional procurement that awarded offtake contracts in autumn of 2024 has been delayed multiple times,[41] and Rhode Island pulled out entirely from its offtake agreement negotiations with SouthCoast Wind, naming the uncertainty

---

[39] *See supra* note 36.
[40] Oceantic, Investments (attached hereto as Exhibit 10).
[41] John Cropley, *New England OSW Contracts Delayed Again*, RTO Insider (July 1, 2025), https://www.rtoinsider.com/109172-new-england-offshore-wind-contracts-delayed/.

around its permit as a leading cause for its trepidation.[42] In New Jersey, Atlantic Shores and Leading Light Wind (a combined 3.9 GW) canceled their offtake agreements, potentially setting the state back years in progress towards its clean energy goals and putting in jeopardy hundreds of millions of dollars in direct supply chain investments which were part of the offtake agreements.[43]

33.     The actions undertaken by DOI and the Corps have resulted in major losses for suppliers. Contracts in the upstream quadrants of the supply chain have been reduced to virtually nothing since offshore wind permitting ground to a halt.  Nearly half of the contracts Oceantic identified as signed or announced in 2025 were for work on Empire Wind 1 or Revolution Wind, the construction of which DOI has repeatedly sought to halt.

34.     New vessel orders at shipyards have decreased significantly with the evaporation of a firm project pipeline.  Since the late 2010s, Oceantic has identified 61 new or retrofit vessel orders to serve the U.S. industry from shipyards across 15 states, totaling $1.8 billion in shipyard activity. *See* Oceantic, Vessels Launched (attached hereto as Exhibit 11). While shipyards are finishing some existing orders, Oceantic is aware of one new vessel order in 2025, worth approximately $12 million that was announced in late 2024 before the current Administration began implementing its policies.[44]  This slowdown will force shipyards to reduce payrolls that had

---

[42] Nancy Lavin, *Rhode Island Energy Breaks Off Contract with SouthCoast Wind Amid Federal Uncertainty*, R.I. Current (Nov. 14, 2025), https://rhodeislandcurrent.com/2025/11/14/rhode-island-energy-breaks-off-contract-with-southcoast-wind-amid-federal-uncertainty/.

[43] Order Approving Leading Light Wind 2400 MW Project as a Qualified Offshore Wind Project, *In Re the Opening of N.J.'s Third Solicitation for Offshore Wind Renewable Energy Certificates (OREC)*, BPU Docket No. QO22080481 (N.J. Bd. of Pub. Utils. Jan. 24, 2024), https://www.nj.gov/bpu/pdf/boardorders/2024/20240124/8A%20ORDER%20Solicitation%203%20Inven ergy.pdf.

[44] Nichola Groom, U.*S. Shipbuilders, Ports Take Knock-On Hit from Trump Assault on Offshore Wind*, Reuters (Oct. 22, 2025), https://www.reuters.com/sustainability/climate-energy/us-shipbuilders-ports-take-knock-on-hit-trump-assault-offshore-wind-2025-10-22; John Cropley, *Patriot Offshore Awarded 10-Year CTV Contract for Empire Wind*, MarineLink (Oct. 28, 2024), https://www.marinelink.com/news/patriot-offshore-awarded-year-ctv-518544.

expanded to meet the increased demand and cause them to lose specialized workers. Further investment in American shipyards is unlikely, especially given the fate of some recently launched vessels. While some small to medium-sized vessels hold long-term charter contracts for maintenance work, larger installation vessels such as the Acadia and Charybdis were financed on the promise of a long-term project pipeline that has evaporated, stranding the asset, potentially forcing companies to explore overseas opportunities, and denying American sailors' jobs.

35.    Additionally, existing American vessel owner-operators are already severely impacted by the pause in permitting activity perpetuated by the four DOI and Corps actions described above.  Pre-construction activities routinely utilize American-flagged vessels to survey, perform boulder removal, or support other vessels operating in wind farm sites.  As construction ramps up, a wide range of vessels are called upon for multiple missions.  In its presentation at the 2025 IPF conference, vessel tracking consultants Clarksons identified at least 50 vessels working on the Revolution Wind project, netting $500 million in charter revenue in 2024 alone.  Clarksons Offshores & Renewables, *U.S. Offshore Wind Vessel Briefing* (April 2025) (attached hereto as Exhibit 12).  This revenue to vessel operators is at risk if projects are delayed, cancelled, or shelved. Furthermore, commercial fishermen, who provide safety and scout services, lose income if their vessels must rest idle in port because there is no work being done at sea; these fishermen rely on this revenue in their offseason, as detailed below. The current market uncertainty is already resulting in abandoned survey campaigns and could lead some near-construction projects to delay, depriving American companies of billions of dollars in charter revenue—even if just a few projects are impacted.

36.    Over $5.3 billion has been spent revitalizing U.S. ports with buildouts designed to support the offshore wind industry, but the permitting freeze perpetuated by these four challenged

DOI and Corps actions is already resulting in lost work and will likely lead to underutilization of these ports in the future as project timelines slip. In New Jersey, the nearly complete Wind Port has no tenants as prospective projects await final permit approvals. In Connecticut, the port of New London continues to support the Revolution Wind and Sunrise Wind projects; however, lack of future projects in the region may leave the port without a tenant after 2028. The newly redeveloped Port of Virginia will look for new tenants with the Coastal Virginia Offshore Wind ("CVOW") project nearing completion in 2027 and no new projects ready for activity in the region. The decision to invest in the South Brooklyn Marine Terminal ("SBMT") was expected to support at least two more wind projects after Empire Wind 1 is completed, but its project developer publicly stated it no longer believed that would be true. As referenced in the complaint filed by the Plaintiff in *New York v. Trump*, ¶¶ 183-185, the nearby Arthur Kill Terminal ("AKT"), with an estimated price tag of $350 million, is also materially impacted by the Wind Memo and subsequent stop order for Empire Wind 1. Trade publication Captain reported that AKT's "2-year construction phase is estimated to produce over 1,000 jobs with more than $500 million in gross regional impact, and the ongoing operations are estimated to produce over 500 jobs with $147 million in gross regional impact."[45] Although the permitting pause in the Wind Memo has been vacated, the continued existence of the four DOI and Corps actions described above is still perpetuating these Wind Memo-related harms.

37.     New Jersey's Board of Public Utilities ("NJBPU" or "BPU") voted to delay the $1.1 billion shared transmission project that would have facilitated the connection of 3+ GW of offshore wind energy to the state, saving ratepayers $900 million in the process. Christine Guhl-Sadovy, president of the BPU, said in a statement, "Today's action is a direct response to a shift

---

[45] Mike Schuler, Staten Island Offshore Wind Port Gets Big Boost From MARAD Grant, Captain (Nov. 14, 2022), https://gcaptain.com/staten-island-offshore-wind-port-gets-big-boost-from-marad-grant/.

in federal policy under the current administration, which has created significant uncertainty and potential for offshore wind project delays."[46]  Not long after this delay, the U.S. Department of Energy canceled a $716 million loan commitment for this infrastructure.[47]  In July, New York's Public Service Commission postponed the Public Policy Transmission Need ("PPTN") process that it was undertaking. The PPTN began in 2023 and was designed to support the smooth and efficient integration of up to 8 GW of offshore wind energy to the New York City grid. In the cancelation announcement, the New York Department of Public Service ("DPS") stated:

> In light of significant federal uncertainty, the New York State Public Service Commission (Commission) today took decisive action to protect New York State ratepayers by recalibrating the timeline for offshore wind transmission development. With the federal government halting new offshore wind permitting, the Commission is strategically terminating the ongoing Public Policy Transmission Need (PPTN) process…[48]

38.     DPS is explicit that actions undertaken by this Administration are the direct cause of its halt. The DPS continues by saying New York's legally mandated renewable energy goals[49] are "impossible in the near term" directly because of this Administration. Except for the operational South Fork Wind (132 MW), and the under-construction Empire Wind 1 and Sunrise Wind (810 MW and 924 MW, respectively), New York's offshore wind projects are distinctly within the permitting pipeline. Given how long it takes to permit an offshore wind project even without the additional obstacles of the four actions described above, the state is at risk of missing

---

[46] Hugh R. Morley, *N.J. Puts on Hold Remaining Pieces of $1.07B OSW Transmission Project*, RTO Insider (Aug. 13, 2025),
https://www.rtoinsider.com/112467-nj-puts-on-hold-remaining-pieces-osw-transmission-project/.
[47] Hugh Morley, *Feds Pull $716M Loan Commitment from N.J. Offshore Wind Project*, RTO Insider (Sept. 8, 2025), https://www.rtoinsider.com/114249-feds-pull-716m-loan-commitment-nj-osw-project/.
[48] *Commission Acts to Protect Ratepayers as Federal Offshore Wind Permitting Stalls*, N.Y. State Dep't of Pub. Serv. (July 17, 2025), https://dps.ny.gov/news/commission-acts-protect-ratepayers-federal-offshore-wind-permitting-stalls.
[49] *About Offshore Wind: reaching New York's Nation-Leading Climate Goals,* N.Y. State Energy Research & Dev. Auth., https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/About-Offshore-Wind.

its 9 GW by 2035 target, which means that suppliers are unable to even use state-indicated timelines as guidelines in the midst of the federal uncertainty.

**III.    Market Response to Administration's Actions Based on Collected Data.**

39.    Oceantic tracks the U.S. offshore wind industry and its supply chain, collated in our in-house database, OSW Market Dashboard (the "Dashboard"). The Dashboard has tracked the above-mentioned $25 billion in supply chain investments across a 40-state supply chain. Without the certainty of project advancement, investors have been and will be extremely wary to commit more funding to the U.S., including to new vessel orders or infrastructure projects.  Additionally, suppliers, many of whom have significantly expanded their operations in preparation for long-term demand profiles, have lost and will continue to lose work and contracts as individual projects' development schedules are delayed.  Finally, realized assets depending on a project pipeline of multiple years are at risk of being stranded.  Oceantic data reflects this slowdown.

40.    Oceantic has identified 26 new supply chain contracts announced or signed from January 20 (the inauguration and the publication of the Wind Memo) to December 31, 2025. If we conservatively add back in the three contracts identified before the inauguration, we see an average of 7.25 contracts signed or announced per quarter for 2025. By comparison, Oceantic identified *63.25* contracts in 2024. This is a decrease of 88.5% or, in other words, a complete deterioration of the situation as the aforementioned DOI and Corps actions continue to suffocate the U.S. offshore wind industry.  Figure 2 presents this visually. *See* Exhibit 7.

(Figure 2: Contracts, Annual Quarterly Average)



41.    The investment trend is even more striking. Oceantic registered a negative investment total in Q3 as the Administration was withdrawing transportation, transmission, and research investment across multiple agencies. Those agency decisions were done not only in accordance with Administration's desire to curtail the industry, but also because DOI and the Corps' challenged actions have "doomed" potential port investments as uneconomical. Ironically, many of those withdrawn grants were going to active ports that were already employing hundreds of Americans in the offshore wind industry.

42.    The quarterly average for offshore wind-related investments in 2024 was nearly $2.7 billion, nearly double the $1.4 billion in 2023. In fact, as shown in Figure 6 below, pulled from Exhibit 8, there is a consistent upward trend in quarterly investments from 2021 through 2024. In 2025, the average quarterly investment was negative (-) $89 million. *See* Exhibit 10.

(Figure 6: Investments, Annual Quarterly Average)



43.    If we assume that the industry would have continued to grow and invest at a similar rate without the federal agencies' anti-wind actions (including, at their core, the four challenged actions discussed above), we conclude that the actions undertaken by this Administration's agencies have effectively eliminated $2.75+ billion of direct domestic supply chain investments. This figure does not include the jobs and GDP growth that would have followed such investment.

**IV.    Direct Impacts of the Actions on Oceantic Network and Its Members.**

44.    The following are testimonials of harm from Oceantic and members of the U.S. offshore wind industry due to the four challenged DOI and Corps actions, in tandem with the other anti-offshore wind actions taken by this Administration.  Some are carried over from Oceantic's May 2025 Declaration in *New York v. Trump*, as the situation has not improved throughout the year.  All are shared with permission, and the carried-over companies were consulted to investigate changes to their individual situations before inclusion in this Declaration.  Oceantic speaks for itself and the harms it has uniquely suffered.

45.    Oceantic and its individual members within the offshore wind supply chain have suffered harm as a result of federal actions in 2025 that have slowed or disrupted offshore wind permitting, leasing schedules, and project development. These actions have created prolonged

uncertainty around the project pipeline and market activity, resulting in stalled investments, reduced contracting opportunities, and diminished revenue across the industry.

46.     As a nonprofit and member-based organization, Oceantic derives 91% of its annual operating budget from membership dues and revenue generated through events, including IPF, the largest offshore wind-focused conference in the country. IPF is traditionally held in the first half of the year and had seen significant growth in alignment with market expansion. In 2025, IPF took place from April 28 to May 1 in Virginia Beach, Virginia. Compared to 2024, event attendance declined by 51%, and paid revenue decreased by 67.5%. Historically, attendee registration increases substantially in the four weeks leading up to the event. However, in April 2025, attendee revenue dropped sharply to $356,711, a decline of more than 76% from IPF's 2024 $1.5 million, indicating a major fall-off in late registrations. Total attendee revenue for 2025 was $1.1 million, down over 67% compared to the $3.4 million collected in 2024.

47.     As of January 5, 2026 (approximately five weeks prior to the start of 2026 IPF), registration revenue totaled roughly $261,903. At the same point in the registration cycle in prior years, IPF had generated approximately $726,386 in 2025 and $1.7 million in 2024. This represents a 2026 IPF decline of approximately $464,000 (nearly 64%) compared to 2025, and a decrease of about $1.4 million (approximately 85%) compared to 2024, indicating a substantially weaker early registration position heading into the 2026 conference registration cycle.

48.     Membership revenue represents a critical component of Oceantic's operating budget and has historically reflected broader market conditions. Membership revenue increased significantly from $2.31 million at the close of 2023 to $2.11 million by the end of 2024, driven by strong industry engagement and expanding offshore wind development activity.  However, this trend reversed sharply in 2025.  As of the end of December 2025, membership revenue totaled

$842,258, representing a decline of more than 60% compared to 2024 year-end totals. This contraction reflects reduced industry participation, delayed project timelines, and heightened financial uncertainty across the offshore wind sector. Based on current renewal patterns, pipeline prospects, and prevailing market conditions, membership revenue in 2026 is projected to remain well below prior peak levels.

49.     These market disruptions have also had direct consequences for Oceantic's internal operations. In 2025, the organization implemented a reduction in force that resulted in the termination of nine full-time employees. During the same period, seven additional full-time staff resigned. Oceantic also reduced its reliance on contractors to align with reduced industry demand. Together, these workforce impacts have constrained Oceantic's capacity to deliver programs, support suppliers, and maintain the level of services previously provided to the offshore wind industry.

50.     Beginning in 2020, members of Oceantic, along with many other companies in the offshore wind industry, made substantial financial and operational investments based on the expectation of a stable and growing project pipeline. This expectation was grounded in the existence of a clear and publicly promoted permitting schedule outlined by the Bureau of Ocean and Energy Management ("BOEM"), consistent state-level offtake commitments, and later in 2021, a steady succession of fully federally permitted offshore wind projects.

51.     These conditions created a strong market signal that encouraged companies to expand operations, invest in infrastructure, hire and train workers, and build out domestic supply chains. The industry relied on this regulatory and policy certainty to plan multi-year business strategies and capital expenditures.

52.    However, the challenged federal actions throughout 2025 have slowed offshore wind permitting and introduced uncertainty into project timelines, causing widespread harm across the industry's supply chain.  Companies have experienced broken or indefinitely delayed contracts, reduced future revenue opportunities, and increased risk that projects will not move into installation and operations on expected schedules.

53.    An East Coast company providing pre-construction and construction development services has consistently expanded payroll to match the workload and opportunity offshore wind generated annually and, prior to the current Administration, had dozens of staff working across multiple states. Since the administration has begun and continued to take actions against the industry, the company has seen the majority of its contracts, totaling millions of dollars, either falter, stall, or be outright cancelled.

54.    An environmental and geophysical consulting company based in Houston, Texas, invested in the U.S. offshore wind industry after two successful years.  Due to the federal actions halting offshore wind permitting in 2025, the company is experiencing a 56% drop in forecasted U.S. offshore wind revenue and faces an expected revenue loss of $2.65 million through 2025, halting any new investments and job creation the company was planning.

55.    A national labor union spent years preparing for a sustained wave of offshore wind construction activity by negotiating Project Labor Agreements ("PLAs") and making substantial financial and operational investments in workforce development. These investments included: hiring and training instructors; purchasing new equipment; constructing and upgrading training facilities; and building a specialized offshore wind curriculum.  Based on the expected multi-year project pipeline, the union trained more than 350 workers (at an average cost of $7,000 per member) and deployed members to Europe to gain practical offshore experience in preparation for

U.S. projects. However, the federal actions throughout 2025 that halted offshore wind permitting and project development have caused the anticipated wave of construction activity to stall. As a result, the union now faces a dramatic reduction in future job opportunities and significant underutilization of the workforce in which it invested heavily in preparation. Many of the training investments made in reliance on a robust offshore wind pipeline are at risk of becoming stranded costs, and thousands of anticipated jobs may never materialize without a stable project schedule. Further harms include delays and cancellations of associated manufacturing projects, including one planned facility that would have created an estimated 250 to 350 construction jobs for union members.

56.    A Global Wind Organization ("GWO") training provider in the Northeast continues to experience reduced demand for its certificate courses. As of December 2025, the center reports a decline of $175,140 in revenue (nearly 30%) compared to 2024. This ongoing reduction in training demand reflects the market disruptions that began earlier in the year and have persisted through 2025 due in large part to agency actions that halted offshore wind permitting.

57.    A West Coast-based offshore engineering firm has experienced significant financial harm as a result of federal actions halting offshore wind permitting that have persisted through 2025. In January 2025, the firm was in the advanced stages of securing two major contracts totaling $2 million in anticipated revenue. These contracts were expected to expand into long-term engagements valued between $10 million and $12 million over the 2026–2028 period. The total estimated revenue loss resulting from the cancellation of these projects is approximately $14 million, excluding potential construction and operational phase revenues that could have resulted if the projects successfully reached a Final Investment Decision. According to the firm, both clients placed all technical investments on indefinite hold due to the market uncertainty

introduced by the administration's actions affecting offshore wind development. A significant

drop in U.S. revenue forced the firm to undertake substantial layoffs, reducing its workforce by

nearly 50%. Additionally, offshore wind developers have grown increasingly suspicious about the

long-term prospects of the U.S. market. The temporary federal pause on Empire Wind 1 and

Revolution Wind, which caused hundreds of millions of dollars in project losses, has amplified

these concerns. In addition, the firm has seen several key clients shut down offices, lay off local

teams, and exit the market with write-offs. These events will further weaken the market's long-

term outlook.

58.    Sea Services North America, a marine logistical operation company, based in

Connecticut and comprised of local fishermen, that subcontracts local fleet services across the

Northeast[50] for active offshore wind campaigns is experiencing reduced revenues due to project

delays or pauses in normal development activities. Each project is expected to generate at least

$12 million. The four DOI and Corps' actions have, and will continue to, result in a loss of millions

of dollars in income for local fishermen in each project region and reduced investments in vessel

upgrades or equipment purchases required for industry safety.

59.    Geo SubSea LLC, a small consulting business specializing in marine science and

support for all maritime activities for offshore wind development projects, headquartered in

Connecticut with satellite offices in Massachusetts, North Carolina, and California, was working

on renewable energy projects on all U.S. coasts in 2024. The company's work included subject

matter expertise to support companies in each stage of project development. Specifically, the

company helped with initial startup and strategizing; procurement and technical tender

evaluations; pre-survey planning and agency submissions; contractor coordination; field program

---

[50] Specifically, Connecticut, Massachusetts, New Jersey, New York, Rhode Island, and Virginia.

management and data quality control; supervision of survey and HSE protocols; post-survey processing oversight; data and product deliverables quality control; completion of technical engineering studies; and final deliverable submissions to agencies. The company has made investments in materials and/or employees either in service of business opportunity or specific contract wins every year since 2015.  Due in large part to the federal government's actions in 2025 to halt offshore wind permitting (including the four challenged actions), the company has lost over 50% of its staff from 2024 as well as over 50% of its gross revenue, and 90% of the workload has evaporated since January 2025. The company has been operating in the red since August 2025, when spillover contract funds from 2024 were used up.  The economic harm is irreversible, with further reductions in staff and revenue a certainty for 2026.  The company is now pivoting to other marine sectors/industries, with long lead times for future potential contracts.

60.     WindServe Marine, a Northeastern U.S.-based marine operations company, has had current contracts on pause due to the Wind Memo pausing offshore wind leasing and permitting. The company has invested more than $64 million in new vessel assets in reliance on a steady pipeline of work due to both the number of fully federally permitted offshore wind projects and a previously clear and transparent permitting and state offtake pipeline.  However, with permitting halted by the four challenged actions described above, the company faces significant challenges in securing future employment for these assets once existing contracts conclude.  For example, this company had assets standing by waiting to start work on the Empire Wind 1 project, as a result of the Interior Secretary's April 16, 2025, memorandum instructing BOEM to order that the Empire Wind project off the coast of New York to indefinitely "cease all construction activities," a direct result of the Wind Memo.  Although the April 2025 work stoppage was later lifted and the company was able to resume work on the Empire Wind 1 project pursuant to existing contractual

obligations, that stop-work order affected vessel deployment, workforce planning, and revenue certainty.  The Interior Department's December 22, 2025, order directing work stoppages across all five offshore wind projects currently under construction underscores the ongoing risk that future permitting or policy actions may again halt these projects, even where work is currently proceeding.  Should future permitting actions again halt these projects, the company faces an approximately 20% annual revenue loss.  Furthermore, if the project does not happen, it jeopardizes long-term vessel utilization across the industry.

61.    In 2021, Technostrobe, a small East Coast manufacturer specializing in offshore wind components, set up a facility to establish their supply chain in New York using American-made materials.  The company doubled its full-time employees and expanded its manufacturing space by 25,000 square feet.  Due to deteriorating market conditions as a result of ongoing federal actions halting offshore wind permitting (including the four challenged actions described above), the company has been forced to cut a portion of their workforce and scale back operations.  It has now relocated much of its manufacturing and inventory to Montreal and reduced manufacturing space to 5,000 square feet.  The company has experienced a 75% loss in revenue.

62.    Sea Risk Solutions, a company with staff presence in North Carolina, Rhode Island, New Jersey, Pennsylvania, and Washington, specializing in stakeholder engagement for offshore infrastructure, entered the offshore wind market in the late-2010's as a strategic growth opportunity.  It invested resources and capital to build its brand and created jobs for both entry-level and experienced professionals.  However, due to the federal actions halting offshore wind permitting in 2025 (including the four challenged actions described above), the company has experienced a loss of about $400,000—about 28% of total revenue—following the cancellation of

two contracts and reductions in others, resulting in staff layoffs and uncertainty around future investments.

63.    Alpine Ocean, an East Coast-based offshore geophysical/geotechnical data collection company lost tens of millions in contracts in the first quarter of 2025, a significant portion of their annual revenue, resulting in a material impact on the profitability of the company and the need to lay off almost 50% of its work force.  Due to continued federal actions to halt offshore wind permitting (including the four challenged actions described above), market conditions have not rebounded, and the company is now focused on foreign markets.  It has also brought on a foreign investor to re-capitalize the company and will now no longer be 100% U.S. owned.

64.    JASCO Applied Sciences (USA) Inc., a company with employees in 15 states, now with close to 40 employees specializing in underwater acoustic measurements and modeling, opened an office and warehouse in Rhode Island in 2022 and purchased equipment to serve the U.S. offshore wind industry. This company secured work on more than five offshore wind projects, increasing expected revenue in 2025 by approximately $9 million, and hired 25 additional employees (plus 15 subcontracted workers). Due to federal actions halting offshore wind permitting (including the four challenged actions described above), the company now faces losses of approximately $7 million in revenue and may be unable to follow through on expected future investments that would have resulted in job creation and innovative measurement systems that were targeted for use in the U.S. and abroad.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on: January 7th, 2026

_____

*Elizabeth J. Burdock*

**Attached Exhibits:**

**Exhibit 1 –** Oceantic, 2024 U.S. Offshore Wind Market Report (2024)

**Exhibit 2 –** Jake Spring, *Trump's Wind Power Restrictions Put Blue States' Climate Goals Out of Reach*, Wash. Post, Feb. 16, 2025

**Exhibit 3 –** Lisa Friedman, et al., *Trump Is Freezing Money for Clean Energy. Red States Have the Most to Lose.*, N.Y. Times, Feb. 11, 2025

**Exhibit 4 –** Jennifer Hiller, *Trump Paralyzes the U.S. Wind Power Industry*, Wall St. J., Feb. 23, 2025

**Exhibit 5 –** Nicholas Groom, *Focus: Trump Hostility to U.S. Offshore Wind Reverberates Through Supply Chain*, Reuters, Feb. 14, 2025

**Exhibit 6–** Nicholas Groom, *U.S. Shipbuilders, Ports Take Knock-On Hit from Trump Assault on Offshore* Wind, Reuters, Oct. 22, 2025

**Exhibit 7 –** Oceantic, Contracts

**Exhibit 8 –** Contracts by Quarter Comparison

**Exhibit 9 –** U.S. Offshore Wind Market Map

**Exhibit 10 –** Investments

**Exhibit 11 –** Oceantic, Vessels

**Exhibit 12 –** Clarksons IPF 2025 - Offshore Market Review - Q&A Session