# EXHIBIT L

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

RENEW Northeast, *et al.*,

        *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

    *Defendants*.

Civil Action No. 1:25-cv-13961

**DECLARATION OF MICHAEL GOGGIN, VICE PRESIDENT OF
GRID STRATEGIES LLC, IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

Pursuant to 28 U.S.C. § 1746(2), I, MICHAEL GOGGIN, declare as follows:

1.  I have knowledge of the facts stated herein either personally or through the evidence identified in this declaration and, if called as a witness, could and would competently testify regarding those facts and opinions contained herein.

**QUALIFICATIONS AND RELEVANT EXPERIENCE**

2.  My name is Michael Goggin. I am the Vice President of Grid Strategies LLC, a power sector consulting firm with extensive experience in transmission system planning and operations and wholesale power markets. My CV is attached as Exhibit 1.

3.  I received a Bachelor of Arts with Honors in Social Studies from Harvard University in 2004.

4.  For over seven years, I have been providing consulting services related to electricity markets, transmission, and reliability. Prior to joining Grid Strategies LLC, I held multiple positions over a decade at the American Wind Energy Association (now known as the American Clean Power

Association), including Electric Industry Analyst, Manager of Transmission Policy, and Senior Director of Research. My areas of expertise include technical and policy aspects of clean energy integration, especially wind energy; transmission solutions; electricity markets; bulk power system reliability; and state-level resource planning.

5.      As Vice President at Grid Strategies LLC, I specialize in preparing reports and analysis in my areas of expertise and writing filings and testifying before the Federal Energy Regulatory Commission ("FERC") and state public utility commissions regarding electric reliability, transmission projects, generation plans, and other matters within my areas of expertise.

6.      In this role, I have written over one hundred filings to FERC and state public utility commissions and testified before those entities dozens of times. I have also authored hundreds of press articles, letters to the editor, academic articles, and reports. I have also served as an elected member of technical committees for the North American Electric Reliability Corporation ("NERC").

7.      In just the last three years, I have served as an expert witness regarding the following matters: at FERC in a network upgrade self-funding case (Docket Nos. EL24-80-000, EL24-81-000, EL24-82-000, EL24-83-000); at FERC in a Basin Electric prudence case (Docket Nos. ER20-2441-002, ER20-2442-002, EL20-68-002, ER21-426-001, ER21-768-002, ER21-682-002 (Consolidated)); in Wisconsin for the Paris and Oak Creek cases (Docket Nos. 6630-CE-316 (Paris), 6630-CE-317 (Oak Creek)), and two Midcontinent Independent System Operator ("MISO") Long Range Transmission Planning ("LRTP") Tranche 1 transmission line permitting cases (Docket Nos. 5-CE-157 and 5-CE-158); in Louisiana for an Entergy Bayou Power Station case (Docket No. U-37131); in Montana for two NorthWestern rate cases (Docket Nos. 2024.05.053, 2022.07.078); in Kentucky for a LGEE/KU gas plant case (Case No. 2022-00402); in Illinois for a MISO LRTP Tranche 1 case (Docket No. 24-0088); in Michigan for a MISO LRTP Tranche 1 case (Case No. U-21471 (consolidated with U-21472)); in Missouri for the Grain Belt Express case (Docket No. EA-2023-

0017); in Illinois for the Grain Belt Express case (Docket No. 22-0499); in Nova Scotia for Utility and Review Board Matter No. M11458; in Virginia for the 2024 Dominion IRP (Docket No. PUR-2024-00184) and 2025 fuel factor (PUR-2025-00059) cases; in North Carolina in the Duke Energy Carolinas general rate case and application for performance-based regulation (Docket E-7 Sub 1276), the 2023 Duke Energy Carbon Plan and Integrated Resource Plan ("CPIRP") (Docket E-100 Sub 190), and the fuel charge adjustments case (Docket E-2 Sub 1358); and in Georgia for Georgia Power's 2022, 2023, and 2024 IRPs (Docket Nos. 44160, 55378, 56002).  I have also provided expert testimony in Federal court, including on behalf of the Alliance for Clean Energy – New York as an intervenor in *State of New York v. Trump*, an ongoing case before the U.S. District Court for the District of Massachusetts (No. 1:25-cv-1122).

## EXECUTIVE SUMMARY

8.      This declaration explains why the Administration's actions targeting wind and solar generation are premised on a fundamental misunderstanding of electric reliability and why those actions, if not enjoined, will undermine, not enhance, the reliability and affordability of the United States electric grid.

9.      First, the Administration repeatedly characterizes wind and solar resources as "unreliable," including in executive orders and agency guidance. That framing is conceptually flawed. Electric reliability is not assessed at the level of individual generation resources, because no generator of any type, renewable, nuclear, coal, gas, or hydro, is available 100 percent of the time. Instead, reliability is a system-wide concept evaluated at the level of the electric grid as a whole. Grid operators and planners assess whether the collective mix of resources can meet demand across a wide range of conditions, accounting for outages, fuel constraints, and operational needs. Labeling individual resources as "reliable" or "unreliable" is therefore not a meaningful or accepted metric for evaluating electric system reliability.

3

10.     Second, decades of analysis and real-world operating experience demonstrate that wind and solar are integral components of reliable electric systems. Regional Transmission Organizations and Independent System Operators, the Department of Energy's National Laboratories, utilities, state regulators, FERC, and NERC have all studied the reliability impacts of wind and solar generation. These analyses consistently find that wind and solar make substantial, quantifiable contributions to meeting peak electricity demand and resource adequacy, often with capacity values comparable to or greater than certain conventional generators. Grid operators routinely rely on these quantified contributions in capacity auctions, integrated resource plans, and long-term reliability assessments.

11.     Third, grid operators have long accounted for the variability of wind and solar using established statistical methods such as effective load carrying capability. These methods have been used for decades, approved by FERC, and refined through extensive operational experience. They recognize that wind and solar provide dependable capacity contributions that materially reduce the risk of supply shortfalls. Moreover, wind, solar, offshore wind, storage, and other resources have complementary daily and seasonal output patterns that enhance system reliability when deployed as part of a diversified portfolio.

12.     Fourth, extensive studies show that the operational impacts of wind and solar variability are minimal and often less costly than the impacts associated with large, inflexible conventional generators. Changes in wind and solar output are generally gradual, predictable, and well forecasted, allowing grid operators to accommodate them through routine market dispatch with little or no additional need for costly operating reserves. By contrast, the sudden and unplanned outages of large fossil-fueled or nuclear plants drive the need for substantial and expensive contingency reserves. In many cases, wind and solar reduce fuel security risks by diversifying the resource mix and reducing dependence on constrained fuel supplies.

4

13.     Fifth, the Administration's actions jeopardize electric reliability by restricting the development of new generation resources at a time of rapidly growing electricity demand. Demand growth is now at its highest level in decades, driven by electrification, data centers, and increased domestic manufacturing. Most resources capable of coming online in the near term are already in interconnection queues, and the overwhelming majority of those resources are wind, solar, storage, or hybrid facilities. Delaying or canceling these projects removes capacity that grid operators have already counted on in forward capacity markets and long-term planning, increasing the risk of generation shortfalls, higher electricity prices, and, in extreme cases, rolling outages.

14.     Sixth, the Administration's reliance on "capacity density" to evaluate energy projects is fundamentally flawed. Grid reliability depends on a diverse mix of resources, not on energy-per-acre metrics. Wind and solar, while less energy-dense than nuclear, provide complementary output patterns that strengthen system-wide reliability. They also deliver some of the most affordable energy on the grid, meaning delays in their deployment will raise costs for consumers. Further, agency assumptions that wind and solar projects exclude other land or water uses are incorrect: solar land-use requirements have declined significantly, agrivoltaics enable dual-use with agriculture, onshore wind leaves 96–99% of land available for other purposes, and offshore wind layouts can accommodate navigation. These realities render capacity density comparisons both irrelevant and misleading.

15.     Finally, the Administration's actions undermine its own stated objectives of grid reliability, economic competitiveness, and energy security. Halting or delaying fully permitted, under-construction renewable projects introduces regulatory uncertainty that raises financing costs, discourages investment, and threatens the timely development of all types of critical infrastructure. Rather than strengthening reliability, these actions threaten to deprive consumers and businesses of reliable and affordable electricity precisely when it is most needed.

5

16.     In sum, the challenged actions misapply and misrepresent well-established principles of electric reliability. Wind and solar resources are already playing a central role in maintaining reliable, affordable electric service, and grid operators are actively depending on their continued deployment. By inhibiting those resources, the Administration's actions risk undermining electric reliability, increasing costs to ratepayers, and frustrating state, regional, and national efforts to meet growing electricity demand.

### DISCUSSION

**I.    The Administration's actions reflect a fundamental misunderstanding of electric reliability.**

17.     The Administration justifies many of its actions by labelling wind and solar as "unreliable." For example, EO 14315, "Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources," refers repeatedly to "unreliable energy sources like wind and solar," and their alleged displacement of "reliable, dispatchable domestic energy sources."[1]  Similarly, the September 18, 2025, U.S. Army Corps of Engineers (the "Corps") Directive ("Corps' Anti-Renewable Memorandum") directs the Corps to "consider the project's annual potential energy generation per acre, [and] whether [projects] displace more reliable energy sources."[2]

18.     As an initial matter, characterizing wind and solar resources as "unreliable" reflects a fundamental misunderstanding of the concept of electric system reliability. No individual generation resource is reliable in isolation. Accordingly, electric system planners and utilities assess reliability at the level of the electric grid as a whole, not at the level of any single generator. Labels such as "reliable" or "unreliable," when applied to individual generation resources, are therefore not meaningful metrics for evaluating system-wide reliability. The relevant inquiry is whether, at any

---

[1] Available at https://www.federalregister.gov/documents/2025/07/10/2025-12961/ending-market-distorting-subsidies-for-unreliable-foreign-controlled-energy-sources.
[2] Amended Complaint, Exhibit C.

given time, the electric grid as a whole has sufficient available energy and capacity to meet demand, even if particular generators are unavailable during certain hours.

19.    A 2024 report from the National Renewable Energy Laboratory ("NREL") describes the three main elements of reliability: resource adequacy, operational reliability (the ability to withstand sudden disturbances), and resilience (the ability to withstand, reduce the magnitude of, and recover from disruptive events).[3]  Importantly, each of these elements is evaluated at a *system-wide* level.  In contrast, the Administration consistently focuses on the "reliability" of *individual resource*s.

20.    No individual generation resource is "reliable" on its own, as no resource is available 100% of the time.  This means that every generator on the electric grid, regardless of the technology it uses, depends on other resources to fill in when it is unavailable due to maintenance outages, equipment failures, a lack of fuel, or other reasons. For example, a large share of thermal (coal and gas) generators have been unavailable during recent peak demand periods due to factors like equipment failures, gas supply shortages, and frozen coal supplies, in some cases causing widespread power outages.[4] Moreover, aside from the energy that is delivered to customers, electric grids also require certain reliability services – for example, ensuring that the transmission system operates at a constant frequency of 60 Hertz (cycles per second), or maintaining some amount of reserve generation to address disturbances.[5]  Most generation resources are not capable of providing all needed reliability services, or at least cannot do so economically. For example, most nuclear and

[3] NREL, *Explained: Fundamentals of Power Grid Reliability and Clean Electricity* (Jan. 2024), https://docs.nrel.gov/docs/fy24osti/85880.pdf.

[4] *FERC - NERC - Regional Entity Report: The February 2021 Cold Weather Outages in Texas and the South Central United States* (Nov. 2021), https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and; *Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott* (Oct. 2023), https://www.ferc.gov/media/winter-storm-elliott-report-inquiry-bulk-power-system-operations-during-december-2022.

[5] *See* Staff Paper, FERC, *Energy and Ancillary Services Market Reforms to Address Changing System Needs* (Sep. 2021), https://www.ferc.gov/sites/default/files/2021-09/20210907-4002_Energy%20and%20Ancillary%20Services%20Markets_2021_0.pdf.

coal generators are not flexible enough to follow rapid changes in electricity demand over the course of a day, so grid operators rely on more flexible hydropower, gas, or battery resources to change their level of output in response to fluctuations in electricity demand. As a result, a power system that relied on any single type of generation resource for the vast majority of its electricity would not be reliable or economic. An individual generator is even less "reliable," as all generators (renewables, nuclear, gas, coal, and hydroelectric) experience periodic maintenance and unplanned outages.

21.    Moreover, adding a new generating resource inherently makes the power system more reliable, and cannot make it less reliable. All resources make positive contributions to meeting peak electricity demand (called resource adequacy), providing energy, and serving other reliability needs. As noted below, all generating resources undergo an extensive interconnection study process before they proceed to construction, ensuring that they will support and not detract from electric reliability. Adding new resources of any generation type contributes to reliability and resilience by diversifying the generation mix, which makes the power system less susceptible to correlated outages that affect individual resource types (for example, multiple gas plants connected to the same gas pipeline could suffer outages if gas is unavailable in a particular interval). Based on the foregoing, the administration's actions asserting that whether individual resources are "reliable" or "unreliable" is inherently futile and meaningless.  No generating resource of any type is fully reliable on its own, and all generating resources contribute to reliability – including wind and solar.

**I.    Wind and solar are well understood as key components of reliable electric grids.**

22.    The administration's error in focusing on the reliability of wind and solar resources, rather than their role in a portfolio of resources that collectively provide energy supply, also runs fully counter to long-standing energy industry analysis and operational experience.  FERC-regulated electric grid operators (Regional Transmission Organizations/Independent System Operators, or

RTO/ISOs), DOE's National Laboratories, utilities, and state regulators have all conducted detailed analyses of the economic and reliability impacts of offshore and land-based wind generation and solar generation and found them to be a valuable part of their energy portfolio. These entities – many of which are tasked with operating electric grids, assuring that adequate supply is available, and ensuring that energy supply meets demand in real-time – have consistently found that wind and solar generation provide large contributions to meeting electricity demand,[6] in some cases larger and more dependable than that provided by natural gas generators. Studies conducted by these entities also demonstrate that wind and solar make synergistic contributions to resource adequacy, with wind being particularly beneficial in winter and at night, solar helping to meet peak summer afternoon demand, and batteries and other resources filling in during rare instances when the availability of both resources is low.[7] Moreover, multiple studies show that accommodating the abrupt and unexpected failures of inflexible nuclear and fossil power plants is far more costly and challenging for power grid operators than gradual and predictable changes in wind or solar output.

23. These findings have been validated by states and utilities' real-world experience reliably and cost-effectively obtaining a large share of their electricity from land-based wind in the United States, international experience integrating large amounts of offshore wind, and rapidly growing experience with deployment of solar energy. For example, the Southwest Power Pool, the grid operator for the Plains states, has at times obtained 90% of its electricity from renewable

---

[6] *See, e.g.*, NREL, *Explained: Fundamentals of Power Grid Reliability and Clean Electricity*, *supra*; Cal. ISO, *2024 Saw More Shared Progress on Critical Strategic Objectives for Grid Reliability* (Dec. 4, 2024), https://www.caiso.com /about/news/energy-matters-blog/2024-saw-more-shared-progress-on-critical-strategic-objectives-for-grid-reliability.

[7] N. Schlag et al., *Capacity and Reliability Planning in the Era of Decarbonization: Practical Application of Effective Load Carrying Capability in Resource Adequacy* at 6–7 (Aug. 2020), https://www.ethree.com/wp-content/uploads/2020/08/E3-Practical-Application-of-ELCC.pdf.

generation,[8] while the main grid operator in Texas has at times reached above 75% wind,[9] and California's grid has had sufficient amounts of wind and solar to power its entire electrical system in some intervals.[10]

24.    Based on those extensive analyses and real-world experience, utilities and their state regulators have approved purchases of both land-based and offshore wind energy, as well as solar energy.[11] The expected contribution of wind and solar generation to meeting peak electricity demand is frequently accounted for in Power Purchase Agreement prices that were negotiated and agreed to by private parties and approved by state regulators. Any incremental cost impact of the variability of renewable generation on the utility's fleet, which studies show is small to non-existent, would also be accounted for by the utility purchaser and its state regulators. Further, FERC and NERC (the Electric Reliability Organization identified in Section 215 of the Federal Power Act,[12] pertaining to federal reliability standards) have regulatory authority, substantial experience, and a strong collective track record of ensuring grid reliability.  By contrast, a federal permitting agency taking actions that functionally undermine agreements between private parties that (in many cases) were approved by state regulators with the expertise and authority to make electricity generation mix choices and are

---

[8] *See* Kassia Micek, S&P Global, *Surge of Renewable Generation Leads to Numerous SPP Records, Drop in Power Prices* (Mar. 30, 2022), https://www.spglobal.com/commodity-insights/en/news-research/latest-news/electric-power/033022-surge-of-renewable-generation-leads-to-numerous-spp-records-drop-in-power-prices.

[9] ERCOT, *June 21, 2025 Analysis: New Renewable Generation Record* (July 18, 2025), https://www.ercot.com/files/docs/2025/07/17/062125_RenewableRecord_Public.pdf.

[10] Cal. ISO, *New Renewables Records – What They Mean for the Grid and Its Carbon-Free Future* (June 6, 2024), https://www.caiso.com/about/news/energy-matters-blog/new-renewables-records-what-they-mean-for-the-grid-and-its-carbon-free-future.

[11] *See, e.g.*, Dominion Energy, Virginia 2025 Update to the 2024 Integrated Resource Plan at 35 (Oct. 15, 2025), https://cdn-dominionenergy-prd-001.azureedge.net/-/media/content/about/our-company/irp/pdfs/2025-integrated-resource-plan-update.pdf?rev=c656e4bd80184dbc80d4531cb6e9e975; *id.* at 50 (evaluating 20-year scenarios calling for 3,4560 MW of wind and between 17,534 and 19,754 MW of solar).

[12] 16 U.S.C. § 824o.

subject to the oversight of federal reliability requirements, is both inappropriate[13] and – as discussed below – is likely to *harm* reliability by deterring entry of much-needed new supply.

25.     Moreover, all new generation resources are extensively studied by the grid operator before they sign an interconnection agreement, which is a mandatory step before a generator proceeds to construction and commercial operations. These studies evaluate the full spectrum of reliability needs and issues and ensure that a resource will only improve and not degrade reliability across a range of scenarios. The general requirements for these interconnection studies and processes are specified by FERC, with additional requirements by some grid operators to meet regional needs. The interconnection requirements for inverter-based resources like wind, solar, and batteries are more stringent than those placed on conventional synchronous generators.[14] Once operating, generation resources are required to meet stringent NERC reliability standards through regular audits of the generator owner and the grid operator.

26.     In sum, and as detailed further below, grid operators have extensively studied wind and solar energy's impact on power system operations and are actively depending on renewable resources' quantified contributions to meet rising electricity demand.

### A. Grid operators have already quantified, and are depending on, wind and solar energy's contribution to meeting electricity demand.

27.     Grid operators across the country have already extensively studied and quantified wind and solar energy's contribution to meeting peak electricity demand and are actively depending on these proven contributions for resource adequacy planning, making the actions under review

---

[13] The Federal Power Act leaves generation choices solely up to states, with the federal role through FERC oversight limited to ensuring that electricity rates are just and reasonable, reliability is maintained, and there is no undue discrimination or preference. The actions of FERC-regulated regional transmission organizations and independent system operators (RTOs/ISOs) to accredit the capacity value contributions of wind generation have been approved by FERC as part of this oversight role.

[14] For example, see FERC Order 2023, available at https://www.ferc.gov/media/order-no-2023, at Paragraphs 1621 through 1735, revising the *pro forma* Large Generator Interconnection Agreement to set new requirements for interconnecting inverter-based resources – wind, solar, and battery storage – that do not apply to other generators.

disruptive to established operations. These studies by grid operators show that wind and solar energy contribute significantly to meeting peak electricity demand and resource adequacy, a finding that is confirmed by decades of real-world performance data.

28.     Peak demand on an electrical grid is the highest electrical power demand that has occurred over a specified time period. Resource adequacy is the ability of the electricity system to supply the aggregate electric power and energy requirements of the electricity consumers at all times, taking into account scheduled and expected unscheduled outages of system components.

29.     For several decades, grid operators have used "effective load carrying capability" and similar methods to accurately assess the resource adequacy contributions of wind and solar resources. These methods involve determining a resource's "capacity value," meaning the accredited contribution of a resource to meeting peak demand. Capacity value is often measured as a percent of a resource's nameplate capacity, where nameplate capacity refers to the maximum amount of electricity that a resource can produce under ideal conditions (as rated by the manufacturer). For example, a wind farm with a nameplate value (its maximum output) of 100 megawatts might have an accredited value of 50 megawatts (its projected contribution to resource adequacy). This accredited value, although lower than the nameplate capacity, is still positive – meaning that the wind farm is measurably contributing to resource adequacy. These methods can be used to assess the resource adequacy contributions of other resources, and grid operators are increasingly using these methods to account for correlated outages of thermal resources during peak demand periods. Grid operators do not presume that any resource – renewable or thermal – will be able to contribute 100% of its nameplate capacity to meeting every interval of peak demand, as all resources go offline periodically due to equipment failures or inadequate fuel supply.  This approach to resource adequacy helps to ensure adequate reserves, as no individual generator is overly relied upon.

30.     Nearly all regional grid operators currently use these methods to assess and accredit the resource adequacy contributions of different resources. FERC regulates these grid operators and has approved their capacity accreditation methodologies after finding them to be just and reasonable. As an example, PJM Interconnection, L.L.C. ("PJM") recently released capacity accreditation values for all resource types, and found that offshore wind contributes 67% of its nameplate capacity as dependable capacity value, higher than the 61% capacity value for gas combustion turbines.[15]

31.     Outside of RTOs/ISOs, utilities and state regulators use similar methods. For example, the Tennessee Valley Authority uses comparable approaches to account for the large resource adequacy contribution of wind and solar in its integrated resource plans. These analyses show the seasonal complementarity between wind and solar resources, with solar contributing 68% of its nameplate capacity as capacity value in summer and 15% in winter, and wind contributing 33% in winter and 19% in summer.[16]

32.     The resource adequacy contributions of renewable resources are well-understood, and the capacity value calculation methods discussed above have been used for decades. For example, as far back as 2008, NREL reviewed the methods utilities and other grid operators were using to account for the resource adequacy contributions of wind energy at the time.[17] In 2011, NERC released a white paper documenting these methods.[18] As noted above, FERC has designated NERC as the Electric Reliability Organization responsible for electric reliability in most of North America.[19]

---

[15]   PJM, *ELCC Class Ratings for the 2027/2028 Base Residual Action*, https://www.pjm.com/-/media/DotCom/planning/res-adeq/elcc/2027-28-bra-elcc-class-ratings.pdf.

[16] Tenn. Valley Auth., *Integrated Resource Plan 2025 Volume 1 / Draft Resource Plan* at D-8 (Sep. 2024), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/environmental-stewardship/integrated-resource-plan/2025/draft-2025-irp-volume-1-092324.pdf?sfvrsn=26f01b64_1.

[17] M. Milligan & K. Porter, NREL & Exeter Assocs., Inc., *Determining the Capacity Value of Wind: An Updated Survey of Methods and Implementation* (June 2008), https://www.nrel.gov/docs/fy08osti/43433.pdf.

[18] NERC, *Methods to Model and Calculate Capacity Contributions of Variable Generation for Resource Adequacy Planning* (Mar. 2011), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/IVGTF1-2.pdf.

[19] *See* 16 U.S.C. § 824o (Federal Power Act Section 215) (giving FERC authority to designate an Electric Reliability Organization to establish and enforce reliability standards for the bulk-power system, subject to FERC review).

33.     Other early studies showed that wind energy significantly contributes to meeting peak demand and resource adequacy needs. For example, a 2005 wind integration study prepared for New York State Energy Research and Development Authority ("NYSERDA") by General Electric using these methods found that a hypothetical offshore wind generator near the site of the currently under-construction Empire Wind project would contribute significantly to meeting peak electricity demand in New York. As that report concluded, "[t]he offshore wind generation site near Long Island exhibits both annual and peak period effective capacities on the order of 40% [of nameplate capacity] – nearly equal to their energy capacity factors." According to the report, "[t]he higher effective capacity is due to the daily wind patterns peaking several hours earlier in the day than the rest of the inland wind sites and therefore being much more in line with the load demand."[20] So, for offshore wind generation in the area that General Electric studied in 2005, grid operators could confidently assume that at least 40% of the nameplate capacity would be available to meet peak demand, and therefore contribute to meeting resource adequacy.

34.     Similarly, a 2010 General Electric report for the Independent System Operator - New England ("ISO-NE") found offshore wind generation's capacity value to be between 20% and 35% of nameplate capacity, depending on the penetration.[21] PJM's renewable integration study similarly found large capacity value contributions from land-based and offshore wind, as well as solar resources.[22] Combined with the fact that wind generation has no fuel costs, states and utilities

---

[20] R. Piwko et al., *The Effects of Integrating Wind Power on Transmission System Planning, Reliability, and Operations*, at 2.15 (Mar. 4, 2005), https://www.nyserda.ny.gov/-/media/Project/Nyserda/Files/Publications/Research/Biomass-Solar-Wind/wind-integration-report.pdf.

[21] GE Energy et al., *Final Report: New England Wind Integration Study* at 28 (Dec. 5, 2010), https://www.iso-ne.com/static-assets/documents/committees/comm_wkgrps/prtcpnts_comm/pac/reports/2010/newis_report.pdf.

[22] GE Energy Consulting, *PJM Renewable Integration Study* at 30 (Mar. 31, 2014), https://documents.dnrec.delaware.gov/energy/information/otherinfo/Documents/RPS%20Cost%20Cap%20Regulation%20Public%20Record/RPS%20Cost%20Cap%20Exhibits/36%20PJM%20Renewable%20Integration%20Study.pdf.

reasonably concluded that investment in wind generation helps ensure ratepayer access to reliable and affordable electricity.

35.     The contributions of wind generators during peak demand periods, including winter peak demand periods when many fossil-fueled generators can fail due to extreme weather and high gas demand for home heating, have been validated by additional RTO/ISO studies. In 2018, ISO-NE released a fuel security report following reliability concerns after repeated instances of widespread natural gas generator failures. ISO-NE found that three of the four generation mixes that avoided reliability concerns had high renewable energy penetrations.[23] As a result, ISO-NE concluded that "renewable resources can mitigate the region's fuel-security risk."[24] This is logical, given that – as noted above – reliability is *only* meaningfully understood on a system-wide basis.  As no one resource type can be available in all intervals, grid operators have consistently found that reliability is bolstered through a diverse portfolio of resources with complementary availability.

36.     Real-world experience validates the important role of wind and solar energy in meeting peak electricity demand. The Southwest Power Pool has documented that across Winter Storms Uri, Gerri, and Elliott, wind generation provided 100%, 235%, and 350% of its accredited capacity value.[25] MISO also noted that "[w]ind production remained high during Winter Storm Elliott, providing support to the transmission system," enabling the Midwest region to not only meet

---

[23] ISO-NE, *Operational Fuel-Security Analysis* at 33, 56 (Jan. 17, 2018), https://www.iso-ne.com/static-assets/documents/2018/01/20180117_operational_fuel-security_analysis.pdf.

[24] *Id.* at 53.

[25] Garrett Crowson, *January 2024 Winter Storm Gerri*, Operating Reliability Working Group Presentation (Feb. 8, 2024), https://www.spp.org/Documents/71037/ORWG%20Meeting%20Materials%2020240208.zip  (file 11 Winter storm Gerri MOPC ORWG.pptx, slides 21-23).

its demand but also export power to the east.[26] This means that Midwest wind helped PJM and other grid operators keep the lights on as many conventional generators failed.[27]

37.    Solar energy has been rapidly deployed in many parts of the United States in recent years.  In its Summer 2025 Reliability Assessment, NERC noted that solar-plus-storage resources would provide considerable reliability benefits.[28]

38.    Importantly, when viewing reliability at a system level, these resources are complementary. Solar and land-based wind generation tend to have opposite daily and seasonal output profiles, with high solar output during summer and the daytime, complementing wind output that peaks during nighttime and in fall, winter, and spring.[29] Offshore wind generation works synergistically with solar and land-based wind generation, with offshore wind output often highest during morning and evening hours during the transition between daytime solar peaks and nighttime wind peaks. This is because offshore wind output is often driven by the temperature gradient between land and the ocean, which is highest during those transitional hours. Due to the same temperature gradient, offshore wind output is typically high when electricity demand peaks due to either extreme heat or cold on land, as ocean temperatures change more gradually.  Once again, each of these resources contribute to *system-wide* electric reliability – even though they are not available in all hours, which grid operators fully anticipate and plan for.

39.    Most offshore wind generators deliver their output into load centers, such as large cities, in highly constrained parts of the grid. These areas typically have high prices for both energy

---

[26] MISO, *Overview of Winter Storm Elliott December 23, Maximum Generation Event* at 6, 11 (Jan. 17, 2023), https://cdn.misoenergy.org/20230117%20RSC%20Item%2005%20Winter%20Storm%20Elliott%20Preliminary%20Report627535.pdf.

[27] M. Goggin and Z. Zimmerman, *The Value of Transmission During Winter Storm Elliott*, (Feb. 2023), https://acore.org/wp-content/uploads/2023/02/The-Value-of-Transmission-During-Winter-Storm-Elliott-ACORE.pdf.

[28] NERC, *2025 Summer Reliability Assessment* at 5 (May 2025), https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2025.pdf.

[29] Schlag et al., *supra.*

and capacity in the wholesale electricity markets. Energy market prices can be particularly high during periods of peak demand, including extreme winter weather events when natural gas generation is either expensive or unavailable. As a result, states, utilities, and markets operated by RTOs/ISOs have determined that offshore wind generation is the most economic and reliable choice to meet their needs and protect against the risk of fuel price spikes and conventional generator outages.

40.    In short, grid operators and other experts have repeatedly and consistently found that renewable energy resources significantly contribute to meeting peak demand and resource adequacy needs. As noted below, the administration's actions against resources that are scheduled to come online in the near future, in the purported name of reliability, would actually undermine electric reliability by eliminating resources that the grid operator was counting on to meet electricity demand and other reliability needs.

### B. Grid operators have also studied the impact of wind and solar variability on power system operations and found it to be minimal.

41.    The impact of variable generation like wind and solar energy on power system operations has also been extensively studied by utilities, grid operators, and other experts for more than two decades. This includes effects on the amount of generation that grid operators must keep available for emergencies, including pools termed "operating reserves" and "contingency reserves."

42.    Operating reserves are an important part of system reliability. Essentially, they are electricity supply that is held back and not regularly used to meet demand but can quickly change its output in case of a number of unforeseen events. The capacity of the operating reserve is typically set to match the capacity of the largest generator in the system (the contingency reserve – discussed more below) plus a risk margin for peak load. The level of operating reserves needed depends, in part, on the type of generation and other system characteristics. Operating reserves include both supplies that are already online and producing electricity, but have capacity to increase output, *i.e.* produce more

electricity, when called upon (spinning reserves), as well as supplies that are offline and not producing electricity but that can quickly ramp up to help balance the grid (non-spinning reserves).

43.    As noted above, contingency reserves are a subset of operating reserves. Contingency reserves are calculated by determining how much generation is needed to replace the largest generator on the system, typically the single largest fossil fueled or nuclear power plant, in the event that there is an unplanned loss of that generator due to a failure. In most regions, the contingency reserve represents thousands of MWs. A large share of conventional generator contingency reserves must be held as fast-acting spinning reserves, which tend to be significantly more expensive than the non-spinning reserves that grid operators primarily use to accommodate slower and predictable changes, such as "variable" changes in wind output.

44.    Studies have generally found that even high levels of wind energy on a system have a minimal impact on the amount of operating reserves needed to maintain reliability and on efficient generator dispatch. This minimal impact is due to the fact that changes in the output of a fleet of wind or solar plants occur gradually and tend to largely offset opposite changes in electricity supply and demand. While the output of an individual wind plant can change significantly due to localized weather, it takes an hour or more for a weather event to have a significant impact on a fleet of wind plants.[30] Similarly, while individual solar plants can experience variability due to passing clouds, *fleets* of solar plants show minimal short-term output variability.[31] The FERC-regulated wholesale electricity markets redispatch generation every five minutes, so these gradual changes in electricity supply and demand are readily accommodated by the response of generators to market price signals

---

[30] Hannele Holttinen et al., *Design and Operation of Power Systems with Large Amounts of Wind Power: Final Summary Report, IEA WIND Task 25, Phase Three 2012–2014* at 22 (2016), https://iea-wind.org/wp-content/uploads/2021/08/T268.pdf; Clara M. St. Martin et al., Environmental Research Letters, *Variability of Interconnected Wind Plants: Correlation Length and Its Dependence on Variability Time Scale* at 10(4) (Apr. 2015), http://iopscience.iop.org/article/10.1088/1748-9326/10/4/044004.

[31] Andrew D. Mills et al., *Implications of Geographic Diversity for Short-term Variability and Predictability of Solar Power* (July 2011), https://ieeexplore.ieee.org/document/6039888.

with little to no need for deploying operating reserves. Moreover, changes in wind output can be accurately predicted using wind energy forecasting, making it even easier for grid operators to accommodate those changes.[32] Particularly over a broad geographic region, the availability of any individual renewable resource does not directly correlate to system-wide reliability, and grid operators are increasingly able to forecast and adjust the power mix based on weather changes.

45.    PJM's renewable integration study confirms that renewable resources do not increase the need for contingency reserves and only marginally increase the total need for other operating reserves.[33] Data from Texas likewise shows that the contingency reserves needed to accommodate large conventional power plant outages are many times more costly than the incremental increase in operating reserves due to wind energy.[34] In fact, in many cases holding non-spinning reserves costs nothing, as only rarely does the grid operator need to start up the offline generator to accommodate an unexpected drop in output. Moreover, the ongoing addition of many gigawatts of battery resources, primarily to meet capacity needs, has the additional advantage of providing a low- or zero-cost source of flexibility as these resources can quickly and efficiently change their level of output, further reducing the cost of accommodating wind generation.

46.    It is worth noting that the *inflexibility* of many nuclear and fossil fueled power plants also imposes integration costs on ratepayers. Nuclear plants do not typically change their output, and many types of fossil fueled power plants also have limited flexibility, including coal plants that cannot quickly change their output and natural gas plants that must schedule gas purchases in advance. NREL has documented that these *inflexible* power plants impose integration costs on the power system, as

---

[32] Ulrich Kaltenbach et al., *International Best Practices in Solar and Wind Power Forecasting* (Nov. 2023), https://www.get-transform.eu/wp-content/uploads/2024/01/GET.transform-Brief_VRE-Forecasting-Solar-Wind.pdf.

[33] GE Energy Consulting, *PJM Renewable Integration Study*, *supra*, at 15. Frequency regulation reserves, similar to operating reserves, are a category of stand-by power that can quickly be used to address unexpected system events, but in the case of frequency regulation reserves, to maintain grid frequency within the required range for normal operations.

[34] Michael Goggin, Am. Wind Energy Ass'n, *Renewable Energy Builds a More Reliable and Resilient Electricity Mix* at 44–46 (May 2017).

they force other more flexible generators to operate sub-optimally by disproportionally carrying the burden of responding to fluctuations in electricity demand.[35]

47.    In short, the impact of the variability of renewable generation on power system operations is minimal. Wind and solar generation resources frequently impose *less* economic costs for operating reserves than large and inflexible conventional generators, in addition to other economic benefits of wind generation such as zero fuel costs.

**C. Grid operators' reliance upon diverse energy resources demonstrates that "capacity density" orders are fundamentally mistaken**

48.    Because (as noted above) no resource operates at 100% availability, grid operators must use a diverse range of complementary energy supply resources to keep the lights on. This renders the administration's actions based upon "capacity density" of proposed projects profoundly erroneous for several reasons.  As noted above, the Corps' Anti-Renewable Memorandum directs the Corps to consider "the project's annual potential energy generation per acre, [and] whether [projects] would displace more reliable energy sources."[36]  Similarly, in issuing a Secretarial Order on wind and solar resources, the Secretary of the Interior required consideration of energy projects' "capacity density,"[37] and specifically referenced "[m]assive, unreliable energy projects, such as wind and solar."[38] However, the comparison to "more reliable energy sources" and denigration of "massive, unreliable energy projects" ignores the importance of *grid-wide* reliability and affordability.  That wind or solar produce less energy per acre than a nuclear generator is unsurprising, but also irrelevant: wind and solar provide output at different times of the day or year, and with different risks of

---

[35] Michael Milligan et al., NREL & U.S. Dept. of Energy, *Cost-Causation and Integration Cost Analysis for Variable Generation* (June 2011), https://www.nrel.gov/docs/fy11osti/51860.pdf.

[36] Amended Complaint, Exhibit C.

[37] U.S. Sec'y of the Interior, Order No. 3438, Managing Federal Energy Resources and Protecting the Environment (Aug. 1, 2025), https://www.doi.gov/document-library/secretary-order/so-3438-managing-federal-energy-resources-and-protecting (also available as Amended Complaint, Exhibit B).

[38] Press Release, U.S. Dep't of the Interior, *Secretary Burgum Announces Order to Rein in Environmentally Damaging Wind and Solar Projects* (Aug. 1, 2025), https://www.doi.gov/pressreleases/secretary-burgum-announces-order-rein-environmentally-damaging-wind-and-solar.

unavailability, when compared to nuclear, coal, gas, or other resources. As noted above, this diversification contributes to *system-wide* reliability.

49.    Second, wind and solar provide what is typically the most affordable energy on the grid.  As noted below, the administration's actions will prevent expected additions of wind and solar from being developed on schedule, which will drive up costs.  Evaluating "capacity density" ignores whether the energy provided contributes to an affordable energy supply for customers.

50.    Third, the land use figures relied upon by the administration to determine capacity density for nuclear energy and fossil fuel likely do not include upstream land use from fuel production and transportation. As such the figures are an invalid comparison to wind and solar capacity density.

51.    Third and finally, the capacity density figures themselves are fundamentally erroneous.  Both the Corps and DOI appear to assume that land or waters utilized for wind or solar projects are entirely excluded from other uses. This is not the case. Reports from the national laboratories show that land use requirements for solar (on a megawatt or megawatt-hour per acre basis) have gone down substantially.[39] The Corps' statement suggests that 2000 MW of solar would require 12,000 acres of land – but 2022 research indicates that, in fact, it would take less than half that amount.[40]  Additionally, practices such as agrivoltaics – locating agriculture alongside and within solar projects – allows for multiple uses of a project footprint, which neither the Corps nor DOI account for.[41] Onshore wind projects are even more spread-out; as another national laboratory report indicates, "A large percentage of the typical [onshore] wind plant footprint (~96% to > 99%) is not directly impacted by permanent physical infrastructure, allowing for multiple uses in the spaces

---

[39] Mark Bolinger & Greta Bolinger, *Land Requirements for Utility-Scale PV: An Empirical update on Power and Energy Density* (2021), https://www.energy.gov/sites/default/files/2022-01/lbnl_ieee-land-requirements-for-utility-scale-pv.pdf.
[40] 2000 MW / 0.35 MW/acre (DC) = 5714.29 acres.
[41] Nat'l Lab. of the Rockies, *Agrivoltaics* (last updated Dec. 7, 2025), https://www.nrel.gov/solar/market-research-analysis/agrivoltaics.

between turbines."[42] And offshore wind layouts can be highly variable, and can include spacing of turbines to allow for alternate uses including ship navigation.[45] Neither agency's capacity density issuance appears to account for the actual land or use.

### D.  The Administration's actions jeopardize electric reliability.

52.     The cumulative effect of the actions noted above, and identified in greater detail in the Complaint, is to *restrict* the supply of the most significant new sources of energy in the face of growing demand.  The U.S. Department of Energy estimates that load will grow 2.4% in 2025, and 2.6% in 2026.[43]  NERC indicates that "[e]lectricity peak demand and energy growth forecasts over the 10-year assessment period continue to climb; demand growth is now higher than at any point in the past two decades."[44] Because all resources contribute to reliability, removing a planned resource, particularly one that the grid operator expected to come online in the near future, only harms electric reliability.

53.     Meeting this demand growth necessitates new energy supply.  However, before coming online and delivering electricity to customers, all new energy resources must navigate the interconnection process with the applicable grid operator and/or the local utility.[45] This process was already sluggish prior to the actions before this Court; NERC again notes that "[t]he sluggish rate at which new generation moves through the interconnection queue and begins service has been a cause for concern for long-term reliability planning . . . . The delay in bringing new generation capacity online in assessment areas that are anticipating steady or accelerated thermal capacity retirements, as well as increased demand, presents a significant reliability risk."[46] The interconnection process spans

---

[42] Dylan Harrison-Atlas et al., *Dynamic Land Use Implications of Rapidly Expanding and Evolving Wind Power Deployment* (2022), https://docs.nrel.gov/docs/fy22osti/75863.pdf.

[43] EIA, *Short-Term Energy Outlook* (Dec. 9, 2025), https://www.eia.gov/outlooks/steo/.

[44] NERC, *2024 Long-Term Reliability Assessment* at 8 (Dec. 2024), https://www.nerc.com/globalassets/our-work/assessments/2024-ltra_corrected_july_2025.pdf.

[45] FERC, *Explainer on the Interconnection Final Rule* (last updated Jan. 23, 2025), https://www.ferc.gov/explainer-interconnection-final-rule.

[46] NERC, *2025 Long-Term Reliability Assessment*, *supra*, at 24.

multiple years – meaning that most of the resources capable of coming online by 2030 are *already* being evaluated in the interconnection process.  The vast majority of these resources are solar, wind, storage, or hybrid resources combining renewables and storage at the same location.  By contrast, new gas turbines are fully subscribed, and are unlikely to be available before 2030.[47]

54.     In the case of the administration's actions against offshore wind resources[48] in New England, the regional grid operator, ISO-NE has already run its Forward Capacity Auctions for the 2026-2027 and 2027-2028 periods.[49] Revolution Wind, a mostly complete offshore wind project for which the administration attempted to halt construction via a Stop Work order,[50] was selected in both auctions and thus has a capacity supply obligation beginning in 2026, when it was expected to be operational. Trade press has reported that "Revolution has a 150-MW capacity supply obligation (CSO) in the winter months of the 2026/27 capacity commitment period (CCP) and a 67-MW CSO in the summer months. For the 2027/28 CCP, the resource's CSOs are set to increase to a 466-MW winter commitment and a 203-MW summer commitment."[51] As a result, ISO-NE would have faced an unexpected generation shortfall for at least two full years if the administration were successful in preventing Revolution Wind from reaching commercial operations.

55.     Administration actions that delay or cancel other renewable resources expected to come online in the near future will have a similar effect. PJM also runs auctions for generating

---

[47] Jared Anderson, *US Gas-fired Turbine Wait Times as Much as Seven Years; Costs Up Sharply* (May 20, 2025), https://www.spglobal.com/commodity-insights/en/news-research/latest-news/electric-power/052025-us-gas-fired-turbine-wait-times-as-much-as-seven-years-costs-up-sharply.

[48] *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Presidential Memorandum). The Presidential Memorandum orders federal agencies to cease issuing permits for wind energy development pending a review by federal permitting authorities.

[49] ISO-NE, *Results of the Annual Forward Capacity Auctions*, https://www.iso-ne.com/about/key-stats/markets#fcaresults.

[50] U.S. Dep't of the Interior, Director's Order (Aug. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId=Y674sNo8zi7jLu3VWRvq2hFb_8KtMldc.

[51] John Cropley & Jon Lamson, *ISO-NE Warns Halting Revolution Wind Boosts Reliability Risk*, RTO Insider (Aug. 26, 2025).

capacity several years in advance, and renewable projects make up a significant share of the new resources selected to provide capacity in recent auctions.[52] New York also operates a capacity auction in which planned renewable resources have been selected to meet electricity demand. NERC's Long Term Reliability Assessment indicates the three northeast regions, ISO-NE, New York Independent System Operator, Inc. ("NYISO"), and PJM, each have large quantities of planned offshore wind generation that plays a key role in meeting expected growth in electricity demand. NERC shows PJM has over 30,000 MW of planned offshore wind capacity through 2034, ISO-NE has 15,000 MW, and NYISO has more than 6,000 MW.[53]

56.     The removal of capacity that the region was counting on to meet peak demand increases the risk of the region experiencing a generation shortfall, which could result in rolling blackouts or other reliability problems. For example, ISO-NE has calculated that for the 2027-2028 CCP, removing 400 MW of accredited capacity increases reserve shortfall hours from 12.3 to 16 per year.[54] These hours are defined as periods "when the amount of available capacity in the system is not adequate to meet the system load and operating reserve requirement."[55] ISO-NE's analysis for the 2026-2027 similarly found the expected shortfall increased from 11.5 to 14.6 hours per year with the removal of 400 MW of accredited capacity.[56]

57.     Even if a grid operator does not experience rolling blackouts due to the removal of generating capacity, this unexpected removal of generation can lead to or exacerbate shortage events

---

[52] *See, e.g.*, PJM, *2026/2027 Base Residual Auction Report* at 11 (July 22, 2025), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2026-2027/2026-2027-bra-report.pdf.

[53] NERC, *2024 Long-Term Reliability Assessment* at 25 (updated July 2025), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_Long%20Term%20Reliability%20Assessment_2024.pdf.

[54] Fei Zeng, *Operating Reserve Deficiency Information – Capacity Commitment Period 2027-2028* at 4 (Aug. 30, 2024), https://www.iso-ne.com/static-assets/documents/100014/iso_memo_on_operating_reserve_deficiency_information_ccp_2027_2028.pdf.

[55] *Id.* at 2.

[56] Fei Zeng, *Operating Reserve Deficiency Information – Capacity Commitment Period 2026-2017* at 3 (Nov. 1, 2022), https://www.iso-ne.com/static-assets/documents/2022/11/iso_memo_on_operating_reserve_deficiency_information_for_ccp_2026_2027.pdf.

that drastically increase electricity prices. Power system modeling by the Connecticut Department of Energy and Environmental Protection indicates that removing Revolution Wind would have increased ISO-NE energy market costs by more than $200 million per year.[57]

58. Ratepayers are likely to experience harm beyond the near-term period in which planned renewable resources have a capacity supply obligation under the regional capacity auctions. Replacing large amounts of generation that was expected to come online within the next several years is likely infeasible, or at minimum, could only be achieved at great cost on ratepayers. Electricity demand is increasing rapidly, causing a shortage for all types of generators as well as supporting infrastructure like power transformers and circuit breakers. For example, natural gas turbines are now largely sold out through the end of this decade and have nearly tripled in cost over the last several years.[58] As a result, the administration's actions put consumers and businesses at risk of power outages due to generation shortfalls into the next decade at least. At best, ratepayers will face increased costs as state regulators and utilities must scramble to line up replacement resources on short notice.

59. The administration's actions also undermine the stated intent of the "energy emergency" executive order that the administration issued on January 20, and a subsequent order on "Strengthening the Reliability and Security of the United States Electric Grid" issued on April 8, 2025. The April order's stated intent was meeting the "surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and an increase in domestic manufacturing," noting a "[l]ack of reliability in the electric grid puts the

---

[57] Conn. Dep't of Energy and Envt'l Prot., *DEEP Preliminary Estimates of Energy Cost Impacts Associated with Revolution Wind Stop Work Order* (Sep. 9, 2025), https://portal.ct.gov/-/media/deep/energy/procurements/deep-preliminary-estimates-of-energy-cost-impacts-associated-with-revolution-wind-stop-work-order.pdf.
[58] Rebecca F. Elliott, N.Y. Times, *Why a Plane-Size Machine Could Foil a Race to Build Gas Power Plants* (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/business/energy-environment/gas-turbines-power-plants.html; NextEra Energy, *Fourth Quarter and Full-year 2024 Earnings Conference Call* at 11–12, https://www.investor.nexteraenergy.com/~/media/Files/N/NEE-IR/news-and-events/events-and-presentations/2025/Final_Q4%202024%20Script.pdf.

national and economic security of the American people at risk. The United States' ability to remain at the forefront of technological innovation depends on a reliable supply of energy from all available electric generation sources and the integrity of our Nation's electric grid." Removing available generating sources that are under construction and expected to achieve commercial operations in the near future undermines the competitiveness of U.S. manufacturing and data centers and harms homeowners and businesses by inflating electric bills and reducing electric reliability. The administration's actions are thus diametrically opposed to its stated goals of achieving "energy dominance" and making the United States the world leader in artificial intelligence via affordable and reliable electricity.

60.    The precedent set by the administration's actions further jeopardizes customers' access to reliable and affordable power, by adding uncertainty regarding the timely completion of other generating resources. If renewable projects are delayed or canceled due to the administration's actions identified in the Complaint, this harmful precedent can undermine the timely and cost-effective development of all types of electricity generation, and even all types of infrastructure that require federal permits. If generating projects that are already fully permitted, under construction, and form a key part of state and regional plans for meeting growing electricity demand can be arbitrarily halted, that imposes a costly risk on all future generating projects. Cost-effective financing of the development and construction of multi-billion dollar infrastructure projects requires certainty that the projects will not be delayed or cancelled due to retroactive policy changes after all permits have been issued. Adding that regulatory risk at best increases financing costs that are passed on to ratepayers, and at worst can lead to the delay or cancellation of projects whose timely completion is needed to meet electricity demand growth.

61.    Actively inhibiting wind and projects that are already under development from advancing – including resources that are far along, and which could reasonably be expected to provide

energy to the electric grid in the near future (absent the actions identified in this proceeding) –will pose clear risks to the ability of the electricity system *as a whole* to meet rising demand.  And, as noted at the outset of my testimony, when evaluating reliability, it is ultimately the *system-wide* view that matters.

**CONCLUSION**

62.    The administrative actions challenged in this proceeding misrepresent well-understood concepts regarding the reliability of the electric grid, by focusing on specific resources rather than the system as a whole.  Through the wide range of administration actions identified in the Complaint, the present administration is likely to harm electric reliability by inhibiting development of wind and solar resources. If not enjoined, the identified actions will likely prevent badly needed new wind and solar resources from coming online on the timetable necessary to meet growing demand.

63.    Studies and experience show that wind and solar energy provides reliable and affordable power that contributes significantly to meeting peak electricity demand. Regulators and grid operators use sophisticated statistical tools to assess the contributions of resources towards meeting peak demand. By diversifying their electricity mix with wind, and solar states ensure electricity remains reliable and affordable when fossil fueled generation is unavailable. The economic and reliability contributions of wind and solar energy have been extensively documented by states, utilities, reliability entities, and FERC-regulated system operators, the entities with the expertise and authority over those matters. Based on those analyses and successful real-world experience, many states have decided that additional wind and generation meets their need for affordable and reliable power, while also providing a range of other benefits, including job creation and economic development. The indicated actions would only deprive customers of reliable and affordable power by jeopardizing the

timely completion of a generating resource that forms the foundation for state, utility, and regional plans for reliably and cost-effectively meeting growing electricity demand.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of January, 2026.

s/    Michael Goggin

Michael Goggin