# EXHIBIT M

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

RENEW NORTHEAST, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

*Defendants*.

Civil Action No. 1:25-cv-13961

**DECLARATION OF KURT G. STRUNK, VICE PRESIDENT OF CHARLES RIVER ASSOCIATES INC., IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746(2), I, Kurt G. Strunk, declare as follows:

1. I submit this declaration in support of Plaintiffs' motion for a preliminary injunction. I am a Vice President of Charles River Associates Inc. ("CRA") and a member of the firm's Energy Practice. My business address is 1411 Broadway, New York, NY 10018. CRA is an established consulting firm with more than 50 years of experience, and its experts specialize in applied economics.

2. I have personal knowledge of the facts stated herein and, if called to testify, could and would testify competently thereto.

## I. RELEVANT BACKGROUND AND EXPERIENCE

3. I have served as an advisor to power market participants, governments, and regulators for more than 30 years. My practice at CRA focuses on the intersection of energy and

finance, and my assignments address strategic, regulatory, and financial issues confronting energy companies as the markets in which they operate restructure and evolve.

4. I have an in-depth understanding of power markets, power contracts, power project development, power-sector economics, and power project financials. I have advised on the structuring and origination of numerous wholesale energy transactions and on the acquisition of fuels for power generation facilities. I have served as an advisor on matters related to power and gas trading and trading strategies and have reviewed power and gas trading books on behalf of utility clients. I have calculated early-termination payments for wholesale power contracts and other energy-commodity trades, and I have testified on issues relating to power project development, risk allocation, and bankability under the Public Utility Regulatory Policies Act.

5. My work frequently involves the quantification of economic harm resulting from specific events, actions, or policies. I have quantified economic harm in more than 100 litigated proceedings, including matters involving delays in disputed projects or transactions. Through this work, I have developed an in-depth understanding of the established financial and economic methodologies used to quantify harm.

6. The assignments I lead often involve complex valuation matters. I have valued power plants and power contracts in both advisory engagements and litigated disputes. I have quantified economic harm arising from delays in advancing power projects toward commercial operation and in bringing energy products to market. I frequently testify regarding the quantum of damages in energy-sector disputes. **(Exhibit A – Curriculum Vitae and Qualifications).**

## II. REMIT

7. I was retained by counsel for Alliance for Clean Energy New York ("ACE New York"), Renewable Northwest, Southern Renewable Energy Association ("SREA"), Mid-Atlantic Renewable Energy Coalition Action ("MAREC Action"), Interwest Energy Alliance

("Interwest"), Clean Grid Alliance ("CGA"), Carolinas Clean Energy Business Association ("CCEBA"), and Green Energy Consumers Alliance (collectively, "the Plaintiffs") to examine the economic effects of the following actions (collectively, the "Directives") taken by the United States government adversely affecting wind and solar energy development:

a. **Gregory Wischer, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities*, Dep't of the Interior, Office of the Sec'y (July 15, 2025) ("The Memo").** The Memo requires three levels of senior agency review for all "decisions, actions, consultations, and other undertakings" related to wind and solar energy, predictably impeding agency action, increasing uncertainty, and functioning as a *de facto* block on permitting and project approvals.[1]

b. **Sec'y of Interior, *Secretarial Order 3438, Managing Federal Energy Resources and Protecting the Environment* (Aug. 1, 2025) (the "Capacity Density Order").** DOI's order directs its bureaus to incorporate a capacity-density screen—measured as installed capacity per acre—into permitting decisions for renewable energy projects on federal lands and public waters,[2] systematically disfavoring and ensuring the disapproval of wind and solar projects that inherently require larger land footprints.

c. **United States Army Corps of Engineers ("Corps") Capacity Density Memorandum (September 18, 2025) (the "Corps Memo").** The Corps Memo

[1] U.S. Department of the Interior, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities* (July 17, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other.

[2] U.S. Department of the Interior, *SO 3438 - Managing Federal Energy Resources and Protecting the Environment*, (Aug. 4, 2025), https://www.doi.gov/document-library/secretary-order/so-3438-managing-federal-energy-resources-and-protecting.

directs the U.S. Army Corps of Engineers to also incorporate a similar "energy density" screen into permitting decisions under the Clean Water Act and the Rivers and Harbors Act while deprioritizing less "capacity dense" projects,[3] thereby structurally disadvantaging wind and solar projects.

d. **United States Fish and Wildlife Service ("USFWS") Eagle Take Permit Ban (on or about January 20, 2025).** USFWS announced a notice stating that it was temporarily ceasing issuance of eagle incidental take permits to wind energy facilities under the Bald and Golden Eagle Protection Act ("BGEPA") "until further notice" and that ePermits would no longer automatically issue general permits.[4] In the interim, USFWS has increased BGEPA enforcement against unpermitted wind energy projects.

e. **USFWS Wind and Solar IPaC Ban (on or around July 15, 2025) ("IPaC Ban").** USFWS announced that wind and solar projects would no longer be able to access the IPaC portal, a publicly available tool used by developers to facilitate consultation under Section 7 of the Endangered Species Act ("ESA"), streamline incidental take permitting under Section 10 of the ESA, and obtain Clean Water Act Section 404 nationwide permits from the U.S. Army Corps of Engineers.[5] USFWS subsequently modified this decision to state that wind and solar projects required the approval of the Deputy Secretary and Secretary of the Interior to use IPaC. By closing the permitting portal to wind and solar developers, USFWS eliminates the

---

[3] Press Release, U.S. Army Corp of Engineers, Army Corps of Engineers Begins Implementing Policy to Increase America's Energy Generation (Sep. 22, 2025), https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/4311128/army-corps-of-engineers-begins-implementing-policy-to-increase-americas-energy/.

[4] While the Eagle Take Permit Ban implicates both operating and future wind projects, the CRA Report focuses only on those impacts attributable to projects currently under construction and in the energy pipeline. We also note that USFWS removed the quoted website language after the initial Complaint for this lawsuit was filed.

[5] IPaC Information for Planning and Consultation, U.S. Fish & Wildlife Serv., https://ipac.ecosphere.fws.gov/.

primary and agency-designated mechanism available to initiate required federal consultation and obtain necessary permits.

f. **DOI Solicitor's Office M-Opinion 37086 (May 1, 2025) (the "Zerzan/Jorjani Opinion").** This DOI memorandum interprets the Outer Continental Shelf Lands Act ("OCSLA") as requiring the agency to prevent "all interference" from proposed activities on the Outer Continental Shelf if such interference is more than "de minimis or reasonable," and directs the Department to reevaluate existing offshore wind projects under this interpretation.[6] The memorandum departs from the prior interpretation, which required consideration of whether a proposed activity, on balance, supported the goals enumerated in OCSLA subsection 8(p)(4), and materially constrains and, in practice, forecloses approval of offshore wind projects by eliminating the statutory balancing analysis previously required under that subsection.

8. These actions followed closely after the January 20, 2025, Presidential Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects"; Executive Order 14315, issued July 7, 2025, entitled "Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources";[7] and Secretarial Order

---

[6] *Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059*, U.S. DOI, M-37086 (May 1, 2025).

[7] *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/temporary-withdrawal-of-all-areas-on-the-outer-continental-shelf-from-offshore-wind-leasing-and-review-of-the-federal-governments-leasing-and-permitting-practices-for-wind-projects/.

3437 (July 29, 2025),[8] which announced a policy shift intended to curb "preferential treatment" for wind and solar projects.[9]

9. Collectively, I refer to these actions as "the Directives." Based on my review and discussions with Plaintiffs, I understand that the Directives have collectively halted permitting in practice for wind and solar projects on both private and public lands, including the Outer Continental Shelf.

## III. UNDERSTANDING OF THE LEGAL CONTEXT

10. I understand that Plaintiffs seek a preliminary injunction enjoining the Directives. I further understand that, to obtain the requested preliminary injunction, Plaintiffs must establish, among other things, that their members face immediate and irreparable harm as a result of the Directives. I also understand that the Court will balance the harm to Plaintiffs against any effects on Defendants and will consider the public interest in reaching its decision.

11. Within this legal framework, I first analyze and quantify the immediate and irreparable harm suffered by wind and solar developers affected by the Directives. I then analyze and quantify the broader impacts of the Directives on the electric power sector, state energy policy objectives, and the broader economy—matters directly relevant to the Court's consideration of the public interest. In doing so, I summarize analysis conducted by CRA quantifying increased electricity prices paid by American households and businesses, impediments to achieving state policy goals, employment effects, and broader impacts on economic activity.

[8] The White House, *Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources* (July 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/ending-market-distorting-subsidies-for-unreliable-foreign%e2%80%91controlled-energy-sources/.

[9] U.S. Department of the Interior, *Department of the Interior Curbs Preferential Treatment for Wind Energy* (July 29, 2025), https://www.doi.gov/pressreleases/department-interior-curbs-preferential-treatment-wind-energy.

## IV. METHODOLOGY

12. To evaluate the implications of the Directives, I directed CRA staff to compile a dataset of affected projects (the "Impacted Project Dataset"), covering approximately 41.7 gigawatts ("GW") of wind, solar, and hybrid projects that were previously expected to achieve commercial operation before 2029 but are no longer expected to do so, as well as an additional 15.4 GW of projects that were previously expected to come online by 2029 but are now at risk of delay or cancellation. I assembled the dataset using: (1) CRA's independent research identifying projects on public lands and public sponsor statements describing the effects of the Directives; and (2) a survey conducted by the American Clean Power Association ("ACP") of its members reporting project delays and cancellations. Because ACP estimates that its survey captures only 10–15 percent of total U.S. industry activity, these capacity estimates are conservative.

13. The Impacted Project Dataset represents a time-bound snapshot. There is an inherent lag before the effects of the Directives are fully realized because go-or-no-go investment decisions occur on staggered timelines. The reported delayed and cancelled megawatts are conservative by design, excluding projects expected to come online after 2029, projects without documented permitting or development holdups, and member-identified delays characterized as likely but not certain. Moreover, the underlying data capture only a portion of total U.S. industry activity. If the requested preliminary injunction is not granted and the Directives remain in place during the anticipated 12-to-18-month litigation period, additional deferrals and interconnection-queue withdrawals are likely, with increased schedule and financing uncertainty suppressing near-term investment decisions and increasing longer-term attrition from the development pipeline.

## V. CATEGORIES OF HARM

14. I directed the CRA team to prepare a study calculating the following categories of harm:

i. Direct, immediate, and irreparable harm to wind and solar developers caused by the Directives

   1. Forfeited deposits and higher carrying costs associated with projects removed from the queue;

   2. Lost profits from delays in getting the projects to commercial operation; and

   3. Foregone tax credits due to project delays and cancellations resulting from the Directives.

ii. Public-interest considerations, including the harm caused by the Directives that is borne by the public and other third parties.

   1. Harm from the Directives jeopardizing state legislative goals

      a. Inability to achieve Renewable Portfolio Standards ("RPS") established in state laws; and

      b. Penalties imposed on load-serving entities ("LSEs") for shortfalls in Renewable Energy Credit ("REC") procurement.

   2. Harm from the Directives borne by electricity consumers across the country

      a. Higher commodity electricity prices resulting from a smaller generation fleet due to delays and cancellations driven by the Directives; and

      b. Increases in resource adequacy shortfalls leading to a higher expected cost of unserved energy.

   3. Local economic effects - Consequences for local employment and economics of canceled or delayed projects.

15. In assessing public interest effects, I emphasize that current conditions in the power sector—including the retirement of many large generating units and demand growth not seen in

decades, driven in significant part by energy-intensive data centers—substantially amplify the harm caused by slowing or halting development of new generation resources. Recent analysis by the Department of Energy ("DOE") underscores how tight the U.S. resource-adequacy outlook already is. DOE's 2025 Report on Evaluating U.S. Grid Reliability and Security finds that rapid load growth, including approximately 50 GW of incremental data-center demand by 2030, combined with 104 GW of announced firm retirements, renders the current trajectory "unsustainable," with expected loss-of-load hours in 2030 increasing by roughly a factor of 100 under the plant-retirement scenario.[10] In this environment, every megawatt of accredited capacity matters, including wind and solar. Delays to otherwise viable wind, solar, and hybrid projects reduce both expected energy supply and accredited capacity during stressed hours, increasing the likelihood and magnitude of unserved-energy events and shifting generation toward higher-cost resources. These effects place upward pressure on wholesale electricity prices and, where costs are passed through, retail electricity bills. Given the exceptionally tight conditions in regional power markets nationwide, any slowdown in the development of new power-supply resources imposes substantial economic costs.

## VI. SUMMARY OF FINDINGS

16. The CRA Report **(Exhibit B – CRA Report)** explains how CRA classified as cancelled or delayed approximately 57.2 GW of wind and solar projects as a result of the Directives, as reflected in the Impacted Project Dataset. In certain instances, the analysis includes only specific regions or subsets of the impacted projects due to data availability or other limitations, which are described in greater detail in the body of the report.

[10] Resource Adequacy Report, Evaluating the Reliability and Security of the United States Electric Grid, Department of Energy (July 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

17. Specifically, the CRA Report describes how the Directives impose the following significant harms:

18. **Harm to wind and solar developers**: By delaying or canceling otherwise viable projects, the Directives are expected to result in the loss of investment tax credits ("ITCs"), causing direct and immediate harm to the solar and wind industries nationwide.[11] As detailed in the CRA Report, I estimate this harm to total up to $25.6 billion. These investment tax credit losses are irreparable as a matter of economic recovery because, once statutory eligibility windows are missed as a result of project delays or cancellations, the credits cannot be recovered at a later date. In addition, developers face further irreparable financial harm from increased carrying costs and forfeited interconnection-queue deposits, the latter of which often become non-refundable at key milestones and may not be recoverable even if a project later proceeds. These impacts are quantified for only a subset of the Impacted Project Dataset and are therefore illustrative of broader, unquantified harm across the industry. My analysis indicates that the subset of wind and solar projects analyzed will incur approximately $48.3 million in additional carrying costs per year for each year of delay attributable to the Directives.[12] Developers also incur additional irreparable net present value losses from deferred offtake revenue streams, which cannot be fully recovered once contractual delivery timelines are missed and which are not quantified for all affected projects. Finally, the analysis identifies approximately $1.9 million in irreparable forfeited

[11] These foregone credits lessen immediate federal spending, but the goals that motivated the legislature to implement the policy remain. Governments and ratepayers may face higher or deferred costs to meet the same goals. For clarity, these estimates report the private harm from lost credits.

[12] Carrying costs are calculated based on reported investment to rate, which is only available for 51 percent of projects in the Impacted Project Dataset.

interconnection-queue deposits in the Midcontinent Independent System Operator ("MISO") region, representing only a small subset of impacted projects.[13]

19. **Harm to state legislative goals**: The Directives create material, unquantified risk of non-compliance with state Renewable Portfolio Standard ("RPS") mandates in other jurisdictions, as project delays reduce expected renewable energy certification ("REC") volumes, undermining state legislative objectives and imposing additional costs on ratepayers. The Directives will trigger RPS non-compliance charges in California, which I estimate—on an illustrative upper-bound basis—to total up to $168 million if modeled REC shortfalls are left uncured. The failure to meet state mandates for renewables development and any associated costs will be borne not by developers alone, but ultimately affect electricity consumers and taxpayers, and therefore directly implicate the public interest.

20. **Harm to ratepayers**:[14] The Directives will cause wholesale electricity costs to rise by reducing the available supply of low-marginal-cost generation and increasing reliance on higher marginal cost resources. In 2026, I estimate approximately $87 million in higher wholesale electricity costs, increasing to an estimated $4.6 billion over time. These costs are borne primarily by electricity residential consumers and businesses and therefore constitute direct and immediate public interest harm. The estimated increases reflect conditions in the Western Interconnect under the assumption that no timely mitigation is available to replace generation lost as a result of projects canceled or delayed by the Directives, resulting in higher market-clearing prices and, where costs are passed through, higher retail electricity bills.

[13] Within the impacted project dataset, I was only able to match projects in our impacted project dataset to withdrawals in the MISO interconnection queue. As a result, the deposit losses reported here reflect only a subset of total forfeited interconnection queue deposits.

[14] Ratepayer harm is concentrated in the Western Interconnection and PJM because those regions face the highest volumes of project cancellations and delays beyond 2029 in the Impacted Project Dataset, and they also experience some of the highest electricity prices and the most acute reliability concerns in the country.

21. In PJM, the CRA modeling estimates approximately $475 million in increased wholesale energy costs in 2029, the first year in which project cancellations occur in that region. These increased costs result from tighter market conditions caused by the absence of megawatt hours from projects CRA classified as delayed or canceled as a result of the Directives. Because wholesale energy costs are largely passed through to retail rates, these impacts are borne by electricity consumers and businesses, directly implicating the public interest.

22. The Directives will also exacerbate resource-adequacy challenges in PJM by reducing available capacity through project delays and cancellations attributable to the Directives. I estimate up to $435 million in direct and immediate harm resulting from these resource adequacy shortfalls, reflecting increased risks of reliability events and higher costs to consumers and system operators. These effects further underscore the substantial public-interest harms caused by the Directives.

23. **Economic harm**: The Directives will result in fewer jobs and reduced economic activity, effects that are borne by workers, local communities, and state and local governments. I estimate an average[15] loss of more than 23,000 average annual direct construction and operations jobs, with associated labor income totaling approximately $1.4 billion over the 2026–2029 period, due to project cancellations attributable to the Directives. In addition, projects delayed as a result of the Directives place at risk an additional approximately 22,800 average annual direct construction and operations jobs and approximately $1.4 billion in average annual labor income over the 2026–2029 period. These employment and income losses are borne by workers and local communities and therefore constitute significant public-interest harms.

[15] Averages are computed across 2026–2029 combining construction and O&M.

24. Finally, as explained in the CRA Report, I estimate that an average of approximately $1.5 billion in gross domestic product ("GDP") contributions will be lost annually from 2026 through 2029 as a result of wind and solar project cancellations attributable to the Directives. These losses reflect foregone economic activity in construction and operations and are borne by local economies through reduced incomes and tax bases, directly implicating the public interest. In addition, I estimate that an average of approximately $1.6 billion in GDP contributions will be at risk annually over the 2026–2029 period due to projects delayed as a result of the Directives, further amplifying these public-interest harms.[16]

**Table 1: Summary of Quantified Direct and Imminent Harm Due to the Directives**

[16] GDP impacts reflect only the wind and solar components of impacted projects and exclude the battery storage portion of hybrid projects because reliable storage-specific multipliers were not available.

| | *Category of Harm* | *Description of Harm* | *Harm Quantification* |
|---|---|---|---|
| [1] | Investment tax credit losses | The value of ITC lost due to projects being canceled or delayed | |
| (a) | | Based only on canceled projects | $5 billion nationwide |
| (b) | | Based on a three-year delay scenario | $25.6 billion nationwide |
| [2] | Effects on investment to date | Increased carrying costs for delayed projects and lost investment for canceled projects | |
| (a) | | Increased carrying costs per year due to wind and solar projects being delayed as a result of the Directives | 48.3 million annually nationwide* |
| (b) | | Lost investment due to project cancellation | $85 million nationwide* |
| [3] | Queue withdrawal fees | Queue withdrawal penalties faced by identified MISO projects that withdrew from the interconnection queue. | $1.9 million, example for one regional market (MISO) * |
| [4] | RPS non-compliance penalties | Penalty fees paid by California LSEs if unable to comply with state RPS | Up to $168 million in California |
| [5] | Impact of higher power prices | Change in power prices from 2026-2029 of projects being canceled or delayed beyond 2029 | |
| (a) | | Impact in the Western Interconnect | $87 million to $4.6 billion in the Western Interconnect from 2026-2029 |
| (b) | | Impact in PJM | $475 million in PJM in 2029 |
| [6] | Impacts on the resource adequacy value | Impact within PJM in 2029 | Up to $435 million in PJM in 2029 |
| [7] | Impact on direct employment | Annual construction and operational jobs lost or at risk at impacted projects from 2026-2029 | |
| (a) | | Average annual jobs lost due to projects being canceled | 23,003 average annual jobs nationwide<br>$1.4 billion in annual labor income nationwide |

| | ***Category of Harm*** | ***Description of Harm*** | ***Harm Quantification*** |
|---|---|---|---|
| (b) | | Average annual jobs at risk due to project being delayed | 22,764 average annual jobs nationwide<br>$1.4 billion in annual labor income nationwide |
| [8] | Impact on local economies | Annual GDP contributions from construction and operations lost or at risk impacted projects from 2026-2029 | |
| (a) | | Average annual GDP contributions lost due to projects being canceled | $1.5 billion nationwide |
| (b) | | Average annual GDP contributions at risk due to project being delayed | $1.6 billion nationwide |

Note: All dollar values presented in 2025 dollars in net present value terms

*Inclusive of only a subset of the Impacted Project Dataset

25. The results presented in the CRA Report assume no offsetting mitigation measures, such as generation builds, emergency procurement, expanded demand response, incremental REC banking, or near-term transmission upgrades. This assumption is consistent with the economic and operational realities facing the sector. Most potential mitigation measures require multi-year lead times and face binding constraints related to equipment availability, labor, financing, and interconnection during the 2026–2029 period. Treating mitigation as zero in the base case is therefore necessary to isolate the causal effects of the Directives and avoid materially understating their impacts. While some utilities or states may attempt partial or stopgap measures, such actions cannot fully offset the capacity, energy, price, employment, and economic losses quantified in the CRA Report.

26. Even if partial mitigation action is taken, there is no credible pathway to eliminate the immediate and irreparable harm caused by the Directives so long as they remain in place. Many of the resulting losses—missed statutory tax-credit eligibility, forfeited interconnection deposits,

foregone revenues, lost employment, and higher electricity costs borne by consumers—are permanent once incurred and cannot be reversed through later remedial action. Moreover, these harms compound over time: each additional month that the Directives remain in effect increases project attrition, worsens resource-adequacy risks, raises electricity costs, and deepens economic losses.

27. My work on this matter is ongoing. I reserve the right to supplement or amend this Declaration as additional information becomes available through discovery, updated market data, or other sources.

28. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on: January 12, 2026

____________________________

Kurt G. Strunk