# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

RENEW NORTHEAST, *et al.*,

         Plaintiffs,

    v.

UNITED STATES DEPARTMENT
OF THE INTERIOR, *et al.*,

         Defendants.

Civil Action No. 1:25-cv-13961

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 2

BACKGROUND ................................................................................................. 2

    I.      Challenges in Pursuing Energy Development, Including Renewable Energy ........ 3

    II.     Statutory Background ........................................................................ 4

          A.     The Outer Continental Shelf Lands Act ................................. 4

          B.     The Federal Land Policy and Management Act .......................... 6

          C.     The Clean Water Act and Rivers and Harbors Act ..................... 7

          D.     Endangered Species Act ..................................................... 7

          E.     Bald and Golden Eagle Protection Act .................................. 9

          F.     The Fixing America's Surface Transportation Act ................... 10

    III.    The Internal Agency Guidance Documents and Temporary Practices ............... 11

          1.     Interior Departmental Review Procedures Memorandum ....................... 11

          2.     Interior Secretary's Order No. 3438 ...................................... 12

          3.     Corps Direction on Reviewing Permit Applications ...................... 13

          4.     Fish and Wildlife Service Interim Practice for Eagle Incidental Take Permits .................................................... 13

          5.     Fish and Wildlife Service Interim Practice for IPaC Website ............. 13

          6.     Interior Solicitor Memorandum Opinion .................................. 14

LEGAL STANDARDS ........................................................................................ 14

    I.      A Preliminary Injunction Is an Extraordinary Remedy .......................... 14

    II.     Administrative Procedure Act Review of Final Agency Action ..................... 15

ARGUMENT ................................................................................................... 17

    I.      Plaintiffs Fail to Show a Likelihood of Imminent, Irreparable Injury ........... 17

          A.     Plaintiffs Do Not Demonstrate that Any Irreparable Injury Is Imminent ................................................................... 18

i

B.      Plaintiffs' Asserted Economic Injury is Not Irreparable ......................... 21

C.      Plaintiffs' Claimed Injury Is Speculative................................................... 23

II.    Plaintiffs Are Unlikely to Succeed on the Merits ................................................. 31

A.      Plaintiffs Attempt a Jurisdictionally Flawed Programmatic Attack ......... 31

B.      Plaintiffs Fail to Demonstrate Standing..................................................... 39

C.      Plaintiffs' Claims Are Not Ripe for Judicial Review ............................... 41

D.      Plaintiffs' APA Claims Fail on the Merits................................................. 43

III.   The Balance of Equities and Public Interest Favor Defendants ......................... 44

IV.    Any Injunction Must Be Narrowly Tailored......................................................... 45

CONCLUSION.................................................................................................................. 46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alabama Association of Realtors v. Department of Health & Human Services*,
  594 U.S. 758 (2021) ................................................................................................... 22

*Allen v. Wright*,
  468 U.S. 737 (1984) ................................................................................................... 40

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
  271 F. Supp. 2d 230 (D.D.C. 2003) .......................................................................... 19

*Am. Tort Reform Ass'n v. OSHA*,
  738 F.3d 387 (D.C. Cir. 2013) ................................................................................... 37

*Ass'n of Am. Univs. v. Dep't of Def.*,
  792 F. Supp. 3d 143 (D. Mass. 2025) ........................................................................ 15

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015) ................................................................................... 35

*Associated Fisheries of Me., Inc. v. Daley*,
  127 F.3d 104 (1st Cir. 1997) ............................................................................... 17, 44

*Axia NetMedia Corp. v. Mass. Tech. Park Corp.*,
  889 F.3d 1 (1st Cir. 2018) .......................................................................................... 46

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ................................................................................................... 18

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 8, 32, 33

*Bos. Redev. Auth. v. Nat'l Park Serv.*,
  838 F.3d 42 (1st Cir. 2016) ........................................................................................ 17

*Bowman Transp. Inc. v. Ark.-Best Freight Sys.*,
  419 U.S. 281 (1974) ............................................................................................. 16, 44

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*,
  622 F.3d 36 (1st Cir. 2010) .................................................................................. 15, 17

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................................... 45

*Camp v. Pitts*,
  411 U.S. 138 (1973) ................................................................................................... 19

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
  370 F.3d 151 (1st Cir. 2004) ............................................................................... 14, 23

*City of Chelsea v. Trump*,
    802 F. Supp. 3d 289 (D. Mass. 2025) ................................................................. 15

*Clevinger v. Advoc. Holdings, Inc.*,
    134 F.4th 1230 (D.C. Cir. 2025) ......................................................................... 15

*Colo. River Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985) .............................................................................. 21

*Colo. River Indian Tribes v. U.S. Dep't of the Interior*,
    No. ED CV14-02504 JAK (SPx), 2015 WL 12661945 (C.D. Cal. June 11, 2015) ................... 3

*Connecticut v. U.S. Dep't of the Interior*,
    363 F. Supp. 3d 45 (D.D.C. 2019) ...................................................................... 38

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    141 F.4th 976 (9th Cir. 2025) .............................................................................. 4

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    No. CV 17-8587-GW(ASX), 2019 WL 2635587 (C.D. Cal. June 20, 2019) ................... 37, 38

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
    563 F.3d 466 (D.C. Cir. 2009) .............................................................................. 5

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020) ........................................................................... 39, 40

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) .......................................................................... 15

*Does 1-6 v. Mills*,
    16 F.4th 20 (1st Cir. 2021) ................................................................................ 44

*DraftKings Inc. v. Hermalyn*,
    118 F.4th 416 (1st Cir. 2024) ............................................................................. 45

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) .......................................................................................... 44

*Esch v. Yeutter*,
    876 F.2d 976 (D.C. Cir. 1989) ........................................................................... 19

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ..................................................................................... 35, 36

*Global NAPS, Inc. v. Verizon New England, Inc.*,
    489 F.3d 13 (1st Cir. 2007) ................................................................................ 46

*Goebel v. Denv. & Rio Grande W. R.R. Co.*,
    215 F.3d 1083 (10th Cir. 2000) .......................................................................... 25

*Gonzalez-Droz v. Gonzalez-Colon*,
    573 F.3d 75 (1st Cir. 2009) ................................................................................ 23

*Harper v. Werfel*,
   118 F.4th 100 (1st Cir. 2024) ................................................................... 32

*Hearst Stations Inc. v. Aereo, Inc.*,
   977 F. Supp. 2d 32 (D. Mass. 2013) ......................................................... 18

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   110 F.4th 295 (1st Cir. 2024) ................................................................... 40

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   995 F.3d 18 (1st Cir. 2021) ...................................................................... 40

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   593 F. Supp. 2d 549 (S.D.N.Y. 2008) ....................................................... 25

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2012) ......................................................... 39, 40, 45

*La Casa Del Convaleciente v. Sullivan*,
   965 F.2d 1175 (1st Cir. 1992) ................................................................... 38

*Louisiana v. Haaland*,
   No. 2:24-CV-00820, 2025 WL 761743 (W.D. La. Mar. 10, 2025) ............. 26

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ...................................................................... 31, 32, 39

*Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*,
   649 F.2d 71 (1st Cir. 1981) ....................................................................... 23

*Mayor of Ocean City v. U.S. Dep't of the Interior*,
   No. SAG-24-03111, 2025 WL 3628137 (D. Md. Dec. 15, 2025) ........... 41, 42

*Me. Cent. R.R. Co. v. Bhd. of Maint. of Way Emps.*,
   650 F. Supp. 615 (D. Me. 1986) ............................................................... 21

*Melone v. Coit*,
   100 F.4th 21 (1st Cir. 2024) ..................................................................... 44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................. 16, 17

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
   100 F.4th 1 (1st Cir. 2024) ..................................... 3, 11, 13, 14, 16, 29

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
   675 F. Supp. 3d 28 (D. Mass. 2023) .......................................... 3, 16, 29

*Nat. Res. Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) .................................................................... 5

*Nat'l Mining Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) ................................................. 21, 30, 31

*Nat'l Motor Freight Traffic Ass'n, Inc. v. Gen. Servs. Admin.*,
   25 F. Supp. 3d 52 (D.D.C. 2014) ................................................................ 22

*Nat'l Treasury Emps. Union v. Vought*,
   149 F.4th 762 (D.C. Cir. 2025) ................................................................... 42

*New York v. Trump*,
   No. 25-cv-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ............... 2, 37

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................ 44

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ........................................................................ 6, 11, 16

*Ohio v. EPA*,
   603 U.S. 279 (2024) ........................................................................... 21, 22

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) .................................................................................. 38

*Power Mobility Coal. v. Leavitt*,
   404 F. Supp. 2d 190 (D.D.C. 2005) ............................................................ 30

*Pub. Emps. for Env't Resp. v. Hopper*,
   827 F.3d 1077 (D.C. Cir. 2016) ................................................................ 3, 5

*Ramsey v. Kantor*,
   96 F.3d 434 (9th Cir. 1996) ...................................................................... 8, 9

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ................................................................................ 12

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.*,
   No. 1:25-cv-02214 (CJN), 2025 WL 2996157 (D.D.C. Oct. 24, 2025) ............ 15

*Seafreeze Shoreside, Inc v. U.S. Dep't of the Interior*,
   No. 1:22-CV-11091-IT, 2023 WL 3660689 (D. Mass. May 25, 2023) .......... 18, 26

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
   123 F.4th 1 (1st Cir. 2024) ........................................................................ 44

*Sec'y of Interior v. California*,
   464 U.S. 312 (1984) .................................................................................. 5

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025) ................................................................................. 35

*Sierra Club v. Larson*,
   769 F. Supp. 420 (D. Mass. 1991) ........................................... 17, 18, 23, 24, 25

*Sig Sauer, Inc. v. Brandon*,
   826 F.3d 598 (1st Cir. 2016) ..................................................................... 16

vi

*Silber v. Barbara's Bakery, Inc.*,
    950 F. Supp. 2d 432 (E.D.N.Y. 2013) ............................................................................... 18

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    Nos. 3:23-cv-58 and -61-SLG, 2023 WL 2759864 (D. Alaska Apr. 3, 2023) ....................... 20

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ......................................................................................................... 39

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
    No. 6:23-CV-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) ................................... 22

*Tex. v. Camenisch*,
    451 U.S. 390 (1981) ......................................................................................................... 18

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................................... 41, 42

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ......................................................................................................... 41

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ......................................................................................................... 22

*Toilet Goods Ass'n, Inc. v. Gardner*,
    387 U.S. 158 (1967) ................................................................................................... 41, 42

*Town & Cnty. of Nantucket v. Burgum*,
    No. 25-CV-906, 2025 WL 3120419 (D.D.C. Nov. 4, 2025) ................................................. 6

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ......................................................................................................... 45

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................. 14, 15, 23, 24, 44

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ......................................................................................... 21

**Statutes**

16 U.S.C. § 1536(a)(2) ............................................................................................................ 7

16 U.S.C. § 1536(b)(1)(A) ...................................................................................................... 8

16 U.S.C. § 1536(b)(4) ............................................................................................................ 8

16 U.S.C. § 1536(o)(2) ............................................................................................................ 8

16 U.S.C. § 1539(a)(1)(B) ...................................................................................................... 9

16 U.S.C. § 1539(a)(2)(A) ...................................................................................................... 9

16 U.S.C. § 668(a)-(b) ............................................................................................................ 9

16 U.S.C. § 668a .............................................................................................................. 9

33 U.S.C. §§ 1344 ........................................................................................................... 7

42 U.S.C. § 4331 ............................................................................................................ 12

42 U.S.C. § 4370m(6) ............................................................................................... 10, 11

43 U.S.C. § 1331(a) ......................................................................................................... 5

43 U.S.C. § 1332(3) ......................................................................................................... 5

43 U.S.C. § 1334(a) ......................................................................................................... 5

43 U.S.C. § 1337(p)(1)(C) ............................................................................................... 5

43 U.S.C. § 1337(p)(4) ................................................................................................... 33

43 U.S.C. § 1701 ............................................................................................................. 6

43 U.S.C. § 1702(e) ......................................................................................................... 6

43 U.S.C. § 1761(a)(4) ..................................................................................................... 6

5 U.S.C. § 551(13) ............................................................................................... 16, 32, 33

5 U.S.C. § 553(b)(4)(A) .................................................................................................. 39

5 U.S.C. § 704 ................................................................................................................ 32

5 U.S.C. § 705 ................................................................................................................ 15

5 U.S.C. § 706(1) ........................................................................................................... 16

Pub. L. No. 114-94, 129 Stat. 1312 (2015) ..................................................................... 10

**Rules**

Fed. R. Civ. P. 65 .......................................................................................................... 45

Fed. R. Civ. P. 65(c) ...................................................................................................... 46

Fed. R. Civ. P. 65(d)(1)(C) ............................................................................................. 45

**Regulations**

30 C.F.R. § 585.102(a) ..................................................................................................... 5

30 C.F.R. §§ 585.600 ....................................................................................................... 6

33 C.F.R. § 322.3(a) ........................................................................................................ 7

43 C.F.R. § 2804.25(a)-(e) ......................................................................................... 27, 28

43 C.F.R. §§ 2802.10(a) ................................................................................................... 7

50 C.F.R. § 22.250 ......................................................................................................... 10

50 C.F.R. § 402.14(e) ....................................................................................................... 8

50 C.F.R. § 402.14(i)(5)..............................................................................................8

50 C.F.R. §§ 17.22(b) ...............................................................................................9

50 C.F.R. §§ 402.14(a) 402.02 ..................................................................................8

**Other Authorities**

75 Fed. Reg. 62853 (Oct. 13, 2010)........................................................................34

85 Fed. Reg. 30982 (May 21, 2020) ........................................................................34

89 Fed. Reg. 35634 (May 1, 2024) ............................................................................6

*How to Blow Up A Solar Farm: Local Opposition to Renewable Energy Projects*,
    54 Envtl. L. Rep. (ELI) 10945 (2024) ................................................................4

## INTRODUCTION

If a company wants to develop a wind or solar project, it generally must get various approvals and authorizations from the federal government.  And any adverse decisions that meet certain criteria can be subject to judicial review.  But Plaintiffs do not challenge any discrete decision here. They are advocacy groups and trade associations that have not themselves even applied for any approval.  They instead challenge the so-called "permitting regime" for wind and solar energy projects.  To be sure, Plaintiffs point to six internal agency documents or practices that they claim are delaying all wind and solar projects across the board.  But the Administrative Procedure Act ("APA") does not allow a party to bring a freestanding challenge to every agency action that feeds into a future decision—it allows challenges to final agency action.  And a plaintiff cannot show standing—let alone irreparable harm—by relying on a generalized theory of delay untethered to a final agency action that affects it in some concrete way.

But that is exactly what Plaintiffs have tried to do here.  For example, Plaintiffs point to allegedly "stalled" projects, but the project proponent has not even submitted the necessary permit applications for many of those.  And even if they had, Plaintiffs shed no light on how the challenged agency documents—including one that says approval decisions will be reviewed by the head of the relevant agency—harm them in a concrete way.  And some of the purported actions have even been rescinded or discontinued.

Those fatal defects permeate this case.  Most directly for purposes of the motion for preliminary injunctive relief, it means Plaintiffs are not suffering any actual or imminent irreparable harm that would warrant preliminary relief.  Controlling Supreme Court authority therefore precludes Plaintiffs motion. And Plaintiffs' formulaic, self-serving testimony seeking to

1

demonstrate economic injury and connect it to the challenged agency documents and practices falls far short of the standard for showing irreparable injury.

The lack of harm also forecloses the merits of Plaintiffs' case. Even assuming the identified actions are "agency actions" for purposes of the APA, none impact existing rights and obligations. Plaintiffs have therefore failed to challenge "final agency action," as is necessary for jurisdiction under the APA.[1]  Similarly, because none of the actions directly harms Plaintiffs or their membership, Plaintiffs lack the injury, causation, and redressability necessary to demonstrate standing under Article III.  And any project-specific harms that Plaintiffs will become ripe for review only if and when an agency acts on an application pending before it.  Claims challenging only interlocutory procedural guidance or optional tools that may structure or facilitate an agency decision-making process are not within federal court jurisdiction.  Plaintiffs' motion for preliminary injunctive relief should be denied.

## **BACKGROUND**

Plaintiffs claim this case is needed to restore "a stable, predictable, and apolitical permitting regime for wind and solar development[.]"  Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 49, Dkt. 36 ("Pls.' Br."); *see also*, *id*., 30 ("[w]ind and solar developers have long relied on the Corps' predictable approach to the [CWA] Section 404 public interest analysis"); 38 (asserting that offshore wind developers have long relied on "DOI's prior, predictable permitting procedures").  But claiming that pending wind and solar energy projects "cannot move forward" and "operating projects risk being unnecessarily shut down" by the challenged agency documents and practices

---

[1]      While one Plaintiff here recently prevailed in a different case resulting in vacatur of the "Wind Order," the court there interpreted the agencies as having instituted an indefinite agency prohibition "freez[ing] all approvals of wind energy projects," Am. Compl. ¶ 7, Dkt. 33 (citing *New York v. Trump*, No. 25-cv-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025).  The challenged actions here are not of the same ilk.

invents a cause-and-effect relationship where none exists, misrepresenting the role played by the challenged agency documents and practices.

## I.  Challenges in Pursuing Energy Development, Including Renewable Energy

Approval and development of energy projects rarely proceed in a stable, predictable, or expeditious fashion.  Plaintiffs' attempt to single out the challenged agency documents or practices as the cause of instability or uncertainty in the renewable energy industry ignores the history of energy development and multi-layered complexity of any energy project.

Since an offshore wind project "must comply with a slew of federal statutes" and endure administrative procedures "to satisfy regulations promulgated under these statutes," *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1080-81 (D.C. Cir. 2016), such projects perhaps demonstrate the height of complex and protracted regulatory processes.  *See*, *e.g.*, *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28, 35-38 (D. Mass. 2023), *aff'd,* 100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (Jan. 13, 2025) (describing the leasing and administrative review process stretching from 2009 to 2021 for the Vineyard Wind project, at which point the subject litigation started).  But other renewable energy projects face similar challenges, including regulatory reviews to consider resource concerns and public comment, as well as operational issues and financial difficulties arising from a longer than anticipated timeline to project completion.  *See*, *e.g.*, *Colo. River Indian Tribes v. U.S. Dep't of the Interior*, No. ED CV14-02504 JAK (SPx), 2015 WL 12661945 (C.D. Cal. June 11, 2015) (Mojave Desert solar energy project).  Institutional caution frequently arises not only to meet regulatory requirements, but also in anticipation of eventual litigation, even where there is otherwise broad support for a project.  *See*, *e.g.*, Alexandra Potamianos, *How to Blow Up A Solar Farm: Local Opposition to Renewable Energy Projects*, 54 Envtl. L. Rep. (ELI) 10945, 10946

(2024) (describing New York as "an interesting case study because, despite the fact that most people in the state support climate-related policies, renewable energy projects have generated significant community opposition."). Of course, similar regulatory pathways and associated challenges occur in non-renewable energy development, as well. *See*, *e.g.*, *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt*., 141 F.4th 976, 989-92 (9th Cir. 2025) (describing a process starting in "the late 1990s" culminating in 2023 approval (following remand) for the Willow Project, "an oil and gas venture" in the National Petroleum Reserve in Alaska).

The complex and lengthy authorization, design, and approval processes for energy projects vary depending on the nature of the project, relevant statutory and regulatory requirements, and project-specific issues requiring additional layers of statutory or regulatory analysis and approval.

## II.     Statutory Background

Plaintiffs' complaint concerns potential energy development through offshore wind and onshore wind and solar projects. Plaintiffs reference multiple federal statutes, some of which address agency authority to consider, authorize, and administer these uses. Plaintiffs also reference other statutes that do not govern wind and solar projects but rather are designed to conserve wildlife and natural resources that may be impacted by a wide range of actions, including wind and solar energy projects. Familiarity with these statutes and the governing federal regulatory regime for wind and solar projects is important for understanding the jurisprudential problems with Plaintiffs' case and motion for preliminary relief.

### A.     The Outer Continental Shelf Lands Act

The Outer Continental Shelf ("OCS") consists of the submerged lands beneath the ocean, generally the area from 3 to 200 nautical miles seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a).

Under the Outer Continental Shelf Lands Act ("OCSLA"), the United States holds the OCS as a "vital national resource reserve . . . for the public," which Congress declared "should be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3). Congress enacted OCSLA in 1953 to authorize oil and gas leasing. *Sec'y of the Interior v. California*, 464 U.S. 312, 336 (1984).

In 2005, Congress amended OCSLA to authorize the Secretary of the Interior to issue leases on the outer continental shelf to "support production, transportation, storage, or transmission of energy from sources other than oil and gas," including wind, waves, and ocean currents. 43 U.S.C. § 1337(p)(1)(C); *Hopper*, 827 F.3d at 1080-81. In Section 8(p)(4) of OCSLA, Congress directed that, in approving any lease, easement, or right-of-way, the Secretary "shall ensure" that all authorized activities within the outer continental shelf are "carried out in a manner that provides for" twelve enumerated goals. 43 U.S.C. § 1337(p)(4)(A)-(L). These include, *inter alia*, protection of the environment; conservation of natural resources; prevention of interference with reasonable uses of the exclusive economic zone, high seas, and territorial seas; consideration of other uses of the sea and seabed, including fishing and navigation concerns; and the opportunity for public notice and comment on lease proposals. *Id.*; *see also* 30 C.F.R. § 585.102(a).

OCSLA provides that the Secretary "shall administer the provisions of this subchapter relating to the leasing of the [OCS], and shall prescribe such rules and regulations as may be necessary to carry out such provisions." 43 U.S.C. § 1334(a); *see also id.* § 1337(p)(8). This broad grant of authority is essential to the Act's scheme, since OCSLA, as a general matter, "sets only broad standards and leaves much to the Secretary's discretion." *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 302 (D.C. Cir. 1988); *see also Town & Cnty. of Nantucket v. Burgum*, No. 25-CV-906, 2025 WL 3120419, at *1 (D.D.C. Nov. 4, 2025) (explaining that "broad discretion"

under OCSLA extends to issuance of offshore wind energy leases). Various regulations promulgated pursuant to this authority address the manner in which the Bureau of Offshore Energy Management ("BOEM") administers offshore renewable energy projects. *See*, *e.g.*, 30 C.F.R. §§ 585.600, 585.605-613, 585.620-628 (describing process for site assessment and submission and approval of a Construction and Operations Plan ("COP")).

      B.     The Federal Land Policy and Management Act

      The Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq*. ("FLPMA"), was enacted in 1976 and establishes the guiding principles governing management of public lands owned by the United States and managed by BLM. 43 U.S.C. § 1702(e). FLPMA acknowledges a national policy of managing these public lands on a multiple-use, sustained-yield basis. This has been described as an "enormously complicated task of striking a balance among the many competing uses to which land can be put." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). Title V of FLPMA authorizes BLM to grant rights-of-way on public lands relating to "systems for generation, transmission, and distribution of electric energy[.]" 43 U.S.C. § 1761(a)(4). BLM has issued regulations relating to its exercise of this authority for wind and solar energy projects. *See* Rights-of-Way, Leasing, and Operations for Renewable Energy, 89 Fed. Reg. 35634 (May 1, 2024) (Final Rule promulgating regulations codified at 43 C.F.R. Part 2800). Title V of FLPMA, along with the implementing regulations, provides BLM with considerable discretion in how to process and consider applications for wind and solar energy projects, prioritize such applications, and decide whether to approve, approve with modifications, or deny such applications for rights-of-way to use public lands. 43 C.F.R. §§ 2802.10(a), 2804.25(e)(2), 2804.26, 2804.35.

C.    The Clean Water Act and Rivers and Harbors Act

A permit under Section 404 of the Clean Water Act ("CWA") authorizes the discharge of dredged and fill material into "waters of the United States."  33 U.S.C. §§ 1344, 1362(7).  Section 10 of the Rivers and Harbors Act ("RHA") prohibits structures or work that would affect "the navigable capacity of any of the waters of the United States."  *Id.* § 403.  An RHA Section 10 permit is therefore required to build structures or perform work in or affecting such waters.  33 C.F.R. § 322.3(a).

The U.S. Army Corps of Engineers ("Corps") administers Section 404 permits and RHA Section 10 permits pursuant to its regulations, *see, e.g.*, 33 C.F.R. Parts 320, 325.  In doing so, the Corps must often await actions by other parties, including permit applicants, agencies completing environmental reviews, and states addressing certification under Section 401 of the CWA.  *See id.* § 325.2(d)(3).

D.    Endangered Species Act

Under Section 7(a)(2) of the Endangered Species Act ("ESA"), federal agencies ("action agencies") must ensure that any "action" they authorize, fund, or carry out "is not likely to jeopardize the continued existence of" a species listed under the ESA or "result in the destruction or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2).  To facilitate compliance with these requirements, action agencies are required to consult with either the U.S. Fish and Wildlife Service ("FWS") or National Marine Fisheries Service, or both ("consulting agencies"), whenever the action agencies authorize, fund, or carry out a discretionary action that "may affect" an ESA-listed species or its designated critical habitat.  *Id*. § 1532(7); 50 C.F.R. §§ 402.14(a) 402.02, 402.03.

Formal consultation concludes with the issuance of a written biological opinion ("BiOp") by the consulting agency assessing the likelihood that the proposed action will jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat. *Id*. § 402.14(g)-(h). The ESA sets forth a default deadline of 90 days in which to complete Section 7 consultation, but allows this 90-day schedule to be extended "within such other period of time as is mutually agreeable to the Secretary and the Federal agency" where an applicant is not involved. 16 U.S.C. § 1536(b)(1)(A); *accord* 50 C.F.R. § 402.14(e).

After formal consultation concludes, the action agency must determine "whether and in what manner to proceed with the action in light of its Section 7 obligations and the Service's biological opinion." *Id*. § 402.15(a). "The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees)," because then it would not be able to take advantage of the protections of an incidental take statement ("ITS"). *Bennett v. Spear*, 520 U.S. 154, 170 (1997).

An ITS shields the action agency from liability under Section 9 for incidental take that occurs as a result of the agency's action and in compliance with the terms and conditions that are specified in the ITS. "[A]ny taking that is in compliance with the terms and conditions specified in [the ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5). This exemption may extend to private applicants covered by the federal action. 16 U.S.C. § 1536(b)(4); *Ramsey v. Kantor*, 96 F.3d 434, 441-42 (9th Cir. 1996).

If there is no federal nexus, a private applicant may seek take coverage through an incidental take permit ("ITP") under ESA Section 10. 16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. §§ 17.22(b) and 17.32(b). Processing an ITP is a "more rigorous and time-consuming procedure."

*Ramsey*, 96 F.3d at 439.  An applicant for a Section 10 ITP must submit a habitat conservation plan that addresses enumerated criteria, including the impacts from the taking and the steps the applicant will take to minimize and mitigate such impacts. 16 U.S.C. § 1539(a)(2)(A).  The consulting agency may issue an ITP only after providing public review and comment on the permit application and making enumerated findings, including that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id*. § 1539(a)(2)(B)(iv), (c). In addition, because issuing an ITP is a federal action that may adversely affect a listed species, the Service proposing to issue the ITP must complete an internal Section 7(a)(2) consultation to ensure the permit is not likely to cause jeopardy or destruction or adverse modification of designated critical habitat.

Notably, BiOps, ITSs, and ITPs are used solely for ESA compliance purposes across a spectrum of applicable activities.  These documents might be required to proceed with a wind or solar energy project without violating the ESA, but they could not authorize the construction or operation of any such project.

E.     Bald and Golden Eagle Protection Act

The Bald and Golden Eagle Protection Act ("BGEPA") imposes criminal and civil penalties against "whoever" shall "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" bald and golden eagles, except as permitted by the Interior Secretary. 16 U.S.C. § 668(a)-(b).  Consistent with the BGEPA's conservation purpose, the statute does not mandate that FWS issue incidental take permits or impose any deadline for issuing permit decisions. 16 U.S.C. § 668a.  FWS's regulations allow applicants to request permits for the incidental taking of bald and golden eagles from various activities including wind energy projects (50 C.F.R. § 22.250), but the regulations do not impose a concrete deadline for issuing permit

9

decisions. This program authorizes FWS to issue general permits, *id.* § 22.210, and specific permits, *id.* § 22.200. While the regulations state that FWS will automatically issue a general permit to authorize the take requested in the application upon an applicant registering by submitting an application under the applicable regulation, *id.* § 22.210(d), FWS nonetheless retains authority over such permits to ultimately determine whether the permit application meets certain general and specific criteria set forth in the regulations, *id.* § 22.210(b)(6).

Notably, BGEPA permits are used solely for BGEPA compliance purposes across a spectrum of applicable activities. These permits might be required to lawfully proceed with a wind or solar energy project without violating BGEPA, but could not authorize its construction or operation.

### F.    The Fixing America's Surface Transportation Act

The Fixing America's Surface Transportation ("FAST") Act, Pub. L. No. 114-94, 129 Stat. 1312 (2015), is an omnibus transportation bill that, among other things, streamlines federal permitting for certain complex infrastructure projects. *See* 42 U.S.C. § 4370m(6). It establishes a framework for an oversight council and federal agencies to outline coordinated project plans and permitting timetables for covered projects. *See id.* § 4370m-2(c)(1)-(2). Information is then published to a "Permitting Dashboard" to track the status of any covered project. *See id.* § 4370m-2(b).

The FAST Act is not intended to set certain or enforceable deadlines and has several features that recognize and allow for agency flexibility and discretion. For example, if an agency needs more time to complete an authorization, it may seek to modify the permitting timetable. *See id.* § 4370m-2(c)(2)(D). Should disputes regarding a project's permitting timetable arise, the FAST Act provides for a dispute resolution process. *See id.* § 4370m-2(c)(2)(C). Any deadlines

in the FAST Act address posting of information to the Permitting Dashboard and the dispute resolution process, rather than mandatory timelines for completion of authorizations or reviews. If an agency fails to meet a projected completion date, the agency needs only to provide an explanation for the departure, an alternative completion date, and a monthly status report until the subject action has occurred. *See id.* § 4370m-2(c)(2)(F)(ii).

## III.    The Internal Agency Guidance Documents and Temporary Practices

Plaintiffs characterize their case as "challeng[ing] six final agency actions" that they contend unlawfully prevent advancement of wind and solar energy projects. Am. Compl. ¶ 4; *see also*, *id*. at 77, Prayer for Relief (requesting that the Court "vacate and set aside" each of the alleged actions). But none of the supposed actions represent an agency decision under any of the statutory regimes discussed above. Instead, Plaintiffs focus on internal agency guidance and memoranda.

### 1.    *Interior Departmental Review Procedures Memorandum*

On July 15, 2025, the Interior Deputy Chief of Staff – Policy issued a memorandum titled "Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities." Am. Compl. Ex. A, Dkt. 33-1. This memorandum clarifies established delegation of functions and states that actions related to wind and solar energy "shall require submission" to the Interior Office of the Executive Secretariat and Regulatory Affairs, and be subsequently "review[ed]" by the Deputy Secretary and Secretary. *Id*. at 2. The memorandum does not prohibit or prescribe any action relating to any wind or solar energy project, it simply requires submission for review to the agency officials ultimately tasked with carrying out Interior's mission.[2]

---

[2]    The implementation of any purported "anti-renewable" policies through project-level decisions with cognizable impacts is being raised in multiple lawsuits brought by project developers. On December 22, 2025, orders issued for several partially constructed (or partially

2.    *Interior Secretary's Order No. 3438*

On August 1, 2025, the Secretary issued Order 3438, which directs bureaus and personnel within the Department of the Interior to consider, when conducting review of any "proposed energy project" under the National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.*, ("NEPA"), "a reasonable range of alternatives that includes projects with capacity densities meeting or exceeding that of the proposed project."  Am. Compl. Ex. B, at 2, Dkt. 33-2.  NEPA is a purely procedural statute that "merely prohibits uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).  Thus, the Order addresses internal management and procedures for addressing NEPA analysis of energy projects. The Order further provides, "[t]o the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control."  Am. Compl. Ex. B, at 4.

---

operational) offshore wind projects, directing that all ongoing activities relating to the respective projects be suspended for 90 days to evaluate national security concerns.  Eight lawsuits have been filed challenging those orders, and motions for preliminary injunction have been granted in all of those cases.  *See*, *e.g.*, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-2999-RCL (D.D.C.) (filed Sep. 4, 2025, related to No. 1:25-cv-4328 pending before the same judge, order granting preliminary injunction and staying stop work order issued on Jan. 12, 2026, Dkt. 64).  The other cases are *Va. Elec. and Power Co. v. U.S. Dep't of the Interior*, No. 2:25-cv-830 (JKW/LRL) (E.D. Va.) (filed Dec. 23, 2025, order granting preliminary injunction and staying stop work order issued on Jan. 16, 2026, Dkt. 81); *Empire Leaseholder, LLC v. Burgum*, No. 1:26-cv-4-CJN (D.D.C.) (filed Jan. 2, 2026, minute order granting preliminary injunction and staying stop work order issued on Jan. 15, 2026); *Sunrise Wind, LLC v. Burgum*, No. 1:26-cv-28-RCL (D.D.C.) (filed Jan. 6, 2026, motion for preliminary injunction filed Jan. 9, 2026, Dkt. 11, pending resolution); *New York v. Burgum*, No. 1:26-cv-72-RCL (D.D.C.) (filed Jan. 9, 2026, consolidated with *Sunrise Wind* before the same judge); *Vineyard Wind, LLC v. U.S. Dep't of the Interior*, No. 26-cv-10156 (D. Mass.) (filed Jan. 15, 2026, order staying stop work order issued on Jan. 27, 2026, Dkt. 71).

### 3.    Corps Direction on Reviewing Permit Applications

On September 18, 2025, the Assistant Secretary of the Army for Civil Works issued a memorandum providing direction "for applying the public interest review on certain permit actions" under CWA Section 404 and RHA Section 10 permits "related to energy generation." Am. Compl. Ex. C, at 2, Dkt. 33-3. This memorandum directs that certain regulatory criteria be considered, *id*. at 3, and that the Corps "prioritize" permit applications "related to projects that would generate the most annual potential energy generation per acre over projects with low potential generation per acre," *id*. at 4.

### 4.    Fish and Wildlife Service Interim Practice for Eagle Incidental Take Permits

Plaintiffs contend there is a "ban" on issuing BGEPA incidental take permits, based on a banner that Plaintiffs indicate appeared on the FWS website. *See* Am. Compl. ¶ 127; Ex. D, Dkt. 33-4. The banner stated that "ePermits will no longer automatically issue general permits for eagle Incidental Take," but advised that applicants could "still complete a general permit application form" and submit the form via email. *Id*. at 2. Regardless, FWS has discontinued the temporary practice described in the banner, and has resumed issuance of general permits and processing of specific permit applications, including processing all applications that were received during the temporary pause. *See* Decl. of Jerome Ford ¶¶ 15-16, Dkt. 63-1.

### 5.    Fish and Wildlife Service Interim Practice for IPaC Website

Plaintiffs contend, based again on a screenshot of a website banner, that solar and wind energy projects face a "ban" from using the Information for Planning and Consultation ("IPaC") feature of the FWS website and that this "functionally prevents such developers from (among other things) obtaining Corps nationwide permits for their projects." *See* Am. Compl. ¶ 144; Ex. F, Dkt. 33-6. The banner stated that such use of IPaC requires "review" by the Deputy Secretary and the

13

Secretary, and instructed potentially affected developers to "contact the appropriate FWS Field Office to commence" the review process. *Id.* at 2. But use of the IPaC tool is neither required nor guaranteed by any law or regulation. *See* Decl. of Gina Shultz ¶ 9, Dkt. 63-2.

6.    *Interior Solicitor Memorandum Opinion*

On May 1, 2025, Acting Interior Solicitor Gregory Zerzan issued a memorandum withdrawing Solicitor's Opinion M-37067 dated April 9, 2021, addressing the Department's interpretation of OCSLA Subsection 8(p)(4), and reinstating Solicitor's M-Opinion 37059 on the same subject matter dated December 14, 2020. *See* Am. Compl. Ex. G, Dkt. 33-7 (Zerzan Memorandum); *id.* Ex. H, Dkt. 33-8 (Opinion M-37059). More specifically, the Opinion clarifies that in evaluating the statutory factors the Secretary must act "to prevent . . . all interference, if the proposed activity would lead to *unreasonable* interference, but not if the proposed activity would lead only to de minimis *or reasonable* interference." *Id.* at 15. The Opinion outlines principles to be considered in evaluating the Subsection 8(p)(4) factors, but does not prescribe an outcome for that analysis, let alone apply that statutory provision to any specific project.

## LEGAL STANDARDS

### I.    A Preliminary Injunction Is an Extraordinary Remedy

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (describing preliminary injunction as "a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests"). The movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest." *Winter*, 555 U.S. at 20.  The movant "bears the burden of establishing that all

four factors weigh in his favor[.]" *City of Chelsea v. Trump*, 802 F. Supp. 3d 289, 294 (D. Mass.

2025).[3]

Plaintiffs alternatively frame their request as seeking relief under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 705, suggesting that this is a different standard or otherwise

relaxes certain "limits on preliminary injunctions[.]"  Pls.' Br. 17-18.  But "[t]he same standard

governs both forms of relief." *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D.

Mass. 2025); *see also Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, No. 1:25-cv-02214

(CJN), 2025 WL 2996157, at *2-3 (D.D.C. Oct. 24, 2025) (analyzing D.C. Circuit case law in

rejecting argument that the Section 705 standard is "distinct from" the preliminary injunction

standard).

## II.    Administrative Procedure Act Review of Final Agency Action

Plaintiffs bring their claims under the APA, which will govern the Court's assessment of

the likelihood of success prong of the preliminary injunction standard.  "Agency action includes

the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial

---

[3]    Defendants dispute the validity, after *Winter*, of "measur[ing] irreparable harm on a sliding scale in tandem with likelihood of success," *City of Chelsea*, 802 F. Supp. 3d at 295 (quoting *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010)). *Compare Braintree*, 622 F.3d at 40 (listing the "familiar set of four factors" in the preliminary injunction standard including "the *possibility* that, without an injunction, the movant will suffer irreparable harm") (emphasis added) *with Winter*, 555 U.S. at 22 (the "'possibility' standard is too lenient."); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235-36 (D.C. Cir. 2025) ("we have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("a movant cannot obtain a preliminary injunction without showing *both* a likelihood of success *and* a likelihood of irreparable harm, among other things").

thereof, or failure to act," 5 U.S.C. § 551(13), and the APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action[,]" *id.* § 704.

The APA provides for judicial review of agency inaction, by addressing the manner in which a reviewing court might "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). And while this mechanism would seemingly address Plaintiffs' narrative seeking a way to spur agency action on alleged indefinite delays in approving member projects, they conspicuously avoid bringing such claims, presumably because they know that a proper Section 706(1) claim lies "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64.

Plaintiffs thus purport to challenge "final agency action." Judicial review of final agency action proceeds "to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601 (1st Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)). This standard "affords great deference to agency decision-making and agency actions are presumed valid[.]" *Nantucket Residents Against Turbines*, 675 F. Supp. 3d at 52, *aff'd,* 100 F.4th 1 (1st Cir. 2024). A decision is "arbitrary and capricious" only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). And "[e]ven if an inquiring court disagrees with the agency's conclusions, it 'cannot substitute its judgment for that of the agency.'" *Bos. Redev. Auth.*

*v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)).

## ARGUMENT

Plaintiffs fail to carry their burden on each element of the preliminary injunction standard. Because they raise only speculative economic injuries that are not plausibly connected to any of the identified agency documents or practices, they have not demonstrated irreparable injury. And they fail to show that any of their arguments on the merits are likely to succeed. Finally, the balance of equities and public interest does not favor entry of preliminary injunctive relief. The Court should deny Plaintiffs' motion.

### I.    Plaintiffs Fail to Show a Likelihood of Imminent, Irreparable Injury

"The plaintiffs' failure to demonstrate the existence of an immediate threat of harm is sufficient to warrant the denial of injunctive relief." *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991); *see also Braintree*, 622 F.3d at 41 ("we need to focus our attention on only one of the four factors – irreparable harm"). The Court can reach that conclusion here because Plaintiffs have failed to demonstrate a likelihood that they will suffer irreparable injury before the Court can resolve the merits. Instead, Plaintiffs attempt to marshal perceived, industry-wide uncertainties in some energy sectors and speculatively tie those uncertainties to the challenged actions in a way that (in Plaintiffs' view) justifies judicial intervention into internal agency processes. Plaintiffs fall far short of the showing required to warrant that extraordinary preliminary relief.

A.    Plaintiffs Do Not Demonstrate that Any Irreparable Injury Is Imminent

To start, Plaintiffs' formulation of irreparable injury fails to address the relevant timeframe, and thus fails the essential requirement that their alleged injury be imminent.  The imminent harm requirement demands that any preliminary injunction satisfy the purpose of such relief, which "is merely to preserve the relative positions of the parties" until a court can resolve the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Even if a court were to find the alleged "prospect of harm is real" a request for a preliminary injunction is properly denied when "the harm will take several years to materialize."  *Hearst Stations Inc. v. Aereo, Inc.*, 977 F. Supp. 2d 32, 41 (D. Mass. 2013); *see also Larson*, 769 F. Supp. at 423 (denying injunctive relief when the proffered harm would arise from construction of a facility "not scheduled to begin for a number of years").  Defendants do not anticipate that it will take years to decide this APA case on the merits.[4]

Plaintiffs largely fail to address imminence, speaking instead of general delay or uncertainty in "the pipeline of renewable energy development[.]"  Pls.' Br. 41-42.  This is insufficient to justify a preliminary injunction.  Insofar as Plaintiffs rely on delay-related harms for projects in the process of being proposed or initially developed, such alleged harms – if they occur at all – will not materialize for years.  And while existing projects in active construction and operation have the potential to experience harm in the shorter term, the mere *potential* for harm cannot justify a preliminary injunction.  In fact, some of the more substantial projects Plaintiffs

---

[4]    Plaintiffs also fail to address the timing of their request for a preliminary injunction.  "[A] party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 585 U.S. 155, 159 (2018); *see also Seafreeze Shoreside, Inc v. U.S. Dep't of the Interior*, No. 1:22-CV-11091-IT, 2023 WL 3660689, at *4-5 (D. Mass. May 25, 2023).  While this is a case-specific inquiry, "months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief."  *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013).  The agency documents challenged here were issued as early as May 1, 2025.  *See* Am. Compl. Ex. G, at 2.

identify are proceeding as a result of court orders that have issued subsequent to Plaintiffs' case being filed.  *See above* at 11, n.1 (addressing the Revolution, Virginia, Empire, Sunrise, and Vineyard offshore wind projects).

Plaintiffs' submissions either gloss over these distinctions or fail to provide any way to evaluate the timing of the alleged injury to any Plaintiff members.  For example, Plaintiffs commissioned testimony from applied economics specialists at Charles River Associates, Inc. ("CRA").  *See* Decl. of Kurt G. Strunk, Dkt. 42.[5]  The CRA Report is designed to calculate the effects associated with "projects that were previously expected to achieve commercial operation before 2029 but are no longer expected to do so" as well as additional projects "expected to come online by 2029 but are now at risk of delay or cancellation."  *Id*. ¶ 12.  This analysis is based on an "Impacted Project Dataset" which CRA opines "captures only 10-15 percent of total U.S. industry activity," but neither the analysis nor the Dataset is provided in a way that allows a reader (or the Court) to determine the timing of impacts on a project-by-project basis.  *Id*.  In other words, there is no way to know if the Dataset includes the above-described offshore wind projects, and, if so, whether it treats them as delayed, canceled, or "removed from the queue" in calculating "[d]irect, immediate, and irreparable harm to wind and solar developers caused by the Directives," notwithstanding the fact that activities on those projects are being allowed to proceed.  *Id*. ¶ 14.

---

[5]    Plaintiffs have filed numerous declarations in support of their motion for preliminary injunction.  Generally, in APA review of final agency action "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  However, Defendants acknowledge that one of the limited exceptions to this rule involves evaluating irreparable injury in the context of a motion for preliminary injunction.  *See Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 247 (D.D.C. 2003); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (extra-record evidence may sometimes be considered "in cases where relief is at issue, especially at the preliminary injunction stage").  Absent a sufficient showing that any such exception applies, Defendants do not concede that Plaintiffs' declarations, or further extra-record material, are properly before the Court.

Similarly, Plaintiffs offer testimony of the President and Founder of Atlantic Wind Transfers ("AWT"), which provides "crew transfer vessel" services to support offshore wind development. Decl. of Charles A. Donadio Jr. ¶¶ 1-4, Dkt. 39. But again, AWT's near-term operations seem to focus on the projects that are now again proceeding following court orders issued after Mr. Donadio executed his declaration. *See* https://www.atlanticwindtransfers.com/our-location (last visited February 10, 2026) (indicating that AWT provides services from its Rhode Island headquarters to the Ørsted, Revolution, Sunrise, and Vineyard projects, among others, and from its Virginia satellite office to the Coastal Virginia project). And again, concerns about impacts to the "pipeline" of future projects or broader threats to the renewable energy industry or electric service grid stability fall well outside of the timeframe need to show imminent harm is likely and, hence, to justify a preliminary injunction. *See*, *e.g.*, Decl. of Lawrence Chretien ¶ 10, Dkt. 38 (addressing destabilization of the New England market for renewable energy certificates); Decl. of Elizabeth J. Burdock ¶ 17, Dkt. 40 (describing ten-year timeframe for an offshore wind project to "materialize" and effect of permitting process changes on market activity); Decl. of Michael Goggin ¶ 8, Dkt. 41 (opining that "the Administration's actions targeting wind and solar generation . . . will undermine . . . the reliability and affordability of the United States electric grid.").[6]

---

[6]    This case reflects, or is perceived by some as, an effort seeking broadscale advancement of renewable energy and its role relating to climate change, electricity grid stability, and other "economic and environmental reasons." Br. of Amici applicant Massachusetts, *et al*., 1-2, Dkt. 56-1; Br. of Amici applicant Environmental Organizations 2, Dkt. 47-1 (arguing that challenged actions will result in "well-documented risks to public health, wildlife, and the environment"). "But regardless of the validity of these concerns, they are not relevant to the Court's consideration of the current motion." *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, Nos. 3:23-cv-58 and -61-SLG, 2023 WL 2759864, at *7 (D. Alaska Apr. 3, 2023) (addressing concerns relating to eventual oil and gas extraction and global climate change, in denying motions seeking to preliminarily enjoin limited initial construction activities relating to approval of an oil and gas development plan).

Plaintiffs do not document their alleged injuries in sufficient detail to demonstrate that any such injury will be imminent.  Absent this showing, they cannot satisfy the irreparable injury prong of the preliminary injunction standard.

B.      Plaintiffs' Asserted Economic Injury is Not Irreparable

Plaintiffs next rely on asserted economic injury to satisfy the irreparable injury requirement.  Their approach is deficient as a matter of law.

More traditionally, and logically, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Me. Cent. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 650 F. Supp. 615, 618 (D. Me. 1986).  Instead, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business."  *Wisconsin Gas*, 758 F.2d at 674.  These principles apply with particular force when a claimant proffers economic injury in the form of lost or delayed revenues.  *See Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 n.11 (D.D.C. 2011); *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849-50 (9th Cir. 1985).  However, Plaintiffs make no showing of the specific losses that will be suffered by any member, let alone demonstrate the effect of any such asserted losses in the context of a particular business or project.

Plaintiffs' theory of irreparable injury flows from the simple assertion that "[e]conomic harm resulting from agency action is irreparable because monetary damages are 'nonrecoverable' due to the government's sovereign immunity."  Pls.' Br. 41 (citing *Ohio v. EPA*, 603 U.S. 279, 292 (2024)).  But the cited portion of that case does not say that unrecoverable economic injury is a basis for finding a likelihood of irreparable injury in granting a motion for preliminary injunction, it only says that States claiming to incur "hundreds of millions, if not billions of dollars" to comply

with a regulation that might be struck down have "strong arguments about the harms they face[.]" *Ohio*, 603 U.S. at 292.  The Court did not rule on this basis, noting that "each side [had] strong arguments" on harms and equity, and ruled that the matter, a request for an emergency stay, "ultimately turns on the merits[.]" *Id.*[7]  Moreover, Plaintiffs' argument would prove far too much. "[M]onetary damages" are not available under the APA.  *Nat'l Motor Freight Traffic Ass'n, Inc. v. Gen. Servs. Admin.*, 25 F. Supp. 3d 52, 61 (D.D.C. 2014); *see also Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:23-CV-59-JDK, 2023 WL 4977746, at *14 (E.D. Tex. Aug. 3, 2023) (concluding that "return of money" is an available remedy under the APA only where a suit seeks to enforce a statutory mandate for the payment of money, or to return unlawfully confiscated property in the form of currency).  So, a plaintiff proceeding under the APA waiver of sovereign immunity could reflexively satisfy the irreparable injury requirement by showing it would likely suffer some non-trivial amount of economic injury attributable to the challenged agency action. There is no way to square this reasoning with the tenet that a preliminary injunction is "an extraordinary remedy," *Winter*, 555 U.S. at 22, and that showing a likelihood of future irreparable harm is "the essential prerequisite for equitable relief."  *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 81 (1st Cir. 2009).  Put differently, irreparable injury would become easiest to establish

---

[7]    Plaintiffs find no support in the cases that *Ohio* cites to characterize "unrecoverable" economic injury.  One of those citations, to a concurring opinion from Justice Scalia, uses the phrase "irreparable harm of nonrecoverable compliance costs" as dicta addressing the jurisdictional infirmity of pre-enforcement judicial review.  *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in judgment).  And *Alabama Association of Realtors v. Department of Health & Human Services* addressed an unlawful moratorium on tenant evictions having the effect of depriving "millions of landlords" of rent payments "with no guarantee of eventual recovery."  594 U.S. 758, 765-66 (2021).  These circumstances are readily distinguishable from Plaintiffs' generalized claim that the agency documents and temporary practices will cause them to lose sunk costs or delay receipt of anticipated revenue.

through future economic injury in an APA case, under a statute that does not contemplate economic recovery. This cannot be the law.

C.  Plaintiffs' Claimed Injury Is Speculative

Plaintiffs' asserted economic injury is also insufficient to establish irreparable injury because it is theoretical and speculative. "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II*, 370 F.3d at 162. "A preliminary injunction will not be issued simply to prevent a mere possibility of injury. A presently existing, actual threat must be shown." *Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 74 (1st Cir. 1981); *see also Larson*, 769 F. Supp. at 422 ("Plaintiffs must establish injury that is not remote or speculative, but is actual and imminent.").

Plaintiffs contend that the challenged agency documents and temporary practices "continue to indefinitely delay, or outright prohibit, wind and solar development on both public and private lands[.]" Pls. Br. 41. They rely on the CRA analysis in claiming these harms will amount to "at least $905 million in sunk investment costs" and will jeopardize receipt of "up to $26 billion in investment tax credits that expire if developers cannot start construction of their projects within the statutory deadline." *Id*. at 41-42. And they assert that Plaintiffs' member-developers are "los[ing] revenue and incur[ring] other unrecoverable expenditures" caused by the challenged agency documents and temporary practices. *Id*. at 43-48 (citing Joint Decl. of Regional Org. Pls.' Exec. Dirs. in Supp. of Mot. for Prelim. Inj., Am. Compl. Ex. H, Dkt. 37 ("Joint Decl.").

The CRA analysis, in addition to the timeframe issues raised above, suffers additional flaws. As noted, the analysis is built from the "Impacted Project Dataset" of "wind, solar, and hybrid projects that were previously expected to achieve commercial operation before 2029 but

are no longer expected to do so" along with some additional projects "at risk of delay or cancellation." Strunk Decl. ¶ 12. But the Dataset was compiled through unspecified "independent research" on projects and "public sponsor statements describing the effects of the [agency] Directives," along with "a survey conducted by the American Clean Power Association ("ACP") of its members reporting project delays and cancellations." *Id.*; *see also* Report at 4, Dkt. 42-2 at 10. CRA "identif[ied] projects delayed and canceled as a result of the Directives" based on these public statements by project sponsors, or on ACP members' survey responses. *Id.* The ACP survey was distributed on July 31, 2025, to assess the impacts of only one of the challenged agency documents, the July 15 DOI memo. Report at Appx. B, Dkt. 42-2 at 41. The Report indicates that ACP "represents more than 750 member companies" yet survey responses were received from only 18 members. *Id.* At best, this method is conspicuously circular, *i.e.*, CRA treated projects as delayed or canceled when project proponents themselves said they were. The Dataset makes no distinction between delays or cancellations, nor does it demonstrate that such delays are directly attributable to "the Directives" rather than from "normal" process-related delays attending virtually all large energy projects.

Without the requisite project-level detail, the Dataset cannot provide any causal connection between project status and the challenged agency documents and practices. Without this causal connection, Plaintiffs cannot show an "actual, existing threat" of the economic harms they assert. Instead, the Report hints at a generalized approach keyed to a choice, again, apparently based on the views of project developers themselves, that "it is reasonable to treat canceled and delayed offshore projects as directly impacted by those [agency documents and practices] in addition to other actions by the current administration." *Id.* The Report opines that "[t]ogether, these actions have halted permit reviews, extended timelines indefinitely, increased costs, and jeopardized the

viability of virtually every offshore wind project in development in the United States." *Id*. The nature and breadth of this testimony together with the lack of detailed factual basis reveal its insufficiency to support preliminary injunctive relief.

Additionally, in offering these opinions, the Report has seemingly veered beyond the area of its author's expertise. *See Goebel v. Denv. & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."). "An expert's first and most important duty is to testify truthfully and accurately to the best of his ability and leave the advocacy to the lawyers." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 564 (S.D.N.Y. 2008), *on reconsideration in part* (June 26, 2008).[8]

The key contentions of the Joint Declaration (Exhibit H to Plaintiffs' Motion), when carefully reviewed, highlight these flaws, epitomize conjecture, or are simply wrong. The Joint Declaration reflects a formulaic structure, whereby various projects are identified that are purportedly "owned or developed by a member of at least one" Plaintiff organization. Joint Decl. ¶ 51.[9] Different sections follow thereafter for each of the challenged agency documents or

---

[8] At least some of the legal analysis offered in the Report or provided to CRA is questionable. For example, the Report states that the "Zerzan/Jorjani [M-]Opinion reintroduces a new 'de minimis' standard for allowable interference with other ocean users" under OCSLA. Report at Appx. B, Dkt. 42-2 at 41. The actual text of the M-Opinion states that "the Secretary must act 'to prevent . . . all interference, if the proposed activity would lead to *unreasonable* interference[.]'" Opinion M-37059 at 15 (emphasis added), Am. Compl. Ex. H, at 17, Dkt. 33-8.

[9] Plaintiffs provide only seven examples purporting to show "an owner or developer associated with a project listed in this declaration." Joint Decl. ¶ 51. For the remaining projects, there is an insufficient basis to conclude that the project developers are Plaintiff members, or to determine the developers' relationship to Plaintiffs. These distinctions are important given the generalized allegations about project status that, at least in some instances, does not comport with the agency's available information. *See, e.g.*, Decl. of Jacob Siegrist ¶ 4, Dkt. 63-4 (indicating there have been two pre-application meetings but no permit application submitted for the Empire Prairie Wind and Solar Project).

temporary practices, discussing identified projects allegedly affected by the particular document

or practice.  *See*, *e.g.*, *id.* ¶¶ 52-237 (describing the DOI July 15 memorandum, and its purported

effect on 20 projects starting with the American Glory Solar Project and ending with the Sundew

Solar Project).  For many of these projects, Plaintiffs allege, "[b]ased on our extensive experience

advocating for wind and solar development and consultations with our developer members," that

the identified project "would typically receive ROW approval within a predictable timeframe."  *Id.*

¶ 64.  This baseless allegation is repeated verbatim ten additional times in this section.  *See*, *id.* ¶¶

90, 118, 134, 151, 161, 180, 191, 212 (addressing ROW approval for solar projects); ¶¶ 71, 80

(addressing COP approval for offshore wind projects).  The repetitiveness of this approach alone

casts doubt on its credibility.[10]  Plaintiffs offer no suggestion as to what the "predictable

timeframe" should be for any of these projects.  Their further allegations rebut the contention that

any such timeframe can be reasonably identified, or that delays are attributable to the July 15 DOI

memorandum, because the identified projects have awaited the next procedural step since as early

as 2019, *id.* ¶ 186 (Ship Rock Solar Project), and in other instances since 2022, *id.* ¶¶ 59, 85, 207

(American Glory Solar Project, Bouse Solar, Wildcat Solar).  In other words, Plaintiffs offer no

coherent basis for a finding of irreparable injury relating to these projects, "beyond a generalized

and self-serving declaration."  *Louisiana v. Haaland*, No. 2:24-CV-00820, 2025 WL 761743, at

*5-6 (W.D. La. Mar. 10, 2025) (denying preliminary injunction for State and industry plaintiffs

challenging a BOEM rule regarding supplemental financial assurance for decommissioning of

offshore oil and gas facilities); *see also Seafreeze*, 2023 WL 3660689, at *6 (finding claims of

---

[10]    The cited boilerplate testimony is generally followed by a paragraph claiming that "[i]f federal permitting does not resume expeditiously, the developer may ultimately be forced to abandon the [Project], forfeiting all anticipated profits and incurring significant sunk, non-recoverable costs."  Joint Decl. ¶¶ 65, 72, 81, 91, 119, 135, 152, 162, 182, 192, 213, 229, 237.

economic injury in a motion for preliminary "wholly unsupported" by a declaration offering only "speculative" predictions of declining revenues).

Plaintiffs' speculation as to an indefinite delay in processing applications or a halt on authorizations also suffers from the misperception that applications must be approved at all. In the case of the pending solar projects proposing to use public lands, for example, FLPMA provides BLM with considerable discretion in not only processing applications but in deciding whether to approve, approve with modifications, or deny such applications. *See* Decl. of Jayme M. Lopez ¶¶ 7-13, Dkt. 63-3. A proponent seeking such authority under Title V of FLPMA is not entitled to an authorization. Indeed, Title V implementing regulations establish requirements for providing certain types of information, along with funding for processing costs, and compliance with applicable procedural requirements, notably including NEPA. *See* 43 C.F.R. § 2804.25(a)-(e). Neither the statute nor the regulations mandate the timing for processing such applications. In fact, with respect to wind and solar energy applications, the regulations require that BLM hold a public meeting to "prioritize the application in accordance with § 2804.35," and "evaluate the application based on the information provided by the applicant and input from other parties, such as Federal, State, Tribal, and local government agencies." *Id.* § 2804.25(e)(2). "Based on these evaluations, the BLM will either deny [the] application or continue processing it." *Id.* The regulations allow BLM to prioritize the processing of a wind and solar right-of-way application "to ensure that agency resources are allocated to applications with the greatest potential for approval and implementation." *Id*. § 2804.35(a). The regulations provide for wide ranging prioritization criteria, commensurate with BLM's broad discretion in choosing when and how to process wind and solar right-of-way applications. Thus, Plaintiffs' assertions of harm relating to the solar projects based on an implied notion that BLM is obligated to expeditiously process wind

and solar right-of-way applications is not only factually incorrect with respect to the identified projects in Plaintiffs' declarations, but also ignores the applicable regulations that clearly offer the BLM broad discretion in processing and reaching decisions on such applications.  *See*, *e.g.*, Lopez Decl. ¶ 17 (American Glory Solar Project has been "de-prioritized" at the developer's request to prioritize a different project); ¶ 20 (similar status for Monte Cristo Solar Project).

As Mr. Lopez further explains, none of Plaintiffs' identified projects involving applications to BLM are being "effectively halted" or "preclude[d] from securing a ROW from BLM for the foreseeable future," let alone prohibited, by any of the challenged actions.  *See*, *e.g.*, Joint Decl. ¶¶ 60-61.  Instead, each project is proceeding in typical fashion.  For example, BLM met with some project proponents in late 2025 to prepare a timeline for internal review and NEPA compliance. *See* Lopez Decl. ¶ 18 (Bouse Solar Project); ¶ 21 (Parker Solar Project).  The Lonely Road Solar Project is undergoing "pre-NEPA work . . . including engaging with the proponent on the draft plan of development," with meetings occurring as recently as January 21, 2026.  *Id*. ¶ 19.  In other instances, BLM is awaiting further information from, or a next step that must be taken by, the project proponent.  *Id*. ¶ 23 (Sapphire Solar Project); ¶ 24 (Ship Rock Solar Project); ¶ 25 (Wildcat Solar Project).

The same is true for identified projects involving applications to the Corps.  In two instances, the Corps' regulatory tracking database contains no record of a pending application.  *See* Siegrist Decl. ¶¶ 4-5.  For the Canisteo Wind Project, the Corps was informed by the New York Department of Public Service that the proponent "may be modifying the project design" and is therefore trying to confirm whether the proponent will update the application or proceed with the application as submitted.  *Id*. ¶ 3.  For the Rich Road Solar Project, the application was determined

to be complete as of December 4, 2025, and is proceeding with ESA Section 7 and additional steps, all of which were discussed in a meeting with the project proponent on January 23, 2026. *Id*. ¶ 4.

As indicated, Plaintiffs cannot show actual, imminent irreparable injury in situations where the developer has not even applied for the next step in the approval process. *See* Joint Decl. ¶ 68 (Atlantic Shores Bight Project developer "has postponed indefinitely its preparation and submittal of a COP, as doing so would be futile"); ¶ 123 (Macadamia Solar Project "has been deterred from attempting to obtain" a permit "based on the understanding that such application is futile").[11]  In other instances, the developer is not even attempting to proceed, but has apparently chosen a workaround by redesigning the project. *See id*. ¶ 97 ("the Canisteo Wind Project needed to be redesigned at significant cost"); ¶ 219 (Empire Prairie Wind and Solar Project "had to be re-engineered to avoid the need for a Section 404 permit").  In numerous other instances, Plaintiffs claim that project developers are not proceeding to satisfy CWA Section 404 or ESA Section 7 requirements because any submittals "must include IPaC documentation" and developers thus "cannot finalize" their permit applications without access to IPaC. *See id*. ¶¶ 366-67, 373-74, 380-81, 387-88, 393-94, 400-01, 407-08, 414-15, 421-22, 428-29, 435-36, 442-43.  At most, these claims misapprehend the relevant permit or consultation processes.  These processes remain potentially available and, in any event, IPaC is a facilitative tool.  Relevant permits/consultation were completed for decades prior to IPaC's existence and can still proceed without using IPaC. *See* Shultz Decl. ¶¶ 5-10.  None of these instances turn on requirements or direction of the supposed

---

[11]    Note that for the Vineyard Wind Project initial evaluation began in 2009, leases were issued in 2015, a proposed COP was submitted in 2017, but was withdrawn by the proponent in 2020 "to conduct a technical and logistical review of the [selected] turbines," after which the COP was resubmitted in March 2021 and ultimately approved by BOEM in July 2021. *Nantucket Residents Against Turbines*, 675 F. Supp. 3d at 35-38; 100 F.4th at 10.

agency actions, but rather a developer's choice on whether or how to proceed given business or project-specific considerations.

*National Mining Association* is illustrative. The trade association there similarly alleged that agency guidance documents "unlawfully obstructed the [CWA] permitting processes for coal mining." 768 F. Supp. 2d at 40. And to support the irreparable injury prong of the preliminary injunction standard, the Association claimed that its members were likely to be driven out of business, to incur substantial economic loss caused by the new permitting requirements, and suffer interference with private property rights. *Id*. at 50. The court rejected these claims because, in part, any supporting declarants' predictions that business failures would result from permit delays or denials were "at best, remote and speculative." *Id*. at 51-52 (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 205 (D.D.C. 2005). Additionally, the court found that the Association did "not even shown that the [economic] losses are wholly unrecoverable" because it had "not demonstrated how or why these losses cannot ultimately be recovered if and when the mining projects in question are permitted to proceed." *Id*. at 53. Moreover, even if "the purported losses [were] totally beyond remediation, the plaintiff [had] still not shown that they [were] imminent or certain." *Id*. at 54. These points apply with similar force here and similarly justify denial of the motion for preliminary injunction.

In sum, the motion should be denied because Plaintiffs fail to demonstrate a likelihood of imminent, irreparable injury. Plaintiffs fail to provide a timeframe for their alleged injury, or only broadly assert harms to the renewable energy industry or project pipeline, none of which will materialize before this Court can decide the merits. And Plaintiffs' asserted economic injury is insufficient to satisfy the irreparable harm requirement. Finally, Plaintiffs' declarations reflect flawed methodology, mischaracterize permitting requirements, and fail to account for project

status within the unpredictable nature of the project development process. Their repetitive, conclusory testimony belies the speculative nature of their claims. Plaintiffs have failed to show an actual or imminent harm that is required for a preliminary injunction.

## II.    Plaintiffs Are Unlikely to Succeed on the Merits

Plaintiffs' motion must also be denied because Plaintiffs are not likely to prevail on the merits of their claims. Plaintiffs' claims suffer jurisdictional defects. But even if the Court determines, at least for now, that it may have jurisdiction to consider them, Plaintiffs simply fail to show that the challenged documents and agency practices should be set aside under the APA's deferential standard of review.

### A.    Plaintiffs Attempt a Jurisdictionally Flawed Programmatic Attack

Plaintiffs' amended complaint is subject to dismissal because none of the six challenged "actions" are final agency actions reviewable under the APA. Defendants have not denied any permit or other license. And the amended complaint does not even allege that Defendants have unlawfully withheld some required action on any specific application. This case thus stands in stark contrast to a case brought by a project developer – like the cases noted above, *see supra* 11 n.2 – seeking to vindicate its interests in a pending application or an ongoing project, or to otherwise seek judicial review of a concrete dispute. Plaintiffs here are trade organizations or advocates with a clear purpose of effecting change to Defendants' "review" or "permitting regime" to provide better prospects for the "clean energy" industry writ large. *See* Pls.' Br. 20, 24, 28, 29. This unabashed effort at wholesale "regime" shifting is not permissible under the APA. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990)

The APA provides for judicial review of agency action "made reviewable by statute [or] *final agency action* for which there is no other adequate remedy." 5 U.S.C. § 704 (emphasis

added); *see Lujan*, 497 U.S. at 882.  Plaintiffs identify no "final agency action" subject to APA review.

"Final agency action" is action that (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) creates "legal rights or obligations," with "direct and appreciable legal consequences."  *Bennett*, 520 U.S. at 178 (citations omitted).  The action "must not be of a merely tentative or interlocutory nature."  *Id*.  Preliminary steps, "far upstream" of an agency's ultimate decision, are not final agency action.  *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024).[12]

Here, Plaintiffs launch a broadly framed attack against the agency documents and temporary practices that they allege are:

> resulting in project delays and cancellations that have in turn caused – and, if not enjoined, wi[ll] continue to cause – billions of dollars in increased project costs, lost investments and revenues, breached contracts, and unrecoverable expenditures.

Pls.' Br. 2.  They further claim that "every day" the purported "Actions" remain in place "is a day that hundreds of utility-scale wind and solar projects at various stages of the permitting process cannot move forward, while operating projects risk being unnecessarily shut down."  *Id*.  This hyperbole exposes Plaintiffs' claims as seeking "wholesale improvement of this [alleged "anti-renewable"] program by court decree, rather than in the offices of the Department or the halls of Congress," or by "direct[ing] its attack against some particular 'agency action' that causes it harm."  *Lujan*, 497 U.S. at 891.  Reviewing courts should "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately

---

[12]    While none of them are final agency actions, some of Plaintiffs' challenges do not even target agency action.  For example, Plaintiffs fail to explain how a banner that temporarily appeared on a website can constitute "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13).

threatened effect." *Id*. at 894.  Plaintiffs bring a free-floating challenge to internal agency documents and website banners addressing internal agency procedures.  Plaintiffs thus do not challenge final action.

Even if any of these internal documents or practices are treated as final, they do not prescribe outcomes or otherwise create "legal rights or obligations," with "direct and appreciable legal consequences."  *Bennett*, 520 U.S. at 178.  Starting with the July 15 DOI memorandum, Plaintiffs claim the memorandum "creates insurmountable bottlenecks designed to freeze wind and solar applications and deter developers from advancing permit applications in the first place because any attempt to do so would be futile."  Pls.' Br. 6; 20 ("the Memorandum unjustifiably stymies and all-but-halts DOI wind and solar permitting").  But in fact, all this memorandum does is direct that the specified proposed activities be submitted to the appropriate DOI officials for review.  It does not compel a certain outcome on any application, and it requires nothing of Plaintiffs or their membership.  While the Secretary's ultimate decision after an assumption of his previously delegated authority may constitute a final agency action, the mere re-assumption of that authority does not.

Indeed, Plaintiffs are effectively asking this Court to enjoin the Secretary from reviewing proposed activities squarely within the statutory authority Congress granted to him when the Secretary has delegated such authority to subordinate Department of the Interior officials and employees.  *See* 43 U.S.C. § 1337(p)(4) (OCSLA provision directing that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner" that addresses statutory criteria).  The Secretary has delegated this authority to the bureaus through the Assistant Secretaries down to the bureau directors.  *See* Section 2 of the Reorganization Plan No. 3 of 1950 (64 Stat. 1262) (Mar. 13, 1950); *see also* Interior Departmental Manual, 200 DM 1 – Delegation

of Authority (Aug. 22, 2001); 218 DM 1 – General Program Authority – Outer Continental Shelf (Sept. 14, 2022); 235 DM 1 – General Program Delegation, Director, Bureau of Land Management (Oct. 5, 2009).  There is neither a legal nor logical basis for an assertion that the Secretary can delegate his statutory authority but then loses any ability to review or make decisions.  Plaintiffs' view would turn the concept of delegation on its head, and is contrary to the many past examples in which the Secretary has elected to both review project proposals and issue decisions.  *See*, *e.g.*, Notice of Availability of the Record of Decision for the Imperial Valley Solar Project and Associated Amendment to the California Desert Conservation Area Resource Management Plan Amendment, Imperial County, California, 75 Fed. Reg. 62853 (Oct. 13, 2010); Notice of Availability of the Record of Decision for the Proposed Resource Management Plan Amendment and Final Environmental Impact Statement for the Gemini Solar Project in Clark County, Nevada, 85 Fed. Reg. 30982 (May 21, 2020).  What Plaintiffs really argue is that the memorandum reflects the Department's alleged bias against wind and solar project approvals.  But the memorandum itself decides nothing about any specific wind or solar project.

Plaintiffs' arguments against Secretary's Order 3438 fare no better.  Again, that Order offers only procedural guidance on how Interior bureaus will consider capacity density in conducting future NEPA analysis of energy projects.  This is classic procedural guidance which does not dictate the outcome of the actual analysis or the agency decision to approve or deny any specific project – any legal consequence will arise from an actual decision, not from the mere consideration of any particular alternative(s).  And, under NEPA, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry[.]  Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness."  *Seven Cnty.*

*Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 183 (2025).  Even more fundamentally, Plaintiffs instinctually read a renewable energy stigma into the Order not stated by its text – the Order directs consideration of capacity density "when reviewing a proposed *energy* project" under NEPA.  Order 3438 at 1, Am. Compl. Ex. B, at 2 (emphasis added).  Thus, Plaintiffs' interpretation of the Order fails to account for the scenario in which a proponent for an "Ultra-Supercritical Coal Plant without Carbon Capture" could be subjected to the same alleged disadvantage as Plaintiffs' members in pursuing a project with a lower capacity density than other energy types addressed in the Order.  *See* Order 3438 Appx. 1, Am. Compl. Ex. B, at 5.  This Order provides procedural guidance addressing the manner Interior bureaus will comply with a purely procedural statute.  It does not constitute a final agency action reviewable under the APA.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (internal guidance that does not carry the force and effect of law is not a final agency action).[13]

Next, Plaintiffs assault the Corps' memorandum, similarly claiming it "rigs the CWA Section 404 and RHA Section 10 permitting processes against wind and solar by disadvantaging energy sources that generate lower amounts of energy per acre."  Pls.' Br. 28.  Here again, Plaintiffs' arguments against the Corps' memorandum suffer similar flaws.  Plaintiffs have not identified any actual denial or even delay for any project that is attributable to the memorandum.  Again, the memorandum does no more than provide guidance on principles and prioritization for the agency in evaluating applications and making future decisions.  Insofar as evidence is

---

[13]    Plaintiffs' arguments claiming the new procedures unlawfully deviate from a prior agency rule (or even policy) are also wide of the mark.  *See* Pls.' Br. at 20-21 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)).  The delegation memorandum does not deviate from a prior agency rule that prohibited the Secretary from assuming authority over a pending application or approval.  And Secretary's Order 3438 cannot be characterized as deviating from a prior agency rule (or guidance) that prohibited bureaus from considering capacity density.  *See* Pls.' Br. at 25-26.

presented, it demonstrates that the Corps is proceeding with any relevant processes, with any delays in identified projects attributable to pending action by other agencies, or the developer itself. *See* Siegrist Decl. ¶ 4 (indicating there have been two pre-application meetings but no permit application submitted for the Empire Prairie Wind and Solar Project); Decl. of Martin P. Wargo ¶¶ 3-4, Dkt. 63-5 (Canisteo Wind and Rich Road Solar projects are proceeding at typical pace through permitting processes).  In other words, the facts before the Court demonstrate that the memorandum is not creating legal consequences for any applicant.

Arguments against the so-called Eagle Permit Ban are perhaps the easiest to reject.  FWS has lifted the temporary pause on the issuance of Eagle take permits.  *See* Ford Decl. ¶ 15.  FWS has issued 25 of the 30 general permits to applicants who submitted applications during the suspension period and requested necessary information from the remaining 5 applicants, while simultaneously resuming the processing of specific permit applications.  *Id.*  There is simply no Eagle Permit Ban for this Court to consider or redress.  And Plaintiffs' IPaC arguments lack merit.  No statute or regulation requires or guarantees access to IPaC.  Plaintiffs' argument here is dubious under *Bennett*'s first requirement; they point to no authority for the proposition that a website banner is the consummation of the agency's position on the use of IPaC.  And the banner itself has no legal consequence – it requires a proponent to request the use of IPaC but "wind and solar projects are not categorically prohibited from using IPaC."  Shultz Decl. ¶8 (which no proponent has requested).  Whether or not a project proponent can utilize the full functionality of IPaC, which is no more than a facilitative tool, has little to do with whether they can proceed with ESA consultation or present a relevant application for ESA or CWA permit approval.  *Id.* ¶ 9.  Put differently, using IPaC has no legal effect whatsoever on a relevant decision on take permits or Section 7 consultation.

36

Finally, the M-Opinion too provides guidance for future decision-making in interpreting a certain OCSLA provision, but it neither decides nor dictates the outcome of any pending application. It is thus not final agency action. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. CV 17-8587-GW(ASX), 2019 WL 2635587, at *12 (C.D. Cal. June 20, 2019) (under *Bennett*'s second prong, an M-Opinion "provides abstract guidance to the agency that only affects parties' rights when the opinion is *applied* to a particular situation"); *see also Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("[I]nterpretative rules or statements of policy generally do not qualify because they are not 'finally determinative of the issues or rights to which [they are] addressed.' . . . '[A]n interpretative rule is subject to review when it is relied upon or applied to support an agency action in a particular case." (second alteration in original) (citations omitted)). It is not uncommon for the Interior Solicitor to revisit prior M-Opinion guidance that is incorrectly reasoned and does not align with the Department's current views. Such opinions are binding on the Department, but legal opinions in and of themselves do not create rights or obligations for third parties. And it is unremarkable that the M-Opinion now concludes that, under OCSLA, unreasonable interference of other uses may not be authorized, notwithstanding Plaintiffs' mischaracterization of the opinion's text as establishing a lower "*de minimis*" interference standard.

Defendants are mindful of the analysis in the "Wind Order" litigation. *See New York*, 2025 WL 3514301, at *7-9. While that decision is not binding here, the Court held that the Wind Order was final agency action. But that flowed from the determination that the Wind Order was "an indefinite pause" that "'prevent[s] [p]laintiffs from moving forward' with their proposed activities, such that they are 'trapped without recourse due to the indefinite postponement of agency action.'" *Id*. at *9 (quoting *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 60 (D.D.C. 2019)).

In other words, rather than addressing a process, it created a prohibition. This cannot be said of any of the agency documents or temporary practices at issue in this case. None of them prevent an applicant from moving forward with a wind or solar energy project. *See*, *e.g.*, Shultz Decl. ¶ 9; Wargo Decl. ¶¶ 3-4; Lopez Decl. ¶¶ 14-24. At most, the challenged documents/practices clarify steps that may take place in such ongoing review, all within each agency's broad discretion to employ in processing applications and meeting both statutory and regulatory steps necessary to approve or deny such applications. If Plaintiffs could demonstrate a nondiscretionary deadline has passed for some discrete, legally required action in a specific project, they could seek review under APA Section 706(1). That is not this case.

For similar reasons – and assuming that they are even "rules" to begin with – notice-and-comment rulemaking was not required to issue the identified memoranda and internal guidance documents. *See* Pls.' Br. 24, 28, 31-32, 40-41. Such rulemaking is only required for "legislative" rules; the APA expressly exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from the notice-and-comment requirement except where notice or hearing is otherwise required by statute. 5 U.S.C. § 553(b)(4)(A). A legislative rule carries "force and effect of law," whereas interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (citation omitted); *accord La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992) (a substantive rule "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself" whereas an interpretive rule is "merely a clarification or explanation of an existing statute or rule") (citations omitted).

In sum, and as *Lujan* explains, judicial review of final agency action should proceed when the relevant procedures are applied in a new decision(s). "The case-by-case approach that this requires is understandably frustrating to [ ] organization[s] such as [Plaintiffs], which [have] as [their] objective across-the-board protection of [the renewable energy industry]. But this is the traditional, and remains the normal, mode of operation of the courts." 497 U.S. at 894.

B.    Plaintiffs Fail to Demonstrate Standing

Plaintiffs are also unable to demonstrate standing. To do so, they "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). Plaintiffs cannot meet any of these requirements.

Plaintiffs have not identified any tangible action whatsoever affecting any application – an essential predicate to meeting the injury in fact requirement. At best, Plaintiffs have identified projects in the Joint Declaration on which they seemingly rely to establish actual or imminent injury. Whereas Plaintiffs present generalized, repetitive allegations, agency personnel have shown that the projects are proceeding in normal fashion, have been de-prioritized at the request of the proponent, or simply have not been presented to the agency. *See*, *e.g*., Shultz Decl. ¶ 9; Siegrist Decl. ¶¶ 3-5; Wargo Decl. ¶¶ 3-4; Lopez Decl. ¶¶ 14-24.

Plaintiffs also fail "to show a sufficiently direct causal connection between the challenged action and the identified harm." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc*., 958 F.3d 38, 47 (1st Cir. 2020) (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)). Because the agencies are not delaying or otherwise diverting the identified projects from the typical approval process, any purported adverse effects cannot be tied to the challenged agency guidance documents or temporary practices. In short, "the 'links in the chain of causation' between the

challenged conduct and the alleged injury [are] 'far too weak for the chain as a whole to sustain

. . . standing.'" *Dantzler*, 958 F.3d at 48 (quoting *Allen v. Wright*, 468 U.S. 737, 757-59 (1984)).

Further, Plaintiffs fail to satisfy the redressability requirement because they cannot show

"that a favorable resolution of the claim would likely redress the professed injury." *In re Fin.*

*Oversight & Mgmt. Bd. for Puerto Rico*, 995 F.3d 18, 22 (1st Cir. 2021) (quoting *Katz*, 672 F.3d

at 72). Plaintiffs cannot plausibly show that an injunction addressing the agency guidance

documents or practices will have any effect on projects that have awaited the next procedural step

since as early as 2019, *id*. ¶ 186 (Ship Rock Solar Project), or 2022, *id*. ¶¶ 59, 85, 207 (American

Glory Solar Project, Bouse Solar, Wildcat Solar). There is similarly no conceivable benefit to an

injunction for projects that have been "de-prioritized" at the developer's request. *See* Lopez Decl.

¶ 17 (American Glory Solar Project); ¶ 20 (Monte Cristo Solar Project). Other projects are

proceeding through the normal approval process, irrespective of any challenged guidance. *See*

Lopez Decl. ¶ 18 (Bouse Solar Project); ¶ 19 (Lonely Road Solar Project); ¶ 21 (Parker Solar

Project); ¶ 23 (Sapphire Solar Project); ¶ 24 (Ship Rock Solar Project); ¶ 25 (Wildcat Solar

Project). Lastly, other identified projects are unaffected by the guidance (or its absence) where the

developer is proceeding following project redesign. *See* Joint Decl. ¶ 97 (Canisteo Wind Project);

¶ 219 (Empire Prairie Wind and Solar Project).

Finally, Plaintiffs must meet associational standing requirements. The test for associational

standing requires showing (1) an organization member(s) have standing to bring suit on their own

accord; (2) the interests the organization seeks to protect are germane to the organization's

purpose; and (3) the claims asserted and relief requested do not require an individual member's

participation in the lawsuit. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295,

308 (1st Cir. 2024). Plaintiffs largely overlook this requirement, aside from alleging that in seven

instances they have identified "an owner or developer associated with a project listed in this declaration." Joint Decl. ¶ 51. And where other organizational plaintiffs represent interests in the renewable energy industry (or supply chain), they cannot demonstrate standing through injuries resulting from "the independent action of a third party," not Defendants. *Dantzler*, 958 F.3d at 47 (quoting *Katz*, 672 F.3d at 71).

Plaintiffs have not met their burden to demonstrate standing, and therefore cannot show a likelihood of success on the merits that would justify a preliminary injunction.

C.    Plaintiffs' Claims Are Not Ripe for Judicial Review

Relatedly, Plaintiffs' claims are not ripe for judicial review. In determining whether this challenge "is ripe for review a twofold inquiry must be made: first to determine whether the issues tendered are appropriate for judicial resolution, and second to assess the hardship to the parties if judicial relief is denied at that stage." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162 (1967).

On the first prong, Plaintiffs' alleged legal injury "rest[s] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)); *see also Mayor of Ocean City v. U.S. Dep't of the Interior*, No. SAG-24-03111, 2025 WL 3628137, at *4 (D. Md. Dec. 15, 2025) (plaintiff "has pointed to no action that marks the 'consummation' of a decision-making process, and because future uncertainties remain"). Even if an agency action (such as a formally adopted regulation) meets the "consummation" prong of the finality test, it may be not ripe where such a regulation "serves notice only that" some further action may take place. *Toilet Goods Ass'n*, 387 U.S. at 163. The regulation at issue in *Toilet Goods Association* addressed the manner of certain agency inspections, which could result in

41

agency findings and orders. *Id*. The Court found a facial challenge to the regulation to be unripe, because "[a]t this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order." *Id*. The same analysis applies here. For example, it may be that BLM includes capacity density alternatives/analysis in a NEPA document supporting one or more of the solar project ROW applications that Plaintiffs mention. But the feared unlawfulness of doing so cannot be determined from the text of Secretary's Order 3438. Indeed, BLM may grant the ROW to the satisfaction of the applicant, and judicial review will be unnecessary, unless sought by an opponent to the project. Similarly, even if the challenged documents and practices "reflect[ ] 'an abstract decision' to revoke [or disapprove] [a] COP . . . agency consideration remains ongoing, and there remain opportunities for BOEM to depart from that inferred abstract decision before any decision resulting in the denial of an agency service, such as an approval necessary to continue development, is made." *Ocean City*, 2025 WL 3628137, at *4 (quoting *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025)).

The second prong of the ripeness analysis further militates against relief. Here, the procedural nature of the challenged documents and practices has particular force. Plaintiffs are "not required to engage in, or to refrain from, any conduct[.]" *Texas*, 523 U.S. at 301. Plaintiffs have provided no basis for determining that they will suffer hardship in withholding relief – many of the identified projects have been awaiting the next approval for years, well before any purported unlawful shift in policy. And hardship of withholding review cannot be demonstrated for the numerous examples where a developer is "not currently proceeding with the next steps in developing the project[.]" *Ocean City*, 2025 WL 3628137, at *2. The Plaintiffs here thus stand in stark contrast to developers for projects like Vineyard or Revolution Wind, where developers are

proceeding with their own litigation and seeking to demonstrate actual, immediate, project-specific harm.[14]

As in *Texas*, the Court should "find it too speculative whether the problem[s] [Plaintiffs] present[ ] will ever need solving[.]"  523 U.S. at 302.  Plaintiffs' abstract claims are not fit for judicial consideration, and they cannot demonstrate hardship in continuing the status quo.

D.    Plaintiffs' APA Claims Fail on the Merits

 If the Court reaches them, Plaintiffs' theories about why the challenged agency documents and temporary practices run afoul of the arbitrary and capricious standard simply do not withstand a common sense reading or interpretation.  As such, Plaintiffs are unlikely to show that these agency documents and temporary practices are unlawful.

Agency action is arbitrary or capricious "if the agency relied on factors Congress did not intend it to consider, failed to consider an important aspect of the problem, explained the decision in terms that run counter to the evidence, or reached a decision so implausible that it cannot be ascribed to a difference in view or the product of agency expertise."  *Seafreeze*, 123 F.4th at 15 (citing *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024)).  But courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp.*, 419 U.S. at 286.  Thus, if the agency had a rational basis for taking the subject action, it must be upheld. *See Associated Fisheries of Maine*, 127 F.3d at 109.

As demonstrated above, the challenged agency documents and practices fall within the broad realm of reasonable agency guidance.  *See supra* 33-37.  APA analysis of the agency documents focuses on whether they reflect a rational exercise of the Secretary's broad authority to administer activities under the relevant statutes.  Properly framing the inquiry makes apparent the

---

difficulty of Plaintiffs' burden. Even if the Court concludes that the challenged actions are sufficiently final under *Bennett*, the actions still withstand review under the arbitrary and capricious standard because, in this context, they are reasonable.

Plaintiffs have not shown a likelihood of success on the merits, and the motion can also be denied on this basis.

### III.    The Balance of Equities and Public Interest Favor Defendants

Plaintiffs must finally also prove that their requested preliminary injunction would serve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the analyses of the public interest and balance of equities merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). When addressing these factors, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citation omitted).

The Court need not reach these factors, but Plaintiffs' highly speculative harms are outweighed by the intrusive effect an injunction could have on further agency decision-making and agency discretion. That discretion aspires to reflect agency procedures and decisions that are sound and legally defensible, and avoid or minimize environmental impacts consistent with applicable law. Against these concerns Plaintiffs circularly argue that the public interest is served by agencies complying with the law, or raise broad policy concerns. *See* Pls.' Br. 48-49. But again, these considerations relate to the overall course of the litigation and have little weight in deciding the motion for preliminary injunction. For these reasons, Plaintiffs fall short of their burden to show that the balance of the equities and public interest favor granting a preliminary injunction.

## IV.    Any Injunction Must Be Narrowly Tailored

The Court should deny Plaintiffs' motion, and therefore need not consider the scope of any injunctive relief.  However, if the Court does reach this question, Plaintiffs' requested relief is imprecise and overbroad.  *See* Fed. R. Civ. P. 65.  In their supporting brief, Plaintiffs "request that this Court grant a preliminary injunction enjoining Defendant Agencies from enforcing the challenged Agency Actions."  Pls.' Br. 50.  In the Amended Complaint, Plaintiffs first ask the Court to "vacate and set aside" the identified actions, Am. Compl. at 77 (Prayer for Relief ¶ 2), but they also seek to "[p]reliminarily and permanently enjoin, without bond, the Defendants from implementing or otherwise giving effect to" the identified actions, *id.* at 78, ¶ 3.  *Contra* Fed. R. Civ. P. 65(d)(1)(C) (injunction must "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required").

"Judges must closely tailor injunctive relief to the specific harm alleged."  *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024).  This means, in part, that "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 862 (2025) (Thomas, J., concurring) ("In no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries.").  An order stating that Defendants cannot "give effect to" the agency documents would violate these principles, likely be confusing, fail to comport with Rule 65, and intrude on agency province.[15]  For example, an order stating that Defendants are prohibited

---

[15]    Plaintiffs suggest that the Court need not observe the recognized limitations on injunctive relief if it orders relief under APA Section 705.  *See* Pls.' Br. 17-18 (citing *CASA*, 606 U.S. at 851 n.10).  But that footnote hardly supports Plaintiffs' interpretation; it says "[n]othing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action."  *Id.*  It says nothing about the relationship between preliminary relief under Rule 65 and APA Section 705.

from "giving effect" to Interior's July 15 memorandum could seemingly suggest that Interior is prohibited from elevating decisions to its leadership for review when that capability is authorized by the relevant statutes. Finally, should the Court be inclined to order any injunctive relief, the Court should require Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c); *see also Global NAPS, Inc. v. Verizon New England, Inc.*, 489 F.3d 13, 22 (1st Cir. 2007) ("a party is wrongfully enjoined when it had a right all along to do what it was enjoined from doing"). The Court has broad discretion in determining the proper amount of the bond. *See Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018).

Even if Plaintiffs had met their burden to show preliminary relief to be appropriate, they could, at most, obtain a preliminary injunction against application of the discrete agency document or practice as applied to a circumstance(s) or project(s) for which one of the Plaintiffs or their members has shown that it is likely to suffer a concrete and irreparable injury before the case can be decided on the merits. But no Plaintiff member has made such a showing.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for preliminary injunction.

Respectfully submitted this 10th day of February 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/  Paul A. Turcke*
PAUL A. TURCKE
Trial Attorney (Idaho Bar No. 4759)
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
(202) 532-5994
paul.turcke@usdoj.gov

ROBERT P. WILLIAMS
Senior Trial Attorney (DC Bar No. 474730)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
(202) 305-0210
robert.p.williams@usdoj.gov

REDDING C. CATES
Senior Trial Attorney (Cal. Bar No. 269055)
Environmental Defense Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
(202) 353-5561
redding.cates@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on February 11, 2026.

*/s/  Paul A. Turcke*
PAUL A. TURCKE