## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RENEW NORTHEAST, et al.,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, et al.,

        *Defendants*.

Civil Action No. 1:25-cv-13961-DJC
(leave to file granted February 11,
2026)

**BRIEF OF MASSACHUSETTS, NEW YORK, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

INTERESTS OF AMICI..................................................................................................1

ARGUMENT..................................................................................................2

I.      Absent an Injunction, the Anti-Renewable Actions
        Will Irreparably Harm Amici States and the Public Interest................................................3

        A.  The Anti-Renewable Actions Will Undermine
            Traditional State Interests in Planning and
            Production of Reliable, Affordable Energy..................................................4

        B.  The Anti-Renewable Actions Will Inflict
            Significant Harms on Amici States' Economies
            and Job Markets..................................................10

        C.  The Anti-Renewable Actions Will Cause
            Environmental and Public Health Harms to
            Amici States and Our Residents..................................................12

II.     Plaintiffs Are Likely to Succeed on the Merits of Their
        Challenge to the Anti-Renewable Actions Because, Among Other
        Reasons, Defendants Failed to Consider Substantial Reliance Interests..........................15

CONCLUSION..................................................................................................16

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Alaska v. U.S. Dep't of Transp.*,

   868 F.2d 441 (D.C. Cir. 1989) ................................................................................. 4

*American Hospital Ass'n v. Kennedy*,

   No. 25-2236, 2026 WL 49499 (1st Cir. Jan. 7, 2026) .......................................... 16

*Ass'n of Am. Universities v. Dep't of Def.*,

   792 F. Supp. 3d 143 (D. Mass. 2025) ..................................................................... 3

*Belmont Mun. Light Dep't v. FERC*,

   38 F.4th 173 (D.C. Cir. 2022) ................................................................................. 4

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

   591 U.S. 1 (2020) .................................................................................................. 15

*FCC v. Fox Television Stations, Inc.*,

   556 U.S. 502 (2009) .............................................................................................. 15

*Housatonic River Initiative v. EPA*,

   75 F.4th 248 (1st Cir. 2023) ............................................................................ 15, 16

*Massachusetts v. EPA*,

   549 U.S. 497 (2007) .............................................................................................. 13

*Natural Res. Def. Council v. Wheeler*,

   955 F.3d 68 (D.C. Cir. 2020) ............................................................................... 13

*New York v. Trump*,

   No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) .................. 10

*Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*,

   461 U.S. 190 (1983) ................................................................................................ 4

*Smiley v. Citibank (South Dakota), N.A.*,

   517 U.S. 735 (1996) .............................................................................................. 15

*Winter v. Natural Res. Def. Council*,

   555 U.S. 7 (2008) .................................................................................................... 3

## <u>FEDERAL STATUTES</u>

5 U.S.C. § 705 ................................................................................................................ 3, 16

5 U.S.C. § 706 (2)(A) ................................................................................... 15, 16

5 U.S.C. § 706 (2)(C) ....................................................................................... 15

5 U.S.C. § 706 (2)(D) ................................................................................. 15, 16

## <u>STATE STATUTES</u>

20 Ill. Comp. Stat. 3855 / 1-75(c)(1)(B) ............................................................. 5

2022 Mass. Acts c. 179 § 61(a)-(b) ..................................................................... 5

2023 Mich. Pub. Act 235 ..................................................................................... 5

39 R.I. Gen. Laws § 39-26-4 ............................................................................... 5

Cal. Pub. Util. Code § 399 ................................................................................... 5

Conn. Gen. Stat. § 16-245a(a)(25) ...................................................................... 5

D.C. Code Ann. § 34-1432 ................................................................................... 5

Del. Code Ann. tit. 26, § 354(a) .......................................................................... 5

Mass. Gen. Laws ch. 25A, § 11F(a) .................................................................... 5

Md. Code Ann., Pub. Util. § 7-704.1(a)(1)(i) ...................................................... 5

Md. Code. Ann., Pub. Util. §7-703(b)(25) ........................................................... 5

Me. Rev. Stat. Ann. tit. 35-A, § 3404(2) .............................................................. 5

Me. Rev. Stat. Ann. tit. 35-A,(1-A)(A) § 3210 .................................................... 5

Minn. Stat. § 216B.1691(2g) ............................................................................... 5

N.J. Stat. § 14:8-1 – 14:8-2 ................................................................................. 5

N.J. Stat. Ann. § 48:3-87(d)(2) ........................................................................... 5

N.M. Stat. Ann. § 62-16-4(A)(3) ......................................................................... 5

N.Y. Env't Conserv. Law § 75-0103(13)(e) ........................................................ 5

N.Y. Pub. Serv. Law § 66-p(2) ............................................................................ 5

Or. Rev. Stat. Ann. § 469A.410(1)(c) .................................................................. 5

Wash. Rev. Code § 19.405.010(2) ....................................................................... 5

## INTERESTS OF AMICI

Amici Massachusetts, New York, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington submit this amicus brief in support of Plaintiffs' motion for a preliminary injunction and relief under Section 705 of the Administrative Procedure Act (APA). Plaintiffs seek to preliminarily enjoin or stay implementation of six actions (the Anti-Renewable Actions) undertaken by the defendant federal government agencies and officials to arbitrarily and unlawfully obstruct the development of wind and solar energy projects.[1]

Amici States have substantial interests in this case. Over the past several decades, Amici States have planned for and made substantial investments in the deployment of large-scale wind and solar energy projects as an important part of a portfolio that maintains reliable, clean, and affordable electricity for our States and our residents. Amici States are responsible for ensuring that our hospitals, schools, businesses, and residents receive a steady supply of affordable and reliable energy. That well-established sovereign responsibility requires our States to undertake complex, long-term planning for developing the generation, transmission, and distribution resources needed over the coming years. As fossil-fueled facilities have aged and become more expensive to maintain, our States have increasingly relied on wind and solar energy projects to

---

[1] The Anti-Renewable Actions are: (1) an order by the U.S. Department of the Interior (DOI) requiring that any decision or action related to a wind or solar facility be reviewed and approved by the offices of the three most senior DOI officials; (2) another DOI order requiring the agency to consider "capacity density" (a metric reflecting the total amount of energy produced divided by the total acreage of the project area, including open space) in reviewing applications for wind and solar projects; (3) an order by the U.S. Army Corps of Engineers prioritizing projects with high capacity densities; (4) a ban instituted by the U.S. Fish and Wildlife Service prohibiting wind facilities from applying for permits to "take" certain eagle species under the Bald and Golden Eagle Protection Act; (5) a DOI directive preventing wind and solar developers from accessing a publicly available tool designed to provide information useful to the protection of species and minimization of wildlife impacts; and (6) a DOI Memorandum Opinion interpreting a provision of the Outer Continental Shelf Lands Act.

fulfill growing demand. Thus, for economic and environmental reasons, our States' long-term plans rely heavily on rapidly scaling up wind and solar generation.

The Anti-Renewable Actions threaten to undermine these decades-long investments in wind and solar energy sources and to impose irreparable harms on Amici States, as well as residents and businesses located within our respective jurisdictions. Indeed, Plaintiffs have identified at least thirty-four wind and solar projects, the majority of which are located within the borders of Amici States, that are currently known to be at risk of cancellation, delay, or significant cost increases due to the Anti-Renewable Actions. *See* Pls.' Joint Decl. Supp. Mot. Prelim. Inj., ¶¶ 56–486, ECF No. 37. Absent preliminary relief, such delays and cancellations will undermine our States' traditional interest as sovereigns in reliable, affordable energy planning and production amid growing energy demand; inflict significant harms on our States' economies and job markets; and obstruct our States' ongoing efforts to ameliorate the acute environmental and public health harms caused by pollution emitted by fossil fuel energy sources.

## ARGUMENT

Amici States support Plaintiffs' motion to preliminarily enjoin or temporarily stay implementation of the six Anti-Renewable Actions, which are severely and unlawfully hindering the development of wind and solar energy projects in our jurisdictions. Amici States submit this brief to underscore two points. First, preliminary relief will serve the public interest and protect Amici States and our residents from the irreparable harms that would otherwise flow from the Anti-Renewable Actions. Second, in undertaking the Anti-Renewable Actions, Defendants violated the APA by failing to consider substantial reliance interests, including those of Amici States, as well as of businesses and individuals located in our respective jurisdictions.

I.       **Absent an Injunction, the Anti-Renewable Actions Will Irreparably Harm Amici States and the Public Interest.**

The Court should grant Plaintiffs' motion for preliminary relief or a stay because, absent such relief, the Anti-Renewable Actions will impose significant and irreparable harms on Amici States, our residents, and businesses. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (courts must consider the public interest when determining whether to grant injunctive relief); *see also Ass'n of Am. Universities v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025) (same standard applies to preliminary relief under 5 U.S.C. § 705). If not enjoined or stayed, the Anti-Renewable Actions will continue to severely undermine existing plans to construct wind and solar projects in Amici States and chill future investments in such projects.

Plaintiffs have already identified at least thirty-four wind and solar projects with a total capacity of more than 22 gigawatts at risk of cancellation, delay, or significant cost increases due to the Anti-Renewable Actions. *See*, Pls.' Joint Decl. Supp. Mot. Prelim. Inj. ¶¶ 56–486, ECF No. 37. The majority of these projects are in Amici States, including Arizona (2 solar projects), California (2 solar projects), Illinois (3 wind projects, 2 solar projects), Maryland (1 wind project), Minnesota (1 wind project, 1 solar project), Nevada (5 solar projects), New Jersey (3 wind projects), New Mexico (1 solar project), New York (1 wind project, 1 solar project), North Carolina (3 solar projects), and Washington (2 solar projects), which collectively account for more than 90% of the identified capacity at risk. *Id.*[2]

Cancellations, delays, and cost increases of such projects in Amici States will, in turn, impose at least three distinct harms on Amici States. Specifically, they will: (1) undermine Amici States' sovereign interests in planning for and obtaining reliable, affordable energy; (2) damage

---

[2] The proposed 2,500 MW Monte Cristo Solar Project described at paragraphs 275–281 of the Joint Declaration is located in Nevada, not Arizona. See Original Filing, Monte Cristo Solar, Public Utilities Commission of Nevada, Docket No. 22-09026 (Sept. 30, 2022) https://perma.cc/F43P-MRNZ.

our economic investments in renewable energy development as well as related revenue streams and employment markets; and (3) jeopardize Amici States' ability to protect our land and residents from the severe environmental and public health harms caused by pollution emitted by fossil fuel energy sources.

### A. The Anti-Renewable Actions Will Undermine Traditional State Interests in Planning and Production of Reliable, Affordable Energy.

The Anti-Renewable Actions impede Amici States' sovereign interests in implementing their energy laws and policies, which Amici States have enacted to advance development of reliable and affordable energy in the years to come. It is well established that "States have an interest, as sovereigns, in exercising the power to create and enforce a legal code." *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (quotation marks omitted). That sovereign interest includes the authority to plan for reliable and affordable energy. *See Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 205 (1983). Indeed, courts have repeatedly acknowledged this "traditional responsibility in the field of regulating electrical utilities" including "determining questions of need, reliability, cost and other related state concerns." *Id.*; *see also Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (recognizing States' interest "in protecting their citizens and electric ratepayers").

Over the past decades, Amici States have exercised this traditional authority by assessing their respective energy needs and by implementing statutes, regulations, and plans that encourage—and often require—increasing use of wind and solar energy in our respective jurisdictions. For example, Massachusetts, New York, Maryland, Maine, and New Jersey have all

enacted statutes that set procurement targets for offshore wind energy.[3] In addition, most Amici States have Renewable Portfolio Standards, Clean Energy Standards, or other renewable energy mandates that require electricity suppliers to provide a minimum percentage of electricity from renewable energy sources or other zero-emission sources.[4] Moreover, many Amici States have statutes setting statewide targets for reducing greenhouse gas emissions, which are emitted at much higher rates by fossil fuel energy sources compared to wind and solar energy sources. In New York, which has enacted a statutory target of 100% zero-emissions electricity by 2040, the 2025 State Energy Plan notes that annual electricity demand is projected to increase 24% by 2040. *See* 2025 New York State Energy Plan, Vol. I, at 5, 38, https://perma.cc/Z4FY-8H46. To meet that demand and the State's climate protection targets, the State Energy Plan finds that the State may need 28 gigawatts of new solar and 11–13 gigawatts of new wind capacity by 2040, in addition to major investments in nuclear generation, transmission, and battery storage. *Id.* at 30.

Amici States' policies have increasingly counted on wind and solar energy development to maintain grid reliability, support climate goals, and protect ratepayers from increasing energy costs, as coal, gas, and other fossil-fueled power plants have aged and become more expensive to operate and maintain, while renewable technologies in many cases have become less expensive. In many Amici States, wind and solar energy resources are often the cheapest electricity resources to construct and operate. As one recent report by Lazard found, on a nationwide scale, "utility-

---

[3] 2022 Mass. Acts c. 179 § 61(a)-(b) (5,600 MW by 2027); N.Y. Env't Conserv. Law § 75-0103(13)(e) (9 GW by 2035); Md. Code Ann., Pub. Util. § 7-704.1(a)(1)(i) (8,500 MW by 2031); Me. Rev. Stat. Ann. tit. 35-A, § 3404(2) (3,000 MW by 2040); N.J. Stat. Ann. § 48:3-87(d)(2) (3,500 MW by 2030).

[4] N.Y. Pub. Serv. Law § 66-p(2) (70% by 2030); Mass. Gen. Laws ch. 25A, § 11F(a) (annually increasing percentage); Wash. Rev. Code § 19.405.010(2) (100% by 2045); Conn. Gen. Stat. § 16-245a(a)(25) (33% by 2030); Del. Code Ann. tit. 26, § 354(a) (40% by 2035); 20 Ill. Comp. Stat. 3855 / 1-75(c)(1)(B) (40% by 2030, 50% by 2040); Me. Rev. Stat. Ann. tit. 35-A,(1-A)(A) § 3210 (80% by 2030); Minn. Stat. § 216B.1691(2g) (2025) (100% by 2040); Md. Code. Ann., Pub. Util. § 7-703(b)(25) (50% by 2030); 39 R.I. Gen. Laws § 39-26-4 (100% by 2033); N.J. Stat. § 14:8-1 – 14:8-2 (50% by 2030); D.C. Code Ann. § 34-1432 (100% by 2032); Cal. Pub. Util. Code § 399 (100% by 2045); N.M. Stat. Ann. § 62-16-4(A)(3) (40% by 2025, 100% by 2040); Or. Rev. Stat. Ann. § 469A.410(1)(c) (100% by 2040); 2023 Mich. Pub. Act 235 (100% by 2040).

scale solar and onshore wind remain the most cost-effective forms of new-build energy generation" even when tax subsidies are not included. Lazard, *Lazard Releases Levelized Cost of Energy+ Report* (June 1, 2025), https://perma.cc/989X-5TVX. The report further found that "renewable energy will continue to play a key role in the buildout of new power generation in the U.S. as the lowest-cost and quickest-to-deploy generation." *Id.* Furthermore, unlike fuel-dependent generation, renewable energy projects lock in predictable costs over the life of their contracts (typically 10–25 years), insulating ratepayers from fuel price volatility and supply disruptions. By impeding renewable energy deployment, the Anti-Renewable Actions expose ratepayers to potentially higher long-term energy prices, increase reliance on more volatile and capital-intensive alternatives, and risk future capacity shortfalls as future demand increases. Facilitating cost-effective generation that stabilizes prices and improves reliability aligns with longstanding state efforts to protect ratepayers and secure grid reliability.

By contrast, the Lazard report noted that "the cost of building a new combined cycle gas turbine has reached a 10-year high," due to turbine shortages, rising costs, and long delivery times. *Id.* The report forecasts "steep" increases in the cost of electricity for gas technologies in the near term. *Id.* Additionally, public reports suggest that the supply of equipment (*e.g.*, gas turbines) that would support other forms of new energy generation are experiencing major backlogs, impeding the ability to build such electricity generation projects in the short or even medium term. *See, e.g.*, Stephen Stapczynski et al., *AI-Driven Demand for Gas Turbines Risks a New Energy Crunch*, Bloomberg (Oct. 2, 2025), https://perma.cc/GY3Z-U9Z4.

In light of these economic and practical realities, the vast majority of projects that are currently in the process of interconnecting into Amici States' electric systems are wind, solar and energy storage projects. *See* New York Independent System Operator, Inc., *2025 Load & Capacity*

*Data Report*, at 117-28 (released April 2025), https://perma.cc/8937-U56R. Indeed, the U.S. Energy Information Administration projected in February 2025, that wind, solar, and battery storage would make up 93% of new utility-scale capacity additions in 2025, with natural gas accounting for only 7% of new capacity. *See* U.S. Energy Info. Admin., *Solar, Battery Storage to Lead New U.S. Generating Capacity Additions in 2025* (Feb. 24, 2025), https://perma.cc/5RKK-EL49. While the Anti-Renewable Actions are plainly intended to suppress the contribution of wind and solar to serve future energy demand growth, data show that the alternatives are likely to take longer to come online.

The costs wrought by the Anti-Renewable Actions have serious implications for State Amici and our residents. Without offshore wind, for example, the independent operator of New England's energy grid (commonly referred to as ISO-NE) has estimated that energy costs in the New England region could increase by approximately 50% by 2050. *See* Richard Kornitsky & Ellie Ross, *2024 Economic Study*, ISO-NE, at 22–25 (Mar. 19, 2025), https://perma.cc/EDS6-NJZJ. Similarly, research has shown that solar and storage additions in New England between 2025 and 2030, which are jeopardized by the Anti-Renewable Actions challenged here, would save an estimated $684 million for ratepayers in 2030 alone. *See* Solar Energy Indus. Ass'n, *Powered Up: Evaluating the Year-Round Benefits of Solar and Storage in Massachusetts* (Dec. 11, 2025) ("Powered Up Study"), https://perma.cc/F63P-JG57.

The Anti-Renewable Actions are also harming ratepayers in New York, where developers of solar and wind projects are being forced to redesign their projects in costly and inefficient ways to avoid the need for federal agency approval. *See, e.g.*, Pls. Joint Decl. Supp. Mot. Prelim. Inj., ¶¶ 92–98 (Canisteo Wind Project), ¶¶ 163–71 (Rich Road Solar Projects), ECF No. 37. These design alternatives may be significantly more expensive than original project configuration—for

example, by requiring additional access roads to create patchwork projects that avoid land under federal jurisdiction and therefore fail to achieve economies of scale. In addition, the redesign process itself can be expensive and may significantly delay development and construction timelines. These delays can drive up costs, including by increasing interest payments and potentially preventing projects from taking advantage of federal tax credits that are scheduled to expire soon. Because the costs of such redesigns are ultimately incorporated into New York's competitive renewable energy solicitations, they result in more expensive long-term offtake agreements and higher costs to New York ratepayers. In other cases, no design alternatives may be available due to prohibitive expense or technical infeasibility. In such cases, projects will fail to advance so long as the Anti-Renewable Actions remain in place.

Additionally, through implementation of their energy policies, Amici States rely on wind and solar energy as part of an energy portfolio that maintains grid reliability in a cost-effective manner and, as explained, have planned to continue increasing their development and use of these energy resources going forward to serve reliability needs. In New England and New York, for example, offshore wind performs at its highest capacity during the winter months and is particularly important for ensuring energy reliability during peak cold periods. *See* ISO-NE, *High-Level Assessment of Potential Impacts of Offshore Wind Additions to the New England Power System During the 2017-2018 Cold Spell*, 3 (Dec. 17, 2018), https://perma.cc/YG4T-AQ6Z. Indeed, ISO-NE recently explained that New England has been "counting on offshore wind as a major new source of energy," and internal studies have shown "substantial reliability benefits" for the energy grid. *Keeping the Lights On: Examining the State of Regional Grid Reliability: Hearing Before the Subcomm. on Energy*, 119th Cong. 35-44 (Mar. 25, 2025) (statement of Gordon van Welie, President & CEO, ISO New England), https://perma.cc/9KWE-EGQA.

By delaying and even blocking the development of wind and solar energy projects, the Anti-Renewable Actions challenged here imperil Amici States' ability to maintain grid reliability, keep energy costs affordable, and achieve our renewable energy targets amid rapidly increasing demand for electricity. For example, in August 2025, when Defendants issued a stop-work order related to an offshore wind project in New England, ISO-NE stated publicly that "[d]elaying the project will increase risks to reliability." *See* Press Release, ISO-NE, Statement on Revolution Wind Stop Work Order (Aug. 25, 2025), https://perma.cc/VS2M-5WQC. Four months later, after the Department of the Interior announced that it was suspending offshore wind leases, ISO-NE stated that offshore wind projects in New England are "particularly important to system reliability in the winter when offshore wind output is highest and other forms of fuel supply are constrained." *See* Press Release, ISO-NE, Statement on Department of the Interior Offshore Wind Announcement (Dec. 22, 2025), https://perma.cc/P6PR-GRL7. ISO-NE further explained that while there may be enough generation capacity available for the current season, "canceling or delaying these projects will increase costs and risks to reliability in [the] region." *See id.*

New York's 2025 State Energy Plan also has warned that delays in obtaining permits for renewable energy projects are already affecting the State's energy policy. The plan found that, due to delays in offshore wind development, which have been greatly exacerbated by ongoing federal efforts to block offshore wind projects, the State will need to repower three gigawatts of fossil-fueled generation capacity in New York City by 2035. 2025 New York State Energy Plan, Vol. I, at 32. Without near-term renewable energy additions, the plan further explained, a significant buildout of additional gas generation will be needed by 2030—which may now be impracticable given the supply chain backlogs for gas turbines. *Id.*, Vol. II, at 26–27. This untenable situation risks undermining the supply of reliable and affordable energy going forward.

9

Preliminary relief thus will serve the public interest by preventing the Anti-Renewable Actions from undermining Amici States' ability to further their energy policies and cost-effectively maintain grid reliability through wind and solar energy projects.

**B. The Anti-Renewable Actions Will Inflict Significant Harms on Amici States' Economies and Job Markets.**

Amici States will also suffer irreparable economic harms if the Anti-Renewable Actions are not preliminarily enjoined. *See New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301, at *4 (D. Mass. Dec. 8, 2025) (finding that federal government's indefinite suspension of permitting actions for wind projects would harm plaintiff States by reducing or deferring tax revenue and investments).

Our States have invested billions of dollars in clean-energy infrastructure, research and development, job-training programs, and supply chains—all of which are at risk of becoming stranded investments or severely diminishing in value if Defendants are allowed to continue to unlawfully obstruct clean energy permitting and development. As one example, Massachusetts spent $75 million to convert a coal-fired power plant into an offshore wind marshalling port for assembling turbine components before loading—an investment that could become stranded if Defendants are allowed to arbitrarily impede offshore wind development. *See* Press Release, Massachusetts Clean Energy Center, *Baker-Polito Administration Announces $180M in Funding Through the Offshore Wind Ports Infrastructure Investment Challenge and Administration Releases the 2022 Clean Energy Industry Report* (Dec. 22, 2022), https://perma.cc/V2RZ-7XQL.

In addition to jeopardizing state investments, the Anti-Renewable Actions put our States at risk of losing large sources of revenue. In Arizona, for example, the State Land Department earns revenues by leasing or selling certain state-owned lands to renewable energy projects. *See, e.g.*, Letter from Commissioner Robyn Sahid to Governor Katie Hobbs (Sep. 16, 2024),

https://perma.cc/46P6-ZCEF. Lease and sale revenues are an important source of funding for Arizona's K-12 public-education system and its three state universities. *See* Arizona State Land Dep't, State Trust Land Beneficiaries, https://perma.cc/92TK-HNAZ. Multiple clean energy projects are currently in the process of being developed on state-owned land in Arizona, which are expected to provide tens of millions of dollars to Arizona's public-education system. *See, e.g.*, Longroad Energy, Agua Fria Solar, Storage, and Gen-Tie Project, https://perma.cc/7NK9-5CNN; RWE Renewables Development, LLC, Notice of Filing Application for Certificates of Environmental Compatibility, Arizona Corporation Comm'n (Jul. 24, 2023), https://perma.cc/Y2RE-FNJA. But Defendants' actions have stifled the permitting process, endangering the viability of these projects and any revenue they are expected to produce.

Other Amici States similarly stand to lose billions of dollars in financial commitments and tax revenue from renewable energy projects if the Anti-Renewable Actions are not enjoined. For example, in California, offshore wind development was expected to generate over $1.8 billion in cumulative state and local tax revenue during the construction and installation phases alone. E2, *California's Offshore Wind Opportunity* (Feb. 2023), https://perma.cc/6GNT-QA4T. In Washington, renewable energy projects provided local counties with over $13.8 million dollars in tax revenues in 2024. Renewable Northwest, *Economic Benefits of Renewable Energy in Washington* (2025), https://perma.cc/2HX7-PPSE. Colorado wind development projects generated more than $10 million in state and local tax dollars in 2022, and more than $18 million annually goes to Colorado residents directly in the form of land lease payments. American Clean Power Association, *Wind Energy in Colorado* (2022), https://perma.cc/FMU7-Y6P7. These revenue streams are now at risk due to Defendants' actions.

By obstructing the development of clean-energy projects, the Anti-Renewable Actions also jeopardize significant employment opportunities within Amici States. For example, in 2024, California and New York were the two States with the most renewable electric power generation jobs in the United States, at 147,161 and 27,384 jobs respectively. U.S. Dep't of Energy, Energy Employment by State 2024, United States Energy & Employment Report (Aug. 2024), https://perma.cc/NW77-73B3. The Anti-Renewable Actions put these jobs and future employment opportunities at risk, as wind and solar projects become increasingly difficult or even impossible to build. Other economic benefits these projects provide that are being thwarted by the Anti-Renewable Actions include local investments by project developers, electricity bill credits, and other direct payments to host communities.

In sum, the public interest weighs heavily in favor of preliminary relief to prevent the Anti-Renewable Actions from stifling the otherwise fast growth of wind and solar project development, to the detriment of Amici States' economies and clean energy workforce.

### C. The Anti-Renewable Actions Will Cause Environmental and Public Health Harms to Amici States and Our Residents.

Absent preliminary relief, the Anti-Renewable Actions will further harm Amici States and the public interest by delaying our ability to transition away from energy resources that produce high levels of greenhouse gas emissions and other pollutants, thereby exacerbating the devastating effects of climate change and other environmental and public health harms. A recent study, for example, estimated that solar and storage additions in New England between 2025 and 2030 will provide between $432 and $721 million in avoided greenhouse gas emissions in the year 2030. *See* Powered Up Study, *supra* at 7. Similarly, Maryland estimates that one planned offshore wind project, which is threatened by the Anti-Renewable Actions, will supply enough electricity to avoid millions of tons of greenhouse gases over the first twenty years of operation; in addition, by

12

displacing fossil fuel combustion, it will reduce emissions of conventional air pollutants that harm human health, such as nitrogen oxides, sulfur dioxide, particulate matter, and volatile organic compounds, resulting in approximately $275 million in total health savings over that period. *See* Order No. 91496, Public Serv. Comm'n of Maryland (Jan. 24, 2025), https://perma.cc/V25C-RMWD.

Allowing the Anti-Renewable Actions to undermine Amici States' wind and solar energy projects would jeopardize hundreds of millions of dollars in emission-reduction benefits across Amici States. As a result, our States will continue to experience the severe negative effects of climate change, including damage and destruction to state-owned property and infrastructure from severe weather events, strain on public resources and services, and public health harms. For example, as a result of climate change, States have experienced severe weather phenomena, including more frequent and intense storms, flooding, heat waves, droughts, and wildfires. *See Massachusetts v. EPA*, 549 U.S. 497, 521–23 (2007); *Natural Res. Def. Council v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020). In 2024, for instance, California experienced over 8,100 wildfires, resulting in more than 1 million acres burned. *See* California Dep't of Forestry and Fire Protection, 2024 Incident Archive, https://perma.cc/AA2S-UGYQ. In January 2025 alone, the greater Los Angeles area experienced wildfires that burned over 40,000 acres, destroying thousands of homes, businesses, and community institutions. *See* Los Angeles Cnty. Econ. Dev. Corp., *Impact of 2025 Los Angeles Wildfires and Comparative Study* (Feb. 2025), https://perma.cc/E23H-C6LL.

Amici States located in the Northeast have not been spared from the environmental harms caused by climate change. Warming oceans and more frequent and intense precipitation have increased the risk of flooding across the region. *See* Allison R. Crimmins et al., U.S. Global Change Research Program, *Fifth National Climate Assessment* (Nov. 14, 2023), https://perma.cc/KZM3-

RAGY. One study published in 2021 on economic damage from Hurricane Sandy found that climate change greatly exacerbated the destructiveness of the storm: the 9.6 centimeters of sea level rise driven by climate change caused an additional $8.1 billion of property damage in Connecticut, New Jersey, and New York and exposed an additional 70,600 people and 36,000 homes to coastal flooding. Benjamin H. Strauss et al., *Economic Damages from Hurricane Sandy Attributable to Sea Level Rise Caused by Anthropogenic Climate Change*, Nature Communications (May 21, 2021), https://perma.cc/878B-3UZ7. In Massachusetts, coastal property damage is expected to reach over $1 billion a year, on average, by the 2070s, with over 70% of the damage occurring in the Boston Harbor region, where a large portion of the Commonwealth's commercial economic base is located. Massachusetts Climate Change Assessment Volume II – Statewide Report 72 (2022), https://perma.cc/6TLU-CZR3. By impeding the development of emission-reducing wind and solar projects, the Anti-Renewable Actions risk exacerbating climate change's negative effects on public health in Amici States, ranging from injuries and deaths related to extreme weather events to increased respiratory and cardiovascular disease related to pollution.

The Anti-Renewable Actions also risk exacerbating the public health harms of conventional air pollution from fossil fuel plants. One recent report estimates that the health costs caused by fossil fuel pollution currently exceed $820 billion *each year* in the United States, and that such pollution causes around 107,000 premature deaths annually. *See* The Medical Society Consortium on Climate & Health et al., *The Costs of Inaction: The Economic Burden of Fossil Fuels and Climate Change on Health in the United States*, at 5 (May 20, 2021), https://perma.cc/VS6U-YJFQ. Preliminary relief is warranted to prevent the Anti-Renewable Actions from undermining Amici States' efforts to use increased wind and solar energy generation to help ameliorate these severe public health and environmental harms.

14

II.    **Plaintiffs Are Likely to Succeed on the Merits of Their Challenge to the Anti-Renewable Actions Because, Among Other Reasons, Defendants Failed to Consider Substantial Reliance Interests.**

Amici States agree with Plaintiffs that the Anti-Renewable Actions violate federal law and the APA because they exceed the agencies' statutory authority and are arbitrary and capricious on the merits. *See* 5 U.S.C. § 706 (2)(A), (C), (D). Amici States emphasize here one defect in particular. Specifically, the Anti-Renewable Actions are arbitrary and capricious because Defendants' prior policies, which encouraged the development of wind and solar projects, engendered serious reliance interests, and Defendants failed to consider those interests or to provide a detailed justification for their drastic change in policies. *See Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *accord Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). Relevant reliance interests include those of third parties like the Amici States who are affected by Defendants' change in policies. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31–32 (2020).

The Anti-Renewable Actions implicate substantial reliance interests. As explained above, in planning current and future energy production, Amici States have relied heavily on Defendants' prior policies toward wind and solar energy projects. Over multiple decades, Defendants' policies encouraged investments in wind and solar energy projects and the permitting of those projects, subject to specific regulations and procedures that were adopted based on reasoned consideration and rigorous study. Amici States and businesses in those States accordingly invested billions of dollars into the wind and solar industries to meet energy needs, reduce ratepayer costs, spur employment opportunities and economic growth, and ameliorate the acute public health and environmental harms caused by fossil fuel energy sources. *See supra* at 4–14. Despite these significant reliance interests, Defendants failed to provide any explanation—much less the more

detailed one required in such circumstances—for abruptly changing course and seeking to delay and block development of wind and solar projects through the Anti-Renewable Actions. *See Housatonic River Initiative*, 75 F.4th at 270; *American Hospital Ass'n v. Kennedy*, No. 25-2236, 2026 WL 49499, at *3 (1st Cir. Jan. 7, 2026) (finding APA violation where the record was "devoid of evidence that the federal government considered … significant reliance interests—a critical factor in the analysis of an arbitrary-and-capricious claim"). Defendants' failure to conduct the required reliance analysis violates the APA. *See* 5 U.S.C. § 706(2)(A), (D). Plaintiffs' likelihood of success on the merits thus further supports issuance of a preliminary injunction or temporary stay under 5 U.S.C. § 705.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' motion, the Court should grant Plaintiffs' request for a preliminary injunction or temporary stay.

Dated: February 11, 2026

LETITIA JAMES
  Attorney General of New York


Barbara D. Underwood
  *Solicitor General*
Judith N. Vale
  *Deputy Solicitor General*
Raymond D. Moss
  *Assistant Solicitor General*
Rene F. Hertzog
Matthew Eisenson
  *Assistant Attorneys General*
  Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-6274
judith.vale@ag.ny.gov

*Counsel for the State of New York*

Respectfully submitted,

ANDREA JOY CAMPBELL
  Attorney General of Massachusetts

/s/ Nathaniel Haviland-Markowitz
Turner Smith, BBO No. 684750
  *Deputy Chief & Assistant Attorney General*
Nathaniel Haviland-Markowitz, BBO No. 713940
  *Assistant Attorney General*
Jon Whitney, BBO No. 694760
  *Special Assistant Attorney General*
Energy and Environment Bureau
One Ashburton Place
Boston, MA 02108
(617) 727-2200
nathaniel.haviland-markowitz@mass.gov

*Counsel for the Commonwealth of Massachusetts*

KRIS MAYES
*Attorney General*
*State of Arizona*
2005 N Central Ave
Phoenix, AZ 85004

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W.
Washington, D.C. 20001

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, Maryland 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
445 Minnesota Street
St. Paul, MN 55101

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

JENNIFER DAVENPORT
*Acting Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

17

JEFF JACKSON
*Attorney General*
*State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

## CERTIFICATE OF SERVICE

     I, Nathaniel Haviland-Markowitz, hereby certify that I have this day, February 11, 2026, served the forgoing document upon all parties of record, by electronically filing to all ECF-parties and by sending a copy, first-class mail, postage prepaid to all unregistered parties.

/s/ Nathaniel Haviland-Markowitz
Nathaniel Haviland-Markowitz
Assistant Attorney General
Commonwealth of Massachusetts
