**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RENEW NORTHEAST, et al <br><br> *Plaintiffs,* <br><br> *v.* <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, et al <br><br> *Defendants*. | Civil Action No. 1:25-cv-13961 <br> ***Leave to file granted on February 11, 2026*** |

**BRIEF OF *AMICI CURIAE* CENTER FOR RURAL AFFAIRS, SOLAR UNITED NEIGHBORS, RENEW MISSOURI AND CURE IN SUPPORT OF THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES …………………………………………………………….. iii

RULE 7.1 CORPORATE DISCLOSURE STATEMENT ……..…………………………. iv

INTERESTS OF AMICI CURIAE…………………………………………….…….…… 1

PRELIMINARY STATEMENT…………………………………………………….. 2

ARGUMENT ………………………………………………………………… 4

I.      The Anti-Renewable Actions Adversely Impact the Property Rights
        of Rural Landowners ….…………………………………………………… 4

II.     The Anti-Renewable Actions Have Significant Economic Implications
        for Rural Landowners …………………………………………………… 5

III.    The Anti-Renewable Actions May Harm the Character of Rural Communities ……….. 8

CONCLUSION ……………………………………………………………….. 10

CERTIFICATE OF COMPLIANCE …………………………………………… 11

CERTIFICATE OF SERVICE …………………………………………………... 12

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Kaiser Aetna v. United States*,
    444 U.S. 164, 176 (1979)……………………………………………… 4

*Loretto v. Teleprompter Manhattan Catv Corp.*,
    458 U.S. 419, 435 (1982)……………………………………………… 4

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003, 1014–19 (1992)……………………………………… 4

*Murr v. Wisconsin*,
    582 U.S. 383, 387 (2017) ……………………………………………. 5

*Sackett v. Environmental Protection Agency*,
    598 U.S. 651, 670 (2023) …………………………………………… 4

**RULE 7.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel of record for

*Amici Curiae* Center for Rural Affairs, Solar United Neighbors, Renew Missouri and CURE

certify that none of the *Amici* (all private, not-for-profit, non-governmental organizations) has a

corporate parent, subsidiary, or affiliate, and that none issues stock to the public.

**INTERESTS OF AMICI CURIAE**

Amici are regional and national nonprofit organizations who have an interest in protecting property rights, economic liberty, and the ability of private landowners to make productive and efficient use of their land, and who are dedicated to advancing clean energy development in rural communities. Amici and their members are directly and adversely affected when federal policies and actions restrict lawful, voluntary land uses and impede the deployment of renewable energy infrastructure, including wind and solar facilities.

The Center for Rural Affairs is a nonprofit organization that works to support rural communities in Nebraska, Iowa, Minnesota, and South Dakota. The Center for Rural Affairs' mission is to cultivate strong communities rooted in social and economic justice, environmental stewardship, and opportunity for all.

Solar United Neighbors (SUN) is a nonprofit organization dedicated to representing the needs and interests of clean energy supporters in Arizona, Colorado, Florida, Indiana, Maryland, Minnesota, Nevada, Ohio, Pennsylvania, Puerto Rico, Texas, Virginia, West Virginia, and the District of Columbia. SUN is working to build a clean, equitable energy system across the nation that directs control and benefits back to homeowners, renters, farmers, small business owners, and local communities.

Renew Missouri is a nonprofit organization committed to clean energy advocacy throughout the state of Missouri. Renew Missouri works directly with rural landowners and community leaders to educate on the benefits of clean energy and advance the deployment of renewables in rural communities. Renew Missouri also works with rural electric cooperative member-owners to help transform their utilities into a force for economic development.

1

Clean Up the River Environment (CURE) is a nonprofit organization dedicated to improving the well-being of the community, the health of land and water, and the legacy for future generations. In Minnesota and neighboring states, CURE works in climate, sustainability, water, and energy with a focus on rural energy democracy. CURE's members are largely rural landowners and member-owners of rural electric cooperatives that support clean energy development on private lands.

Amici have a strong interest in rural land development because responsible land use decisions shape economic sustainability, community stability, environmental stewardship, and generational continuity.

Amici submit this brief to assist the Court by explaining how federal restrictions on solar and wind energy development affect private landowners and rural communities by constraining land use choices, eliminating income opportunities, and harming rural character. The implications of the federal actions at issue in this litigation extend beyond the immediate parties and bear directly on the rural landowners' ability to use their land profitably and in their own best interests.[1]

## PRELIMINARY STATEMENT

Plaintiffs are challenging six final federal agency actions (the Anti-Renewable Actions) as "arbitrary and capricious" violations of the Administrative Procedure Act, 5 U.S.C. §§ 500-596; 701-706 (APA). Three of these Anti-Renewable Actions — i) the September 18, 2025 "U.S. Army Corps of Engineers re: Direction on Reviewing Permit Applications Related to

---

[1] Amici affirm that no counsel for a party authored this brief in whole or in part, and no person other than Amici or their counsel made any monetary contributions intended to fund the preparation or submission of the brief. Fed. R. App. P. §29(a)(4)(E).

Energy Generation Projects, Department of the Army" (Corps' Anti-Renewable Memorandum); ii) the August 4, 2025 "Ensuring Compliance with the Bald and Golden Eagle Protection Act and Executive Order 14315" (Eagle Take Permit Ban); and iii) the July 15, 2025 final decision on the IPaC Information for Planning and Consultation, U.S. Fish & Wildlife Service database (Wind and Solar IPaC Ban) — directly affect private property, and rural landowners and communities in particular, by stacking the deck against permitting wind and solar energy facilities on private land, effectively limiting lawful land use choices, foreclosing significant economic opportunities, and constraining rural development. Plaintiffs' Br. at 9 – 15.

Wind and solar projects located on private lands are often subject to federal permitting processes. *See* Charles River Associates (CRA) Report at 4 – 5 (Ex. M to Plaintiffs' Br.).  Here, the Corps' Anti-Renewable Memorandum categorically disadvantages rural wind and solar facilities, including those sited on private land, because it requires the Corps to prioritize projects with high "per acre" energy generation when reviewing applications for individual permits under Section 404 of the Clean Water Act (CWA) and Section 10 of the Rivers and Harbors Act (RHA). Plaintiffs' Br. at 9 – 11. The Eagle Take Permit Ban increases the legal risk and expense associated with developing and operating wind energy facilities on rural land by prohibiting wind facilities from obtaining permits authorizing the incidental "take" of both eagle species under the Bald and Golden Eagle Protection Act, which makes leases on private land far less likely. Plaintiffs' Br. at 11 – 13. The Wind and Solar IPaC Ban precludes wind and solar developers from accessing IPaC data, impeding their ability to mitigate wildlife impacts and obtain critical permits for renewable energy facilities on private property in rural areas – as elsewhere. Plaintiffs' Br. at 13 – 15.

These three Anti-Renewable Actions place broad, federal restrictions on the permitting and siting of clean energy facilities on private land and thereby limit rural landowners' voluntary and economically beneficial uses of their property. These unnecessary and arbitrary restraints on land-use autonomy, in turn, adversely impact the economies and character of rural communities. Amici respectfully urge the Court to consider these concerns when evaluating the merits of the Complaint, the harms caused by the Anti-Renewable Actions challenged by the plaintiffs, and the public interest in enjoining them.

## ARGUMENT

**I.     The Anti-Renewable Actions Adversely Impact the Property Rights of Rural Landowners**

Private property ownership has long been understood to encompass a suite of rights, including the authority to determine lawful uses of land, to exclude others, and to derive economic benefit from one's property. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014–19 (1992); *Loretto v. Teleprompter Manhattan Catv Corp.*, 458 U.S. 419, 435 (1982); *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). Where federal actions functionally prohibit lawful uses of land, thus narrowing the traditional bundle of property rights and limiting contractual freedom, courts should carefully scrutinize such restrictions to ensure they have a rational basis, are not arbitrary and capricious, and conform to the protections afforded by required administrative procedures.

In *Sackett v. Environmental Protection Agency*, a majority of the United States Supreme Court, concerned about the "staggering array of landowners" at risk of the Army Corps' and EPA's regulatory reach over wetlands, asked, "What are landowners to do if they want to build on their property?" 598 U.S. 651, 670 (2023). The same question pertains here. The Anti-

4

Renewable Actions—especially the Corps' Anti-Renewable Memorandum, the Eagle Take Permit Ban, and the Wind and Solar IPaC Ban—have effectively destroyed rural landowners' ability to lease their private property for solar and wind energy development. Rural landowners thus have been and are unable to derive the economic benefits of participating as lessors to clean energy development projects because those projects cannot satisfy the "capacity density" criteria improperly applied to CWA Section 404 and HRA Section 10 permitting decisions, cannot obtain incidental take permits for eagles, and cannot even access the data necessary to determine whether any protected species are present on the property. Plaintiffs' Br. at 45 – 47.

In *Murr v. Wisconsin*, the Supreme Court affirmed that the government does not hold "unfettered authority to shape and define property rights and reasonable investment-backed expectations, leaving landowners without recourse against unreasonable regulations." *Murr v. Wisconsin*, 582 U.S. 383, 387 (2017). Here, these Anti-Renewable Actions seek to use just such an "unfettered authority," resulting in financial instability for rural landowners and their families, an inability to preserve the desired use of their property for future generations, and downstream effects on their communities. And, as plaintiffs persuasively demonstrate in their brief, it does so without adequate procedures or a fulsome, rational explanation. Plaintiffs Br. at 28 – 37.

## II.     The Anti-Renewable Actions Have Significant Economic Implications for Rural Landowners

Federal agencies may, of course, regulate land use in pursuit of legitimate legislative objectives. However, agency actions that broadly eliminate lawful income opportunities for property owners raise, at a minimum, questions of fairness that demand conformance with substantive and procedural requirements imposed by federal law. Here, these Anti-Renewable

Actions impose additional barriers and financial risks on wind and solar energy development that substantially disincentivize and hinder the siting, permitting, and construction of new facilities. As noted by the plaintiffs, experts have estimated that the Anti-Renewable Actions all together have already resulted in the cancellation or delay of approximately 57.2 gigawatts (GW) of wind and solar projects located on both private and public lands. These delays and cancellations have compromised private investments of at least $905 million. Plaintiffs' Br. at 41 – 42.

Given that large-scale wind and solar generation is frequently sited in rural areas with abundant land resources, such disincentives have very real repercussions for rural landowners — who are precluded from benefiting from significant and sustainable economic opportunities, including land lease payments and indirect benefits from increased state and local tax revenue.

Many rural property owners rely on voluntary lease agreements with renewable energy developers to generate necessary supplemental income, given the volatile and often decreasing profitability of the farming business due to excessive operational costs, low commodity prices, and market instability. Across the nation, private landowners receive approximately $3 billion annually in land lease payments for the development of wind, solar, and battery energy storage facilities.[2] The revenues from solar and/or wind farm leasing provide financial stability and diversify household income during times of economic uncertainty. This supplemental income allows farming families to maintain their property, avoid relocation, secure generational ownership of the land, honor the agricultural legacy of their land, and plan for retirement with greater confidence. Denying rural landowners access to these lease payments may force many to

---

[2] The estimate of $3 billion represents the U.S. total annual land lease payments paid by developers of wind, solar and battery storage facilities through the third fiscal quarter of 2025. *See* Clean Power State by State, The American Clean Power Association, https://cleanpower.org/facts/state-fact-sheets/ (last visited January 14, 2026).

delay necessary investments, scale back production, or forego conservation initiatives that provide long-term benefits to both their land and surrounding communities.

These individual financial losses also ripple outward, affecting the broader economic health of rural communities. On average, state and local governments receive approximately $2.8 billion annually in tax revenue from renewable energy development.[3] The increased tax revenue provides funding to finance critical municipal services, including investing in the public school, transportation and health sectors in rural communities. In addition, wind and solar development may spur indirect economic activity, allowing landowners to spend more on local goods and services. When federal restrictions impede solar and wind development, this broader economic activity will be curtailed, reducing business revenues and diminishing the benefits to the community.

The projected downstream effects of the Anti-Renewable Actions hit rural communities in other ways, as well. For instance, Charles River Associates projects that they will result in increased  wholesale electricity costs of approximately $87 million, increasing to an estimated $4.6 billion over time. CRA Rep. at 2, 23. These costs will be borne primarily by residential consumers and businesses, causing direct additional financial strain on the population as a whole, including rural landowners and communities. Charles River Associates also projects significant employment and income losses due to the decrease in direct construction and operations jobs that are typically generated by clean energy facilities – losses which will, again, be borne by rural America. *See* CRA Rep. at 2, 29.

---

[3] The estimate of $2.8 billion represents the U.S. total annual paid by developers in property, state and local taxes through the third fiscal quarter of 2025. *See* Clean Power State by State, The American Clean Power Association, https://cleanpower.org/facts/state-fact-sheets/ (last visited January 14, 2026).

7

In short, the challenged Anti-Renewable Actions not only deprive rural landowners of lawfully earned, supplemental income but also impose new costs and weaken the overall economic resilience of the communities in which clean energy generation facilities would otherwise be sited.

### III.    The Anti-Renewable Actions May Harm the Character of Rural Communities

Rural landowners, in choosing how to use their land, have traditionally played a pivotal role in shaping the character of their communities. Here, the Anti-Renewable Actions unjustifiably restrict and disincentivize lawful income-generating wind and solar land uses.

In creating these impediments to development, the Anti-Renewable Actions perpetuate the misconception that renewable energy development is incompatible with rural character. But supplemental income from lawful wind and solar development often enable farming families to retain property during periods of economic hardship, retirement, or other life transitions — thus allowing families to keep their land within the household across generations. Moreover, wind and solar development actually preserve the agrarian character of rural communities for the next generation of farmers.[4] Many renewable energy facilities are fully compatible with continued agricultural use, which reinforces the economic benefits without disrupting traditional land practices.

Wind turbines and solar installations, including pasture-compatible and agrivoltaics designs, generally occupy a limited physical footprint, allowing crops, grazing, and normal farm

---

[4] *Beneath Solar Panels, the Seeds of Opportunity Sprout,* National Laboratory of the Rockies, https://www.nrel.gov/news/feature/2019/beneath-solar-panels-the-seeds-of-opportunity-sprout (last visited January 16, 2026).

operations to continue beneath and around them.[5] These innovative practices allow for land regeneration during the operational life of the renewable installations. As of 2024, there were nearly 600 agrivoltaics sites operating across the nation with grazing, crop production, native and pollinator habitat, greenhouses, and sites that combine these activities.[6] At the end of their operational life, wind and solar facilities can be removed, with land restored to its prior condition and soils returned to agricultural use. This reversibility preserves the long-term character and identity of agricultural communities.

When wind and solar development opportunities are foreclosed, however, rural landowners face increased pressure to sell portions of their land to meet financial obligations. The loss of family-held lands, in turn, has profound consequences for rural communities. Open spaces and historic homesteads that contribute to local identity may be replaced by residential development, roads, or commercial structures incompatible with agrarian landscapes.[7] The financial pressures on rural landowners induced by these arbitrary, capricious and unexplained restrictions on private land use opportunities, can thereby translate into lasting economic, social, and infrastructural challenges for entire communities.

---

[5] Andrew, A., Hain, L., Barter, J., Goldberg, Z., Desario, A., Antoszewski, K., White, A., Roszell, C. (2025). *Sheep Grazing Impacts on Soil Health and Pasture Quality at Commercial Solar Sites in Northeastern USA: Solar Sheep Grazing and Site Conditions*. AgriVoltaics Conference Proceedings, 3., https://doi.org/10.52825/agripv.v3i.1402; *Growing Plants, Power, and Partnerships Through Agrivoltaics*, National Laboratory of the Rockies, https://www.nrel.gov/news/detail/program/2022/growing-plants-power-and-partnerships (last visited January 16, 2026).

[6] *Lighting the Way for Agrivoltaics*, National Laboratory of the Rockies, https://www.nrel.gov/news/feature/2024/lighting-the-way-for-agrivoltaics (last visited January 16, 2026).

[7] Between 2001 and 2016, 11 million acres of farmland and ranchland were irreversibly converted to urban and highly developed land use (4.1 million acres) or low-density residential land use (nearly 7 million acres). *Farms Under Threat: The State of the States (2020)*, American Farmland Trust, https://farmlandinfo.org/publications/farms-under-threat-the-state-of-the-states/. (last visited January 20, 2026).

**CONCLUSION**

Amici respectfully urge the Court to consider these property rights, economic, and community character concerns when evaluating the federal Anti-Renewable Actions challenged by the plaintiffs and, for the foregoing reasons, grant the motion.

Dated: February 20, 2026

Respectfully submitted,

/s/ John L. Fink

John L. Fink (BBO No. 683290)
Sims & Sims, LLP
130 Liberty Street, Bldg. 6
Brockton, MA 02301
(508) 588-6900
JohnFink@simsandsimsllp.com

/s/ Michael Burger

Michael Burger*
Sabin Center for Climate Change Law,
Columbia Law School
435 West 116th Street
New York, NY 10027
(212) 854-2372
mburger@law.columbia.edu

*Counsel for amici curiae Center for Rural Affairs, Solar United Neighbors, Renew Missouri and CURE*

*Admitted pro hac vice*

10

## CERTIFICATE OF COMPLIANCE

*Amici* certify that they have both used the Federal Rules of Appellate Procedure (Fed. R. App. P. 29(a)(5) and 32 (a)(7)(B)) and Local Rule 7.1(b)(4) for reference and have, accordingly, limited their brief to no more than 20 pages and fewer than 6,500 words.

Dated: February 20, 2026

/s/ Michael Burger
MICHAEL BURGER

11

**CERTIFICATE OF SERVICE**

I, Michael Burger, hereby certify that on this 20th day of February 2026, this *Amici Curiae* Brief was filed with the Clerk of the Court via the Court's electronic filing system, which will provide electronic mail notice to all counsel of record.

Dated: February 20, 2026

/s/ Michael Burger
MICHAEL BURGER