**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| RENEW NORTHEAST, *et al*, | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 1:25-cv-13961 |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*, | |
| *Defendants*. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION**
**FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

I.  Plaintiffs Are Likely To Succeed On The Merits Of Their APA Claims ......................... 3

   A.  Defendants Offer No Merits Defense To Any Of The Challenged Actions ............... 3

   B.  Defendants Cannot Shield Their Unlawful Actions From Judicial Review ............... 4

      1.  Each Of The Actions At Issue Here Is "Final" ............................................ 4

      2.  Each Of The Actions Is Ripe For Judicial Invalidation ................................. 9

      3.  Plaintiffs Have Standing To Challenge Each Final Action ............................ 11

II.  Plaintiffs And Their Members Face Imminent, Irreparable Harm Without A Preliminary Injunction ................................................................................. 13

III.  The Balance Of The Equities And Public Interest Favor Immediate Relief .................. 19

IV.  This Court Has Authority To Grant Plaintiffs Complete Relief ................................. 19

CONCLUSION ................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laby's. v. Gardner*,
  387 U.S. 136 (1967)..................................................................................... 9

*ACK for Whales, Inc. v. U.S. Dep't of Commerce*,
  No. 2:25-cv-1678 (D.D.C. Dec. 2, 2025) ................................................ 9

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021)..................................................................................... 14

*Ass'n of Am. Univs. v. Dep't of Defense*,
  792 F. Supp. 3d 143 (D. Mass. 2025) ........................................................ 20

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................................... 4, 5, 8

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  No.CV 17-8587-GW(ASX), 2019 WL 2635587 (C.D. Cal. June 20, 2019)............................. 9

*CropLife Am. v. EPA*,
  329 F.3d 876 (D.C. Cir. 2003) ....................................................... 6, 12, 13

*Doe v. Tr. of Bos. Coll.*,
  942 F.3d 527 (1st Cir. 2019)................................................................. 3, 4

*Doe v. Trump*,
  157 F.4th 36 (1st Cir. 2025).................................................................... 19

*E. Tenn. Nat. Gas Co. v. Sage*,
  361 F.3d 808 (4th Cir. 2004) ................................................................... 14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................. 2

*Haitian Evangelical Clergy Ass'n v. Trump*,
  789 F. Supp. 3d 255 (E.D.N.Y. 2025) ...................................................... 20

*In re Clean Water Act Rulemaking*,
  60 F.4th 583 (9th Cir. 2023) .................................................................. 7

*In re Fin. Oversight & Mgmt. Bd.*,
  110 F.4th 295 (1st Cir. 2024)................................................................. 13

*Jensen v. R.I. Cannabis Control Comm'n*,
  160 F.4th 18 (1st Cir. 2025)............................................................... 9, 10

*Liu v. Noem,*
 780 F. Supp. 3d 386 (D.N.H. 2025)....................................................................... 20

*Marasco & Nesselbush, LLP v. Collins,*
 6 F.4th 150 (1st Cir. 2021)................................................................................. 8

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,*
 915 F.3d 197 (4th Cir. 2019) ........................................................................ 14, 15

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
 397 F. Supp. 3d 430 (S.D.N.Y. 2019) ................................................................ 8, 9

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
 417 F.3d 1272 (D.C. Cir. 2005)............................................................................ 7

*Nat'l Min. Ass'n v. Jackson,*
 768 F. Supp. 2d 34 (D.D.C. 2011).......................................................... 6, 10, 13, 18

*Nat'l Envtl. Dev. Ass'n Clean Air Project v. EPA,*
 752 F.3d 999 (D.C. Cir. 2014 ............................................................................. 6

*New York v. McMahon,*
 784 F. Supp. 3d 311 (D. Mass. 2025) .................................................................. 19

*New York v. Trump,*
 No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ....................... 1, 4, 5, 8

*Ohio v. EPA,*
 603 U.S. 279 (2024).......................................................................................... 14

*Save Long Beach Island, Inc. v. U.S. Dep't of Comm.,*
 No. 1:25-cv-02211 (D.D.C. Sept. 26, 2025)............................................................. 9

*Save Long Beach Island, Inc. v. U.S. Dep't of Comm.*,
 No. 1:25-cv-02214 (D.D.C. Sept. 30, 2025)............................................................. 9

*Sierra Club v. Trump,*
 929 F.3d 670 (9th Cir. 2019) ............................................................................... 6

*Texas v. United States,*
 523 U.S. 296 (1998).......................................................................................... 11

*Toilet Goods Ass'n, Inc. v. Gardner,*
 387 U.S. 158 (1967).......................................................................................... 11

*Transcon. Gas Pipe Line Co., LLC v. Permanent Easement for 0.03 Acres*,
 No. 4:17-CV-00565, 2017 WL 3485752 (M.D. Pa. Aug. 15, 2017) ................................ 14, 15

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025)...................................................................................... 19, 20

*Trump v. Cook*, No. 25A312
   (U.S. Jan. 21, 2026) ........................................................................................ 2

*United States v. Zannino*,
   895 F.2d 1 (1st Cir. 1990)............................................................................... 4

*Wagafe v. Biden*,
   764 F. Supp. 3d 980 (W.D. Wash. 2025)...................................................... 6

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
   589 F.3d 458 (1st Cir. 2009)..................................................................... 10, 11

**Statutes**

5 U.S.C. § 555.................................................................................................... 17

5 U.S.C. § 558.................................................................................................... 17

5 U.S.C. § 704...................................................................................................... 4

5 U.S.C. § 706.................................................................................................... 17

**Other Authorities**

*Proposed 2020 Memo: DOI Secretarial Review of Oil & Gas Permits, an Inverse of DOI*
   *Secretary Doug Burgum's Solar & Wind July 2025 Memo*, Evergreen Action ........................ 2

*Trump to Repeal Landmark Finding in Huge Regulatory Rollback*, Wall St. J. (Feb. 9, 2026) .... 2

## INTRODUCTION

Plaintiffs have satisfied every requirement for a preliminary injunction. On the merits, Defendants' brief all but concedes that each of the Actions is unlawful. Defendants offer no justification for singling out wind and solar for a new and burdensome internal review regime, provide no reasoned explanation for disfavoring renewables via a novel "capacity density" metric, and make no attempt to reconcile their actions with Congress's statutory commands. While Defendants' merits arguments are virtually nonexistent, their jurisdictional and equities objections are meritless. Each challenged action is "final" because it consummates agency decision-making and alters the legal status quo by stalling wind and solar projects through bureaucratic hurdles applied only to wind and solar projects and unlawful "capacity density" tests gerrymandered to kill just those projects—no different from agencies' wholesale and indefinite refusal to make permitting decisions that this District recently determined to be final and unlawful in *New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025). The claims are also ripe because the Actions govern agency conduct and block or reshape specific projects, vacatur would remove these unlawful barriers and allow normal permitting to resume, and Plaintiffs need not await specific project decisions to seek judicial review. Plaintiffs also have standing, as their members face concrete and specific economic and operational injuries traceable to the Actions and redressable by an injunction restoring the status quo. As Plaintiffs' declarations explain, an injunction reinstating the prior predictable and legal permitting regime would remedy their harm.

Defendants' recent conduct underscores the speed with which a preliminary injunction would remedy the harms Plaintiffs' declarations detail. The day after Plaintiffs filed their preliminary injunction motion, Defendant United States Fish and Wildlife Service ("USFWS") revoked the Eagle Take Permit Ban by reenabling automatic issuance of eagle general permits for wind projects, and within days had cleared a backlog of pending applications. In other words,

when the unlawful final action is removed—whether by the agency's *sua sponte* reversal[1] or through a preliminary injunction—normal permitting resumes.

The stakes here go beyond Defendants' systematic, unlawful destruction of wind and solar projects—although that intended destruction is bad enough.  If agencies can get away with inflicting these Actions on wind and solar energy, a future Administration will use the same tools to attack other sources, creating a feedback loop that will destroy the Nation's energy grid.   As Justice Kavanaugh recently pointed out, once "tools are unleashed, they are used by both sides and usually more the second time around."[2]   One group has already created a mock-up of the Bottleneck Memorandum it would like to see targeting the oil and gas industry.[3]  No sources of energy can be planned, funded, and built in such a back-and-forth, lawless regime.[4]   The Administrative Procedure Act ("APA") and other laws that Congress has enacted forbid such unreasoned, discriminatory actions that attempt to pick winners and losers through bureaucratic fiat.

---

[1] Although Jerome Ford, Assistant Director for the Office of Migratory Bird Management within USFWS, claims that DOI ended the Eagle Take Permit Ban "to comply with the [December 8, 2025] court order in *New York v*[.] *Trump*," Dkt.63-1 ("Ford Dec.") ¶¶ 10–12, the fact that USFWS only reversed the Ban the day after Plaintiffs filed this preliminary injunction motion (and several weeks after the *New York* ruling) is telling.  In light of the reinstatement of this prior policy to avoid the present preliminary injunction motion, Plaintiffs no longer seek a preliminary injunction against the enforcement of the Ban, but do not drop the claim entirely because "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000) (citation omitted).

[2] Transcript of Oral Argument, *Trump v. Cook*, No. 25A312 at 51 (U.S. Jan. 21, 2026), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25a312_c0nd.pdf (all websites last visited Feb. 20, 2026).

[3] *See Proposed 2020 Memo: DOI Secretarial Review of Oil & Gas Permits, an Inverse of DOI Secretary Doug Burgum's Solar & Wind July 2025 Memo*, Evergreen Action, https://www.evergreenaction.com/documents/Proposed-2029-Memo.pdf.

[4] As Defendant Secretary of the Interior Burgum stated in a recent interview, "[e]nergy abundance is the thing that we have to focus on, *not regulating certain forms of energy out*." *Trump to Repeal Landmark Finding in Huge Regulatory Rollback*, Wall St. J. (Feb. 9, 2026), https://www.wsj.com/politics/policy/trump-to-repeal-landmark-climate-finding-in-huge-regulatory-rollback-ff7d58db?st=M5FyU5 (emphasis added).

## ARGUMENT

I.   **Plaintiffs Are Likely To Succeed On The Merits Of Their APA Claims**

   A.   **Defendants Offer No Merits Defense To Any Of The Challenged Actions**

1. As Plaintiffs have explained, each Action violates the APA for multiple reasons. Dkt.36 ("Br.") at 19–41. To name just a few, the Bottleneck Memorandum is arbitrary and capricious because it fails to provide *any* explanation for subjecting almost every step in the federal permitting process for wind and solar technologies (and just these technologies) to a new, onerous review regime. Br.20–21. The Federal Lands Anti-Renewable Ban and the Corps' Anti-Renewable Memorandum are illegal because they premise permitting decisions on a technology's "capacity density"—a methodologically flawed metric designed to disfavor wind and solar technologies— without any reasoned basis and in violation of multiple statutes. Br.24–26, 29–30. The IPaC Ban is unlawful because it arbitrarily frustrates wind and solar developers' access to this vital, taxpayer-supported resource. Br.36–37. And in addition to being arbitrary and capricious, the Zerzan/Jorjani Opinion is contrary to law because its "*de minimis* interference" standard contravenes the text and intent of the Outer Continental Shelf Lands Act ("OCSLA"). Br.27–28.

2. Defendants' 46-page Opposition remarkably offers no meaningful response to any of Plaintiffs' merits arguments, devoting less than a page to the merits, despite likelihood of success being "the most important of the four preliminary injunction factors." *Doe v. Tr. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019). Defendants merely assert that the Actions "reflect a rational exercise of the Secretary's broad authority," Dkt. 63 ("Opp.") at 43–44, and claim that none of the Actions are "legislative rules" subject to the notice-and-comment requirement, Opp.38. But Defendants fail to explain *how* each of these Actions is "rational" under the APA, *why* each Action is not legislative, or otherwise rebut Plaintiffs' numerous other merits arguments. And Defendants' footnoted assertion that the Actions do not "deviate from [ ] prior agency" rules or

policies, Opp.35 n.13, is simply wrong, given that the Actions each create new substantive requirements or procedural hurdles for only wind and solar projects. Defendants' failures to respond meaningfully to Plaintiffs' merits-based arguments constitute concessions, *accord United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), of this "most important" factor, *Tr. of Bos. Coll.*, 942 F.3d at 533, weighing heavily in favor of a preliminary injunction here.

### B. Defendants Cannot Shield Their Unlawful Actions From Judicial Review

#### 1. Each Of The Actions At Issue Here Is "Final"

a. Each of the Actions is "final" under the APA, 5 U.S.C. § 704, because each (1) marks the "consummation" of the relevant agency's "decision making process," and (2) creates significant "legal consequences" by indefinitely stalling or imposing new, insuperable barriers to the approval of wind and solar projects that need federal permits. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Just like the recently vacated implementation of the Wind Memorandum, each Action "'alter[s] the legal status quo' under which the relevant agencies previously processed applications for leases, permits, and other authorizations necessary for" renewable energy project development, *New York*, 2025 WL 3514301, at *8 (citation omitted), as Plaintiffs explained, *see* Br.19–20, 24, 28–29, 32, 35, 37–38; *see also* Supplemental Joint Declaration of Clean Energy Plaintiffs' Executive Directors ("Supp. Dec.") (attached as Ex. A).

b. Defendants' opposition offers no meaningful rebuttal on the first *Bennett* prong, thus conceding that each of the Actions represents the "consummation" of the respective agencies' "decision making process[es]." 520 U.S. at 178.[5] On the second *Bennett* prong, Defendants' position contradicts this District's recent ruling in *New York*, which held that an agency action

---

[5] Defendants' labeling of their Actions as "temporary practices," *e.g.*, Opp.11, does not render them any less final. *New York*, 2025 WL 3514301, at *7.

with the identical effect as the ones challenged here was final for purposes of judicial review. 2025 WL 3514301, at *26–31; *see infra* pp.5–9. Defendants fail to distinguish agencies' indefinite pause on wind energy decisions in that case, since the Actions here similarly "prevent an applicant from moving forward with a wind or solar energy project," Opp.38; *see* Br. Exs.A–D, F–G, to the massive detriment of Plaintiffs and their members, *see* Br. Exs.H–M.

1. *The Bottleneck Memorandum*. Like the Wind Memorandum, the Bottleneck Memo "gives rise to 'direct and appreciable legal consequences'" by "alter[ing] the legal status quo" for "process[ing] . . . authorizations necessary for wind [and solar] project development." *New York*, 2025 WL 3514301, at *9. It does so by creating a new three-tiered DOI review structure applicable only to the wind and solar permitting process. Br.19–20. Permitting for wind and solar is highly sequential, and delays in one aspect of the permitting process cause downstream consequences and ripple effects. Supp. Dec. ¶¶ 3–9. Delay in one review will extend the timeline for subsequent reviews, and the cycle repeats itself. *Id.* ¶ 3; *e.g.*, *id.* ¶¶ 17–19, 22, 24. Compounding delays cause legal consequences for project developers ranging from increased construction and material costs to project cancellation (when the developer has to renegotiate construction schedules) to project cancellation (when the delay threatens a project's ability to meet contractual commitments and, consequently, its financial viability). *Id.* ¶¶ 3–12 (ripple effect of Bottleneck Memo on BLM permitting), 35 (same for offshore wind projects on Outer Continental Shelf).

Defendants argue that the Bottleneck Memo does not create legal consequences because it governs the actions of agency officials and not private parties, Opp.33, but that does not matter. Under the Memo, **wind and solar projects are legally placed in a regulatory second-class status**, which is a specific "legal consequence[]." *Bennett*, 520 U.S. at 178; *see, e.g., id.* at 169–70, 177 (finding decisive that challenged agency action had practical "coercive effects" and "alter[ed] the

legal regime to which the [action agency wa]s subject"); *see also Sierra Club v. Trump*, 929 F.3d 670, 698 n.23 (9th Cir. 2019) (finality turns on "whether the agency action imposes obligations on the agency, not . . . Plaintiffs").  The Memorandum resembles the policy in *Wagafe v. Biden*, 764 F. Supp. 3d 980 (W.D. Wash. 2025), which increased the intensity and duration of background checks for certain naturalization applicants, creating "concrete obligations" that applied "across the board" for those applicants and thus "[could] of course be challenged under the APA by a person adversely affected."  *Id.* at 1002–04 (citation omitted).

2. *The Federal Lands Anti-Renewable Order*.  This Order creates legal consequences by imposing an unlawful "capacity density" metric on DOI's review of applications to build energy projects on public lands and in federal waters, systematically disfavoring the approval of wind and solar projects.  Br.8–9, 24–25.  Courts routinely conclude that agency actions that alter the criteria used to evaluate permits are final, legislative rules subject to pre-enforcement review under the APA.  For instance, *National Environmental Development Association's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014), held that an EPA directive regarding which sources of air pollution can be aggregated into a single operating permit was a final agency action because it "provide[d] firm guidance to enforcement officials about how to handle permitting decisions," and thus had "legal consequences for [regional officials] administering their permit programs and for companies" applying for such permits.  *Id.* at 1007.  Numerous other examples abound.  *See CropLife Am. v. EPA*, 329 F.3d 876, 879–882 (D.C. Cir. 2003) (prohibition on consideration of third party human studies subject to pre-enforcement review because its "clear and unequivocal language" "reflects an obvious change in established agency practice" to create a "binding norm" that is "finally determinative of the issues . . . to which it is address"); *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 45 (D.D.C. 2011) (EPA memorandum announcing new, region-wide water

quality standards used to "screen permit applications as . . . the first of several steps in the permitting process" was final agency action subject to pre-enforcement review because it constituted "a change in the permitting process" and "ha[d] a practical impact on the plaintiff's members seeking permits"); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005) (EPA's modification of criteria for certain Nationwide Permits subject to pre-enforcement review because those modifications had "legal consequences" for regulated entities and "directly affect[ed] the[ir] investment and project development choices"); *In re Clean Water Act Rulemaking,* 60 F.4th 583, 594 (9th Cir. 2023) (pre-enforcement challenge to Rule defining criteria for Clean Water Act certifications).  The Order here alters the criteria against which Plaintiffs' members' permit applications will be judged and thus creates legal consequences for finality purposes.  And while Defendants claim that the Order is mere "procedural guidance," Opp.34, the Order behaves no differently than any legislative rule by using mandatory language to establish binding criteria that DOI must now apply to evaluate applications, *see* Br. Ex.B.

3. *The Corps' Anti-Renewable Memorandum*.  The Corps' Memorandum similarly creates legal consequences by imposing substantive criteria on permit applications and requiring the Corps to disfavor and deprioritize projects with low "capacity density" (that is, wind and solar energy projects).  Br.28–32.  Defendants respond that the Memorandum "does no more than provide guidance," Opp.35–36, when it directs the agency to apply a new, mandatory set of criteria to applications.  Br. Ex.C at 2–3.  As with other broadly applicable agency rules that set out the standards that an agency must apply to evaluate permit applications, challengers do not need to wait until actual permit denials occur before challenging this Memorandum.  *See supra* pp. 6–7.

4. *The IPaC Ban*.  The IPaC Ban creates "legal consequences" by taking away from wind and solar developers a tool that plays a critical role in the ESA Section 7 consultation and Corps

permit process.  Br.35–37; Supp. Dec. ¶¶ 40–47.  Defendants argue that the IPaC Ban is not final because "[n]o statute or regulation requires or guarantees access to IPaC" and it is only a "website banner."  Opp.36.  That conflates whether the Ban is within USFWS's statutory authority[6] with whether it is a final agency action.  And on that score, there is nothing tentative or interlocutory about the Ban—it is the consummation of USFWS's decision-making process regarding wind and solar projects' inability to access the database.  *Bennett*, 520 U.S. at 177–78.

5. *The Zerzan/Jorjani Opinion*.    The Opinion gives "rise to 'direct and appreciable legal consequences'" in two ways.  *Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 448 (S.D.N.Y. 2019).[7]  First, it directs that offshore wind projects may (and potentially must) be disapproved based on anything more than *de minimis* interference with other ocean uses, Br. Ex.G at 2, 15[8]—a new standard that "alter[s] the legal status quo" for offshore wind developers seeking approval of their construction and operations plans (COPs), *New York*, 2025 WL 3514301 at *8; *see, e.g.*, Dkt.37 ("Joint Dec.") ¶ 456.  Second, the Opinion instructs BOEM to "re-evaluate" any "Departmental action taken in reliance on" the prior DOI interpretation of OCSLA, Br. Ex.G at 3, a task BOEM has begun, including by teeing up "new decisions" for all five COP approvals for offshore wind projects that have not yet commenced on-

---

[6] This offhand comment in the finality section of Defendants' brief also does not constitute a meaningful defense of the Ban on the merits; whether USFWS has discretion to manage access to IPaC is immaterial to whether the Ban violates the APA.  *See Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 170 (1st Cir. 2021) ("Even when an agency is afforded broad discretion . . . [t]here is a 'strong presumption' of judicial review under the APA.").  Defendants proffer no reasoned basis for excluding wind and solar applicants from IPaC's benefits.

[7] Defendants concede the Zerzan Opinion is binding on BOEM, satisfying *Bennett*'s first prong.  Br.38 n.44.

[8] Contrary to Defendants' assertion, the Jorjani Opinion (which the Zerzan/Jorjani Opinion reinstates) does not just interpret Section 8(p)(4)(I) of OCSLA to bar offshore wind from "unreasonable interference of other [ocean] uses," Opp.37, but goes a significant step further by defining "unreasonable interference" as interference that is not "*de minimis* or reasonable" and mandating that the Secretary "err on the side of less interference." Br. Ex. G at 2.  A "no more than *de minimis*" standard is facially more demanding than a "reasonable" standard, in addition to existing nowhere in OCSLA or BOEM's regulations.  Br.39.

lease construction.[9]  The Opinion is thus the mirror image of the M-Opinion that the court in *Natural Resources Defense Council* determined was final: the M-Opinion there "reliev[ed] regulated parties of liabilities they would otherwise face," *Nat. Res. Def. Council, Inc. v. DOI*, 397 F. Supp. 3d 430, 449 (S.D.N.Y. 2019), while the Zerzan/Jorjani Opinion systematically *creates* liabilities, including for offshore wind developers who thought they had final project approvals and now face imminent "new decisions."  Thus, far from being "abstract guidance," Opp.37,[10] this substantive change in the criteria BOEM uses to evaluate COP approvals has direct and adverse legal consequences for offshore wind developers' business that make the Zerzan/Jorjani Opinion final and judicially reviewable. *See supra* pp.6–7.

### 2.  Each Of The Actions Is Ripe For Judicial Invalidation

a. Ripeness requires a court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Laby's. v. Gardner*, 387 U.S. 136, 149 (1967).  This inquiry overlaps substantially with finality: an issue is "fit[ ]" where plaintiffs challenge a consummated agency decision that presently governs agency conduct, *see id.* at 149–53, and hardship is satisfied where "granting relief would serve a useful purpose" for the applicant, *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 25 (1st Cir. 2025) (citation omitted).  Ripeness is met where "resolution[ ] of the[ ] issues might not secure [a]

---

[9] *See* Br.17, n.37; *see also* Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand & Stay at 5, Giacona Dec. ¶¶ 12-15, *Save Long Beach Island, Inc. v. U.S. Dep't of Comm.*, No. 1:25-cv-02211 (Dkt. No. 13) (D.D.C. Sept. 26, 2025); Unopposed Mot. to Defer Fed. Defs' Deadline to Respond to the Compl., *Save Long Beach Island, Inc. v. U.S. Dep't of Comm.*, No. 1:25-cv-02214 (Dkt. No. 25) (D.D.C. Sept. 30, 2025); Fed. Defs.' Mot. & Mem. in Support of Voluntary Remand & Stay at 6, Giacona Dec. ¶¶ 12-15, *ACK for Whales, Inc. v. U.S. Dept. of Comm.*, No. 2:25-cv-1678 (Dkt. No. 18) (D.D.C. Dec. 2, 2025).

[10] Defendants cite *Center for Biological Diversity v. U.S. Bureau of Land Management*, No.CV 17-8587-GW(ASX), 2019 WL 2635587 (C.D. Cal. June 20, 2019), for the proposition that M-Opinions with "abstract" implications are not final.  Opp.37.  But the 2017 M-Opinion in that case (unlike the Zerzan/Jorjani Opinion) did not direct the wholesale re-evaluation of final decisions under the prior legal interpretation or change the rules of the road for an entire industry's pending and future project applications.

project's ultimate approval," if the challenged agency actions "would cease to be barriers to ultimate approval of the project" once vacated. *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 469 (1st Cir. 2009). Finally, an APA challenge that presents "purely legal questions" that rise and fall on the administrative record and the agency's statutory authority is ripe for review. *Nat'l Min. Ass'n*, 768 F. Supp. 2d at 46.

b. The claims here are clearly ripe. Plaintiffs raise legal challenges to discrete memoranda, orders, and an M-Opinion that Defendants do not dispute are being used to dictate real world permitting processes. There can be "no doubt of the practical usefulness of a decision on [Plaintiffs'] claims," *Jensen*, 160 F.4th at 25, where enjoining and vacating the challenged actions will restore the status quo permitting regime for Plaintiffs' members and other regulated entities, *infra* pp.13–18; *see Weaver's Cove*, 589 F.3d at 469. If this Court enjoins the Actions, the result will be similar to what has occurred with the Eagle Take Permit Ban: Defendants will once again begin processing permit applications like they did before the Actions. *See* Opp.36.

c. Defendants contend that Plaintiffs' injuries rest on "contingent future events," Opp.41, but that mischaracterizes the arguments and evidence before this Court. The Actions have already harmed Plaintiffs' members, including by forcing them to redesign their projects at significant expense, extending construction timelines and reducing revenues, *see* Joint Dec. ¶¶ 95–97, 325–31, 359, threatening investments in projects that are likely to be denied permits, *see id.* ¶¶ 258–66, 325–31, and making it futile or impossible to submit applications in the first place, *see id.* ¶¶ 39–40, 52–237, 364–446, 468–72. Contrary to Defendants' claims, Opp.42–43, the hardship inquiry is not limited to situations in which the government formally commands a regulated party to act; it asks whether "granting relief would serve a useful purpose," *Jensen*, 160 F.4th at 25, including

by eliminating "barriers to ultimate approval of [a] project," *Weaver's Cove*, 589 F.3d at 469. Plaintiffs' evidence more than meets that standard. *Infra* pp.13–18.

Defendants' reliance on *Texas v. United States*, 523 U.S. 296 (1998), and *Toilet Goods Association, Inc. v. Gardner*, 387 U.S. 158 (1967), is inapt. *See* Opp.41–42. In *Texas*, the Supreme Court confronted a pre-enforcement challenge to a statute where it was speculative whether the government would ever apply the law in the way that Texas feared. 523 U.S. at 300–02. Here, Defendants do not dispute that the Actions are already being used to structure the permitting process, and have already imposed "barriers" to "ultimate [permit] approval" for wind and solar projects. *See Weaver's Cove*, 589 F.3d at 469. And in *Toilet Goods Association*, 387 U.S. at 163, the Court considered a notice stating that an inspection of certain facilities and data might someday occur. The challenged Actions are the opposite: they govern Defendants' present conduct and have already imposed legal and practical consequences on Plaintiffs' members. *Infra* pp.13 – 18.

### 3. Plaintiffs Have Standing To Challenge Each Final Action

a. Standing has three elements—injury in fact, causation, and redressability, *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009)—and Plaintiffs satisfy these for each of the Actions. Plaintiffs and their members will continue to suffer actual, concrete injuries traceable to Defendants' conduct, as detailed in their declarations. Joint Dec. ¶¶ 56–486; Dkt.39 ("Donadio Dec.") ¶¶ 11–17; Supplemental Declaration of Larry Chretien ("Supp. GECA Dec.") ¶¶ 3–23 (attached as Ex. B). Each of the Actions has stranded sunk costs, increased anticipated costs, threatened investments and financing, and jeopardized projects' future financial viability. *E.g.*, Joint Dec. ¶¶ 78–79, 218–19, 263–66, 367–69, 456–58. An injunction would redress these harms by removing the impediment to timely and predictable permit adjudications as was standard prior to the Actions taking effect. *See, e.g.*, Joint Dec. ¶¶ 81, 220–21, 266, 370, 459.

b. Defendants' effort to undermine Plaintiffs' standing fails. Defendants' erroneous arguments about Plaintiffs' injury in fact and traceability mirror those they raise in response to Plaintiffs' irreparable harm, and are rebutted below. *Infra* pp.13–18. Defendants claim that Plaintiffs' harm is not redressable because an injunction will not have any effect on projects that have "awaited the next procedural step as early as 2019 . . . or 2022," or "been deprioritized," or projects that are "proceeding following project redesign," or "proceeding through the normal approval process." Opp.40. But these critiques apply only to a small subset of the specifically named projects, Joint Dec. ¶¶ 56–486, and many are factually incorrect, *e.g.,* Supp. Dec. ¶¶ 14–15 (explaining that decision to deprioritize American Glory and Monte Cristo solar projects was made at BLM's request and outside of BLM regulations). In any event, they would not affect redressability because none of them contradict that the Actions are systematically holding up federal permits for wind and solar. An injunction would remedy these harms by removing artificial barriers to permit approvals and eliminating uncertainty about whether permits may be issued at all. *See CropLife Am.,* 329 F.3d at 884. It would also serve developers who chose to redesign projects to avoid the Actions' effect—these projects can still be built more efficiently and at a lower cost (as originally contemplated), but the time in which it remains feasible to do so is running out. Joint Dec. ¶¶ 98, 219–221, 329–31; Supp. Dec. ¶ 47. An injunction would also serve other industry participants, whose businesses depend on the construction and operation of wind and solar energy facilities. Donadio Dec. ¶¶ 11–17; Dkt. 38 ("GECA Dec.") ¶¶ 9–19.

Defendants' challenge to Plaintiffs' associational standing, Opp.40, also fails. As an initial matter, Plaintiff GECA alleges (and then established through its unrebutted declaration) that it has been directly harmed by the Actions, *infra* pp.13–18, and that its harm would be redressed by an order enjoining the Actions' enforcement. While Plaintiff GECA's standing is sufficient to

maintain this lawsuit, Plaintiffs have also offered more than sufficient allegations to meet the First Circuit's associational standing test. An organization may sue on behalf of its members when (1) its members would have standing, (2) the interests it seeks to protect are "germane" to its purpose, and (3) the individual members are not necessary parties to the suit. *In re Fin. Oversight & Mgmt. Bd.*, 110 F.4th 295, 308 (1st Cir. 2024). Here, Plaintiffs have identified at least seven members that have been injured by the Actions and therefore have standing to sue, *see supra* pp.11–12, and Defendants offer no legal authority requiring every articulated harm to be specifically associated with a particular member. Further, the interests that Plaintiffs seek to vindicate are "germane" to their organizations' goals of promoting and protecting wind and solar technologies throughout the United States, and this case does not require the participation of each individual member given the generally applicable nature of the relief sought. *See Nat'l Min. Ass'n,* 768 F.Supp. 2d at 45 (trade association had standing where its members experienced "delays in the permitting process" as a result of EPA guidance that "threat[ened] the financial viability of proposed mining projects"); *CropLife Am.*, 329 F.3d at 879 (trade association had standing where new policy prohibited members from relying on previously admissible evidence).

## II.    Plaintiffs And Their Members Face Imminent, Irreparable Harm Without A Preliminary Injunction

A. Without an injunction, the Actions will continue to harm Plaintiffs and their members by indefinitely delaying permit adjudications or preordaining permit denials. Br.41–48. The Actions will also continue to impose harm on Plaintiff GECA because its business model depends on selling renewable energy credits—the supply of which the Actions will decimate. Br.42.

B. Defendants' assertion that economic harms caused by agency action cannot be "irreparable," Opp.21–23, is contrary to binding caselaw. Economic loss is "non-recoverable" (and thus irreparable) when a defendant is immune to suits for money damages. *Ohio v. EPA*, 603

U.S. 279, 292 (2024); *see also Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003). Courts have routinely held that compliance costs associated with agency action are irreparable; this is not an open issue. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021); *Kentucky v. Biden*, 23 F.4th 585, 611 (6th Cir. 2022).

Defendants contend that Plaintiffs' harm is not sufficiently "imminent" because it may take years for the full scope of the economic harm resulting from permit delays and denials to materialize, Opp.18–21, but that too is incorrect. Courts routinely "treat prospective economic injuries flowing from a delay in [ ] construction as a form of irreparable injury," *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 218 (4th Cir. 2019), particularly when a project "requires a complex and coordinated construction process" in which "[e]ach piece of the construction puzzle depends on the prior piece timely placed," *Transcon. Gas Pipe Line Co., LLC v. Permanent Easement for 0.03 Acres*, No. 4:17-CV-00565, 2017 WL 3485752, at *3 (M.D. Pa. Aug. 15, 2017). Even minor delays can cause irreparable harm because they have "a domino effect on the timeliness of all other areas of the projects'" development. *Id.* Such delays can cause purely monetary harms, such as loss of future anticipated revenues, *see id.*, and other harms, including an increased risk that a project developer will breach power purchase agreements or contracts with third-parties, *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 829 (4th Cir. 2004).

The undisputed evidence before this Court establishes that each of the Actions trigger imminent, "prospective economic injury," *Mountain Valley Pipeline, LLC*, 915 F.3d at 218, by indefinitely delaying permit adjudications or preordaining permit denials.

For instance, the Bottleneck Memo's requirement that nearly all steps in the wind and solar permitting process be reviewed and approved by three different senior officials within DOI ensures that DOI permitting will take substantially more time than without this illegal directive. Wind and

solar projects "require[ ] a complex and coordinated construction process," *Transcon. Gas Pipe Line Co.*, 2017 WL 3485752, so even a minor delay in any step of the permitting process has an immediate "ripple effect" and extends the timeline for the subsequent steps in the sequential chain, Supp. Dec. ¶ 3.  These snowballing delays cause serious harm, including by disrupting negotiated construction timelines, forcing developers to pay higher prices for labor and materials, and making it more difficult to attract capital investment.  Joint Dec. ¶¶ 35–45.  This uncertainty that the Bottleneck Memo has created regarding when—if ever—permits may issue threatens developers with higher prices, jeopardizes sunk costs, investments, and future revenues, *e.g.*, *id.* ¶¶ 78–79, and, in some cases, has forced developers to contemplate abandoning their projects altogether, *e.g.*, *id.* ¶¶ 71–72; Supp Dec. ¶¶ 22, 39.

The IPaC Ban triggers these same economic harms by making it substantially more difficult for wind and solar developers to obtain information that must be included in Corps authorization applications before the Corps can consult with USFWS as required by the ESA.  *E.g.*, Joint Dec. ¶¶ 366–67.  The inability to access this information makes it impossible for developers to apply for Corps authorization and, consequently, threatens project viability and investments already made therein.  *E.g.*, *id.* ¶¶ 368–69; Supp Dec. ¶¶ 40–47.[11]

The Federal Lands Anti-Renewable Order and the Corps' Anti-Renewable Memorandum cause imminent "prospective economic injury," *Mountain Valley Pipeline, LLC*, 915 F.3d at 218, because they change permitting criteria in a way that preordains permit denials for wind and solar projects.  These Actions preclude developers from getting the permits they need to "commence

---

[11] While the IPaC Ban on its face purports to allow wind and solar developers to access IPaC with approval from DOI senior leadership, there is no established procedure, timeline, or criteria governing intra-agency requests for senior leadership review, nor is there any indication that the Secretary's office has granting and exemptions for wind and solar projects.  Supp. Dec. ¶¶ 42–44.

development, deliver electricity, [and] generate revenue" from their projects—even if their permit applications could make it through the Bottleneck Memo. *E.g.*, Joint Dec. ¶¶ 246–47.

The Zerzan/Jorjani Opinion has a similar effect for offshore wind developers because it preordains the denial (or revocation) of COP approvals by allowing (or even requiring) rejection of projects that have more than a "*de minimis*" interference with other reasonable uses of the Outer Continental Shelf and directing BOEM to reevaluate COPs approved under the prior legal standard. The uncertainty created by the Zerzan/Jorjani Opinion similarly threatens already-made investments, jeopardizes future revenues, and in some cases has caused developers to consider abandoning their projects altogether. *E.g.*, *id.* ¶¶ 457–59; Supp. Dec. ¶ 39.[12]

Defendants' argument that Plaintiffs' harm showing is "theoretical" and "speculative," Opp.23–31, ignores the largely undisputed evidence of concrete harms that Plaintiffs have put forward. **Plaintiffs offered dozens of project-specific examples and multiple categories of systemic harm arising from the Anti-Renewable Actions, *the majority of which Defendants do not even mention (let alone attempt to rebut)*, including sunk and at-risk costs across numerous projects; the cascading effects on power purchase agreements, interconnection rights, and supply-chain contracts; and the specific descriptions of layoffs, curtailed or shelved investments, and stranded assets**. *See* Joint Dec. ¶¶ 34–44, 48–49, 218–19, 327–29, 368–69, 375–76, 382–83, 389–90, 395–96, 402–03, 409–10, 444–45, 468–486; Supp. Dec. ¶¶ 14–

---

[12] Defendants' footnoted suggestion, Opp.18 n.4, that Plaintiffs' harm is not imminent because Plaintiffs did not file suit until December 2025 fails. None of Defendants' cases suggest that a plaintiff must endure ongoing harm for however long it takes to resolve its claims—which can take many months and stretch into years of appeals—because it waited a few months before bringing an APA lawsuit. And in any event, there is good cause for Plaintiffs' timing. For one, the harm stemming from the Anti-Renewable Actions has worsened over time, as Defendants have taken additional actions that exacerbate and compound the Actions' effects on Plaintiffs and Plaintiffs' members. Joint Dec. ¶ 47; Br.13, 17 n.35. Moreover, this District's December 8, 2025 ruling in *New York v. Trump*, which enjoined federal agencies' implementation of the Wind Memorandum, amplified the practical effects of the Actions challenged here that continue to stymie wind and solar energy development. Joint Dec. ¶ 47.

34, 36–39, 45–47. Defendants instead cherry-pick only a few specific projects to critique, and then misstate or omit critical facts. *E.g.*, *compare* Opp.28 (arguing that two solar projects, American Glory and Monte Cristo, have been "de-prioritized" at the developers' request), *with* Supp. Dec. ¶¶ 14–15 (explaining that these developers have been forced to select projects to prioritize at BLM staff's request); *compare* Opp.28 (arguing that the Wildcat Solar Project "is proceeding in typical fashion"), *with* Supp. Dec. ¶¶ 16–18 (explaining that BLM staff will not approve a necessary baseline needs assessment form for this project due to the Bottleneck Memo); *compare* Opp.28 (stating that BLM met with certain "proponents" for the Bouse and Parker projects "in late 2025 to prepare a timeline for internal review and NEPA compliance"), *with* Supp. Dec. ¶ 22 (explaining that BLM "expressly represented that they will not be proceeding" with the milestone schedule due to the Bottleneck Memo). And while Defendants broadly criticize the Joint Declaration's purported "formulaic structure," Opp.25–27, Defendants cite no case suggesting that the use of standardized language is a basis to discount sworn testimony.

Defendants claim that Plaintiffs' harms are speculative because the agencies are under no obligation to approve specific projects and none of Plaintiffs' members' projects have been specifically precluded from proceeding, Opp.28–29, but that misses the point. The APA provides regulated entities with a right to be free from agency actions that arbitrarily and capriciously inflict harm, including during the permitting process. *See* 5 U.S.C. §§ 555, 558, 706. The additional and unlawful barriers that the Actions have injected into the statutorily authorized permitting process for wind and solar energy projects are jeopardizing investments, triggering construction schedule modifications or project redesigns, and threatening the financial viability of Plaintiffs' members' projects. *See, e.g.*, Joint Dec. ¶¶ 73–81, 453–459 (explaining that the Bottleneck Memo has stalled BOEM's ability to adjudicate Atlantic Shores North's COP application, that the Zerzan/Jorjani

Opinion preordains BOEM's denial of that COP application, and that if Atlantic North Shores does not receive a COP approval soon, it will lose over $215 million in sunk costs invested into the project and may be forced to abandon the project altogether). The Supplemental Declaration demonstrates that agency staff are unable to make any material progress on specific projects *because of* the Actions. Supp. Dec. ¶¶ 11, 18, 22, 27, 32. That some projects had longer baseline permitting timespans does not alter the fact that the challenged Actions now impose additional, unlawful delays and uncertainty that create imminent, irreparable harm.

Defendants' reliance on *National Mining Association,* 768 F. Supp. 2d 34, Opp.30, is unavailing. There, the court rejected plaintiffs' assertion that new coal mining regulations would cause its small business members to face "certain, imminent business closings." *Id.* at 50. Plaintiffs here do not base their irreparable harm arguments on any such contention, focusing instead on the economic consequences of delayed permit adjudications. While the *National Mining Association* court stressed that the plaintiff had "not demonstrated the certainness or the imminence of any of its members' losses," nor "any information on currently planned or future projects in jeopardy or at risk of incurring losses," *id.* at 53–54, Plaintiffs here have provided substantial details about the imminence and non-recoverability of the harms caused by the Anti-Renewable Actions to Plaintiffs' members specific projects, *see supra* pp.13–18.[13]

---

[13] Defendants' efforts to discount the Charles River Associates, Inc. ("CRA") study, Burdock Declaration, and Goggin Declaration, Opp.18–20, also fail. These Declarations describe the magnitude of the ongoing harms that the actions impose on the renewable energy industry, third parties, and the American energy-consuming public. And Plaintiffs have introduced ample evidence of project specific harms that sufficiently justify the issuance of preliminary injunctive relief. Br.43–48; *see supra* pp.13–18. Defendants' critique of the Donadio Declaration on the grounds that Atlantic Wind Transfer's "near-term operations seem to focus on the projects that are now again proceeding following court orders issued after Mr. Donadio executed his declaration," Opp.20, overlooks the crux of AWT's declared harms. AWT invested $30 million into the construction of six new vessels to service offshore wind farms—four of which remain unbuilt (and with no market to serve if they ever are built), and one of which is not presently under contract despite being completed in 2025. Donadio Dec. ¶¶ 7, 8. So long as the Actions remain in place, AWT will continue to lose anticipated revenue related to the use of these vessels while paying for the maintenance and storage of vessels that cannot be deployed. *Id.* ¶¶ 13–14. Finally, Plaintiffs provide a supplemental declaration explaining that, contrary

## III.    The Balance Of The Equities And Public Interest Favor Immediate Relief

Both the balance of the equities and the public interest favor a preliminary injunction here because there is no public interest in allowing federal agencies to act unlawfully, and because the government suffers no cognizable harm from an injunction that preserves the status quo and prevents the continued implementation of unlawful agency actions.   Defendants effectively concede this prong of the *Winter* test, complaining only that an injunction would have an "intrusive effect . . . on further agency decision-making and agency discretion," which "aspires to reflect agency procedures and decisions that are sound and legally defensible." Op.Br.44.  It is impossible to square this "aspir[ation]" with Defendants' failure to mount a substantive defense to Plaintiffs' claims.  *See supra* pp.3–4.  And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *New York v. McMahon*, 784 F. Supp. 3d 311, 373 (D. Mass. 2025).

## IV.    This Court Has Authority To Grant Plaintiffs Complete Relief

This Court should reject Defendants' request for relief tailored only to the particular "circumstance(s) or project(s)" identified in Plaintiffs' declaration.  Opps.45–46.  While that relief is both necessary and appropriate, *see supra* pp.13–18, it is imperative that relief extend—at a minimum—to all of Plaintiffs' members. *See, e.g., Doe v. Trump*, 157 F.4th 36, 80 (1st Cir. 2025) (rejecting argument that "preliminary injunction may bar enforcement of [an Executive Order] to only the two members whom the [plaintiff-]organizations identified in seeking associational standing").  Indeed, the "equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties." *Trump v. CASA, Inc.*, 606 U.S. 831, 834 (2025) (emphasis omitted) (citation omitted).  Here, "complete relief" requires an order preliminarily enjoining Defendants from implementing or otherwise giving effect to the Actions with respect to

---

to Defendants' contentions, GECA's harms from renewable permitting delays are imminent due to the unique nature of the market for renewable energy credits that is GECA's bread and butter. *See* Supp. GECA Dec. ¶¶ 3–23.

Plaintiff GECA, as well as all members of the Plaintiff trade organizations. Courts "have 'no difficulty' finding a likelihood of irreparable injury based on 'illustrative' examples combined with facts showing that the risk of irreparable harm faced by some members is representative of the risk faced by all." *Ass'n of Am. Univs. v. Dep't of Defense*, 792 F. Supp. 3d 143, 176 n.74 (D. Mass. 2025) (citation omitted). That is precisely what Plaintiffs have demonstrated here. *See* Br.41–48.

This Court would also be justified in granting "the functional equivalent of a universal injunction" by "preliminarily setting aside" the Actions "under the APA." *CASA*, 606 U.S. at 873 (Kavanaugh, J., concurring); 5 U.S.C. § 705. "[C]ourts routinely stay already-effective agency action under Section 705." *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 274 (E.D.N.Y. 2025) (citation omitted). There would be nothing "confusing," Opp.45, about such a stay here; indeed, Defendants' decision to lift the Eagle Take Permit Ban, *see* Opp.36, demonstrates how readily Defendants can restore the *status quo* and stay their implementation of the challenged actions pending this Court's final decision on the merits.

Finally, this Court should decline Defendants' request to require Plaintiffs to post security. Opp.46. Rule 65(c) gives courts broad discretion to require no bond or only a nominal bond, particularly where (as here) nonprofit Plaintiffs seek to vindicate statutory rights and Defendants have not identified any concrete, compensable monetary harm they would suffer if later deemed wrongfully enjoined. *See Liu v. Noem*, 780 F. Supp. 3d 386, 405 (D.N.H. 2025). Requiring a bond in this context—where Plaintiffs and their members will not even be able to recover their own damages from Defendants when they ultimately prevail in this litigation, *see supra* pp.13–14, would chill enforcement of administrative law constraints and serve no equitable purpose.

## CONCLUSION

Plaintiffs respectfully request that this Court grant a preliminary injunction enjoining Defendants from enforcing the challenged Actions.

Dated: February 20, 2026.

Respectfully submitted,

BY: */s/ Daron L. Janis*
Daron L. Janis (BBO #703028)
TROUTMAN PEPPER LOCKE LLP
111 Huntington Ave., 9th Floor
Boston, MA 02199
(617) 239-0124
daron.janis@troutman.com

Misha Tseytlin (*pro hac vice pending*)
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr.
Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

M. Benjamin Cowan (*pro hac vice pending*)
TROUTMAN PEPPER LOCKE LLP
600 Travis Street, Suite 2800
Houston, TX 77002
(713) 226-1339
ben.cowan@troutman.com

Kaitlin O'Donnell (*pro hac vice pending*)
TROUTMAN PEPPER LOCKE LLP
1313 N. Market St., Suite 1000
Wilmington, DE 19801
(302) 777-6541
kaitlin.odonnell@troutman.com

Anais Jaccard (*pro hac vice pending*)
TROUTMAN PEPPER LOCKE LLP
301 S. College St, 34th Floor
Charlotte, NC 28202
(704) 916-1506
anais.jaccard@troutman.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 20th day of February, 2026, a true and correct copy of the foregoing is being served via the Court's CM/ECF system upon all counsel of record.


                     */s/ Daron L. Janis*
                     Daron L. Janis