# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| RENEW NORTHEAST, *et al*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*, <br><br> *Defendants*. | Civil Action No. 1:25-cv-13961 |

**SUPPLEMENTAL JOINT DECLARATION OF REGIONAL ORGANIZATION PLAINTIFFS' EXECUTIVE DIRECTORS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1. Pursuant to 28 U.S.C. § 1746(2), I, Francis Pullaro; I, Marguerite Wells; I, Nicole Hughes; I, Simon Mahan; I, Erika ("Rikki") Seguin; I, Evan Vaughan; I, Beth Soholt; and I, Chris Carmody submit this supplemental joint declaration in support of Plaintiffs' motion for a preliminary injunction. This declaration supplements the January 12, 2026 declaration we have provided in this case, incorporated herein by reference to avoid repetition.

2. We provide this Supplemental Declaration to rebut Defendant's assertions that Plaintiffs' injuries are "speculative" and not sufficiently "imminent," ECF No. 63 ("Opp.") at 17-31, by offering additional explanation regarding the irreparable harms suffered by several of our member companies.

**Projects on Bureau of Land Management ("BLM") Lands**

3. Delays at any individual step of the BLM permitting process immediately push downstream milestones for wind and solar projects, including operational deadlines established through interconnection agreements and power purchase agreements ("PPAs"). The permitting and

1

environmental review process is highly sequential: administrative review, cost recovery, prioritization, internal planning, environmental pre-studies, environmental review, consultations, and issuance of the final Record of Decision ("ROD"), with each step building on the previous one. A delay at any stage in this process creates a ripple effect, extending the timeline for subsequent reviews, approvals, and construction authorizations. Consequently, even short-term disruptions cause immediate, irreparable harm to developers because they prevent the project from advancing to the next scheduled milestone and trigger cascading delays that cannot later be remedied.

4. BLM authorizes utility-scale wind and solar facilities on public lands under Title V of the Federal Land Policy and Management Act, 43 U.S.C. § 1761 *et seq*., and its right-of-way ("ROW") regulations, 43 C.F.R. Part 2800.

5. The process begins when a developer submits a ROW application and Plan of Development ("POD"). BLM reviews the submission for completeness under 43 C.F.R. § 2804.12, and once deemed complete, BLM enters into a cost recovery agreement ("CRA") pursuant to 43 C.F.R. § 2804.14, under which the applicant funds the agency's processing costs.

6. At or around this stage, BLM applies its regulatory prioritization framework under 43 C.F.R. § 2804.35 to assign the application a high, medium, or low priority based on criteria such as consistency with land use plans, location within designated or preferred development areas, potential resource conflicts, and other administrative considerations. BLM then allocates staff time and determines the order of review according to that priority level, generally advancing higher-priority applications first.

7. In conjunction with establishing cost recovery and assigning project priority, BLM prepares internal workload planning documents, including a "Needs Assessment" form. The Needs Assessment identifies the anticipated scope of environmental review and permitting requirements,

estimates the level of interdisciplinary staffing and contractor support needed, and helps project the time and funding necessary to complete National Environmental Policy Act ("NEPA") compliance and associated consultations. This form functions as a project management tool for BLM to align available agency resources with the complexity of the proposed action, support implementation of the cost recovery agreement, and establish key survey milestones. Following these administrative and planning steps, BLM typically authorizes pre-NEPA baseline studies—such as biological surveys, cultural resource inventories pursuant to Section 106 of the National Historic Preservation Act (54 U.S.C. § 306108), geotechnical investigations, and hydrologic studies through a formal review process, for example the Nevada State Office's baseline needs assessment form ("BNAF"). The studies then inform BLM's subsequent environmental review.

8. BLM next initiates review under NEPA, 42 U.S.C. § 4321 *et seq.*, consistent with applicable Department of the Interior regulations and procedures. For most utility-scale solar projects, BLM publishes a Notice of Intent ("NOI") in the Federal Register to prepare an environmental impact statement ("EIS") or environmental assessment ("EA"), commencing public scoping. Through scoping, BLM solicits input from cooperating agencies, Tribes, stakeholders, and the public to identify issues, alternatives, and appropriate mitigations. BLM then prepares a Draft EIS analyzing the proposed action; a reasonable range of alternatives (including a no-action alternative); and direct, indirect, and cumulative impacts. After circulation of the Draft EIS for public comment—typically for at least 45 days[1]—and completion of required consultations, including any applicable Endangered Species Act ("ESA") Section 7 consultation, BLM prepares a Final EIS responding to comments and refining its analysis.

---

[1] DOI's April 2025 NEPA guidelines have eliminated this public comment requirement. *See* U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures, 516 DM 1.

3

9. Following publication of the Final EIS, BLM issues a ROD documenting the selected alternative, required mitigation measures, and monitoring and compliance obligations. If the decision is approval of the project, BLM issues a ROW grant to the developer subject to terms and conditions, bonding requirements, and adherence to the approved POD. The grant authorizes construction and operation consistent with the decision, and BLM conducts oversight through inspections and compliance monitoring throughout construction, operations, and eventual decommissioning and reclamation.

10. The July 15, 2025, Bottleneck Memorandum has made it virtually impossible to advance wind and solar projects through any step of the BLM permitting process.

11. Based on our members' experiences, BLM field offices have received no guidance on how to secure senior political review pursuant to the Bottleneck Memorandum. Indeed, staff at BLM's Arizona State Field Office have told at least one member that they have not routed any pending wind and solar permits, approvals, or authorizations for senior political reviews and signatures in accordance with the Memorandum because DOI leadership has not established a formal internal process for doing so. To the extent other BLM state offices are successfully getting permits, authorizations, and approvals in front of senior political officials for review, it is believed that this is due in part to outside political pressure.

12. Due to staffing constraints exacerbated by layoffs, voluntary departures, and re-allocation of staff to projects (such as mining) that meet new administration goals, agency staff in BLM state offices have informally advised developers that they cannot realistically process all pending applications and have urged developers to identify a limited number of projects for "prioritization." In other words, it is *BLM* that is forcing project developers to choose which projects they would choose to "deprioritize," including some projects that are still formally

4

designated as "high priority" per 43 C.F.R. § 2804.35. Developers are not voluntarily choosing to "deprioritize" projects, and to the best of our knowledge these projects are still legally designated as high priority.

13. With all of this as background, we provide more detail on the Anti-Renewable Actions' impacts on specific projects, each of which were originally described in the January 12, 2026 Joint Declaration.

*American Glory, Monte Cristo, and Wildcat Solar Projects*

14. The developer of the American Glory Solar Project, Monte Cristo Solar Project,[2] and Wildcat Solar Project informally notified BLM staff at the Nevada State Offices that, if it had to choose certain projects for "prioritization," it would prefer to prioritize the Wildcat Solar Project over the other two. Critically, this "reprioritization" was conducted informally, at BLM staff's behest, and not formally pursuant to BLM regulations. The developer did not request "deprioritization" of the other two projects for any reason other than in response to BLM staff's request.

15. Defendants' contentions in Lopez Dec. ¶¶ 17 and 20 that "BLM has de-prioritized" the American Glory Solar and Monte Cristo Projects "consistent with the BLM's implementing regulations" and "based on the proponent's request" are therefore inaccurate.

16. But even then, the "prioritized" project, Wildcat Solar, is still facing currently insurmountable permitting barriers as a result of the July 15, 2025, Bottleneck Memorandum, which, if not soon resolved, will render the project non-viable.

---

[2] The Joint Declaration erroneously stated that the Monte Cristo Solar Project was an Arizona project. Joint Dec. at ¶¶ 126, 275; it is actually a Nevada project. Additionally, the Rainbow Star Project was erroneously characterized as a 250 MW Nevada project, *id.* ¶¶ 153, 292; it is actually a 500 MW Arizona project.

5

17.     For example, in order to maintain its "Large Generator Interconnection Agreement" (the "Agreement"), the Wildcat Solar Project must advance through critical project milestones in a timely manner. In order to uphold its obligations under this Agreement, Wildcat Solar will need to complete pre-NEPA baseline studies, including its Geotech and Class 3 Cultural Surveys, by Q3 of 2026; will need to prepare a draft environmental analysis by Q4 of this year, and submit this document to BLM by Q1 of next year so that the Wildcat Solar Project can secure its NOI before the project's legally mandated June 2027 deadline.

18.     But the developer cannot commence these baseline studies until BLM has formally approved its BNAF, which will identify all of the studies needed to initiate review under NEPA. This is a critical step, because it ensures that BLM does not identify the need for additional studies at a later point in development, which would delay the project development timeline and threaten project viability. Moreover, pre-NEPA study costs cost over $3 million for a project of this size. The developer would suffer financial losses if it moved forward with millions of dollars of studies that BLM then determined to be unnecessary, or if BLM determined that additional studies were required that could have been done earlier. But BLM staff have reported that they are no longer able to approve BNAFs due to the Bottleneck Memorandum.

19.     So long as the Bottleneck Memorandum is in place, the Wildcat Solar Project therefore will not be able to meet critical and imminent internal deadlines.

20.     If Wildcat Solar Project cannot meet site control requirements, it will be in default on its interconnection agreement and subject to withdrawal penalties. Realistically, if the project cannot meet its requirements by June 2026, it would need to withdraw its interconnection positions by the end of May 2026. This would significantly harm the project because it would "lose its place in line" and no longer have a position in the grid interconnection queue.

6

*Bouse Solar Project*

21. The proposed Bouse Solar Project in Arizona faces many of the same barriers as Wildcat Solar.

22. As an initial matter, contrary to what the government has stated in Lopez Dec. ¶ 18, the BLM Arizona State Office is not currently working on a milestone schedule for this project. Staff have expressly represented that they will not be proceeding with this step in the project because of Bottleneck Memorandum. This project faces imminent and immediate risk of cancellation if the Bottleneck Memorandum is not soon enjoined. To comply with existing interconnection and commercial agreements, the Bouse Solar Project would need to start operations in 2033. Working backwards, the developer estimates, based on its extensive experience permitting and constructing solar projects, that the Bouse Solar Project would need to commence construction by 2030. Starting construction by 2030 requires final BLM approval by 2029. Final BLM approval by 2029 requires BLM to initiate the formal NEPA process needs to commence by 2027, and pre-NEPA studies need to be initiated by 2026. BLM staff currently do not expect to be able to authorize a BNAF due to the Bottleneck Memorandum. If the project gets delayed to the point that it cannot meet its interconnection and commercial agreement obligations, that will trigger substantial financial penalties. Significant further BLM permitting delays could therefore mean that in the near future, it would be more economical for the developer to cancel the project and write off its sunk costs than to invest many additional millions of dollars only to not be able to deliver it on time and pay more money in penalties than the current sunk costs.

*Lonely Road Solar Project*

23. The government correctly states in Lopez Dec. ¶ 19 that "the BLM Ely District Office is continuing to conduct pre-NEPA work for the solar right-of-way application, including engagement with the proponent on the draft plan of development ("POD")."

24. However, the developer of the Lonely Road Solar Project submitted the draft POD in July 2025. Typically, a BLM district office would have provided feedback in a matter of weeks, but this POD has been pending before the agency for six and a half months. Notably, the BLM Ely District Office only offered feedback on the draft POD on January 20, 2026, *after* this lawsuit and the preliminary injunction motion were filed. Moreover, the developer is still waiting for additional feedback and information from agency staff.

25. Critically, these staff meetings are of much lower value than they would have been prior to the Bottleneck Memorandum, as local staff no longer have the authority to approve the POD, which must now go through the layers of senior political review as set forth in the Bottleneck Memorandum.

*Parker Solar Project*

26. The government correctly states in Lopez Dec. ¶ 21 that BLM coordinated with the project proponent to target the start of NEPA compliance in 2025. However, two months into 2026, the developer still does not have a schedule to initiate NEPA compliance.

27. Ever since the Bottleneck Memorandum issued, the NEPA process for the project has been paused. The BLM Arizona State Office has represented to the developer that it will not process anything until it gets guidance from DOI on how to send approvals up to senior political leadership in compliance with the Bottleneck Memorandum.

8

28.     The length of the delay caused by the Bottleneck Memorandum, and the uncertainty that delay has created, is beginning to threaten the project's ultimate ability to connect with the grid.

29.     These delays are complicating the developer's negotiations with the Western Area Power Administration ("WAPA") for an interconnection agreement. The Parker Solar Project needs a ROW grant to demonstrate site control and execute the interconnection agreement, but due to the Bottleneck Memorandum, there is no certainty regarding whether or when that will happen.

*Sapphire Solar Project Gen-Tie Right of Way (ROW)*

30.     With respect to the Sapphire Solar Project, the government's assertion that "BLM is awaiting further information from, or a next step that must be taken by, the project proponent" is incorrect. Opp. 28. As an initial matter, all environmental reviews under the National Environmental Policy Act were completed and the ROW was approved by the BLM field office in March 2025. Lopez Decl. ¶ 23. Moreover, BLM received all requested information from the applicant on July 29, 2025. *Id.* As early as August 2025, BLM staff communicated that they have all of the information required to complete the draft ROW grant. Staff represented to the developer that they were awaiting approval from the Secretary's office to transmit the draft ROW package to the applicant, pursuant to the Bottleneck Memorandum. As of the date of this declaration, the ROW approval still has not been transmitted.

31.     Defendants' assertion that "none of the projects are within a 'designated leasing area'" is also inaccurate. Lopez Dec. ¶ 15. The Sapphire Solar Project is located in a "development focus area" or "DFA," as designated by the Record of Decision for the Desert Renewable Energy Conservation Plan ("DRECP").[3] According to 43 C.F.R. § 2804.35(b)(1), DFA's are included with

---

[3] Record of Decision for the Desert Renewable Energy Conservation Plan 47, Bureau of Land Mgmt. (Sep. 2016), available at

9

"designated leasing areas" and have the same force and effect in terms of prioritization. This inclusion is corroborated with Section I.4.5.4 of the Record of Decision for the Desert Renewable Energy Conservation Plan, which states that "[t]he DFAs designated on public lands through the DRECP process would be considered designated leasing areas[.]"[4]

32. Finally, the government's assertion that "BLM has continued to communicate with the proponent regarding the timeline for preparing the draft right-of-way grant," Lopez Dec. ¶ 23, is inaccurate. As of the date of this filing, BLM staff have been unable to communicate a timeline for when the Applicant will receive the draft ROW package because they are awaiting approval from the Secretary's office with no knowledge of when such approval will occur.

33. The developer of the Sapphire Solar Project faces imminent harm if the Bottleneck Memorandum is not promptly lifted and its ROW is not issued. The developer has been forced to refrain from executing a PPA with an identified prospective off-taker due to BLM's refusal to issue the ROW, resulting in schedule uncertainty. Additionally, because of the Secretary's inaction, the Sapphire Solar Project was required to seek an extension of its interconnection deadline from the California Independent System Operator ("CAISO"), the non-profit organization that manages most of California's transmission grid, and is currently targeting a commercial operation date in 2028. If the developer cannot secure the ROW grant to commence construction in the near term, it faces a substantial risk that it will be unable to meet this 2028 deadline—with no guarantee that a further extension will be granted. As explained in the initial Joint Declaration, the Sapphire Solar Project faces outstanding interconnection-related liabilities of approximately $1.8 million that

---

https://eplanning.blm.gov/public_projects/%2Fup%2F66459%2F133460%2F163124%2FDRECP_BLM_LUPA_ROD.pdf.
[4] *Id.* at 28.

10

cannot be recouped in the event of default, and has already incurred approximately $18.6 million in sunk costs that would be unrecoverable if default occurs. Joint Dec. ¶ 179.

34. These harms are neither speculative nor remote. Each additional month of delay compresses the construction schedule, increases financing risk, jeopardizes contractual relationships, and heightens the likelihood of default under the interconnection agreement. The developer's financial exposure is concrete and present today, not years in the future. Absent relief, the Bottleneck Memorandum will continue to cause immediate and escalating harm to the project.

**Offshore Wind Projects on the OCS**

35. Projects developed in federal waters pursuant to the Outer Continental Shelf Lands Act ("OCSLA") face imminent harms similar to those faced by wind and solar projects on public lands. Each stage—from leasing to site assessment to NEPA review to final approval—is contingent upon completion of the preceding step, so any delay immediately affects downstream milestones such as financing, turbine and vessel commitments, interconnection schedules, and commercial operation dates. As with BLM-permitted projects, even brief interruptions can stall progress, trigger ripple effects, and impose irrecoverable costs and other harms on developers.

*Atlantic Shore Bight Project*

36. The Atlantic Shores Bight Project is currently in the six-year preliminary period of its lease. The developer was awarded this Lease on May 1, 2022, and now has until May 1, 2028 to submit a Construction and Operations Plan ("COP"). In addition to the Lease acquisition cost of $780 million, the developer has paid a total of $952,212 in annual lease payments to the U.S. Treasury since it acquired the lease.

37. During the preliminary period, Atlantic Shores must conduct site characterization activities—including geophysical and geotechnical surveys—and complete the full range of site

11

assessments, technical studies, environmental analyses, and supporting reports necessary to generate the environmental and engineering data that inform project design and form the foundation of the Construction and Operations Plan ("COP"), a draft of which is then submitted for federal environmental review and interagency consultation pursuant to 30 C.F.R. §§ 585.620–585.628. The preparation of a COP is a multi-year undertaking that costs tens of millions of dollars.

38. After obtaining the lease, the developer spent millions of dollars conducting surveys and site assessment activities through the end of 2024 in order to prepare for COP submission. Since March 2025, the developer has been awaiting National Marine Fisheries' Service ("NMFS") approval of an authorization needed to continue carrying out site characterization surveys. Although NMFS is not a party to this suit, it is clear that the federal government writ large bears responsibility for the developer not currently pursuing the next step in the approval process.

39. Even if NMFS approves the pending authorization, due to the regulatory uncertainty stemming from the Federal Lands Anti-Renewable Ban, the Zerzan/Jorjani Opinion, and the Bottleneck Memorandum, the project lacks clarity on whether it makes economic sense to continue sinking millions of dollars into further geophysical, geotechnical, and environmental studies necessary to support the COP. Without an injunction against these Actions, the project will either be forced to continue investing millions in an attempt to meet the COP submittal requirements before the 2028 deadline, with no guarantee of ever obtaining a COP approval, or will be forced to write off those losses and shelve the project indefinitely, all while continuing to pay rental fees in the amount of $238,053 per year.

**Projects Requiring a Corps Permit on Private & Public Lands**

*Harms Arising From IPaC Ban*

40. The government is wrong in contending that developer's inability to access IPaC does not harm wind and solar developers because, *inter alia*, the U.S. Fish and Wildlife Service ("USFWS") "consulted with other Federal agencies for decades before IPaC." Schultz Dec. ¶ 9. This statement ignores the interdependent structure of the Endangered Species Act ("ESA") and U.S. Army Corps of Engineers ("Corps") permitting regimes and the undisputed fact that the Bottleneck Memorandum has caused USFWS to freeze any Section 7 consultations with other federal agencies regarding wind and solar projects.

41. The government does not dispute that the Corps must rely on USFWS species inputs before issuing permits. Prior to the issuance of the Bottleneck Memorandum, the Corps would have been able to access such information automatically, through IPaC, without the need for direct, discretionary involvement by USFWS. Due to the IPaC Ban, that pathway for the Corps is effectively closed.

42. Local USFWS field offices have told our members that the field offices are unable to respond to written requests from wind and solar developers to utilize IPaC or otherwise generate the species review outputs that IPaC previously provided. In other words, no authorized official at the working level is empowered to provide the information necessary to advance ESA Section 7 consultation.

43. In theory, the only current pathway forward would be approval from senior DOI leadership under the Bottleneck Memorandum. But there appears to be no established procedure, timeline, or criteria governing intra-agency requests for senior leadership review (*see, e.g.,* ¶ 12,

13

*supra*). Nor is there any indication that the Secretary's office is granting, or intends to grant, exemptions for specific wind and solar projects.

44. In these circumstances, the purported availability of Secretarial approval to use IPaC is illusory. An indefinite, standardless, and effectively unavailable discretionary waiver does not cure the concrete harm caused by shutting off the only functional means for the Corps to currently satisfy its ESA Section 7 obligations.

*Rich Road Solar Project*

45. Corps personnel have represented to the developer of the Rich Road Solar Project that a staff biologist at USFWS was assigned to the project on January 16, 2026, after the preliminary injunction motion in this matter was filed. *See also* Wargo Dec. ¶ 4. The project review was then sent to DOI headquarters on January 20, 2026. Absent the Bottleneck Memorandum, the Corps could issue a Letter of Permission ("LOP") as early as February 2026 allowing the project to impact jurisdictional wetlands. Because the project may have "effects" on federally listed species (*see* Joint Dec. ¶ 165) as indicated by the IPaC search consulted in 2022 the Corps needs USFWS to complete the Section 7 consultation in order to issue the LOP. Due to the Bottleneck Memorandum, it is unclear when, if ever, this consultation will be completed.

46. The Rich Road Solar Project has reached an inflection point, with upcoming development deadlines rapidly approaching, including the need to execute the Large Generator Interconnection Agreement and PPAs, and the need to initiate detailed construction design in March 2026 to maintain target commercial operation date viability.

47. The project would have a clear view to a permit issuance date, if not for the Bottleneck Memorandum. If the indefinite delay and functional permitting moratorium created by the Bottleneck Memorandum is not lifted by Q2 2026 and the LOP issued, the Rich Road Solar

Project will be forced to redesign the project, at substantial cost to the developer in terms of monetary outlay and project efficiency.

We declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Executed on February 20, 2026.

_____

Francis Pullaro

_____

Marguerite Wells

_____

Nicole Hughes



_____

Simon Mahan



_____

Erika ("Rikki") Seguin



_____

Evan Vaughan

_____

Beth Soholt

_____

Chris Carmody