# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| RENEW Northeast, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, <br><br> *Defendants*. | Civil Action No. 1:25-cv-13961 |

**SUPPLEMENTAL DECLARATION OF LAWRENCE CHRETIEN, EXECUTIVE DIRECTOR, GREEN ENERGY CONSUMERS ALLIANCE, INC. IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746(2), I, Lawrence Chretien, declare as follows:

1.      I submit this declaration in support of Plaintiffs' brief in support of a Motion for Preliminary Injunction. This declaration supplements the previous declaration I have provided in this case, incorporated herein by reference to avoid repetition.

2.      I provide this Supplemental Declaration to rebut assertions made by Defendants in their opposition brief by offering additional factual detail regarding the immediacy and irreversibility of the resulting financial and mission-based impacts on Green Energy Consumers Alliance ("GECA").

3.      In their opposition brief, Defendants argue that GECA's injuries as a result of the challenged agency actions are not "imminent" because "impacts to the 'pipeline' of future projects or broader threats to the renewable energy industry or electric service grid stability fall well outside of the timeframe need[ed] to show imminent harm is likely and, hence, to justify a preliminary

1

injunction." Defendants' Opposition Brief at 20. This contention misunderstands the relationship between federal permitting delays caused by the Anti-Renewable Actions and constrained Renewable Energy Certificate ("REC") supply in New England, and thus misapprehends the urgency of GECA's need for relief from such ongoing delays.

4.    GECA's largest funding source relies on the purchase of RECs from New England-based generators and on the sale of these RECs to individual consumers and to municipal aggregations in Massachusetts and Rhode Island. GECA's current throughput is approximately 300,000 RECs per year, the vast majority of which are sold to municipal aggregations (32 communities in Massachusetts and eight communities in Rhode Island). These sales generate approximately $12 million in gross revenue and approximately $1 million in gross margin annually. The inability of GECA to purchase RECs as a result of the challenged directives places imminent financial stress on GECA.

5.    REC supply in Massachusetts and Rhode Island is a direct function of renewable electricity actually produced by eligible facilities. A project generates RECs only after it has obtained all required permits, completed construction, and entered commercial operations. When renewable projects experience permitting delays or regulatory uncertainties that postpone their anticipated commercial operation dates ("CODs"), the expected REC output for the affected compliance years does not materialize. Those RECs are permanently lost and cannot later be created retroactively.

6.    In the New England market, projected REC supply for upcoming compliance years is based on anticipated CODs for wind and solar projects. When those CODs slip due to permitting delays or regulatory uncertainty, expected supply for those compliance years is reduced. Because compliance obligations under the Massachusetts and Rhode Island renewable energy standards

increase annually, reductions in expected REC supply create immediate upward pressure on REC prices.

7.     Massachusetts Class I REC prices have remained at or near the Alternative Compliance Payment (ACP) level (essentially a price ceiling) of approximately $40 per REC for multiple consecutive years. Attached as Exhibit A is a graph showing the price per REC by vintage year based on daily REC broker price sheets for Massachusetts Class I RECs, using averages from three independent price reports. The data reflected in that graph demonstrate sustained clustering of REC prices at or near the ACP ceiling across multiple vintage years. In my experience, this sustained pricing pattern is the result of demand for RECs, as measured by compliance obligations, with voluntary consumption outpacing the supply of eligible projects.

8.     Unless additional renewable projects are permitted, constructed, and placed into service, structural scarcity will persist and REC prices will not go down to a price point that would encourage greater demand.

9.     Based on ISO New England ("ISO-NE") data and my experience monitoring project development in the region, renewable energy development has stagnated.[1] In fact ISO-NE's figures for the resources that are classified as "on the way" materially overstate what renewable projects will be placed in service in the foreseeable future. Many of the projects reported in the ISO interconnection queue are projects that, due to a halt in federal permitting, stand little to no chance of being completed in the near term—if at all. For example, the wind power generation numbers shown assigned to Massachusetts, Rhode Island, and Maine grossly overstate how much will be placed into service in the foreseeable future.

---

[1] https://www.iso-ne.com/about/key-stats/resource-mix#on-the-way-in.

3

10.     The stagnation and overstatement of expected resources described above is not the result of ordinary market fluctuation alone. Instead, it is largely the result of delay or uncertainty caused by the inability of projects to secure needed permits to advance to development. In the New England region, for example, several large wind and solar projects expected to contribute substantial REC volumes have experienced delay or uncertainty in their anticipated CODs due to the ongoing freeze in federal permitting review. When those projects do not advance on previously expected timelines, the REC volumes associated with those compliance years do not materialize, directly reducing available supply in the Massachusetts and Rhode Island markets.

11.     GECA's injury is therefore not based on a generalized concern about renewable energy policy or industry conditions. GECA is a direct purchaser and retiree of approximately 300,000 RECs annually in defined compliance and voluntary program years. When expected project CODs slip due to federal permitting delay, the reduction in projected REC supply affects the prices and volumes GECA must secure in the current procurement cycle.

12.     GECA's annual REC procurement at current ACP-level pricing approaches $12 million. Even modest sustained price elevation materially compresses GECA's earned margin.

13.     REC-based revenue is GECA's largest source of earned income and supports the majority of our operational activities. Sustained margin compression directly affects staffing, program development, and the scope of services GECA can provide.

14.     Procurement decisions for current and upcoming compliance and voluntary program years are being made now. GECA must secure forward contracts months in advance of retirement deadlines. Elevated prices and constrained supply are materially affecting those present procurement decisions.

15.    The voluntary REC market operates under a foundational principle often referred to as "no double dipping."  Because each REC may be retired only once in the tracking system, a REC used for statutory compliance cannot also support a voluntary environmental claim.

16.    For voluntary purchases to deliver incremental environmental benefit, they must correspond to renewable generation beyond what is required for compliance. When supply is constrained and compliance demand remains high, voluntary purchases may displace compliance retirements and increase reliance on ACP payments rather than stimulate new renewable generation.

17.    Consumers and municipalities participating in GECA's programs expect that their voluntary purchases drive additional renewable development—*i.e*., additionality. When market conditions indicate that REC prices are pinned at the ACP level due to insufficient new generation, confidence in additionality diminishes.

18.    Declines in voluntary participation resulting from high prices or reduced confidence occur during the present program cycle. Lost sales and lost participants during that period cannot later be recreated, even if supply conditions improve.

19.    The harm to GECA described here is not limited to increased cost of the RECs. It also includes lost transactions, reduced program participation, erosion of consumer confidence, and contraction of program growth.

20.    These harms are occurring in the current procurement cycle and fiscal planning period. They are not contingent on long-term projections or speculative future events. The injury associated with delayed renewable deployment is ongoing and inherently irreparable.

21.    Renewable facilities that do not enter service in a given year cannot generate RECs for that year at a later date. The associated environmental attributes and transactions are permanently lost. Even if regulatory conditions later improve, there is no mechanism to restore

REC supply that was not generated during the period of delay. Lost revenue, lost participation, and lost market confidence during that period cannot be fully remedied through later price adjustments or monetary compensation.

22.    For these reasons, delayed renewable project deployment directly constrains REC supply, sustains ACP-level pricing, and presently and materially affects GECA's financial stability and mission-based activities in a manner that is immediate and not reversible.

23.    Importantly, these existing and ongoing injuries to GECA will continue and perpetuate themselves the longer the Anti-Renewable Actions remain in place.

24.    The only thing that can mitigate these harms to GECA going forward is the resumption of federal permitting for renewable energy projects—ideally as soon as possible—because that would ensure the generation of RECs that will stabilize the market in future years and minimize the number of years of constrained REC supply.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Lawrence Chretien, Executive Director

Green Energy Consumers Alliance, Inc.

Executed on February 19, 2026.

6

**EXHIBIT A**

This graph shows the annual price per REC based on daily broker price sheets for Massachusetts Class I RECs, using averaged data from three independent price reports. The data demonstrate that REC prices have remained elevated over multiple years, reflecting constrained supply. In my experience, prices are unlikely to decline materially unless additional renewable energy projects are permitted, constructed, and brought into operation. Sustained elevated prices directly affect the voluntary market in which GECA operates and also increase overall compliance costs borne by Massachusetts ratepayers.

