

# United States Department of the Interior
## OFFICE OF THE SOLICITOR
### Washington, D.C.  20240

May 1, 2025

M-37086

Memorandum

To:          Secretary

From:        Acting Solicitor

Subject:     Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059, *Secretary's Duty to Prevent Interference with Reasonable Uses of Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p)*, Alternate Energy-related Uses on the Outer Continental Shelf

On December 14, 2020, former Solicitor Daniel H. Jorjani issued M-Opinion 37059,[1] addressing how the Department is to interpret and apply subsection 8(p)(4) of the Outer Continental Shelf Lands Act ("OCSLA").[2] That subsection is part of subparagraph (p), which grants the Secretary authority to grant a lease, easement, or right-of-way on the Outer Continental Shelf for activities not otherwise authorized in OCSLA and other applicable law.[3] Subsection 8(p)(4), in relevant part, states:

> "(4) **Requirements.** The Secretary [of the Interior] shall ensure that any activity under this subsection is carried out in a manner that provides for— . . . (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas[.]"[4]

Paragraph (4) of that subsection directs the Secretary to ensure that any activity undertaken pursuant to subsection (p) must be taken in accordance with the requirements established in that paragraph.[5]

---

[1] M-Opinion 37059 was formally entitled, *Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p)*, Alternate Energy-related Uses on the Outer Continental Shelf. This M-Opinion will refer to that document by the far-less verbose "M-Opinion 37059" or the "Jorjani Opinion".

[2] 43 U.S.C. § 1337(p)(4).

[3] *Id.* § 1337(p)(1).

[4] *Id.* § 1337(p)(4).

[5] *Id.*

In M-Opinion 37059, Solicitor Jorjani concluded that the proper scope of the phrase "prevention of interference with reasonable uses" is such that, when evaluating whether a proposed activity would conflict with an existing use, the Secretary is required "to act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference."[6]

On April 9, 2021, Principal Deputy Solicitor Robert Anderson revisited M-Opinion 37059 in an M-Opinion entitled, *Secretary's Duties under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf*, M-37067 ("Anderson Opinion" or "M-Opinion 37067"). The Anderson Opinion withdrew the Jorjani Opinion, reasoning that:

> M-Opinion 37059 did not read OCSLA subsection 8(p)(4) as a whole, but instead applied tools of statutory construction to "interpret" the phrase "prevention of interference with reasonable uses" in subsection 8(p)(4)(I). Because the Opinion did not acknowledge the subsection's remaining text—requiring the Secretary to act "in a manner providing for" several goals—the Opinion failed to situate subsection 8(p)(4) within a familiar category of statutes imposing only general obligations on federal agencies.

The Anderson Opinion then concluded that the Jorjani Opinion's analysis was superfluous and stated: "because subsection 8(p)(4) commands only that the Secretary rationally balance the subsection's various goals, the subsection may not be read to impose additional requirements in its individual paragraphs, such as the requirement that the Secretary 'prevent[] all interference, if the proposed activity would lead to unreasonable interference.'"[7]

The Jorjani Opinion and the Anderson Opinion thus both wrestle with the question of how best to interpret the statutory language of OCSLA's subsection 8(p)(4) "requirements" paragraph. Questions of statutory interpretation are notoriously fraught exercises subject to no small amount of conflicting methods and precedent. However, since the time of the Anderson Opinion, the U.S. Supreme Court has added a guiding light to direct federal agencies as to how best to approach this dilemma.

In *Loper Bright Enterprises v. Raimondo, Secretary of Commerce*, the Supreme Court addressed the question of whether federal courts should defer to "'permissible' agency interpretations of the statutes those agencies administer . . ."[8] The Court concluded that when reviewing agency action under the Administrative Procedure Act ("APA") it is the duty of federal courts to exercise their own best judgment to independently interpret a statute and effectuate the will of Congress, subject to constitutionally imposed limitations.[9] The clear implication of the Court's holding is

---

[6] M-Opinion 37059 at 15.

[7] M-Opinion 37067 at 4-5 (internal footnotes and citations omitted).

[8] 603 U.S. 369, 378 (2024).

[9] *Id.* at 395 ("When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.").

that a "permissible" agency interpretation of a statute will not suffice to shield the agency from reproach if its reading is not the best, most faithful reading of the statute in question.[10]

A recent decision in the First Circuit Court of Appeals, *Seafreeze Shoreside v. United States Department of the Interior*,[11] offers a useful interpretation of the (p)(4) criteria. That court upheld the District Court's conclusion that "the OCSLA criteria are 'mandatory,'" and "BOEM must ensure that 'each criterion is met' in a manner that is 'not to the detriment of the other criteria.'"[12] The Anderson Opinion's assertion that "subsection 8(p)(4) commands only that the Secretary rationally balance the subsection's various goals" both diminishes the importance of each subparagraph (contrast "mandatory" with "goals"), while also opening the door to the possibility that any one criteria may be favored over another. This no longer reflects the best, or even a permissible, agency interpretation. It must therefore be withdrawn.

The same defect does not exist with respect to the Jorjani M-Opinion 37059. The Jorjani Opinion is focused on interpreting and providing advice on the scope of the subsection (p)(4)(I) requirement. Its guidance counsels a Secretary to err on the side of ensuring less interference with reasonable uses while neither minimizing nor aggrandizing the relative importance of that particular criteria.

Because M-Opinion 37067 conflicts with the best reading of OCSLA, M-Opinion 37067 is hereby withdrawn. Furthermore, M-Opinion 37059 is hereby reinstated and all relevant Department bureaus and offices are instructed to treat M-Opinion 37059 as binding and authoritative. In addition, the regulatory provision at 30 C.F.R. § 585.102, and any other Departmental action taken in reliance on the now withdrawn M-Opinion 37067, should be re-evaluated in light of this Memorandum.

Gregory Zerzan

---

[10] *Id.* at 373 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").
[11] 123 F.4th 1, 25-27 (1st Cir. 2024).
[12] *Id.* at 25.

3



# United States Department of the Interior
OFFICE OF THE SOLICITOR
1849 C Street N.W.
Washington, DC 20240

**DEC 1 4 2020**

M-37059

Memorandum

To:         Secretary

From:       Solicitor

Subject:    Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive
            Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer
            Continental Shelf Lands Act Subsection 8(p), *Alternate Energy-related Uses on
            the Outer Continental Shelf*

## I.    Introduction

In a memorandum dated September 15, 2020, attorneys in the Division of Mineral Resources of
the Solicitor's Office provided advice to David MacDuffee, Chief, Projects Coordination Branch,
Office of Renewable Energy Programs, Bureau of Ocean Energy Management (BOEM), on the
interpretation of subsection 8(p)(4)(I) of the Outer Continental Shelf Lands Act, as amended in
2005 (OCSLA)[1] (September 2020 Memo).  The initial advice was that "prevention of
interference with reasonable uses of the exclusive economic zone, the high seas, and the
territorial seas," meant that BOEM should prevent interference with the legal right to fish or
navigate, rather than prevent physical impediments to fishing and vessel transit.  The Secretary
has asked me to review this initial legal advice and provide my analysis of the language of
subsection 8(p)(4)(I) to determine what the statement, "The Secretary shall ensure that any
activity under this subsection is carried out in a manner that provides for— . . . (I) prevention of
interference with reasonable uses (as determined by the Secretary) of the exclusive economic
zone, the high seas, and the territorial seas" means, particularly in relation to fishing and vessel
transit.

Rather than the highly constrained interpretation of "interference" cited in the September 2020
Memo, a strict textual reading of the statute lends itself to an interpretation that requires the
Secretary, when assessing whether to approve an activity on the Outer Continental Shelf (OCS)

---

[1] Section 8 of OCSLA was amended by section 388 of the Energy Policy Act of 2005 (EPAct) to add a new
paragraph (p).  That modification to OCSLA was codified at 43 U.S.C. § 1337(p).

under subsection 8(p)(1) of OCSLA,[2] to prevent any and all interference with fishing or other reasonable uses. Under such a reading, if it is not possible to prevent interference, the Secretary would be required to disapprove the activity. However, as discussed below, just as the September 2020 Memo was impermissibly narrow in its interpretation, interpreting the provision to require prevention of "any and all interference"—even the prevention of *de minimis* or reasonable interference—would be overly proscriptive when the statutory provision is read in context and in light of established canons of statutory interpretation.

Accordingly, I conclude that the meaning of the phrase "prevention of interference with reasonable uses" requires a more nuanced interpretation. Based on the analysis below, I advise the Secretary that the phrase requires the Secretary to act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference. This means preventing all interference, if the proposed activity would lead to unreasonable interference, but not the type of interference that would be described as *de minimis* or reasonable. Moreover, the interference that the Secretary should prevent is more than impediments only to the legal right to engage in other reasonable uses.

Additionally, in its initial regulations promulgated after subsection 8(p)(4)(I) was enacted, BOEM included a regulatory provision at 30 C.F.R. § 585.621(c) (emphasis added) that requires a lessee to demonstrate in its Construction and Operations Plan (COP) that the proposed activities will not "*unreasonably* interfere with other uses of the OCS, including those involved with National security or defense." Though this interpretation adds a modifier to "interfere" that the statute did not provide—and thus differs from the statutory language—by disallowing interference that is unreasonable, the regulation implements an avenue for preventing all interference when that interference is unreasonable, thereby implementing the plain meaning of the statute in this context. At the same time, the regulatory provision would not bar *de minimis* or reasonable interference, and this is consistent with the statutory provision when it is read in context and considering established canons of statutory interpretation, as discussed below. Under this reading, in determining whether interference is unreasonable, I advise the Secretary to consider not only the individual proposed activity but how that activity would add to the overall level of interference with a reasonable use and to consider the nature of the interference from the perspective of the other users.

## II.    Purpose and Relevant Text of Section 388 of the Energy Policy Act of 2005

### A. Purpose

Section 388 of the Energy Policy Act of 2005 (EPAct) amended OCSLA to authorize the Secretary to:

> grant a lease, easement, or right-of-way on the outer Continental Shelf for activities not otherwise authorized in this . . . Act [OCSLA] . . . if those activities:

---

[2] In this memorandum, I am focusing on wind energy activities under subsection 8(p)(1)(C) of OCSLA, but its findings are equally applicable to other activities that could be authorized by subsection 8(p)(1). 43 U.S.C. § 1337(p)(1).

    (i)      support exploration, development, production, or storage of oil or natural gas . . . ;

    (ii)    support transportation of oil or natural gas, excluding shipping activities;

    (iii)   produce or support production, transportation, or transmission of energy from sources other than oil and gas; or

    (iv)   use, for energy-related or other authorized marine-related purposes, facilities currently or previously used for activities authorized under the [OCSLA], . . . .[3]

## B. Requirements of Subsection 8(p)(4)

In addition to providing the authority to issue leases, easements, and rights-of-way, the EPAct included a requirement that any activity authorized under this authority must be:

carried out in a manner that provides for—

(A) safety;

(B) protection of the environment;

(C) prevention of waste;

(D) conservation of the natural resources of the outer Continental Shelf;

(E) coordination with relevant Federal agencies;

(F) protection of national security interests of the United States;

(G) protection of correlative rights in the outer Continental Shelf;

(H) a fair return to the United States for any lease, easement, or right-of-way under this subsection;

(I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;

(J) consideration of—

(i) the location of, and any schedule relating to, a lease, easement, or right-of-way for an area of the outer Continental Shelf; and

(ii) any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;

---

[3] Section 388 of the EPAct modified section 8 of OCSLA by adding a subsection (p), and is codified at 43 U.S.C. § 1337(p).

(K) public notice and comment on any proposal submitted for a lease, easement, or right-of-way under this subsection; and

(L) oversight, inspection, research, monitoring, and enforcement relating to a lease, easement, or right-of-way under this subsection.

43 U.S.C. 1337(p)(4).

## III.    Analysis

### A.  Textual Analysis of Subsection 8(p)(4)(I)

When interpreting a statute, we are to give words their ordinary, everyday meanings, unless Congress has provided a specific definition. Congress has not done so here. "Congress' intent is found in the words it has chosen to use." *Harbison v. Bell*, 556 U.S. 180, 198 (2009) (Thomas, J., concurring) (citation omitted). While it could be argued that, at first glance, the meaning of subsection 8(p)(4)(I) is clear and, in fact, requires the Secretary to ensure that an activity is carried out in a manner that provides for prevention of *any* interference with reasonable uses, such a reading could effectively negate the authority Congress provided to the Secretary in this subsection. If fishing and vessel transit are reasonable uses and offshore renewable energy service vessels and infrastructure would interfere—even in a *de minimis* or reasonable manner— with those uses, this subsection could render the EPAct's grant of authority superfluous as it seems unlikely that any wind energy activity could meet that bar.

I do not believe a reading that results in an outcome potentially incompatible with the plain grant of authority in the statute is supported. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) ("In deciding whether a result is absurd, we consider not only whether that result is contrary to common sense, but also whether it is inconsistent with the clear intentions of the statute's drafters—that is, whether the result is absurd when considered in the particular statutory context. If the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, . . . the intention of the drafters, rather than the strict language, controls.") (internal citations and quotation marks omitted) (citations omitted). Moreover, "[t]he rule that statutes are to be read to avoid absurd results allows an agency to establish that seemingly clear statutory language does not reflect the unambiguously expressed intent of Congress . . . ." *Id.* (internal citations and quotation marks omitted). Accordingly, I find that the provision requires a more nuanced interpretation and that the text must be given the best reading considering the entire statute and Congress's unambiguous grant of authority to issue certain leases, easements, and rights-of-way.

The term "interference" is normally understood to mean "the act or process of interfering." *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com (last visited Dec. 4, 2020). The term "interfere" generally means "to interpose in a way that hinders or impedes." *Id.* The term "uses" is generally understood to mean the plural of "use," which is itself understood to mean "to put into action or service, or to expend or consume." *Id.* The term "prevention" is generally understood to mean "the act of preventing or hindering." *Id.* Given the generally understood meaning of these terms, the Secretary has a duty to carry out subsection 8(p)(4)(I) in a manner that, at a minimum, hinders activities that would impede reasonable uses. Moreover,

4

nothing in these general terms expressly or impliedly limits the definition of interference only to interference with the legal right to engage in the particular use.

Having found that subsection 8(p)(4)(I) cannot be applied fully because it would conflict with Congress' statutory intent, established canons of statutory interpretation can be applied to clarify its meaning. When analyzing the meaning of a statutory duty, there is a presumption of consistent usage. This presumption means that "[a] term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (citation omitted). The Supreme Court, in at least one instance, has referred to "the established canon of construction that similar language within the same statutory section must be accorded a consistent meaning." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501(1998). The term "prevention" is used in subsections 8(p)(4)(C) and (I) of OCSLA. Based on this canon, the meaning of the word "prevention," as used in subsection 8(p)(4)(I) should be accorded the same meaning as the word "prevention" as used in subsection 8(p)(4)(C).

As used in subsection 8(p)(4)(C), it requires the Secretary to ensure that any activity under subsection 8(p) is carried out in a manner that provides for "prevention of waste." 43 U.S.C. § 1337(p)(4)(C). In the context of wind energy development, the concept of waste is evolving, since, unlike oil and gas resources, wind is a renewable and nearly ever-present resource. Nevertheless, waste in the wind energy context could involve the inefficient placement of turbines for capture of wind energy or the inefficient transmission of generated power. It is fair to say that, under subsection 8(p)(4)(C), the Secretary should take action to prevent all waste from activities authorized by subsection 8(p). Nevertheless, as a practical matter, while operators may be able to prevent almost all waste, they may not be able to prevent all waste. For example, despite best efforts in installing, spacing, and operating wind energy facilities and running power transmission lines to shore in the most efficient manner, there may be factors that cause or tend to cause either a reduction in or waste of the quantity of power generation from the project area that would otherwise be produced under ideal conditions or an unacceptable loss in electrical transmission due to inefficient routing of transmission lines. Thus, "prevention of waste" means, in practice, nearly all waste, but not waste that is beyond what could reasonably be expected from current wind energy industry expertise and technology.

In light of these considerations about subsection 8(p)(4)(C), applying the word "prevention" in subsection 8(p)(4)(I) should likewise recognize the practical limitations on the ability of the wind energy industry, given current expertise and technology, to avoid all interference with reasonable uses, thereby leading to an interpretation that would disallow interference that could practically be avoided, while allowing for *de minimis* or reasonable interference.

"The plainness or ambiguity of statutory language is determined by the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citations omitted). In the very next subsection, 8(p)(4)(J), the statute requires the Secretary to ensure that any activity under subsection 8(p) is carried out in a manner that provides for consideration of:

5

> (i)    the location of . . . a lease, easement or right-of-way for an area of the outer Continental Shelf, and
>
> (ii)    any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation.

43 U.S.C. § 1337(p)(4)(J). This subsection requires the Secretary to consider use of the sea or seabed for a fishery or vessel transit and subsection 8(p)(4)(I) requires the Secretary to prevent interference with those uses if they are reasonable. Based on the textual analysis above, wind energy activities that may cause *de minimis* or reasonable interference with reasonable uses for fishing or vessel transit under subsection 8(p)(4)(I) will also be considered under subsection 8(p)(4)(J). Moreover, the Secretary's consideration of use of the sea or seabed for a fishery or vessel transit under subsection 8(p)(4)(J) would help inform any determination that certain wind energy activities would cause unreasonable interference under subsection 8(p)(4)(I).

In addition, I note that to the contrary, there is nothing in the statute that states, either expressly or impliedly, that interference related to fishing or vessel transit[4] is limited to interference with the legal right to fish or navigate within the area. Simply put, if the Secretary determines that either fishing or vessel transit constitute "reasonable uses . . . of the exclusive economic zone, the high seas, and the territorial seas," the Secretary has a duty to prevent interference with that use. *See id.* § 1337(p)(4)(I). Nowhere does the statute indicate that the Secretary is only to prevent interference with the legal right to navigate or fish in an area. It is the Secretary's job to provide for the prevention of interference with those uses. Thus, when considering whether to "grant a lease, easement, or right-of-way, on the outer Continental Shelf for activities not otherwise authorized in [OCSLA] . . . or other applicable law," *see id.* § 1337(p)(1), the Secretary must determine whether the activities proposed on a lease, easement, or right-of-way would interfere with reasonable uses in the area, beyond *de minimis* or reasonable interference, and take action to ensure that such interference is prevented or disapprove the activity if that interference cannot be prevented to a degree the Secretary deems acceptable within the parameters of the provision.

## B. Legislative History for Subsection 8(p)(4) of OCSLA

Being mindful of "[t]he false notion that committee reports and floor speeches are worthwhile aids in statutory construction," A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts, 369 (2012), I nevertheless review the legislative history for potential insight into the meaning of this provision. *See also* Oliver Wendell Holmes, The Theory of Legal Interpretation, Collected Legal Papers 203, 207 (1920) ("We do not inquire what the legislature meant; we ask only what the statute means."). The legislative history for the amendment of OCSLA that added subsection 8(p)(4) is very limited and does not appear to shed light on the meaning of the terms used in subsections 8(p)(4)(I) or 8(p)(4)(J) in any detail.

Included as part of the EPAct, the amendment is referenced as "Alternate Energy-Related Uses on the Outer Continental Shelf." Pub. L. No. 109-58, § 388, 119 Stat. 594 (2005). Two senators, Vitter and Warner, introduced the amendment text as Amendment Nos. 802 and 860,

---

[4] For purposes of this memorandum, I am assuming that fishing and vessel transit are reasonable uses, recognizing that BOEM would make such a determination on a case-by-case basis when implementing these provisions.

6

respectively. 151 Cong. Rec. S7204-02, S7232 (2005) (statement of Sen. David Vitter); 151 Cong. Rec. S7078-01, S7087-88 (2005) (statement of Sen. John Warner). Neither amendment version included the language now provided in subsections 8(p)(4)(I) or 8(p)(4)(J). *See id.*

The amendment text as originally proposed to the Congress by the Department of the Interior years before included some of the subsections now listed under section 8(p)(4) as "factors" for the Secretary of the Interior to consider in deciding "whether a lease, easement, or right-of-way shall be granted competitively or noncompetitively." *See, e.g.*, 151 Cong. Rec. S6834, S6865 (2005). In the final statutory language, those factors, in addition to subsections 8(p)(4)(I) and 8(p)(4)(J), are instead written as requirements that the Secretary must ensure are met by any activity approved under subsection 8(p)(4). *See* 43 U.S.C. § 1337(p)(4)(A)-(L).

The textual changes between the amendment as proposed and as adopted reveal a shift from mere considerations to affirmative requirements with which all approvals must comply. *Compare* 151 Cong. Rec. at S7087-88 *to* 43 U.S.C. § 1337(p)(4). This change may be in response to states' concern over the protection of coastal areas and near-shore waters. *See* 151 Cong. Rec. H2192, H2209 (2005) (statement of Rep. Samuel Farr) ("[S]everal provisions in H.R. 6 will weaken California's right to govern itself. These include changes in . . . expanding alternative energy projects situated on the [OCS]."); *see also* 151 Cong. Rec. H2180, H2186 (2005) (statement of Rep. Anna Eshoo) ("This bill will give the Department of the Interior permitting authority for 'alternative' energy projects, such as wind projects, situated on the [OCS]. It also grants [DOI] authority to permit other types of energy facilities, including facilities to 'support the exploration, development, production, transportation, or storage of oil, natural gas, or other minerals.' These facilities could be permitted within coastal areas currently subject to congressional moratoria on oil and gas leasing.").

Considering the dearth of legislative history, courts have interpreted the requirements provided for in subsection 8(p)(4) based on the statutory language alone without reference to legislative history. In one case, after fully quoting subsection 8(p)(4), the United States District Court for the District of Columbia stated: "The plain language of the Shelf Lands Act therefore suggests that it would have been unlawful for BOEM to rely on the Coast Guard's findings if those findings did not further the Secretary of the Interior's obligation to ensure that the Cape Wind project 'is carried out in a manner that provides for safety.'" *Pub. Emps. for Env'tl Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 98 (D.D.C. 2014).

### C. Legislative History for Subsection 11(g) of OCSLA

Subsection 11(g) of OCSLA, which governs geological and geophysical oil and gas exploration permitting, contains two other references to the term "interfere" that may help inform the interpretation of the term "interference" as it appears in subsection 8(p)(4)—one with and one without the adverb "unreasonably":

> (g) Determinations requisite to issuance of permits
>
> Any permit for geological explorations authorized by this section shall be issued only if the Secretary determines, in accordance with regulations issued by the Secretary, that—

7

(1) the applicant for such permit is qualified;

(2) the exploration will not *interfere* with or endanger operations under any lease issued or maintained pursuant to this subchapter; and

(3) such exploration will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, *unreasonably interfere* with other uses of the area, or disturb any site, structure, or object of historical or archeological significance.

43 U.S.C. § 1340(g) (emphasis added).

The legislative history for subsection 11(g) of OCSLA, included as part of the 1978 amendments to section 11 of OCSLA, Pub. L. No. 95-373 § 202, 92 Stat. 629, does not explicitly discuss the reasoning behind the differing references to the word "interfere" in paragraphs (2) and (3) of that subsection. However, the textual difference between the paragraphs can be inferred as having significance, considering its regulatory origin.

The language in subsection 11(g)(2) was included in the original statutory language of OCSLA in 1953. *See* Pub. L. No. 83-212, § 11, 67 Stat. 462 ("Any agency of the United States and any person authorized by the Secretary may conduct geological and geophysical explorations in the [OCS], which do not interfere with or endanger actual operations under any lease maintained or granted pursuant to this Act[.]"). The language in subsection 11(g)(3), however, was added as part of the 1978 amendments to the Act. *See* H.R.1614, Sec. 206 [H. Rep No. 95-590], 95th Cong., 1st Sess. (1977). Congress's only explanation for adding this language is mentioned in an Ad Hoc Select Committee on OCS Report, which briefly explained that the language in subsection 11(g)(3) was added to "establish[] the requirements for regulations as to the granting of any exploration permit, 'on' or 'off structure[,]'" and was "patterned on existing regulations, 43 C.F.R. [sic] 251.5." H. Rep. No. 95-590, 95th Cong., 1st Sess. (1977), at 148.

At the time of the 1978 OCSLA amendments, the pertinent regulation at 43 C.F.R. § 251.5 stated: "The Supervisor shall not issue any permit until he has found that such exploration *will not interfere with or endanger operations under any lease maintained or granted pursuant to the [OCSLA]* and that such exploration will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, *unreasonably interfere with other uses of the area*, or disturb any site, structure or object of historical or archaeological significance." 40 Fed Reg. 17,743, 17,759 (Apr. 22, 1975); codified at 43 C.F.R. § 251.5(b) (emphasis added). These permit conditions are listed elsewhere in the regulations and include the same use and non-use of "unreasonably" as a modifier to the verb "interfere." *See id.* (codified at 43 C.F.R. §§ 251.5(f), 251.11(b), 251.12(a)).

Although Congress does not explicitly discuss the significance of the text in subsection 11(g), some inferences can be drawn from the Department's regulatory language upon which Congress based the amendment. *See* 40 Fed. Reg. at 17,759. First, 43 C.F.R. § 251.5 enumerated the conditions of paragraphs (2) and (3) of the OCSLA together in one list, which suggests including "unreasonably" as a modifier only to the second use of the verb "interfere" was intentional. *Id.* Second, the use of the term "unreasonably" to modify the verb "interfere"

8

regarding "other uses of the area," but not regarding "operations under any lease maintained or granted pursuant to [OCSLA]" in the same subsection suggests the two standards are to be interpreted differently. *Cf. Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) ("[E]very clause and word of a statute should, if possible, be given effect.") (international quotation marks omitted) (citations omitted). Thus, the modifier instructs the Secretary not to issue a permit for exploration if the interference with other uses of the area would be unreasonable, as opposed to if any interference with other uses were to occur. *See* 40 Fed Reg. at 17,759. By contrast, the lack of a modifier for interference with operations under any leases is a stricter standard that disallows the Secretary from issuing a permit application if any interference with those other lease operations would take place, regardless of reasonableness. *Id.* This underscores that a stricter standard for the application of the term "interference" in subsection 8(p)(4)(I)—where it is used without modification—is warranted, while at the same time recognizing that the determination in subsection 11(g) pertains to whether or not to issue a permit at all, rather than ensuring that an activity authorized under subsection 8(p) is carried out in a manner to prevent interference with reasonable uses.

Lastly, interpreting subsection 11(g)(3) to create greater restrictions for avoiding conflicts with existing leases and lesser restrictions for avoiding conflicts with other uses, such as fishing and vessel transit, is consistent with the congressional interest in allowing for exploration and development of the oil and gas resources of the OCS in the Act, as amended. *See* Ad Hoc Select Comm. on OCS Report (1977), at 1167, 1308.

Finally, section 1421 of the Deep Seabed Hard Mineral Resources Act (30 U.S.C. §§ 1401-1473) (emphasis added), enacted on June 28, 1980, may be instructive in determining the significance of not including the term "unreasonably" to modify "interference" in subsection 8(p)(4)(I):

> § 1421. Prevention of interference with other uses of the high seas
>
> Each license and permit issued under this subchapter shall include such restrictions as may be necessary and appropriate to ensure that exploration or commercial recovery activities conducted by the licensee or permittee do not *unreasonably interfere* with the interests of other states in their exercise of the freedoms of the high seas, as recognized under general principles of international law.

Another example in which Congress directed the application of a reasonableness standard is in 46 U.S.C. § 3715(b)(4), which relates to transport of oil or hazardous materials on navigable waters of the United States and states that "[t]he Secretary shall prescribe regulations to carry out subsection (a) of this section. The regulations shall include provisions on . . . the prevention of any unreasonable interference with navigation or other reasonable uses of the high seas, as those uses are defined by treaty, convention, or customary international law[.]" These other laws demonstrate that when Congress intends to include a reasonableness standard related to interference with other uses, it has done so expressly. However, the Supreme Court has also recognized that "because words used in one statute have a particular meaning they do not necessarily denote an identical meaning when used in another and different statute." *United States ex rel. Chicago, New York & Boston Refrigerator Co. v. Interstate Com. Comm'n*, 265

9

U.S. 292, 295 (1924). The significance of Congress not including a reasonableness standard in subsection 8(p)(4)(I) must be determined in the context of section 8(p).

Thus, this usage also supports a stricter interpretation of "interference" than mere "legal right" or other interpretations based on reasonability that would permit a more substantial amount of interference.

### D. Implementing Regulations

The regulations that the Department promulgated in 2009 define "prevention of interference of reasonable uses" by applying a reasonableness standard. Subsection 8(p)(4)(I) is implemented by the regulations at 30 C.F.R. §§ 585.102 and 585.621.

The regulations at 30 C.F.R. § 585.102(a)(9) mimic subsection 8(p)(4)(I) in describing BOEM's responsibilities, stating, with emphasis added:

> What are BOEM's responsibilities under this part?
>
> (a) BOEM will ensure that any activities authorized in this part are carried out in a manner that provides for:
>
> * * *
>
> (9) *Prevention of interference with reasonable uses* (as determined by the Secretary or Director) of the exclusive economic zone, the high seas, and the territorial seas; . . .

The regulations at 30 C.F.R. § 585.621 account for the use of the term "prevention" in subsection 8(p)(4)(I) by including a reasonableness standard, thereby rejecting the interpretation that all interference is disallowed. The regulations at 30 C.F.R. § 585.621 state, with emphasis added:

> What must I demonstrate in my COP?
>
> Your COP must demonstrate that you [the Lessee] have planned and are prepared to conduct the proposed activities in a manner that conforms to your responsibilities listed in [section] 585.105(a) and:
>
> * * *
>
> (c) Does not *unreasonably interfere* with other uses of the OCS, including those involved with National security or defense."

While the preamble to the Final Rule, *Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf*, 74 Fed. Reg. 19,638 (April 29, 2009), does not contain any express discussion of why 30 C.F.R. § 585.621(c) uses the term "unreasonably interfere," the Minerals Management Service (MMS, which is BOEM's predecessor agency) noted that "[a] common thread running through the comments on coordination and consultation is the desire to establish and use planning and coordination mechanisms to facilitate appropriate siting of OCS

10

renewable energy activity and to develop meaningful priorities." 74 Fed. Reg. at 19,643. Further, BOEM stated that:

> Consistent with this statutory direction, MMS understands that this rule will be applied in conjunction with interagency-led planning activities that are undertaken to avoid conflicts among users and maximize the economic and ecological benefits of the OCS. These activities will include multifaceted spatial planning effort[s] that will incorporate ecosystem based science and stewardship along with socioeconomics, research, and modeling in the context for demands for other ocean uses and functions. It is anticipated that the Council on Environmental Quality will help coordinate this interagency effort, with the National Oceanic and Atmospheric Administration (NOAA) playing a key role, along with MMS. Through this type of coordination and advance planning, we expect to be able to speed the process of developing renewable energy projects in the OCS.

*Id.* at 19,643. This preamble language recognizes that a certain amount of "give and take" would take place to avoid conflicts when siting renewable energy facilities; thus, it is not surprising that, in its rulemaking, MMS would interpret "prevention of interference with reasonable uses" to mean that proposed activities must not "unreasonably interfere" with other uses.

This interpretation has not been challenged in over 10 years since this regulation was promulgated and it is likely that a court would uphold it as a reasonable agency interpretation, especially considering the analysis set out above. However, the limits on such an interpretation are critical to a proper implementation of the regulatory provision, as discussed below.

What constitutes "unreasonable interference" must be properly understood. Assuming the Secretary deems a use to be reasonable, how is the Secretary to determine what level of interference is unreasonable and, therefore, impermissible under this regulation? To improve the likelihood of success in litigation, were there to be a challenge by the fishing industry to an authorized wind energy activity under subsection 8(p), I advise the Secretary to make two sliding-scale determinations when implementing this regulatory provision:

1. ***Determine what is unreasonable based on the perspective of the fishing user.*** This means, for example, that for commercial fishermen whose transit would suffer minimal interference (e.g., adding only a couple minutes to arrive at their fishing location), such interference by itself would likely not constitute unreasonable interference. If the proposed wind energy activity, however, would bar access to, or greatly impact fishing activity, then this degree of interference would rise to the level of unreasonableness.

2. ***Determine what is unreasonable based on the cumulative interference.*** While one minimal interference by itself might not be unreasonable, the cumulative effect of multiple interferences from a proposed activity, along with the interference from other pre-existing wind energy activities, might lead to a determination that the cumulative impact is unreasonable as a whole, given the limitations on the Secretary.

11

Consequently, the Department should evaluate whether a series of minor interferences might collectively become unreasonable.

Further, it is important to observe that any compensation system established by a lessee to make users of the lease area whole financially does not negate interference—indeed the creation of such a system *presumes* interference. As such, any proposed compensation process should not be viewed as "curing" any 8(p)(4(I) interference since the statute does not provide for such a cure.

## E. Relevant Case Law

Federal courts have directly addressed challenges to agency action taken under subsection 8(p) of OCSLA, as amended by the EPAct, in two disputes over offshore wind energy projects. In both cases, federal courts referred to the statutory language in subsection 8(p) and regulations implementing that section, 30 C.F.R. §§ 585.100 *et seq.*, to determine whether the federal government complied with the requirements of OCSLA.

In *Public Employees for Environmental Responsibility v. Beaudreau*, environmental groups and others challenged the Cape Wind Energy Project, an offshore wind energy project proposed in Nantucket Sound off the coast of Massachusetts, under 43 U.S.C. § 1337(p)(4). 25 F. Supp. 3d at 77. Plaintiffs argued that BOEM—the lead federal agency delegated by the Secretary to implement section 1337—had violated subsections 8(p)(4)(A) and (B) by relying on insufficient navigational safety analyses conducted by the U.S. Coast Guard and thus failing to "provide [] for . . . safety" and "protection of the environment." *Id.* at 101.

In its analysis, the D.C. District Court referred to the plain language of 43 U.S.C. § 1337(p)(4) and interpreted that section as creating an obligation in the Secretary to ensure offshore renewable energy activities approved under the statute provide for the enumerated requirements in that section. *Id.* at 102. The district court recognized that the Secretary extended this obligation to BOEM by regulation. *Id.* at 84. The district court concluded that, if BOEM relied on findings that did not further this obligation, the agency would fail to meet the requirements of 43 U.S.C. § 1337(p)(4) and would violate OCSLA. *Id.* After its review of the administrative record, the district court held that the terms and conditions provided by the U.S. Coast Guard, upon which BOEM relied, were "consistent with the terms of the [OCSLA]." *Id.* at 97. Further, the district court held that the inclusion of "provisions for future action are [also] consistent with the terms of the [OCSLA]" because activities approved under 43 U.S.C. § 1337 must be "carried out in a manner that provides for" all the terms in subsection 8(p)(4). *Id.* at 100 (citing 43 U.S.C. § 1337(p)(4)(L)).

Additionally, plaintiffs in the Cape Wind case claimed BOEM violated OCSLA by approving the project's COP without requiring prior geotechnical and geophysical studies of the project area. *Id.* at 106. The district court noted that, generally, the regulations require these studies to be completed in advance of COP approval, but the regulations also provide for a temporal departure under certain circumstances. *Id.* at 107. Reading both the statutory and regulatory language in context, the district court rejected plaintiffs' "selective reading" of OCSLA and determined that a "departure" is not a "lease proposal" according to the exact language of 43 U.S.C.

12

§ 1337(p)(4)(K). *Id.* The district court thus plainly interpreted the regulations implementing the statute to hold that BOEM complied with OCSLA regarding the approval of departures from those regulations to require survey completion before construction. *Id.* The district court again clarified that 43 U.S.C. § 1337(p) requires an overall obligation for the Secretary to provide for the various terms enumerated under subsection 8(p)(4) that "applies not only to approving individual steps of the process, such as the timing of the collection of survey data, but rather to the entirety of the leasing process." *Id.*

On appeal, the United States Court of Appeals for the District of Columbia upheld the lower court's ruling that BOEM had not violated OCSLA, applying the same statutory language analysis. *Pub. Emps. for Env'tl Resp. v. Hopper*, 827 F.3d 1077, 1085 (D.C. Cir. 2016) (interpreting subsection 8(p)(4)(A)-(B)). However, the D.C. Circuit also held that the statute provides for flexibility, so long as compliance with the enumerated terms are ultimately ensured. *Id.* at 1085 (citing 30 C.F.R. § 585.103(b)(2)).

In *Fisheries Survival Fund v. Jewell*, the D.C. District Court addressed challenges to a wind energy lease and development of an approximately 127-square mile wind energy facility proposed off the coast of New York state. No. 1:16-cv-2409, 2018 WL 4705795, *1-2 (D.D.C. Sept. 30, 2018), *appeal docketed*, No. 20-5094 (D.C. Cir. Apr. 16, 2020). In that case, three municipalities and nine commercial fishing organizations and businesses challenged BOEM's lease issuance to Statoil Wind US, LLC, under OCSLA and other laws. *Id.* Plaintiffs were concerned about the project's potential harmful impacts to fishing and the marine habitat and argued BOEM had violated OCSLA by "failing to properly consider and provide for fishing, safety, conservation of natural resources, and navigation during both the site selection and the lease issuance process." *Id.* at *10. The D.C. District Court listed several of the enumerated factors that BOEM "must consider" when deciding whether to issue leases, easements, or rights-of-way for offshore renewable energy projects. *Id.* at *1 (citing 43 U.S.C. § 1337(p)(4)(A)-(L) & (J)(i)(ii)). However, the court did not further discuss the requirements under subsection 8(p)(4) because it held that plaintiffs' OCSLA claims were barred by a failure to comply with section 23(a)(1) of the Act, which provides "that no action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation, in writing, under oath, to the Secretary." *Id.* at *11.

In sum, while federal courts have not addressed subsection 8(p)(4)(I) specifically, they have strictly construed the language in subsection 8(p)(4) and its implementing regulations as requiring BOEM to ensure that offshore renewable energy activities comply with the enumerated requirements of that section. However, federal courts have also acknowledged some flexibility in those requirements, so long as BOEM meets its "overall obligation" to ensure that the enumerated factors are met. *See Pubs. Emps.*, 25 F. Supp. 3d at 107. The requirements are technical in nature, and thus federal courts have recognized the role of multiple federal agencies possessing different technical expertise to inform BOEM's research and ultimate findings to fulfill the requirements of subsection 8(p)(4). Accordingly, in the few cases involving challenges under subsection 8(p)(4), as summarized above, federal courts have read the language in subsection 8(p)(4) of OCSLA strictly, but have also deferred to agency expertise consistent with the deferential standard of the Administrative Procedure Act (APA) to assess whether

BOEM has complied with OCSLA. *See, e.g., Fisheries*, 2018 WL 4705795 at *4 (citing 5 U.S.C. § 706(2)(A)).

In an earlier case, *Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872 (1st Cir. 1979), the circuit court commented on section 3(b) of OCSLA, 43 U.S.C. § 1332(2) (emphasis added), which provides that:

> this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the *right* to navigation and fishing therein shall not be affected.

Some have suggested that the court's interpretation of section 3(b) might be used to determine the meaning or scope of subsection 8(p)(4)(I) to interject the concept that interference only with the right to fishing or navigation must be prevented. However, the provisions of section 3(b) are quite different from the language of subsection 8(p)(4)(I), which states, as discussed above, that the Secretary shall

> ensure that any activity carried out under this subsection is carried out in a manner that provides for . . . (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas.

The court noted that section 3(b) was "directed at the legal right to fish rather than at prohibiting physical impediments" and that "[b]oth the previous and amended Outer Continental Shelf Lands Act seem to us to reflect Congress's underlying belief that mineral development can be so orchestrated with the development and preservation of renewable resources like fish as to do no irreparable harm to them. It is left to the Secretary to harmonize the interests of the various resources wherever they impinge upon one another." *Commonwealth*, 594 F.2d at 889 (1st Cir. 1979).

The provision at issue in *Commonwealth* dated from the 1953 Act, before the scope of coastal state authority for fishing and navigation of ocean waters beyond the territorial sea had been settled by the Law of the Sea Convention and Proclamation 5030--Exclusive Economic Zone of the United States of America and similar proclamations of most other coastal nations. It speaks of effect on the "character of the high seas" while subsection 8(p)(4) does not. That issue was well settled by 2005 and thus looking to that provision or *Commonwealth* to inform a reading of 8(p) is not well founded.

For these reasons, section 3(b) does not facilitate an understanding that subsection 8(p)(4)(I) refers to preventing interference only with the legal right to navigation or fishing. While section 3(b) refers to the "the right to navigation and fishing," there is no such language found in subsection 8(p)(4)(I). There is no indication that Congress intended the terms "prevention of interference" in subsection 8(p)(4)(I) to mean only that the Secretary must prevent interference with a "right to navigation and fishing."

In addition, in 2018, the Department of Justice argued in a motion for summary judgment that "[l]ike section 3 of OCSLA, this subsection [8(p)(4)(I)] is intended to ensure compliance with

14

international standards and is 'directed at the legal right to fish,' not to establish a specific standard with respect for fisheries." Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, *Fisheries Survival Fund v. Zinke*, No. 16-cv-2409 (D.D.C. Oct. 24, 2017). While this argument was too narrow, as has been shown in this memorandum, the district court did not rely on this argument in reaching its decision and, therefore, the analysis in this memorandum does not affect the reasoning in that court's decision, nor will this memorandum affect the consideration of that district court's decision on appeal to the U.S. Court of Appeals. *See Fisheries Survival Fund v. Bernhardt*, No. 20-5094 (D.C. Circuit Apr. 16, 2020).

## IV.    Conclusion

Based on the foregoing, I have determined that the interpretation of subsection 8(p)(4)(I) in the September 2020 Memo—that it is limited to preventing interference with the legal right to fish or navigate—is not permissible.

I have also determined that the meaning of the statement, "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for— . . . (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas" means that the Secretary must act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference. Indeed, this means preventing all interference, if the proposed activity would lead to unreasonable interference, but not if the proposed activity would lead only to *de minimis* or reasonable interference.

Further, following the established canon of statutory construction that similar language contained within the same section of a statute should be accorded a consistent meaning, "prevention" in subsection 8(p)(4)(I) should be accorded the same meaning as "prevention" in subsection 8(p)(4)(C). Having accepted that subsection 8(p)(4)(C) requires the prevention of nearly all waste, but not waste that is beyond what could reasonably be expected from current wind energy industry expertise and technology, I also advise you that the use of the word "prevention" in subsection 8(p)(4)(I) means preventing nearly all interference with reasonable uses, but not *de minimis* or reasonable interference that could reasonably be expected based on the current wind energy industry expertise and technology—recognizing that technological limitations cannot be a basis for authorizing unreasonable interference with reasonable uses.

For these reasons, I find that BOEM's interpretation of the statute it administers in its implementing regulations at 30 C.F.R. § 585.621(c), which requires a lessee to demonstrate in its COP that the proposed activities do not "unreasonably interfere with other uses of the OCS, including National security or defense," is permissible—subject to the limitations discussed above. Though this interpretation adds a modifier to "interfere" that the statute did not provide, the regulation implements a means for preventing all interference when the interference is unreasonable, thereby implementing the plain meaning of the statute. At the same time, the regulatory provision would not bar *de minimis* or reasonable interference, and this would be consistent with the principal purpose of the statute as a whole and considering established canons of statutory interpretation, as discussed above. In determining whether interference is

15

unreasonable, I advise the Secretary to consider not only the individual proposed activity, but how that activity would add to the general cumulative level of interference to other reasonable uses when combined with previously approved activities, as described in Section II. D. above, as well as the cumulative practical impact on those other users.

Daniel H. Jorjani

16