**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| RENEW NORTHEAST, *et al*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*, <br><br> *Defendants*. | Civil Action No. 1:25-cv-13961 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 2

ARGUMENT ............................................................................................................ 5

   I.  Plaintiffs Have Pleaded Article III Standing As To Each Of The Challenged Actions
      .......................................................................................................................... 5

   II.  Plaintiffs' Challenge To Each Of The Actions Is Ripe ...................................... 10

   III. Each Challenged Action Is A Final Agency Action ......................................... 15

CONCLUSION ......................................................................................................... 20

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Lab'ys. v. Gardner*,
387 U.S. 136 (1967) .................................................................................................. 10

*AstraZeneca Pharms. LP v. Sec'y U.S. Dep't of Health & Hum. Servs.*,
137 F.4th 116 (3d Cir. 2025) .................................................................................... 10

*Bennett v. Spear*,
520 U.S. 154, 169 (1997) ............................................................................... 15, 19, 20

*Beshir v. Holder*,
10 F. Supp. 3d 165 (D.D.C. 2014) ...................................................................... 15, 20

*CropLife Am. v. EPA*,
329 F.3d 876 (D.C. Cir. 2003) ......................................................................... 16, 17, 20

*Democratic National Committee v. Trump*,
No. CV 25-00587 (AHA), 2025 WL 1573181 (D.D.C. June 3, 2025) ..................................... 10

*Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ............................................................................ 20

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................................................. 4

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
321 F. App'x 704 (9th Cir. 2009) ....................................................................... 6, 7, 9

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
529 F. Supp. 2d 1110 (N.D. Cal. 2007) ............................................................... 6, 7, 9

*In re Fin. Oversight & Mgmt. Bd.*,
110 F.4th 295 (1st Cir. 2024) ..................................................................................... 8

*Jensen v. R.I. Cannabis Control Comm'n*,
160 F.4th 18 (1st Cir. 2025) ............................................................................. 11, 12, 13

*Katz v. Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012) ...................................................................................... 8

*Lerner v. Sinovac Biotech Ltd.*,
691 F. Supp. 3d 326 (D. Mass. 2023) .................................................................... 5, 8

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ................................................................................................ 16

*Mangual v. Rotger-Sabat*,
  317 F.3d 45 (1st Cir. 2003)................................................................................. 4

*Massachusetts v. Trump*,
  790 F. Supp. 3d 8 (D. Mass. 2025)............................................................... *passim*

*Mayor and City Council of Ocean City v. US Dep't of Interior*,
  2025 WL 3628137 (D. Md. Dec. 15, 2025)..................................................... 14

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011) ........................................................... 5, 6, 7, 9

*Mountain Valley Pipeline, LLC v. 0.32 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ............................................................... 7

*Murthy v. Missouri*,
  603 U.S. 43 (2024)............................................................................ 5, 6, 7

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
  397 F. Supp. 3d 430 (S.D.N.Y. 2019) ................................................. 18, 19

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  417 F.3d 1272 (D.C. Cir. 2005)..................................................... 16, 17, 20

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  440 F.3d 459 (D.C. Cir. 2006)...................................................... 11, 12, 13

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  No. CIV.A.01 0274 JR, 2007 WL 259944 (D.D.C. Jan. 30, 2007)........................... 6

*National Urban League v. Trump*,
  783 F. Supp. 3d 61 (D.D.C. 2025).......................................................... 9

*Nat'l Envt'l Dev. Ass'n Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014)...................................................... 15, 17, 20

*New England Power Generators Ass'n, Inc. v. FERC*,
  707 F.3d 364 (D.C. Cir. 2013)............................................................... 10

*New York v. Trump*,
  No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ..................... 1, 16, 18, 19

*Ocasio-Hernandez v. Fortuno-Burset*,
  640 F.3d 1 (1st Cir. 2011)................................................................. 5

*Roe v. Mayorkas*,
  No. 22-cv-10808-ADB, 2023 WL 3466327 (D. Mass. May 12, 2023)................................. 17

iii

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019). ........................................................................ 15, 20

*Spirit of Sage Council v. Kempthorne*,
   511 F. Supp. 2d 31 (D.D.C. 2007) .............................................................. 11, 12, 13

*Texas v. United States*,
   523 U.S. 296 (1998) ........................................................................................ 14

*Toilet Goods Ass'n v. Gardner*,
   387 U.S. 158 (1967) ...................................................................................... 14, 15

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*,
   524 F.3d 315 (1st Cir. 2008) .............................................................................. 2

*Vara v. DeVos*,
   2020 WL 3489679 (D. Mass. June 25, 2020) ..................................................... 15

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ........................................................................................ 20

*Wagafe v. Biden*,
   764 F. Supp. 3d 980 (W.D. Wash. 2025) ........................................................... 16

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
   589 F.3d 458 (1st Cir. 2009) ....................................................................... 11, 13

**Statutes**

5 U.S.C. § 551 ..................................................................................................... 20

5 U.S.C. § 704 ..................................................................................................... 15

**Rules**

Fed. R. Civ. P. 8 .................................................................................................... 5

Fed. R. Civ. P. 12 ................................................................................................... 5

**INTRODUCTION**

Plaintiffs are renewable energy trade groups and a renewable energy advocacy organization challenging six final agency actions by the U.S. Department of the Interior ("DOI") and the U.S. Army Corps of Engineers ("the Corps"). The challenged actions prevent Plaintiffs' members from obtaining federal permits necessary to construct their wind and solar projects, in furtherance of the Administration's pretextual goal of "getting rid of the falsely named renewables." Dkt. 33 ("Am. Compl.") ¶ 71. Plaintiffs' Amended Complaint and attached declarations painstakingly lay out how each action has stymied wind and solar permitting, while laying out the myriad concrete harms the trade group Plaintiffs and Plaintiff GECA will continue to suffer from each action. These filings demonstrate that the challenged actions constitute an even more comprehensive and enduring effort to halt renewable energy than the Wind Memorandum at issue in *New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025).

Defendants have filed a motion to dismiss so lacking in specific argumentation as to each challenged action that it can most fairly be understood as a placeholder to avoid filing an Answer. At this pleading stage, this Court must accept the well-pleaded allegations in Plaintiffs' Amended Complaint. Those allegations make clear that this is a standard APA lawsuit, challenging three actions that set final, binding procedural barriers to Plaintiffs obtaining their required permits, and three other actions that set final, binding substantive requirements for Defendants' permitting decisions. Standing, ripeness, and finality are even clearer here than in *New York*, 2025 WL 3514301, where agencies implemented what purported to be a temporary permitting pause. Here, the five challenged final actions that remain in effect—which similarly constitute a wholesale and indefinite freeze on permitting—are mandatory and permanent on their face.

Plaintiffs urgently need relief from the ongoing harms that these final actions are imposing. But as to this Motion, this Court need only reject Defendants' flawed threshold arguments.

**BACKGROUND**

Plaintiffs' Amended Complaint challenges six final agency directives that systematically disfavor wind and solar projects and have ground wind and solar permitting to a halt by design, causing massive, ongoing harms to the trade group Plaintiffs' members and to Plaintiff GECA.

DOI Renewable Bottleneck Memorandum.  This Memorandum states that "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities shall require" review by three levels of senior DOI political leadership.  Am. Compl. ¶¶ 83–85; Dkt.33-1.  As the Amended Complaint and attached declaration detail,[1] the Memorandum violates the APA by putting wind and solar projects in a second-class status and effectively halting federal permitting for only these projects, while offering no reasoned basis despite constituting a dramatic policy shift and transgressing numerous statutory requirements.  Am. Compl. ¶¶ 188–207; Dkt.33-9 ("Joint Dec.") ¶¶ 53–237.  The Memorandum systematically prevents wind and solar projects from receiving necessary approvals from DOI, causing ongoing project delays that are harming Plaintiffs' members, and these harms can be redressed by vacating the Memorandum and thereby returning to the normal permitting process.  Am. Compl. ¶¶ 75–93; Joint Dec. ¶¶ 52–237.

IPaC Ban: The Ban mandates that wind and solar projects "are currently not eligible" to access USFWS's taxpayer-funded protected species planning resource, IPaC, without approval from high-ranking DOI officials.  Am. Compl. ¶¶ 144–45; Dkt.33-6.[2]  This Ban prevents Plaintiffs' members from receiving Corps nationwide permits, Am. Compl. ¶¶ 146–54, by making it impossible for wind and solar developers to use IPaC to obtain an automated determination of "no

---

[1] Plaintiffs' Joint Declaration is attached as Exhibit I to the Amended Complaint and thus must be taken as true at the pleading stage.  *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).

[2] Defendants admit in a declaration attached to their preliminary injunction opposition brief that they consider the IPaC Ban just an application of the Bottleneck Memo. Dkt.63-2 ¶ 8.

2

effects" on federally protected species that allows them to obtain a Corps permit without the Corps needing to consult with USFWS under Section 7 of the Endangered Species Act—as was routine before the Ban. Joint Dec. ¶ 357. Without an IPaC report, Corps offices are declining to issue "no effect" determinations without USFWS input—which they cannot obtain because the Bottleneck Memorandum prohibits USFWS staff from providing it absent three layers of DOI senior political approval. *Id.* ¶¶ 357–58. The Ban violates the APA by being devoid of any rationale, failing to account for reliance interests, and violating USFWS's statutory obligations. Am. Compl. ¶¶ 278–95. The Ban harms Plaintiffs' members and GECA by forcing costly delays and redesigns, which harms can be redressed through an order vacating the Ban. *Id.* ¶¶ 155–58; Joint Dec. ¶¶ 353–446.

Federal Lands Anti-Renewable Order. This Order creates a new, substantive criterion— "capacity density"—for DOI's evaluation of projects on public lands and in federal waters, which DOI crafted to disfavor wind and solar projects. Am. Compl. ¶¶ 102–10; Dkt.33-2. The Order violates the APA by inventing a project review standard that lacks a rational explanation, violates several statutes, and fails to follow notice-and-comment rulemaking procedures. Am. Compl. ¶¶ 208–32. The Order harms Plaintiffs' members and GECA by creating insurmountable barriers to projects' ability to obtain permits that in turn increase costs and threaten project viability, and such harms are redressable by vacating the Order. *Id.* ¶¶ 111–12; Joint Dec. ¶¶ 238–319.

Corps' Anti-Renewable Memorandum: This Memorandum "direct[s] that the Corps" consider capacity density as a dispositive factor in its Clean Water Act permitting and deprioritize permit applications for technologies with lower capacity densities, like wind and solar. Am. Compl. ¶¶ 114–22; Dkt.33–3. The Memorandum violates the APA by creating an irrational new standard for wind and solar projects that violates statutes and regulations and fails to follow notice-and-comment procedures. Am. Compl. ¶¶ 233–58. The Memorandum harms Plaintiffs' members

and GECA by creating hurdles to obtaining necessary permits, increasing costs, and putting projects at risk, redressable through vacatur. *Id.* ¶¶ 123–25; Joint Dec. ¶¶ 320–38.

Eagle Take Permit Ban: At the time of the Amended Complaint, this directive mandated that the U.S. Fish and Wildlife Service ("USFWS") cease issuance of incidental take permits for wind projects under the Bald and Golden Eagle Protection Act ("BGEPA"). Am. Compl. ¶¶ 127–35; Dkt.33-4. The Ban violates the APA because it lacks any explanation and violates USFWS regulations. Am. Compl. ¶¶ 259–77. The Ban harms Plaintiffs' members and GECA by forcing projects without eagle permits to choose between operating normally and risking enforcement actions or curtailing operations and risking financial harm. *Id*. ¶¶ 136–43; Joint Dec. ¶¶ 339–52.[3]

Zerzan/Jorjani Opinion: This M-Opinion replaces the substantive standard the Bureau of Ocean Energy Management ("BOEM") applied to the evaluation of construction and operations plans ("COPs") for offshore wind projects—a standard codified in regulations through notice and comment rulemaking—with a new standard that allows (and likely requires) BOEM to reject a project if it would cause anything more than "*de minimis*" interference with other ocean uses of the Outer Continental Shelf. Am. Compl. ¶¶ 159–76; Dkt.33-7, 33-8. The Opinion also requires BOEM to reevaluate COPs approved under existing law. Dkt.33-7. The Opinion violates the APA by ignoring reliance interests, violating the Outer Continental Shelf Lands Act ("OCSLA"), being impermissibly retroactive, and requiring BOEM to disregard one of its own regulations. Am. Compl. ¶¶ 296–31. The Opinion is harming Plaintiffs' members and GECA by freezing progress

---

[3] Although Defendants withdrew the Eagle Take Permit Ban after Plaintiffs filed for a preliminary injunction in this matter, Dkt.86 ("Mot.") at 3, Defendants have not moved to dismiss this challenge on mootness grounds, which is dispositive because "the burden of establishing mootness rests squarely on the party raising it, and the burden is a heavy one," *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003). It must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)—a showing Defendants have not even attempted to make here.

on offshore wind projects at numerous stages in the development process, and such harms can be redressed through an order vacating the Opinion.  *Id.* ¶¶ 172–76; Joint Dec. ¶¶ 447–86.

**ARGUMENT**

At the motion to dismiss stage, this Court "accept[s] all well-pled factual allegations as true and draw[s] all reasonable inferences in favor of" plaintiff.  *Lerner v. Sinovac Biotech Ltd.*, 691 F. Supp. 3d 326, 331 (D. Mass. 2023) (citation omitted).  Under Rule 12(b)(1), "[d]ismissal should be allowed only if, taking all plaintiff's allegations as true, subject matter jurisdiction cannot be justified."  *Id.* Dismissal under "Rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of a short and plain statement of the claim showing that the pleader is entitled to relief."  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011).

## I.    Plaintiffs Have Pleaded Article III Standing As To Each Of The Challenged Actions

A.    To survive a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a complaint must plausibly allege that the plaintiff has "suffered, or will suffer, an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling."  *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted).  Courts routinely find that agency actions that delay or foreclose the issuance of permits harm permit-seekers in a manner that "suffices for standing purposes," *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 247 n.4 (3d Cir. 2011), particularly where permit-related construction delays and/or denials cause economic injury.  For example, in *Minard Run*, mineral owners and related businesses had standing to challenge a new policy requiring the U.S. Forest Service to conduct a National Environmental Policy Act ("NEPA") analysis before issuing certain permits because that policy imposed "a new substantive rule on the issuance of [permits] that could delay issuance of [permits] to" plaintiffs.  *Id.*  Similarly, in *Massachusetts v. Trump*, 790 F. Supp. 3d 8 (D. Mass. 2025), a trade association (and one of the Plaintiffs in this case) had standing to challenge

5

the Wind Memorandum's permitting freeze because it alleged that "its members are experiencing delays in permitting decisions leading to costs and other harms." *Id.* at 20; *see also Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 529 F. Supp. 2d 1110, 1116 (N.D. Cal. 2007), *aff'd sub nom. Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 321 F. App'x 704 (9th Cir. 2009); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,* No. CIV.A.01 0274 JR, 2007 WL 259944, at *2 (D.D.C. Jan. 30, 2007).

B. Plaintiff have alleged facts that satisfy the elements of Article III standing.  As alleged in the Amended Complaint and detailed in the Joint Declaration, the challenged actions are indefinitely delaying permits for wind and solar energy projects and thereby causing economic harm to Plaintiffs' members and GECA, which "suffices for standing purposes." *Minard Run Oil*, 670 F.3d at 247 n.4; *Massachusetts*, 790 F. Supp. 3d at 8; *Home Builders Ass'n*, 321 F. App'x 704; *Nat'l Ass'n of Home Builders*, 2007 WL 259944, at *2.  An order vacating these actions would redress these harms.  *See Murthy*, 603 U.S. at 47.

Bottleneck Memorandum: By grinding DOI's wind and solar permitting to a halt, the Memorandum has created widespread disruptions to Plaintiffs' members' projects.  Am. Compl. ¶¶ 88–92; Joint Dec. ¶¶ 52–237.  Delays caused by the Memorandum have a tangible economic cost: they disrupt negotiated construction timelines, force developers to pay higher prices for labor and materials, require costly redesigns, and make it more difficult to attract capital investment. Joint Dec. ¶¶ 35–45.  The Memorandum also harms Plaintiff GECA because the Memorandum has halted the pipeline for wind and solar development, which, in turn, constrains the supply of renewable energy credits ("RECs") GECA sells.  Am. Compl. ¶ 93.  These harms would be redressable, *Murthy*, 603 U.S. at 47, by an order vacating the Memorandum, Joint Dec. ¶¶ 52–237.

6

IPaC Ban: The Ban harms Plaintiffs' members by, *inter alia*, preventing them from obtaining Section 404 authorizations from the Corps. Am. Compl. ¶¶ 144–58; Joint Dec. ¶¶ 353–59; *see supra* pp.2–3.[4] This Court can redress those harms, *Murthy*, 603 U.S. at 47, by vacating the IPaC Ban, Joint Dec. ¶¶ 353–446.

Federal Lands Anti-Renewable Order: By preordaining the denial of wind and solar permit applications on federal lands and waters through the rigged "capacity density" metric, Am. Compl. ¶¶ 94–113, the Order imposes imminent "economic injury," *Mountain Valley Pipeline, LLC v. 0.32 Acres of Land*, 915 F.3d 197, 218 (4th Cir. 2019), on Plaintiffs' members, Joint Dec. ¶¶ 238–319, and GECA, *id.* ¶ 113; *see Minard Run Oil*, 670 F.3d at 247 n.4; *Home Builders Ass'n*, 321 F. App'x 704; *Nat'l Ass'n of Home Builders*, 2007 WL 259944, at *2. These harms are redressable, *Murthy*, 603 U.S. at 47, by an order vacating the Order, Joint Dec. ¶¶ 238–319.

Corps' Anti-Renewable Memorandum: This Memorandum similarly imposes "prospective economic injury" on Plaintiffs' members, *Mountain Valley Pipeline, LLC*, 915 F.3d at 218, because it gerrymanders the permitting process in a way that prohibits wind and solar developers from getting the permits they need to "commence development, deliver electricity, [and] generate revenue" from their projects—even if their permit applications could make it through the Bottleneck Memorandum. *See e.g.*, Joint Dec. ¶¶ 246–47. This also harms GECA by constraining the supply of RECs for resale. Am. Compl. ¶ 126. These harms are redressable, *Murthy*, 603 U.S. at 47, by an order vacating the Memorandum. Joint Dec. ¶¶ 326–38.

Eagle Take Permit Ban: This Ban harms Plaintiffs' members by leaving them vulnerable to an increase in BGEPA enforcement against unpermitted eagle take, creating a Catch-22 for wind

---

[4] Defendants misconstrue Plaintiffs' allegations in asserting that IPaC is "merely a facilitative tool" and that Plaintiffs' members can still "obtain[] relevant species information" from USFWS field offices without it. Mot.9. As discussed *supra* p.2, the IPaC Ban also prevents *the Corps* from issuing permits for wind and solar projects without running headlong into the Bottleneck Memorandum.

project operators.  Am. Compl. ¶¶ 137–41.  Given that Defendants have not showed that this claim is moot, *supra* n.3, Plaintiffs' harms remain redressable, Joint Dec. ¶¶ 339–52.

Zerzan/Jorjani Opinion: The Zerzan/Jorjani Opinion's new *de minimis* standard for interference with other ocean uses ensures that BOEM will reject new offshore wind COPs and seek revocation of existing COP approvals, *id*. ¶ 308, harming Plaintiffs' members by undermining investments, jeopardizing revenues, and in some cases causing developers to consider abandoning their projects altogether.  *See e.g.*, *id*. ¶¶ 457–59.  This Court can redress these harms, *Murthy*, 603 U.S. at 47, by vacating the Zerzan/Jorjani Opinion, Joint Dec. ¶¶ 447–86.[5]

C.  Even though "the standing inquiry is claim-specific," *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012), Defendants' motion to dismiss fails to raise standing arguments specific to any claims as to any of the six final agency actions challenged here.  Nor do Defendants address any of Plaintiffs' well-pleaded allegations, as relevant in the context of a 12(b)(1) motion.  *See Lerner*, 691 F. Supp. 3d at 331.  The standing arguments Defendants make lack merit.

Defendants collectively categorize the challenged actions as "purely procedural" and suggest that they have only hypothetical effects, Mot.6, 8, but that flies in the face of the Amended Complaint's detailed, well-pleaded allegations of harms flowing directly from each of the actions, *see supra* pp.6–8, which must be accepted as true at this stage, *Lerner*, 691 F. Supp. 3d at 331.

Defendants wrongly suggest that Plaintiffs cannot suffer Article III injury until "the agency defendants have acted with finality on any permit application." Mot.6.  Courts routinely find injury

---

[5] While Defendants do not challenge Plaintiffs' organizational standing here, for completeness, the Amended Complaint's allegations easily satisfy the organizational standing standard.  The Amended Complaint contains sufficient allegations demonstrating that Plaintiffs' members would have standing to sue in their own right. *In re Fin. Oversight & Mgmt. Bd.*, 110 F.4th 295, 308 (1st Cir. 2024).  And the interests Plaintiffs seek to vindicate through this litigation are "germane" to their goals of promoting and protecting wind and solar energy in the United States, *id.*; Am. Compl. ¶¶ 9, 21, 23, 25, 27, 29, 31, 33, and there is no need for the participation of individual members given the generally applicable nature of the relief sought, *see id*. ¶¶ 77–78.

attributable to agency action that restricts, eliminates, or delays an agency's ability to issue permits without requiring an actual permit denial—a requirement that would, in any event, make no sense where one of the challenged actions is indefinitely delaying permitting decisions. *See Minard Run Oil*, 670 F.3d at 247 n.4; *Massachusetts*, 790 F. Supp. 3d at 8; *Home Builders Ass'n*, 321 F. App'x 704; *Nat'l Ass'n of Home Builders*, 2007 WL 259944, at *2, n.2. Plaintiffs have alleged in detail that the actions have *already* been applied in a manner that has caused actual and imminent harm to Plaintiffs' members, and that the harms are ongoing so long as the actions are in effect. *See* Am. Compl. ¶¶ 88–93, 111–13, 123–26, 137–143, 154–58, 172–76; Joint Dec. ¶¶ 56–486.

The cases upon which Defendants rely to argue that courts reject "challenges to . . . agency guidance . . . that have not yet been applied to the party bringing suit," Mot.6, backfire. *National Urban League v. Trump*, 783 F. Supp. 3d 61, 80 (D.D.C. 2025), concluded that plaintiffs were unlikely to succeed on the merits of their claims for the purposes of a preliminary injunction because they lacked standing to challenge a Presidential Memorandum directing the Attorney General to prepare a "report" to "inform and advise" the President about how to consider addressing diversity, equity, and inclusion in the civil rights policy context. In so holding, *National Urban League* explained that the report "issues no commands or prohibitions to" the plaintiffs, and that they would only be harmed if a "multi-tiered" chain of speculative events occurred: (1) the Attorney General's report recommended cutting funds for organizations like plaintiffs'; (2) the President adopted that portion of the proposed plan; (3) the finalized plan included plaintiffs within its scope; and (4) a government official enforced the plan against plaintiffs. *Id*. No such "multi-tiered speculation" exists here, where the Amended Complaint details how the agencies are *already* enforcing the challenged actions to restrict plaintiffs' members' ability to obtain mandatory permits and consequently causing immediate and concrete economic injury to

9

plaintiffs' members. *See* Am. Compl. ¶¶ 88–93, 111–13, 123–26, 137–143, 154–58, 172–76. And in *Democratic National Committee v. Trump*, No. CV 25-00587 (AHA), 2025 WL 1573181, at *6 (D.D.C. June 3, 2025), the court found that plaintiffs had not been harmed by an executive order that allegedly undermined the independence of the Federal Election Commission because, at the time of filing, the FEC had not changed any of its procedures as a result of the Executive Order. *Id.* Here, Defendants have *already* changed their procedures and substantive standards under each of the challenged actions—and those changes have impacted Plaintiffs' members' "dealings with" these agencies, *id.*; *see* Am. Compl. ¶¶ 88–93, 111–13, 123–26, 137–143, 154–58, 172–76.

The other cases that Defendants cite, Mot.7, do not help them. In *AstraZeneca Pharms. LP v. Secretary of U.S. Department of Health & Human Services*, 137 F.4th 116 (3d Cir. 2025), a manufacturer lacked standing to challenge agency guidance concerning prescription drug pricing because the manufacturer "did not identify any actual decision about drug development or marketing that [it] has made or will make to avoid" the effect of the guidance, and relied instead on "conjectural" "broad-based market effects." *Id.* at 124 (citation omitted). In *New England Power Generators Association, Inc. v. FERC*, 707 F.3d 364 (D.C. Cir. 2013), a trade association lacked standing to challenge certain FERC rate-related orders because the association "cited no factual support for its claim of economic harm." *Id.* at 369. Here, Plaintiffs submitted an Amended Complaint and detailed declaration showing the specific choices their members "ha[ve] made or will make to avoid," *AstraZeneca*, 137 F.4th at 124, the burdensome effects of the actions and the economic harms that stem from the actions, *see New England Power*, 707 F.3d at 369.

## II.    Plaintiffs' Challenge To Each Of The Actions Is Ripe

A. Ripeness evaluates "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 149 (1967). An issue is "fit[ ]" when plaintiffs challenge a consummated agency decision that presently

10

governs agency conduct. *See id.* at 149–53. An APA challenge that involves "purely legal" questions that rise and fall on the administrative record and the agency's statutory authority is presumptively fit for review. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464 (D.C. Cir. 2006); *Spirit of Sage Council v. Kempthorne*, 511 F. Supp. 2d 31, 39 (D.D.C. 2007). Hardship exists where "granting relief would serve a useful purpose." *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 25 (1st Cir. 2025) (citation omitted). In the permitting context, a challenge to agency action is ripe even though its resolution "might not secure [a] project's ultimate approval," so long as it "would cease to be [a] barrier[ ] to ultimate approval of the project" once vacated. *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 469 (1st Cir. 2009).

B. Each of Plaintiffs' claims is ripe because each challenges a discrete agency directive that is already being implemented in a manner that has catastrophic consequences for wind and solar projects—the validity of which hinges on legal questions.

Bottleneck Memorandum: Plaintiffs' challenge to the Memorandum is "fit[ ]" because Plaintiffs' claims involve "purely legal questions," *Nat'l Ass'n of Home Builders*, 440 F.3d at 463–64; *Jensen*, 160 F.4th at 24–25, including regarding DOI's lack of justification for subjecting only wind and solar projects to these insurmountable hurdles, Am. Compl. ¶¶ 188–207. The Memorandum is causing "hardship" to Plaintiffs, *Jensen*, 160 F.4th at 25, because, by design and as implemented, it has halted wind and solar permitting, *see* Am. Compl. ¶¶ 85–92, Joint Dec. ¶¶ 52–237, and an order vacating the Memorandum would "serve [the] useful purpose," *Jensen*, 160 F.4th at 25, of lifting its "barrier[s]" to permit adjudication, *Weaver's Cove*, 589 F.3d at 469.

IPaC Ban: Plaintiffs' challenge to the Ban is "fit[ ]" for judicial review because it involves "purely legal questions" about the propriety of barring wind and solar developers from using IPaC.

*Jensen*, 160 F.4th at 24–25; *Nat'l Ass'n of Home Builders*, 440 F.3d at 463–64, Am. Compl. ¶¶ 279–95.   The Amended Complaint also alleges that "hardship" has befallen wind and solar developers that need access to IPaC, as they are being prevented from obtaining permits needed to advance projects.   Am. Compl. ¶¶ 151–58, Joint Dec. ¶¶ 353–63; *Jensen*, 160 F.4th at 24–25.

Federal Lands Anti-Renewable Order:   Plaintiffs' claims related to this Order are "fit[ ]" for judicial review because they ask this Court to evaluate the legality of the new substantive "capacity density" criterion on a "purely legal" basis, *Jensen*, 160 F.4th at 24–25; *Nat'l Ass'n of Home Builders*, 440 F.3d at 463–64, including evaluating whether DOI has any justification for the imposition of this new rigged metric and whether the elevation of the capacity density metric violates other laws, *see* Am. Compl. ¶¶ 208–32.   Withholding judicial review now would cause a significant "hardship" to Plaintiffs' members, who have invested substantial resources in projects that are unlikely to satisfy the Order's new criterion. *Jensen*, 160 F.4th at 24–25; *Spirit of Sage Council*, 511 F. Supp. 2d at 38–39; Am. Compl. ¶¶ 102–13, Joint Dec. ¶¶ 238–319.

Corps' Anti-Renewable Memorandum:   Plaintiffs' claims as to this Memorandum are ripe because Plaintiffs challenge the Corps' new, substantive criteria on "purely legal" grounds, such that the legality of the Corps' decision will "not change from case to case or become clearer in a concrete setting." *Nat'l Ass'n of Home Builders*, 440 F.3d at 463–64; Am. Compl. ¶¶ 234–58.   And "hardship" is imminent in the absence of judicial review, given that Plaintiffs and their members rely on the availability of federal permits that will be denied under the Memorandum's capacity density focus. *Jensen*, 160 F.4th at 24–25; *Spirit of Sage Council*, 511 F. Supp. 2d at 38–39; Am. Compl. ¶¶ 118–26, Joint Dec. ¶¶ 320–38.

Eagle Take Permit Ban:   Plaintiffs' Ban claims are "fit[ ]" for review because they too raise "purely legal" questions about the legality of USFWS's decision to pause BGEPA permits for only

12

wind developers. *Jensen*, 160 F.4th at 24–25; *Nat'l Ass'n of Home Builders*, 440 F.3d at 463–64; Am. Compl. ¶¶ 260–77. The Amended Complaint also alleges that wind developers would suffer a "hardship" in the absence of review because they have had to implement expensive mitigation methods or risk capacious liability while the Ban is in effect. *Jensen*, 160 F.4th at 24–25; *Spirit of Sage Council*, 511 F. Supp. 2d at 38–39; Am Compl. ¶¶ 129–44, Joint Dec. ¶¶ 339–52.

Zerzan/Jorjani Opinion: The challenge to the Zerzan/Jorjani Opinion is ripe for review because it raises "purely legal" questions about the legality of BOEM's decision to ignore existing, lawfully promulgated regulations, in favor of a new substantive standard designed to deny and/or revoke COP approvals. *Jensen*, 160 F.4th at 24–25; *Nat'l Ass'n of Home Builders*, 440 F.3d at 463–64; Am. Compl. ¶¶ 297–313. "Hardship" to Plaintiffs' members in the absence of judicial review is clear, given that BOEM has already invoked the Zerzan/Jorjani Opinion to "reevaluate" COP approvals issued under the prior, codified standard. *Id.* ¶¶ 172–76, Joint Dec. ¶¶ 447–86. Thus, a decision on this claim would be "practical[ly] useful[ ]," because an order vacating and enjoining the Opinion would restore the prior, lawful standard pursuant to which COP approvals were fairly adjudicated. *Jensen*, 160 F.4th at 24–25, *Weaver's Cove*, 589 F.3d at 469.

C. Defendants again do not bother addressing ripeness with respect to each of Plaintiffs' legal claims as to each challenged action, instead generally arguing that Plaintiffs' claims are unripe because Plaintiffs' "alleged legal injury" is speculative. Mot.13–15. But Defendants ignore the well-pleaded allegations in the Amended Complaint that refute Defendants' broadbrush ripeness assertions.

As to the first prong of the ripeness analysis, Defendants merely argue that none of Plaintiffs' claims are "fit" for judicial resolution until a Defendant agency acts upon a permit application. Mot.13. But Plaintiffs' challenge is not to any specific permit adjudications, but to

13

the legality of each action itself, including on the grounds that Defendants failed to articulate any justification for the disparate treatment of wind and solar technologies, provide any reasoned explanation for substantive policy changes, consider reliance interests previous policies had created for wind and solar developers, and abide by other statutory directives governing wind and solar permitting or the APA's notice and comment requirements. *See generally Am. Compl.* Those are standard APA arguments that courts regularly adjudicate without awaiting a permit denial. *See infra* pp.15–16 (collecting cases).

As for the second prong, Defendants assert that there is no "basis to determine[ ] that [plaintiffs] will suffer hardship" in the absence of relief. Mot.14. But again, Defendants fail to address the hardships Plaintiffs have alleged with respect to each challenged action, which must be assumed to be true at this stage. *See supra* pp.6–8. That point renders *Texas v. United States*, 523 U.S. 296 (1998)—in which the Supreme Court rejected a pre-enforcement challenge to a statute at the pleadings stage where there was no evidence that the government would *ever* apply the law in the way plaintiffs feared—inapplicable. *See id.* at 300. Defendants also cannot successfully argue lack of hardship where a developer is "not currently proceeding with the next steps in developing the project," Mot.15 (citing *Mayor and City Council of Ocean City v. US Dep't of Interior*, 2025 WL 3628137, at *2 (D. Md. Dec. 15, 2025)), when Plaintiffs have pleaded that Defendants' challenged actions have caused their projects to stall out, *see generally* Joint Dec.[6] Defendants' reliance on *Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967), Mot.13, is also misplaced, as the Court there held that a trade association's challenge to an FDA notice was not ripe because that notice stated that an inspection of certain facilities and data might occur on

---

[6] *Ocean City* is inapposite because the question of ripeness there turned on whether defendants had taken a final agency action that was legally binding on the plaintiff, not whether the plaintiff had paused its development of the project at issue. 2025 WL 3628137, at *4. Here, the actions are final, as discussed in Section III, *infra.*

14

some undefined date in the future.  *See id.* at 164–65.  Here, the Amended Complaint alleges in detail the practical consequences each action has on Plaintiffs' members now.  *See supra* pp.6–8.

### III.    Each Challenged Action Is A Final Agency Action

A. An agency action is "final" under the APA, 5 U.S.C. § 704, if it (1) marks the "consummation" of the relevant agency's "decision making process," and (2) creates significant "legal consequences" by indefinitely stalling or imposing new insuperable barriers to the approval of wind and solar projects that need federal permits.  *Bennett v. Spear*, 520 U.S. 154, 169, 178 (1997) (challenged agency action had practical "coercive effect[s]" and "alter[ed] the legal regime to which the [agency] [was] subject" (citations omitted)).  The use of "mandatory language" is a strong indicator of final agency action, as such language "creates boundaries and requirements" for the agency.  *Vara v. DeVos*, 2020 WL 3489679, at *25 (D. Mass. June 25, 2020) (citations omitted); *see also Beshir v. Holder*, 10 F. Supp. 3d 165, 180 (D.D.C. 2014) ("[T]he language actually used by the agency' is often central to making such determinations.")  The finality of an agency action is a "pragmatic" inquiry that hinges on its "practical effects," *Massachusetts*, 790 F. Supp. 3d at 27 (citation omitted), and turns on "whether the agency action imposes obligations on the agency, not . . . Plaintiffs," *Sierra Club v. Trump*, 929 F.3d 670, 698, n.23 (9th Cir. 2019).

Courts routinely conclude that agency actions that alter the criteria used to evaluate permits are final, legislative rules subject to pre-enforcement review under the APA.  For instance, in *National Environmental Development Association's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014), the D.C. Circuit held that an EPA directive regarding which sources of air pollution can be aggregated into a single operating permit was final agency action subject to judicial review because it "provides firm guidance to enforcement officials about how to handle permitting decisions," and therefore has "legal consequences for [regional officials] administering their permit programs and for companies" applying for such permits.  *Id.* at 1007 (citation omitted)*; see*

15

*also CropLife Am. v. EPA*, 329 F.3d 876, 879–82 (D.C. Cir. 2003); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005).

B. As stated in the Amended Complaint, each of the challenged actions is final because it "alter[s] the legal status quo" under which the relevant agencies previously processed applications for leases, permits, and other authorizations necessary for renewable energy project development. *See* Am. Compl. ¶¶ 190–94; 210–13; 235–38; 261–62; 280–83; 298–300. This case presents precisely type of the challenge to "particular agency action[s]" that the Supreme Court in *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990), held to be proper under the APA.

Bottleneck Memorandum. This Memorandum is the "consummation" of DOI's "decision making process" by "alter[ing] the legal status quo" for "process[ing] . . . authorizations necessary for wind [and solar] project development," *New York*, 2025 WL 3514301, at *8, and [creates "legal consequences'" by creating a "de facto suspension of the law" with respect to wind and solar development, *id.* at *9. The mandatory, onerous review process that the Bottleneck Memorandum imposes, Am. Compl. ¶¶ 75–76, 83–86; Dkt.33-1, has brought wind and solar permitting to a standstill and created a second-class regulatory status for just these types of projects, thus increasing costs for project developers and forcing some developers to contemplate costly redesigns or project cancellations. Am. Compl. ¶¶ 87, 198; Joint Dec. ¶¶ 52–237; *see supra* p.6. This is more consequential than the policy found to be final in *Wagafe v. Biden*, 764 F. Supp. 3d 980 (W.D. Wash. 2025), which increased the intensity and duration of background checks for some naturalization applicants, creating "concrete obligations" that applied "across the board" for those applicants and thus "[could] of course be challenged under the APA by a person adversely affected." *Id.* at 1002–04 (citations omitted); *see also Roe v. Mayorkas*, No. 22-cv-10808-ADB,

16

2023 WL 3466327, at \*3 (D. Mass. May 12, 2023) (denying motion to dismiss where USCIS policy "pausing adjudication" of humanitarian parole applications constituted final agency action).

The IPaC Ban. The IPaC Ban constitutes the consummation of USFWS's process for banning wind and solar developers from accessing a critical tool, and creates "legal consequences" by, *inter alia*, stymieing their ability to obtain Corps permits.  Am. Compl. ¶¶ 144–55; Dkt.33-6. The Amended Complaint articulates the "practical effects" of being unable to use IPaC, *Massachusetts*, 790 F. Supp. 3d at 27 (citation omitted), and the Ban places wind and solar projects in the same regulatory second-class status as the Bottleneck Memo.  *Supra* p.7.

Federal Lands Anti-Renewable Order. The Order is the consummation of DOI's process for imposing an illegal "capacity density" metric on DOI's review of certain applications and creates legal consequences by disfavoring the approval of wind and solar projects.  Am. Compl. ¶¶ 94–110; Dkt.33-2.   The Order's effects are similar to those in *National Environmental Development Association's Clean Air Project*, 752 F.3d 999, *CropLife*, 329 F.3d 876, and *National Association of Home Builders*, 417 F.3d 1272, in which agencies' announcement of new, mandatory criteria used to evaluate permit applications and/or other agency findings were subject to pre-enforcement review under the APA.  The Order here similarly alters the criteria under which Plaintiffs' members' applications will be judged and thus creates legal consequences.

Corps' Anti-Renewable Memorandum.   This Memorandum similarly constitutes the consummation of the Corps' mandatory process for imposing new substantive criteria on permit applications, and it creates legal consequences by requiring the Corps to disfavor and deprioritize projects with low "capacity density"—that is, wind and solar projects.  Am. Compl. ¶¶ 114–22; Dkt.33-3.   As with other broadly applicable agency rules that set out the standards for the

17

evaluation of permit applications, challengers do not need to wait until actual permit denials occur before challenging this Memorandum. *See supra* p.17.

The Eagle Take Permit Ban. The Ban constitutes the consummation of USFWS's process for banning the issuance of incidental take permits to wind energy facilities "until further notice," and when in effect thereby creates legal consequences for Plaintiffs' members who can no longer obtain such permits. Am. Compl. ¶ 127; Dkt.33-4. The Ban is thus just like the permitting freeze in *New York* that Defendants proffered as the sole justification for the Ban, creating a "de facto suspension of the law with respect to wind energy development." 2025 WL 3514301, at *9.

The Zerzan/Jorjani Opinion. The Zerzan/Jorjani Opinion is the consummation of BOEM's revision to its standard for reviewing offshore wind projects and gives "rise to direct and appreciable legal consequences." *Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 448 (S.D.N.Y. 2019) (citation omitted). The Opinion uses mandatory language to direct that BOEM "err on the side of less interference" between offshore wind projects and other users, and that such projects may (and likely must) be disapproved based on anything more than *de minimis* interference with other ocean uses—a new standard that "alter[s] the legal status quo" for offshore wind developers seeking approval of their COPs. Am. Compl. ¶¶ 163–64, 168–70; Dkt.33-7; *New York*, 2025 WL 3514301 at *8 (citation omitted). The Opinion also purports to nullify an M-Opinion that has been codified in a BOEM regulation promulgated through notice and comment, Am. Compl. ¶¶ 167–69, rendering it a rulemaking subject to judicial review, *see Massachusetts*, 790 F. Supp. 3d at 27 (agency action that "in effect amends several regulations" is final and reviewable). And the Opinion instructs BOEM to "re-evaluate[ ]" any "Departmental action taken in reliance on" the prior DOI interpretation of OCSLA, Am. Compl. ¶ 169; Dkt.33-7 at 3, a task BOEM has begun, including by teeing up "new decisions" for all five COP approvals

18

for offshore wind projects that have not yet commenced on-lease construction, *id.* ¶ 171  The Opinion is thus the mirror image of the M-Opinion that *Natural Resources Defense Council* determined was final: the M-Opinion there "reliev[ed] regulated parties of liability they would otherwise face," 397 F. Supp. 3d at 449, while the Zerzan/Jorjani Opinion *creates* liabilities, including for offshore wind developers who thought they had final project approvals and now face imminent "new decisions," Am. Compl. ¶ 171.

C. Defendants' motion offers no meaningful rebuttal on the first *Bennett* prong, thus conceding that each of the actions represents the "consummation" of the respective agencies' "decision making process[es]." 520 U.S. at 177–78.[7]  On the second *Bennett* prong, Defendants adopt the untenable position that agency actions cannot be final unless they impose direct requirements on Plaintiffs or have been applied to deny a specific project. Mot. 9-10.  But courts routinely review agency actions that create binding norms for the agencies themselves, *see, e.g., Bennett*, 520 U.S. at 177 (challenged agency actions were final because they "alter[ed] the legal regime *to which the action agency* [wa]s subject" (emphasis added)), as well as actions that have not yet been implemented on specific projects.  Defendants' position also contradicts the recent rulings in *Massachusetts* and *New York*, which held that an agency action with the identical effect as the ones challenged here was final.  Defendants fail to distinguish the indefinite pause on wind energy decisions in that case, since the Actions here similarly "prevent [p]laintiffs from moving forward with their proposed activities," Mot.12 (citing *New York*, 2025 WL 3514301, at *9), to the detriment of Plaintiffs and their members, *see generally* Joint Dec.

---

[7] Defendants' labeling of their Actions as "temporary practices," *e.g.*, Mot.11, does not render them any less final.  *New York*, 2025 WL 3514301, at *7.

Defendants argue that the Bottleneck Memorandum does not create legal consequences because it "advises that identified agency leadership . . . will at least review actions relating to wind and solar energy projects." Mot.11. But this disregards the Bottleneck Memorandum's "mandatory" language, *Beshir*, 10 F. Supp. 3d at 180, as well as its "practical effects" of halting wind and solar permitting while placing those projects in a regulatory second-class status, *Massachusetts*, 790 F. Supp. 3d at 27; *Bennett*, 520 U.S. at 169–70, 177; *Sierra Club*, 929 F.3d at 698, n.23.[8] The IPaC Ban (as an extension of the Bottleneck Memo) and the Eagle Take Permit Ban (as a freeze on permits) have similarly real consequences for Plaintiffs' members.[9]

Defendants also claim that the challenged substantive agency actions—the Federal Lands Anti-Renewable Order, Corps Memorandum, and Zerzan/Jorjani Opinion—merely "provide guidance regarding the manner in which future decisions will be made." Mot.11. But these actions are not different than any rules using mandatory language, *Beshir*, 10 F. Supp. 3d at 180, to establish binding criteria that Defendants must apply to evaluate subsequent applications. *See generally Nat'l Envt'l Dev. Ass'n*, 752 F.3d 999; *CropLife*, 329 F.3d 876; *Nat'l Ass'n of Home Builders*, 417 F.3d 1272.[10]

## CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss.

---

[8] *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978), is inapposite, as that case merely prohibits a court from requiring agencies to go *beyond* what the APA requires for agency procedures, *id.* at 543-49; it does not give agencies *carte blanche* to establish procedures that *violate* the APA.

[9] Defendants argue that the Eagle Take Permit Ban and the IPaC Ban are not "agency actions" as defined by the APA because they take the form of a "website banner," Mot.11, 10 n.3 (citing 5 U.S.C. § 551(13)), but the "agency action" definition "is expansive . . . [and] is meant to cover comprehensively every manner in which an agency may exercise its power," *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 49 (D.D.C. 2025) (citations omitted).

[10] Defendants also mischaracterize the Federal Lands Anti-Renewable Order as "purely procedural" because it relates to DOI's NEPA review process, but the Order on its face unlawfully *converts* NEPA into a substantive statute by "preordaining the outcome of DOI's NEPA analyses for wind and solar projects by making capacity density its *primary* (if not outcome-determinative) consideration." Am. Compl. ¶ 229.

Dated: March 24, 2026.

Respectfully submitted,


BY: */s/ Daron L. Janis*
Daron L. Janis (BBO #703028)
TROUTMAN PEPPER LOCKE LLP
111 Huntington Ave., 9th Floor
Boston, MA 02199
(617) 239-0124
daron.janis@troutman.com

Misha Tseytlin (*admitted pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr.
Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

M. Benjamin Cowan (*admitted pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
600 Travis Street, Suite 2800
Houston, TX 77002
(713) 226-1339
ben.cowan@troutman.com

Kaitlin O'Donnell (*admitted pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
1313 N. Market St., Suite 1000
Wilmington, DE 19801
(302) 777-6541
kaitlin.odonnell@troutman.com

Anais Jaccard (*admitted pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
301 S. College St, 34th Floor
Charlotte, NC 28202
(704) 916-1506
anais.jaccard@troutman.com

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of March, 2026, a true and correct copy of the foregoing is being served via the Court's CM/ECF system upon all counsel of record.


        */s/ Daron L. Janis*
        Daron L. Janis