**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| Renew Northeast, et al., ) ) ) ) | |
| Plaintiffs ) | |
| ) | |
| v. ) ) | **No. 25-cv-13961-DJC** |
| ) | |
| United States Department of Interior, et al., ) ) | |
| ) | |
| Defendants. ) ) ) | |

**MEMORANDUM AND ORDER**

CASPER, C. J.                                                         **April 21, 2026**

## I.      Introduction

Plaintiffs RENEW Northeast, the Green Energy Consumers Alliance, Inc. ("GECA"), Mid-Atlantic Renewable Energy Coalition Action ("MAREC Action"), Alliance for Clean Energy – New York ("ACE NY"), Renewable Northwest, Southern Renewable Energy Association ("SREA"), Interwest Energy Alliance ("Interwest"), Clean Grid Alliance ("CGA") and the Carolinas Clean Energy Business Association ("CCEBA") (collectively, "Plaintiffs") (collectively except GECA, "Regional Organization Plaintiffs") have filed this action against Defendants United States Department of the Interior ("DOI"), Douglas Burgum, DOI Secretary, in his official capacity ("DOI Secretary Burgum"), Bureau of Land Management ("BLM"), Steve Pearce, Director of BLM, in his official capacity, Bureau of Ocean Energy Management ("BOEM"), Matthew Giacona, Acting Director of BOEM, in his official capacity, Bureau of Safety and Environmental Enforcement ("BSEE"), Kenneth Stevens, Principal Deputy Director of BSEE, in his official

1

capacity, United States Fish and Wildlife Service ("USFWS"), Brian Nesvik, Director of USFWS, in his official capacity, United States Army Corps of Engineers (the "Corps") and William H. Graham, Jr., Chief of Engineers and Commanding General, in his official capacity (collectively, "Defendants") alleging that six agency actions violate the Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701-706 ("APA").  D. 1; D. 33.  Plaintiffs have now moved to enjoin Defendants preliminarily from enforcing five of these agency actions (collectively, the "Agency Actions") and to stay their effective dates pursuant to Fed. R. Civ. P. 65(a) and 5 U.S.C. § 705, respectively.  D. 35.[1]

After careful consideration of the parties' filings, briefs from *amici curiae* and oral argument by the parties, the Court ALLOWS Plaintiffs' motion as to their request to enjoin the Agency Actions preliminarily with respect to GECA and the Regional Organization Plaintiffs' members and DENIES same to the extent that it sought other relief for the reasons explained below.

## II.    Background

### A.    <u>Existing Federal Law</u>

#### 1.    *The Outer Continental Shelf Lands Act ("OCSLA")*

In 1953, Congress enacted the OCSLA to authorize federal oil and gas leasing of the Outer Continental Shelf ("OCS").  <u>Sec'y of the Interior v. California</u>, 464 U.S. 312, 336 (1984).  The OCS consists of the submerged lands beneath the ocean "beyond those reserved to the States and up to the edge of the United States' jurisdiction and control," generally the area from 3 to 200 nautical

---

[1] After Plaintiffs filed their initial complaint, D. 1, USFWS reversed one of the challenged agency actions that banned wind facilities from obtaining permits authorizing the incidental "take" of both eagle species under the Bald and Golden Eagle Protection Act and ceased USFWS's automatic issuance of general permits for eagle Incidental Take (the "Eagle Take Permit Ban").  D. 33 ¶ 128; Ford Decl., D. 63-1 ¶¶ 12-16; <u>see</u> D. 33-4 at 2.  In light of this reversal, "Plaintiffs no longer seek a preliminary injunction against the enforcement of the [Eagle Take Permit] Ban" but otherwise maintain this claim.  D. 77 at 7 n.1.

miles seaward of the coastline.  Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior, 123 F.4th 1, 8 (1st Cir. 2024) (citing 43 U.S.C. § 1331(a)(1)); Ctr. for Biological Diversity v. U.S. Dep't of the Interior, 563 F.3d 466, 472 (D.C. Cir. 2009).  Under OCSLA, the United States holds the OCS as a "vital national resource reserve . . . for the public," which Congress declared "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with maintenance of competition and other national needs."  43 U.S.C. § 1332(3).

In 2005, Congress amended OCSLA to authorize the DOI Secretary to issue leases on the OCS to "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas," including renewable sources such as wind, waves, and ocean currents.  43 U.S.C. § 1337(p)(1)(C); Pub. Emps. for Env't Resp. v. Hopper, 827 F.3d 1077, 1080-81 (D.C. Cir. 2016).  § 8(p)(4) of OCSLA provides that, in approving any lease, easement, or right-of-way, the Secretary "shall ensure" that all authorized activities within the OCS are "carried out in a manner that provides for" twelve enumerated goals.  43 U.S.C. § 1337(p)(4).  OCSLA also provides that the DOI Secretary "shall administer the provisions of this subchapter relating to the leasing of the [OCS], and shall prescribe such rules and regulations as may be necessary to carry out such provisions."  Id. § 1334(a); see id. § 1337(p)(8).

After receiving a lease, "a lessee must formulate a site assessment plan, obtain BOEM's approval of that plan, and then obtain the BOEM's approval of a construction and operations plan ('COP')."  Seafreeze, 123 F.4th at 9 (citing 30 C.F.R. §§ 585.600, 585.605-607, 585.610-614, 585.620-622, and 585.626-628).  "The [COP] must describe 'all planned facilities that [the lessee] will construct and use,' as well as 'all proposed activities including [the lessee's] proposed construction         activities,        commercial        operations,        and        conceptual        decommissioning

3

plans.'" Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt., 100 F.4th 1, 8 (second and third alterations in original) (quoting 30 C.F.R. § 585.620(a)-(b)). "No construction may begin until the BOEM approves the COP." Seafreeze, 123 F.4th at 9 (citing 30 C.F.R. § 585.620(c)). When evaluating whether to approve a COP, BOEM must comply with the National Environmental Policy Act, id. (citing 30 C.F.R. § 585.628), and the Endangered Species Act, id. (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a)), which are described further below.

### 2. The Federal Land Policy and Management Act ("FLPMA")

In 1976, Congress enacted the FLPMA, 43 U.S.C. §§ 1701-1787, which established the guiding principles governing the management (by DOI and BLM) of public lands owned by the United States. 43 U.S.C. § 1702(e). FLPMA requires DOI to, as relevant, manage public lands "on the basis of multiple use," id. § 1701(a)(7), which ensures a "combination of balanced and diverse resource uses . . . with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output," id. § 1702(c). As part of this mandate, Title V of FLPMA authorizes BLM to grant rights-of-way ("ROW") on public lands relating to "systems for generation, transmission, and distribution of electric energy," id. § 1761(a)(4), including wind and solar energy projects. See Rights-of-Way, Leasing, and Operations for Renewable Energy, 89 Fed. Reg. 35634 (May 1, 2024) (to be codified at 43 C.F.R. pt. 2800).

### 3. The Clean Water Act ("CWA") and the Rivers and Harbors Act ("RHA")

In 1972, Congress enacted CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by decreasing and eventually eradicating the discharge of pollutants into those waters. 33 U.S.C. § 1251(a). CWA prohibits the "discharge of any pollutant" into "navigable waters," including the "territorial seas," unless done in compliance with

the Act. Id. §§ 1311(a), 1344(a), 1362(7); 33 C.F.R. §§ 328.2, 328.3(a)(1), 328.4(a). The CWA "regulates the discharge of dredged or fill material into 'navigable waters.'" Solid Waste Agency v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 162 (2001) (citing 33 U.S.C. § 1344(a)). This provision grants the Corps authority to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a).

The Rivers and Harbors Act of 1899 ("RHA") restricts the obstruction of navigable waters. United States v. San Juan Bay Marina, 239 F.3d 400, 404 (1st Cir. 2001). The RHA "prohibits construction or other work, such as dredging, in navigable U.S. waters without congressional authorization or a recommendation by the Army Corps Chief of Engineers as well as the Secretary of the Army's authorization." Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 463 (1st Cir. 2009) (citing 33 U.S.C. § 403). Pursuant to § 10 of RHA, "[t]he Corps [] may issue permits to authorize the installation of structures in navigable U.S. waters more than three nautical miles from the coast." Seafreeze, 123 F.4th at 11 (citing 33 U.S.C. § 403; 33 C.F.R. §§ 320.2(b), 322.3(a)-(b)). As relevant here, an RHA § 10 permit is required to build structures or perform work in or affecting such waters. 33 C.F.R. § 322.3(a).

To grant a permit under either CWA or RHA, the Corps must comply with its own permitting regulations, Seafreeze, 123 F.4th at 11 (citing 33 C.F.R. pt. 320), which, among other mandates, require a "public interest" review, considering "[a]ll factors which may be relevant to the proposal" and balancing "[t]he benefits which reasonably may be expected to accrue from the proposal . . . against its reasonably foreseeable detriments," 33 C.F.R. § 320.4(a)(1). "Where there are unresolved conflicts as to resource use," the Corps must consider "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed" project. Id. § 320.4(a)(2)(ii). "[P]racticable alternatives" are those that are "available and capable of being

done after taking into consideration cost, existing technology, and logistics in light of overall project purposes," 40 C.F.R. § 230.10(a), and with limited exceptions, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." Id.

### 4.    Endangered Species Act ("ESA")

ESA establishes protections for fish, wildlife and plants that are listed as endangered or threatened, and imposes criminal and civil penalties for non-compliance. 16 U.S.C. §§ 1531-1544. Under § 7(a)(2), federal agencies ("action agencies") must ensure that any "action" they authorize, fund or carry out "is not likely to jeopardize the continued existence of" a species listed under ESA or "result in the destruction or adverse modification" of a designated critical habitat. Id. § 1536(a)(2). Federal agencies must also "consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species." Id. § 1536(a)(3).

To facilitate compliance with these requirements, action agencies are required to consult with either the USFWS, the National Marine Fisheries Service, or both, whenever the action agencies authorize, fund, or carry out a discretionary action that "may affect" an ESA-listed species or its designated critical habitat. 50 C.F.R. §§ 402.14(a), 402.02, 402.03. The Information for Planning and Consultation website ("IPaC") is a publicly available database that provides information "to assist in determining how activities being proposed may impact sensitive natural resources, and . . . obtain suggestions for ways to address these impacts." Frequently Asked Questions – Who can use IPaC?, U.S. Fish & Wildlife Service, https://ipac.ecosphere.fws.gov/ (last

visited Apr. 18, 2026). "IPaC is [] designed to assist the USFWS." Frequently Asked Questions – How does IPaC benefit me?, U.S. Fish & Wildlife Service, https://ipac.ecosphere.fws.gov/ (last visited Apr. 18, 2026). "IPaC is heavily focused on streamlining delivery of section 7 consultation" and "can provide an official species list, assist with (and, in some cases, conclude) consultation for certain species and activities, and assist [an applicant] in preparing a biological analysis suitable for use as a Biological Assessment" "[a]s part of the section 7 consultation process." Frequently Asked Questions – Is IPaC for section 7 or section 10 of the Endangered Specified Act (ESA)?, U.S. Fish & Wildlife Service, https://ipac.ecosphere.fws.gov/ (last visited Apr. 18, 2026).

5. *The National Environmental Policy Act ("NEPA")*

In 1969, Congress enacted the NEPA, "a procedural statute that requires federal agencies to take a 'hard look' at the environmental impacts of and alternatives to a proposed action." Seafreeze, 123 F.4th at 9 (quoting Beyond Nuclear v. U.S. Nuclear Regul. Comm'n, 704 F.3d 12, 19 (1st Cir. 2013)). NEPA requires an analysis of "a reasonable range of alternatives . . . that are technically and economically feasible and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii). NEPA "does not mandate particular results, but simply prescribes the necessary process for an agency's environmental review of a project." Seven Cnty. Infrastructure Coal. v. Eagle County, 605 U.S. 168, 177 (2025) (quotation and quotation marks omitted). "This process is designed to prevent uninformed agency action and to provide information about environmental impact to the public and other government agencies so that they have an opportunity to respond." Seafreeze, 123 F.4th at 9 (citing Town of Winthrop v. FAA, 535 F.3d 1, 4 (1st Cir. 2008)).

**B.     Preceding Wind and Solar Executive Action**

On January 20, 2025, President Trump issued an executive memorandum entitled Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing

and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects (the "Wind Memo"). 90 Fed. Reg. 8363 (Jan. 20, 2025). The Wind Memo directed federal agencies to suspend issuing all new permits, leases and other authorizations needed to develop and operate wind energy projects, both onshore and offshore, pending a wide-ranging assessment of federal wind leasing and permitting practices. Id. at 8363-64. Section 1 of the Wind Memo invoked the President's authority under section 12(a) of OCSLA to "withdraw from disposition for wind energy leasing all areas within the [OCS]," thereby "temporarily prevent[ing] consideration of any area in the OCS for any new or renewed wind energy leasing." Id. at 8363. Section 2 states, in relevant part, that:

> [The DOI Secretary], the Secretary of Agriculture, the Secretary of Energy, the Administrator of the Environmental Protection Agency, and the heads of all other relevant agencies, shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices. The [DOI Secretary] shall lead that assessment and review in consultation with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, the Secretary of Energy, and the Administrator of the Environmental Protection Agency. The assessment shall consider the environmental impact of onshore and offshore wind projects upon wildlife, including, but not limited to, birds and marine mammals.

Id. at 8364.

The same day, in response to the Wind Memo, DOI Secretary Burgum issued Secretary Order No. 3415 entitled Temporary Suspension of Delegated Authority (the "Wind Order"). Among other things, the Wind Order "temporarily suspended" all "delegations of authority" within the DOI "[t]o issue any onshore or offshore renewable energy authorization, including but not limited to a lease, amendment to a lease, right of way, amendment to a right of way, contract, or any other agreement required to allow for renewable energy development." Wind Order § 3(g). The Wind Order was set to expire after 60 days, id. § 5, but the temporary halt on issuing permits

8

remained in effect for several months past that timeframe as agencies awaited the Comprehensive Assessment (and results of same) directed in the Wind Memo, New York v. Trump, 811 F. Supp. 3d 215, 227 (D. Mass. 2025).

The same day that the Wind Memo and Wind Order were issued, President Trump issued Executive Order No. 14156 entitled Declaring a National Energy Emergency ("Executive Order No. 14156") which declares "a national emergency" regarding the nation's "inadequate and intermittent energy supply" and "increasingly unreliable grid." Id. § 1. The order directs agency heads to use their emergency authorities to facilitate the generation of domestic energy resources. Id. §§ 2-7. President Trump also issued Executive Order No. 14154 entitled Unleashing American Energy ("Executive Order No. 14154") which orders an "[i]mmediate [r]eview of [a]ll [a]gency [a]ctions that [p]otentially [b]urden the [d]evelopment of [d]omestic [e]nergy [r]esources . . . with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources," Exec. Order No. 14154 § 3, and revokes and revises several prior administration regulations related to energy and natural resources, id. § 4. The order also directs certain Secretaries, including the DOI Secretary, to "undertake all available efforts to eliminate all delays within their respective permitting processes." Id. § 5(d).

On February 3, 2025, DOI Secretary Burgum issued Secretary Order No. 3417 entitled Addressing the National Energy Emergency ("Secretary Order No. 3417") to implement Executive Order No. 14156, Sec. Order No. 3417 § 1, and Secretary Order No. 3418 entitled Unleashing American Energy ("Secretary Order No. 3418") to implement Executive Order No. 14154, Sec. Order No. 3418 § 1. Secretary Order No. 3418 directs DOI Assistant Secretaries to "promptly review all agency actions and submit an action plan to [DOI Secretary Burgum] in 15 days to

consider how to comply with" the revocation of the prior administration's enumerated policies, including by terminating "any actions taken to implement the revoked EOs."  Id. § 4.

On July 7, 2025, President Trump further issued Executive Order No. 14315 entitled Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources ("Executive Order No. 14315") which directs the DOI Secretary to "review [] regulations, guidance, policies, and practices under the [DOI]'s jurisdiction to determine whether any provide preferential treatment to wind and solar facilities in comparison to dispatchable energy sources" and "revise any identified regulations, guidance, policies, and practices as appropriate and consistent with applicable law to eliminate any such preferences for wind and solar facilities."  Id. § 4.  On July 29, 2025, DOI Secretary Burgum issued Secretary Order No. 3437 entitled Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision Making to implement Executive Order No. 14315 ("Secretary Order No. 3437") to implement Executive Order No. 14315.  Id. § 1.  The order reports its findings in response to Executive Order No. 14315 on prior agency actions that the DOI Secretary concluded to have preferenced wind and solar energy and disfavored oil, gas and fossil fuel energy.  Id. § 4.

C.      **Challenged Agency Actions**

Plaintiffs seek to enjoin preliminarily and stay five agency actions issued in response to these executive branch actions.  Specifically, Plaintiffs seek to enjoin and stay:  (1) DOI's July 15, 2025 memorandum entitled Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities ("DOI Review Procedures Memo") which established a review procedure for all DOI agency actions related to wind and solar energy facilities, DOI Review Procedures Memo at 1, D. 35-2; (2) USFWS's July 2025 announcement that solar and wind projects cannot use the IPaC website prior to undergoing

the review procedures outlined in the DOI Review Procedures Memo ("Wind and Solar IPaC Ban"), D. 33-6 at 2; D. 35-7; (3) Section 4 of DOI Secretary Burgum's August 1, 2025 Secretarial Order No. 3438 entitled Managing Federal Energy Resources and Protecting the Environment ("DOI Land Order") which restricts DOI's ability to approve energy projects based on a project's "capacity density," DOI Land Order § 4, D. 35-3; (4) Section 4(c) of the Corps' September 18, 2025 memorandum entitled Direction on Reviewing Permit Applications Related to Energy Generation Projects ("Corps' Memo") requiring the Corps to "prioritize processing CWA and RHA permit applications" for projects with higher capacity densities, Corps' Memo § 4(c), D. 35-4; and (5) then-Acting DOI Solicitor, Gregory Zerzan's May 1, 2025 M-Opinion 37086 entitled Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059, Secretary's Duty to Prevent Interference with Reasonable Uses of Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf ("Zerzan M-Opinion"), D. 35-8, which withdraws the prior administration's Anderson M-Opinion interpretation of § 8(p)(4) of OCSLA and reinstates the first Trump Administration's Jorjani M-Opinion interpretation of same, requiring all DOI bureaus and offices to "treat [the Jorjani M-Opinion] as binding and authoritative" and mandating that DOI "re-evaluate[]" all "Departmental action taken in reliance on" the withdrawn Anderson M-Opinion, Zerzan M-Opinion at 3.

### D.    Previous Wind Order Litigation

On May 5, 2025, several States and intervenor ACE NY brought a challenge before another session of this Court (Young, J.) against President Trump and several of the Defendants here alleging that the Wind Order was unlawful under the APA, OCSLA and the United States

11

Constitution.  Massachusetts v. Trump, 790 F. Supp. 3d 8, 14-15 (D. Mass. 2025).[2]  On July 3, 2025, the court denied the defendants' motion to dismiss as to the plaintiffs' APA claims, concluding that the plaintiff States and ACE NY had standing to challenge the Wind Order, id. at 20-24, and that the plaintiffs plausibly alleged that the Wind Order was a final agency action that violated the APA, id. at 25-30.

The parties there subsequently cross-moved for summary judgment and on December 8, 2025, another session of this Court (Saris, J.) granted the plaintiffs' motions for summary judgment and denied the defendants' motion for same.  New York, 811 F. Supp. 3d at 226.  The court first concluded that the plaintiff States and ACE NY, which is, as here, a renewable energy organization suing on behalf of its members, established standing to challenge the Wind Order as a matter of law.  Id. at 229-31.  The court next concluded that the Wind Order was a final agency action subject to APA review, id. at 232-34, and that it was arbitrary and capricious and contrary to law in violation of the APA, id. at 234-43.  The court thus vacated the Wind Order in its entirety and declared it unlawful in violation of 5 U.S.C. § 706(2)(A) and (C).  Id. at 244.  Defendants appealed and, as of the date of this order, the appeal is pending before the First Circuit.  See New York v. Trump, 811 F. Supp. 3d 215 (D. Mass. 2025), appeal docketed, No. 26-1174 (1st Cir. Feb. 23, 2026).

## III.    Procedural History

Plaintiffs filed this action on December 23, 2025, D. 1, and filed the operative amended complaint on January 12, 2026, D. 33.  Plaintiffs have moved to enjoin preliminarily and stay the

---

[2] The plaintiffs in the Wind Order litigation "challenged 'the Agency Defendants' actions under the' Wind Memo," i.e., the Wind Order, "not the Wind Memo itself."  New York, 811 F. Supp. 3d at 243 (quoting New York v. Trump, 133 F.4th 51, 70 n.17 (1st Cir. 2025)).

Agency Actions.  D. 35.  The Court heard oral argument from the parties on this motion and took the matter under advisement.  D. 82.[3]

## IV.    Standard of Review

"The same standard governs" a motion to stay an agency action under § 705 of the APA and a motion for preliminary injunction pursuant to Fed. R. Civ. P. 65(a).  Ass'n of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143, 164 (D. Mass. 2025) (citations omitted).  Under both standards, the Court must assess:  "(1) the [movant]'s likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden [the nonmovant] less than denying an injunction would burden [the movant]; and (4) the effect, if any, on the public interest."  González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)).  "The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor: "likelihood of success on the merits."  New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)).  Accordingly, the Court turns to this analysis as to each of Plaintiffs' challenges, after addressing standing, which Defendants challenge here.  See United Seniors Ass'n, Inc. v. Philip

---

[3] The Court has received and considered the *amici curiae* briefs from twenty states and the District of Columbia, D. 69, Citizens Campaign for the Environment, Conservation Law Foundation, Environmental Defense Fund, Inc., Environmental League of Massachusetts, Environmental Protection Information Center, National Wildlife Federation, Natural Resources Defense Council, New York League of Conservation Voters and Sierra Club, D. 71, and Citizens United for Resources and Environment ("CURE"), Center for Rural Affairs, Solar United Neighbors and Renew Missouri, D. 76, filed in support of Plaintiffs' motion for preliminary relief.

Morris USA, 500 F.3d 19, 23 (1st Cir. 2007) (noting that "[t]he federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case").

## V.    Discussion

### A.    <u>Justiciability</u>

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "Such a case or controversy exists only when the plaintiff demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." Gustavsen v. Alcon Lab'ys., Inc., 903 F.3d 1, 6-7 (1st Cir. 2018) (citations and internal quotation marks omitted). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." TransUnion, 594 U.S. at 423 (citation and internal quotation marks omitted). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Plaintiffs must also establish that their challenges are ripe for judicial review. "[T]he question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (internal citation and quotation marks omitted).

Organizational plaintiffs may demonstrate standing by:  (1) showing associational standing; or (2) by showing that the organizational plaintiffs have standing to sue on their own. See Equal Means Equal v. Dep't of Educ., 450 F. Supp. 3d 1, 5-6 (D. Mass. 2020). In either instance, the

organization must demonstrate more than a "mere interest in a problem."  Sierra Club v. Morton, 405 U.S. 727, 739 (1972) (internal quotations omitted).  As such, they must make the same showing as is required in the case of an individual:  injury, causation and redressability.  Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982) (explaining that the court "conduct[s] the same inquiry as in the case of an individual" to assess organizational standing).

Here, RENEW Northeast, ACE NY, Renewable Northwest, SREA, Interwest, MAREC Action, CGA and CCEBA (again, the "Regional Organization Plaintiffs") rely upon an associational standing theory based upon direct harm to their members to challenge each of the Agency Actions.  See Regional Organization Plaintiffs' Executive Directors Joint Decl. ("Joint Decl."),[4] D. 37 at 2-3; id. ¶ 487.[5]  To establish associational standing to sue on behalf of their members, the plaintiff organizations are required to show that (1) at least one member would have standing to sue; (2) the interests the suit seeks to protect are "pertinent to the objectives for which the organization[s were] formed" and (3) neither the claim nor the relief requested requires the organizations' members to participate in the suit.  United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992).

---

[4] Defendants argue that Plaintiffs' declarations are not properly before the Court as they are outside the administrative record.  D. 63 at 29 n.5.  While documents outside the administrative record generally cannot be considered for purposes of conducting APA review of agency action, see Olsen v. United States, 414 F.3d 144, 155 (1st Cir. 2005), "courts may freely consider extra-record evidence offered solely for the purpose of establishing a plaintiff's standing," Pawnee Nation v. U.S. Bureau of Indian Affs., No. 16-cv-697-JHP-JFJ, 2020 WL 91498, at *2 (N.D. Okla. Jan. 8, 2020) (citation omitted); cf. Pennell v. City of San Jose, 485 U.S. 1, 8 (1988).

[5] With their reply brief, Plaintiffs submitted supplemental declarations from the Regional Organization Plaintiffs' Executive Directors and GECA's Executive Director, Regional Organization Plaintiffs' Executive Directors Supp. Joint Decl. ("Supp. Joint Decl."), D. 77-1; Lawrence Chretien Supp. Decl., D. 77-2.  The Court considered this evidence only to the extent it served to rebut Defendants' evidence.  See Sunrise Techs., Inc. v. SELC Ireland, Ltd., No. 15-cv-11546-NMG, 2016 WL 3360418, at *8 (D. Mass. June 14, 2016).

GECA relies upon a theory of organizational standing whereby organizations may sue on behalf of their own interests "separate and apart from the interests of their members." Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 44 n.7 (1st Cir. 2012). For an organization to allege standing in its own right, it must allege "(1) an injury in fact, which is (2) fairly traceable to the defendant's misconduct, and which can be (3) redressed through a favorable decision of the court." Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 324 (D. Mass. 2013). Germane to the organizational injury inquiry is whether the injury is sufficiently concrete or merely an abstract social interest. See Havens Realty, 455 U.S. at 378-79; Abigail All. For Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 133 (D.C. Cir. 2006) (explaining that "[t]he court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised") (citation omitted).

Defendants challenge the justiciability of each of Plaintiffs' claims. D. 63 at 49-53. As to standing, Defendants do not contest that the interests the Regional Organization Plaintiffs seek to protect in this suit are pertinent to their organizations' objectives or that their claims and requested relief do not require their members' participation. See id. at 50-51. The last two prongs of the Regional Organization Plaintiffs' associational standing are thus not in dispute. See Joint Decl., D. 37 ¶¶ 2, 6, 10, 14, 18, 22, 26, 30 (noting organizations' purpose); New York, 811 F. Supp. 3d at 230-31 (concluding that the remedies of declaratory relief and vacatur do not require individual member participation) (citations omitted). Defendants argue, however, that Plaintiffs have failed to establish either the Regional Organization Plaintiffs' members' standing to support the Regional Organization Plaintiffs' associational standing or GECA's organizational standing. D. 63 at 49-51. As to ripeness, Defendants argue that Plaintiffs' challenges are not ripe for judicial review because the Agency Actions "'serve[] notice[s] only that' some further action may take place" and Plaintiffs

16

have not established hardship.  Id. at 51-52 (quoting Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 158, 163 (1967)).  The Court considers the challenged elements of standing and ripeness as to each Agency Action below.

### 1.     DOI Review Procedures Memo

Plaintiffs seek to enjoin and stay the DOI Review Procedures Memo.  The memo provides, in relevant part:

> Consistent with [Executive Order No. 14315], [Executive Order No. 14156], [the Wind Memo], Secretary[] Order [No.] 3417, and [Secretary Order No. 3418], all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities shall require submission to the Office of the Executive Secretariat and Regulatory Affairs, subsequent review by the Office of the Deputy Secretary, and final review by the Office of the Secretary.

DOI Review Procedures Memo at 1.  The memo identifies a non-exhaustive list of 68 specific "decisions, actions, consultations, and other undertakings" related to wind and solar projects that are subject to this review procedure, including agencies' issuance of several wind and solar energy project permits, id. at 1-3, as well as a catch-all category for "any other similar or related decisions, actions, consultations, or undertakings," id. at 3.

As to the Regional Organization Plaintiffs, to establish the first element of associational standing, an association must "adequately show[] that 'at least one of its members would have standing to sue as an individual.'"  Housatonic River Initiative v. EPA, 75 F.4th 248, 265 (1st Cir. 2023) (quoting Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010)); see Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (noting that "the association must, at the very least, 'identify [a] member[] who ha[s] suffered the requisite harm'") (alterations in original) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009))).  As to the first element, injury in fact, a standing-conferring injury must be "actual or imminent."  Clapper v. Amnesty Int'l, USA, 568 U.S. 398, 409 (2013) (quotation omitted).  The imminence requirement is met "if the threatened injury is 'certainly

impending' or there is a 'substantial risk that the harm will occur.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper, 568 U.S. at 409, 414 n.5). "Either a certainly impending harm or substantial risk of harm suffices." Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 222 (1st Cir. 2019) (emphasis in original) (citation omitted). The "imminence concept, while . . . far reaching, is bounded by its Article III purpose: 'to ensure that the alleged injury is not too speculative.'" Berner v. Delahanty, 129 F.3d 20, 24 (1st Cir. 1997) (quotation omitted). As such, imminently threatened fiscal injury, even "a relatively small economic loss," is sufficient to confer jurisdiction in federal court. Katz v. Pershing, LLC, 672 F.3d 64, 76 (1st Cir. 2012) (citing Adams v. Watson, 10 F.3d 915, 924 (1st Cir. 1993)).

Here, the Regional Organization Plaintiffs identify twenty of their members' projects for which they attest there have been delays in various permit processings that have impacted their ability to obtain COP approval from BOEM, ROW approval from BLM and CWA § 404 permits from the Corps. See Joint Decl., D. 37 ¶¶ 52-237.[6] For example, the Atlantic Shores North Project, a proposed offshore wind project, submitted an updated COP application on March 1, 2024 and has had BOEM's review of their COP application paused since May 22, 2025. Id. ¶¶ 73-75. To date, the developer "has spent $215 million in initial lease acquisition fees plus an additional milestone payment of tens of millions of dollars (for all three leases), and continues to pay rental fees, including $243,387 in rental payments attributable to the OCS-A 0549 lease for 2025 alone" and

---

[6] Defendants challenge Plaintiffs' reliance upon the Joint Declaration arguing that for all but seven projects, "there is an insufficient basis to conclude that the project developers are Plaintiff members." D. 63 at 35 n.9. Defendants, however, do not offer any facts to rebut the Regional Organization Plaintiffs' executive directors' averment that "[e]ach project listed in this declaration is owned or developed by a member of at least one" Regional Organization Plaintiff and that each plaintiff organization "includes, as a member in its own right, at least one company or an owner or developer associated with a project listed in this declaration." Joint Decl., D. 37 ¶ 51. Absent evidence to the contrary, the Court credits Plaintiffs' showing on this point.

"continues to pay rental fees to the United States" while the project has been stalled in review. Id. ¶ 79. These members' economic harms are "ongoing or imminent" as any action on their permit applications is currently subject to the three-tiered review procedure outline in the DOI Review Procedures Memo. See New York, 811 F. Supp. 3d at 228 (concluding that states established imminent injuries due to Wind Order where "delays caused by the Wind Order reduce or defer tax revenue and returns on the State Plaintiffs' investments in wind energy developments") (collecting cases recognizing similar); see also Massachusetts, 923 F.3d at 222-27 (concluding state established imminent fiscal harm based on prospective costs it would incur due to regulation); Massachusetts, 790 F. Supp. 3d at 20 (concluding that plaintiff-organization plausibly alleged members' injury in fact where it "alleged that its members are experiencing delays in permitting decisions leading to costs and other harms" and submitted a declaration to support these assertions) (citations omitted); FDA v. All. for Hippocratic Med., 602 U.S. 367, 384-85 (2024) (recognizing that downstream economic injuries to suppliers can form basis for standing where injuries result from "predictable chain of events"). These imminent economic harms are sufficient to establish injury in fact as to these members. See Katz, 672 F.3d at 76.

Defendants attempt to rebut the Regional Organization Plaintiffs' evidence of harm by offering declarations from agency personnel attesting that certain of their identified projects have been "proceeding in normal fashion, have been de-prioritized at the request of the proponent, or simply have not been presented to the agency." D. 63 at 49; see Lopez Decl., D. 63-3 ¶¶ 14-25 (attesting that BLM is reviewing and processing applications for nine of Plaintiffs' identified projects); Siegrist Decl., D. 63-4 ¶¶ 3-5 (attesting that the Corps has no record of pending permit applications for three of Plaintiffs' identified projects); Wargo Decl., D. 63-5 ¶¶ 3-4 (attesting that the Corps is processing applications for two of the identified projects). Plaintiffs have, however,

19

offered evidence to the contrary, see Supp. Joint Decl., D. 77-1 ¶¶ 14-15, 22-24, 26, 30-32, 40-45, and Defendants' evidence fails to address all of the identified projects, see Joint Decl., D. 37 ¶¶ 56-237. Moreover, Defendants' evidence does not negate the economic costs already incurred by these members nor their imminently threatened economic injuries. See Katz, 672 F.3d at 76. As such, Defendants' evidence does not undermine these members' otherwise undisputed actual and imminent economic harms. The first standing requirement is met.

Causation is also met. To establish causation, Plaintiffs must "'show a sufficiently direct causal connection between the challenged action and the identified harm.'" Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020) (quoting Katz, 672 F.3d at 71). Defendants argue that Plaintiffs fail to demonstrate that the Regional Organization Plaintiffs' members' economic harms are caused by the DOI Review Procedures Memo "[b]ecause the agencies are not delaying." D. 63 at 49. This argument again "disregards the economic costs that [Plaintiffs'] members have already incurred in response to project delays," see New York, 811 F. Supp. 3d at 230, which Plaintiffs have established through undisputed evidence, see Joint Decl., D. 37 ¶¶ 52-237; see Massachusetts, 923 F.3d at 222-28 (holding that state has demonstrated standing to challenge two interim final health insurance coverage rules where state made "'rational economic assumptions'" regarding financial impact of regulations) (quoting Adams, 10 F.3d at 923). Likewise, the argument that the identified projects have not diverted from the "typical" approval process, D. 63 at 49, is belied by the DOI Review Procedures Memo itself, which establishes a three-tiered internal review procedure not previously in place for any agency action related to wind and solar projects, DOI Review Procedures Memo at 1; see D. 36 at 15 & n.16.

To the extent Defendants contend that Plaintiffs fail to show causation due to uncertainty over whether the identified projects would have timely proceeded absent the DOI Review

20

Procedures Memo, the Regional Organization Plaintiffs' members' economic injuries can be traceable "'even though the [Agency Defendants] might reach the same result exercising [their] discretionary powers lawfully'" as "'those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground.'" Massachusetts, 790 F. Supp. 3d at 21 (quoting Federal Election Comm'n v. Akins, 524 U.S. 11, 25 (1998)); see New York, 811 F. Supp. 3d at 230 (recognizing same). Whereas here, the Regional Organization Plaintiffs have demonstrated that their members' permitting timelines have been delayed, prolonged and stalled while subject to the review procedure under the DOI Review Procedures Memo, Joint Decl., D. 37 ¶¶ 56-237, Plaintiffs have standing to challenge the memo even if, as Defendants suggest, the permitting timelines would be the same absent it. See New York, 811 F. Supp. 3d at 230 (concluding same); Akins, 524 U.S. at 25. The second standing requirement is satisfied.

Plaintiffs have also demonstrated redressability. To satisfy the redressability requirement, Plaintiffs must show "'that a favorable resolution of [the] claim would likely redress the professed injury'" to their members. In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 995 F.3d 18, 22 (1st Cir. 2021) (alteration in original) (quoting Katz, 672 F.3d at 72). Defendants argue that Plaintiffs cannot show that an injunction will redress their harms as it would have no impact on "projects that have awaited the next procedural step since as early as 2019 . . . or 2022," D. 63 at 50 (citing Joint Decl., D. 37 ¶¶ 59, 85, 186, 207), "projects that have been 'de-prioritized' at the developer's request," id. (citing Lopez Decl. D. 63-3 ¶¶ 17, 20), projects "proceeding through the normal approval process," id. (citing Lopez Decl. D. 63-3 ¶¶ 18, 19, 21, 23-25), or "projects unaffected by the guidance (or its absence) where the developer is proceeding following project redesign," id. (citing Joint Decl. ¶¶ 97, 219). As Plaintiffs note, D. 77 at 17, this argument again does not reach

21

all of the Regional Organization Plaintiffs' members' projects, see Joint Decl. ¶¶ 56-237, and, as explained above, the evidence upon which Defendants rely for their contention is disputed. More significantly, this argument is unavailing. As the Regional Organization Plaintiffs have shown that several of their members have and will suffer economic injuries due to permitting delays caused by the review procedures prescribed by the DOI Review Procedures Memo, their requested relief would redress these injuries by removing this procedure. Further, as with causation, Plaintiffs' injuries are "redressable 'even though the [Agency Defendants] might reach the same result exercising [their] discretionary powers lawfully.'" Massachusetts, 790 F. Supp. 3d at 21 (quoting Akins, 524 U.S. at 25); see NTCH, Inc. v. Fed. Commc'ns Comm'n, 950 F.3d 871, 879 (D.C. Cir. 2020) (concluding same); see also Doe v. Noem, No. 25-cv-10495-IT, 2026 WL 686483, at *12 (D. Mass. Mar. 11, 2026) (noting that "[p]laintiffs need not prove that [government agency] could not cause Plaintiffs' same injuries through some other action to satisfy the redressability requirement"). The third standing element is thus satisfied. Accordingly, the Regional Organization Plaintiffs have established their members' standing to challenge the DOI Review Procedures Memo and thus their associational standing.

As to GECA, GECA is "a nonprofit organization whose mission is to empower consumers and communities to speed a just transition to a zero-carbon future." Chretien Decl., D. 38 ¶ 1. To do so, "GECA advocates for the timely and responsible development of renewable energy sources by, among other things, selling renewable energy certificates ('RECs') to consumer and municipal aggregations in Massachusetts and Rhode Island." D. 33 ¶ 19. A REC "represents the property rights to the environmental, social, and other non-power attributes of renewable electricity generation" and is "issued when one megawatt-hour (MWh) of electricity is generated and delivered to the electricity grid from a renewable energy resource." Renewable Energy Certificates (RECs),

22

United States Environmental Protection Agency, https://www.epa.gov/green-power-markets/renewable-energy-certificates-recs (last accessed Apr. 18, 2026). GECA offers "RECS to consumers . . . through utility bills and tradeable certifications," Chretien Decl., D. 38 ¶ 8, and uses the revenue from its REC sales to fund "consumer education, clean energy programming, and advocacy initiatives," D. 33 ¶ 19. GECA's REC sales represent GECA's largest source of earned income and largest funding source, generating "approximately $12 million in gross revenue and approximately $1 million in gross margin annually." Chretien Decl., D. 38 ¶¶ 13-14.

As to the first standing element, GECA alleges that the DOI Review Procedures Memo has caused delays and disruptions to renewable energy development in New England that has "reduce[d] and destabilize[d] the supply of [RECs] available in the New England market." Id. ¶ 10. GECA's executive director avers that these delays and disruptions harm GECA by "increas[ing] GECA's program costs and forc[ing] GECA to divert limited organizational resources away from other mission-critical work to sustain existing commitments," "impos[ing] significant operational burdens, requiring GECA to devote additional staff time and organizational resources to securing RECs, negotiating procurement arrangements, and revising program materials and communications to avoid disruptions to GECA's REC retirement obligations," "creat[ing] a real risk that GECA will be forced to contract its programs because GECA cannot sustainably procure sufficient RECs and ensure their timely retirement to maintain affordability and support growth" and "undermin[ing] GECA's ability to achieve its organizational mission . . . accelerat[ing] a just transition to a zero-carbon world by supporting verifiable renewable electricity." Id. ¶ 18. These harms are "far more than simply a setback to [GECA]'s abstract social interests." Havens Realty, 455 U.S. at 379 (citation omitted); see Abigail All., 469 F.3d at 133. Rather, the reduction in renewable energy projects impedes GECA's activities by, among other things, decreasing the availability of RECs,

23

thereby interfering with its ability to provide RECs to customers.  See Havens Realty, 455 U.S. at 379 (holding that organization suffered a concrete injury because defendant's actions "perceptibly impaired" the organization's ability to provide services, such that there has been a "concrete and demonstrable injury to the organization's activities").  Further, GECA has established a direct economic harm as the reduction in available RECs directly impacts its ability to fundraise through its primary revenue source.  These economic harms are sufficient to support injury in fact.  See Katz, 672 F.3d at 76; Dantzler, 958 F.3d at 48.

GECA has also established causation.  While "[t]he Supreme Court has cautioned against courts finding that a plaintiff's injury is fairly traceable to a defendant's conduct where the plaintiff alleges a causal chain dependent on actions of third parties," Dantzler, 958 F.3d at 48 (citing Allen v. Wright, 468 U.S. 737, 757-59 (1984)), here, GECA has established that it is directly harmed by the delays in renewable energy project approvals resulting from the DOI Review Procedures Memo. See Chretien Decl., D. 38 ¶ 10; see also Massachusetts, 923 F.3d at 222-28; Alianza Americas v. DeSantis, 727 F. Supp. 3d 9, 51 (D. Mass. 2024).  GECA's economic injuries are thus fairly traceable to the DOI Review Procedures Memo.  GECA also satisfies redressability for the same reasons as explained as to the Regional Organization Plaintiffs' members.  See Massachusetts, 790 F. Supp. 3d at 21.  Accordingly, Plaintiffs too have sufficiently demonstrated GECA's organizational standing to challenge the DOI Review Procedures Memo.

Plaintiffs have also established that their challenge to the DOI Review Procedures Memo is ripe for judicial review.  As to the fitness prong, "[t]he critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all."  Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992).  The fitness for review prong is more easily satisfied when

it "presents an issue that is 'purely legal, and will not be clarified by further factual development.'" Susan B. Anthony List, 573 U.S. at 167 (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985)).

Defendants argue that Plaintiffs' challenge to the DOI Review Procedures Memo is not fit because the memo "'serves notice only that' some further action may take place" and thus Plaintiffs' economic injuries are too speculative to support fitness. D. 63 at 51-52 (quoting Toilet Goods Ass'n, 387 U.S. at 163; citing Mayor of Ocean City v. U.S. Dep't of the Interior, No. 24-cv-03111-SAG, 2025 WL 3628137, at *4 (D. Md. Dec. 15, 2025)). This argument cannot be squared with the text of the DOI Review Procedures Memo which states that the review procedures are "effective immediately." DOI Review Procedures Memo at 3. Defendants' reliance upon Toilet Goods Ass'n Inc. and Ocean City is also misplaced. Unlike those cases, where the courts concluded that the plaintiffs "ha[d] no idea whether or when" an agency action under a regulation would be occur, Toilet Goods Ass'n, 387 U.S. at 163, or whether challenged agency documents "reflect[ing] 'an abstract decision'" would ultimately result in a particular decision because "agency consideration remains ongoing, and there remain opportunities for [the agency] to depart from that inferred abstract decision," Ocean City, 2025 WL 3628137, at *4, here, the DOI Review Procedures Memo mandates that all DOI offices "shall require" the three-tiered review procedure under the memo for wind and solar energy projects, DOI Review Procedures Memo at 1. Thus, "the impact of the [DOI Review Procedures Memo] [will] be felt immediately by those subject to it in conducting their day-to-day affairs." Cf. Toilet Goods Ass'n, 387 U.S. at 164 (citations omitted). Part of Defendants' argument also misapprehends Plaintiffs' standing claim as to the DOI Review Procedures Memo, which is aimed at the permitting delays resulting from the review process itself, not at the ultimate permitting decisions. D. 77 at 15-16; see Joint Decl. ¶¶ 56-237; Chretien Decl., D. 38 ¶¶ 10-18.

The fitness prong is met. As to the hardship prong, hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995) (citation and internal quotation marks omitted). For the same reasons as discussed as to their economic injuries from the permitting delays, Plaintiffs have established that the DOI Review Procedures Memo creates direct and immediate economic harm to Plaintiffs. The hardship prong is thus also satisfied. Plaintiffs' claims are therefore ripe for judicial review.

Accordingly, Plaintiffs' challenge to the DOI Review Procedures Memo is justiciable.

### 2. Wind and Solar IPaC Ban

Plaintiffs also seek to enjoin and stay the Wind and Solar IPaC Ban:

> Consistent with [the DOI Review Procedures Memo], solar and wind projects are currently not eligible to utilize the [IPaC] website prior to review by the Office of the Deputy Secretary, and final review by the Office of the Secretary.

D. 33-6 at 2.

As to the Regional Organization Plaintiffs' associational standing, their executive directors attest that their wind-and-solar-developer members "rely on IPaC to obtain crucial information about the presence of federally listed species, critical habitat, and other USFWS-managed resources when planning their projects," Joint Decl., D. 37 ¶ 356, and to identify whether they need certain permits to "avoid potential criminal and civil liability under the ESA," id. ¶ 360. They further attest that without access to the IPaC website, developers cannot complete the species and habitat analyses required to support a CWA § 404 permit application or a pre-construction notice requesting that the Corps "verify" that the project qualifies for a CWA Nationwide Permit, and that the Ban makes it "virtually impossible" for the Corps to determine whether § 7 consultation "is necessary" for the members' projects to proceed. Id. ¶ 357. The Regional Organization Plaintiffs have identified a

26

dozen of their members' projects for which they contend § 7 consultations have been "effectively stalled," in turn, stalling permitting, and several of which projects their members have been "forced to redesign . . . to avoid legally protected jurisdictional waters—often at substantial expense." Id. ¶¶ 358-59; see id. ¶¶ 364-446.

Defendants attempt to rebut these harms by arguing that IPaC access is not a requirement for § 7 consultations but a "convenience" and that these members can obtain the information provided by IPaC from other sources. Shultz Decl., D. 63-2 ¶ 9; see Tr. of Mar. 4, 2026 Mot. Hr'g ("PI Tr."), D. 83 at 25-27. But even if IPaC's information is replicable, as Plaintiffs note, D. 77 at 20; PI Tr., D. 83 at 39, and Defendants acknowledge, PI Tr., D. 83 at 27, there are significant costs associated with obtaining the § 7 information that IPaC provides for free by other means, and only wind and solar projects would be forced to incur those additional costs to proceed with the § 7 consultation process due to the Wind and Solar IPaC Ban, see PI Tr., D. 83 at 39. These economic harms are sufficient to establish an injury in fact, are traceable to the Wind and Solar IPaC Ban and are redressable by the relief the Plaintiffs seek here. See Katz, 672 F.3d at 76; See Massachusetts, 790 F. Supp. 3d at 21. Accordingly, the Regional Organization Plaintiffs have established their members' standing and thus their associational standing to challenge the Wind and Solar IPaC Ban. The resulting permitting delays are also sufficient to support organizational standing as to GECA for the same reasons as stated above as to the DOI Review Procedures Memo. Plaintiffs' challenge is also ripe as the Ban is currently in place and Plaintiffs are facing imminent economic harm. See Pac. Gas & Elec. Co., 461 U.S. at 201.

Accordingly, Plaintiffs' challenge to the Wind and Solar IPaC Ban is justiciable.

### 3.    DOI Land Order

Plaintiffs also seek to enjoin and stay the DOI Land Order.  § 1 of the order provides that its purpose is to "direct[] [DOI] . . . to optimize the use of lands under its direct management, including the [OCS] . . . by considering, when reviewing a proposed energy project under [NEPA], a reasonable range of alternatives that includes projects with capacity densities meeting or exceeding that of the proposed project." DOI Land Order § 1.  The order defines "capacity density" as "the nameplate generation capacity of an energy project multiplied by its projected capacity factor, the product of which is then divided by the total acres of the project area." Id.  The order mandates that DOI "shall consider energy projects' capacity density in its decision-making, including when considering reasonable alternatives to a proposed energy project," id. § 3, and that DOI "only permit those energy projects that are the most appropriate land use when compared to a reasonable range of project alternatives," id. § 4.  The order also contains a saving clause which states that "[t]o the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control."  Id. § 6.

As to the Regional Organization Plaintiffs' associational standing, Plaintiffs have identified nine of their members' projects for which they contend the DOI Land Order will prevent them from receiving ROW and CWA § 404 permits based on the order's "capacity density" criteria.  Joint Decl., D. 37 ¶¶ 238-41; see id. ¶¶ 242-319.  Plaintiffs argue that these imminent permit denials will deprive their members of "revenues they anticipated generating from the permitted projects" and result in "irretrievable loss of sunk costs invested in project development." Id. ¶ 240; see id. ¶¶ 238-319.  For one example, the developer for the American Glory Solar Project, a proposed solar facility on BLM lands in Nevada, has invested approximately $1 million in development of the project to date.  Id. ¶¶ 242-48.  Without a ROW grant from BLM, this project will not be able to

28

commence development, deliver electricity or generate revenue and the developer will be forced to abandon the project. Id. ¶¶ 247, 250. Plaintiffs also claim that due to "contractual commitments made while their permit applications were pending," these members will be exposed to "contract penalties, inflated prices, and higher long-term costs." Id. ¶ 240. These imminently threatened economic injuries are sufficient to establish injury in fact. See Katz, 672 F.3d at 76; New York, 811 F. Supp. 3d at 230; Massachusetts, 923 F.3d at 222-27. The first standing requirement is thus met.

Causation is also met. The Regional Organization Plaintiffs' members' economic harms are fairly traceable to the DOI Land Order as the order mandates that DOI "only permit those energy projects that are the most appropriate land use when compared to a reasonable range of project alternatives," i.e., high capacity-density projects, DOI Land Order § 4, and explicitly states that "wind and solar projects are highly inefficient uses of Federal Land" that "use disproportionate Federal lands relative to their energy generation when compared to other energy sources, like nuclear, gas, and coal," i.e., low capacity-density projects, id. § 3; see Massachusetts, 923 F.3d at 222-28. Defendants do not dispute that each of the members' projects have a "low capacity density" compared to alternative energy projects and thus will fail to meet the DOI Land Order's permitting requirement. See Joint Decl., D. 37 ¶¶ 242-319. The DOI Land Order, therefore, places these wind and solar energy projects' permits at imminent risk of denial and these members at imminent risk of the resulting economic harms. Massachusetts, 923 F.3d at 222-28. Causation is thus met. Plaintiffs have also established that these imminent economic harms are redressable by vacating the DOI Land Order, as they seek, which would remove the requirement that DOI only permit high-capacity-density energy projects, even if the agencies would have ultimately denied the Regional Organization Plaintiffs' wind and solar project permits without the order. See Massachusetts, 790

F. Supp. 3d at 21; NTCH, Inc., 950 F.3d at 879.  Accordingly, the Regional Organization Plaintiffs have established their members' standing and, thus, their associational standing to challenge the DOI Land Order.

As to GECA, as the DOI Land Order prohibits low-capacity-density energy projects from receiving ROW and CWA § 404 permits when there is a high-capacity-density alternative, it reduces the number of renewable energy projects that will be approved which consequently reduces the supply of available RECs from which GECA primarily raises its revenue.  See Chretien Decl., D. 38 ¶¶ 13-14.  GECA thus suffers imminent economic harm that is traceable to the DOI Land Order and is redressable for the same reasons as stated above.  Accordingly, GECA too has standing to challenge the DOI Land Order.

Plaintiffs have also established that their claim against the DOI Land Order is ripe. Defendants' argument that the DOI Land Order serves only as "notice" of future action, D. 63 at 51-52, is belied by the text of the DOI Land Order, which states that DOI "shall" only permit high-capacity-density projects with immediate effect, DOI Land Order §§ 4, 7; see Mass. Ass'n of Afro-Am. Police, Inc., 973 F.2d at 20.  Given the DOI Land Order's clear command, Plaintiffs' challenge is fit for judicial review.  Additionally, for the same reasons as stated as to standing, the DOI Land Order poses "a direct and immediate dilemma" to the Regional Organization Plaintiffs' members and GECA that is sufficient to support hardship.  Ernst & Young, 45 F.3d at 535 (citation and internal quotation marks omitted).   Plaintiffs' challenge is thus also ripe.

Accordingly, Plaintiffs' challenge to the DOI Land Order is justiciable.

4.    The Corps' Memo

Plaintiffs also seek to enjoin and stay the Corps' Memo.  The memo states that its purpose is to "provide direction to the [Corps] for applying the public interest review on certain permit

30

actions under [CWA] Section 404, and [RHA] Section 10, related to energy generation." Corps' Memo § 1. §§ 4(a) and 4(b) of the Corps' Memo directs the Corps to:

> consider the project's annual potential energy generation per acre [i.e., their "capacity density" as defined in the DOI Land Order], whether they displace other more reliable energy sources, and whether the activities related to the projects denigrate the beauty of the Nation's natural landscape under the public interest review's 'aesthetics' factor. . . [and to] consider whether an alternative energy generation source can deliver the same amount of generation while having a 'proposed discharge [with] . . . less adverse impact on the aquatic environment.'

Id. §§ 4(a), 4(b) (citing 40 C.F.R. § 230.10(a)). Section 4(c) of the memo directs the Corps to "prioritize processing CWA and RHA permit applications related to projects that would generate the most annual potential energy generation per acre over projects with low potential generation per acre." Id. § 4(c).

As to the Regional Organization Plaintiffs' associational standing, Plaintiffs have identified two of their members' projects which they contend have experienced delays in processing CWA § 404 and RHA § 10 permits that have deprived them of revenue and costs invested in project development. Joint Decl., D. 37 ¶¶ 320-23; see id. ¶¶ 325-38. These economic harms are sufficient to establish injury in fact. See Katz, 672 F.3d at 76; New York, 811 F. Supp. 3d at 230; Massachusetts, 923 F.3d at 222-27. As to causation, Plaintiffs contend that, as these members' wind and solar projects have a low capacity density under the Corps' Memo's definition, the Corps' Memo requires the processing of these projects' permit applications to be deprioritized in favor of projects with high capacity density. Joint Decl., D. 37 ¶¶ 320-23; see id. ¶¶ 325-38; see also Corps' Memo § 4(c). Defendants do not dispute that these members' projects have a low capacity density and that their permit processing will thus be deprioritized. See D. 63 at 49-51. As these members' economic harm is, therefore, traceable to the Corps' Memo's mandate, causation is met. The members' harm is also redressable by the Corps' Memo's vacatur, for the same reasons as discussed

31

as to the other Agency Actions.  See Massachusetts, 790 F. Supp. 3d at 21; NTCH, Inc., 950 F.3d at 879.  Accordingly, the Regional Organization Plaintiffs have established their members' standing and thus their associational standing to challenge the Corps' Memo.

As to GECA, as the Corps' Memo delays permit processing for low-capacity-density energy projects, it reduces the amount of renewable energy projects that will be permitted within a given timeframe and thus reduces the supply of available RECs from which GECA primarily raises its revenue.  See Chretien Decl., D. 38 ¶¶ 13-14.  GECA, therefore, suffers imminent economic harm that is attributable to the Corps' Memo and is redressable for the same reasons as stated above. Accordingly, GECA also has standing to challenge the Corps' Memo.  Plaintiffs have also established that this challenge is ripe for judicial review as permitting for the Plaintiffs' identified projects will be delayed under the Corps' Memo due to its mandated prioritization regime and the memo creates imminent economic harm for the reasons articulated above.  See Pac. Gas & Elec. Co., 461 U.S. at 201.

Accordingly, Plaintiffs' challenge to the Corps' Memo is justiciable.

5.    *The Zerzan M-Opinion*

Finally, Plaintiffs seek to enjoin and stay the Zerzan M-Opinion.  The Zerzan M-Opinion states, in relevant part, that:

> Because [the Anderson M-Opinion] conflicts with the best reading of OCSLA, [the Anderson M-Opinion] is hereby withdrawn. Furthermore, [the Jorjani M-Opinion] is hereby reinstated and all relevant Department bureaus and offices are instructed to treat [the Jorjani M-Opinion] as binding and authoritative. In addition, the regulatory provision at 30 C.F.R. § 585.102, and any other Departmental action taken in reliance on the now withdrawn [the Anderson M-Opinion], should be re-evaluated in light of this Memorandum.

Zerzan M-Opinion at 3.

32

As to the Regional Organization Plaintiffs' associational standing, the Regional Organization Plaintiffs' executive directors attest that the Zerzan M-Opinion's reinstatement of the Jorjani M-Opinion's prohibition on offshore projects with more than a "*de minimis* or unreasonable interference" with the OCS, Jorjani M-Opinion at 15; see Zerzan M-Opinion at 3, and the Zerzan M-Opinion's mandate that DOI "re-evaluate[]" all "Departmental action taken in reliance on" the withdrawn Anderson M-Opinion, Zerzan M-Opinion at 3, creates significant economic harm for their members, Joint Decl., D. 37 ¶¶ 447-52. The Regional Organization Plaintiffs have identified at least two instances where BOEM has cited the Zerzan M-Opinion in requests to federal courts for permission to retract its prior COP approval for the Regional Organization Plaintiffs' members' offshore wind projects so that it may re-evaluate said approval in light of the Zerzan M-Opinion, id. ¶¶ 464, 479-80, the resulting litigation over which has caused delays in one project's construction timeline, forcing the project's developers to reduce workforce, terminate contracts and cancel planned investments, id. ¶¶ 465-67, and places hundreds of millions of dollars in secured leases in jeopardy, id. ¶¶ 460-67, 475-86. Additionally, the Regional Organization Plaintiffs have identified two of their members' projects for which they contend the Zerzan M-Opinion has imposed an imminent "*de facto* bar" on obtaining COP approvals based on the M-Opinion's permitting restrictions, jeopardizing hundreds of millions of dollars of financial investments into projects that cannot commence development, deliver electricity or generate revenue without COP approvals. Id. ¶¶ 453-59, 468-74. These economic harms are sufficient to establish an injury in fact, are traceable to the Zerzan M-Opinion and are redressable by vacatur of same as sought by Plaintiffs. See Katz, 672 F.3d at 76; Massachusetts, 790 F. Supp. 3d at 21; see also Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell, 915 F.3d 197, 218-19 (4th Cir. 2019) (collecting cases concluding that "prospective economic injuries" from delays in

construction are an economic harm).  Accordingly, the Regional Organization Plaintiffs have established their members' standing and thus their associational standing.  The resulting permitting denials and reversals under the Zerzan M-Opinion are also sufficient to support organizational standing as to GECA for the same reasons as stated above as to the other Agency Actions.  Additionally, Plaintiffs' challenge to the Zerzan M-Opinion is ripe as the M-Opinion is currently in effect, the resulting guidance is being enforced against the Regional Organization Plaintiffs' members and these members and GECA are experiencing imminent and present hardship due to the M-Opinion for the reasons explained above.  See Pac. Gas & Elec. Co., 461 U.S. at 201.

Accordingly, Plaintiffs' challenge to the Zerzan M-Opinion is justiciable.

For the aforementioned reasons, Plaintiffs' challenges to the Agency Actions are justiciable. The Court now turns to whether Plaintiffs are likely to succeed on the merits of their claims.

### B.    Likelihood of Success on the Merits

Plaintiffs challenge the Agency Actions under the APA.  D. 33 ¶¶ 188-313.  The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Court must "hold unlawful and set aside" final agency actions that are, among other things, "without observance of procedure required by law," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority."  Id. § 706(2)(A), (C), (D).  In reviewing agency action under the APA, "'a court is not to substitute its judgment for that of the agency.'"  DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020) (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)).  Instead, it should "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Id. (internal citation and quotation marks omitted).  "While this is a highly deferential standard of review, it is not a rubber stamp."  NLRB

34

v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 24 (1st Cir. 1999) (quotations and quotation marks omitted).  Therefore, "[a]lthough 'the ultimate standard of review is a narrow one,' the court must undertake 'a thorough, probing, in-depth review' and a 'searching and careful' inquiry into the [administrative] record."  Id. (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971)); see Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013) (noting that "[t]he focal point of APA review is the existing administrative record") (citation omitted)).

As a threshold matter, agency action is reviewable under the APA only if it is a "final agency action."  See 5 U.S.C. § 704.  An agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  Id. § 551(13); see id. § 701(b)(2).  To be "final," agency action must (1) mark the consummation of the agency's decision-making process and (2) be one by which rights or obligations have been determined or from which legal consequences will flow.  Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)).

Additionally, where, as here, a plaintiff challenges agency action directed by the President as arbitrary and capricious under § 706(2)(A) of the APA, the Court must consider whether arbitrary-and-capricious review applies.  The First Circuit and "[a]t least two other circuits" have recognized that "'agency action that carries out a presidential directive is ordinarily subject to APA review,'" New York, 811 F. Supp. 3d at 235 (quoting Agatha v. Trump, 151 F.4th 9, 11 (1st Cir.), rev'd on other grounds, Trump v. Orr, 146 S. Ct. 44 (2025)); see Nebraska v. Su, 121 F.4th 1, 15 (9th Cir. 2024) (noting that "[t]he Supreme Court has never excepted a final rule from APA review because it carried out a presidential directive"); Chamber of Com. v. Reich, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (noting "that the [agency]'s regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA"); see also Massachusetts

v. Dep't of Education, ___ F. Supp. 3d ___, 2026 WL 918941, at *13 (D. Mass. Apr. 3, 2026) (noting that "Presidential directives do not enable agencies to bypass those requirements"); American Academy of Pediatrics v. Kennedy, ___ F. Supp. 3d ___, 2026 WL 733828, at *11 (D. Mass. Mar. 16, 2026) (noting similar).  Under certain circumstances, however, agency action made pursuant to a presidential directive can be precluded from APA review.   In Orr, the Supreme Court addressed the applicability of APA review in such a circumstance in a case out of another session of this Court (Kobick, J.).  Orr v. Trump, 778 F. Supp. 3d 394 (D. Mass. 2025).  There, the U.S. State Department adopted a new passport policy to implement President Trump's executive order directing such action.  Id. at 400.  The district court issued a preliminary injunction enjoining enforcement of the policy as to the plaintiffs challenging it.  Id. at 423-33.  The government appealed the preliminary injunction ruling to the First Circuit and requested a stay pending appeal, which the First Circuit denied.  See Agatha, 151 F.4th at 13.  In denying the government's stay request, the First Circuit, as did the district court, rejected the government's arguments that the passport policy was "not subject to review under the APA because it was 'compelled by' the President's [e]xecutive [o]rder" and that the passport policy was "unreviewable" because 22 U.S.C. § 211a "commits the action [concerning the content of passports] to the President's sole discretion."  Id. at 11-12; see 22 U.S.C. § 211a.  The Supreme Court granted the government's subsequent request to stay the district court's ruling, concluding, as relevant here, that the respondents were not "likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow."  Trump v. Orr, __ U.S. __, 146 S. Ct. 44, 46 (2025) (citing 22 U.S.C. § 211a).  Specifically, the statute at issue in Orr, 22 U.S.C. § 211a, provides that "[t]he Secretary of State may grant and

36

issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States."  22 U.S.C. § 211a.

As the New York court concluded in its analysis of analyzing the impact of Orr on its review of the Wind Order's implementation of President Trump's Wind Memo under the APA, "Orr did not overrule First Circuit precedent dictating that 'agency action that carries out a presidential directive is ordinarily subject to APA review," New York, 811 F. Supp. 3d at 237 (emphasis in original) (quoting Agatha, 151 F.4th at 11; citing New York, 133 F.4th at 70 n.17).  "Rather, that precedent still applies where no statute 'expressly require[s] [the agency] to follow' a presidential directive," id. (alterations in original) (quoting Orr, 146 S. Ct. at 46); see Massachusetts, 2026 WL 918941, at *13 n.10 (concluding same).  Accordingly, where, as in Orr, a statute vests the president with exclusive authority to prescribe a rule, arbitrary-and-capricious review does not apply.  New York, 811 F. Supp. 3d at 238 (quoting Franklin v. Massachusetts, 505 U.S. 788, 801 (1992)); see id. at 237 (explaining that Orr's "phrasing of [its sentence regarding success on the merits], in conjunction with the Supreme Court's citation to § 211a, makes clear that the Supreme Court is likely to accept" the argument that "an agency need not provide a reasoned explanation, other than pointing to an executive order, in the specific scenario where a statute (such as § 211a) expressly delegates discretion to the President himself and 'require[s] [the agency] to follow' directives pursuant to that delegation") (citation omitted).  In contrast, where, as here, "a 'challenge is to an action delegated to an agency head but directed by the President,' rather than 'to an action that Congress ha[s] committed to the sole discretion of the President,' . . . 'the review provisions [of the APA] usually applicable to that agency's action should govern.'"  Id. at 238 (first and third alterations in original) (quoting Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245,

2351 (2001)). Such agency action is therefore not "[i]nsulat[ed]" from arbitrary-and-capricious review. Id.

Here, Defendants contend that Plaintiffs cannot establish a likelihood of success on the merits of their claims because the Agency Actions are not final agency actions within the meaning of the APA, D. 63 at 41-49, and the Agency Actions are "reasonable," id. at 53-54. The Court considers these threshold factors to APA review and the likelihood of Plaintiffs' success on the merits of their claims against each of the Agency Actions.

> 1.    *Count I:  DOI Review Procedures Memo*

>> a)    The DOI Review Procedures Memo is a final agency action

As to the first finality prong, numerous courts have recognized that "an agency-imposed suspension of certain activities constitutes final agency action." New York, 811 F. Supp. 3d at 233 (collecting cases); see Massachusetts, 790 F. Supp. 3d at 26 (noting that "significant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate") (citations omitted); id. (collecting cases); Louisiana v. Biden, 622 F. Supp. 3d 267, 291-92 (W.D. La. 2022) (collecting cases); see, e.g., Env't Def. Fund, Inc. v. Gorsuch, 713 F.2d 802, 813 (D.C. Cir. 1983) (noting that "suspension of the permit process as to a class of waste management facilities amounts to a suspension of the effective date of regulation governing that class, and may be reviewed . . . as the promulgation of a regulation"); Texas v. United States, 524 F. Supp. 3d 598, 642-43 (S.D. Tex. 2021) (holding that "100-day pause on removals" constituted final agency action). This includes suspension of agency activity pending newly-imposed review of said action. See, e.g., New York, 811 F. Supp. 3d at 233 (concluding that the Wind Order's mortarium on issuing permits for wind projects until the completion of a comprehensive review assessment "qualif[ies] as a 'consummation of the agency's decisionmaking

process") (citations omitted); <u>Minard Run Oil Co. v. U.S. Forest Serv.</u>, 670 F.3d 236, 247-49 (3d Cir. 2011) (holding that moratorium on mineral drilling until completion of environmental impact statement constituted final agency action); <u>Louisiana</u>, 622 F. Supp. 3d at 291-92 (holding that indefinite "[p]ause" on issuing new oil and natural gas leases pending a comprehensive review constituted final agency action); <u>Clean Air Council v. Pruitt</u>, 862 F.3d 1, 6-8 (D.C. Cir. 2017) (per curiam) (concluding that a decision to stay, pending reconsideration, of the implementation of a final rule was a final agency action).

In <u>New York</u>, the court concluded that the DOI Secretary's suspension on all authorizations related to wind energy projects under the Wind Order which, though by its terms was set to expire after sixty days, in practice remained in effect until the Comprehensive Assessment of those projects' impacts prescribed in the Wind Memo was complete, "mark[ed] the consummation of the Agency Defendants' decisionmaking process" as it "'altered the legal status quo' under which the relevant agencies previously processed applications for leases, permits, and other authorizations necessary for wind project development" and "w[ould] remain in effect until, at the earliest, the Comprehensive Assessment is complete" without "a timeline for that assessment in the administrative record nor [] an anticipated end date." <u>New York</u>, 811 F. Supp. 3d at 233-34 (citation omitted). Defendants argue that the Wind Order is distinct from the DOI Review Procedures Memo because the Wind Order "created a prohibition" while the DOI Review Procedures Memo merely "address[es] a process" and does not prevent an applicant from "moving forward with a wind or solar energy project." D. 63 at 47-48. This argument mischaracterizes the effect of the DOI Review Procedures Memo. Under the memo, "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities shall require submission to the Office of the Executive Secretariat and Regulatory Affairs, subsequent review by the Office of the Deputy Secretary, and

final review by the Office of the Secretary." DOI Review Procedures Memo at 1. Both parties have interpreted this language to mean that the memo requires all wind-and-solar-related agency action to undergo three levels of review "before the action can proceed." D. 36 at 15; see D. 63 at 43-44. Similar to the Wind Order, which, in practice, suspended all issuing authorizations related to wind energy projects until the Comprehensive Assessment was complete, New York, 811 F. Supp. 3d at 227, the DOI Review Procedures Memo suspends all agency action related to wind and solar energy until it undergoes the three-tiered review procedure prescribed in the memo, see DOJ Review Procedures Memo at 1. Also like the Wind Order, which provided no timeline for the completion of the Comprehensive Assessment, New York, 811 F. Supp. 3d at 234, neither the DOI Review Procedures Memo itself nor the administrative record indicate a timeline for the three-tiered internal review. Thus, like the Wind Order, the DOI Review Procedures Memo, at minimum, "'represents the consummation of the [agency]'s decisionmaking process with respect to the moratorium' and therefore is subject to APA challenge." Id. at 233 (alteration in original) (emphasis omitted) (quoting Minard, 670 F.3d at 248); see Texas, 524 F. Supp. 3d at 642 (concluding that "[t]he immediacy of the implementation of the . . . pause demonstrates [the agency]'s decision with regard to the pause itself is final").

Moreover, Defendants' contention that the DOI Review Procedures Memo does not mark the consummation of DOI's decision-making because it merely "direct[s] that the specified proposed activities be submitted to the appropriate DOI officials for review," and "does not compel a certain outcome on any application," D. 63 at 43, is unpersuasive. "The APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review." Salazar v. King, 822 F.3d 61, 83-84 (2d Cir. 2016). Instead, "when agencies opt to make final administrative determinations in [a] two-stage way," the initial stage of

the process may be a final agency action if it "itself [has] altered the legal status quo." Glob. Tower Assets, LLC v. Town of Rome, 810 F.3d 77, 84 (1st Cir. 2016) (citations omitted).  Here, the DOI Review Procedures Memo altered the legal status quo by establishing review procedures not previously in place, see D. 36 at 15 & n.16; Clean Air Council, 862 F.3d at 6 (noting that an "interim" modification of the status quo can constitute final agency action), and the memo "is not itself subject to further consideration by the agency," Nat. Res. Def. Council v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020).  Accordingly, the DOI Review Procedures Memo is the consummation of DOI's decisionmaking process as to the review procedures imposed on wind and solar projects.[7] The first finality prong is, therefore, met.

As to the second finality prong, an agency action is final only if it is "one by which rights or obligations have been determined, or from which legal consequences will flow." U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 597 (2016) (quoting Bennett, 520 U.S. at 178). "Courts have regularly determined that this condition is satisfied when an indefinite pause is imposed by an agency." New York, 811 F. Supp. 3d at 234 (collecting cases); see, e.g., Louisiana, 622 F. Supp. 3d at 291 (concluding that "[t]here [was] no real question that [p]laintiff [s]tates ha[d] met the second prong of the Bennett test" due to a suspension of oil and natural gas lease issuance); Texas, 524 F. Supp. 3d at 643 (holding that "legal consequences . . . undoubtedly flow[ed]" from an 100-day pause on removals); Doe v. Trump, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) (noting that "a 'suspension' or an indefinite delay . . . has significant real-world impacts on

---

[7] To the extent Defendants also argue that the DOI Review Procedures Memo is not subject to APA review because the DOI Secretary has authority to review DOI action pursuant to OCSLA, D. 63 at 43-44 (citing 43 U.S.C. § 1337(p)(4)), this argument is unavailing.  The question of whether the memo is reviewable is not whether the DOI Secretary has authority to review DOI actions, but rather whether the review procedures outlined in the DOI Review Procedures Memo constitute a final agency action.  See 5 U.S.C. § 704.

[p]laintiffs' various situations") (citation omitted). "A suspension on agency authorizations 'prevent[s] [p]laintiffs from moving forward' with their proposed activities, such that they are 'trapped without recourse due to the indefinite postponement of agency action.'" New York, 811 F. Supp. 3d at 234 (citations omitted).

The second finality prong is met here as the DOI Review Procedures Memo "gives rise to 'direct and appreciable legal consequences'" to wind and solar energy projects by altering the legal status quo for processing authorizations necessary for their development and suspending agency activity related to them until they have undergone a three-tiered review. See Hawkes Co., 578 U.S. at 598 (quoting Bennett, 520 U.S. at 178); New York, 811 F. Supp. 3d at 234. As noted above, the "practical effect" of the DOI Review Procedures Memo prohibits agency action related to wind and solar energy facilities pending internal review. See Nat'l Educ. Ass'n v. U.S. Dep't of Educ., 779 F. Supp. 3d 149, 184 (D.N.H. 2025); Hawkes Co., 578 U.S. at 599. "[B]y requiring that [DOI subordinates] must not follow the usual, specified procedures for an unspecified period of time," for wind and solar projects, the DOI Review Procedures Memo "enact[s] a kind of de facto suspension of the law with respect to wind [and solar] energy development." Massachusetts, 790 F. Supp. 3d at 27 (citing Doe, 288 F. Supp. 3d at 1070). The second finality prong is therefore met.

Accordingly, the DOI Review Procedures Memo is a final agency action.

        b)      <u>Arbitrary-and-Capricious Review Applies to the DOI Review Procedures Memo</u>

As a second threshold issue, the DOI Review Procedures Memo purports to be "[c]onsistent" with Executive Order No. 14156, Executive Order No. 14315 and the Wind Memo. DOI Review Procedures Memo at 1. Executive Order No. 14156 invokes the President's general Article II powers, U.S. Const. Art. II, and specific powers under the National Emergencies Act, 50 U.S.C. § 1601-1651, and 3 U.S.C. § 301 to declare "a national emergency" regarding the current

42

state of the nation's "inadequate and intermittent energy supply" and "increasingly unreliable grid." Exec. Order No. 14156 § 1. Executive Order No. 14315 invokes the President's general Article II powers and the general powers under the One Big Beautiful Bill Act, Pub. L. 119-21, 139 Stat. 72 (2025), to direct the DOI Secretary to "review [] regulations, guidance, policies, and practices under the [DOI]'s jurisdiction to determine whether any provide preferential treatment to wind and solar facilities in comparison to dispatchable energy sources" and "revise any identified regulations, guidance, policies, and practices as appropriate and consistent with applicable law to eliminate any such preferences for wind and solar facilities." Exec. Order No 14315 § 4. The relevant provision of the Wind Memo, § 2, "invokes no statutory grant of authority to the President, instead merely instructing certain agencies to implement a suspension of wind energy authorizations 'consistent with applicable law.'" New York, 811 F. Supp. 3d at 239 (quoting Wind Memo).

Although the DOI Review Procedures Memo purports to be consistent with these presidential directives, Defendants do not appear to contend that the DOI Review Procedures Memo was required by them. See D. 63 at 21. Instead, Defendants claim that the DOI Review Procedures Memo was issued pursuant to the DOI Secretary's authority under § 8(p)(4) of OCSLA. Id. at 43-44 (citing 43 U.S.C. § 1337(p)(4)). But to the extent Defendants contend that the DOI Review Procedures Memo was required by these directives, the Court concludes that APA review still applies to it. Unlike the statute at issue in Orr, Congress does not "expressly require[]" DOI to follow Presidential rules under § 8(p)(4) of OCSLA. See Orr, 146 S. Ct. at 46; 43 U.S.C. § 1337(p)(4). Nor do Defendants contend that 50 U.S.C. §§ 1601-1651, 3 U.S.C. § 301 or the One Big Beautiful Bill Act require DOI to do so. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J. concurring). "Because Congress has not 'committed to the sole discretion of the President' the ability to [establish review procedures for DOI agency action], the

43

'usually applicable' arbitrary-and-capricious standard of the APA governs the Court's review." New York, 811 F. Supp. 3d at 239; see Agatha, 151 F.4th at 11; Massachusetts, 2026 WL 918941, at *13 n.10. Accordingly, the DOI Review Procedures Memo's general reference to these presidential directives does not shield the DOI Review Procedures Memo from arbitrary-and-capricious review.

c)    Merits as to DOI Review Procedures Memo Challenge

As to the merits, Plaintiffs seek to vacate the DOI Review Procedures Memo under the APA on several grounds, including that it: (1) is arbitrary and capricious, (2) is contrary to law and (3) was not promulgated through the APA's notice-and-comment procedures. D. 33 ¶¶ 188-207; D. 36 at 28-33. The Court need not reach the latter two grounds at this juncture as it concludes that Plaintiffs are likely to succeed on the merits of the first ground. See Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent, __ F. Supp. 3d __, 2026 WL 309281, at *19 n.13 (D. Mass. Feb. 5, 2026).

"[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). "This means that the agency's reasons 'must be set forth with such clarity as to be understandable.'" California v. U.S. Dep't of Educ., 132 F.4th 92, 98 (1st Cir. 2025) (quoting SEC v. Chenery Corp. (Chenery II), 332 U.S. 194, 196 (1947)). "To change its 'existing policies,' an agency need only 'provide a reasoned explanation for the change.'" New York, 811 F. Supp. 3d at 239 (quoting

44

Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016)).  The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible . . ., that there are good reasons for it, and that the agency believes it to be better.'"  Fox Television, 556 U.S. at 515 (emphasis in original).  But where the agency's new position "rests upon factual findings that contradict those which underlay [the] prior" position or "has engendered serious reliance interests," however, the agency may be required to provide a "more detailed justification."  Id.  Plaintiffs argue that the DOI Review Procedures Memo is arbitrary and capricious because it:  (1) does not provide satisfactory explanation, (2) does not provide sufficient justification and (3) fails to consider reliance interests.  D. 36 at 29-31.  Plaintiffs are likely to succeed on each of these challenges.

The DOI Review Procedures Memo states that its review procedures are "[c]onsistent" with Executive Order No. 14315, Executive Order No. 14156, the Wind Memo, Secretary Order No. 3417 and Secretary Order No. 3418.  DOI Review Procedures Memorandum at 1.  Aside from this statement, the DOI Review Procedures Memo lacks any indication of how these referenced documents either explain or justify its review procedures for wind-and-solar-energy agency action.  Nor does it provide any further explanation on the adoption of this review process.  As "[a] decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order," Louisiana, 622 F. Supp. 3d at 295 (citation omitted), this explanation, without more, is insufficient, see id. at 294 (concluding that where "[o]ther than a reference to [an executive order] no reasons or explanations were given by the agencies for stopping the oil and gas leasing process" the agency action did not provide sufficient explanation); New York, 811 F. Supp. 3d at 240 (recognizing similar).

Even if the Court construes the documents referenced in the DOI Review Procedures Memo as DOI's explanation, they fall short of providing adequate explanation and justification. As to the Wind Memo, "the Wind Memo does not provide adequate explanation: It merely includes a single sentence citing 'various <u>alleged</u> legal deficiencies underlying' wind permitting, '<u>potential</u> inadequacies in various environmental reviews,' and the possibility that these vaguely defined issues '<u>may</u> lead to grave harm.'" <u>New York</u>, 811 F. Supp. 3d at 240 (emphasis in original) (citing Wind Memo). This Court "is 'unable to divine or fathom a relationship between' this cursory sentence 'and the immense scope of the moratorium'" on all wind and solar energy agency action as contemplated in the DOI Review Procedures Memo. <u>See id.</u> (quoting <u>Hornbeck Offshore Servs., L.L.C. v. Salazar</u>, 696 F. Supp. 2d 627, 637 (E.D. La. 2010)); <u>see also</u> <u>Louisiana</u>, 622 F. Supp. 3d at 294-95. The Wind Memo thus does not provide sufficient explanation or justification for the DOI Review Procedures Memo.

As to the remaining executive orders and secretary orders, Plaintiffs argue that none of them explains the DOI Review Procedures Memo. D. 36 at 29-30. Executive Order No. 14156 declares "a national emergency" regarding what it describes as the nation's "inadequate and intermittent energy supply" and "increasingly unreliable grid." Exec. Order No. 14156 § 1. The executive order defines "energy" as "crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals." <u>Id.</u> § 8(a) (citing 30 U.S.C. 1606 (a)(3)). It is unclear how this executive order can serve as "reasons for the new policy" regarding DOI's review procedures for wind and solar projects, as wind and solar projects do not appear to fall within its purview. <u>See</u> <u>Fox Television</u>, 556 U.S. at 515. Secretary Order No. 3417, which merely "implements provisions of [Executive Order No. 14156]," Sec. Order No. 3417 § 1, fails to provide adequate reasoning for

46

the same reason. Secretary Order No. 3418 implements Executive Order No. 14154, which orders an "[i]mmediate [r]eview of [a]ll [a]gency [a]ctions that [p]otentially [b]urden the [d]evelopment of [d]omestic [e]nergy [r]esources . . . with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources." Exec. Order No. 14154 § 3; see Sec. Order No. 3418 §§ 1, 3. Although wind and solar energy sources arguably fall under Executive Order No. 14154's purview, neither this order nor Secretary Order No. 3418 explains or justifies the three-tiered review process for DOI agency action related to wind and solar projects. This is particularly so as the DOI Review Procedures Memo appears to conflict with Executive Order No. 14154, which is aimed at removing impediments to energy development, see Exec. Order No. 14154 §§ 1-3, and specifically directs the DOI Secretary to "undertake all available efforts to eliminate all delays within their respective permitting processes," id. § 5

Executive Order No. 14315 too falls short of providing sufficient explanation and justification for the DOI Review Procedures Memo. Although this order directs the DOI Secretary to "review" DOI practices for "preferential treatment to wind and solar facilities" and "revise" any identified practices to "eliminate any such preference," Exec. Order No. 14315 § 4, it does not explain nor justify DOI's adoption of a three-tiered review process for all agency actions related to wind and solar projects only. Nothing in the administrative record here suggests that DOI determined that any of their practices or, more specifically, their internal review procedure, provided preferential treatment to wind and solar facilities nor that DOI adopted a three-tiered review procedure for agency action related to wind and solar energy facilities to eliminate such preference. See Am. Pub. Health Ass'n v. Nat'l Insts. of Health, 145 F. 4th 39, 54 (1st Cir. 2025) (affirming conclusion that agency's prohibitions on categories of research grants were arbitrary and capricious where "there was no indication in the record that [the agency] performed any analysis to

47

support [its] conclusion that the forbidden categories of grants . . . were unscientific and/or wasteful") (citation omitted).[8] The DOI Review Procedures Memo's general reference to this order thus does not offer adequate explanation for same. See Fox Television, 556 U.S. at 515. In short, these referenced documents do not provide sufficient explanation or justification for the DOI Review Procedures Memo.

Further, as Plaintiffs note, D. 36 at 31, as the DOI Review Procedures Memo represents a significant departure from DOI's precedent, see Thompson v. Barr, 959 F.3d 476, 484 (1st Cir. 2020), it required a "more detailed justification" than that needed for merely implementing a new policy, Fox Television, 556 U.S. at 515. "[A]t minimum," it was required "to 'provide a reasoned explanation for the change' and to 'display awareness that [they were] changing position.'" New York, 811 F. Supp. 3d at 240 (second alteration in original) (quoting Encino Motorcars, 579 U.S. at 221). The DOI Review Procedures Memo does neither. Nor does the memo "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." Regents, 591 U.S. at 33. As detailed as to standing, Plaintiffs raise "serious reliance interests" that DOI's prior regime had "engendered" for wind and solar projects which do not appear to be contemplated in the promulgation of the DOI Review Procedures Memo. For all these reasons, the DOI Review Procedures Memo is arbitrary and capricious.

Accordingly, Plaintiffs are likely to succeed on the merits of their claim that the DOI Review Procedures Memo violates the APA. See 5 U.S.C. § 706(2)(A).

---

[8] Although Secretary Order No. 3437 reports on the DOI Secretary's findings on prior agency actions that purportedly preferred wind and solar energy and disfavored oil, gas and fossil fuel energy, Sec. Order No. 3437 § 4, these findings do not include any reference to DOI's internal review procedures and, more importantly, this order postdates the issuance of the DOI Review Procedures Memo and thus cannot stand in for DOI's reasoning for same, see In re Fin. Oversight & Mgmt. Bd. for P.R., 37 F. 4th at 761.

2.      *Count V:  The Wind and Solar IPaC Ban*

a)      The Wind and Solar IPaC Ban is a final agency action

As to finality, the Wind and Solar IPaC Ban constitutes a consummation of USFWS's decisionmaking "with respect to the moratorium" on IPaC website access for solar and wind projects until the review process outlined in the DOI Review Procedures Memo is completed.  See D. 33-6 at 2; Minard, 670 F.3d at 248; Texas, 524 F. Supp. 3d at 642.  The Ban is also an action from which "rights or obligations have been determined," Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970), as it "indefinite[ly]" restricts access to an otherwise publicly-available website, for the same reasons as stated as to the DOI Review Procedures Memo, and places this restriction only upon solar and wind projects.  See New York, 811 F. Supp. 3d at 234.  Accordingly, the Wind and Solar IPaC Ban is a final agency action.

b)      Merits as to the Wind and Solar IPaC Ban Challenge

As to the merits, Plaintiffs seek to vacate the Wind and Solar IPaC Ban under the APA contending that it:  (1) is arbitrary and capricious and (2) is contrary to §§ 7(a)(2) and 7(a)(3) of the ESA.  D. 33 ¶¶ 278-95; D. 36 at 44-46.  The Court need not reach the latter ground at this juncture as Plaintiffs are likely to succeed on the merits of the former.

The only reasoning USFWS provides for the Wind and Solar IPaC Ban is that it is "[c]onsistent" with the DOI Review Procedures Memo.  D. 33-6 at 2.  Although the DOI Review Procedures Memo requires all agency action related to wind and solar facilities, including "consultation under the [ESA]," to undergo three-tiered internal review, DOI Review Procedures Memo at 1, 3, it does not require USFWS to ban wind and solar projects from accessing the IPaC database before such review, or otherwise explain USFWS's reasoning for doing so, see id.  As such, USFWS's reference to the DOI Review Procedures Memo does not provide sufficient

49

explanation nor justification for the Ban.  See Fox Television, 556 U.S. at 515.  Nor does the Ban

"point to a relevant distinction" between IPaC access for wind and solar projects and IPaC access

for any other entity that would justify subjecting only wind and solar projects to this ban.  See

Westar Energy, Inc. v. Fed. Energy Regul. Comm'n, 473 F.3d 1239, 1241 (D.C. Cir. 2007) (noting

that "[i]f the agency makes an exception in one case, then it must either make an exception in a

similar case or point to a relevant distinction between the two cases") (collecting cases); Lafortune

v. Garland, 110 F.4th 426, 434 (1st Cir. 2024) (noting that "an agency is expected to 'apply the

same basic rules to all similarly situated applicants'") (quoting Henry v. INS, 74 F.3d 1, 6 (1st Cir.

1996)).  Further, there is no indication from this record that USFWS considered the reliance

interests of wind and solar project developers, including those described as to standing, and other

stakeholders working with wind and solar projects on accessing the IPaC website.  See Regents,

591 U.S. at 30-31.  This falls well below the "more detailed justification" needed to explain this

change in policy.  Fox Television, 556 U.S. at 515.  The Wind and Solar IPaC Ban is, therefore,

arbitrary and capricious.[9]

Accordingly, Plaintiffs are likely to succeed on the merits of their claim that the Wind and

Solar IPaC Ban violates the APA.  See 5 U.S.C. § 706(2)(A).

> 3.    Count II:  DOI Land Order
>
> a)    The DOI Land Order is a final agency action

The DOI Land Order both mandates that DOI "consider energy projects' capacity density

in its decision-making, including when considering reasonable alternatives to a proposed energy

project," DOI Land Order § 3, and directs DOI to "only permit those energy projects that are the

---

[9] To the extent Defendants contend that the Wind and Solar IPaC Ban is merely an implementation of the DOI Review Procedures Memo, see Shultz, Decl., D. 63-2 ¶¶ 4, 7-8, under this interpretation, the Ban violates the APA for the same reasons as does that memo.

most appropriate land use when compared to a reasonable range of project alternatives," id. § 4. Contrary to Defendants' contention, D. 63 at 44, this order does not merely provide "procedural guidance on how [DOI] bureaus will consider capacity density in conducting future NEPA analysis of energy projects," id., but instead "provides firm guidance to enforcement officials about how to handle permitting decisions," Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA, 752 F.3d 999, 1007 (D.C. Cir. 2014). "It therefore clearly 'reflect[s] a settled agency position which has legal consequences for [DOI officials] administering their permit programs and for companies . . . who must obtain [] permits" requiring a NEPA evaluation. Id. (alteration in original) (citation omitted).

As Plaintiffs note, D. 77 at 11-12, numerous courts have found that similar guidance on factors to consider or discount when making agency determinations constitutes a final agency action in that area. See, e.g., CropLife Am. v. EPA, 329 F.3d 876, 879-82 (D.C. Cir. 2003) (concluding that agency's prohibition on consideration of third party human studies is final as prohibition's "clear and unequivocal language . . . reflects an obvious change in established agency practice" to create a "binding norm" that is "finally determinative of the issues . . . to which it is addressed") (internal citation and quotation marks omitted); Nat'l Min. Ass'n v. Jackson, 768 F. Supp. 2d 34, 42-45 (D.D.C. 2011) (concluding that EPA memorandum announcing new, region-wide water quality standards used to "screen permit applications as . . . the first of several steps in the permitting process" was final agency action because it constituted "a change in the permitting process" and "ha[d] a practical impact on the plaintiff's members seeking permits"); Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1278-80 (D.C. Cir. 2005) (concluding that EPA's modification of criteria for certain Nationwide Permits was a final agency action as those modifications had "legal consequences" for regulated entities and "directly affect[ed] the[ir] investment and project development choices"). The DOI Land Order's mandate that reviewing

51

officials "only permit" energy projects with high capacity density compared to "a reasonable range of project alternatives," DOI Land Order § 4, further "alter[s] the legal status quo" under which the relevant agencies processed applications for permits requiring NEPA evaluation, see Glob. Tower Assets, 810 F.3d at 84, and "gives rise to 'direct and appreciable legal consequences'" for wind and solar projects seeking these permits. Hawkes Co., 578 U.S. at 598 (quoting Bennett, 520 U.S. at 178).[10] Accordingly, the DOI Land Order is a final agency action.

> b)    Arbitrary-and-Capricious Review Applies to the DOI Land Order

The DOI Land Order purports to be "issued under the authority of section 2 of the Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended; FLPMA (43 U.S.C. §§ 1701 *et seq.*); OCSLA (43 U.S.C. §§ 1331 *et seq.*); NEPA (42 U.S.C. §§ 4331 *et seq.*); [Executive Order No.] 14156; and [Executive Order No.] 14315." DOI Land Order § 2. Defendants, however, do not appear to contend that either Executive Order No. 14156 or Executive Order No. 14315 required DOI to issue the DOI Land Order. See D. 63 at 22. To the extent Defendants argue as much, the Court concludes that APA review still applies. Similar to the DOI Review Procedures Memo, Congress does not "expressly require[]" DOI to follow Presidential rules under § 2 Reorganization Plan No. 3 of 1950, see Orr, 146 S. Ct. at 46; Reorganization Plan No. 3 of 1950, 15 Fed. Reg. 3174, reprinted as amended in 5 U.S.C. App. 1 §§ 1–2, nor do Defendants identify any specific provision under FLPMA, OCSLA or NEPA for which they contend they are expressly required to follow Presidential rules. "Because Congress has not 'committed to the sole discretion of the

---

[10] Defendants' contention at oral argument that Plaintiffs' challenges to the Agency Actions are not yet reviewable because Plaintiffs have not yet had a permit denied under them, PI Tr., D. 83 at 21-23, is unavailing. As Plaintiffs noted in rebuttal, id. at 38, Plaintiffs need not wait for a permit denial to challenge these actions under the APA, as "'preenforcement review of agency rules' [is] 'the norm, not the exception.'" Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 840 (2024) (Kavanaugh, J., concurring) (quoting S. Breyer & R. Stewart, Administrative Law and Regulatory Policy 1137 (2d ed. 1985)).

President' the ability to [establish procedures for energy project management on federal lands], the 'usually applicable' arbitrary-and-capricious standard of the APA governs the Court's review." New York, 811 F. Supp. 3d at 239; see Agatha, 151 F.4th at 11; Massachusetts, 2026 WL 918941, at *13 n.10.  Accordingly, the DOI Land Order's general reference to these executive orders does not shield the DOI Land Order from arbitrary-and-capricious review.

c)    Merits as to DOI Land Order Challenge

As to the merits, Plaintiffs seek to vacate the DOI Land Order under the APA on several grounds, including that it:  (1) is arbitrary and capricious; (2) is contrary to OCSLA, FLPMA and NEPA; and (3) was not promulgated through the APA's notice-and-comment procedures.  D. 33 ¶¶ 208-32; D. 36 at 33-37.  For the reasons explained below, even if the Court cannot conclude at this juncture that Plaintiffs are likely to succeed on their arbitrary-and-capricious claims, Plaintiffs are likely to succeed on their claim that the DOI Land Order violates the APA because it is contrary to OCSLA and FLPMA.  As Plaintiffs are reasonably likely to succeed on this ground, the Court need not reach Plaintiffs' remaining grounds at this juncture.  See Cmty. Econ. Dev. Ctr. of Se. Mass., 2026 WL 309281, at *19 n.13.

(1)    Arbitrary-and-Capricious

As to Plaintiffs' first arbitrary-and-capricious challenge, Plaintiffs argue that the DOI Land Order lacks satisfactory explanation "for requiring DOI to deny permit applications to wind and solar facilities wherever 'reasonable project alternatives with higher capacity densities are technically and economically feasible,'" D. 36 at 33 (quoting DOI Land Order § 4), and for its conclusion that "wind and solar projects are highly inefficient uses of Federal lands," DOI Land Order § 3, and that capacity density should thus be "a dispositive threshold factor . . . in DOI's permitting decisions," D. 36 at 34.  Section 3 of the DOI Land Order provides that DOI "shall

consider energy projects' capacity density in its decision-making" "[t]o ensure [DOI] optimizes the use of its Federal lands in accordance with" 43 U.S.C. § 1702(c)'s requirement that BLM shall make "the most judicious use of the land for some or all of these resources" and consider "the long-term needs of future generations for renewable and nonrenewable resources," OCSLA's requirements under § 8(p)(4) for activity on the OCS and NEPA's command under 42 U.S.C. § 1331(b) to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." DOI Land Order § 3. Section 3 states that "[b]ased on common sense, arithmetic, and physics, wind and solar projects are highly inefficient uses of Federal lands" because they "use disproportionate Federal lands relative to their energy generation when compared to other energy sources, like nuclear, gas, and coal." Id.

Plaintiffs challenge DOI's reliance upon data from the U.S. Energy Information Administration which purports to show that "one advanced nuclear plant (2 x AP1000) produces 33.17 megawatts (MW) per acre, while one offshore wind farm produces approximately 0.006 MW/acre." See DOI Land Order § 3 (citing DOI Land Order Appendix). But as Plaintiffs concede, D. 36 at 34, this data point is at least "rational[ly] connect[ed]" to DOI's position that wind and solar projects have a lower capacity density and are a less efficient use of federal land. See State Farm, 463 U.S. at 43 (quotation marks and citation omitted). Further, contrary to Plaintiffs' suggestion, the administrative record consists not only of this data, but also the data provided in the Appendix, which provides a comparison between the capacity densities of wind and solar energy systems and those of several different energy types and purportedly shows that wind and solar energy sources have the lowest capacity density of the included energy sources. DOI Land Order Appendix. This data as well is "rationally connected to DOI's position that wind and solar projects

54

have a lower capacity density and are a less efficient use of federal land.  On this record, the Court cannot conclude that Plaintiffs are likely to succeed on their claim that the DOI Land Order is arbitrary and capricious because it lacks satisfactory explanation.

For similar reasons, the Court cannot conclude on this record that Plaintiffs are likely to succeed on their second arbitrary-and-capricious argument that the DOI Land Order "constitutes a significant departure from DOI's prior permitting policies" without sufficient justification or acknowledgment of the change.  D. 36 at 34.  As previously noted, a change of existing policy requires, at minimum, a reasoned explanation for the change and an awareness that the agency is changing position.  Encino Motorcars, 579 U.S. at 221.  An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible . . ., that there are good reasons for it, and that the agency believes it to be better."  Fox Television, 556 U.S. at 515 (emphasis in original).  The DOI Land Order states that the new policy addresses prior policies targeted by Executive Order No. 14315 as "artificially stimulated proliferation of intermittent energy sources."  DOI Land Order § 3.  This incorporated order acknowledges a change in course from pre-existing policies as it directs the DOI Secretary to "revise any identified regulations, guidance, policies, and practices . . . to eliminate [] preferences for wind and solar facilities."  Exec. Order No. 14315 § 4.

As to whether DOI provided a reasoned explanation for the change, as noted above, the DOI Land Order provides data rationally related to DOI's reason for changing permitting guidelines and also cites the U.S. Department of Energy's July 2025 report, entitled Evaluating the Reliability and Security of the United States Electric Grid ("Electric Grid Report"), a report which purports to "identify at-risk region(s)" for energy instability "and guide reliability interventions," Electric Grid Report at vi, for its proposition that "the Nation's energy grid outlook has been undermined by 'the

accelerated retirement of existing generation capacity and the insufficient pace of firm, dispatchable generation additions (partly due to a recent focus on intermittent rather than dispatchable sources of energy),'" DOI Land Order § 3 (quoting Electric Grid Report at 1). Although Plaintiffs challenge DOI's conclusion that this makes wind and solar projects less "optimal" for federal lands and thus should prohibit their approval, see id. § 4, as stated above, APA review does not allow a court "to substitute its judgment for that of the agency," Regents, 591 U.S. at 16 (quotation and quotation marks omitted); see River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009) (noting that a court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions") (citation omitted). Based on the data, reports and directives in the present administrative record, the Court cannot conclude at this juncture that Plaintiffs are likely to succeed on their arbitrary-and-capricious claim on this ground.

The Court also cannot conclude on this record that Plaintiffs are likely to succeed on their claim that the DOI Land Order is arbitrary and capricious because it fails to consider reliance interests, as it must. Regents, 591 U.S. at 33. Plaintiffs argue that the order ignores the reliance interests that wind and solar developers had in "a decades-long understanding that [their permitting] proposals would be subjected to a fair and lawful permitting process." D. 36 at 35 & n.42 (citation omitted). This argument, however, appears to implicate whether the DOI Land Order is contrary to law rather than whether it properly considered and weighed reliance interests. Moreover, at this juncture, although Plaintiffs "disagree with the Secretary's reasoning and the weight that []he gave to their significant reliance interests . . . [the Court] cannot say that the Secretary's explanation was so deficient that Plaintiffs have made a strong showing that they are likely to succeed on the deferential arbitrary and capricious standard." See Doe v. Noem, 152 F.4th 272, 290-91 (1st Cir. 2025).

56

(2)    Contrary to Law

Plaintiffs are, however, likely to succeed on their argument that the DOI Land Order is contrary to § 8(p)(4) of OCSLA and § 1702(c) of FLPMA.  D. 36 at 35-37.  Under the APA, the Court must "hold unlawful and set aside agency action . . . not in accordance with law."  5 U.S.C. § 706(2)(A).  As to OCSLA, § 8(p)(4) provides that, in approving any lease, easement, or right-of-way, the Secretary "shall ensure" that all authorized activities within the OCS, including offshore activities, are "carried out in a manner that provides for" twelve enumerated goals.  43 U.S.C. § 1337(p)(4)(A)-(L).  As the First Circuit has explained, "the BOEM must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide."  Seafreeze, 123 F.4th at 26; see 30 C.F.R. § 585.102(a) (requiring BOEM to "ensure that any activities authorized [under § 8 of OCSLA] are carried out in a manner that provides for and reaches a rational balance among" the § 8(p)(4) goals).  As Plaintiffs note, D. 36 at 48, the DOI Land Order appears to flout § 8(p)(4)'s mandate to consider and balance each of the twelve statutory criteria for offshore energy projects by mandating DOI only to permit those offshore projects with a high capacity density "compared to a reasonable range of project alternatives."  DOI Land Order § 4.  This single criterion does not "balance" the twelve enumerated goals under § 8(p)(4).  See Seafreeze, 123 F.4th at 26.  Indeed, the DOI Land Order itself does not appear to even include all twelve goals in its explanation of the Secretary's responsibilities under § 8(p)(4).  DOI Land Order § 3 (citing seven goals required to be balanced under § 8(p)(4)).  The DOI Land Order is thus "not in accordance with" OCSLA.  5 U.S.C. § 706(2)(A).

As to FLPMA, § 1702 requires that federal public lands are managed "on the basis of multiple use," 43 U.S.C. § 1701(a)(7), such that "balanced and diverse resources" are used in a way that "account[s] [for] the long-term needs of future generations for renewable and nonrenewable

57

resources," id. § 1702(c), and that "consideration [is] given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output," id.  Under this multiple use principle, "BLM is not required 'to promote one use above others' nor is BLM precluded 'from taking a cautious approach to assure preservation of natural and cultural resources.'" Cahill Ranches, Inc. v. Bureau of Land Mgmt., 766 F. Supp. 3d 1079, 1090 (D. Or. 2025) (quoting Nat'l Mining Ass'n v. Zinke, 877 F.3d 845, 872 (9th Cir. 2017)). This principle does, however, require BLM to "strik[e] a balance among the many competing uses to which land can be put." Norton v. S. Utah Wilderness All., 542 U.S. 55, 58 (2004)); see Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 504 (D.C. Cir. 2010).  The DOI Land Order's mandate that DOI "only permit those energy projects that are the most appropriate land use when compared to a reasonable range of project alternatives," DOI Land Order § 4, conflicts with § 1702(c)'s requirement that DOI balance competing uses of federal land and consider "the relative values of the resources and not necessarily [] the combination of uses that will give the greatest economic return or the greatest unit output," § 1702(c).  The DOI Land Order is thus too "not in accordance with" FLPMA.  5 U.S.C. § 706(2)(A).[11]

The DOI Land Order's conflicts with OCSLA and FLPMA cannot be shielded by the order's saving clause.  See DOI Land Order § 6.  The Supreme Court has "long rejected interpretations of sweeping saving clauses that prove 'absolutely inconsistent with the provisions of the act' in which they are found." Atl. Richfield Co. v. Christian, 590 U.S. 1, 23 (2020) (quoting AT&T Co. v. Cent. Off. Tel., Inc., 524 U.S. 214, 228 (1998)).  This is because "[i]f 'consistent with law' precludes a court from examining whether [an executive order] is consistent with law, judicial review is a

---

[11] Having determined that Plaintiffs are likely to succeed on their claim that the DOI Land Order is contrary to § 1702(c) of FLMPA, the Court need not reach Plaintiffs' claim that it is also contrary to § 1702(j) of FLMPA or NEPA. See D. 36 at 36.

meaningless exercise, precluding resolution of the critical legal issues." City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1240 (9th Cir. 2018). "In other words, the act cannot be held to destroy itself" through a saving clause. Tex. & Pac. Ry. Co. v. Abilene Cotton Co., 204 U.S. 426, 446 (1907). Here, the saving clause cannot shield the DOI Land Order from review because the order mandates that DOI "only permit" the highest capacity density energy projects on federal land "when compared to a reasonable range of project alternatives." DOI Land Order § 4. The saving clause "does not and cannot override [this] meaning." City & Cnty. of San Francisco, 897 F.3d at 1240.

For the aforementioned reasons, namely likely violations of OCSLA and FLMPA, Plaintiffs are likely to succeed on the merits of their claim that the DOI Land Order violates the APA. See 5 U.S.C. § 706(2)(A).

### 4. Count III: The Corps' Memo

#### a) The Corps' Memo is a final agency action

Like the DOI Land Order, the Corps' Memo "provides firm guidance," see Nat'l Env't Dev. Assoc.'s Clean Air Project, 752 F.3d at 1007, requiring the Corps to, among other mandates, "prioritize processing CWA and RHA permit applications related to projects" with high capacity density "over projects with" low capacity density, Corps' Memo § 4(c). In doing so, the order "alter[s] the legal status quo" under which these agencies previously processed applications, Glob. Tower Assets, 810 F.3d at 84, and "gives rise to 'direct and appreciable legal consequences'" for these agencies and for renewable energy projects, as described as to standing, see Hawkes Co., 578 U.S. at 598 (quoting Bennett, 520 U.S. at 178). The Corps' Memo, therefore, is a final agency action.

59

b)      Arbitrary-and-Capricious Review Applies to the Corps' Memo

The Corps' Memo states that its direction "is needed to alleviate the National Energy Emergency declared in Executive Order [No.] 14156." Corps' Memo § 2. For the same reasons as stated above as to other of the Agency Actions, the memo's reference to this executive order does not preclude arbitrary-and-capricious review. Neither of the identified statutory provisions under which the Corps issued CWA and RHA permits "expressly require[]" the Corps to follow Presidential rules. See Orr, 146 S. Ct. at 46; Corps' Memo § 3 (citing 33 C.F.R. § 320.4(a)(1); 40 C.F.R. § 230.10(a)). "Because Congress has not 'committed to the sole discretion of the President' the ability to [direct CWA and RHA permitting considerations and prioritizations], the 'usually applicable' arbitrary-and-capricious standard of the APA governs the Court's review." New York, 811 F. Supp. 3d at 239; see Agatha, 151 F.4th at 11; Massachusetts, 2026 WL 918941, at *13 n.10. Accordingly, this executive order does not shield the Corps' Memo from arbitrary-and-capricious review.

c)      Merits as to the Corps' Memo Challenge

As to the merits, Plaintiffs seek to vacate the Corps' Memo under the APA arguing that it: (1) is arbitrary and capricious, (2) is contrary to the CWA, (3) violates §§ 555(b) and 558(c) of the APA and (4) was not promulgated through the APA's notice-and-comment procedures. D. 33 ¶¶ 233-58; D. 36 at 37-41. The Court need not reach the latter three grounds at this juncture as Plaintiffs are likely to succeed on the merits of the former.

The Corps' Memo purports that its direction "is needed to alleviate the National Energy Emergency declared in Executive Order 14156." Corps' Memo § 2; see id. § 3(c). Aside from stating that the direction in the memo "alleviate[s]" the national energy emergency under Executive Order No. 14156, the Corps' Memo offers no explanation for how the capacity density

60

considerations and prioritizations "alleviate" the national energy emergency, see id., and Executive Order No. 14156, for similar reasons as explained above, offers no further clarification on this point. This reference, on its own, is thus not "satisfactory explanation." Fox Television, 556 U.S. at 513. The Corps' Memo offers only two data points suggesting that "onshore wind farm[s]" encompass larger boundary areas than "Solar PV generation" and "advanced nuclear reactors."  Corps' Memo § 3(c).  These two data points neither suggest that the Corps considered all "relevant data" in issuing this memo, State Farm, 463 U.S. at 43, nor adequately explain why the Corps must prioritize processing CWA and RHA permit applications for high capacity density projects.  Specifically, this data does not establish that the Corps considered the reliance interests, as detailed above as to standing, of low capacity density projects or accounted for all relevant impacts of this newfound focus on capacity density in the public interest analysis and in permitting prioritization.  See Regents, 591 U.S. at 30-31.  At a minimum, the Corps' explanations do not provide the "more detailed justification" needed to explain this change in policy.  Fox Television, 556 U.S. at 515. Plaintiffs, therefore, are likely to succeed on their claim that the Corps' Memo is arbitrary and capricious.

Accordingly, Plaintiffs are likely to succeed on the merits of their claim that the Corps' Memo violates the APA.  See 5 U.S.C. § 706(2)(A).

### 5.    Count VI:  Zerzan M-Opinion

#### a)    The Zerzan M-Opinion is a final agency action

As to finality, Defendants argue that the Zerzan M-Opinion merely "provides guidance for future decision-making in interpreting" § 8(p)(4) of OCSLA and thus is not agency action. D. 63 at 47 (citing Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., No. 17-cv-8587-GW-ASX, 2019 WL 2635587, at *12 (C.D. Cal. June 20, 2019); Am. Tort Reform Ass'n v. OSHA, 738

F.3d 387, 395 (D.C. Cir. 2013)).  Defendants' reliance upon Am. Tort Reform Ass'n is unavailing.

As that case recognized, where "an agency issues a statement that is labeled an interpretative rule

or a policy statement and it has all of the indicia of a final legislative rule, then the rule will be

subject to review."  Am. Tort Reform Ass'n, 738 F.3d at 395 (collecting cases recognizing same).

As explained below, such is the case here.  Ctr. For Biological Diversity is also distinguishable

from the present case as to the contested second Bennett prong.  In Ctr. For Biological Diversity,

the court considered whether a BLM M-Opinion interpreting the scope of the 1875 Act of rights-

of-way constituted final agency action.  Ctr. for Biological Diversity, 2019 WL 2635587, at *10-

13.  As to the first Bennett prong, the court found that the M-Opinion "represents the culmination

and final legal interpretation of the scope of" the Act as it was "immediately binding upon the

BLM."  Id. at *11-12 (citing 209 Interior Department Manual 3.2(A)(11) (noting that under the

DOI's Manual M-Opinions are "final legal interpretations" and are "binding, when signed, on all

other Departmental offices and officials and which may be overruled or modified only by the

Solicitor, the Deputy Secretary, or the Secretary")).  Similar to the M-Opinion in Ctr. For Biological

Diversity, the Zerzan M-Opinion satisfies the first finality prong because, as Defendants

acknowledge, D. 63 at 47, and as the text of the Zerzan M-Opinion states, the M-Opinion is

"binding" on DOI.  Zerzan M-Opinion at 3; see Ctr. for Biological Diversity, 2019 WL 2635587,

at *11-12.

As to the second Bennett prong, Ctr. for Biological Diversity concluded that the BLM M-

Opinion merely "provide[d] abstract guidance to the agency that only affects parties' rights when

the opinion is applied to a particular situation," and as such, did not give rise to legal consequences.

Ctr. for Biological Diversity, 2019 WL 2635587, at *12 (emphasis in original).  Unlike the M-

Opinion in Ctr. For Biological Diversity, the Zerzan M-Opinion goes beyond providing "abstract

guidance" on the interpretation of § 8(p)(4) of OCSLA, see id., but rather requires DOI to treat the Jorjani M-Opinion as "authoritative," Zerzan M-Opinion at 3. In doing so, the Zerzan M-Opinion "provides firm guidance to enforcement officials about" permitting activity under § 8(p)(1) of OCSLA. See Nat'l Env't Dev. Assoc.'s Clean Air Project, 752 F.3d at 1007; see also Hawkes Co., 578 U.S. at 599-600 (holding that a Clean Water Act jurisdictional determination was a final agency action even where the determination was not subject specific). In particular, this "authoritative" interpretation "requires" the DOI Secretary to "prevent[] all interference" with fishing or other reasonable uses of the OCS "if the proposed activity would lead to" more than "*de minimis* or reasonable" interference. Jorjani M-Opinion at 15. This mandate "gives rise to 'direct and appreciable legal consequences'" for DOI agents and projects that cause more than a *de minimis* interference with other OCS activity, such as those described as to standing. See Hawkes Co., 578 U.S. at 598 (quoting Bennett, 520 U.S. at 178). Further, the Zerzan M-Opinion requires DOI to re-evaluate all agency action taken under the withdrawn Anderson M-Opinion. Zerzan M-Opinion at 3. This re-evaluation too gives rise to direct and appreciable legal consequences for DOI agents and previously approved projects, by placing permit approvals at risk, threatening imminent litigation over such approvals and casting a range of potential downstream effects including construction delays and economic costs, such as those described as to standing. Id.

Accordingly, the Zerzan M-Opinion is a final agency action.

b)      Merits as to the Zerzan M-Opinion

As to the merits, Plaintiffs seek to vacate the Zerzan M-Opinion under the APA contending that it: (1) is arbitrary and capricious, (2) is contrary to OCSLA and (3) was not promulgated through the APA's notice and comment procedures. D. 33 ¶¶ 295-313; D. 36 at 46-50. The Court

63

need not reach the latter ground at this juncture as it concludes that Plaintiffs are likely to succeed on the merits of the first two grounds.

Certainly, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." State Farm, 463 U.S. at 59 (Rehnquist, J., concurring). As noted previously, as with other changes to "existing policies," an agency need only "provide a reasoned explanation for the change," Encino Motorcars, 579 U.S. at 221, unless the agency's new position "rests upon factual findings that contradict those which underlay [the] prior" position or "has engendered serious reliance interests," which instead requires the agency to provide a "more detailed justification," Fox Television, 556 U.S. at 515. Plaintiffs first argue that the Zerzan M-Opinion is arbitrary and capricious because it fails to account for serious reliance interests that offshore developers had in "DOI's prior, predictable permitting procedures." D. 36 at 47. Specifically, Plaintiffs contend that the Zerzan M-Opinion's command that the DOI re-evaluate prior agency action taken in accordance with the withdrawn Anderson M-Opinion impacts serious reliance interests of offshore wind developers who have made significant investments in projects based on prior approvals of COP permits issued under the Anderson M-Opinion's interpretation of § 8(p)(4) of OCSLA, as well as developers who face imminent rejection of their COP approvals under the new guidelines. Id. Neither the Zerzan M-Opinion nor any document referenced therein appears to consider the reliance interest of these groups in the decision to reinstate the Jorjani M-Opinion's interpretation of § 8(p)(4) of OCSLA or to re-evaluate agency action taken under the Anderson M-Opinion. See State Farm, 463 U.S. at 43. The Zerzan M-Opinion is thus arbitrary and capricious.

64

Plaintiffs also argue that the Zerzan M-Opinion is contrary to § 8(p)(4) of OCSLA.  D. 36 at 47-49.  Similar to the DOI Land Order, the Zerzan M-Opinion appears to disregard § 8(p)(4)'s mandate to consider and balance each of the twelve statutory criteria for energy projects on the OCS, see Seafreeze, 123 F.4th at 26; 30 C.F.R. § 585.102(a), by requiring the Secretary to "prevent" activity with more than a "*de minimis* or reasonable" interference with the OCS, regardless of the eleven other factors, Jorjani M-Opinion at 15.  The Zerzan M-Opinion thus violates the APA on the independent ground that it is contrary to law.  Accordingly, Plaintiffs are likely to succeed on their claim that the Zerzan M-Opinion violates the APA.  See 5 U.S.C. § 706(2)(A).

For the aforementioned reasons, the Court concludes that Plaintiffs are likely to succeed on the merits of at least some of their claims against the Agency Actions.

### C.        **Irreparable Harm**

To obtain preliminary relief, Plaintiffs must also show that "irreparable injury is likely in the absence of an injunction."  Winter, 555 U.S. at 22.  As the First Circuit has explained, "[t]he necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.  The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable."  K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989).  "[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits."  Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (citations omitted); see Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) (noting that "an attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem").  Thus, "when the likelihood of success

on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996).

>   *1.*      *Imminence of Harm*

As explained above as to standing, Plaintiffs have established both present and imminent economic harms resulting from each of the Agency Actions. In further support of their irreparable harm claim, Plaintiffs have submitted an expert report which attests that "approximately 57.2 GW of wind, solar, hybrid, and offshore wind capacity" have either been cancelled or "placed at material risk of delay or cancellation beyond 2029" due to the Agency Actions, representing "roughly $905 million in sunk capital invested in projects." Charles River Associates Rep. ("CRA Rep."), D. 42-2 at 7; see Donadio Decl., D. 39 ¶¶ 8, 11-15; Burdock Decl., D. 40 ¶¶ 44-64. The report further avers that the Agency Actions will jeopardize a projected $8.4 billion to $25.6 billion of federal tax credits for renewable energy developers within a three-year range. CRA Rep., D. 42-2 at 7; see Joint Decl., D. 37 ¶ 44.

Defendants argue that Plaintiffs have failed to establish that this harm is imminent because their "delay-related harms . . . will not materialize for years." D. 63 at 28-31. This argument ignores the present harms that several of the Regional Organization Plaintiffs' members face due to these Agency Actions, including permitting delays, permit processing de-prioritizations, project redesign costs and restrictions on access to the IPaC website, see Joint Decl., D. 37 ¶¶ 33-486, as well as the imminent harms of permit rejections based on new permitting criteria and re-evaluation of prior permit approvals, id. As explained above, these harms satisfy the imminence requirement. Susan B. Anthony List, 573 U.S. at 158; see Mountain Valley Pipeline, 915 F.3d at 218-19 (collecting cases concluding that "prospective economic injuries" from delays in construction are an economic harm); E. Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 828-29 (4th Cir. 2004) (concluding that undue

66

delay constitutes irreparable harm where delay disrupted construction and rendered plaintiff unable to fulfill contractual duties with third parties); see also Ass'n of Am. Univs., 792 F. Supp. 3d at 176 n.74 (noting that "courts in this Circuit have 'no difficulty' finding a likelihood of irreparable injury based on 'illustrative' examples combined with facts showing that the risk of irreparable harm faced by some members is representative of the risk faced by all") (citation omitted).[12]

### 2.    *Irreparability of Harm*

As to irreparability, Plaintiffs argue that the economic harms resulting from the Agency Actions are "irreparable because monetary damages are 'nonrecoverable' due to the government's sovereign immunity." D. 36 at 50 (citation omitted). While "traditional economic damages can be remedied by compensatory awards . . . some economic losses can be deemed irreparable." See Vaqueria Tres Monjitas, Inc., 587 F.3d at 485. For APA suits, "[t]he APA's waiver of sovereign immunity does not apply . . . to claims seeking 'money damages.'" Dep't of Educ. v. California, 604 U.S. 650, 651 (2025) (internal citation omitted). As such, "[c]onsideration of recoverability is particularly relevant in the context of the APA." California v. Kennedy, 802 F. Supp. 3d 273, 283 (D. Mass. 2025). Courts within this district and others have recognized that money damages resulting from agency action is sufficient to establish irreparable harm in an APA suit. See, e.g., id. (concluding that states established irreparable harm where they incurred compliance costs from regulations as they "are suing under the APA" and thus "have no recourse to recover incurred costs

---

[12] Defendants also challenge the timing of Plaintiffs' request. D. 63 at 28 n.4. Even assuming, *arguendo*, that Defendants have not waived this argument by raising it only in a footnote, Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC, 137 F.4th 6, 24 (1st Cir. 2025), Defendants' argument is unpersuasive here, particularly where the First Circuit has rejected similar arguments, see, e.g., Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 16 (1st Cir. 2012) (concluding that lower court erred in finding that the timing of plaintiffs' request to enjoin preliminarily a "seven-and-a-half months old" law weighed against the injunction); We the People PAC v. Bellows, 40 F.4th 1, 25-26 (1st Cir. 2022) (affirming finding that "even though the plaintiffs' delay[ed] filing their lawsuit" the public interest weighed in favor of an injunction).

if the challenged regulations are later found invalid"); Liu v. Noem, 780 F. Supp. 3d 386, 403-04 (D.N.H. 2025) (concluding similar); N.H. Hosp. Ass'n v. Burwell, No. 15-cv-460-LM, 2016 WL 1048023, at *16-18 (D.N.H. Mar. 11, 2016) (holding that plaintiffs showed they would suffer irreparable harm from economic losses absent a preliminary injunction because they could not recover money damages under the APA); Wages & White Lion Invs., L.L.C. v. FDA, 16 F.4th 1130, 1142 (5th Cir. 2021) (noting that "'complying with [an agency order] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs'") (alteration in original) (quoting Texas v. EPA, 829 F.3d 405, 433 (5th Cir. 2016)); Kentucky v. Biden, 23 F.4th 585, 611 n.19 (6th Cir. 2022) (concluding economic damages irreparable because "the APA does not waive federal sovereign immunity from money-damages claims"); see also Maryland v. U.S. Dep't of Agric., 770 F. Supp. 3d 779, 813 (D. Md. 2025) (collecting cases); Mock v. Garland, 697 F. Supp. 3d 564, 579 (N.D. Tex. 2023) (collecting cases).

While this principle has mainly been observed in the context of economic costs incurred from complying with agency action, courts have also held that economic costs incurred as a result of agency action can constitute irreparable harm in an APA case, see, e.g., Liu, 780 F. Supp. 3d at 403 (concluding that student's loss of stipend following government's withdraw of SEVIS "can be considered irreparable harm because he has no adequate remedy at law to recover for his damage"); see Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003) (reversing a preliminary injunction denial where "the district court made no findings concerning the many potential obstacles to [] a damage award, including whether the individual defendants would be entitled to qualified immunity"); Alabama Ass'n of Realtors v. Dep't of Health, 594 U.S. 758, 765 (2021) (noting that a CDC-imposed eviction moratorium "has put the applicants, along with millions of landlords

across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery").

Here, "there is no dispute that [Plaintiffs are] neither seeking nor able to recover monetary damages in this case." Liu, 780 F. Supp. 3d at 403.  Given Plaintiffs' likelihood of success on the merits of their APA claims, the monetary recovery bar under the APA and the imminent economic harms Plaintiffs face, the Court concludes that Plaintiffs have satisfied the irreparable harm requirement.  See Vaqueria Tres Monjitas, Inc., 587 F.3d at 485.

## VI.    Equities and the Public Interest

Finally, Plaintiffs must demonstrate that "the balance of equities tips in [their] favor" and that "an injunction is in the public interest." Winter, 555 U.S. at 20.  The analysis regarding the balance of the equities and the public interest "merge when the [g]overnment is the opposing party." Does 1-6 v. Mills, 16 F. 4th 20, 37 (1st Cir. 2021) (alteration in original) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).  "[T]he public has an important interest in making sure government agencies follow the law," Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin., 407 F. Supp. 2d 323, 343 (D. Mass. 2005), aff'd, 463 F.3d 50 (1st Cir. 2006), and agencies have no countervailing interest in perpetuating unlawful practices, League of Women Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016); Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013).  Here, where, as determined, Plaintiffs' challenges to the Agency Actions are likely to succeed on the merits, the equities and the public interest favor preliminary relief.

Defendants assert that Plaintiffs' harms "are outweighed by the intrusive effect an injunction could have on further agency decision-making and agency discretion." D. 63 at 54.  Defendants, however, have no interest in perpetuating unlawful agency practices that do not comply with the

APA.  Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 76 (1st Cir. 2025); Newby, 838 F.3d at 12; see New Jersey v. Trump, 131 F.4th 27, 41 (1st Cir. 2025).

On the other hand, Plaintiffs have shown that the public interest favors preliminary relief from the Agency Actions because the Agency Actions "harm the public by delaying and preventing the development of wind and solar energy projects in the United States, which in turn threatens the public's vital interest in maintaining a reliable, affordable, and resilient power grid, which is currently struggling to meet record energy demand."  D. 36 at 58; see CRA Rep., D. 42-2 at 7-8, 21-38; see also D. 69 at 7-18 (attesting that the Agency Actions will harm states' interests in planning and production of reliable, affordable energy, states' economies and job markets, the environment and the public health of the states' and their constituents); D. 76 at 8-13 (attesting that the Agency Actions adversely impact the property rights of rural landowners and harm the character of rural communities).  Plaintiffs have also provided testimony that the Agency Actions' negative impact on the availability of wind and solar energy harms the public interest as these energy sources "diversify the electrical grid . . . mak[ing] the grid more reliable" and "help[ing] grid operators meet the ever-increasing demand for electricity."  D. 36 at 58; see Goggin Decl., D. 41 ¶¶ 10-19; see also D. 71 at 8-14 (attesting that wind and solar power are critical for meeting the United States's energy needs and have "enormous" public health, environmental and climate benefits).  On balance, the equities and the public interest favor granting Plaintiffs preliminary relief from the Agency Actions.

## VII.    Relief

### A.    Scope of Relief

As to relief, Plaintiffs initially requested "an order preliminarily enjoining Defendants, their agents, or anyone acting in concert or in participation with Defendants from implementing, instituting, maintaining, or giving effect to the [Agency Actions]" pursuant to both Fed. R. Civ. P.

65(a) and 5 U.S.C. § 705.  D. 35 at 2.  In their reply brief, Plaintiffs narrowed their request to "an order preliminarily enjoining Defendants from implementing or otherwise giving effect to the [Agency] Actions with respect to Plaintiff GECA, as well as all members of the [Regional Organization Plaintiffs]" and took the position that such an order would provide "complete relief" to Plaintiffs at this stage in the litigation.  D. 77 at 24-25.  Defendants challenge the scope of Plaintiffs' requested relief.  D. 63 at 55-56 & n.15.  Fed. R. Civ. P. 65(a) allows a court to enjoin preliminarily action "to preserve the relative positions of the parties until a trial on the merits can be held."  Starbucks Corp. v. McKinney, 602 U.S. 339, 346 (2024) (quoting Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)).  Generally, in granting relief under Fed. R. Civ. P. 65(a), "a court of equity . . . may administer complete relief between the parties," Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 507 (1928), but "'[c]omplete relief'" under an injunction "is not synonymous with 'universal relief,'" Trump v. CASA, Inc., 606 U.S. 831, 851 (2025) (quotation omitted).  Accordingly, as the Supreme Court clarified in CASA, "injunctive relief must be limited to 'administer[ing] complete relief between the parties.'"  Ass'n of Am. Univs., 792 F. Supp. 3d at 182 (alteration in original) (citing CASA, 606 U.S. at 851).

Here, Plaintiffs have taken the position that "an order preliminarily enjoining Defendants from implementing or otherwise giving effect to the [Agency] Actions with respect to Plaintiff GECA" and "all members of the [Regional Organization Plaintiffs]" would provide "complete relief" to Plaintiffs at this stage in the litigation, D. 77 at 24-25.  The Court concludes that the scope of this requested injunctive relief is appropriate and consistent with the Supreme Court's limitations on nationwide injunctions.[13]

---

[13] Despite "some 'functional overlap,'" "[a]n APA stay and a preliminary injunction are fundamentally different remedies."  Miot v. Trump, __ F. Supp. 3d __, 2026 WL 266413, at *17

**B.      Injunction Bond**

Defendants ask that the Court require a bond if it issues a preliminary injunction.  D. 63 at 56.  "The bond requirement is not jurisdictional," and district courts have discretion to issue an injunction without requiring the States to post a bond.  Pineda v. Skinner Servs., Inc., 22 F.4th 47, 57 (1st Cir. 2021) (citing cases); see Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991) (observing that "there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond").  Defendants do not suggest and have not demonstrated that they will suffer a monetary loss from this Court's injunction.  See D. 63 at 56.  "Further, a number of cases have found that a bond is 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'"  Ass'n of

---

(D.D.C. Feb. 2, 2026) (quoting Nken, 556 U.S. at 428).  Section 705 of the APA allows a court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of review proceedings," when such relief is "necessary to prevent irreparable injury."  5 U.S.C. § 705.  "[R]elief pursuant to § 705 does not 'operate in personam,' but rather 'functions as a "temporary form of vacatur."'"  Afr. Communities Together v. Noem, __ F. Supp. 3d __, 2026 WL 395732, at *14 (D. Mass. Feb. 12, 2026) (quoting Make the Rd. New York v. Noem, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (emphasis in original) (citation omitted)), appeal docketed, No. 26-1254 (1st Cir. Mar. 13, 2026).  As such, § 705 "authorize[s] courts to postpone or stay the agency action itself, rather than enjoining its enforcement as to particular plaintiffs."  Doe v. Noem, No. 25-cv-15483, 2026 WL 184544, at *26 (N.D. Ill. Jan. 23, 2026); see Afr. Communities Together, 2026 WL 395732, at *14 (noting that "[u]nlike injunctive relief, vacatur need not be (and typically is not) party-specific") (citation omitted).

Here, although Plaintiffs request preliminary relief under both § 705 and that under Fed. R. Civ. P. 65(a), D. 35 at 2, the focus of Plaintiffs' briefing is their request for a preliminary injunction, D. 36; D. 77 at 24-25.  Consistent with Plaintiffs' position that "an order preliminarily enjoining Defendants from implementing or otherwise giving effect to the [Agency] Actions with respect to Plaintiff GECA" and "all members of the [Regional Organization Plaintiffs]" would provide "complete relief" to Plaintiffs at this stage in the litigation, D. 77 at 24-25, and absent arguments that the "more expansive" preliminary relief under § 705, see Ass'n of Am. Univs., 792 F. Supp. 3d at 183 n.84, is "necessary to prevent irreparable injury," 5 U.S.C. § 705, "the Court finds that a preliminary injunction is the more appropriate remedy at this time," and need not reach Plaintiffs' request for a stay under § 705, see Ass'n of Am. Univs., 792 F. Supp. 3d at 182-83.

Am. Univs. v. Dep't of Energy, 789 F. Supp. 3d 118, 153 (D. Mass. 2025) (quoting Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases)); see Doe v. Noem, 778 F. Supp. 3d 311, 341 n.33 (D. Mass. 2025) (rejecting government's argument to require a bond because of "a grave risk" it would "deter individuals from enforcing their procedural rights to challenge agency action").  The Court, therefore, declines to require Plaintiffs to post a bond.

## VIII.  Conclusion

For the foregoing reasons, the Court shall grant Plaintiffs' motion as to their request for a preliminary injunction as sought as to the five Agency Actions with respect to GECA and the Regional Organization Plaintiffs' members.  D. 35.

Plaintiffs are not required to post an injunction bond or any other security as a condition of obtaining the injunction described in this Memorandum or the accompanying Order.

Nothing in this Memorandum or the accompanying Order shall prevent Defendants from taking any lawful action that is not based on the challenged Agency Actions as described herein and in the accompanying Order.  An Order of preliminary injunction shall be entered today in accordance with this Memorandum.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

73